### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS, INC. | ) |
| Plaintiff | ) |
| v. | ) |
|  | )    3:05-CV-30068-KPN |
| IKON OFFICE SOLUTIONS, INC. | ) |
| & IOS CAPITAL, INC. d/b/a | ) |
| IKON FINANCIAL SERVICES | ) |
| Defendants. | ) |

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS

## I.    Introduction

The defendants, IKON Office Solutions, Inc.[1] and IOS Capital, Inc.[2] (collectively

"IKON"), respectfully submit this memorandum of law in support of their motion to

dismiss all six counts of the complaint pursuant to Federal Rule of Civil Procedure

12(b)(6).  As demonstrated below, the plaintiff, Human Resource Development Press,

Inc. ("HRD"), seeks in this action to evade its contractual obligations that it assumed

when it leased photocopiers from IOS Capital in 1998 and 2000.  HRD attempts to avoid

paying for copiers that it has used in its business for the past seven years by claiming that

the defendant (1) committed fraud, (2) imposed usurious interest rates, (3) breached a

warranty for a particular purpose, (4) violated Article 9 of the Uniform Commercial Code

("UCC"), (5) breached a covenant of good faith and fair dealing, and (6) committed

unfair trade practices in violation of section 93A of the Massachusetts General Laws.

---

[1]    The plaintiff incorrectly calls the first-named defendant IKON Office Solutions Company, Inc. The actual name of the first defendant is IKON Office Solutions, Inc.

[2]    IOS Capital, Inc.'s successor, IOS Capital, LLC, was merged into IKON Office Solutions, Inc. on March 30, 2004.  The entity IOS Capital, Inc. d/b/a IKON Financial Services does not exist.

None of these claims withstand scrutiny. The applicable statutes of limitations bar HRD's fraud, breach of warranty, and section 93A claims. Article 9 of the UCC and the usury statute do not apply to lease transactions, as are alleged in this case. Finally, HRD bases its breach of good faith and fair dealing claim as well as its section 93A claim on the exercise of valid legal rights by IKON and IOS Capital, facts that can support neither claim. In sum, HRD has failed to state any claims on which relief can be granted and, therefore, its claims should be dismissed.

## II.    <u>Summary of Allegations</u>

### A.    HRD LEASED TWO COPIERS FROM IOS CAPITAL IN 1998

HRD creates, owns, and publishes certain assessment tests, human resource training materials, and various other training and development materials. (Complaint, ¶ 6.) On or about May 20, 1998, HRD leased two Oce copiers (the "First Equipment") from IOS Capital. (Complaint, ¶¶ 8-9, 13, Ex. A.) HRD selected that type of copier after working with IKON to identify a copier that would meet HRD's business needs. (Complaint, ¶¶ 8-9, 13, Ex. A.) This lease was memorialized in two documents: a Field Order Form/Security Agreement, which HRD calls the "First Agreement," (*see* Complaint, ¶ 8, Ex. A), and a Copy Management Program Agreement (attached hereto as Exhibit 1.)[3] Collectively, these two documents will be referenced hereinafter as the 1998 Lease.

---

[3]    The Field Order Form/Security Agreement, which HRD characterizes as the "First Agreement" in its Complaint, does not include the price or any of the contract's terms. (Complaint, ¶¶ 10-12.) The terms to which HRD refers are actually contained in the Copy Management Program Agreement, attached hereto as Exhibit 1. That document was signed by both HRD and IOS Capital. Given that the Complaint references terms found only in that document, the Complaint necessarily references that document and the Court may properly consider it in deciding this motion to dismiss. See Stanton v. Metro Corp., 357 F. Supp. 2d 369, 373 (D. Mass. 2003) (court may consider documents referenced in a complaint when deciding a motion to dismiss).

The 1998 Lease was a 60-month lease and required monthly payments of $4,268.00 for the first thirty-six months and $5,825.00 for the remaining twenty-four months. (1998 Lease; Complaint, ¶ 11.) These monthly payments included service/maintenance and supplies. (Complaint, ¶ 12.) The 1998 Lease also expressly stated: "**THIS AGREEMENT IS NON-CANCELABLE**" and "The Customer agrees that this Agreement is for the minimum usage term indicated above." (1998 Lease, at 1.) IOS Capital, as a financial services company and lessor, expressly disclaimed any warranties, but instead transferred the manufacturer's or dealer's warranties to its lessee, HRD. (1998 Lease, at 2, ¶ 10.)

HRD alleges that it "specifically described and identified" its copying needs to IKON and that IKON told HRD that the First Equipment would meet those needs. (Complaint, ¶ 13.) HRD contends that these representations were made before HRD executed the 1998 Lease. (*See* Complaint, ¶¶ 13-16.) HRD further alleges that, about two years later, it determined that the First Equipment did not meet its needs and that it upgraded the First Equipment to different and more expensive copiers. (Complaint, ¶¶ 17-18.)

## B.    HRD LEASED NEW COPIERS FROM IOS CAPITAL IN 2000

On or about June 19, 2000, HRD executed another Copy Management Agreement (the "2000 Lease") by which it leased four Canon copiers (referenced in the Complaint and herein as the "Second Equipment") from IOS Capital. (Complaint, ¶¶ 18-19, Ex. B.) This 72-month lease required HRD to make monthly payments of $8,949.00 for the first thirty-six months and $12,116.00 for the next thirty-six months. (Complaint, ¶ 21, Ex. B.) The 2000 Lease also expressly stated that "THIS IS AN UNCONDITIONAL, NON-

CANCELABLE AGREEMENT FOR THE MINIMUM TERM INDICATED ON ANY

SCHEDULE TO THIS MASTER AGREEMENT.  All payments to us are "net" and are

not subject to set off or reduction."  (Complaint, Exhibit B, at 2, ¶ 3.)  Again, IOS Capital

disclaimed any express or implied warranties, including any warranty of fitness for a

particular purpose.  (Complaint, Ex. B., at 2, ¶ 6.)

HRD returned the First Equipment to IOS Capital when it received the Second

Equipment, notwithstanding the fact that HRD had approximately forty-five months of

rent remaining on the 1998 Lease when it entered the 2000 Lease.  (Complaint, ¶¶ 22, 25-

26.)  Accordingly, since the 1998 Lease was, by its own terms, "non-cancelable" and

"net," the 2000 Lease's payment terms included the remaining rent due on the 1998

Lease.  (Complaint, ¶ 38, Ex. D.)  The Financial Statement attached to the Complaint as

Exhibit D breaks down the components of the 2000 Lease's monthly payments as

follows:

| Term | New Equipment | Service & Supplies | Previous Contract* | Total Contract Payment |
|------|---------------|--------------------|--------------------|------------------------|
| 1-36 | $4,110.37 | $3,065.75 | $1,772.88 | $ 8,949 |
| 37-72 | $6,301.13 | $3,065.75 | $2,749.12 | $12,116 |

* 11 months remaining on your previous contact @ $4,268 and 24 months remaining at
$5,825 for an Oce 3100 and an Oce 3165 along with 250,000 monthly impressions
included (service and supplies).

(Complaint, Ex. D.)

**C.     HRD FILED SUIT SEVEN YEARS AFTER THE 1998 LEASE AND FIVE YEARS AFTER THE 2000 LEASE**

HRD commenced this suit on March 15, 2005, alleging the following claims:

### 1.     Count I – Fraud and Misrepresentation

HRD alleges that IKON, rather than IOS Capital, made intentional misrepresentations to HRD in order to induce HRD to execute the 2000 Lease. (Complaint, ¶¶ 27-28, 48.)  HRD accuses IKON of falsely stating that the 2000 lease was an "excellent deal" and that HRD was receiving a "significant discount off the list price." (*Id.*)  HRD also claims that IKON represented that the 2000 Lease's payments did not include the service/maintenance or supplies components of the 1998 Lease's payments. (Complaint, ¶ 49.)  Finally, HRD alleges it relied on these false statements in executing the 2000 Lease.  (Complaint, ¶¶ 49, 51-52.)

### 2.     Count II – Violation of Massachusetts' Usury Laws

The payments due under the 2000 Lease included the rent remaining due on the 1998 Lease, as demonstrated by Exhibit D to the Complaint.  (Complaint, Ex. D.)  HRD alleges that the rent remaining due on the 1998 Lease included an interest component that continues to be assessed and to be compounded in the payments due under the 2000 Lease.  That compounding results, as claimed by HRD, in an effective interest rate that allegedly exceeds the 20% APR limit set forth in Massachusetts General Laws, ch. 271, § 49.  (Complaint, ¶¶ 37, 38, 42, 55.)

### 3.     Count III – Breach of Warranty for a Particular Purpose

HRD alleges that it disclosed its specific needs to IKON prior to entering the 1998 Lease and that IKON warranted that the First Equipment would meet these needs. (Complaint, ¶¶ 13, 58-59.)  HRD alleges that the First Equipment did not meet its needs

and therefore IKON breached its express warranty that the First Equipment was fit for the particular purpose that HRD disclosed to IKON. (Complaint, ¶ 60.)

### 4. Count IV – Failure to Dispose of Collateral in a Commercially Reasonable Manner

HRD returned the First Equipment to IOS Capital when it entered the 2000 Lease. (Complaint, ¶ 22.) HRD alleges that IOS Capital has not disclosed how it disposed of the First Equipment, has not credited HRD with any proceeds that IKON may have received from disposing the First Equipment, and that IKON has retained the First Equipment in full satisfaction of the rent remaining due on the 1998 Lease or has waived its right to payment of the remaining rent by retaining the First Equipment. (Complaint, ¶¶ 24, 41 63-64.)

### 5. Count V – Breach of the Covenant of Good Faith and Fair Dealing

HRD alleges that IKON and IOS Capital violated the covenant of good faith and fair dealing when it sought to impose and then collected charges for the rent that remained due on the 1998 Lease through the 2000 Lease. (Complaint, ¶ 67.)

### 6. Count VI – Violation Of Chapter 93A

HRD alleges the following conduct constituted unfair trade practices in violation of Massachusetts General Laws chapter 93A, § 11:

- In order to induce HRD to execute the 2000 Lease, IKON or IOS Capital intentionally made the material and false representation that HRD was receiving a "significant discount off the list price" and that the 2000 Lease's payments did not include the service/maintenance or supplies charge from the 1998 Lease;

- IKON or IOS Capital did not dispose of the First Equipment in a commercially reasonable manner, did not credit HRD for the value of the First Equipment, and that IKON or IOS Capital retained possession of the First Equipment in full satisfaction of the remaining rent due under the

1998 Lease, but continued to collect payments for the same through the 2000 Lease;

- IOS Capital has collected interest payments that exceed the legal limit; and

- IKON or IOS Capital has engaged in a consistent practice of seeking and collecting charges that were allegedly covered by the 1998 and/or 2000 Lease's payments.

(Complaint, ¶ 70, Ex. E, at 4.)

As demonstrated below, all six of these counts asserted by HRD fail to state a claim upon which relief may be granted. Each count should, therefore, be dismissed.

## III.   **Standard of Review**

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. See Stanton v. Metro Corp., 357 F.Supp.2d 369, 373 (D. Mass. 2005). The court may only look to the facts alleged, documents attached to the complaint or referenced therein, and matters of which the court may take judicial notice. Id. If after considering this information, the court concludes that the plaintiff cannot prove any facts that would entitle him or her to relief on the claim asserted, the court should grant the motion to dismiss. Id.

## IV.   **Argument**

### A.   **COUNT 1 MUST BE DISMISSED AS IT IS TIME-BARRED AND BASED SOLELY ON SUBJECTIVE OPINIONS**

#### 1.   **HRD's Fraud Claim Is Barred By The Statute of Limitation**

Massachusetts law establishes a three-year statute of limitations for fraud and other tort claims. Mass. Gen. Laws, ch. 260, § 2A. A fraud claim accrues "when the injured party knew, or, in the exercise of reasonable diligence, should have known the

factual basis for the cause of action." <u>Geo. Knight & Co., Inc. v. Watson Wyatt & Co.</u>, 170 F.3d 210, 213 (1st Cir. 1999). The claim does not accrue if the underlying facts were "inherently unknowable" at the time of the alleged injury. <u>Id.</u> When evaluating when a fraud claim accrued, "courts sometimes ask when sufficient indicia of trouble -- storm warnings, so to speak -- should have been apparent to a reasonably prudent person." <u>Rodi v. Southern New England School of Law</u>, 389 F.3d 5, 17 (1st Cir. 2004).

HRD bases its fraud claim on alleged representations that occurred before it entered the 2000 Lease. Specifically, HRD claims that IKON made fraudulent representations so as to induce HRD to enter into the 2000 Lease. (Complaint ¶ 27-28, 48.) Thus, the representations that give rise to HRD's claim of fraud occurred approximately five years before HRD filed suit, well outside the controlling three-year statute of limitation.

As a result, HRD's claim could only be actionable if the alleged fraudulent information was "inherently unknowable" to HRD at the time those statements were allegedly made. <u>Geo. Knight & Co., Inc.</u>, 170 F.3d at 213. The substance of the representations on which HRD bases its claim, however, demonstrates that the alleged fraudulent nature of the statements was not "inherently unknowable." The characterization of the 2000 Lease as an "excellent deal" and a "significant discount" either were or could have been verified by HRD through the exercise of reasonable diligence. HRD may have and certainly could have compared the proposed 2000 Lease to other available leases from IKON's many competitors. Such a simple comparison would have either confirmed or disproved the accuracy of IKON's alleged characterization of the 2000 Lease. Similarly, HRD could have sought expert advice

- 8 -

regarding the value of the 2000 Lease, just as it did after the transaction. (Complaint, ¶ 31.) Thus, whether the 2000 Lease was actually an "excellent deal" and a "significant discount" was not "inherently unknowable" at the time those representations were allegedly made.

Moreover, HRD had dealt with IKON and IOS Capital for two years prior to the alleged representations that give rise to its fraud claim. Thus, HRD possessed substantial information with which to evaluate the statements that it claims IKON made to it about the 2000 Lease. At a minimum, HRD knew what payments it had previously been making and for what services it had paid. It further knew what payments it would be required to make under the 2000 Lease, because all of the payments and the various components of those payments were expressly disclosed in the 2000 Lease. Thus, it knew or should have known the quality of the deal offered in 2000 at the time it was offered.

Further, while HRD claims that IKON falsely stated that 2000 Lease did not include the part of the 1998 lease payments attributed to service/maintenance and supplies costs, (Complaint, ¶ 50), HRD had previously paid for service/maintenance and supplies costs under the 1998 Lease. Accordingly, HRD knew or certainly could have known what it had previously paid for service/maintenance and supplies costs when it entered the 2000 Lease and could have determined whether the 2000 Lease payments included that amount. Therefore, HRD's fraud claim accrued at the time of the alleged representations, in 2000, and expired pursuant to Massachusetts law two years before HRD filed suit.

### 2.    Statements Of Subjective Opinion Do Not Constitute Fraud

To state a claim of fraud, the alleged false statement must be one of fact, not mere opinion or subjective judgment. See Stolzoff v. Waste Sys. Int'l, Inc., 58 Mass. App. Ct. 747, 759 (2003). "A representation is one of opinion if it expresses only (a) the belief of the maker, without certainty, as to the existence of a fact, or (b) his judgment as to quality, value, authenticity, or other matters of judgment." McEneaney v. Chestnut Hill Realty Corp., 38 Mass. App. Ct. 573, 575 (1995) (internal quotes omitted).

HRD bases its fraud count on alleged statements by IKON that the 2000 Lease was an "excellent deal" and that it represented a "significant discount off the list price." (Complaint, ¶¶ 27-28, 48.) These statements – "excellent deal" and "significant discount" – convey the alleged speaker's subjective judgment or opinion about the quality of the deal and discount. The subjective nature of these statements is most clearly demonstrated by the fact that their objective truth or falsity could never be established: the terms "excellent" and "significant" can only be interpreted subjectively. In short, these alleged statements are not factual in nature and, therefore, cannot be the basis of a claim of fraud.

### B.    THE LAWS OF USURY DO NOT APPLY TO LEASES

Massachusetts law empowers courts to void usurious loans.[4]  That statute, however, makes clear in its very text that it applies only to loans. Mass. Gen. Laws, ch.

---

[4]        Massachusetts General Law chapter 271, section 49, provides "Whoever in exchange for either a loan of money or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum upon the sum loaned or the equivalent rate for a longer or shorter period, shall be guilty of criminal usury.... For the purposes of this section the amount to be paid upon any loan for interest or expenses shall include all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged against or paid or to be paid by the borrower for making or securing the loan, directly or indirectly, to or by any person, other than the lender, if such payment or charge was known to the lender at the time of making

271, § 49(c). The purpose of this statute is "to protect the necessitous debtor from outrageous demands by lenders." Comstock v. Steinbergh, 18 Mass. L. Rptr. 573, 2004 WL 3120554, at *3 (Mass. Super. Dec. 16, 2004) (quoting Begelfer v. Najarian, 381 Mass. 177, 182 (1980)).

The Massachusetts Appeals Court has noted the distinction between loans and leases and has indicated that the usury statute does not apply to equipment leases. See Allegheny Int'l Credit Corp. v. Bio-Energy of Lincoln, Inc., 21 Mass. App. Ct. 155, 160 (1986) (attached hereto as Exhibit 2). In Allegheny, the defendant claimed that an equipment lease was actually a loan and the "lease payments" exceeded the 20% interest rate limit. Id. at 159-161. The court could not decide, based on the summary judgment record, whether the transaction was a loan or a lease because an addendum to the lease contained provisions similar to typical loan terms. Id. at 161. For example, the addendum tied payments to the prime rate at a particular bank on the "principal balance outstanding" and provided that the lessor would stop billing once the cost of the equipment to the lessor was "fully amortized." Id. The Appeals Court therefore remanded the issue of whether the transaction was a loan or lease to the trial court and ordered the judgment for the plaintiff lessor to stand, including the alleged usurious interest payments, *if* the trial court determined that the transaction was a lease, not a loan. Id. at 164-65.

In this case, the 2000 Lease is a lease, not a loan. It does not have any terms, like the contract in Allegheny, that suggest that it is a loan. Rather, its terms clearly

---

the loan, or might have been ascertained by reasonably inquiry." Mass. Gen. Laws, ch. 271, § 49(a) (emphasis added).

demonstrate that it is in fact a true lease.  For example, among other things, the 2000 Lease:

- states that the lessor, IOS Capital, is the owner and holds title to the equipment, (2000 Lease, ¶ 8);

- states that the lessee agrees that the lease "is a true rental," (2000 Lease, ¶ 8);

- states that the lessor agrees to rent to the lessee and the lessee agrees to rent from the lessor the specified equipment, (2000 Lease, ¶ 1);

- is unconditional and non-cancelable for the minimum term, (2000 Lease, ¶ 3);

- requires the lessee to maintain the equipment in good condition, except for ordinary wear and tear, (2000 Lease, ¶ 4);

- requires the lessee to reimburse the lessor for any property taxes that the lessor pays, (2000 Lease, ¶ 5);

- transfers any warranties made by the vendor or supplier of the equipment to the lessee for the term of the lease, (2000 Lease, ¶ 6);

- warrants that the lessor will not interfere with the lessee's quiet enjoyment of the leased property, (2000 Lease, ¶ 6);

- disclaims all other warranties by the lessor, including the implied warranties of merchantability or fitness for a particular purpose, (2000 Lease, ¶ 6);

- places the risk of loss on the lessee and obligates the lessee to continue to pay rent in the event of theft, destruction, or damage of the equipment, (2000 Lease, ¶ 7);

- clearly contemplates remedies available under Article 2A of the Uniform Commercial Code, which governs leases, (2000 Lease, ¶ 12); and

- requires the lessee to return the equipment at the end of the lease term unless it wishes to renew the lease, (2000 Lease, ¶ 13).

Accordingly, the 2000 Lease is a lease, not a loan.  Therefore, the Court should dismiss Count II because Massachusetts' usury laws do not apply to leases.

## C.    HRD's WARRANTY CLAIM IS TIME-BARRED

Massachusetts law requires an injured party to commence suit for breach of warranty in connection with a lease contract within four years after the claim accrued.

- 12 -

Mass. Gen. Laws ch. 106, § 2A-506(1). A breach of warranty claim accrues "when the act or omission on which the default or breach of warranty is based is or should have been discovered by the aggrieved party. . . ." Mass. Gen. Laws ch. 106, § 2A-506(2).

HRD claims that it told IKON what its copying needs were in 1998 and that IKON represented that the First Equipment would meet those needs. (Complaint, ¶¶ 13, 58-59.) HRD also claims that it entered the 2000 Lease because IKON had breached this warranty. (Complaint, ¶ 61.) HRD therefore must have discovered this alleged breach of warranty no later than June 2000, when it entered the 2000 Lease. Because HRD filed suit more than four years after it knew or should have known that a warranty had been breached, this claim is time-barred and must be dismissed.

## D.    HRD HAS NO REMEDY UNDER ARTICLE 9

In Count IV, HRD purports to assert a claim under Article 9 of the UCC, for failure to dispose of collateral in a commercially reasonable manner. See Mass. Gen. Laws ch. 106, § 9-625 (secured party's liability for failure to comply with Article 9's remedies). Section 9-625 creates debtors' rights and remedies against a secured party in the event the debtor defaults on its obligation. See Mass. Gen. Laws ch. 106, § 9-601(d). For the remedies of section 9-625 to apply, however, HRD must first allege facts that would establish that Article 9 governs the parties' relationship in this case. As demonstrated below, the facts that HRD has asserted, however, demonstrate that Article 9 does not apply.

HRD seeks an Article 9 remedy with regard to the First Equipment. (Complaint ¶ 63.) As a result, HRD necessarily contends that the 1998 Lease was subject to Article 9. Article 9 of the UCC governs transactions that create a security interest in personal

property by contract. Mass Gen. Laws ch. 106, § 9-109(a). A "security interest" is an interest in personal property which secures payment or performance of an obligation. Mass Gen. Laws ch. 106, § 1-201(37). A security interest can only exist if, among other things, the debtor has rights in the collateral or the power to transfer rights in the collateral to the secured party. Mass Gen. Laws ch. 106, § 9-203(b). HRD acknowledges that the personal property at issue under the 1998 Lease was the First Equipment, two Oce copiers. Thus, for Article 9 to apply to the 1998 Lease, HRD must have granted to IOS Capital a security interest in the two Oce copiers, and to have granted IOS Capital a security interest in those copiers, HRD must have possessed a property interest in those copiers that it could grant to IOS Capital. *See* Mass Gen. Laws ch. 106, § 9-203(b).

The text of the 1998 Lease demonstrates that HRD possessed no property interest in the copiers that HRD could grant to IOS Capital to secure HRD's payments under the 1998 Lease. Indeed, that document states that "IOS Capital is the sole owner and title holder to the System" and defines the "System" as the two Oce copiers. (Ex. 1 at 2, ¶ 1.) The 1998 Lease further provided that HRD had "NO RIGHT TO SELL, TRANSFER, ENCUMBER, SUBLET OR ASSIGN THE SYSTEM OR THIS AGREEMENT," further demonstrating that only IOS Capital held a property interest in the copiers. (*Id.* ¶ 9.) Finally, IOS Capital retained the right to immediate repossession of the copiers under the terms of the 1998 Lease. (*Id.* ¶ 11.)

Thus, under the terms of the 1998 Lease, HRD had no property interest in the Oce copiers that it could have transferred to IOS Capital. Instead, the 1998 Lease makes clear that the copiers at all times remained the sole property of IOS Capital. Thus, HRD could not have granted a security interest in the copiers because it held no property interest in

those copiers. Mass. Gen. Laws ch. 106, § 9-203(b). Further, nothing in the text of the 1998 Lease suggests that any security interest was created.[5] (*Id.*) Because the 1998 Lease could not have and did not give IOS Capital a security interest in the copiers, the 1998 Lease is not governed by Article 9. Remedies under that Article are, therefore, inapplicable in this matter and the claim asserted in Count IV must be dismissed.

### E.     HRD HAS FAILED TO STATE FACTS THAT ESTABLISH A BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

#### 1.     IOS Capital's Exercise Of Contract Rights Cannot Constitute A Breach Of Good Faith And Fair Dealing

HRD alleges that IOS Capital breached the covenant of good faith and fair dealing by "seeking to impose and then collecting charges for HRD Press's use of the First Equipment after the same had already been surrendered. . . ." (Complaint, ¶ 67.) These allegations fail to state a claim against IOS Capital because HRD has not alleged any bad faith conduct that deprived it of the benefits of either the 1998 Lease or the 2000 Lease.

The implied covenant of good faith and fair dealing ensures that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Oestec, Inc. v. Krummenacker, -- F.Supp.2d -- 2005 WL 958252, at *7 (D. Mass. Apr. 13, 2005). "A breach of the implied covenant of good faith and fair dealing will only be found if there is conduct taken in bad faith either to deprive a party of the fruits of the labor already substantially earned or unfair

---

[5]     To the extent that HRD relies on the text of the May 20, 1998 Field Order Form/Security Agreement as proof of a security interest, that document is likewise unavailing given that (1) the security interest described therein is a "purchase money security interest," (2) HRD has never alleged that it had purchased the Oce copiers, (3) the form contains no financial information of any kind regarding the transaction between the parties, and (4) the Copy Management Program Agreement dated May 28, 1998 followed and superceded the original order form. (*Compare* Complaint Ex. A *with* Ex. 1 hereto.)

leveraging of the contract terms to secure an undue economic advantage." Id. "Such bad faith is often evidenced by 'deceit or unfair subterfuge' on the part of the breaching party." Id.

HRD has not alleged any deceit or unfair subterfuge by IOS Capital in collecting the remaining rent due on the 1998 Lease after HRD returned the First Equipment. In fact, HRD agreed to continue making the payments as part of the 2000 Lease. Further, the 1998 Lease clearly indicated that HRD could not cancel the lease and that the lease was a net lease. IOS Capital did not fool HRD into making the 1998 rent payments but, instead, exercised its contractual right to receive the rent that HRD had promised to pay. Therefore, the facts alleged by HRD do not state a claim for breach of the covenant of good faith and fair dealing.

## 2. IKON Cannot Have Breached The Covenant Of Good Faith And Fair Dealing As IKON Was Not A Party To Either Lease

HRD alleges that IKON breached the covenant of good faith and fair dealing by "seeking to impose and then collecting charges for HRD Press's use of the First Equipment after the same had already been surrendered. . . ." (Complaint, ¶ 67.) The 2000 Lease obligated HRD to pay rent to *IOS Capital* for the First Equipment. IKON was neither a party to the 1998 Lease nor a party to the 2000 Lease. As there existed no contract between IKON and HRD, there existed no covenant of good faith and fair dealing that could have been breached. See Levenson v. L.M.I. Realty Corp., 31 Mass. App. Ct. 127, 131 (1991) (implied covenant of good faith and fair dealing requires the existence of a contract between the parties). Therefore, the claim asserted against IKON in Count IV of the Complaint must be dismissed.

**F.     HRD FAILS TO STATE A VIABLE CLAIM UNDER 93A**

**1.     HRD's Claims Are Time Barred**

A claim under chapter 93A is subject to a four-year statute of limitations. See Mass. Gen. Laws ch. 260, § 5A. The nature of the underlying facts determine when this limitation period begins. See Kozikowski v. Toll Bros., Inc., 246 F.Supp.2d 93, 99 (D. Mass. 2003). A chapter 93A claim based on fraud allegations therefore accrues when the plaintiff knew or reasonably should have known about the alleged fraud. See Geo. Knight & Co., Inc., 170 F.3d at 213. Likewise, chapter 93A claims based on a breach of warranty accrue when the plaintiff knew or reasonably should have known of the breach. See Mass. Gen. Laws ch. 106 § 2A-506(2).

The facts giving rise to HRD's chapter 93A claim all occurred more than four years before HRD initiated suit in March of 2005. For example, the alleged fraudulent statements regarding the value of the 2000 Lease were necessarily made prior to June 2000. (See supra part __.) As such, they cannot give rise to a chapter 93A claim asserted in March of 2005. Similarly, HRD asserts that IKON violated chapter 93A by stating that the 2000 Lease did not include the 1998 Lease's service/maintenance or supplies costs. (Complaint, ¶ 70; Ex. E. at 4.) Even if IKON had made that representation, it was made before HRD signed the 2000 Lease and, as a result, more than four years before HRD filed suit.

HRD also attempts to support its 93A claim with its allegations that IKON and/or IOS Capital sent HRD invoices for products and services that were covered by the lease agreement. (Complaint, Ex. C.) Even if IKON or IOS Capital had submitted invoices for services or products that were included in the lease payments, HRD knew of this fact in

- 17 -

2000, five years before it filed suit. Accordingly, its claim under chapter 93A expired before HRD filed suit and its claim must be dismissed.

### 2.      HRD Fails To State Claims That Could Support A 93A Claim

To rise to the level of a chapter 93A violation, the alleged conduct must fall "within a penumbra of common law, statutory, or other established concept of unfairness … [or be] immoral, unethical, or unscrupulous." Morrison v. Toys "R" Us, Inc., 441 Mass. 451, 457 (2004). Facts establishing viable claims of fraud, misrepresentation, or breach of good faith and fair dealing can state a 93A claim. See Kitner v. CTW Transport, Inc., 53 Mass. App. Ct. 741, 747 (2002); see also Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 476 (1991). The lawful exercise of contractual or other legal rights, however, do not violate Chapter 93A unless those actions obviously violate public policy or have "an extortionate quality that [gives] it the rancid flavor of unfairness." McDonald v. Rockland Trust Co., 59 Mass. App. Ct. 836, 843 (2003). Similarly, facts that cannot constitute misrepresentation or a breach of good faith and fair dealing likewise cannot constitute a violation of Chapter 93A. See Kitner, 53 Mass. App. Ct. at 747; Anthony's Pier Four, Inc., 411 Mass. at 476.

In this case, HRD bases its Chapter 93A claim on its flawed fraud, usury, Article 9, and good faith and fair dealing claims. (Complaint ¶ 70; Ex. E at 4.) None of these allegations, however, can support a claim for violation of Chapter 93A. For example, the facts asserted by HRD to establish its fraud count do not themselves constitute fraud even if accepted as true. (See supra part IV.A.2.) Statements of subjective opinion, such as the alleged representations that the 2000 Lease was an "excellent deal" and a "significant discount," are not statements of fact and a claim of fraud can only be based on statements

of fact. See McEneaney, 38 Mass. App. Ct. at 575.  Further, fraud claims that are barred by the statute of limitations cannot give rise to a Chapter 93A claim.

HRD's usury claim likewise cannot state a claim under Chapter 93A because Massachusetts usury law does not apply to the leases described in and attached to the Complaint. (See *supra* part IV.B.)  Moreover, HRD's Complaint and the agreements referenced therein establish that HRD entered into the 2000 Lease only after full disclosure of all of the payments that it would have to make under that lease. Accordingly, the facts alleged by HRD in no way demonstrate the type of unfairness actionable under Chapter 93A.

HRD also vainly attempts to base its 93A claim on its pursuit of a remedy under Article 9.  As demonstrated above, however, that Article of the UCC does not apply to HRD's leases. (See *supra* part IV.D.)  Further, the text of the 2000 Lease, which HRD attached to its Complaint, demonstrates that HRD was clearly and unmistakably informed that its payments under the 2000 Lease would include the remainder of the payments that it owed under the 1998 Lease. (Complaint, Ex. B.)  Nothing in the 2000 Lease suggested that any credit would be provided for the First Equipment, which HRD had returned, and HRD never even claims that IKON or IOS Capital represented that it would receive a credit for the value of the First Equipment.  Thus, HRD's own allegations regarding disposal of the First Equipment provide no support for a claim that the disposal of that equipment was unfair or unscrupulous.  Finally, even if Article 9 applied to the 1998 Lease or the 2000 Lease, the putative failure to dispose of collateral in a commercially reasonable manner does not establish the type of immoral, unethical, or unscrupulous conduct actionable under Chapter 93A.  Rather, HRD's own allegations demonstrate that

Article 2A gave IOS Capital the statutory right to retain possession of the leased equipment and to collect damages when HRD failed to comply with its payment obligations under the 1998 Lease. (See *supra* part IV.D.) Therefore, HRD's claims cannot constitute a violation of Article 9 and, as a result, cannot state a claim for violation of Chapter 93A.

## V.   <u>Conclusion</u>

For the foregoing reasons, the Court should reject HRD's attempt to evade the contractual obligations that it knowingly and voluntarily assumed under the 2000 Lease, the benefits of which HRD has accepted for five years. As demonstrated above, HRD has failed to state any claim upon which relief could be granted. Therefore, the Complaint should be dismissed.

> DEFENDANTS
> IKON OFFICE SOLUTIONS, INC. and
> IOS CAPITAL, INC.
>
> By   *Brett Boskiewicz*
> Bradford S. Babbitt (BBO# 566390)
> e-mail: bbabbitt@rc.com
> Brett J. Boskiewicz (BBO# 656545)
> e-mail: bboskiewicz@rc.com
> Robinson & Cole LLP
> 280 Trumbull Street
> Hartford, CT  06103-3597
> Tel. No.: (860) 275-8200
> Fax No.: (860) 275-8299

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on May 19, 2005.

_Brett Boskiewicz_
_____
Brett J. Boskiewicz



## Copy Management Program

**AGREEMENT**

**Customer (Location)**

Full Legal Name (Please Print)
Human Resource Development Press

Address
22 Amherst Rd

City     County     State     Zip
Amherst   Hampshire   MA   01002

Customer Contact (Must be billing contact)

**Customer (Billing address, if different)**

Full Legal Name (Please Print)

Address

City     County     State     Zip

Phone  413-253-3488

| Quantity | System Description: Make, Model & Serial Number | Quantity | System Description: Make, Model & Serial Number |
|---|---|---|---|
| 1 | Oce 3100   179420274 | | |
| 1 | Oce 3165   166004056 | | |
| | | | |
| | | | |
| | | | |

| Minimum Term (mos.) | Cost Per Copy | Guaranteed Minimum Monthly Copies | Cost of Additional Copies |
|---|---|---|---|
| 60 | $ See Variable Lease ADDENDUM | 250,000 | $ .0097 |

Minimum Payment (without tax)
☒ Monthly   See Variable
☐ Quarterly   Lease Addendum

Documentation Fee:
$
☐ Invoice   ☐ Included in Advance Payment

Advance Payment (with tax)
☐ First   ☐ Other

Meter Reading/Billing
For Additional Copies
☐ Monthly
☒ Quarterly

Sales Tax Exempt ☐   Yes   (Attach Exemption Certificate)   Customer Purchase Order Number _____   (Attach Copy of Purchase Order)

**Authorized By:** THE PERSON AUTHORIZING THIS AGREEMENT ON BEHALF OF THE CUSTOMER (as indicated above) SPECIFICALLY REPRESENTS THEY HAVE THE AUTHORITY TO DO SO.

By: _____  5/20/98
Authorized By                     Date

R.W. Carkhuff           Director
Authorized Signer's Printed Name    Title

Witness                        Date

**Guaranty:** I guarantee that the Customer will make all rent payments and pay all other charges required under the agreement when they are due, and that the Customer will perform all other obligations under the agreement fully and promptly. I also agree that IOS Capital need not notify me of any default under the Agreement and, in the event of default, I will pay all amounts due under the terms of the Agreement. In addition, I will reimburse IOS Capital for any costs or attorney fees incurred in enforcing their rights.

Signature
X

An Individual (No Title)
Printed Name of Guarantor
Home Address
City/State
Home Phone
Social Security Number

**Copy Management Program Agreement:** The Customer agrees to use from IOS Capital the System listed above. THIS AGREEMENT IS NON-CANCELABLE. The Customer agrees to all of the terms and conditions contained in this Agreement.* The Customer agrees this Agreement is for the minimum usage term indicated above. The Customer also agrees that the System will be used for business only, and not for personal, family or household purposes. IOS Capital's acceptance of this Agreement is indicated by an IOS Capital manager's signature below.

Approved by IKON Office Solutions

By _____  5/28/98
IKON Office Solutions Manager       Date

Accepted in Macon, Georgia
IOS Capital  JUN 03 1998

By _____
IOS Capital Manager             Date

Rev. 4/98   *IMPORTANT – See terms and conditions on reverse side of this document

**Delivery and Acceptance**
Customer certifies that all the System described above has been delivered to and is accepted by Customer. Customer acknowledges that such System is in good condition and is performing satisfactorily.

Customer

By
X

Title                           Date

04/19/2005 13:24 FAX 912 471 2300          IKON FINANCIAL SERVICES                    Ø003

## TERMS AND CONDITIONS

**1. Ownership of System:** IOS Capital is the sole owner and title holder to the System.

**2. Rent:** Monthly payments will begin on the Agreement date or delivery date, whichever is later. The Customer agrees to pay IOS Capital the rent payment when due and if any payment is more than ten days late, the Customer agrees to pay a penalty of 5% or $5 (whichever is greater) on the overdue amount. The Customer also agrees to pay $20 for each check that the bank returns for insufficient funds or any other reason. Customer agrees to pay a one time documentation fee, if any, as it appears on the front of this Agreement of up to $50.00.

**3. Taxes and Fees:** This is a net Agreement. In addition to rent, the Customer agrees to pay all taxes, fees, and filing costs related to the use of the System, even billed after the end of the Agreement. IOS Capital will file property tax returns and bill the Customer as soon as an invoice from the local jurisdiction is received. IOS Capital has the option to estimate any taxes due for the year and bill the Customer monthly in advance on the basis of that estimate. If IOS Capital is required to pay property tax, the Customer agrees to reimburse IOS Capital, even though the Customer is normally exempt from property tax.

**4. UCC Filing:** The Customer authorizes IOS Capital or the dealer to sign any documents in connection with the UCC on the Customer's behalf. The Customer authorizes IOS Capital to insert the serial number(s) of the System in this Agreement (including any schedules) and in any filings.

**5. Liability and Insurance:** The Customer is responsible for any losses or injury caused by the System. The Customer promises to keep the System fully insured against loss until the Agreement is paid in full and maintain insurance that protects IOS Capital from liability for any damage or injury caused by the System or its use. The Customer promises to provide us evidence of the insurance, showing IOS Capital as the loss payee and additional insured, upon request. If the Customer fails to provide such evidence, the Customer authorizes IOS Capital to obtain coverage on the r behalf. IOS Capital may file claims and endorse insurance checks on the Customer's behalf. The Customer must continue to make payments until the Agreement is paid off by the insurance proceeds. Alternatively, IOS Capital may choose to self-insure and add an insurance surcharge to the Customer's rent.

**6. Indemnity:** IOS Capital is not responsible for any losses or injuries caused by the installation or use of the Equipment. The Customer agrees to reimburse IOS Capital for and defend IOS Capital against any claims, for losses or injuries caused by the System, unless due to the willful negligence of gross misconduct of IOS Capital.

**7. Maintenance and Care of IOS Capital's Equipment:** The Customer agrees to install, use and maintain the System in accordance with the dealer specifications and use only those supplies supplied or approved by IKON Dealer which meet manufacturer specifications.

**8. Location of Equipment:** The Customer will keep the System at the location specified in this Agreement. The Customer must obtain IOS Capital's written permission to move the System. The Customer will allow IOS Capital or its agents to inspect the System at any reasonable time wherever it is located.

**9. Assignment:** THE CUSTOMER HAS NO RIGHT TO SELL, TRANSFER, ENCUMBER, SUBLET OR ASSIGN THE SYSTEM OR THIS AGREEMENT. IOS Capital may sell, transfer or assign this Agreement and if we do, the new owner will have the same rights and benefits IOS Capital has and will not have to perform any of IOS Capital's obligations.

**10. Warranties:** IOS CAPITAL IS RENTING THE SYSTEM "AS IS" TO THE CUSTOMER. IOS CAPITAL, BEING A FINANCIAL SERVICES COMPANY, AND NOT THE MANUFACTURER OR IKON DEALER MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE OR FOR A PARTICULAR PURPOSE. THE CUSTOMER CHOSE THE SYSTEM AS WELL AS IKON DEALER. THE CUSTOMER AGREES THAT IOS CAPITAL IS NOT RESPONSIBLE FOR REPAIRS, SERVICE OR DEFECTS. IOS CAPITAL DOES PASS TO YOU, WITHOUT RECOURSE THE BENEFITS OF ANY WARRANTIES MADE BY IKON DEALER OR MANUFACTURER TO IOS CAPITAL.

**11. Default:** If the Customer does not pay any amount due when it is due, the Customer will be in default. If the Customer defaults, IOS Capital can demand that the Customer pay the remaining balance of the Agreement and return the System to us at the Customer's expense. At IOS Capital's option, we may repossess the System. Customer waives any rights Customer may have to notice before IOS Capital seizes any of the System and waives any requirement that IOS Capital post a bond in connection with any such seizure or repossession. In addition, if the Customer breaks any promise in the Agreement, IOS Capital can use any remedies available to IOS Capital under the Uniform Commercial Code or any other applicable law. The Customer promises to pay reasonable attorney fees and any cost associated with any action or repossession of the System. This action will not void the Customer's responsibility to maintain and care for the System, nor will the dealer be liable for any action taken on IOS Capital's behalf.

**12. Business Agreement and Choice of Law:** THE CUSTOMER AGREES THAT THIS AGREEMENT WILL BE GOVERNED UNDER THE APPLICABLE LAW FOR THE STATE IN WHICH IOS CAPITAL HAS ITS HOME OFFICE. IOS CAPITAL HAS THE OPTION OF PURSUING ANY ACTION UNDER THIS AGREEMENT IN ANY COURT OF COMPETENT JURISDICTION AND THE CUSTOMER CONSENTS TO JURISDICTION IN THE STATE OF OUR CHOICE. IOS CAPITAL AND CUSTOMER WAIVE THE RIGHT TO A TRIAL BY JURY IN THE EVENT OF A LAWSUIT.

**13. Renewal:** After the Minimum Term or any extension agreed to, this Agreement will automatically renew on a month to month basis unless the Customer notifies IOS Capital in writing 30 days prior to the expiration of the Minimum Term or extension. At the end of the Agreement the Customer agrees to pay shipping charges as determined by IKON Dealer. The Customer must pay any additional rents due until the System is received in good working condition by IOS Capital or its agents.

**14. Other Rights:** The Customer agrees that IOS Capital's delay, or failure to exercise any rights, does not prevent IOS Capital from exercising them at a later time. If any part of this Agreement is found to be invalid, then it shall not invalidate any of the other parts and the Agreement shall be modified to the minimum extent as permitted by law.

**15. Entire Agreement:** This Agreement represents the entire Agreement between IOS Capital and the Customer. Neither IOS Capital nor the Customer will be bound by any amendment, waiver, or other change unless agreed to in writing and signed by both parties. Except for identifying the goods, services, or software ordered, the price(s), and the quantity(ies), the terms and conditions of the purchase order, or other ordering documents of Customer will not modify or affect this Agreement, or have any other legal effect whether issued or signed before, on, or after the date of this Agreement. The provisions of the EEO Clause in CFR § 60-1.4 and the Affirmative Action Clause at 4CFR § 60-250.4 and § 60-741.4 are incorporated in this Agreement.

# IOS CAPITAL
## Variable Lease Payments Addendum

### For Lease # _____
### Term of Lease __60__ Months

*Customer agrees that the lease payments will vary as indicated below:*

| STEP | MONTH | LEASE PAYMENT |
|------|-------|---------------|
| 1 | 1-36 | 4268 - |
| 2 | 37-60 | 5825 - |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |

Accepted In Macon, Georgia
IOS Capital

JUN 0 3 1998

By: _____
     *Susan C. Morrow*
Date: _____

Human Resource Development Press, Inc.
**Customer's Full Legal Name (Please Print)**

_____
**Authorized Signer**

Robert W. Carkhuff     Director
**Authorized Signer's Printed Name**     **Title**

_____     _____
**Witness**                **Date**

*A-9. 5/96*

ALLEGHENY INTERN. v. BIO–ENERGY OF LINCOLN   Mass.  **965**
Cite as 485 N.E.2d 965 (Mass.App. 1985)

raise that claim by a particularized motion for a protective order.

The judgment is affirmed. The order denying the motion to intervene is affirmed in part and denied in part, as explained in the foregoing opinion. The appeal from the order denying the motion to amend the judgment, not separately argued, is treated as waived. The order denying the motion to compel discovery is reversed, and the motion is to be allowed, subject to later modification by way of protective order if need therefor is shown. The order denying the motion for an attorney's fee is reversed, and the case is remanded to the Superior Court for further proceedings with respect to that motion. The intervener Weir, rather than the original plaintiff Cleary, is to be treated as the class representative for purposes of those proceedings, subject to further substitution if necessary.

*So ordered.*



21 Mass.App. 155
**ALLEGHENY INTERNATIONAL
CREDIT CORPORATION**

v.

**BIO–ENERGY OF LINCOLN,
INC., et al.[1]**

Appeals Court of Massachusetts,
Norfolk.

Argued Oct. 11, 1985.

Decided Nov. 29, 1985.

Further Appellate Review Denied
Jan. 31, 1986.

In connection with sale of piece of earth-moving equipment, seller entered into three-year lease with buyer which required seller-lessee to pay monthly rental fee, which lessee paid for only one month. Buyer's assignee brought action against

1. Fred M. Dellorfano, Jr.

lessee, and its president, who had guaranteed lessee's performance. Defendants filed answer and complaint against two third-party defendants. The Superior Court, Norfolk County, Paul K. Connolly, and Herbert F. Travers, Jr., JJ., entered judgment for assignee, and appeal was taken. The Appeals Court, Dreben, J., held that: (1) automatic stay provision of Bankruptcy Code was inapplicable; (2) assignment by buyer of lease and guaranty did not discharge guarantor's obligations; (3) even if transaction was ultimately found to be loan in violation of usury law, assignee was still entitled to recover amount borrowed which remained unpaid at interest rate not exceeding maximum lawful rate; (4) fact that mechanic's lien may have been placed on earth-moving equipment did not make lien holder necessary party; and (5) trial court did not abuse its discretion in determining there was no just reason for delay in entry of judgment.

Affirmed in part, vacated in part and remanded.

1. Bankruptcy ⊝217.3(3)

Automatic stay provisions of Bankruptcy Code [Bankr.Code, 11 U.S.C.A. § 362(a)] apply only to proceeding against petitioning debtor and not against others.

2. Bankruptcy ⊝659(2.2)

Automatic stay provision of Bankruptcy Code [11 U.S.C.A. § 362(a)] was inapplicable to assignee's action against lessee and guarantor of lease for overdue rental payments, even if lessee, the general partner of limited partnership, entered sale and lease-back transaction for earth-moving equipment on behalf of corporation which was limited partner of lessee and even if limited partner, which had filed petition for relief under Chapter 11 of Bankruptcy Code, might be required to indemnify lessee, where lessee itself was not in bankruptcy court, and its obligations and those of guarantor to assignee of lease were independent of any claims either of them

**966** Mass.     485 **NORTH EASTERN REPORTER, 2d SERIES**

may have against limited partnership. Bankr.Code, 11 U.S.C.A. §§ 362(a), 1101 et seq.

**3. Guaranty ⊜53(2)**

Assignment by buyer of lease and of guaranty of lessee's president did not discharge president's obligation, where lease document which president subscribed as guaranty contained language permitting assignment and setting forth rights of assignee.

**4. Usury ⊜98**

Even if sale lease-back transaction involving earth-moving equipment was not actual lease, but rather loan in possible violation of usury law, buyer's assignee was entitled to recover amount borrowed which remained unpaid at interest rate not exceeding maximum lawful rate. M.G.L.A. c. 271, § 49.

**5. Bailment ⊜29**

Fact that mechanic's lien may have been placed on earth-moving equipment involved in sale lease-back transaction did not make lien holder necessary party to action seeking to recover rental payments and late charges and expenses.

**6. Judgment ⊜272**

Trial court did not abuse its discretion in determining, notwithstanding third-party complaint, that there was no just reason for delay in entering judgment against lessee in sale lease-back transaction involving earth-moving equipment, where buyer's assignee had clear right to payment of at least $99,876.88, any liability of third-party defendants was independent of obligation of lessee and its president, and lessee and its president were in precarious financial position.

———————

Christine J. Benway, Boston, for defendants.

Marvin R. Finn, Malden, for plaintiff.

**2.** The bill of sale designated "Fred M. Dellorfano, Jr. of Bio-Energy of Fort Fairfield Association, and Bio-Energy of Lincoln, Inc." as "Seller."

Before DREBEN, KAPLAN and WARNER, JJ.

DREBEN, Justice.

At the end of January, 1982, Bio-Energy of Lincoln, Inc. (Bio), and another[2] sold a piece of earthmoving equipment for $75,-000. At the same time, Bio entered into a three-year "lease" with the buyer which required Bio to pay a monthly rental fee. Bio paid the rent for one month but failed to make the remaining payments. The plaintiff, Allegheny International Credit Corporation (Allegheny), the assignee of the buyer, brought this action against Bio and its president, Fred M. Dellorfano, Jr., who had guaranteed Bio's performance under the lease. The defendants in their answer complained against two third-party defendants.[3]

After some discovery, Allegheny filed a motion for summary judgment seeking the rental payments which, under the lease, could be accelerated upon default, and also seeking late charges and expenses. A judge of the Superior Court ordered summary judgment for Allegheny "in the sum of $99,876.88 under the lease agreement." The judge also ordered the case to be placed on a hearing list for the determination of reasonable attorney's fees and late charges. The amounts of such fees and charges were decided by another judge who, under Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), also determined, notwithstanding the pendency of the third-party complaint, that there was no just reason for delay and directed the entry of judgment. Judgment entered on December 11, 1984.

The defendants in their appeal raise numerous objections. We affirm the judgment insofar as it awarded the plaintiff $99,-876.88 and remand for further proceedings to determine whether any additional amounts are due.

*1. Stay under the Bankruptcy Code.* The defendants claim that the action should

**3.** The third-party defendants are not involved in this appeal.

have been automatically stayed under 11 U.S.C. § 362(a) (1982).[4] This argument is based on their assertions that Bio, a general partner of a limited partnership, entered the sale and lease-back provisions on behalf of a corporation which is a limited partner of Bio and that the limited partner, which had filed a petition for relief under U.S.C. Title 11, may be required to indemnify Bio. The defendants, by a third-party complaint, have made the limited partner a third-party defendant in this action.

[1] The automatic stay provisions of the Bankruptcy Code apply only to a "proceeding against the [petitioning] debtor," see note 4, *supra*, and not against others. Thus the stay provisions have been held not to apply to proceedings against a co-defendant of the debtor, see *Pitts v. Unarco Indus., Inc.*, 698 F.2d 313, 314–315 (7th Cir.), cert. denied sub nom. *Pitts v. GAF Corp.*, 464 U.S. 1003, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); *Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 4–5 (1st Cir.), cert. dismissed, 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983); *Royal Truck & Trailer, Inc. v. Armadora Maritima Salvadorena, S.A., de C.V.*, 10 B.R. 488, 490–493 (N.D.Ill.1981), against individual partners of the debtor, see *In re Aboussie Bros. Constr. Co.*, 8 B.R. 302, 303–304 (E.D.Mo. 1981); *In re Bank Center, Ltd.*, 15 B.R. 64, 65 (W.D.Pa.1981), or against the guarantors of its debts, see *In re Larmar Estates, Inc.*, 5 B.R. 328, 330 (E.D.N.Y.1980). See generally 2 Collier on Bankruptcy § 362.04 (15th ed. 1985).

The case relied upon by the defendants, *Seybolt v. Bio-Energy of Lincoln, Inc.*, 38 B.R. 123 (D.Mass.1984), is to be distinguished. In that case the creditor was an "insider" and alleged to have been actively involved in the day to day business operations of the petitioning debtor. *Id.* at 124. Also, it seems that the stay in that case was not based on the automatic stay provisions of the Bankruptcy Code but rather on a determination by the court that, in the circumstances, the stay should be granted.

[2] Bio is not in the Bankruptcy Court, and its obligations and those of its president, Dellorfano, to the plaintiff are independent of any claims either of them may have against Bio's alleged limited partner, the debtor in the Bankruptcy Court. The motion judge properly refused to stay the proceedings. Compare *Irving Levitt Co. v. Sudbury Management Associates*, 19 Mass.App. 12, 15, 471 N.E.2d 387 (1984).

[3] 2. *Assignment of guaranty.* Dellorfano argues that the assignment by the buyer of the lease and of his guaranty discharged his obligation. The lease document which Dellorfano subscribed as guarantor belies this claim. The lease contains specific language, quoted in the margin,[5] permitting assignment and setting forth the rights of the assignee. Nothing in the papers filed in opposition to the plaintiff's motion for summary judgment raises a material issue of fact as to the validity of the assignment. The vague claim in the defendants' brief that the guarantor's risk may have been materially increased is not supported by any specific

4. 11 U.S.C. § 362(a) (1982) provides in part:
"Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title ... operates as a stay, applicable to all entities, of—

"(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

"(2) the enforcement, against the debtor or against property of the estate, of a judgment

obtained before the commencement of the case under this title; ..."

5. "19. It is understood that Lessor contemplates assigning this lease, and that said assignee may assign the same. All rights of Lessor in the equipment and hereunder may be assigned, pledged, mortgaged, transferred, or otherwise disposed of, either in whole or in part, without notice to Lessee. The assignee's rights shall be free from all defenses, set-offs or counterclaims which Lessee may be entitled to assert against Lessor. No such assignee shall be obligated to perform any duty, covenant or condition required to be performed by Lessor under the terms of this lease."

facts in the record and is not even asserted in any affidavit.

That Dellorfano did not specifically assent to the assignment to Allegheny is of no consequence. Not only did he consent in advance to the assignment by reason of his signature on the face of the lease which contained the provision previously quoted, see *Merrimack Valley Natl. Bank v. Baird*, 372 Mass. 721, 725, 363 N.E.2d 688 (1977), but, in the absence of special circumstances, such consent is unnecessary. See *Healthco, Inc. v. Zambelis*, 2 Mass. App. 914, 321 N.E.2d 671 (1975); 3 Williston, Contracts § 412, at 34 (3d ed. 1960); 4 Corbin, Contracts § 868, at 469 (1951). No special circumstances have been raised by the record.

3. *Violation of usury laws.* The most troublesome claim made by the defendants is that the transaction is in reality a loan and is a violation of G.L. c. 271, § 49.[6] That statute, set forth in part in the mar-

gin,[7] requires that any person who charges more than twenty percent a year as interest and expenses on a loan must notify the Attorney General. No such notification took place here, and it appears that the payments provided for in the lease exceed a twenty percent interest rate.[8]

The plaintiff argues that the lease is a true lease and therefore that the provisions of G.L. c. 271, § 49, are inapplicable. Whether a transaction is a lease or a loan is often a close question. See generally, White & Summers, Uniform Commercial Code § 22–3 (2d ed. 1980). See also G.L. c. 106, § 9–408, and Official Reasons for 1972 Adoption of that section. The determination cannot, we think, be settled on the bare record before us.

The documents and affidavits, construed in the light most favorable to the parties opposing summary judgment, i.e., the defendants, *Hub Associates v. Goode*, 357 Mass. 449, 451, 258 N.E.2d 733 (1970), and

---

**6.** For purposes of reviewing the allowance of the motion for summary judgment, we assume, without deciding, that the transaction, if a loan, is governed by G.L. c. 271, § 49. Whether that is the case will be more appropriately determined on a more ample factual record.

**7.** General Laws c. 271, § 49, as amended by St.1971, c. 368, provides in part:

"(a) Whoever in exchange for either a loan of money or other property knowingly contracts for, charges, takes or receives, directly or indirectly, interest and expenses the aggregate of which exceeds an amount greater than twenty per centum per annum upon the sum loaned or the equivalent rate for a longer or shorter period, shall be guilty of criminal usury.... For the purposes of this section the amount to be paid upon any loan for interest or expenses shall include all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged against or paid or to be paid by the borrower for making or securing the loan, and shall include all such sums when paid by or on behalf of or charged against the borrower for or on account of making or securing the loan, directly or indirectly, to or by any person, other than the lender, if such payment or charge was known to the lender at the time of making the loan, or might have been ascertained by reasonable inquiry.

"....

"(c) Any loan at a rate of interest proscribed under the provisions of paragraph (a) may be declared void by the supreme judicial or superior court in equity upon petition by the person to whom the loan was made.

"(d) The provisions of paragraphs (a) to (c), inclusive, shall not apply to any person who notifies the attorney general of his intent to engage in a transaction or transactions which, but for the provisions of this paragraph, would be proscribed under the provisions of paragraph (a)...."

**8.** The lease required thirty-six monthly payments of $2943. If the "loan" is considered to be for $75,000 (and a fortiori for any lesser amount), such payments would be at a rate higher than twenty percent if calculated under the Regulation Z Annual Percentage Rate Tables issued by the Board of Governors of the Federal Reserve System. We assume, but do not decide, that such tables provide an appropriate method of determining the interest rate under G.L. c. 271, § 49. See G.L. c. 140D, § 5, and 209 Code Mass.Regs. 32.22(b)(1) (1982), which authorize the use of such tables for computing finance charges which have to be disclosed in connection with consumer credit transactions. We note that the interest rate determined under such tables is virtually identical to that computed according to the monthly mortgage amortization schedule contained in Thorndike Encyclopedia of Banking and Financial Tables 5–210 (Rev. ed. 1980).

taken in the context of the broader negotiations of which this transaction is claimed to have been a part, do not satisfy the plaintiff's burden of showing that "there is no genuine issue of material fact" as to whether the lease was a true lease. *Community Natl. Bank v. Dawes*, 369 Mass. 550, 554, 340 N.E.2d 877 (1976).

Although, taken by itself, the lease does not appear to be a loan, an addendum of even date contains provisions which look in that direction. The addendum ties the payments to the prime rate at a Pittsburgh bank on the "[p]rincipal balance outstanding"[9] and also provides that the lessor will discontinue billing once the cost of the equipment to the lessor "is fully amortized."[10]

Moreover, it is clear from the affidavits of both parties that Bio at the time of entering the lease was actively trying to borrow money. The affidavit of Dellorfano[11] states that in January, 1982, he began negotiations on behalf of Bio to obtain a loan from Allegheny of $1.7 million and that he entered into the sale and lease-back transaction as an interim financing mechanism.

Appended to an affidavit filed on behalf of Allegheny by one John Bartling is a contract dated January 25, 1982, under which, Bartling averred, Bio hired a consulting company to arrange for a $1.7 million loan to Bio. Bartling was the president of the consulting firm hired by Bio and was also president of the corporation which bought its equipment. The quest for much greater financing through Bartling's consulting firm at the same time Bartling, through another of his firms, was negotiating the sale and lease-back transaction lends substance to the defendants' claim that the leasing arrangement may have been a loan.[12]

The principal amount of the loan, if it is one, is also subject to some question. The sale price of the equipment which Bio leased back from the buyer was $75,000. Bio requested that $9,750 be paid to the consulting company of which Bartling was president and the remaining $65,250 to Bio.

The defendants claim that $9,750 should be viewed as part of the cost of the loan. The amount of the consulting firm's retainer as set forth in the consulting contract was $7,500. Since the defendants' affidavits do not contest the existence of that

---

9. The addendum provides in relevant part: "Notwithstanding any provision to the contrary, it is mutually agreed that the monthly payments due under the terms listed on Schedule A are based on a Prime Rate at Mellon Bank, N.A. (Pittsburgh, PA) of 15.75%.

   "In the event that the Prime Rate as quoted by Mellon Bank, N.A., on the 30th day of the calendar month immediately preceding the month in which a rental payment is due [sic], an adjustment shall be made for any increase in the Prime Rate above 15.75% at the rate of $.21 per $1,000.00 of the *Principal balance outstanding* for each ¼% increase in Prime Rate. This adjustment shall be billed monthly and is payable upon receipt by Lessee. In the event that there is a decrease in the Prime Rate of 15.75% an adjustment shall be made for any decrease in Prime at the rate of $.21 per $1,000.00 for each ¼% decrease in Prime to a floor of 13%. This adjustment shall be credited to the last payment of the Lease until the Principal balance shall have been amortized to zero (0). Lessor agrees to discontinue billing once the cost of the Equipment to Lessor is fully amortized, and all charges pertaining to this Lease are paid in full." (Emphasis supplied.)

10. The lease, however, provides for the return of the equipment at the end of the lease term.

11. His deposition, although reproduced in the record appendix, is not properly before us as it was not submitted to the motion judge. On appeal, counsel conceded this point at oral argument.

12. For a discussion of some of the relevant considerations in determining whether a transaction is a lease or a loan, see White & Summers, *supra* at § 22-3. For example, the lease provides for the return of the equipment at the end of the lease term. If, despite the clause in the addendum providing for the cessation of payments upon amortization, the return was really expected, as might be the case if the original lessor or the assignee has facilities to store the goods or rents similar equipment, and if the lessee's payments are found to be in the nature of true rent (a sum for wear and tear plus reasonable profit), then the transaction may, indeed, turn out to be a lease.

contract or question what it was for (services for a $1.7 million loan), a material question of fact is only raised as to whether the excess over $7,500, i.e. $2,250, was a charge relating to the "lease."

[4] We thus conclude that the affidavits raise genuine issues of fact both as to whether the sale lease-back transaction was a loan, and if so, what amount was lent. These questions, however, do not preclude the entry of a partial summary judgment for the plaintiff. It is true that the total amount of the judgment entered by the lower court, i.e., $114,363.39, exceeds the twenty percent figure permitted by G.L. c. 271, § 49. It is also true that the statute, as construed in *Begelfer v. Najarian,* 381 Mass. 177, 189 n. 16, 409 N.E.2d 167 (1980), requires that all fees and expenses be included in determining the interest rate being charged. Nevertheless, *Begelfer* at 187, 409 N.E.2d 167, citing 14 Williston, Contracts § 1630A, at 26 (3d ed. 1972), also indicates that "[u]nless no other conclusion is possible from the words of a statute it should not be held to make agreements contravening it totally void."

We think that here, as in *Begelfer,* a balancing of the relevant factors [13] makes it inequitable to allow the defendants, who have received a substantial sum of money, to defer still longer the payment of amounts which unquestionably are due or to receive a windfall. It was thus proper, even if the transaction is ultimately found to be a loan, for the judge to enter judgment in the amount borrowed which remained unpaid at an interest rate not exceeding the maximum lawful rate. As the computations set forth in the margin indicate, the sum of $99,876.88 does not exceed that figure.[14]

*4. Remaining Claims.* The remaining claims of the defendants are without merit.

[5] (a) The fact that a mechanic's lien may have been placed on the earthmoving equipment does not, as the defendants assert, make the lienholder a necessary party. No challenge is here made to the lien, and this action does not preclude the lienholder from asserting whatever rights he may have.

[6] (b) As indicated earlier, the defendants filed third-party actions against the limited partners of Bio. They urge that it was improper under Mass.R.Civ.P. 54(b) to determine that there is no just reason for delay. There is here no abuse of discretion (1) where the plaintiff had a clear right to payment of at least $99,876.88; (2) where the liability, if any, of the third-party defendants is independent of the obligations of the defendants; and (3) where an uncontroverted affidavit filed on behalf of the plaintiff indicates the precarious financial position of the defendants. See *Curtiss-Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 12, 100 S.Ct. 1460, 1467, 64 L.Ed.2d 1 (1980).

(c) The claim that the legal fees awarded were unreasonable is without basis. We see no abuse of discretion in the amount awarded. Whether the plaintiff will receive such sum will, however, depend on whether the transaction falls within the usury statute.

*5. Remedy.* The portion of the judgment entered December 11, 1984, which awards the plaintiff $99,876.88 is affirmed, and is considered certified under Mass.R. Civ.P. 54(b). No prejudgment interest is to be awarded, as such interest would be du-

---

**13.** As set forth in *Begelfer,* 381 Mass. at 189, 409 N.E.2d 167, those factors include: "the importance of the public policy against usury, whether a refusal to enforce the term will further that policy, the gravity of the misconduct involved, the materiality of the provision to the rest of the contract, and the impact of the remedy on the parties' rights and duties."

**14.** At a minimum Bio owed the plaintiff $71,019.50 of principal—$75,000 minus $2,250 and minus the principal repaid in the first payment,

i.e., $1,730.50. (This figure of $1,730.50 was obtained by subtracting one twelfth of the annual maximum lawful interest [20%] payable on the sum of $72,750, i.e. $1,212.50, from the first payment of $2,943.) The principal sum of $71,019.50 together with simple interest thereon at 20% from April 10, 1982 (the date the second payment was due) to the date of the judgment, December 11, 1984, would result in a figure in excess of $99,876.88.

**TOWN OF LEE v. LABOR RELATIONS COM'N**    Mass.    **971**
Cite as 485 N.E.2d 971 (Mass.App. 1985)

plicative. See *Computer Syss. Engr., Inc. v. Qantel Corp.*, 740 F.2d 59, 71 (1st Cir. 1984). The plaintiff is to have costs under Mass.R.A.P. 26, as amended, 378 Mass. 925 (1979).

Because of the genuine material issues whether the transaction was a loan governed by G.L. c. 271, § 49, and, if so, whether the $2,250 should be considered as part of the amount of such loan, the judgment is vacated insofar as it awards in excess of $99,876.88, and the matter is remanded for further proceedings consistent with this opinion. On remand, if the transaction is determined to be a loan to which G.L. c. 271, § 49, applies, interest (which for the purposes of the statute, includes all fees and late charges) in excess of the maximum lawful rate may not be awarded. If, on remand, the transaction is determined not to be a loan to which the statute is applicable, the entire original judgment entered December 11, 1984, is to stand.

*So ordered.*



21 Mass.App. 166
**TOWN OF LEE**

v.

**LABOR RELATIONS COMMISSION.**

Appeals Court of Massachusetts,
Suffolk.

Argued Oct. 15, 1985.

Decided Dec. 2, 1985.

Appointing authority of town refused to permit full-time permanent police officer to change his residence to nearby town, on pain of forfeiting his job. Claiming action represented new or changed policy on part of town with respect to residency, union requested negotiation, which town in effect refused. Union filed charge of prohibited practice with Labor Relations Commission.

After investigation, Commission issued complaint, expedited hearing, and found charge was substantiated. Town appealed. The Appeals Court, Suffolk County, Kaplan, J., held that: (1) town's residency bylaw yielded to town's duty to bargain, and (2) substantial evidence supported Commission's determination.

Order affirmed.

**1. Labor Relations ⬳178**
Residency of police officer, being term or condition of employment, was mandatory subject of bargaining. M.G.L.A. ch. 150E, §§ 6, 7(d).

**2. Labor Relations ⬳178**
Town bylaw concerning residency of police officers yielded to town's breach of its duty to bargain concerning terms or conditions of employment under M.G.L.A. ch. 150E, § 6.

**3. Labor Relations ⬳574**
Substantial evidence supported Labor Relations Commission's determination that town's insistence that police officer remain resident of town or forfeit his job was departure from prior practice of town requiring collective bargaining; town had made no effort to inform body of police officers, or individual officers, about any residency requirement for continued employment, and town had sought list from civil service on basis of giving preference to candidates who resided in town, not requiring such residency. M.G.L.A. ch. 150E, §§ 6, 7(d).

Jerome J. Scully, Town Counsel, Lee, for plaintiff.

Margery Williams, Cambridge, for defendant.

Before WARNER, KAPLAN and FINE, JJ.

KAPLAN, Justice.

In January, 1983, the board of selectmen of the town of Lee, the appointing authori-