

UNITED STATES DISTRICTCOURT
FOR THE DISTRICT OF MASSACHUSETTS

HUMAN RESOURCE DEVELOPMENT)
PRESS, INC., )

Plaintiff,

v.

IKON OFFICE SOLUTIONS
COMPANY, INC., &

IOS CAPITAL, INC. d/b/a/
IKON FINANCIAL SEVICES

Defendants

CIVIL ACTION NO. 05-30068-KPN

**FIRST AMENDED COMPLAINT**

## INTRODUCTION

This is an action by Human Resource Development Press, Inc. ("HRD PRESS") against Ikon Office Solutions Company, Inc. ("IKON") for (i) fraud and misrepresentations, (ii) breach of M.G.L. ch. 106 § 2A, (iii) failure to dispose of collateral in a commercially reasonable manner, (iv) violation of M.G.L. ch. 271, § 49 failure to dispose of collateral in a commercially reasonable manner, (v) breach of the covenant of good faith and fair dealing and (vi) violation of M.G.L. ch. 93A. This Complaint arises out of two installment sale contracts for copiers entered into between the parties.

## PARTIES

1.    The Plaintiff, Human Resource Development Press, Inc., is a corporation incorporated under the laws of the Commonwealth of Massachusetts with a

usual place of business at 22 Amherst Road, Amherst, Massachusetts, 01002.

2.    The Defendant, Ikon Office Solutions Company, Inc.("IKON"), is a corporation incorporated under the laws of Ohio with a usual place of business at 855 Winding Brook Drive, Glastonbury, Connecticut 06033.

3.    The Defendant, IOS Capital, Inc. d/b/a Ikon Financial Services ("IKON FINANCIAL"), is, upon information and belief a wholly owned subsidiary of IKON and is a corporation incorporated under the laws of Ohio with a usual place of business in Macon, Georgia.

## JURISDICTION

4.    This matter involves damages in excess of $75,000.00 arising from a dispute between citizens of different states.  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

6.    HRD Press is engaged in the business of creating, owning and publishing certain assessment tests, human resource training resources and various training and development materials.

7.    IKON is in the business of providing its customers with copier equipment and printing services, computer networking, print-on-demand services, copy center management, hardware and software product interfaces and electric file conversion. IKON FINANCIAL is in the business of purchasing and

servicing finance contracts for equipment sold and/or leased by IKON to third parties such as HRD PRESS.

8. On or about May 20, 1998, HRD PRESS and IKON entered into a contract entitled *Field Order Form/Security Agreement* ("First Agreement"). A copy of said First Agreement is attached hereto and marked as Exhibit "A".

9. Pursuant to the First Agreement, IKON provided HRD PRESS with two (2) commercial grade copiers: an Oce 3100 and an Oce 3165 ("First Equipment") and IKON was granted a security interest to and in said equipment.

10. The contract term of the First Agreement was for sixty (60) months.

11. Pursuant to the First Agreement, HRD PRESS was obligated to pay FOUR THOUSAND TWO HUNDRED SIXTY-EIGHT DOLLARS ($4,268.00) per month for the first thirty-six (36) months of the contract term and FIVE THOUSAND EIGHT HUNDRED TWENTY-FIVE DOLLARS ($5,825.00) for the remaining twenty-four (24) months of the contract term (jointly the "First Equipment Monthly Charges").

12. In exchange for the First Equipment Monthly Charges, HRD PRESS was to receive, inter alia, free service/maintenance and supplies.

13. HRD PRESS specifically described and identified to IKON HDR PRESS's copying needs. IKON in response to said stated needs, specifically represented to HRD PRESS that the First Equipment would effectively provide HRD PRESS with a minimum of 250,000 copies per month and meet HRD PRESS's copying needs.

14.    The First Equipment was delivered to HRD PRESS on or about May 16, 1998.

15.    HRD PRESS began experiencing mechanical problems with the First Equipment within the first couple of months of said equipment being delivered and the First Equipment required frequent service calls from IKON. Despite said mechanical problems HRD PRESS continued to use the First Equipment for over two years.

16.    Despite IKON's prior representations that the First Equipment would meet HRD PRESS's specified needs, a subsequent IKON agent informed HRD PRESS that if they wanted high production capacity they would need to upgrade the First Equipment.

17.    As a result of the failure of the First Equipment to meet HRD PRESS's specified needs, HRD PRESS was forced to upgrade its First Equipment to different and more expensive copiers.

18.    On or about June 19, 2000, HRD PRESS and IKON entered into an agreement entitled *Product Schedule Copy Management* ("Second Agreement").  A copy of said Second Agreement is attached hereto and marked as Exhibit "B". At the time HRD PRESS entered into the Second Agreement, HRD PRESS was not in monetary default under the terms of the First Agreement.

19.    Pursuant to the Second Agreement, IKON agreed to provide HRD PRESS with four (4) Canon copiers ("Second Equipment") from IKON. The contract term of the Second Agreement was for seventy-two (72) months.

4

20.    Prior to HRD PRESS entering into the Second Agreement, it still owed eleven (11) monthly payments of FOUR THOUSAND TWO HUNDRED SIXTY-EIGHT DOLLARS ($4,268.00) and twenty-four (24) monthly payments of FIVE THOUSAND EIGHT HUNDRED TWENTY-FIVE DOLLARS ($5,825.00) under the First Agreement.

21.    Pursuant to the Second Agreement, HRD PRESS was obligated to pay EIGHT THOUSAND NINE HUNDRED FORTY-NINE DOLLARS ($8,949.00) for each of the first thirty-six (36) months of the contract term and TWELVE THOUSAND ONE HUNDRED SIXTEEN DOLLARS ($12,116.00) for each of the remaining thirty-six (36) months of the contract term ("Second Equipment Monthly Charges").

22.    As part of the negotiation of the Second Agreement, HRD PRESS was told by IKON that the reason the Second Equipment Monthly Charges were significantly higher than the First Equipment Monthly Charges was because the Second Equipment was of a substantially higher quality, that said equipment would solve the problems HRD PRESS was having with the First Equipment and as a result, the Second Equipment would cost more money. This representation of a material fact was materially false. HRD PRESS reasonably relied upon this false representation of fact.

23.  As part of the negotiation of the Second Agreement, HRD PRESS asked if it would have any further payment obligations under the First Agreement. IKON represented to HRD PRESS that IKON was simply replacing and substituting the First Agreement with the Second Agreement and that HRD PRESS would have no further payment obligations for the First Equipment. This representation of a material fact was materially false. HRD PRESS reasonably relied upon this false representation of fact.

24.  Simultaneous with the delivery of the Second Equipment, HRD PRESS surrendered the First Equipment to IKON. Upon information and belief, HRD PRESS received no credit against or price concession on the Second Equipment Monthly Charges.

25.  IKON has asserted that both the First Agreement and the Second Agreement were "lease" and not "purchase and sale" agreements.

26.  HRD PRESS has asserted that substantively both the First Agreement and the Second Agreement were "purchase and sale" agreements and not "lease" agreements.

27.  Despite HRD PRESS's oral and written requests, IKON has failed and refused to disclose to HRD PRESS how IKON disposed of the First Equipment or whether it obtained any value as a result of said disposal.

28.  IKON has not credited HRD PRESS for any value IKON may have later received from the resale or other disposition of the First Equipment.

29.  IKON continued to charge and HRD PRESS, unknowingly, continued to pay for the First Equipment through Second Agreement.

30.    Prior to executing the Second Agreement, IKON specifically represented to HRD PRESS that it was receiving an "excellent deal" pursuant to the terms of the Second Agreement. This representation of material fact was materially false. HRD PRESS reasonably relied upon this false representation of fact.

31.    IKON, due to its business experience, had significantly more knowledge than HRD PRESS of IKON's own cost of acquisition of copiers and the sale and/or leasing market margins of profit for said copiers. Prior to executing the Second Agreement, IKON specifically represented to HRD PRESS that it was given a significant discount off the list price. This representation of material fact was materially false. HRD PRESS reasonably relied upon this false representation of fact.

32.    In the fall of 2003, IKON informed HRD PRESS that it was provided a discount of at least 15% off the list price of the Second Agreement. This representation of material fact was materially false. HRD PRESS reasonably relied upon this false representation of fact.

33.    A traditional discount for transactions similar to the size of the Second Agreement ranges from 20-35% off the list price.

34.    After industry consultants reviewed HRD PRESS' Second Agreement, they concluded that HRD PRESS did not receive an "excellent deal" and that HRD PRESS received less than a 15% discount off the list price.

35.    Prior to executing the Second Agreement, IKON also specifically represented to HRD PRESS that it would no longer be paying any portion of the service/maintenance and supplies costs for the First Equipment. This

representation of material fact was materially false. HRD PRESS reasonably relied upon this false representation of fact.

36. The maintenance portion of the charges under the First Agreement was in excess of TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500.00) per month.

37. Even though pursuant to the terms of the Second Agreement, HRD PRESS was not to be charged for service/maintenance and supplies, IKON consistently sought to impose and collect unjustified fees and charges for service/maintenance and supplies ("Unjustified Charges"). Attached hereto and marked as Exhibit "C" are copies of some, but not all of the Unjustified Charges.

38. In November 2003, IKON and IKON FINANCIAL provided HRD PRESS with a "Financial Summary" representing what HRD PRESS was paying for through the Second Equipment Monthly Charges. A copy of said "Financial Summary" is attached hereto and marked as Exhibit "D".

39. The Financial Summary revealed to HRD PRESS for the first time, that even though IKON represented to HRD PRESS that it would have no further payment obligations for the First Equipment HRD PRESS continued to pay for the same even though it has not had use or possession of said First Equipment since June 2000.

40. The Financial Summary reveals that the interest component, which was built into the First Equipment Monthly Charges, continues to be assessed and in

fact compounded through the seventy-two (72) month period of the Second Equipment Monthly Charges.

41.    IKON has "rolled" into the Second Equipment Monthly Charges thirty-six (36) months of payments at ONE THOUSAND SEVEN HUNDRED SEVENTY TWO DOLLARS and 88/100 ($1,772.88) per month plus thirty-six (36) months of payments at TWO THOUSAND SEVEN HUNDRED FORTY NINE DOLLARS and 12/100 ($2,749.12) per month for a total of ONE HUNDRED SIXTY-TWO THOUSAND SEVEN HUNDRED AND SIXTY DOLLARS and 32/100 ($162,760.32) in unjustified payments for the alleged balance due for the First Equipment.

42.    HRD PRESS has made payments to IKON for the Second Equipment in amounts that are substantially higher than that which HRD PRESS should have paid if the promised significant price discounts had been granted.

43.    HRD PRESS, despite IKON'S specific representations to the contrary, has through the Second Equipment Monthly Charges paid IKON payments for service and/or maintenance charges for the First Equipment.

44.    HRD PRESS, through the Second Equipment Monthly Charges, has paid to IKON payments for the First Equipment even though all financial obligations for the First Equipment have been satisfied and/or waived by IKON'S agreement and representations as well as by its retention of the First Equipment.

9

45.   HRD PRESS, through the Second Equipment Monthly Charges, has paid to IKON interest payments for both the First Equipment and the Second Equipment that is in excess of the legal limit.

46.   Neither IKON nor IKON FINANCIAL has registered with the Massachusetts' Attorney General's Office so as to allow IKON and/or IKON FINANCIAL to impose interest charges in excess of the legal limit.

47.   The First Agreement and the Second Agreement were drafted by IKON.

48.   On or about September 20, 2004, HRD PRESS mailed IKON a demand letter pursuant to M.G.L. ch. 93A (the "Demand Letter"). A copy of said Demand Letter is attached hereto and marked as Exhibit "E".

49.   Neither IKON nor IKON FIANANCIAL has tendered a settlement offer in response to said Demand Letter which is reasonable in light of the facts and law set forth in said Demand Letter.

## COUNT I

## (FRAUD AND MISREPRESENTATION)
## (AS TO PRICING)

50.   HRD PRESS restates and incorporates by reference the allegations contained in paragraphs 1 through 49 of the Complaint.

51.   As an inducement for HRD PRESS to enter into the Second Agreement, IKON intentionally made the material and false representation of fact to HRD PRESS that IKON was providing HRD PRESS with an excellent deal and that HRD PRESS was receiving a significant discount off the list price.

52. Since the execution of the Second Agreement, IKON has continuously represented that HRD PRESS was receiving an "excellent deal" on the copiers.

53. These additional representations of fact were materially false and are further evidence that IKON attempted to induce HRD PRESS into continuing to make payments on the Second Agreement that were unjustified.

54. HRD PRESS reasonably relied on these misrepresentations of fact made by IKON in deciding to enter into the Second Agreement and in deciding to continue to make higher payments than that which was justified.

55. As a result of these illegal actions by IKON, HRD PRESS has suffered damages in an amount to be determined at trial.

## COUNT II

### (FRAUD AND MISREPRESENTATION)
### (AS TO FIRST AGREEMENT PAYMENT OBLIGATIONS )

56. HRD PRESS restates and incorporates by reference the allegations contained in paragraphs 1 through 49 of the Complaint.

57. As an inducement for HRD PRESS to execute the Second Agreement, IKON intentionally made the material and false representation of fact to HRD PRESS that IKON would simply replace and substitute the Second Agreement for the First Agreement and that HRD PRESS would have no other payment obligations for the First Equipment pursuant to the First Agreement.

58.    As an inducement for HRD PRESS to execute the Second Agreement, IKON intentionally made the material and false representation of fact to HRD PRESS that IKON was not imposing service/maintenance or supplies charges for the First Equipment through the Second Equipment Monthly Charges.

59.    HRD PRESS reasonably relied on these misrepresentations of fact made by IKON in deciding to enter into the Second Agreement.

60.    As a result of these illegal actions by IKON, HRD PRESS has suffered damages in an amount to be determined at trial.

## COUNT III

## (VIOLATION OF M.G.L. c. 271, § 49)

61.    HRD PRESS restates and incorporates by reference the allegations contained in paragraphs 1 through 49 of the Complaint.

62.    Pursuant to the First and Second Agreements, IKON and/or IKON FIANANCIAL have impose and collected interest charges in excess of the legal limit provided by law rendering all such payments usurious.

63.    As a result of said violation, HRD PRESS seeks to void the First and Second Agreements and collect from IKON and/or IKON FIANANCIAL any and all payments previously paid pursuant to said First and/or Second Agreements, along with the award of any and all attorney fees incurred by HRD PRESS in asserting its rights under M.G.L. c. 271, § 49.

## COUNT IV

## (FAILURE TO DISPOSE OF COLLATERAL IN A COMMERCIALLY REASONABBLE MANNER IN VIOLATION OF M.G.L. CHAPTER 106A ET SEQ.)

64.  HRD PRESS restates and incorporates by reference the allegations contained in paragraphs 1 through 49 of the Complaint.

65.  If the First Agreement was a lease agreement, then pursuant to M.G.L. c. 106A et seq. IKON had the obligation to give HRD PRESS credit against and/or a reduction of the Second Equipment Monthly Charges.

66.  By failing to account for or provide HRD PRESS with any value for the First Equipment IKON and/or IKON FINANCIAL has either failed to liquidate its collateral in a commercially reasonable manner and/or violated M.G.L. c. 106A et seq. and HRD PRESS has suffered damages in an amount to be determined at trial.

## COUNT V

## (FAILURE TO DISPOSE OF COLLATERAL IN A COMMERCIALLY REASONABLE MANNER)

67.  HRD PRESS restates and incorporates by reference the allegations contained in paragraphs 1 through 49 of the Complaint.

68.  If the First Agreement was a purchase and sale agreement, IKON and/or IKON FINANCIAL failed to account for or provide HRD PRESS with any value for the First Equipment and has either failed to liquidate its collateral in a commercially reasonable manner or retained the collateral in satisfaction of any debt related to the same.

69.    As a result of said failure any financial obligations under the First Agreement sought to be imposed by IKON and/or IKON FINANCIAL upon HRD PRESS should be deemed satisfied as of June 2000 and any and all payments made through the Second Monthly Equipment Charges should be reimbursed to HRD PRESS.

## COUNT VI

## (BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING IMPLIED )

70.    HRD PRESS restates and incorporates by reference the allegations contained in paragraphs 1 through 49 of the Complaint.

71.    The First and Second Agreements between IKON and HRD PRESS are governed by the covenant of good faith and fair dealing imposed upon all contractual relationships.

72.    By seeking to impose and then collecting charges for HRD PRESS's use of the First Equipment after the same had already been surrendered, IKON A and IKON FINANCIAL have breached the covenant of good faith and fair dealing and the First and Second Agreements should be reformed to comply with said covenant of good faith and fair dealing.

## COUNT VII

## (CHAPTER 93A)

73.    HRD PRESS restates and incorporates by reference the allegations contained in paragraphs 1 through 49 of the Complaint.

74.    IKON'S actions detailed above took place in the trade or commerce and occurred primarily and substantially in the Commonwealth of Massachusetts.

14

75. The acts as set forth in Exhibit "E" constituted unfair or deceptive acts or practices committed IKON and/or IKON FINANCIAL against HRD PRESS. As a result of these unfair and deceptive acts or practices, HRD PRESS has been injured.

76. Neither IKON no IKON FINANCIAL tendered any reasonable offers of settlement in violation of M.G.L. c. 93A.

77. IKON's and IKON FINANCIAL's conduct constitutes a knowing and willful violation of M.G.L. c. 93A. As a result, HRD PRESS is entitled to treble (3) its actual and consequential damages, which will be proven at trial, in addition to attorneys' fees, interest, and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, HRD PRESS respectfully requests that this Court:

1) Pursuant to Count I, enter Judgment against the DEFENDANTS in an amount  in an amount to be determined at trial plus interest, costs, and attorneys' fees and that execution or other appropriate process issue for the enforcement of same; and

2) Pursuant to Count II, enter Judgment against the DEFENDANTS in an amount in an amount to be determined at trial plus interest, costs, and attorneys' fees and that execution or other appropriate process issue for the enforcement of same; and

3) Pursuant to Count III, Judgment against the DEFENDANTS voiding the First and Second Agreements and reordering IKON and/or IKON FIANANCIAL to repay to HRD PRESS any and all payments previously paid pursuant to said First and/or Second Agreements, along with the award of any and all attorney fees incurred by HRD PRESS

in asserting its rights under M.G.L. c. 271, § 49 and that execution or other appropriate process issue for the enforcement of same; and

4) Pursuant to Count IV, enter Judgment against the DEFENDANTS in an amount to be determined at trial plus interest, costs, and attorneys' fees and that execution or other appropriate process issue for the enforcement of same; and

5) Pursuant to Count V, enter Judgment against the DEFENDANTS determining that any financial obligation under the First Agreement sought to be imposed upon HRD PRESS is deemed satisfied and any and all payments made for the First Equipment through the Second Monthly Equipment Charges should be reimbursed to HRD PRESS and that execution or other appropriate process issue for the enforcement of same; and

6. Pursuant to Count VI, enter Judgment against the DEFENDANTS determining that the First and Second Agreements are reformed to provide that in compliance with the covenant of good faith and fair dealing HRD PRESS had no obligation for any payments under the First Agreement as of June 2000, that HRD PRESS be reimbursed for said payments and that execution or other appropriate process issue for the enforcement of same; and

7. Pursuant to Count VII, enter Judgment against the DEFENDANTS determining that IKON's and IKON FINANCIAL's conduct constituted a knowing and willful violation of M.G.L. c. 93A and that HRD PRESS is awarded treble (3) its actual and consequential damages, pursuant to Counts I-VI in addition to attorneys' fees, interest, and costs and that execution or other appropriate process issue for the enforcement of same; and

8. For any such other and further relief as this Court deems just and proper.

16

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully submitted this the  28th day of November 2005

The Plaintiff,
HRD PRESS
By Its Attorney,

David J. Noonan, Esq.,
228 Triangle Street
Amherst, MA  01002
Tel: (413) 549-5491
Fax:(413) 549-5156
Email: david.noonan@verizon.net
B.B.O. # 373260

# IKON
### Office Solutions

FIELD ORDER FORM / SECURITY AGREEMENT

No. 294334

EXHIBIT "A"

SHIP TO CUSTOMER _260 860_

NAME _Human Resource Development/HRD_

ADDRESS _23 Amherst Rd_

CITY _Amherst_ ST. _MA_ ZIP _01002_

PHONE _(413) 253-3488_ CONTACT _____

BILL TO CUSTOMER _____

NAME _Same_

ADDRESS _____

CITY _____ ST. ____ ZIP ____

PHONE ( ) CONTACT _____

| ORDER DATE | PURCH. ORDER NUMBER | DIST. CODE | SALE | SHIPPING LOCATION | REP. NUMBER | REQUIRED DATE |
|---|---|---|---|---|---|---|
| | | | CS LS TRN | | 261141/DL | |

| QUANTITY | ITEM | PRODUCT No. | DESCRIPTION / SERIAL NUMBER | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| | | | OCE 3106 | | |
| | | | OCE 3165 | | |
| | | | HRD HAS THE OPTION OF LEASE UPGRADE AT MONTH 36 | | |

TAX EXEMPT NUMBER IF APPLICABLE
(CERTIFICATE COPY MUST BE ATTACHED)

AUTHORIZED SIGNATURE (DEBTOR) _WW Wickoff_

IKON ACCT. REP. _____

DATE _5/30/98_ TITLE _Director_

DATE _____

NO SALESMAN IS AN AUTHORIZED SIGNATORY OF IKON. ALL ORDERS ARE SUBJECT TO APPROVAL BY AN IKON AUTHORIZED REPRESENTATIVE AT A CORPORATE / REGIONAL OFFICE. NO SALES ORDER IS BINDING UPON IKON, UNLESS AND UNTIL APPROVED AS ABOVE STATED.

SUB-TOTAL

| | |
|---|---|
| FREIGHT, SET-UP AND DELIVERY | |
| STATE / LOCAL TAXES (MASS. R.I.) | |
| TRADE-IN ALLOWANCE | |
| FREIGHT, SET-UP AND DELIVERY (ALL OTHER STATES) | |
| STATE & LOCAL TAXES N.Y. | |
| **TOTAL DUE UPON DELIVERY** | |

A 1½% per month late charge (18% per annum) will be applied to all unpaid balances over 10 days.

IKON

FURTHER CONDITIONS AND TERMS FORMING A PART OF THE SECURITY AGREEMENT
SET FORTH ON THE FRONT SIDE HEREOF:

**WARRANTIES AND AGREEMENTS OF DEBTOR**

**DEFAULT BY DEBTOR**

**REMEDIES OF THE SECURED PARTY ON DEFAULT**

**GENERAL**



EXHIBIT "B"

**IOS**

an IKON Office Solutions Company
P.O. Box 9115, Macon, GA 31208-9115

## PRODUCT SCHEDULE
Copy Management
Product Schedule Number: 00787
To Master Agreement Number: _____

This Schedule is made part of the Master Agreement ( Master Agreement ) identified on this Schedule between IOS Capital, Inc. ( we  or  us ) and
Human Resource Development Press, as Customer ( you ). All terms and conditions of the Master Agreement are incorporated into this Schedule and made a part hereof. It
is the intent of the parties that this Schedule be separately enforceable as a complete and independent agreement, independent of all other Product Schedules to the Master Agreement

### CUSTOMER INFORMATION

Customer (Bill To): Human Resource Development Press
Address: 22 Amherst Road
City: Amherst  County: Hampshire  State: MA  Zip: 01002

Product Location
Address
City  County  State  Zip

EXHIBIT "B"

Customer Contact Name:
Customer Telephone Number: 413-253-3488
Marketplace: Hartford/Western Mass

### PRODUCT DESCRIPTION

| Quantity | Description: Make, Model & Serial Number | Quantity | Description: Make, Model & Serial Number |
|---|---|---|---|
| | Please See Addendum A-1 | | |
| | | | |

### PAYMENT SCHEDULE

| Minimum Term (mos.) | Cost Per Copy | Additional Copies | Guaranteed Minimum Monthly Copies | Meter Reading/Billing For Additional Copies |
|---|---|---|---|---|
| 72 | $ | $ 0.00983 | 300,000 | ☐ Monthly  ✓ Quarterly  ☐ Other |

| Minimum Payment (without tax) | Payment Due: | Advance Payment (with tax) | |
|---|---|---|---|
| $ | ✓ Monthly  ☐ Annually  ☐ Quarterly  ☐ Other | ✓ none  ☐ apply to 1st Payment  ☐ apply to other | |

Sales Tax Exempt ☐ Yes (Attach Exemption Certificate)   Customer Billing Reference Number (P.O.#, etc.)

Addendum Attached ☒ Yes  (Check if yes and indicate total number of pages: ___2___ )

### TERMS AND CONDITIONS

1. The first Payment will be due on the Effective Date. The delivery date is to be indicated by signing a separate acceptance form.

2. You, the undersigned Customer, have applied to us, IOS Capital, Inc., to rent the above described items ( Products ) for commercial (non-consumer) purposes. THIS IS AN UNCONDITIONAL, NON-CANCELABLE AGREEMENT FOR THE MINIMUM TERM INDICATED ABOVE.  If we accept this Product Schedule, you agree to rent the above Product(s) from us, and we agree to rent such Product(s) to you, on all the terms hereof, including the Terms and Conditions on the Master Agreement. THIS WILL ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND THIS SCHEDULE AND THE MASTER AGREEMENT AND HAVE RECEIVED A COPY OF THIS SCHEDULE AND THE MASTER AGREEMENT.

3. Copy Charges/Meters: In return for the Minimum Monthly Payment, you are entitled to use the number of Guaranteed Minimum Monthly Copies. If you use more than the Guaranteed Minimum Monthly Copies in any month, you will additionally pay a charge equal to the number of additional metered copies times the Cost of Additional Copies. If you use more than 20% over the Guaranteed used more than 20% over the manufacturer s recommended specifications for supplies, you agree to pay reasonable charges for those excess supplies. The meter reading frequency is the period of time (monthly, quarterly, semi-annually or annually) for which the number of copies used will be reconciled.  If we determine that you have ferent than the Minimum Monthly Payment frequency.  You will provide us or our designee with the actual meter reading upon request. The meter reading frequency and corresponding additional charges, if any, may be dif-may estimate the number of copies used. Adjustments for estimated charges for additional copies will be made upon receipt of actual meter readings.  Notwithstanding any adjustment, you will never pay less than the Minimum Monthly Payment.

4. Additional Payments Terms (if any) are _____

Printed Name of Authorized Signer: R W Carlchuff

X _____ (Authorized Signer)   Date: 6/19/00

[Tear on perforation]

Accepted in Macon, Georgia by:
IOS Capital, Inc.

X _____
Authorized Signer   Date: _____

**DELIVERY AND ACCEPTANCE:**  With respect to Product Schedule Number _____ to Master Agreement Number _____ between IOS Capital, Inc. and _____ as customer ( you ) hereby certify that each Product described on such Product Schedule has been delivered, installed and accepted and you gree that each such Product is in good condition and satisfactory for all purposes of the Product Schedule and the Master Agreement.

CUSTOMER X _____
Date: _____



# MASTER AGREEMENT    Number: _____

CUSTOMER:

Full Legal Name: __Human Resource Development Press___

Address: __22 Amherst Road___

City: __Amherst__ State: __MA__ Zip: __01002__ Contact: __Tom Czekwoniak__ Phone: _____

This Master Agreement has been written in clear, easy to understand English. When we use the words "we", "us", "our" or "IOS Capital" in this Master Agreement, we mean you, our customer, as indicated above. When we use the words "you", "your" or "Customer" in this Master Agreement, we mean IOS Capital, Inc., a wholly-owned subsidiary of IKON Office Solutions, Inc. ("IKON"), located at P.O. Box 9115, Macon, GA 31208-9115.

1. **Agreement.** We agree to rent to you, and you agree to rent from us, subject to the terms of this Master Agreement, the personal and intangible property described in any equipment schedule (a "Schedule") executed by you and us and incorporating the terms of this Master Agreement by reference (the "Agreement"). The personal and intangible property described on a Schedule (together with all attachments, replacements, parts, substitutions, additions, repairs, and accessories incorporated in or affixed to the property and any license or subscription rights associated with the property shall be collectively referred to as "Product"). The manufacturer and/or vendor of the tangible Product shall be referred to as the "Vendor." To the extent the Product includes intangible property or associated services such as periodic software licenses and prepaid data base subscription rights, such intangible property shall be referred to as the "Software".

2. **Schedules; Delivery and Acceptance.** Each Schedule that incorporates this Master Agreement shall be governed by the terms and conditions of this Master Agreement. Each Schedule shall constitute a complete agreement separate and distinct from this Master Agreement and any other Schedule. The termination of this Master Agreement will not affect any Schedules executed prior to the effective date of such termination. When you receive the Product, you agree to inspect it to determine it is in good working order. Scheduled Payments (as specified in the applicable Schedule) will begin on the Product delivery date ("Effective Date"). You agree to sign and return to us a delivery and acceptance certificate within three business days after any Product is installed.

3. **Term; Payments.** The first scheduled Payment (as specified in the applicable Schedule) ("Payment") will be due on or before the Effective Date. The remaining Payments will be due on the same day of each subsequent month, unless otherwise specified on the applicable Schedule. If any Payment or other amount payable under any Schedule is not paid within ten days of its' due date, you will pay to us, in addition to that payment, a late charge of 5% of the overdue payment. You agree to pay $25.00 for each check that the bank returns for insufficient funds or for any other reason. You also agree that THIS IS AN UNCONDITIONAL, NON-CANCELABLE AGREEMENT FOR THE MINIMUM TERM INDICATED ON ANY SCHEDULE TO THIS MASTER AGREEMENT. All payments to us are "net" and are not subject to set off or reduction.

4. **Product Location; Use and Repair.** You will keep and use the Product only at the Product Location shown in the applicable Schedule. You will not move the Product from the location specified in the applicable Schedule or make any alterations, additions or replacements to the Product without our prior written consent, which consent will not be unreasonably withheld. At your own cost and expense, you will keep the Product eligible for any manufacturer's certification and in compliance with applicable laws and in good condition, except for ordinary wear and tear. All alterations, additions or replacements will become part of the Product and our property at no cost or expense to us. We may inspect the Product at any reasonable time.

5. **Taxes and Fees.** In addition to the payments under this Master Agreement or any Schedules, you agree to pay all taxes, fees, and filing costs related to the use of the Product, even if billed after the end of the term of this Master Agreement or any Schedules. We will file property tax returns and bill you as soon as an invoice from the local jurisdiction is received. If we are required to pay property tax, you agree to reimburse us. If you are required to file and pay the taxes directly to the tax collector, we will notify you in advance in writing.

6. **Warranties.** We transfer to you, without recourse, for the term of each Schedule, any warranties made by the Vendor or Supplier (as defined in Section 10 of this Master Agreement) with respect to the Product rented pursuant to such Schedule. We warrant that we will not interfere with your quiet enjoyment of the use of the Product so long as no event of default under this Master Agreement or any Schedule shall have occurred and be continuing. The parties to this Master Agreement each acknowledge that IOS Capital is a wholly owned subsidiary of IKON. YOU ACKNOWLEDGE THAT WE DO NOT MANUFACTURE OR DESIGN THE PRODUCT. YOU ACKNOWLEDGE THAT WE DO NOT REPRESENT THE MANUFACTURER, VENDOR OR EQUIPMENT SUPPLIER AND THAT YOU HAVE SELECTED THE PRODUCT AND THE VENDOR BASED ON YOUR OWN JUDGMENT. However, notwithstanding anything to the contrary, if you enter into any maintenance agreement ("Maintenance Agreement") with IKON with respect to any Product, no provision, clause or paragraph of this Master Agreement shall alter, restrict, diminish or waive the rights, remedies or benefits that (i) you may have against IKON as a vendor of the Product or in connection with the Maintenance Agreement or (ii) you may have against IKON under Article 2A of the UCC. EXCEPT FOR OUR WARRANTY OF QUIET ENJOYMENT, WE MAKE NO WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. AS TO US, YOU RENT THE PRODUCT (S) "AS-IS". The only warranties, express or implied, made to you are the warranties (if any) made by the Vendor to you in any documents executed by and between the Vendor and you. YOU AGREE THAT, NOTWITHSTANDING ANYTHING TO THE CONTRARY, WE ARE NOT RESPONSIBLE FOR, AND YOU WILL NOT MAKE ANY CLAIM AGAINST US FOR, ANY DAMAGES, WHETHER CONSEQUENTIAL, DIRECT, SPECIAL, OR INDIRECT.

7. **Loss or Damage.** You are responsible for any theft, destruction of, or damage to, the Product (collectively, "Loss") from any cause at all, whether or not insured, from the time of Product delivery to you until it is delivered to us at the end of the Schedule. You are required to make all Payments even if there is a Loss. You must notify us in writing immediately of any Loss. Then, at our option, you will either (a) repair the Product so that it is in good condition and working order, eligible for any manufacturer's certification, (b) pay us the amounts specified in Section 12 below, or (c) replace the Product with equipment of similar age and capacity from IKON.

8. **Indemnity, Liability and Insurance.** (a) The parties to this Master Agreement will indemnify, defend and hold each other harmless from all losses, damages, claims, suits and actions (including court costs and reasonable attorneys' fees) ("Claims") arising out of any breach of this Master Agreement except to the extent caused by the negligence or intentional acts or omissions of the other. (b) Because you have sole possession and control of the Product, you are fully responsible for any Claim, or other damage, injury or loss caused by (or to) the Product resulting from the use, misuse or possession of the Product or any accident or other casualty relating to the Product. We are responsible for damage or injury to third persons when the damage or injury is caused exclusively by our negligent acts or omissions. You agree to maintain insurance to cover the Product and will name us as an additional insured and loss payee on your insurance policy. Such insurance will provide that we will be given 30 days advance notice of any cancellation. If you fail to provide evidence of insurance reasonably satisfactory to us, you authorize us to obtain coverage on your behalf and you agree to pay for this coverage. In the event of loss or damage to the Product, you agree to remain responsible for the payment obligations under this Master Agreement until the payment obligations are fully satisfied.

9. **Title; Recording.** We are the owner of and will hold title to the Product (except for any Software). You will keep the Product free of all liens and encumbrances. You agree that this Master Agreement is a true rental. However, if any Schedule is deemed to be intended for security, you hereby grant to us a purchase money security interest in the Product covered by the applicable Schedule (including any replacements, substitutions, additions, attachments and proceeds) as security for the payment of the amounts due under each Schedule. You authorize us to file a copy of this Master Agreement and/or any Schedule as a financing statement and appoint us, or our designee as your attorney-in-fact to execute and file, on your behalf, financing statements covering the Product.



10. **Software or Intangibles.** To the extent that the Product includes Software or other intangibles, you understand and agree that we have no right, title or interest in the Software and you will comply throughout the term of this Master Agreement with any license and/or other agreement ("Software License") entered into with the supplier of the Software ("Supplier"). You are responsible for entering into any Software License with the Software Supplier no later than the Effective Date.

11. **Default.** Each of the following is a "Default" under this Master Agreement and all Schedules: (a) you fail to pay any Payment or any other Payment within 30 days of its due date; b) any representation or warranty made by you in this Master Agreement is false or incorrect and/or you do not perform any of your other obligations under this Master Agreement or any Schedule or in any other agreement with us or with any of our affiliates and this failure continues for 10 days after we have notified you of it, (c) you become insolvent, you dissolve or are dissolved, or you assign your assets for the benefit of your creditors, or you file or have filed against you any bankruptcy or reorganization proceeding, or (d) any guarantor of this Master Agreement or of any Schedule does not perform its obligations under the guaranty, becomes subject to one of the events listed in clause (c) above, or (if a guarantor is an individual) dies.

12. **Remedies.** If a Default occurs, we may do one or more of the following: (a) we may cancel or terminate this Master Agreement and/or any Schedules, or any or all other agreements that we have entered into with you; (b) we may require you to immediately pay to us, as compensation for loss of our bargain and not as a penalty, a sum equal to (i) the present value of all unpaid Payments for the remainder of the term of each Schedule plus the present value of our anticipated value of the Product at the end of the initial term of any Schedule, (or any renewal of such Schedule), each discounted at a rate equal to 6% per year, compounded monthly, plus (ii) all other amounts then due or that become due under this Master Agreement or any Schedule; (c) we may require you to deliver the Product to us as set forth in Section 14; (d) we or our representative may peacefully repossess the Product without court order and you will not make any claims against us for damages or trespass or any other reason; (e) we may exercise any and all other rights or remedies available to a lender or secured party under the Uniform Commercial Code ("UCC"), including without limit, Article 2A of the UCC, and at law or in equity: (f) immediately terminate your right to use the Software including the disabling (on-site or by remote communication) of any Software; (g) demand the immediate return and obtain possession of the Software and relicense the Software at a public or private sale; and/or (h) cause the Supplier to terminate the Software License, support and other services under the Software License. You agree to pay all of our costs of enforcing our rights against you, including reasonable attorneys' fees. If we take possession of the Product, we agree to sell or otherwise dispose of it with or without notice, at a public or private sale, and to apply the net proceeds (after we have deducted all costs related to the sale or disposition of the Product including reasonable attorneys' fees) to the amounts that you owe us. You agree that if notice of sale is required by law to be given, 5 days notice shall constitute reasonable notice. You will remain responsible for any deficiency that is due after we have applied such net proceeds.

13. **Assignment.** YOU HAVE NO RIGHT TO SELL, TRANSFER, ENCUMBER, SUBLET OR ASSIGN THE PRODUCT OR THIS MASTER AGREEMENT OR ANY SCHEDULE WITHOUT OUR PRIOR WRITTEN CONSENT. You agree that we may sell or assign any of our interests without notice to you. In that event, the assignee will have such rights as we assign to them but none of our obligations (we will keep any such obligations) and the rights of the assignee will not be subject to any claims, defenses or set-offs that you may have against us.

14. **Renewal; Return of Equipment.** After the minimum term of any Schedule to this Master Agreement, such Schedule will renew on a month-to-month basis unless you notify us in writing at least 30 days prior to the expiration of the minimum term of such Schedule and return the Product to us as specified in this Section 14. At the end of or upon termination of each Schedule, you will immediately return the Product subject to such expired Schedule to us in as good condition as when you received it, except for ordinary wear and tear, to any place in the United States that we tell you. We will bear the shipping charges so long as replacement equipment is selected from IKON. Otherwise, you will bear all expenses of deinstalling, crating and shipping the Product. You will insure the Product for its full replacement value during shipping. You will, upon request from us, obtain from the supplier or manufacturer (or other maintenance service supplier previously approved by us) a certificate stating that the Product qualifies for a maintenance contract and service at the standard rates and terms then in effect. You must pay additional monthly payments, at the same rate as then in effect under a Schedule, until the Product is returned by you and is received in good condition and working order by us or our designee.

15. **Miscellaneous.** You agree that the terms and conditions contained in this Master Agreement and in each Schedule make up the entire agreement between us regarding the rental of the Product and supersede all prior written or oral communications, understandings or agreements between the parties relating to the subject matter contained herein, including without limitation, purchase orders. Any purchase order, or other ordering documents, will not modify or affect this Master Agreement or any Schedule, nor have any other legal effect and shall serve only the purpose of identifying the equipment ordered. You authorize us to supply any missing information in this Master Agreement or any Schedule. We acknowledge that you have not been induced to enter into this Master Agreement by any representation or warranty not expressly set forth in this Master Agreement. Neither this Master Agreement nor any Schedule is binding on us until we sign it. Any change in any of the terms and conditions of this Master Agreement or any Schedule must be in writing and signed by us. If we delay or fail to enforce any of its rights under this Master Agreement with respect to any or all Schedules, we will still be able to enforce those rights at a later time. All notices shall be given in writing by the party sending the notice and shall be effective when deposited in the U.S. Mail, addressed to the party receiving the notice at its address shown on the front of this Master Agreement (or to any other address specified by that party in writing) with postage prepaid. All of our rights and indemnities will survive the termination of this Master Agreement and each Schedule. If more than one customer has signed this Master Agreement or any Schedule, each customer agrees that its liability is joint and several. It is the express intent of the parties not to violate any applicable usury laws or to exceed the maximum amount of time price differential or interest, as applicable, permitted to be charged or collected by applicable law, and any such excess payment will be applied to Payments in inverse order of maturity, and any remaining excess will be refunded to you.

16. **Governing Law; Jurisdiction; Waiver of Trial By Jury and Certain Rights and Remedies Under The Uniform Commercial Code.** YOU AGREE THAT THIS MASTER AGREEMENT AND ANY SCHEDULES WILL BE GOVERNED UNDER THE APPLICABLE LAW FOR THE STATE IN WHICH OUR (OR OUR ASSIGNEE'S) PRINCIPAL CORPORATE OFFICES ARE LOCATED. YOU ALSO AGREE TO SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE IN WHICH OUR (OR OUR ASSIGNEE'S) PRINCIPAL CORPORATE OFFICES ARE LOCATED. By signing each Schedule, you agree that either (a) you have reviewed, approved, and received, a copy of the Vendor contract and/or the Supplier software license agreement, or (b) that we have informed you of the identity of the Vendor and Supplier, that you may have rights under the Vendor contract and the Supplier license agreement, and that you may contact the Vendor or Supplier for a description of those rights. TO THE EXTENT PERMITTED BY APPLICABLE LAW, YOU WAIVE ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A CUSTOMER OR LESSEE BY ARTICLE 2A OF THE UCC THAT YOU MAY HAVE AGAINST US (BUT NOT AGAINST ANY VENDOR OR SUPPLIER).

17. **Counterparts; Facsimiles.** Each Schedule may be executed in counterparts. The counterpart which has our original signature and/or is in our possession shall constitute chattel paper as that term is defined in the Uniform Commercial Code ("UCC") and shall constitute the original agreement for all purposes, including, without limitation, (i) any hearing, trial or proceeding with respect to such Schedule, and (ii) any determination as to which version of such Schedule constitutes the single true original item of chattel paper under the Uniform Commercial Code. If you transmit a Schedule to us by facsimile, or by "e-commerce" transmission, if applicable, the facsimile copy or e-commerce transmission as received by us shall be binding against you as if it were manually signed. However, no facsimile, e-commerce transmission or other version of a Schedule shall be binding against us until manually signed by us. You agree that the facsimile or e-commerce version of a Schedule manually signed by us shall constitute the original agreement for all purposes, including, without limitation, those outlined above in this Section. You agree to deliver the facsimile or e-commerce version of any counterpart of the Schedule with your original signature upon our request.

IN WITNESS WHEREOF, the parties have executed this Master Agreement as of _____, 20____.

PRINTED NAME OF AUTHORIZED SIGNER: _____

X _____     IOS CAPITAL, INC.

Authorized Signer Signature  Title: _____     Date: 6/19/00     X _____

Authorized Signer Signature  Title: _____     Date: _____

Master Agreement 4.00

Addendum-A2 to IOS Lease # 00787
Variable Lease Payment Addendum

-Customer Agrees that the lease payments will vary as indicated below:

| Step | Month | Lease Payment |
|------|-------|---------------|
| 1 | 1-36 | $ 8,809.00  +$140.00 = $8,949.00 FOR COLOR COPIER |
| 2 | 37-72 | $ 11,876.00 |

_Human Resource Development Press, Inc._
Customers Full Legal Name (Please Print)

_MW Cuel_                    _6/19/00_
Authorized Signer                Date

_RW Carkhuff_    _Publisher_
Authorized Signer's Printed Name    Title

Accepted in Macon, Georgia
IOS Capital

By:_____

Date:_____

## Service / Supply Costs

| Equipment | Impressions Included | Monthly Base | Overage |
|---|---|---|---|
| CANON IR330 | 15,000 | $ 235.50 | $ 0.0133 |
| CANON IR210 | 5,000 | $ 119.00 | $ 0.0176 |

**IKON**
Office Solutions

855 Winding Brook Drive
Glastonbury CT 06033
Phone: 888-645-6005

XN176
Maint agreement     Remit

| Total Invoice Amt |
| :---: |
| 340.62 |
| **Payment Amt Enclosed** |

EXHIBIT "C"

S H I P   I O    260860

HUMAN RESOURCE DEVELOP
PRESS
22 AMHERST RD
AMHERST MA

INVOICE

INV# 250248

DATE 01/20/00

01002-0000

Detach

| CUSTOMER/INVOICE NO. | | MODEL/SERIAL NO. | | LEASE ID | | REPRESENTATIVE | PROG. TYP ! |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 260860 | 250248 | C6085 | NFD06451 | 9W 250248 | | 2K8820 | 310 |

| DATE | | PREV. METER | | DATE 01/18/00 | CUR. METER |
| --- | --- | --- | --- | --- | --- |
| INVOICE PERIOD | FROM | | TO | | |

| QUANTITY | CODE NO. | DESCRIPTION | AMOUNT |
| --- | --- | --- | --- |
| 4 | VA1110 | *Maint agreement* CHARGEABLE LABOR | 129.00 |
| 1 | 1ACSSP | CAN FILTER OZONE NP6085 | ~~14.20~~ |
| | | Vendor # FB3-5236-000 | |
| 1 | 1ACCO2 | CAN FILTER OZONE NP6085 | 45.26 |
| | | Vendor # FB3-5235-000 | |
| 1 | 3AC2J5 | CAN FILTER AIR 1 CLC 1000 CLC 1000 | 1.54 |
| | | Vendor # FA6-4538-000 | |
| 1 | 1ACKOL | CAN TRANSFER/SEP'N CORONA NP-6085 | 145.96 |
| | | Vendor # FG5-8133-060 | |

DON'T PAY

4/27/00   Doug Thorton said
IKon will take care
of this. There is No Charge    C.D. 2/2/00

Please pay from this invoice, overdue
accounts will be charged a late payment
fee of 1 1/2 % per month

TERMS: NET 10 DAYS FROM DATE OF INVOICE

| INVOICE TOTAL | PREV LATE CHARGES | TOTAL DUE |
| --- | --- | --- |
| 335.96 | 4.66 | 340.62 |

HUMAN RESOURCE DEVELOP
PRESS
22 AMHERST RD
AMHERST MA 01002-0000

Reference Service Report # 250248



**IKON**
Office Solutions
REMIT TO: P.O. BOX 30069
HARTFORD, CT 06150

# IKON Office Solutions

855 Winding Brook Drive
Glastonbury CT 06033
Phone: 888-645-6005

Remit This Stub With Payment To:

**IKON Office Solutions**
P.O. Box 30069
Hartford, CT 06150

| Total Invoice Amt |
| --- |
| 692.53 |
| **Payment Amt Enclosed** |

S H I P   T O
260860
BASEMENT
HUMAN RESOURCE DEVELOP
PRESS
22 AMHERST RD
AMHERST MA
01002-0000

**INVOICE**
INV# 081936    1
DATE 04/20/00

| CUSTOMER/INVOICE NO. | | MODEL/SERIAL NO. | | LEASE ID | REPRESENTATIVE | PROG. TYPE |
| --- | --- | --- | --- | --- | --- | --- |
| 260860 | 081936 | O3100 | 179420274 | 9W 081936 | 2A8806 | 2cq |

| DATE | | PREV. METER | DATE 04/19/00 | CUR. METER 5493177 |
| --- | --- | --- | --- | --- |

| QUANTITY | CODE NO. | INVOICE PERIOD FROM — TO | DESCRIPTION | AMOUNT |
| --- | --- | --- | --- | --- |
| 1 | RA01Z | | OCE MASTERS 2475/2500  1045180 Vendor # 1045180 | 339.34 |
| 1 | 1AO0M7 | | OCE ROLL CLNR TTF 2600 Vendor # 2938148 | 0.00 |
| 1 | RA01Z | | OCE MASTERS 2475/2500  1045180 Vendor # 1045180 | 339.34 |
| 1 | 1AO14T | | OCE TTF BELT 2600(ONLY) Vendor # 1974422 | 0.00 |
| 2 | 1AO0OX | | OCE CONVEYER BELT 2500 Vendor # 5753750 | 0.00 |
| 1 | 1AO30P | | OCE BRACKET 2600 Vendor # 1976721 | 0.00 |
| 1 | 1AO0Z3 | | OCE BRAKE O:1001743 Vendor # 1900297 | 0.00 |

Please pay from this invoice, overdue
accounts will be charged a late payment
fee of 1 1/2 % per month

TERMS: NET 10 DAYS FROM DATE OF INVOICE

| INVOICE TOTAL | PREV LATE CHARGES | TOTAL DUE |
| --- | --- | --- |
| 678.68 | 13.85 | 692.53 |

HUMAN RESOURCE DEVELOP
PRESS
22 AMHERST RD
AMHERST MA 01002-0000

Reference Service Report # 081936



REMIT TO: P.O. BOX 30069
HARTFORD, CT 06150

# IKON Office Solutions
## INVOICE

Northeast District
Customer Service Center
855 Winding Brook Drive
Glastonbury, CT 06033
(888) 645-6005

The Way Business Gets Communicated

| | |
|---|---|
| Invoice | : 15171241 |
| Invoice Date | : 09/20/2000 |
| Terms | : Net Due Upon Receipt |
| PO | : |
| Rep Id | : 2S8807 |
| Federal Id | : 23-033440O |

Customer Number: 260860

HUMAN RESOURCE DEVELOP
PRESS
22 AMHERST RD
AMHERST MA 01002-0000

| Model | Serial | Id | Cust# | Description | Meter | Date/Prod | Quan | Amount |
|---|---|---|---|---|---|---|---|---|
| CC900 | NJC01109 | XQ904 | 260860 | CURRENT READING | 71261 | 09/20/2000 | | |
| CAN COL COPIER CLC 900 USED | | | | CHARGEABLE LABOR | | VA1110 | 2 | 129.00 |
| HUMAN RESOURCE DEVELOP | | | | Reference Service Report # 171241 | | | | |
| PRESS | | | | | | | | |
| 22 AMHERST RD | | | | | | | | |
| AMHERST MA 01002-0000 | | | | | Location Total: 129.00 | | | |
| 2ND FLOOR | | | | | | | | |

DO NOT PAY D.K.

WE HAVE SERVICE AGREEMENT

| | | |
|---|---|---|
| Sub Total | : | 129.00 |
| Late Charges | : | 0.00 |
| Freight | : | 0.00 |
| Taxes | : | 0.00 |
| Total Amount Due | : | 129.00 |

REV. 2/2000

**Important:**  Detach and Return This Portion With Your Payment

To ensure proper credit to your account, please
write your customer and invoice number on your check.

☐ Address correction requested. (Please complete reverse side)

Make check payable and remit to:

1.24/1.00E/452/8A9693/9W/171241  /ZZ1/0.00 /0.00
HUMAN RESOURCE DEVELOP
PRESS
22 AMHERST RD
AMHERST MA 01002-0000

Inv #: 15171241
Cust #: 260860
IR  #: 80A09693

IKON OFFICE SOLUTIONS
P.O. BOX 30069
HARTFORD CT 06150

## Total Amount Due:


129.00

Thank you for choosing IKON Office Solutions.

15    0000151712411    00002608602    00000129007    80A09693S 000000000

# IKON Office Solutions
## INVOICE

Northeast District
Customer Service Center
855 Winding Brook Drive
Glastonbury, CT 06033
(888) 645-6005

The Way Business Gets Communicated

Customer Number: 260860

| | |
|---|---|
| Invoice | : 15114814 |
| Invoice Date | : 09/21/2000 |
| Terms | : Net Due Upon Receipt |
| PO | : |
| Rep Id | : 2S8807 |
| Federal Id | : 23-0334400 |

HUMAN RESOURCE DEVELOP
PRESS
22 AMHERST RD
AMHERST MA 01002-0000

| Model | Serial | Id | Cust# | Description | Meter | Date/Prod | Quan | Amount |
|---|---|---|---|---|---|---|---|---|
| CC900 | NJC01109 | XQ904 | 260860 | CURRENT READING | 71622 | 09/21/2000 | | |
| CAN COL COPIER CLC 900 | USED | | | CHARGEABLE LABOR | | VA1110 | | |
| HUMAN RESOURCE DEVELOP | | | | Reference Service Report # 114814 | | | 1 | 129.00 |
| PRESS | | | | | | | | |
| 22 AMHERST RD | | | | | | | | |
| AMHERST MA 01002-0000 | | | | | Location Total: 129.00 | | | |
| 2ND FLOOR | | | | | | | | |

DO NOT PAY — D.A. We have a support Agreement

| | | |
|---|---|---|
| Sub Total | : | 129.00 |
| Late Charges | : | 0.00 |
| Freight | : | 0.00 |
| Taxes | : | 0.00 |
| Total Amount Due | : | 129.00 |

REV. 2/2000

**Important:** Detach and Return This Portion With Your Payment

To ensure proper credit to your account, please
write your customer and invoice number on your check.

☐ Address correction requested. (Please complete reverse side)

Make check payable and remit to:

1.24/1.00E/382/8B2622/9W/114814   /ZZ1/0.00 /0.00
HUMAN RESOURCE DEVELOP
PRESS
22 AMHERST RD
AMHERST MA 01002-0000

| | |
|---|---|
| Inv #: | 15114814 |
| Cust #: | 260860 |
| IR #: | 80B02622 |

IKON OFFICE SOLUTIONS
P.O. BOX 30069
HARTFORD CT 06150

## Total Amount Due:

### 129.00

Thank you for choosing IKON Office Solutions.

15    0000151148148    00002608602    00000129007    80B026220 000000000

# HRD Press

EXHIBIT "D"

# Executive Financial Summary

11/07/03

## Current Situation:

HRD Press is financing an iR 110, iR330, iR210 and CLC 900 on a 72 month Copy Management Agreement that began on 7/25/00 and runs through 7/25/08. For the first 36 months of this agreement your monthly cost was $ 8,949 and included the equipment listed above, all service, parts, labor, toner, developer, fuser oil and 300,000 monthly impressions. From months 37 through 72 your payments are $ 12,116.

In addition you have a separate service and supply agreement for your CLC 900 which bills at $ 450 per quarter and includes 3,000 impressions, all parts, labor, toner, developer and fuser oil. Overage's are @ .15 per impression

The financial breakdown of this Copy Management Program (acct # 434797-121202mlsl) is as follows:

| Term | New Equipment | Service & Supplies | Previous Contract* | Total Contract Payment |
|------|---------------|--------------------|--------------------|------------------------|
| 1-36 | $ 4,110.37 | $3,065.75 | $ 1,772.88 | $ 8,949 |
| 37-72 | $ 6,301.13 | $3,065.75 | $ 2,749.12 | $ 12,116 |

* 11 months remaining on your previous contract @ $ 4,268 and 24 months remaining @ $ 5,825 for an Oce 3100 and an Oce 3165 along with 250,000 monthly impressions included (service and supplies).

As of today your buyout to return the equipment on this Copy Management Program is $ 400,828. Your Buyout to own is $ 482,195.77.

## Equipment Pricing

| | |
|------|------|
| Canon iR110 | $ 290,975 |
| Canon iR330 | $ 27,196 |
| Canon iR210 | $ 13,585 |
| Canon CLC 900 | $ 28,560 |
| Total | $360,316 |

David J. Noonan, Esq.
228 Triangle Street
Amherst, MA  01002                         EXHIBIT "E"
Tel: 413-549-5491
Fax: 413-549-5156
david.noonan@verizon.net

September 20, 2004

By Email: mwalsh@ikon.com
& Express Mail

Mr. Michael Walsh, Esq.
Ikon Office Solutions Company, Inc.
70 Valley Stream Parkway
Malvern, PA 19355

Re: Human Resource Development Press, Inc.
    Demand For Relief Pursuant To
    M.G.L. Chapter 93A

Dear Mr. Walsh

Please be advised that I represent Human Resource Development Press, Inc.,
Inc. ("HRD PRESS") with respect to its claims against Ikon Office Solutions
Company, Inc. and its wholly owned subsidiary IOSCapital ("IKON") as
hereinafter set forth. This letter constitutes a written demand for relief pursuant to
Massachusetts General Law (" M.G.L.") Chapter 93A, through which HRD
PRESS is asserting certain specific claims against IKON.  Pursuant to M.G.L.
Chapter 93A, IKON is required to make a tender of settlement, which is
reasonable in light of both the facts and claims stated herein and in light of
apposite law.

<u>FACTUAL ASSERTIONS UPON WHICH HRD PRESS'S CLAIMS ARE BASED</u>

On or about May 20, 1998 HRD PRESS and IKON entered into a
installment sales contract entitled, "Field Order Form / Security Agreement", for
the purchase of two (2) commercial grade photo copiers, namely an Oce 3100
and an Oce 3165 ("First Equipment"). A copy of said Field Order Form / Security
Agreement is attached hereto and marked as Exhibit "A". Exhibit "A" and every
other document containing contractual terms relevant to this demand for relief

1

were drafted by IKON.

Pursuant to Exhibit "A" during the first 36 months of the contract term, HRD PRESS was obligated to pay $ 4,268 per month and $ 5,825 for the remaining 24 months of the contract term (jointly the "First Equipment Monthly Charges"). In exchange for said monthly payments, HRD PRESS was to receive, inter alia, free service/maintenance and supplies. IKON specifically represented to HRD PRESS that the First Equipment would effectively provide to HRD PRESS 250,000 copies per month. However, notwithstanding said representations and due to continuing mechanical deficiencies with the First Equipment, HRD PRESS was forced to upgrade to different and more expensive photo copiers.

On June 19, 2000 HRD PRESS entered into a second agreement with IKON ("Second Agreement") wherein, HRD PRESS "leased" [1] four (4) Canon photo copiers ("Second Equipment"). A copy of said Second Agreement is attached hereto and marked as Exhibit "B". Pursuant to the terms and conditions of the Second Agreement, HRD PRESS was obligated to pay $8,949 for the first 36 months of the term and $ 12,116 for the remaining 36 months of the term ("Second Equipment Monthly Charges").

Simultaneous with the delivery of the Second Equipment, HRD PRESS surrendered to IKON the First Equipment. In spite of the fact that the First Agreement was an installment sale contract and HRD PRESS held "ownership" rights to and in the First Equipment subject to IKON's security interest, IKON has never disclosed how it disposed of it's collateral nor has it credited HRD PRESS for any value IKON later received from the resale or other disposition of the First Equipment.

Prior to executing the Second Agreement, IKON specifically represented to HRD PRESS that it was receiving an "excellent deal" pursuant to the terms of the Second Agreement and that HRD PRESS was given a significant discount of the list price. In the fall of 2003 IKON confirmed that HRD PRESS was provided at least a 15% discount of the list price. HRD PRESS, after consulting with various other vendors and agents has determined that a traditional discount for a transaction of this size would range anywhere from 20 - 35 % off the list price The same industry consultants, after reviewing the HRD PRESS contract, concluded that not only did HRD PRESS not receive an "excellent deal" but that HRD PRESS did not even receive the more modest 15% discount IKON later represented that it had provided.

IKON also represented to HRD PRESS that it was not paying any portion of the service/maintenance and supplies costs for the First Equipment ( both representations "IKON MISREPRESNTATIONS"). Both of these IKON MISREPRESNTATIONS were material and false. HRD PRESS reasonably and

---

[1] HRD PRESS reserves the right to establish that said Second Agreement is not a "true lease" but rather a "disguised sale".

2

justifiably relied upon all of the IKON MISREPRESNTATIONS to its severe financial detriment. The maintenance portion of the charges under the First Agreement were in excess of $ 2,500 per month. Additionally, the Second Equipment Monthly Charges contained an undisclosed interest factor that was higher than 20%.

Even though pursuant to the terms of the Second Agreement, HRD PRESS was not to be charged for service/maintenance and supplies, IKON consistently sought to impose and collect unjustified fees and charges for service/maintenance and supplies ("Unjustified Charges"). Attached hereto and marked as Exhibit "C" is are copies of some but not all Unjustified Charges.

In November 2003, IKON provided HRD PRESS with a "financial summary" of what HRD PRESS was paying for through the Second Equipment Monthly Charges. A copy of said "financial summary" is attached hereto and marked as Exhibit "D". Exhibit D establishes that:

1) notwithstanding the fact that IKON took possession of the First Equipment, HRD PRESS continues to pay for the same even though it has no use of the same and received no credit for IKON'S liquidation of its collateral; and

2) the interest component which was built into the First Equipment Monthly Charges is continued to be assessed and in fact compounded through the 72 month period of the Second Equipment Monthly Charges; and

3) even assuming that at the time of the execution of the Second Agreement there remained 35 months of payments remaining under the terms of the First Agreement[2], after subtracting $ 2,500 per month for service/maintenance and supplies and subtracting a generous 18% interest on said remaining payments only approximately $ 80,000 of principle balance could have remained due and owing under the First Agreement; however, IKON has "rolled" into the Second Equipment Monthly Charges 36 months at $1,772.88 plus 36 months at $ 2749.12 for a total of in excess of $ 162,760.32 of payments for the alleged balance due for the First Equipment.

After consulting with the Massachusetts' Attorney General's Office ("AG's Office"), HRD PRESS has confirmed that neither IOS Capital nor Ikon Office Solutions Company, Inc. has registered with the AG's Office so as to allow IKON to impose interest charges in excess of the 20 % legal limit.

## SPECIFIC UNFAIR AND DECEPTIVE TRADE PRACTICES UPON WHICH HRD PRESS'S CLAIMS ARE BASED

[2] HRD PRESS asserts that upon the surrender of the First Equipment, no payments remained due and owing pursuant to the First Agreement.

3

IKON in its business relationship with HRD PRESS has engaged in a pattern and practice of misrepresentation, fraud and deceit, breach of contract and unfair and deceptive trade practices. Some but not all of these unfair and deceptive trade practices are listed below:

1) In order to induce HRD PRESS to execute the Second Agreement, IKON intentionally made the material and false representation to HRD PRESS that IKON was providing HRD PRESS with a significant discount off the list price; and

2) In order to induce HRD PRESS to execute the Second Agreement, IKON intentionally made the material and false representation to HRD PRESS that IKON was not imposing service/maintenance or supplies charges for the First Equipment through the Second Equipment Monthly Charges; and

3) IKON did not liquidate its collateral interests in the First Equipment in a commercially reasonable manner nor credit HRD PRESS for the value of the First Equipment that it surrendered; and

4) IKON by retaining possession of the First Equipment and not liquidating the same through a commercial reasonable means, kept the First Equipment in full and complete satisfaction of any remaining obligations under the First Agreement but yet continued to seek and collect payment for the same through the Second Equipment Monthly Charges; and

5) IKON has collected interest payments from HRD PRESS in excess of the legal limit provided by law rendering all such payments usurious; and

6) IKON has engaged in a consistent practice of seeking and collecting Unjustified Charges; and

(The above paragraphs 1-6 are hereinafter "IKON'S UNFAIR & DECEPTIVE TRADE PRACTICES")

HRD PRESS specifically reserves the right to amend and augment the above referenced list of IKON 'S UNFAIR & DECEPTIVE TRADE PRACTICES if and when it discovers other facts indicating that IKON committed other wrongful acts.

## HRD PRESS'S DAMAGES

As a result of the above referenced unfair and /or deceptive trade practices HRD PRESS has suffered several different and distinct kinds of damage.

A) HRD PRESS has paid IKON payments for the Second Equipment in amounts which are substantially higher than that which HRD PRESS should have paid if the promised significant price discounts had been granted; and

B) HRD PRESS, despite IKON's specific representations to the contrary, has through the Second Equipment Monthly Charges paid IKON payments for

service and/or maintenance charges for the First Equipment;

C) HRD PRESS, through the Second Equipment Monthly Charges, has paid to IKON payments for the First Equipment even though all financial obligations for the First Equipment have been satisfied and/or waived by IKON's retention of its collateral, namely the First Equipment; and

D) HRD PRESS, through the Second Equipment Monthly Charges, has paid to IKON interest payments for both the First Equipment and the Second Equipment that is in excess of the legal limit; and

E) Due to IKON 'S UNFAIR & DECEPTIVE TRADE PRATICES, HRD PRESS has been forced to incur in excess of $18,000 of time and out of pocket expense in order to enforce its rights under apposite law.


## HRD PRESS'S SPECIFIC DEMANDS FOR RELIEF TO IKON


HRD PRESS'S specific demands for relief are as follows:

1) That IKON immediately pay and reimburse to HRD PRESS $88,565.76 representing all payments made on the First Equipment that were assessed and paid through the Second Equipment Monthly Charges; and

2) That IKON Immediately pay $18,000 to HRD PRESS for the time and out of pocket expenses, including its legal fees incurred, incurred in enforcing its rights under apposite law; and

3) That IKON, in order to provide HRD PRESS with the "significant" discount IKON represented HRD PRESS was receiving on the Second Equipment, immediately pay and reimburse to HRD PRESS $102,792.67 (30% of the $342,642.24[3] paid to IKON pursuant to the Second Equipment Monthly Charges); and

4) That IKON, in recognition of its violation of Massachusetts' usury laws, deem the Second Agreement void and accept HRD PRESS' surrender of the Second Equipment in full and complete satisfaction of any and all obligations under the Second Agreement.


Pursuant to M.G.L. Chapter 93 A, you have thirty (30) days in which to make a written tender of settlement to HRD PRESS. This tender offer must be reasonably responsive to its demands as set forth herein. You are further advised that in the event you do not make an reasonable and acceptable tender of settlement within the thirty (30) day period, I will commence suit on behalf on HRD PRESS in the United States District Court in Springfield Massachusetts and seek treble damages as well as attorney fees as provided for under M.G.L. Chapter 93A.

---

[3] HRD PRESS has not included in this figure any payments illegally collected for the First Equipment.

PLEASE BE ADVISED THAT HRD PRESS RESERVES ANY AND ALL
RIGHTS UNDER APPOSITE LAW.

Please direct any tender of settlement to my attention.


Regards,

David J. Noonan, Esq.

---

Cc: G. Carkhuff

6