UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HUMAN RESOURCES | ) | |
| DEVELOPMENT PRESS,  INC., | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-30068-KPN |
| | ) | |
| | ) | |
| IKON OFFICE SOLUTIONS | ) | |
| COMPANY, INC. and IOS CAPITAL, | ) | |
| INC., | ) | |
| Defendants | ) | |

MEMORANDUM AND ORDER WITH REGARD TO
DEFENDANT'S MOTION TO DISMISS (Docket No. 18)
January 12, 2006

NEIMAN, U.S.M.J.

Human Resources Development Press Inc. ("Plaintiff"), a company which

creates and publishes human resource training materials, brings this multi-count action

against Ikon Office Solutions, Inc. ("IKON"), a provider of copier equipment and printing

services, and IOS Capital Inc. d/b/a IKON Financial Services ("IKON FINANCIAL"), a

company which services finance contracts for equipment sold or leased by IKON.[1]

IKON and IKON FINANCIAL (together "Defendants") have filed a motion to dismiss the

entirety of Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6).

The matter has been assigned to the undersigned pursuant to 28 U.S.C. §

636(c).  For the reasons which follow, Defendants' motion will be allowed in part and

---

[1]  IOS Capital Inc.'s successor, IOS Capital, LLC, was merged into IKON Office
Solutions, Inc. on March 30, 2004.

denied in part.

## I. Standard of Review

In ruling on a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the plaintiff's complaint and construe all reasonable inferences in favor of the plaintiff. *See Gorski v. New Hampshire Dep't of Corrections*, 290 F.3d 466, 473 (1st Cir. 2002); *Estate of Soler v. Rodriguez*, 63 F.3d 45, 53 (1st Cir. 1995). A dismissal for failure to state a claim is appropriate if it appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory. *Rumford Pharmacy, Inc. v. City of East Providence*, 970 F.2d 996, 998 (1st Cir. 1992).

## II. Background

The court assumes the truth of the following facts which are taken from Plaintiff's First Amended Complaint and the documents attached thereto.[2] Plaintiff entered into a sixty-month contract with IKON ("First Agreement") on or about May 20, 1998. This First Agreement called for IKON to provide Plaintiff with two commercial grade copiers ("First Equipment"), plus free service, maintenance and supplies, for which Plaintiff was obligated to pay approximately four thousand dollars per month for the first thirty-six months and approximately six thousand dollars per month for the remaining twenty-four months. (First Amended Complaint, ¶¶ 8-12.)

Although IKON specifically represented that the First Equipment would meet its

---

[2] Following oral argument on the motion to dismiss, Plaintiff moved to amend its complaint in several limited respects. Defendant has not opposed Plaintiff's motion to amend, which the court this day has allowed by separate order. Accordingly, the instant memorandum and order makes reference to the First Amended Complaint and construes the parties' arguments as if applying thereto.

copying needs, Plaintiff experienced mechanical problems with the equipment within the first few months. (*Id.* ¶¶ 13, 15.) Upon being informed of these mechanical problems, an IKON representative told Plaintiff that it would have to upgrade the First Equipment to more expensive copiers. (*Id.* ¶¶ 16, 17.)

On June 19, 2000, the complaint alleges, while still owing on the balance for the First Equipment, Plaintiff surrendered the equipment to IKON and entered into a seventy-two month contract ("Second Agreement") with IKON. This Second Agreement called for IKON to provide Plaintiff with four copiers ("Second Equipment") and for Plaintiff to pay approximately nine thousand dollars per month for each of the first thirty-six months and approximately twelve thousand dollars per month for each of the remaining thirty-six months. (*Id.* ¶¶ 18-21.)

The complaint states that, prior to the execution of Second Agreement, IKON represented to Plaintiff that it was getting an "excellent deal" and a "significant discount off the list price," assertions Plaintiff now alleges were false. (*Id.* ¶¶ 30, 31.) Plaintiff also alleges that later, in the fall of 2003, IKON falsely represented that Plaintiff "was provided a discount of at least 15% off the list price." (*Id.* ¶ 32.) Thereafter, in 2004, Plaintiff had the Second Agreement reviewed by industry experts who opined that these representations by IKON were false. (*Id.* ¶ 34.)

Prior to the execution of the Second Agreement, IKON also represented to Plaintiff that it would not impose any further service, maintenance or supply costs for the First Equipment. (*Id.* ¶ 35.) Nonetheless, Plaintiff was charged for these items throughout the Second Agreement's term. (*Id.* ¶ 37.) Similarly, IKON represented to

3

Plaintiff, again prior to the execution of the Second Agreement, that it was simply replacing and substituting the First Agreement with the Second Agreement and that Plaintiff would have no further payment obligations for the First Equipment.  (*Id.* ¶ 23.)

Plaintiff has requested in writing that IKON disclose what it had done with the First Equipment, but IKON has refused to answer and has not credited Plaintiff's account for any value IKON may have  received on the disposition of that equipment. (*Id.* ¶¶ 27, 28.)  In November of 2003, however, Plaintiff was provided with a "Financial Summary" by IKON that revealed that Plaintiff continued to pay for the First Equipment, has continued to be assessed interest charges thereon, and did not receive any credit for the value of the First Equipment which it surrendered to IKON. (*Id.* ¶¶ 38-40).

Plaintiff's First Amendment Complaint contains seven counts.  Counts I and II allege fraud and misrepresentation by IKON in the lease of the Second Equipment. Count III alleges a violation of Mass. Gen. L. ch. 271, § 49 ("section 49"), Massachusetts' usury statute, by both defendants.  Counts IV and V allege a failure on the part of Defendants "to dispose of collateral in a commercially reasonable manner." Count VI alleges a breach by Defendants of the implied covenant of good faith and fair dealing.  And Count VII alleges violations of Mass. Gen. L. ch. 93A ("chapter 93A").[3]

### III. DISCUSSION

Defendants have moved to dismiss all seven counts pursuant to Fed. R. Civ. P. 12(b)(6).  The court will address each count in turn.  In the end, the court will dismiss

---

[3]  Plaintiff's initial complaint contained yet another claim, alleging breach of warranty for a particular purpose, but that claim has since been voluntarily dismissed.

Counts I, III, V and VI, but leave Counts II, IV and VII intact.

A.  Fraud and Misrepresentation (Counts I and II)

Plaintiff's claims of fraud and misrepresentation are based on various assertions made by IKON concerning the Second Agreement executed on June 19, 2000.  In Count I, Plaintiff alleges that certain "material and false representations of fact" were made immediately prior to the execution of the agreement, specifically, that Plaintiff was getting an "excellent deal" and a "significant discount off the list price."  Similar statements were made after the contract was signed, more specifically, that Plaintiff received an "excellent deal" as well as "a discount of at least 15% off the list price." (First Amended Complaint, ¶¶ 32, 52.)

In Count II, in some contrast, Plaintiff alleges that the following two "material and false representations of fact" were made "[a]s an inducement for [Plaintiff] to execute the Second Agreement": (1) "that IKON would simply replace and substitute the Second Agreement for the First Agreement and that [Plaintiff] would have no other payment obligations for the First Equipment pursuant to the First Agreement"; and (2) "that IKON was not imposing service/maintenance or supply charges for the First Equipment through the Second Agreement."  (*Id.* ¶¶ 57, 58.)

Defendants make two arguments in support of their motion to dismiss Counts I and II.  First, Defendants assert that the statements alleged in Count I are not actionable.  Second, Defendants assert that, in any even, a three year statute of limitations bars both claims in their entirety.  The court finds merit in the first, but not the second, argument.  Accordingly, the court will dismiss Count I, but leave Count II

5

intact.

    1.  <u>Whether the Statements Alleged in Count I are Actionable</u>

For IKON to be liable for fraud or misrepresentation, Plaintiff must prove that IKON "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [its] damage." *Danca v. Taunton Sav. Bank*, 429 N.E.2d 1129, 1133 (Mass. 1982) (citations and internal quotation marks omitted). To amount to common law fraud, an alleged false statement must be "one of fact; it may not be one of opinion." *Stolzoff v. Waste Sys. Int'l Inc.*, 792 N.E.2d 1031, 1041 (Mass. App. Ct. 2003) (citing *Yerid v. Mason*, 170 N.E.2d 718, 719-20 (Mass. 1960)).

Defendants argue that the "false misrepresentations of fact" made by IKON as alleged to have been made in Count I both before and after the Second Agreement -- *i.e.,* that Plaintiff was getting an "excellent deal" and a "significant discount off the list price," and that Plaintiff had received an "excellent deal" and "a discount of at least 15% off the list price" -- are subjective opinions and cannot constitute fraud. Plaintiff, in response, asserts that these statements, while appearing to be opinions, should be treated as statements of fact because it justifiably believed that IKON, who possessed superior knowledge on the issue of market prices, had facts to support its opinions. *See id.*, 792 N.E.2d at 1041 ("A statement of opinion may be actionable . . . where the opinion is 'reasonably interpreted by the recipient to imply that the speaker knows facts that justify the opinion.'") (quoting *Briggs v. Carol Cars, Inc.*, 553 N.E.2d 930, 933 (Mass. 1990)). The court finds Defendants' position persuasive.

Although *Stolzoff* does provide that opinions may be actionable under certain circumstances, it also states that a plaintiff's reliance on such opinions must be "reasonable." *Id.* (citing *Saxon Theatre Corp. of Boston v. Sage*, 200 N.E.2d 241, 244-45 (Mass. 1964)). Here, it is obvious beyond doubt that the statements alleged in Count I were parts of a sales pitch. A commercial lessee of goods, like Plaintiff, when dealing at arm's length with a lessor, must expect that the lessor, in attempting to procure its business, is going to make statements of opinion touting its equipment and the quality of the deal. *See Stigman v. Nickerson Enterprises, Inc.*, 2000 Mass. App. Div. 223, 2000 WL 1162237, at *2 (Mass. App. Div. Aug. 8, 2000) ("[S]tatements of the superlative quality or condition of items for sale are customarily deemed mere 'puffing' or 'seller's talk' and are not actionable.") (citing cases). This is particularly so when, as here, the transaction is between two sophisticated commercial entities. *See Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 43 (1st Cir. 2005).

The statements cited by Plaintiff, whether before or after the Second Agreement, were obviously mere "puffing" or "sales talk," making any reliance thereon by Plaintiff unreasonable as a matter of law. *See Mahaney v. John Hancock Mut. Life Ins. Co.*, 380 N.E.2d 140, 141 (Mass. App. Ct. 1978) ("[U]nreasonableness of . . . reliance is a complete bar to [a] defendants' liability for deceit."). Moreover, the statements made by IKON *after* the Second Agreement suffer an additional malady, *i.e.*, they could not have "induced" Plaintiff into entering the previously signed contract. In short, the statements alleged in Count I cannot form the basis of a claim of fraud or misrepresentation and Count I, therefore, will be dismissed.

2.  Statute of Limitations as to Count II

Defendants argue that allegedly fraudulent statements made prior to the execution of the Second Agreement and delineated in Count II -- (1) that IKON would replace and substitute the Second Agreement for the First Agreement and that Plaintiff would have no other payment obligations for the First Equipment; and (2) that Plaintiff would not continue to be charged for service, maintenance or supplies for the First Equipment -- are barred by the statute of limitations.  This court disagrees.

As both parties know, the statute of limitations for claims of fraud is three years. *See* Mass. Gen. L. ch. 260, § 2A.  "[A]n action accrues when the injured party knew, or, in the exercise of reasonable diligence, should have known the factual basis for the cause of action."  *Geo. Knight & Co. v. Watson Wyatt & Co.*, 170 F.3d 210, 213 (1st Cir. 1999).  However, the claim does not accrue at the time of the alleged injury if the underlying facts were "inherently unknowable." *Id.*  In evaluating when a fraud claim accrues, therefore, "courts sometimes ask when sufficient indicia of trouble-storm warnings, so to speak-should have been apparent to a reasonably prudent person." *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 17 (1st Cir. 2004).

Defendants argue that Plaintiff was well aware of what amount it was paying under the First Agreement and could easily have determined that those costs had carried over to the Second Agreement when it was executed on June 19, 2000. Accordingly, Defendants assert, Plaintiff's action, filed on March 15, 2005, is too late. Plaintiff, in turn, asserts that it first became aware of the falsity of IKON's representations as to payment obligations in November of 2003, when IKON gave

8

Plaintiff a "Financial Summary."  For its part, the court believes, at least for present purposes, that Plaintiff has the better argument and that its cause of action did not accrue until November of 2003, making its present claim timely.

The price term for the Second Agreement was stated as $8,949 for each of the first thirty-six months and $12,116 for each of the remaining thirty-six months. However, there is nothing in the Second Agreement which indicates what part, if any, of these monthly payments was for anything having to do with the First Equipment. Without a breakdown like the one later provided in the Financial Summary in November of 2003, there was nothing in the contract which informed or reasonably can be interpreted as informing Plaintiff what ongoing payment obligations it had with respect to the First Equipment.

Of course, as indicated, a commercial party must be on guard for "puffing" or "sales talk."  For the world of commerce to work as intended, however, a commercial party must be permitted, absent the presence of obvious facts, to rely on statements that are not opinions, but facts which are verifiable and unarguably true or false.  To demand anything less would allow a commercial party to lie outright and then claim that the other party should have known it was lying.  *See Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 795 (Mass. 2003) ("'The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.'") (quoting Restatement (Second) of Torts § 540 (1977)).

Granted, Plaintiff certainly could have asked for a breakdown, like that later

9

provided, before entering into the Second Agreement with IKON.  Nonetheless, it is the

court's view at this stage of the proceedings that Plaintiff was justified in relying on

IKON's representations at the time the Second Agreement was executed, *i.e.*, that it

would not charge Plaintiff for anything related to the surrendered First Equipment.

Although "[a] person claiming justifiable reliance is 'required to use his senses, and

cannot recover if he blindly relies upon a misrepresentation,'" *Collins v. Huculak*, 783

N.E.2d 834, 839 (Mass. App. Ct. 2003) (quoting Restatement (Second) of Torts, *supra*

at § 541 comment a), the representations made to Plaintiff were not obviously false on

their face.  For present purposes, therefore, the court finds that Plaintiff could not have

known that charges for the First Equipment were being carried over to the Second

Agreement.  Any further factual dispute concerning Plaintiff's knowledge is best left for

a fuller record and, most likely, for trial.  *See, e.g., Riley v. Presnell*, 565 N.E.2d 780,

787 (Mass. 1991); *Clough v. Brown*, 796 N.E.2d 415, 417-18 (Mass. App. Ct. 2003);

*Collins*, 783 N.E.2d at 839.  Accordingly, Defendants' motion to dismiss Count II will be

denied.

B.  Violation of Section 49: Usury (Count III)

       In Count III, Plaintiff claims that Defendants violated Massachusetts' usury

statute by imposing and collecting interest charges in excess of the legal limit provided

by law.  Plaintiff, therefore, seeks to have the contracts declared void and to have

Defendants return all payments made on those contracts.

       The purpose of section 49 is "to protect necessitous debtors from outrageous

demands by lenders."  *Begelfer v. Najarian*, 409 N.E.2d 167, 171 (Mass. 1980).  To that

end, the state legislature has provided that any person who charges more than twenty

per cent a year for interest and expenses on a loan must register with the Attorney

General of the Commonwealth of Massachusetts.  *See* Mass. Gen. L. ch. 271, § 49.

Any person who obtains a loan in which the interest and expenses exceed twenty per

cent per year may request that the loan be declared void if the lender failed to register

with the Attorney General.  *See id.*

Defendants argue that section 49 does not apply to equipment leases and rests

their argument on *Allegheny Int'l Credit Corp. v. Bio-Energy of Lincoln, Inc.*, 485 N.E.2d

965 (Mass. App. Ct. 1986).  There, in a dispute between a plaintiff-lessor and

defendant-lessee regarding the usury statute, the Appeals Court directed that judgment

in favor of the plaintiff-lessor should enter if the trial court determines that the

transaction was a lease, not a loan.  *Id.* at 961.  Defendants argue, therefore, that as a

matter of law section 49 does not apply if the transaction is a true commercial lease.

Plaintiff discounts *Allegheny*, arguing that the Appellate Court failed to consider

the relevant language of section 49, namely, that "[w]hoever in exchange for either a

loan of money *or other property* knowingly contracts for . . . interest and expenses . . .

which exceed[ ] . . . twenty per cent per annum . . . shall be guilty of criminal usury."

Mass. Gen. L. ch. 271, § 49 (emphasis added).  A lease of commercial equipment,

Plaintiff argues, is a loan of "other property" and, thus, subject to the statute.  If the

statute were meant to apply to loans of money only, Plaintiff continues, the legislature

would not have included the term "other property" in the text.

Plaintiff's argument has some resonance; there may well be leases that have

11

loan terms which fall within section 49.  Plaintiff's argument quickly loses strength, however, when the facts of this case are viewed in light of the language and purpose of the statute.  As described, the statute is designed to prevent overbearing lenders from taking advantage of poorly situated borrowers.  *See Begelfer*, 409 N.E.2d at 171.  Here, in contrast, the parties entered into commercial leases for equipment which only addressed price, term, breach, assignment and remedies.  Nowhere in the leases was there any mention of a "loan" or "principal" or, for that matter, "interest."  Nonetheless, Plaintiff seeks to convert the terms of the lease into a "loan" with possible usurious consequences.   To do so, Plaintiff would have the court torture both the facts and the law.

As provided in section 49, "the amount to be paid upon any loan for interest or expenses shall include all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged against or paid or to be paid by the borrower for making or securing directly or indirectly the loan."  Here, however, there is no way to even estimate, let alone precisely calculate, the amount of any "interest" supposedly charged Plaintiff in the Second Agreement.  The Financial Summary later provided to Plaintiff in 2003 is similarly unhelpful.  To be sure, the Financial Summary breaks down the lease into certain component parts, but it is impossible to determine, as Plaintiff would have it, either the "principal" of the "loan" or the "interest rate" "charged."  Still, Plaintiff would have the court engage in conjecture to establish the "usurious interest rate."  Plaintiff would have the court first determine the

fair market rental value of the equipment and then guess the amount allocated to "principal" and "interest." This, of course, is speculation at its worst.

Given the mathematical contortions which Plaintiff suggests, it is clear why the court in *Allegheny* determined that section 49 does not apply to commercial leases. In short, the court concluded that section 49 was not intended to protect lessees of personal property, such as Plaintiff here, in which no loan terms are evident. Here, too, the transformation of the lease into a loan would be patently untenable as a matter of law, particularly given the undisputed facts alleged in the complaint. Accordingly, the court will dismiss Count III.

C. <u>Failure to Dispose of Collateral in a Commercially Reasonable Manner (Counts IV and V)</u>

Plaintiff alleges in Counts IV and V that Defendants failed to account for or provide any value for the First Equipment by failing to liquidate the collateral in a commercially reasonable manner. It became clear in the parties' briefs and at oral argument that these claims are grounded in the Uniform Commercial Code (the "UCC"). Since the language in Count V essentially duplicates Count IV (and makes no reference to the UCC) it will be dismissed.

To be sure, Plaintiff fails to cite a specific section of the UCC in Count IV.[4] Nonetheless, Article 9 of the UCC, which Plaintiff cites in its brief, does govern "transaction[s], regardless of [their] form, that create[ ] a security interest in personal

---

[4] Moreover, Plaintiff mistakenly refers to the UCC as part of chapter *106A* of the Massachusetts General Laws. No such chapter exists. The UCC provisions are codified at chapter *106*.

property or fixtures by contract."  Mass. Gen. L. ch. 106, § 9-109(a)(1).  Article 9 goes

on to create debtors' rights and remedies against a secured party in the event the

debtor defaults on its obligation, including instances in which the secured party fails to

dispose of the collateral in a commercially reasonable manner.  *See* Mass. Gen. L. ch.

106, §§ 9-607(c), 9-625.  Those remedies, however, only apply to transactions

governed by Article 9.

In contrast, a "true lease" is governed by Article 2A of the UCC.  That appears to

be the situation here given the terms set out in the First Agreement.  The agreement

states that "IOS Capital is the sole owner and title holder" to the equipment.  It also

provides that Plaintiff had "no right to sell, transfer, encumber, sublet or assign" the

equipment.  In addition, the agreement appears to require Plaintiff to return the

equipment at the end of the term, unless it wished to renew.  And, perhaps most

significantly for present purposes, the agreement references potential remedies under

Article 2A.

Still, the question with respect to Article 2A of whether a transaction is in fact a

"lease," on the one hand, or a "sale of goods" with a retained security interest, on the

other, depends on the application of yet another provision of the UCC, the relevant

portion of which provides as follows:

> Whether a transaction creates a lease or "security interest"
> is determined by the facts of each case; however, a
> transaction creates a "security interest" if the consideration
> the lessee is to pay the lessor for the right to possession
> and use of the goods is an obligation for the term of the
> lease not subject to termination by the lessee, and:

14

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods,

(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

(d) the lessee has the option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

Mass. Gen. L. ch. 106, § 1-201(37). Here, the first prong of the test is met, as both Plaintiff and Defendants concede that the First Agreement could not be cancelled. Plaintiff's ability to satisfy the second prong of the test, however, is more uncertain.

In the court's opinion, subparagraphs (a) through (c) are outside Plaintiff's reach. To be sure, Plaintiff opines with respect to subparagraph (a) that the economic useful life of the First Equipment may have been less than sixty months, i.e., its term. Unfortunately for Plaintiff, this is pure speculation. As for subparagraphs (b) and (c), Plaintiff hardly mounts an argument. As Plaintiff no doubt recognizes, it was not bound to renew the lease and nowhere in the lease was it granted a renewal option for the remaining economic life of the equipment.

Still, Plaintiff's argument with respect to subparagraph (d), albeit convoluted, has some merit. In essence, Plaintiff maintains that it did have the option to become the owner of the First Equipment for nominal consideration at the end of the First Agreement. Plaintiff acknowledges that the *First* Agreement contains no such

15

provision, but points out that the Financial Summary created by IKON in November of 2003, well after the *Second* Agreement was executed, does mention a "buyout" figure.[5] This is "nominal consideration," Plaintiff maintains, because it is less than 11% of the total contract cost. *See In re Access Equip., Inc.*, 62 B.R. 642, 646 (Bankr. D. Mass. 1986) ("[I]f the option price amounts to 25% or more of the total list price, then the lease is not one intended for security.") (citations and internal quotation marks omitted). Of course, the Financial Summary does not apply to the *First* Equipment -- which, after all, is the subject matter of Count IV -- and Plaintiff acknowledges as much. Nonetheless, Plaintiff argues, it should be given the opportunity to discover whether similar buyout terms and conditions, albeit latent, applied to the First Agreement as well.

As indicated, Plaintiff's argument has merit at least at this stage of the litigation. For example, it is unclear from the record why Defendants would even mention a "buyout" in the Financial Summary when the Second Agreement too had no such provision. Since the Second Agreement is practically indistinguishable in its terms from the First Agreement, Plaintiff should have the opportunity to explore the factual issue further. Granted, as Defendants assert, the court ultimately will have to analyze the issue in terms of the UCC's definition of "nominal" consideration. That, however, is for another day. Accordingly, for present purposes, the court will deny Defendants' motion with respect to Count IV.

---

[5] The Financial Summary states that "[a]s of today your buyout to return the equipment . . . is $400,828. Your buyout to own is $482,195.77." Relying on these figures, Plaintiff asserts that, in effect, the ownership "buyout" would be $81,367.77, *i.e.*, the difference between the remaining costs on the lease and the total figure cited by Defendants.

16

D.  Breach of Covenant of Good Faith and Fair Dealing (Count VI)

        Plaintiff alleges in Count VI that Defendants violated the implied covenant of

good faith and fair dealing by imposing and collecting charges for Plaintiff's use of the

First Equipment after it had been surrendered to Defendants.  Plaintiff does not rest its

argument on the terms of the First or Second Agreements.  Rather, Plaintiff relies on

alleged oral representations prior to its signing the Second Agreement to the effect that

Defendants would not impose any ongoing costs for the surrendered First Equipment.

        "Every contract implies good faith and fair dealing between the parties to it."

*Anthony's Pier Four, Inc., v. HBC Assocs.*, 583 N.E.2d 806, 820 (Mass. 1991).  This

implied covenant of good faith and fair dealing ensures "that neither party shall do

anything that will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract."  *Id.*  However, "the requirement of good-faith

performance ultimately is circumscribed by the obligations-the contractual fruits-

actually contained in the agreement."   *Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir.

2001) (citation and internal quotation marks omitted).  Thus, without a breach of

contract, there can be no claim for a breach of an implied covenant of good faith and

fair dealing.  *See id.*

        Plaintiff has not alleged that Defendants breached the Second Agreement.

Rather, Plaintiff's claim for breach of the implied covenant of good faith and fair dealing

concerns statements made by Defendants *before* the contract was executed.  While

that may prove sufficient for Plaintiff's claim of fraud and misrepresentation under

Count II, or indeed Count VII (*see infra*), it is inadequate for Count VI.  Accordingly,

17

Defendants' motion to dismiss Count VI will be allowed.[6]

## E.  Violation of Chapter 93A (Count VII)

Finally, Plaintiff claims in Count VII that Defendants violated chapter 93A because of the acts committed by them in Counts I through VI.  For their part, Defendants seek to dismiss the claim, first, because the six other counts assertedly fail and, second, because of a four year statute of limitations.  For the reasons which follow, Defendants' arguments fall short.

As the parties agree, the survival of a chapter 93A claim is often dependent upon the survival of at least one underlying claim, particularly when no facts are pled in the chapter 93A count which are independent of other claims.  Here, however, the court, for the reasons stated, is permitting Plaintiff to go forward on Counts II and IV. And insofar as common law fraud and misrepresentation provide bases for liability under chapter 93A, see Count II, it only follows that Plaintiff has stated a claim under chapter 93A as well.  *See Damon v. Sun Co.*, 87 F.3d 1467, 1483 (1st Cir. 1996); *Sheely v. Lipton Indus., Inc.*, 507 N.E.2d 781, 785 (Mass. App. Ct. 1987).

Defendants' second argument -- that any claim under chapter 93A is time-barred by the four year statute of limitations in Mass. Gen. L. ch. 260, § 5A, because all allegedly fraudulent statements concerning the lease of Second Equipment were made in 2000 -- is similarly deficient.  The accrual of Plaintiff's chapter 93A claim necessarily depends, in part, on the accrual of Plaintiff's claim in Count II, *i.e.*, Plaintiff's claim of

---

[6]  Because the court is prepared to dismiss Count VI, it will not address the parties' dispute as to which of the two defendants is the true target of that claim.

fraud and misrepresentation.  For the reasons stated, however, that issue has been resolved in Plaintiff's favor, at least for present purposes.  Since "[t]he accrual date of a 93A claim is established by the same principles that govern determination of the underlying actions," *Kozikowski v. Toll Bros., Inc.*, 246 F. Supp.2d 93, 98 (D. Mass. 2003) (citation and internal quotation marks omitted), the court cannot now find that Plaintiff's chapter 93A claim is time-barred by the four year statute of limitations in Mass. Gen. L. ch. 260, § 5A, as distinct from the three year limitations period applicable to Count II.  Accordingly, Defendants' motion to dismiss Count VII will be denied.

## IV.  CONCLUSION

For the reasons explained, Defendants' motion to dismiss is granted as to Counts I, III, V and VI, but denied as to Counts II, IV and VII.  The clerk shall set the matter down for a scheduling conference.

IT IS SO ORDERED.

DATED: January 12, 2006

   /s/   Kenneth P. Neiman   
KENNETH P. NEIMAN
U.S. Magistrate Judge