# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS INC., | : |
| | : |
| Plaintiff, | : |
| | :     3:05-CV-30068-KPN |
| v. | : |
| | : |
| IKON OFFICE SOLUTIONS, INC. & IOS CAPITAL, INC. d/b/a IKON FINANCIAL SERVICES, | : |
| | : |
| Defendants. | : |

## IKON OFFICE SOLUTIONS, INC.'S
## MOTION FOR PROTECTIVE ORDER

IKON Office Solutions, Inc. ("IKON") hereby moves for a protective order limiting the scope of its continued Rule 30(b) deposition. Based on the Court's order at the December 19, 2006 case management conference, the plaintiff Human Resources Development Press, Inc. ("HRD") provided IKON with a list of deposition topics on which it claims that IKON's testimony was inadequate. IKON disagreed with many of the claimed inadequacies but was able to resolve many issues with HRD's counsel during the required L.R. 37.1 conference. A few issues, however, remain unresolved. Accordingly, IKON hereby moves for a protective order to limit HRD's scope of inquiry at the continued deposition.

## I.    Legal Standard

Fed. R. Civ. P. 26(c) gives this Court the authority to enter protective orders concerning discovery matters upon good cause shown by the moving party. This rule allows a court to order that discovery not be had or that it go forward "only on specified terms and conditions, including

a designation of the time or place." Fed. R. Civ. P. 26(c); *Smith v. Shoe Show of Rocky Mount,*

*Inc.*, 2001 WL 1757184, *2 (D. Mass. Apr. 26, 2001).

## II.    Reasons for Protective Order

During the December 19, 2006 case management conference, HRD voiced its opinion

that IKON had failed to adequately prepare its Rule 30(b)(6) deponent.  At that time, IKON's

designee had testified on two separate days, which exceeded Fed. R. Civ. P. 30's seven-hour

time limit.  The Court considered HRD's arguments and allowed HRD an additional five hours

to examine IKON on the topics on which HRD claimed that IKON had provided inadequate

testimony.  The Court ordered that this continued deposition take place by January 30, 2007.

The Court also ordered HRD to provide IKON with a list of the topics, including deposition

testimony citations, on which it claimed that IKON's designee was not prepared or did not

adequately testify.

At approximately 4:00 p.m. on January 19, 2007, HRD sent IKON an email enclosing a

list of topics on which it believed IKON had not provided adequate testimony.  A copy of that

email is attached as Exhibit 1.  That email also indicated HRD's intention to inquire about topics

other than those that it claimed inadequate responses.  The email also indicated HRD's

availability to continue the deposition on January 25-29.

IKON responded to this email on January 23 and informed HRD that it would need

additional time to evaluate HRD's claimed deficiencies, prepare an appropriate response, and

determine whether a motion for protective order might be necessary.  A copy of this January 23

email is attached as Exhibit 2.  IKON sent HRD an email on January 26 and informed HRD that

it thought a motion for protective order would likely be necessary and inquired about HRD's

availability on Monday January 29 to discuss the underlying issues. A copy of the January 26 email is attached as Exhibit 3.

IKON sent HRD a detailed response to the list of claimed deficiencies on January 29. A copy of that letter is attached as Exhibit 4. The parties held their Local Rule 37.1 conference on January 30. As a result of that conference, IKON agreed to provide HRD with a letter detailing the conversations that it has had with General Electric Capital Corporation regarding this lawsuit and HRD agreed to evaluate this letter and determine whether it was sufficient to eliminate the need for additional testimony on that topic. IKON also agreed to evaluate issues 2, 3, 5, 8 and 9 (as numbered in IKON's January 29 letter, Ex. 4) and determine whether IKON would stipulate to certain facts. Issues 1 and 7 remained in dispute after the conference and are the subject of this motion for protective order, in addition to HRD's claimed right to inquire about topics other than those about which it has claimed IKON failed to provide adequate testimony.

> **A.    HRD's questions regarding the price that IKON paid for the Second Equipment does not fall within the scope of its Rule 30(b)(6) notice or the scope of Rule 26.**

HRD contends that IKON's testimony at pages 45 and 46 of the December 6, 2006 deposition was deficient because IKON's designee, Mr. Jeffrey Snyder, did not take sufficient steps to inform himself of the acquisition cost of the Second Equipment, the Cannon IR110. HRD claims that Topic No. 19 on the Rule 30(b)(6) deposition notice covers this question.[1] Topic No. 19 reads: "How the Defendant purchases its inventory of photocopiers for lease and/or for sale to customers and how the Defendant determines its 'rate of return' on its investment in said inventory of photocopiers."

HRD's question: "What did it cost IKON to purchase the imageRunner 110?" does not fall within the scope of this topic and therefore Mr. Snyder's testimony is not deficient. Mr.

---

[1] Copies of all cited pages of IKON's deposition are attached as Exhibit 5.

Snyder testified that IKON does not maintain an inventory of imageRunner 100s. (IKON Dep., 155:7-19; 157:16.) Moreover, the topic, as stated in the notice, relates to the policies and procedures of IKON in general and does not address specific facts related to the Second Equipment. Accordingly, since Topic No. 19 only involves IKON's <u>inventory and its general policies</u>, HRD's question about the imageRunner 110 that HRD leased is outside the scope of Topic No. 19.

In addition, the cost of the imageRunner 110 to IKON is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence concerning HRD's remaining fraud, UCC, and Chapter 93A claims. The fraud and Chapter 93A claims both involve whether IKON improperly included the remaining obligation on the 1998 Lease into the 2000 Lease. Accordingly, that amount, the remaining obligation, is the proper measure of damages, if any, on these claims. This amount has been disclosed in discovery and during the Rule 30(b)(6) deposition. The amount that IKON paid its supplier for the 2000 Lease equipment, the imageRunner 110, has no bearing on either of these claims.

HRD's remaining UCC claim involves whether IKON should have given HRD credit for the value of the 1998 Lease equipment at the time it returned that equipment to IKON in 2000. Accordingly, the amount that IKON paid its supplier for the 2000 Lease equipment is irrelevant and immaterial to this claim.

**B.    IKON's testimony concerning Topic No. 10 was not deficient.**

HRD claims that IKON's testimony at pages 165:11-24 and 167:11-24 was deficient because Mr. Snyder did not adequately prepare himself to answer HRD's questions about Topic No. 10. Topic No. 10 reads: "The Defendant's internal policies or procedures relating to the

Defendant's acceptance of the surrender of photocopying equipment which is the subject of an agreement with a customer of the Defendant."

At the deposition, HRD asked: "Do you know, is there any set of policies or procedures that IKON has that governs what IKON should do when it received equipment, when equipment is surrendered as part of a trade-up to other equipment?" (IKON Dep., 165:11-15.) Mr. Snyder responded that he contacted people within IKON to determine whether such a policy existed and was told that GE Capital owned the copiers coming off of a lease, not IKON. (IKON Dep., 165:12-24.) He also stated that prior to GE Capital's purchase of IOS Capital, IOS Capital owned the leased equipment and decided how to dispose of it after a lease. IKON had "no right to say what they do with it." (IKON Dep., 165:19-20.) Accordingly, IKON's testimony concerning this topic was not deficient.

In addition, Mr. Snyder testified at length about the general procedures for returned leased equipment. (IKON Dep., 95:1-101:24.) This testimony included a description of the general method for determining whether to re-lease, rent, wholesale, or dispose of the returned lease equipment.

Since receiving HRD's letter on January 19 about this claimed deficiency, IKON conducted an exhaustive search of its records to determine whether a written policy regarding the return and/or disposal of lease equipment existed during July 2000. This search has confirmed that IKON did not have such a written policy in place during that time period, which is logical because IOS Capital, not IKON, owned the leased equipment during that time.

**C.    HRD's continued Rule 30(b)(6) deposition of IKON should be limited to the topics on which HRD has claimed that IKON provided inadequate testimony.**

During the December 19, 2006 case management conference, HRD claimed that IKON's two days of deposition testimony were inadequate because the deponent was unprepared to

testify about certain topics and/or failed to provide sufficient responses to some questions. IKON agreed that the testimony regarding at least one topic needed to be supplemented but indicated that HRD's questions had already exceeded the seven hour time limit set forth in Rule 30. The Court heard both parties' positions about this issue and decided to allow HRD an additional five hours to continue its deposition, but ordered HRD to provide IKON with a list of the topics, including deposition testimony citations, on which it claimed that IKON's designee was not prepared or did not adequately testify so that IKON could adequately prepare its witness.

HRD provided the list of topics as ordered, but also indicated that it planned to ask additional questions concerning topics about which it did not claim IKON's prior testimony was deficient. This catch-all language in HRD's letter attempts to skirt the Court's order about the scope of the continued deposition and impedes IKON's ability to comply with its duty to prepare its chosen witness. IKON therefore asks this Court to limit HRD's scope of inquiry at the continued Rule 30(b)(6) deposition to the topics on which either IKON has agreed or this Court determines that IKON has not provided adequate testimony.

DEFENDANT,
IKON OFFICE SOLUTIONS, INC.


By___/s/  Brett J. Boskiewicz_____
   Bradford S. Babbitt (BBO# 566390)
   e-mail: bbabbitt@rc.com
   Brett J. Boskiewicz (BBO# 656545)
   e-mail: bboskiewicz@rc.com
   Robinson & Cole LLP
   280 Trumbull Street
   Hartford, CT  06103-3597
   Tel. No.: (860) 275-8200
   Fax No.: (860) 275-8299

Dated:  February 16, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that Defendant IKON Office Solutions, Inc.'s Motion to Quash

Deposition Subpoenas filed through the ECF system will be sent electronically to the registered

participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent

to those indicated as non-registered participants on February 16, 2006

  / S /  Brett J. Boskiewicz           
Brett J. Boskiewicz

**EXHIBIT 1**

**Boskiewicz, Brett**

**From:** David J Noonan, Esq. [david.noonan@verizon.net]
**Sent:** Friday, January 19, 2007 4:17 PM
**To:**    Boskiewicz, Brett
**Cc:**    HRD PRESS

January 19, 2007

Brett

Please see the attached file which responds to your most recent e-mail concerning the
continuation of Mr. Snyder's deposition.

Regards,

David J. Noonan, Esq.

January 19, 2007

Brett

By and through this e-mail I will respond to your request to identify deficiencies in A) Mr. Snyder's preparation for his Rule 30 (b)(6) deposition and B) those questions to which his answers were nonresponsive. Please note that all of the page and line references identified in this e-mail are based on a review of the "minuscripts" and not the full single page original deposition transcripts.  For the sake of clarity the numbers underneath the heading "Par. #" correspond to the numbered paragraphs contained on pages 2-5 of the Notice of Deposition which identify the "subject matter" of the deposition.

As you are aware is your client's duty to designate that person or persons who is/are best able to answer questions concerning the subject matters identified in the Rule 30 (b)(6) Notice of Deposition. Notwithstanding that statement it is clear to me that in several important areas Mr. Snyder did not make the requisite effort to inform himself of the subject matters that he knew or should have known were to be explored in the Rule 30 (b)(6) deposition.

<u>December 7, 2006 Deposition</u>

| Page | Line | Deficiency | Par.# |
|------|------|------------|-------|
| 45 | 19-24 | insufficient to inform himself of acquisition cost | 19 |
| 46 | 9-16 | "                          "                          " | 19 |
| 51 | 20-24 | failed to contact Dan Serrenho | 1 |
| 61 | 8-13 | no steps to inform himself so as to respond to | 1 |
| 88 | 18-21 | insufficient to inform himself so as to respond to | 19 |
| 102 | 4-6 | insufficient to inform himself so as to respond to | 15 |
| 103 | 1-3 | "                          "                          " | |
| 104 | 6 -10 | "                          "                          " | |
| 162 | 2-17 | insufficient to inform himself so as to respond to | 8 |
| 163 | 1-6 | "                          "                          " | 8 |

(please note I will expect whoever responds to further questions in this particular area to be able to testify as to communications through the date of the reconvened deposition)

| 165 | 11-24 | insufficient to inform himself so as to respond to | 10 |
| 167 | 11-24 | "                          "                          " | 10 |
| 169 | 17-24 | no steps to inform himself so as to respond to | 14 |
| 170 | 1 | "                          "                          " | 14 |
| 171 | 19-24 | no steps to inform himself so as to respond to | 15 |
| 172 | 6 | "                          "                          " | 15 |
| 173 | 1-7 | no steps to inform himself so as to respond to | 15/18 |

<u>December 18, 2006 Deposition</u>

| Page | Line | Deficiency | Subject Matter of Deposition |
| --- | --- | --- | --- |
| 43 | 14-20 | no steps to inform himself so as to respond to | 8 |
| 44 | 12-21 | no steps to inform himself so as to respond to | 8 |
| 45 46 | 21-24 1-5 | Plaintiff has grave concerns the deponent had taxes to all relevant documents. Plaintiff renews its request for a register" of all documents not produced on advice of counsel. | |
| 57 | 18-23 | no steps to inform himself so as to respond to | 10 |
| 58 | 6-12 | "                          "                          " | 10 |

<u>Documents Referenced And Still Not Produced</u>

<u>December 7, 2006 Deposition</u>

| Page | Line | | |
| --- | --- | --- | --- |
| 98 | 22 | e-mail regarding disposition of first equipment | |

104     14-22          e-mail regarding degree of authority to prepare for questions
                       concerning paragraph 15

### Designee for Continuation of Rule 30 (b)(6) Deposition

Your own review of the transcript will disclose that several of the Subject Matters of Deposition have not been fully explored. In addition to the deficiencies outlined above and without limiting my right to ask any appropriate questions, I intend to ask further questions concerning paragraphs numbers 8,10, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21,. I leave it to your client to determine if someone in addition to Mr. Snyder should be made available for the continuation of this deposition.

### Plaintiff's Availability

Plaintiff is available for the continuation of this deposition on January 24, 25, 26, 27, 28th, 29th.

I await your response with respect to the rescheduling of his deposition.

Regards,

David J. Noonan, Esq.

**EXHIBIT 2**

## Boskiewicz, Brett

| | |
|---|---|
| **From:** | Boskiewicz, Brett |
| **Sent:** | Tuesday, January 23, 2007 9:55 AM |
| **To:** | 'David J Noonan, Esq.' |
| **Subject:** | HRD Press v. IKON |

Dear David:

I received your e-mail late Friday afternoon January 19 regarding the continued Rule 30(b)(6) deposition of IKON. In that e-mail, you identified approximately 24 portions of Mr. Snyder's testimony that you believe were deficient and requested that IKON be available to continue the deposition on January 24, 25, 26, 27, 28 or 29.

I will need to review the transcript citations to evaluate your assessment and to determine the factual issue on which you seek additional testimony. If I conclude that Mr. Snyder was, in fact, unable to provide the factual information that you sought, then I will need to spend time with my client to ensure that the appropriate person is designated and prepared to testify about that particular topic. If I disagree with your assessment, I will have to move for a protective order regarding that particular topic. An appropriate response will take longer than the two business days that you have allowed me. It is for that reason that the Court counseled you not to delay in getting me this information. Therefore, your request for the deposition to continue on January 24, 25, or 26 is unreasonable, as is your request for IKON to be available for deposition on a weekend. You have had the transcripts for the first deposition day since at least December 13, 2006 and the transcripts from the second day since at least January 2, 2007. Yet, you only provided me with your claimed deficiencies after 4:00 on a Friday afternoon six business days before the date on which the court ordered you to complete your deposition. I will attempt to review these issues and determine whether a motion for a protective order is necessary by Friday, January 26. I will contact you once I have completed these tasks to discuss scheduling the final day of the deposition.

Regards,

Brett Boskiewicz

**Brett J. Boskiewicz**

**Robinson & Cole** LLP
280 Trumbull Street
Hartford, CT  06103-3597
Direct (860) 275-8289 | Fax (860) 275-8299
bboskiewicz@rc.com | www.rc.com
Bio | Contact Card

Boston  New London  Hartford  Stamford  White Plains  New York  Sarasota

-----Original Message-----
**From:** David J Noonan, Esq. [mailto:david.noonan@verizon.net]
**Sent:** Tuesday, January 23, 2007 8:16 AM
**To:** Boskiewicz, Brett
**Cc:** HRD PRESS
**Subject:**

1-23-07

Brett

I need a response to my last email concerning the continued deposition of Mr. Synder.

Regards,

David J. Noonan, Esq.

**EXHIBIT 3**

## Boskiewicz, Brett

**From:**    Boskiewicz, Brett
**Sent:**    Friday, January 26, 2007 4:55 PM
**To:**      'David J Noonan, Esq.'
**Subject:** RE: HRD Press v. IKON

Dave:

I have not been able to complete the response to your January 19 email by today as I indicated below. I will have a response to you by Monday January 29.

Based on my review of the issues, I believe that a motion for protective order will be necessary. We anticipate filing such a motion on Monday as well. Are you available Monday afternoon to discuss these issues so that we can try to limit the scope of the motion? Please let me know.

Brett

> **Brett J. Boskiewicz**
>
> **Robinson & Cole LLP**
> 280 Trumbull Street
> Hartford, CT  06103-3597
> Direct (860) 275-8289 | Fax (860) 275-8299
> bboskiewicz@rc.com | www.rc.com
> Bio | Contact Card

Boston  New London  Hartford  Stamford  White Plains  New York  Sarasota

-----Original Message-----
**From:** Boskiewicz, Brett
**Sent:** Tuesday, January 23, 2007 9:55 AM
**To:** 'David J Noonan, Esq.'
**Subject:** HRD Press v. IKON

Dear David:

I received your e-mail late Friday afternoon January 19 regarding the continued Rule 30(b)(6) deposition of IKON. In that e-mail, you identified approximately 24 portions of Mr. Snyder's testimony that you believe were deficient and requested that IKON be available to continue the deposition on January 24, 25, 26, 27, 28 or 29.

I will need to review the transcript citations to evaluate your assessment and to determine the factual issue on which you seek additional testimony. If I conclude that Mr. Snyder was, in fact, unable to provide the factual information that you sought, then I will need to spend time with my client to ensure that the appropriate person is designated and prepared to testify about that particular topic. If I disagree with your assessment, I will have to move for a protective order regarding that particular topic. An appropriate response will take longer than the two business days that you have allowed me. It is for that reason that the Court counseled you not to delay in getting me this information. Therefore, your request for the deposition to continue on January 24, 25, or 26 is unreasonable, as is your request for IKON to be available for deposition on a weekend. You have had the transcripts for the first deposition day since at least December 13, 2006 and the transcripts from the second day since at least January 2, 2007. Yet, you only provided me with your claimed deficiencies after 4:00 on a Friday afternoon six business days before the date on which the court ordered you to complete your deposition. I will attempt to review these issues and determine whether a motion for a protective order is necessary by Friday, January 26. I will contact you once I have completed these tasks to discuss scheduling the final day of the deposition.

Regards,

Brett Boskiewicz

---

**Brett J. Boskiewicz**

**Robinson & Cole LLP**
280 Trumbull Street
Hartford, CT  06103-3597
Direct (860) 275-8289 | Fax (860) 275-8299
bboskiewicz@rc.com | www.rc.com
Bio | Contact Card

---

Boston  New London  Hartford  Stamford  White Plains  New York  Sarasota

-----Original Message-----
**From:** David J Noonan, Esq. [mailto:david.noonan@verizon.net]
**Sent:** Tuesday, January 23, 2007 8:16 AM
**To:** Boskiewicz, Brett
**Cc:** HRD PRESS
**Subject:**

1-23-07

Brett

I need a response to my last email concerning the continued deposition of Mr.
Synder.

Regards,

David J. Noonan, Esq.

**EXHIBIT 4**

# ROBINSON & COLE LLP

BRETT J. BOSKIEWICZ

280 Trumbull Street
Hartford, CT 06103-3597
Main (860) 275-8200
Fax (860) 275-8299
bboskiewicz@rc.com
Direct (860) 275-8289

Also admitted in Massachusetts

January 29, 2007

David J. Noonan, Esq.
Attorney at Law
Suite 1
228 Triangle Street
Amherst, MA 01002

**Re:    Human Resource Development Press Inc. v.**
**IKON Office Solutions, Inc., et al.**
**Civil Action No.: 3:05-CV-30068-KPN**

Dear Attorney Noonan:

I write in response to your e-mail dated January 19, 2007 and my e-mail dated January 23, 2007, concerning what you claim to be deficiencies in IKON's Rule 30(b)(6) deposition testimony. I have reviewed the portions of the transcript that you cited and the reasons that you claim that the cited testimony is deficient. Based on this review, IKON will make Mr. Snyder available for the limited purpose of testifying about Topic Nos. 8, 15, and 19. Mr. Snyder, however, will not be available before January 30 due to the fact that I did not receive your list of claimed deficiencies until 4:00 p.m. on Friday January 19, and the manner in which you presented your assertions required an evaluation before we could respond. We will attempt to make Mr. Snyder or another witness available during the first two weeks of February. I disagree with your contentions about the remaining topics and discuss my disagreement in detail below.

During the December 19, 2006 case management conference, you contended that IKON's designee was not adequately prepared on various topics and therefore you requested additional time to continue the deposition.



*Law Offices*

BOSTON

HARTFORD

NEW LONDON

STAMFORD

WHITE PLAINS

NEW YORK CITY

SARASOTA

*www.rc.com*        HART1-1378405-1

# ROBINSON & COLE LLP

Page 2

The Court allowed you an additional five hours of deposition time based on that contention and ordered you to provide me with a list of the topics on which you believe that you did not get adequate testimony. The Court authorized you to continue your examination only on topics on which IKON had not provided adequate testimony in response to your questions. Accordingly, IKON will not agree to a continuation of your examination of topics that either were covered previously or that could have been covered previously during the first two days of the Rule 30(b)(6) deposition.

I anticipate that it will be necessary for IKON to seek a protective order allowing it to produce its witness after January 30 and to limit the scope of your examination. I will contact you on Monday, January 29 to discuss these issues.

I address your claimed deficiencies in order below.

December 6, 2006 Deposition

1.    *You contend that IKON's testimony at pages 45 and 46 was deficient because Mr. Snyder did not take sufficient steps to inform himself of the acquisition cost of the Second Equipment, the Cannon IR110, which you claim Topic No. 19 on the Rule 30(b)(6) deposition notice covers.*

Topic No. 19 reads: "How the Defendant purchases its inventory of photocopiers for lease and/or for sale to customers and how the Defendant determines its 'rate of return' on its investment in said inventory of photocopiers." Your question: "What did it cost IKON to purchase the imageRunner 110?" does not fall within the scope of this topic and therefore Mr. Snyder's testimony is not deficient. Mr. Snyder testified that IKON does not maintain an inventory of imageRunner 100s. (155:7-19; 157:16.) Moreover, the topic, as you stated it, relates to the policies and procedures of IKON in general and does not address specific facts related to the so-called "second equipment." Accordingly, since Topic No. 19 only involves IKON's inventory and its general policies, your question about the imageRunner 110 that HRD leased is outside the scope of Topic No. 19.



# ROBINSON & COLE LLP

Page 3

2.    *You claim that IKON's testimony about its response to paragraph 13 of the Amended Complaint was deficient because IKON failed to contact Mr. Dan Serrenho, a former IKON employee, to obtain information about that allegation.*

Paragraph 13 of the Amended Complaint reads: "HRD PRESS specifically described and identified to HRD PRESS's copying needs. IKON in response to said stated needs, specifically represented to HRD PRESS that the First Equipment would effectively provide HRD PRESS with a minimum of 250,000 copies per month and meet HRD PRESS's copying needs." IKON's response to this allegation reads: "IKON lacks sufficient knowledge or information to admit or deny the allegations in paragraph 13 and therefore leaves the Plaintiff to its proof."

At the deposition, you asked Mr. Snyder to "tell [you] every fact that justifies IKON's answer as contained in paragraph 13 of [the Amended Complaint]." (49:17-19.) In connection with this question, you also asked Mr. Snyder what he did to prepare to answer this question and explain the basis on which IKON responded that it has no knowledge  Mr. Snyder testified that he reviewed IKON's file relating to HRD and has significant experience and general knowledge relating to document reproduction equipment. (51:24-52:5.) You then asked him whether he contacted Dan Serrenho, who was IKON's sales representative for HRD's account during the time period when HRD claims that IKON made the alleged statements in paragraph 13.  Mr. Sndyer responded that he did not because Mr. Serrenho no longer works for IKON. Mr. Snyder has provided you with all of the factual bases on which IKON asserted that it lacked information on which to admit or deny the claim.  Designating another witness to confirm the facts on which IKON lacks knowledge would serve no valid purpose.  The wasteful nature of such an exercise is highlighted by the fact that your own client knows the identity of the alleged IKON employee that it claims made the statement asserted in paragraph 13.  Accordingly, IKON's testimony about this issue was not deficient.

In addition, Paragraph 13 and IKON's response to it are completely irrelevant to HRD's remaining claims in this lawsuit.  All of the remaining claims involve the Second Agreement and the Second Equipment, not what



# ROBINSON & COLE LLP

Page 4

IKON allegedly said to HRD <u>before</u> it entered the First Agreement.  And, Mr.
Snyder informed you that he spent several hours during multiple days
reviewing the hundreds of pages in IKON's file for the HRD account and
preparing for the Rule 30(b)(6) deposition.  (15:5 – 21:7.)  This amount of
preparation was quite reasonable under the circumstances.

3.    *You claim that IKON's testimony about its response to paragraph 16 of the
Amended Complaint was deficient Mr. Snyder took "no steps to inform himself so as
to respond" to your question.*

Paragraph 16 of the Amended Complaint reads: "Despite IKON's prior
representation that the First Equipment would meet HRD Press's specified
needs, a subsequent IKON agent informed HRD PRESS that if they wanted
high production capacity they would need to upgrade the First Equipment."
IKON's response to that paragraph reads:  "IKON lacks sufficient knowledge
or information to admit or deny the allegations in paragraph 16 and therefore
leaves the Plaintiff to its proof."

Your January 19 letter cites page 61:18-21 as the allegedly deficient
testimony about this topic.  Those lines read:

Q.    "Did you ask them whether anyone on behalf of IKON
indicated that if HRD updated its equipment, that their need for high
production copies would be satisfied?"

A.    "No."

This one question and answer does not provide any basis for your claim that
IKON did not take any steps to prepare Mr. Snyder about this topic because
you have ignored the other four pages of testimony about this issue. (59:7-
64:4.)  Mr. Snyder testified at length about HRD's allegations in paragraph 16
and the steps that he took to prepare and the people with whom he spoke
about this allegation.  For example, Mr. Snyder informed you that he spoke
with two technicians that serviced HRD's account during that time period.
(60:4-6.)  He asked them about HRD's allegation in paragraph 16.  (60:7-13.)
They denied saying what HRD alleged.  (60:14-15.)



# ROBINSON & COLE LLP

Page 5

Furthermore, your claimed deficiency fails to recognize that after the exchange quoted above, Mr. Snyder asked to have that same question and answer read back because he wanted to make sure that he answered your question correctly. (61:16-62:3.) After having the question read back, Mr. Snyder clarified his response to that question over the next two pages of testimony. (62:4 – 64:4.) This clarification stated that the technicians recommended that HRD look into the imageRunner 110 and the reasons for their recommendation. (63:17-19.)

And, finally, paragraph 16 has nothing to do with the remaining claims in this lawsuit. All of the remaining claims involve the Second Agreement and the Second Equipment, not what IKON allegedly said to HRD <u>before</u> it entered the First Agreement.

4.      *You claim that the testimony on page 88:18-21 is insufficient because Mr. Snyder could not answer your question about what IKON paid for the imageRunner 110 that HRD leased from IKON.*

IKON's testimony on this issue was not deficient for the same reasons as set forth above in response to bullet point number one.

5.      *You claim that IKON's testimony on pages 102:4-6, 103:1-3, and 104:6-10 was deficient because Mr. Snyder did not take sufficient steps to inform himself about the number of Oce copiers that were "surrendered, turned over to IKON during the period 1998 through 2000."*

You asked Mr. Snyder: "Do you know how many Oces were surrendered, turned over, to IKON during the period 1998 through 2000?" Mr. Snyder responded: "No, I do not." Again, you have ignored Mr. Snyder's additional testimony on this issue.

After the above exchange, you then asked Mr. Snyder what steps he took to educate himself about the facts relating to this topic. (103:1-3.) He responded:



# ROBINSON & COLE LLP

Page 6

>   I approached my inventory specialist, which provided the access of – or provided information like in the previous questioning about the disposal of the assets. So I went to her and asked her the same question, 'Do you think it would be possible" – you know, you're talking North America, all Canada, and Europe – "to see how many of these were disposed of or surrendered?"

>   She thought that that was a real – she told me that that would – with the purging of the old records and going back, because some of these OCEs started in the field in 1996 and stuff, that she thought that it was an impossible task. Because we have several warehouses across the country, it's not necessarily one disposal point."

(103:4-18.) After that you asked him whether he made "any inquiries of the Northeast region warehouse[.]" He said that he did, but that inquiry did not yield any answers. (103:19 – 104:10.) Accordingly, IKON's testimony about this issue was not deficient.

I also objected to this line of questioning as outside the scope of discovery. How IKON or IOS Capital disposed of other OCE copiers during 1998 through 2000 has no relation to HRD's fraud, UCC, or Chapter 93A claims concerning the Oce equipment that HRD leased, which are the only claims still remaining in this case.

6.   *You claim that IKON's testimony at pages 162:2-17 and 163:1-6 regarding Topic No. 8 was deficient because Mr. Snyder did not take sufficient steps to inform himself about the communications between IKON and GE Capital regarding this lawsuit.*

I indicated to you during the deposition that IKON had inadvertently overlooked this topic when preparing for this deposition. (162:6-13.) As discussed below, IKON made an effort to prepare Mr. Snyder on this topic for the December 18, 2006 deposition date.



# ROBINSON & COLE LLP

Page 7

7.　　*You claim that IKON's testimony at pages 165:11-24 and 167:11-24 was deficient because Mr. Snyder did not adequately prepare himself to answer your questions about Topic No. 10.*

Topic No. 10 reads: "The Defendant's internal policies or procedures relating to the Defendant's acceptance of the surrender of photocopying equipment which is the subject of an agreement with a customer of the Defendant." At the deposition, you asked: "Do you know, is there any set of policies or procedures that IKON has that governs what IKON should do when it received equipment, when equipment is surrendered as part of a trade-up to other equipment?" (165:11-15.) Mr. Snyder told you that he contacted people within IKON to determine whether such a policy existed and was told that GE Capital owned the copiers coming off of a lease, not IKON. (165:12-24.) He also informed you that prior to GE Capital's purchase of IOS Capital, IOS Capital owned the leased equipment and decided how to dispose of it after a lease. IKON had "no right to say what they do with it." (165:19-20.) Accordingly, IKON's testimony concerning this topic was not deficient.

In addition, Mr. Snyder testified at length about the general procedures for returned leased equipment. (95:1-101:24.) This testimony included a description of the general method for determining whether to re-lease, rent, wholesale, or dispose of the returned lease equipment.

Since receiving your letter on January 19 about this claimed deficiency, IKON conducted an exhaustive search of its records to determine whether a written policy regarding the return and/or disposal of lease equipment existed during July 2000. This search has confirmed that IKON did not have such a written policy in place during that time period, which is logical because IOS Capital, not IKON, owned the leased equipment during that time. Therefore, any written policies, such as the one you have inquired about, would likely have been acquired by GE Capital as part of the asset sale.



# ROBINSON & COLE LLP

Page 8

8.    *You claim that IKON's testimony at pages 169:17-24 and 170:1 was deficient because Mr. Snyder took "no steps to inform himself so as to respond to" Topic No. 14, which relates to the condition of the First Equipment at the time it was surrendered.*

Immediately before the cited testimony, you asked Mr. Snyder: "Do you have any knowledge as to what the condition of the OCE equipment was in when it was surrendered?" (169:13-15.) Mr. Snyder responded that the equipment was in a "fully operational state." (169:16.) Accordingly, your assertion that Mr. Snyder took "no" steps to inform himself about Topic No. 14 is incorrect and IKON's testimony about this topic is not deficient. And, again, IOS Capital owned the returned lease equipment, not IKON.

9.    *You claim that IKON's testimony at pages 171:19-24, 172:6, and 173:1-7 is deficient because Mr. Snyder took "no steps to inform himself so as to respond to" Topic Nos. 15 and 18.*

Again, your assertion that Mr. Snyder didn't take any steps to educate himself about this topic is incorrect. Mr. Snyder testified that he learned that the Oce 3165 that HRD had returned was sold at wholesale for $4,500.00 and that the Oce 3100 could not be sold at wholesale. When obtaining this information, Mr. Snyder inquired and confirmed that the $4,500 wholesale price was roughly the average wholesale price at that time. (172:16-24.) Accordingly, your assertion that Mr. Snyder took "no" steps to educate himself about this topic is inaccurate.

<u>December 18, 2006 Deposition</u>

1.    *You claim that IKON's testimony at pages 43:14-20 and 44:12-21 was deficient because Mr. Snyder took "no steps to inform himself so as to respond to" Topic No. 8, which involves IKON's communications with GE Capital about this lawsuit.*

Once again, you have ignored entire pages of testimony when claiming that Mr. Snyder took no steps to prepare himself as to this issue. Mr. Snyder testified that IKON informed GE Capital about this lawsuit by telephone, the



# ROBINSON & COLE LLP

Page 9

names of the people from IKON and GE who were involved in the call, and substance of the conversation with GE Capital. (40:20 – 44:11.) Since Mr. Snyder could not testify about any of this information during the first day of his deposition, he obviously made an effort to prepare himself on this topic for his second day of deposition.

I do not understand what you mean by the statement in your January 19 letter that reads: "Plaintiff has grave concerns the deponent had taxes to all relevant documents. Plaintiff renews its request for a register of all documents not produced on advice of counsel." It is unclear what information you are requesting. IKON will not provide "a register of all documents not produced on advice of counsel." Such a register necessarily involves information protected from disclosure by the attorney-client privilege and/or work product doctrine. Further, I am unaware of any authority that gives you the right to a list of documents that have not been produced in discovery for reasons other than privilege or work product.

After reviewing the testimony about this topic, I agree that some of your questions remain unanswered. Since receiving your January 19 e-mail, IKON has taken additional steps to gather information responsive to this topic. IKON will either provide a complete written description of its communications with GE Capital about this lawsuit or prepare its Rule 30(b)(6) witness accordingly. Please let me know which option you prefer.

2.      You claim that IKON's testimony at pages 57:18-23 and 58:6-12 was deficient because Mr. Snyder took "no steps to inform himself so as to respond to" Topic No. 10, which involves IKON's internal procedures for accepting photocopying equipment returned from a lease.

Your question in the testimony cited above was limited to whether there was a written policy in place regarding this issue. This issue is addressed above in response to bullet point number seven. Again, Mr. Snyder provided substantial testimony about what typically happened to the machines when they were returned from lease. His inability to locate a written policy document does not support your assertion that he did nothing to prepare for this topic.



# ROBINSON & COLE LLP

Page 10

Documents Referenced

 I have reviewed the document referenced at page 98:2 of the December 6, 2006 deposition and have determined that it is responsive to HRD's Request for Production No. 33. In accordance with IKON's ongoing duty to supplement its discovery responses, I have enclosed a copy of that document labeled as IOS 00400 as a supplemental response to Request for Production No. 33.

 IKON will not produce a copy of the document that is referenced at page 104:14-22 because it is not responsive to any of HRD's discovery requests. As you know, you currently do not have the right to conduct any additional discovery in this case other than the limited continuation of the Rule 30(b)(6) deposition.

 Again, I will contact you on Monday January 29 so that we can try to limit the number of issues in the planned motion for protective order.

Sincerely,

Brett J. Boskiewicz



**EXHIBIT 5**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HUMAN RESOURCE DEVELOPMENT )
PRESS, INC., )
                    Plaintiff )
                               )
v.                             )    3:05-CV-30068-KPN
                               )
IKON OFFICE SOLUTIONS, INC. )
& IOS CAPITAL, INC. d/b/a )
IKON FINANCIAL SERVICES, )

        DEPOSITION OF:  JEFFREY SNYDER, taken before

Sharon R. Roy, Notary Public, Registered Professional

Reporter, pursuant to Rule 30 of the Massachusetts

Rules of Civil Procedure, at the law offices of

ROBINSON & COLE, LLP, 280 Trumbull Street, Hartford,

Connecticut on December 7, 2006, commencing at 10:47

a.m.

A P P E A R A N C E S :

(See Page 2)

            Sharon R. Roy
      Certified Shorthand Reporter
      Registered Professional Reporter

---

A P P E A R A N C E S :

FOR THE PLAINTIFF:

DAVID J. NOONAN, ESQ.
228 Triangle Street
Amherst, MA 01002
413-549-5491

FOR THE DEFENDANT:

ROBINSON & COLE, LLP
280 Trumbull Street
Hartford, CT 06103
860-275-8289
    BY:  BRETT J. BOSKIEWICZ, ESQ.

In Attendance:

Gregory Carkhuff

---

I N D E X

EXAMINATION                                    PAGE
----------------------------------------------------

By Attorney Noonan                               6

EXHIBITS:                                      PAGE:

1:  Notice of Deposition ........................  14
2:  Defendant's Answer to Plaintiff's First
    Amended Complaint ...........................  47
3:  Executive Summary ...........................  69
4:  Copy Management Program .....................  119
5:  Product Schedule ............................  128
6:  HRD Press Executive Financial Summary .......  145

            —*—

---

1          S T I P U L A T I O N S
2              It is agreed by and between the
3      parties that all objections, except
4      objections as to the form of the questions,
5      and all motions to strike unresponsive
6      answers are reserved and may be raised at the
7      time of trial for the first time.
8              It is further agreed by and between
9      the parties that the sealing of the original
10     deposition transcript and notification to all
11     parties of the receipt of the original
12     deposition transcript is hereby waived.
13
14         JEFFREY SNYDER, Deponent, having
15     been satisfactorily identified by the
16     production of his driver's license and having
17     first been duly sworn by the Notary Public,
18     deposes and states as follows:
19
20             MR. NOONAN:  I'd like to put on the
21     record something we didn't put on the record
22     yesterday, and that is stipulations.  I think
23     we proceeded yesterday based on stipulations
24     that all objections except as to form were

45

1 relating to paragraph 19 because you already knew
2 those facts?
3     A.    General facts relating to Section 19, yes.
4     Q.    All right, then, fine.  Let's talk about
5 paragraph 19.
6     A.    Okay.
7     Q.    What did it cost IKON to purchase the
8 imageRunner 110?
9         MR. BOSKIEWICZ:    Objection.  That's
10     confidential business information of IKON.
11     The actual purchase price of the equipment is
12     IKON's confidential business information and
13     to the extent it involves agreements with
14     vendors and negotiated prices, that
15     information's confidential.
16     Q.    (By Mr. Noonan)  Have you signed a
17 confidentiality agreement?
18     A.    No.
19     Q.    I repeat the question.  What did IKON pay
20 for the imageRunner 110 that was sold to my client?
21         MR. BOSKIEWICZ:    Same objection.
22     A.    I do not know.
23     Q.    Did you ask anyone to try to inform
24 yourself so that you could answer that question?

46

1     A.    No, I did not.
2     Q.    Did you have independent knowledge already
3 in your head of the answer to that question?
4     A.    General, but not specific.  I mean,
5 purchasing contracts between IKON and their vendors
6 are determined at intervals and may change over time
7 based upon past ordering frequency or market
8 availability.
9     Q.    Before the date of this deposition did you
10 already know in your head what IKON paid for the
11 imageRunner 110 that was sold to my client?
12     A.    No.
13     Q.    Did you review any documents in order to
14 educate yourself as to what price IKON paid for the
15 Canon imageRunner 110 that it sold to my client?
16     A.    No.
17     Q.    And you didn't ask any questions of any
18 supervisor in order to have knowledge to answer that
19 question?
20     A.    No.
21     Q.    Let's go back and figure out what else
22 you've done in order to prepare yourself for this
23 deposition.  Please turn to page 2 of the subpoena.
24     A.    Yes.

47

1     Q.    Now, you've told me that you reviewed all
2 the documents that are in front of you which are
3 Bates numbered 1 through 399, including those
4 documents which Counsel has withheld for purposes of
5 confidentiality.  Is that true?
6     A.    Yes.
7     Q.    What did you do to inform yourself as to
8 the subject matter of paragraph No. 2 -- strike that
9 question.  Go back to paragraph No. 1.  So, having
10 prepared yourself to educate yourself about the
11 subject matter of paragraph No. 1 ...
12             (Exhibit 2, marked)
13     Q.    Let me show you what's been marked as
14 Exhibit No. 2.  Please review that.
15         Have you seen that document before?
16     A.    Yes.
17     Q.    What is that document?
18     A.    Defendant's Answer to Plaintiff's First
19 Amended Complaint.
20     Q.    Have you seen exhibit No. 2 before?
21     A.    Yes.
22     Q.    When did you last see Exhibit No. 2?
23     A.    When did I last see it?
24     Q.    Correct, when did you review it?

48

1     A.    Probably this past Sunday night.
2     Q.    Please focus your attention to paragraph
3 No. 13 of Exhibit 2.  Would you read that to
4 yourself, please.
5         Have you read that?
6     A.    Yes.
7     Q.    Please tell me every fact that you know
8 that supports IKON's answer contained in paragraph
9 No. 13.
10         MR. BOSKIEWICZ:    I'm going to object
11     to the form of that.  He's going to need to
12     have the Complaint in front of him in order to
13     answer that.  You can't expect him to have
14     memorized your First Amended Complaint.
15         MR. NOONAN:    Good point.  Let's go
16     off the record.
17             (Off-record discussion)
18         MR. NOONAN:    Back on the record,
19     please.
20     Q.    (By Mr. Noonan)  The Amended Complaint is
21 included as an exhibit to the Rule 30(b)(6) Notice of
22 Deposition.  Do you have that Amended Complaint in
23 front of you now, Mr. Snyder?
24     A.    Yes, sir.

93

1  was going to be included in the numbers that are
2  contained in the executive summary here?
3      A.    With reference to Exhibit 3 and your
4  question, yes, I was aware that the OCE dollars to a
5  prior agreement were included in this agreement, yes.
6      Q.    And so when you typed in these numbers for
7  the first 36 months and then the number or monthly
8  payment for the remaining 36 months, did you know
9  that those two numbers that you typed in included
10  some cost for what was still owed on the OCE
11  equipment?
12      A.    Yes.
13      Q.    Did Mr. Fusaro know that the numbers
14  contained here in the financial consideration portion
15  included costs for the balance of what was due on the
16  OCE contract?
17          MR. BOSKIEWICZ:    Objection to form.
18      Q.    (By Mr. Noonan)  I'll withdraw the
19  question.  Did you have any discussions with
20  Mr. Fusaro as to what the component parts were of the
21  numbers that are set forth here for the monthly
22  payments?
23      A.    Yes.
24      Q.    And what did you and Mr. Fusaro discuss?

94

1  Did he indicate what comprised these numbers?
2      A.    I'll refer back to the process.  The best
3  way I can answer the question is, once I determine
4  from my work sheet what the appropriate selling price
5  of the new asset is and I obtain the service and
6  supply amounts, I submit to them or with a payoff
7  sheet, upgrade, trade-up sheet of the remaining
8  agreement, so my work sheet has a sales price and the
9  after market component.  There's three components to
10  a lease:  The equipment portion, the new equipment
11  portion, the service supply portion, and trade-up, if
12  any, portion to determine what that monthly payment
13  would be.
14      Q.    When you say the trade-up portion, are you
15  referring to what dollars might be owed under a prior
16  contract?
17      A.    Yes.
18      Q.    Now, when you prepared Exhibit 3 and, in
19  particular, the numbers here for the monthly
20  payments, did you believe that IKON was going to
21  regain possession of the OCE equipment?
22      A.    My understanding is that was our equipment
23  from 1988 and was only leased for usage by HRD Press.
24      Q.    No, my question is, as part of this

95

1  proposal, Exhibit 3, did IKON contemplate that it was
2  going to somehow get possession back of the OCE
3  equipment.  H, that HRD was going to surrender the
4  equipment to you, was that part of this proposal?
5      A.    Yes.
6      Q.    Okay.  Now -- so, IKON knew at the time
7  that it prepared Exhibit 3 that as part of the
8  proposal, the original equipment, first equipment,
9  would be surrendered back to IKON?  Yes?
10      A.    Yes.  I wouldn't necessarily use the word
11  "surrendered," though.
12      Q.    Well, you'd get physical possession of it?
13      A.    Yeah, we'd go pick up the equipment, go
14  collect our assets.
15      Q.    And HRD would no longer have use of that
16  equipment?
17      A.    Yes, sir.
18      Q.    When you prepared Exhibit 3, did you know
19  what IKON would do with the OCE equipment once it had
20  been turned over back to IKON?
21      A.    It's not an exact science how they
22  determine whether -- there's three options for the
23  equipment when it's returned to IKON.  Based upon
24  market viability of the product, based upon age,

96

1  scope, number of impressions -- there's a lot of
2  variables, and what the final determination is I
3  don't know.  There's a lot of factors that go into
4  that.  But, yes, it's either usually they redeploy
5  them in the field under a -- you know, lease it to
6  somebody else or rent it to somebody or use it in the
7  showroom; an alternative use for it.  Or they
8  wholesale it to a wholesaler which basically sends
9  the equipment overseas.  Or they destroy it.
10      Q.    When you say "destroy," does that mean
11  throw it in a junk yard?
12      A.    Yeah.
13      Q.    Do they take salvage parts off it before
14  they destroy it?
15      A.    It really depends upon the asset.  Some
16  parts are more valuable than others, some parts are
17  quickly spoiled and have to be replaced with new,
18  anyways.
19      Q.    In some instances, prior to, quote,
20  destroying it, depending on the piece of equipment,
21  is the equipment cannibalized and parts removed for
22  re-use in another machine?
23      A.    They may do that, yeah.  I can share more
24  in that regard.

97

1    Q.   At the point in time when this executive

2  summary, Exhibit 3, was prepared, did IKON know

3  exactly what it was going to do with the OCE

4  equipment once it was returned to IKON?

5    A.   No. No, they don't -- that's the way the

6  process works is basically we put in the truck's

7  deliver slip for the new equipment and then tell the

8  trucks when to come and get the old equipment. Where

9  it goes from there could be, you know, directed back

10  to an IKON showroom, depending upon the asset, or

11  directed to the warehouse. And from there, I mean,

12  once they pick it up, my knowledge of where that

13  thing's going, unless I have a need for it somewhere

14  else and really try to take that and put it into

15  another transaction, I have no idea. Once the truck

16  picks it up, it could go anywhere.

17    Q.   So, in this particular case, is it your

18  testimony that the decision as to what to do with the

19  OCE equipment, that decision was made after HRD had

20  signed a second agreement?

21    A.   Yes.

22    Q.   Do you know what happened to the OCE

23  equipment?

24    A.   Yes, I do.

98

1    Q.   What happened to the OCE equipment?

2    A.   The 3100 was destroyed and the 3165 was

3  sold to a wholesaler in September of that same year,

4  or beginning of October, for the value of $4,500.

5    Q.   And are there documents in IKON's

6  possession that establish the facts that you just

7  told me?

8    A.   Yes.

9    Q.   What documents establish or support your

10  testimony?

11    A.   We were able to -- I had my inventory

12  specialist make some inquiries into the archives to

13  see if we could find proof of what happened to them,

14  and they were able to find a screen showing the same

15  serial number and what happened to them. That actual

16  information was procured -- well, Brett asked --

17  Robinson & Cole finally got that information.

18    Q.   Was that information printed out onto a

19  piece of paper?

20    A.   It was an e-mail response, I don't know if

21  it got printed.

22      MR. BOSKIEWICZ:  Dave, I might be

23    able to short circuit this for you. That's

24    going to be part of our supplemental responses

99

1  to our interrogatory responses in response to

2  your e-mail.

3      MR. NOONAN:  You're telling me that

4  the documents we were just talking about, the

5  Bill of Sale or proof of the sale of the OCE

6  equipment, you're now going to produce those

7  documents?

8      MR. BOSKIEWICZ:  In response to your

9  e-mail that you sent me within the past two

10  weeks, you requested certain information and

11  had certain questions about our Answers to

12  Interrogatories. Based on your e-mail and the

13  fact that this information that Mr. Snyder is

14  referring to, this e-mail with the print

15  screen on it just recently came into our

16  possession, we're going to produce that to you

17  at part of the supplemental response.

18      If you'd like to look at it right

19  now for purposes of this deposition, I'll

20  walk down to my office and get it. It's part

21  of a package that's going out to you as soon

22  as I have time to finish the letter.

23    Q.   (By Mr. Noonan) All right. Well, are you

24  able to testify about this without looking at that

100

1  document?

2    A.   Yes.

3    Q.   The piece of equipment that was destroyed,

4  was that the more expensive or the less expensive

5  piece of equipment?

6    A.   More expensive.

7    Q.   Do you know why it was destroyed?

8    A.   There's no rhyme or reason. I know the

9  date was after the end of our fiscal year. Also,

10  it's public information. IKON was minimizing our

11  relationship with OCE due to their escalating

12  internal cost to us. So, basically, OCE was a brand

13  on the way out of IKON. But under agreements between

14  manufacturers, you know, you got seven years to

15  provide service and support for anything you sell.

16  We no longer sell OCE new, and I don't believe we

17  have since -- I want to say 2004.

18    Q.   Do you know why the one OCE was destroyed

19  as opposed to sold to a wholesaler?

20    A.   No rhyme nor reason. The only thing that I

21  can think of is the OCE 3100 was a very, very heavily

22  engineered machine with a lot of parts, digits,

23  wheels, et cetera, and usually in a wholesale

24  relationship they aren't looking for more complicated

101

1  machines to support, because you need authorized
2  service personnel. You just couldn't -- the OCE 3100
3  came apart in six different parts that weigh about
4  400 pounds apiece, and usually when you wholesale
5  something, it's usually a one-piece design product or
6  a smaller office copier maybe you're familiar with,
7  but the OCE did have its technical intricacies to it.
8  So, to wholesale it, the wholesaler would have to
9  have somebody on the other end they could sell to
10 that could provide the service, the reinstallation,
11 be an authorized dealer, and OCE just didn't -- they
12 just don't give up service dealerships without a lot
13 of financial investment from a company.
14      So, wholesale viability for a 3100 I
15 believe is -- and this is probably my opinion, but a
16 good one, is due to the intricacy of the product they
17 couldn't wholesale it, nobody would buy it because
18 you'd have to be an authorized dealer to service the
19 thing. And the 3165 was a digital product, smaller
20 frame, a little easier to service, so I think that
21 had a little more viability in the market. And also,
22 the OCE 3100, great machine, did a lot, but it was an
23 analog copier, meaning the only way you get output is
24 put in hard copy originals. The market was heading

102

1  to digital, where every print is an original, not a
2  copy of a copy, and this is the main -- one of the
3  main reasons why HRD wanted the 110.
4      Q.  Do you know how many OCEs were surrendered,
5  turned over, to IKON during the period 1998 through
6  2000?
7          MR. BOSKIEWICZ:  Objection. Again,
8      we're going to object to that as outside the
9      scope of discovery and outside the scope of
10     this 30(b)(6) Deposition Notice. Again, I
11     don't see how that question is relevant to
12     your claims and defenses that are pending in
13     this lawsuit.
14     Q.  (By Mr. Noonan) Mr. Snyder, would you
15 please refer to paragraph 15 of the deposition
16 notice?
17         MR. BOSKIEWICZ:  I'll withdraw that
18     piece of the objection, Dave. I stand
19     corrected. But maintain the objection that I
20     think it's outside the scope of discovery.
21     MR. NOONAN:  Okay, fine.
22     Q.  (By Mr. Noonan) Answer the question. Do
23 you know how many --
24     A.  No, I do not.

103

1      Q.  What steps did you take in preparation for
2  this deposition to educate yourself about the facts
3  relating to paragraph 15 of Exhibit 1?
4      A.  I approached my inventory specialist, which
5  provided the access of -- or provided information
6  like in the previous questioning about the disposal
7  of the assets. So I went to her and asked her the
8  same question, "Do you think it would be possible" --
9  you know, you're talking North America, all Canada,
10 and Europe -- "to see how many of these were disposed
11 of or surrendered?"
12         She thought that was a real -- she told me
13 that that would -- with the purging of the old
14 records and going back, because some of these OCEs
15 started in the field in 1996 and stuff, that she
16 thought it was an impossible task. Because we
17 have -- IKON has several warehouses across the
18 country, it's not necessarily one disposal point.
19     Q.  Did you make any inquiries of the Northeast
20 region warehouse?
21     A.  I did.
22     Q.  And what did you ask them and what did they
23 say?
24     A.  Well, I asked them at the same time about

104

1  the other issue, and they led us to an asset disposal
2  group in Florida, and I did ask the question but they
3  felt they couldn't even give me an exact number
4  without a lot of due diligence and just because -- I
5  couldn't complete the task. I tried.
6      Q.  Did they tell you it was impossible to do?
7      A.  I don't remember the specific wording that
8  they used. I don't remember the wording that they
9  used. I couldn't get the task accomplished. I tried
10 to get it accomplished.
11     Q.  Did you invoke the power of any of your
12 supervisors in order to get the information that we
13 sought in paragraph 15?
14     A.  Yeah, when I asked the inventory specialist
15 to look into these matters for us, and when I related
16 it to a legal matter, she sent a note to the current
17 VP of Finance, "Do you want me to oblige to Jeff's
18 request?" And he was like, "Yes. If you can get it,
19 get it." And --
20     Q.  Did you get a copy of that e-mail?
21     A.  It's probably in my archives, yeah. It's
22 probably somewhere in my PC.
23     Q.  The response from the VP?
24     A.  It was just permission to look for that.

153

1  fully operational, up and running, and meeting your
2  satisfaction before they started billing on a large
3  dollar agreement. So it was de facto standard back
4  then that basically the 110s, although paperwork was
5  signed, it would not commence until a phone call was
6  made to the customer --
7      Q.   What would not commence?
8      A.   Sending out bills, or funding of the
9  equipment. Meaning that our leasing arm wouldn't
10  fund the business unit arm until the client over the
11  phone, after delivery, agreed it was installed and up
12  and running. Because the imageRunner 110s could take
13  up to a week to get up and running because they're
14  big.
15      Q.   When you refer to the funding arm, are you
16  referring to IOS Capital --
17      A.   Yes.
18      Q.   Let me make sure I have the right -- IOS
19  Capital, Inc.?
20      A.   Yes.
21      Q.   And is that a separate legal entity from
22  IKON Office Solutions, Inc. at that point in time?
23          MR. BOSKIEWICZ:   Objection to the
24      form.

154

1      A.   It is to my understanding that they were a
2  wholly-owned financial subsidiary of IKON Office
3  Solutions.
4      Q.   Okay.
5      A.   And money transferred between the leasing
6  company and the business unit of IKON called Business
7  Services which provides the traditional services you
8  think of. You know, the break/fix service, fax
9  machines, copiers.
10      Q.   So, can you tell me approximately how long
11  of a period IKON Office Solutions, Inc. actually
12  owned the equipment that was delivered to my client
13  in June or July of 2000?
14      A.   I believe that -- I want to say we didn't
15  deliver the equipment until -- the agreement was
16  signed on June 19, then we submit the agreements,
17  they get acknowledged, then they put the equipment on
18  the truck. I believe we delivered to HRD around the
19  first week of July, or the second week of July.
20      Q.   How many days prior to that delivery did
21  IKON Office Solutions, Inc. own the equipment?
22      A.   You're talking about four different assets
23  here as listed on the schedule. The 110, I'd say
24  they owned it for about a week.

155

1      Q.   Okay. And so explain the process to me how
2  IKON Office Solutions, Inc. got title to the iR110.
3  That's the most expensive piece of equipment?
4      A.   Yes, by far.
5      Q.   Let's focus our discussion on that piece of
6  equipment.
7      A.   Basically -- well, just use HRD for an
8  example, due to the value of these assets, the 110s
9  and the exposure they represent in inventory dollars,
10  we would only order iR110 systems upon order from
11  Canon. Meaning we wouldn't keep ten of these sitting
12  in a local warehouse that have a value of millions of
13  dollars. So we arrange from Canon, to not make
14  inventory levels shoot through the roof, we would
15  order upon demand.
16      Q.   So did IKON order from Canon the iR110 only
17  after HRD Press had executed the agreement on June
18  19, 2000?
19      A.   Yes, that was the process.
20          MR. BOSKIEWICZ:   Could we take a
21      quick break, Dave?
22          MR. NOONAN:   Okay.
23              (A recess was taken)
24      Q.   (By Mr. Noonan) Now, is there a document

156

1  that you have possession of or that you have reviewed
2  that effectuates some type of a transfer of title of
3  the same Canon iR110 to some other entity?
4      A.   No.
5      Q.   So from the date that you obtained title to
6  this equipment sometime maybe a week, you said,
7  before delivery to my client until today, IKON Office
8  Solutions, Inc. still holds title to this piece of
9  equipment?
10      A.   No, I think I may want to explain the
11  process again for you, just to try to make it very
12  clear this time. I thought I did last time.
13          In the case of imageRunner 110s, a very
14  expensive piece of equipment --
15      Q.   What is the purchase cost of that? You
16  keep saying it's expensive. How do you know it's
17  expensive?
18      A.   MSRP on the product can start anywhere from
19  240,000 and go to 750,000 per machine.
20      Q.   Okay. So your conclusion that it's
21  expensive is based on the MSRP, not on any knowledge
22  of what IKON actually paid for it?
23      A.   Yes.
24      Q.   Okay, go ahead.

157

1  A.  So, it's a very expensive piece of
2  equipment relative to others, so as a result, IKON
3  does not inventory or keep these in local warehouses
4  everywhere because it's an inventory cost in turn of
5  a very expensive piece of asset compared to other
6  products we sell based upon MSRP.
7      As a result, the process usually works --
8  and this is why in the e-mails you'll see Kate Byers
9  and Mike Fusaro.  Kate Byers represented corporate
10 ordering and procurement as well as making sure the
11 finances were done properly, because she would be the
12 one that placed the orders with Canon.
13     So, to refer back, HRD signs a document,
14 say, day one.  I put together the deal package.  I
15 send it to Kate Byers via an administrator, per se.
16 She ensures that we have funding, we have equipment,
17 does her due diligence, then issues the purchase
18 order to Canon from corporate.
19     Canon receives that purchase order and then
20 from a local warehouse releases that equipment from
21 the IKON purchase order to an IKON warehouse.  In
22 this case it would be IKON Westboro, Mass.  IKON now
23 has issued the purchase order, received the equipment
24 in Westboro, Mass., then they put it on a truck with

158

1  IKON packing slips and deliver it to the customer.
2      Unlike other products, the acceptance of
3  the product is done by a phone call with the
4  imageRunner 110s to ensure that the machine is
5  installed and is operational to the client's
6  satisfaction.  When the client says yes to that phone
7  call, then the billing -- then IKON gets funded for
8  the dollar amount of the transaction --
9      Q.  Funded by whom?
10     A.  The finance company, whether it be IOS
11 Capital or today, G.E.
12     Q.  Okay.
13     A.  At that point it's now the finance
14 company's asset.
15     Q.  So, title gets transferred from IKON Office
16 Solutions, Inc. to the financing company, perhaps IOS
17 Capital, is that what your testimony is?
18     A.  Yes.
19     Q.  Is there a document somewhere that shows
20 that transfer?
21     A.  Not to my knowledge.  It's all done through
22 the computer system of we put the application to
23 their system, financial application, so that's now a
24 live application.  And then if paperwork comes

159

1  through, that's executed.  To be honest with you, I
2  do not know how the dollars shift from one, but I do
3  understand the process.
4      Q.  Is there somewhere in Exhibit 5 where IKON
5  Office Solutions, Inc.'s rights are assigned to IOS
6  Capital?
7          MR. BOSKIEWICZ:  Objection to form.
8          MR. NOONAN:  What's the objection to
9      form?
10         MR. BOSKIEWICZ:  You're asking him
11     to interpret a legal document.  He's not a
12     lawyer.
13         MR. NOONAN:  All right, let me
14     rephrase the question.
15     Q.  (By Mr. Noonan)  Are there any words in
16 Exhibit 5 that effectuates some type of transfer of
17 rights to IOS Capital?
18         MR. BOSKIEWICZ:  Same objection.
19         MR. NOONAN:  I'll remind you this is
20     your 30(b)(6) deponent.
21         MR. BOSKIEWICZ:  Sure, but he's not
22     a lawyer.  He can answer the question, but I'm
23     objecting to the form of the question.
24     A.  My answer to the question, reading the

160

1  document, barring I don't have the esquire title
2  behind my name, is, even from paragraph one, "We
3  agree to rent to you," the "we" is IOS Capital, the
4  "you" is, in this case, Human Resource Development
5  Press.
6      Also under the Section 9 of Exhibit 5 under
7  "Title Recording," it says, "We are the owner of and
8  will hold title to the product."  "We" is IOS Capital
9  and "you" is HRD Press.
10     Q.  Okay.
11     A.  So, no, I do not believe there is -- with
12 my technical reading ability of this document, that I
13 see transfer of title from IKON Office Solutions to
14 IOS Capital.  It's an agreement between IOS Capital
15 and the customer.  I am not aware of -- it says,
16 actually, on top of this agreement, too --
17     Q.  You're looking at what agreement, the
18 Master Agreement?
19     A.  I'm looking at the Master Agreement in
20 Exhibit 5 in your package, page 4.
21     Q.  Page number?
22     A.  Four.
23     Q.  Page No. 4?
24     A.  Yeah.  Which actually doesn't have a Bates

165

1      A.   Yes.

2      Q.   And is it your understanding that that was

3  the case with respect to this specific inventory,

4  that it was already -- this specific equipment, that

5  it was already in IKON's inventory?

6      A.   Yeah, other than the imageRunner 110, there

7  are no special circumstances for -- these are what we

8  call standard products, which are readily available

9  from one to three-day delivery, depending upon

10  configuration.

11      Q.   Do you know, is there any set of policies

12  or procedures that IKON has that governs what IKON

13  should do when it receives equipment, when equipment

14  is surrendered as part of a trade-up to other

15  equipment?

16      A.   I believe the policies change upon the

17  model coming back and whether it has a useful life,

18  market viability and sellability, a whole bunch of

19  variables. I don't think it's clear cut.

20      Q.   Did you take any steps to educate yourself

21  in order to testify here today so that you can answer

22  questions concerning paragraph 10 in my Notice of

23  Deposition? Please refer to paragraph 10.

24      A.   I did make a phone call -- well, I went to

166

1  go speak with Christine about what the policies are

2  today.

3      Q.   Christine who?

4      A.   Flanagan. She's our inventory specialist

5  in Hartford.

6      Q.   And --

7      A.   And I met the answer with the G.E.

8  Financial Leasing.

9      Q.   You met the answer, I'm not sure --

10      A.   Well, I asked the question, and she

11  provided the answer.

12      Q.   And what was her answer?

13      A.   For any leased asset coming back, that is

14  G.E.'s asset they pick up their own assets.

15      Q.   No, well, I'm talking about IKON's

16  policies, not G.E.'s policies.

17      A.   Well, as far as financing, which is 95

18  percent of transactions that we write, we don't own

19  the equipment coming back, it's G.E.'s. We have no

20  right to say what they do with it. It is theirs for

21  their disposal.

22      Q.   And prior to G.E., that would have been IOS

23  Capital's decision?

24      A.   Yes, I believe it was IOS Capital's. I do

167

1  not understand from a high-level corporate -- you

2  know, how the two different subsidiaries interacted

3  with each other. I was not able to find out how that

4  is related from one --

5      Q.   Is it your understanding that IOS Capital

6  is now part of IKON Office Solutions, Inc. as a

7  result of a merger?

8      A.   No, they were wholly bought by G.E. Every

9  single asset we had in our portfolio went to them.

10  Nothing retained.

11      Q.   In 2000, in June of 2000 or in July of

12  2000, when IKON accepted the surrender of the OCE

13  equipment, did you take any steps to educate yourself

14  as to what IKON's policy was for accepting and

15  processing surrendered equipment as part of an

16  upgrade?

17      A.   Well, I understand the pickup and return

18  process to the warehouse, and when I was pursuing the

19  answer, trying to find out like where the assets went

20  to on another request, I asked how it was determined,

21  and there was no rhyme or reason that could be

22  supplied.

23      Q.   Does that mean there was no written policy?

24      A.   Yes. There was no -- it's sometimes based

168

1  on age of the equipment, condition of -- it could be

2  a brand-new piece of equipment that a customer had

3  water damage on, even though it's market

4  availability, it gets thrown in the trash. So it's a

5  "if then" statement, sort of.

6      Q.   Did you make any inquiry as to what IOS

7  Capital's policies were with respect to receiving

8  equipment that was surrendered as part of a trade-up

9  and whether or not there were any policies about

10  crediting that customer with any value in exchange

11  for the surrender of the equipment?

12      A.   In my ten years with IKON and with all the

13  transactions I'm aware of and been aware of, the

14  policy, basically, when that equipment comes back,

15  there is no credit or surrender of anything to the

16  customer in the form of like a reduction in payment

17  or a credit.

18      Q.   And that's true even if the customer has to

19  continue to pay for that equipment through the

20  subsequent agreement?

21      A.   Yes. Yes.

22      Q.   Did IKON disclose to HRD Press in June of

23  2000 or in that period of time that, when it

24  surrendered the OCE equipment in order to get into