# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS INC., | : |
| | : |
| | : |
| Plaintiff, | : |
| | :    3:05-CV-30068-KPN |
| | : |
| v. | : |
| | : |
| IKON OFFICE SOLUTIONS, INC. & | : |
| IOS CAPITAL, INC. d/b/a IKON | : |
| FINANCIAL SERVICES, | : |
| | : |
| Defendants. | : |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

This lawsuit is a desperate attempt by a financially-troubled company to escape its contractual obligations.  In June 2000, Human Resource Development Press, Inc. ("HRD") made a six-year commitment to lease a digital printing system from IKON Office Solutions, Inc. ("IKON").[1]  HRD used this system and made its monthly payments without complaint until November 2003.  At that time, HRD informed IKON that it had severe financial problems and asked IKON whether and how it could reduce the amount of its monthly lease payments.

IKON met with HRD and immediately lowered the monthly payment amount by approximately $1,300.  IKON also began working with HRD to try to find a long-term financial solution that would further reduce HRD's monthly payment amount but still satisfy its current contractual obligations.  These discussions eventually ended in February 2004 when HRD

---

[1] HRD's 1998 and 2000 lease contracts were with IOS Capital, Inc., IKON Office Solutions, Inc.'s former subsidiary and finance company.  IOS Capital, Inc. sold the majority of its lease portfolio and operations in an asset sale to General Electric Capital Corporation in 2004 (and later sold the remaining lease portfolio).  IOS Capital, Inc.'s successor, IOS Capital LLC was merged into IKON Office Solutions, Inc. on or about March 30, 2004.

informed IKON that its business and restructuring efforts were not proceeding the way that it had

anticipated.  HRD stopped making its required lease payments a few months later in May 2004.

In September 2004, IKON received a letter from HRD's attorney accusing IKON of,

among other things, lying to HRD when it negotiated the June 2000 lease agreement – a claim

that HRD did not even mention when it was trying to get IKON to reduce its monthly payment

during late 2003 to early 2004.  HRD filed this lawsuit in March 2005 claiming that IKON

committed fraud, violated the usury laws, violated the Uniform Commercial Code, breached the

covenant of good faith and fair dealing, and violated Mass. Gen. Laws. ch. 93A.  IKON

successfully moved to dismiss all of HRD's claims, except a fraud claim, the Article 9 claim, and

the Chapter 93A claim.

IKON now moves for summary judgment on the remaining claims.  HRD cannot prove

the elements of its fraud and Chapter 93A claims, both of which are also time-barred, and it

cannot show that Article 9 applies to its agreement with IKON.  Accordingly, IKON is entitled to

judgment was a matter of law.

## II.    FACTUAL BACKGROUND

HRD creates, owns, and publishes certain assessment tests, human resource training

materials, and various other training and development materials.  (First Am. Compl., ¶ 6.)  HRD

has had a business relationship with IKON or its predecessors since at least 1987.  (Affidavit of

Jeffrey Snyder ("Snyder Aff.") ¶ 6, attached as Ex. 1; Def.'s L. Civ. R. 56.1 Statement of

Material Facts ("SMF") ¶ 2.)  This relationship has involved at least three lease agreements – a

1996 lease agreement for an Oce 2600 document reproduction machine and the 1998 and 2000

lease agreements that are the subject of this lawsuit.  (Id.)  On or about May 20, 1998, HRD and

IKON entered into a written agreement concerning HRD's use of two document reproduction

machines (the "First Agreement") – an Oce 3100 and an Oce 3165 (collectively, the "First Equipment"). (Snyder Aff. ¶ 7, Ex. A; SMF ¶¶ 3-4.) The First Agreement was a 60-month, non-cancelable agreement that required HRD to pay monthly payments of $4,268 for the first thirty-six months and $5,825.00 for the final twenty-four months for the possession and use of the First Equipment. (Snyder Aff. Ex. A; SMF ¶¶ 5-7.) The First Agreement specified that agreement was a lease and that the financing company, IOS Capital, Inc., owned the First Equipment and therefore obligated HRD to return the First Equipment to IOS Capital, Inc. at the end of the 60-month term. (Snyder Aff. Ex. A; SMF ¶¶ 8-10.) At the inception of the First Agreement, IKON determined that, at the end of the 60-month lease term, the Oce 3100 and Oce 3165 would be worth $11,820 and $6,334, respectively. (Deposition of Daniel Feldmann ("Feldmann Dep.") at 12-13, attached as Exhibit 2; SMF ¶¶ 15-18.) Therefore, the estimated economic life of the First Equipment exceeded the First Agreement's 60-month term.

In early 2000, document production technology evolved and Canon, Inc. introduced its ImageRunner 110 digital document production system to the market. (Snyder Aff. ¶ 8; SMF ¶ 18.) The ImageRunner 110 offered near offset press quality printing and high speed production capacity. (Snyder Aff. ¶ 8; SMF ¶ 19.) An IKON service technician told HRD about the new technology and suggested that it look into the benefits that the ImageRunner 110 could offer HRD's business. (December 7, 2006 Deposition of Jeffrey Snyder ("12/7 Snyder Dep.") at 62-63; attached as Ex. 3; SMF ¶ 20.) HRD contacted its IKON account representative and began a several month process of evaluating the ImageRunner product line. (Snyder Aff. ¶ 10; 12/7 Snyder Dep. at 110-116; SMF ¶ 21.)

This process included several meetings between IKON and HRD personnel to assess HRD's business needs, demonstrate the ImageRunner technology, and inspect and assess HRD's

3

facilities to determine installation logistics such as electric service, network requirements, and physical space requirements. (12/7 Snyder Dep. at 106-110; SMF ¶ 22.) HRD was pleased with the technology and eventually decided to implement a Canon ImageRunner 110, ImageRunner 330, ImageRunner 210, and a CLC 900 (collectively, the "Second Equipment") into its business operations. (12/7 Snyder Dep. at 114-116; Snyder Aff. ¶ 11; SMF ¶ 23.) On or about June 14, 2000, IKON's Jeff Snyder, Doug Thornton, and Al Maximino met with HRD's President, Robert Carkhuff, to present the terms of a proposed lease agreement and discuss the logistics of installing the Second Equipment. (12/7 Snyder Dep. at 68-70; Snyder Aff. ¶ 12; SMF ¶ 24.) This meeting detailed the delivery and installation process, the removal of the First Equipment, training that IKON would give HRD's staff, services that IKON would provide to minimize the production downtime during installation, and the financial terms of the proposed lease agreement. (12/7 Snyder Dep. at 106-110; Snyder Aff. ¶ 12; SMF ¶ 24.)

On or about June 19, 2000, Snyder, Thornton, and Maximino met with Robert Carkhuff again to finalize the proposed agreement. (12/7 Snyder Dep. at 134-136; Snyder Aff. ¶ 15, Ex. C; SMF, ¶ 25.) During this meeting, Robert Carkhuff executed a written agreement concerning HRD's use of the Second Equipment (the "Second Agreement"). (12/7 Snyder Dep. at 134-136; Snyder Aff. ¶ 15, Ex. C; SMF, ¶¶ 25-26.) The June 14th and June 19th meetings were the only two times when HRD and IKON discussed the financial terms of the Second Agreement before HRD signed that agreement. (Snyder Aff. ¶ 17; SMF ¶ 27.) Robert Carkhuff did not ask IKON whether the Second Agreement included the remaining obligation that HRD owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff., ¶ 18; SMF ¶ 28.) IKON did not tell Robert Carkhuff or anyone from HRD that cost of the Second Agreement would not or did not include the remaining obligation that HRD

owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶¶ 20-21; SMF ¶¶ 30-32.)

The Second Agreement was a 72-month lease agreement that required HRD to pay $8,949.00 per month for the first thirty-six months and $12,116.00 per month for the final thirty-six months. (Snyder Aff. Ex. C; SMF ¶ 34.) These monthly payments included charges for use of the Second Equipment, charges for services and supplies for the Second Equipment, and charges to satisfy the remaining $119,996.00 that HRD owed for the equipment charges on the First Agreement. (Dec. 18, 2006 Deposition of Jeffrey Snyder ("12/16 Snyder Dep.") at 68, attached as Exhibit 4; April 30, 2007 Deposition of Jeffrey Snyder ("4/30 Snyder Dep.") at 53-54, attached as Exhibit 5; SMF ¶ 35.) The monthly payments did not include the remaining service and supply charges associated with the First Agreement. (4/30 Snyder Dep. at 41-43; December 6, 2006 Deposition of Glenn Robbins ("12/6 Robbins Dep.") at 114, attached as Exhibit 6; SMF ¶ 36.)

The Second Agreement did not specify the costs of the Second Equipment or the other charges that made up the monthly payment amount. At some point in July 2000, however, HRD asked IKON to provide it with the costs of the Second Equipment for insurance and/or accounting purposes. (Snyder Aff. ¶ 23, Ex. D; SMF ¶ 37-38.) In response to this request, Jeff Snyder prepared an Accounting Value Statement for the Second Equipment based on the manufacturer's suggested retail price of that equipment and gave it to HRD in July 2000. (Snyder Aff. ¶ 23, Ex. D; SMF ¶¶ 37-38.)

IKON removed the First Equipment and installed the Second Equipment at HRD in July 2000. (Snyder Aff. ¶ 24; SMF ¶¶ 39-40.) IKON subsequently evaluated the First Equipment and determined that no market existed for that particular Oce 3100 at that time and therefore

discarded the machine or stripped it for parts.  (12/7 Snyder Dep. at 95-98, 100-102; SMF ¶¶ 41-42.)  The Oce 3165 had some value on the wholesale market at the time and was eventually sold for $4,500 to a wholesaler.  (12/7 Snyder Dep. at 98, 100-102; SMF ¶¶ 41-42.)

HRD contacted IKON in the fall of 2003 – after making its required lease payments since August 2000 – and informed IKON that it had been having some financial problems.  (Affidavit of Glenn Robbins ("Robbins Aff.") ¶¶ 7-8, attached as Exhibit 7; SMF ¶ 44.)  HRD's consultant, Don Collins, told IKON's Glenn Robbins that he and HRD's Greg Carkuff were evaluating the business finances to determine whether to continue the business, liquidate, or file for bankruptcy.  (Robbins Aff. ¶ 7; SMF ¶ 45.)  Collins asked to meet with IKON to discuss ways to lower HRD's monthly payment obligation.  (Robbins Aff. ¶ 7; SMF ¶ 45.)

Robbins met with Collins and Greg Carkhuff on October 29, 2003.  (Robbins Aff. ¶ 8; SMF ¶ 45.)  Collins and Carkhuff told Robbins that HRD had lost approximately $700,000 over the past three years and that they needed to reduce HRD's monthly payments on the Second Agreement.  (Robbins Aff. ¶ 7; SMF ¶ 44, 47.)  Robbins, Collins and Carkhuff discussed the fact that the monthly payment amount included the equipment charges, the service and supply charges, and the remaining obligation from the First Agreement.  (Robbins Aff. ¶ 8; SMF ¶ 47.)  HRD asked Robbins for the dollar amount for each component at this meeting.  (Robbins Dep. at 99-100; Robbins Aff. ¶ 8; SMF ¶ 48.)  Robbins did not have that information but told HRD that he would get the figures and get back to them.  (Robbins Aff. ¶ 8; SMF ¶ 48.)

IKON met with Collins and Greg Carkhuff again on November 7, 2003.  (Robbins Aff. ¶¶ 10-11; SMF ¶ 49.)  Robbins brought Paul Lee, a Director of Finance, and Joe McGrath, a Business Development Manager, with him to this meeting.  (Robbins Dep. at 105; Robbins Aff. ¶ 10; SMF ¶ 49.)  Robbins prepared and presented a written financial summary that included the

information that HRD had requested at the October 29th meeting.  (Robbins Dep. at 105; Robbins Aff. ¶ 10, Ex. B; SMF ¶ 50.)  At this meeting, IKON agreed to reduce the service and supply component by approximately $1,300 per month and waive a late fee on a recent invoice. (Robbins Aff. ¶ 11; SMF ¶ 51.)  IKON also agreed to evaluate whether HRD could re-finance and extend the Second Agreement for a longer period of time, which would reduce the monthly payment amount, and to give HRD the option to buy out the Second Agreement if it could get the funds to do so from a third-party lender.  (Robbins Aff. ¶ 11; SMF ¶ 51.)

After the November 7, 2003 meeting, Greg Carkhuff sent an e-mail to Paul Lee expressing his appreciation for the financial concessions that IKON had made and stating that he looked forward to receiving a proposal to buy out the Second Agreement.  (Robbins Aff. ¶ 14, Ex. D; SMF ¶¶ 52-53.)  HRD did not express any dissatisfaction or surprise at either the October 29th or November 7th meetings that the remaining obligation from the First Agreement was a component of the Second Agreement or accuse IKON of misrepresenting that fact to HRD. (Robbins Aff. ¶ 15; SMF, ¶ 54.)

In late November, HRD told IKON that it had received a quote on new document production equipment from one of IKON's competitors.  (Robbins Dep. at 163-166; Robbins Aff. ¶ 16; SMF, ¶ 55.)  HRD asked IKON to provide a quote on the same or similarly configured equipment.  (Robbins Dep. at 163-166; Robbins Aff. ¶ 16; SMF, ¶ 55.)  At this time, however, HRD did not have the financial ability to qualify for a new lease agreement with IKON for that same or similarly configured equipment.  (Robbins Aff. ¶ 16; SMF, ¶ 55.)  IKON's Glenn Robbins met with Greg Carkhuff on January 22, 2004 and told him that IKON could not give him the quote that he requested.  (Robbins Aff. ¶ 16; SMF, ¶ 55.)

These discussions between HRD and IKON ended in February 2004 when Greg Carkhuff informed IKON that HRD's business and restructuring efforts were not going the way that he had anticipated and provided IKON with the contact information for HRD's bankruptcy and restructuring attorney. (Robbins Aff. ¶ 17, Ex. E; SMF, ¶ 56.) HRD made its monthly payments on the Second Agreement until May 2004. (Snyder Aff. ¶ 25; SMF ¶ 57.) It has not made a payment since then but has retained possession of the Second Equipment. (Snyder Aff. ¶25; SMF ¶¶ 57-58.)

HRD's fraud allegations first surfaced in a demand letter that IKON received from HRD's attorney in September 2004. (Snyder Aff. ¶ 26; SMF ¶ 59.) At that time, HRD accused IKON of telling HRD that the Second Agreement would not include the service and supply component of the First Agreement. (First Am. Compl., Ex. E; SMF ¶ 60.) HRD did not claim, at that time, that IKON told it that the Second Agreement would not include any of the remaining obligation from the First Agreement. (First Am. Compl., Ex. E; SMF ¶ 60.) That allegation appeared for the first time when HRD filed this lawsuit in March 2005. (First Am. Compl., Count II; SMF ¶ 60.)

## III.    LEGAL STANDARD

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. "Genuine" means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a "material fact" is one "which might affect the outcome of the suit under the governing law." *Pedicini v. United States*, 480 F. Supp. 2d 438 (D. Mass. 2007). The moving party must show an absence of evidence to support the nonmoving party's case. *Id.* "Once the

movant has made this showing, the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." *Id.*

In determining whether that burden is met, a court must consider "the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.* But, a court need not afford any weight to "conclusory allegations, improbable inferences, and unsupported speculation." *Id.* "Summary judgment provides the necessary opportunity for a court to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Id.*

## IV.    ARGUMENT

### A.    HRD Cannot Prove Its Fraud Claim.

To recover for fraud, a plaintiff must prove that the defendant made a false representation of material fact with the knowledge of its falsity, that the defendant made the statement for the purpose of inducing the plaintiff to act thereon, and the plaintiff relied upon the statement to his or her detriment. *See JSB Indus. v. Nexus Payroll Servs., Inc.*, 463 F.Supp.2d 103, 107 (D. Mass 2006); *Danca v. Taunton Sav. Bank*, 429 N.E.2d 1129, 1133 (Mass. 1982). Here, HRD cannot prove that IKON made any false statement to it, nor can it prove that it acted in reliance upon any false statement. Moreover, any such claim is time-barred.

#### 1.    IKON Did Not Make Any False Statements Of Material Fact That Induced HRD Into The Second Agreement.

HRD claims that IKON made two false statements that allegedly induced it to enter into the Second Agreement. First, HRD claims that IKON told HRD that IKON "would simply replace and substitute the Second Agreement for the First Agreement and that HRD would have no other payment obligations for the First Equipment pursuant to the First Agreement." (First Am. Compl., Count II, ¶ 57.) Second, HRD claims that IKON told HRD that IKON "was not

imposing service/maintenance or supply charges for the First Equipment through the [Second Agreement]." (Id. at Count II, ¶ 58.) Neither of these allegations supports HRD's fraud claim.

There were only two conversations between HRD and IKON regarding the financial terms of the Second Agreement – both occurred in June 2000 between HRD's President, Bob Carkhuff, and IKON's Snyder, Doug Thornton, and Al Maximino. (Snyder Aff. ¶ 17; SMF ¶ 27.) HRD did not ask whether the Second Agreement would include HRD's remaining obligation on the First Agreement during either of those conversations or at any other time prior to signing the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶ 18; SMF ¶ 28.) In fact, HRD did not question or attempt to negotiate the monthly payment amount due under the Second Agreement prior to signing the paperwork. (12/7 Snyder Dep. at 109-113; Snyder Aff. ¶ 19; SMF ¶ 29.) Neither Snyder, Maximino nor Thornton told Robert Carkhuff or any HRD employee that IKON would not include the remaining obligation owed on the First Agreement in the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶¶ 20-21; SMF ¶¶ 30-32.)

Snyder testified that he has provided the amount of the remaining obligation included in an equipment upgrade lease transaction to other customers in the past. (12/7 Snyder Dep. at 119-122.) Unlike these other customers, HRD did not ask for this information. Snyder testified that he would have given HRD this information if HRD had asked for it. (Id.)

HRD also claims that IKON told HRD that IKON "was not imposing service/maintenance or supply charges for the First Equipment through the Second Agreement." (First Am. Compl., Count II, ¶ 58.) Even if IKON made this statement, which it did not, this statement cannot support HRD's fraud claim because it is not a false statement. IKON only included the equipment charges from the First Agreement in the Second Agreement, not the service and supply charges. (4/30 Snyder Dep. at 41-43; 12/6 Robbins Dep. at 114; SMF ¶ 36.)

10

Accordingly, this statement cannot support HRD's fraud claim and therefore IKON is entitled to judgment as a matter of law on Count II.

### 2.   HRD Did Not Rely On The Alleged False Statements.

To prove fraud, a plaintiff must show that it relied on the defendant's false statement of material fact and that it was harmed by this reliance.  *See JSB Indus.*, 463 F.Supp.2d at 107. Even if HRD could prove that IKON made the alleged false statement, the following facts show that HRD did not rely on this statement when it executed the Second Agreement – the most notable of which are that (1) HRD did not question the price of the 2000 Agreement before signing it, and (2) HRD did not accuse IKON of fraud until almost a year after it claims that it learned of the allegedly fraudulent statement.

In the fall of 2003, Don Collins, a consultant for HRD, contacted Glenn Robbins, the IKON sales representative for HRD at that time.  (Robbins Aff. ¶¶ 7-8; SMF ¶ 44.)  Collins told Robbins that HRD was having financial difficulties and that he was in the process of trying to reduce HRD's monthly obligations to try to improve those financial problems.  (Robbins Aff. ¶¶ 7-8; SMF ¶¶ 44-45.)  Collins asked Robbins if IKON would meet with HRD to discuss ways to reduce the monthly payments on the Second Agreement.  (Robbins Aff. ¶¶ 7-8; SMF ¶¶ 44-45.)

Robbins met with Collins and Greg Carkhuff on October 29, 2003 and discussed HRD's financial problems and ways that IKON might be able to help HRD during this difficult time. (Robbins Aff. ¶ 8; SMF ¶¶ 46-47.)  Collins and Carkhuff told Robbins that HRD had lost over $700,000 during the past three years and that they needed to fix this problem, liquidate, or file for bankruptcy protection.  (Robbins Aff. ¶¶ 7-8; SMF ¶¶ 44-45.)  At this meeting, Robbins, Collins, and Carkhuff discussed the fact that the Second Agreement's monthly payment amount was comprised of several components, including the charges for the Second Equipment, the

11

service and supply charges, and the remaining obligation that HRD owed on the First

Agreement.  (Robbins Aff. ¶ 8; SMF ¶ 47.)  Robbins did not know the dollar amounts for each

component, so HRD asked him to provide it with this information.  (Robbins Aff. ¶ 8; SMF ¶

47.)  HRD also asked Robbins to investigate various options to reduce HRD's monthly payment,

including eliminating the service and supply component, refinancing, buying out the equipment,

etc.  Carkhuff and Collins did not, however, complain or express any dissatisfaction or surprise

that the remaining obligation on the First Agreement was a component of the Second Agreement.

(Robbins Aff. ¶ 15; SMF ¶ 54.)  More importantly, they did not accuse IKON of telling HRD

that the remaining obligation on the First Agreement would not be included in the Second

Agreement.  (Robbins Aff. ¶ 15; SMF ¶ 54.)  Had the IKON representatives actually

misrepresented to HRD that the obligations of the First Agreement would not be included in the

Second Agreement, presumably HRD would have complained about that alleged lie during this

meeting.

Robbins met with Carkhuff and Collins again on November 7, 2003.  (Robbins Aff. ¶¶

10-11; SMF ¶ 49.)  Paul Lee, a Director of Finance with IKON, and Joe McGrath, a Business

Development Manager with IKON, accompanied Robbins.  (Id.)  At this meeting, IKON told

HRD that it could immediately reduce the service and supply component of the Second

Agreement by approximately $1,300 per month, waive a late fee on a recent invoice, and would

look into extending the lease agreement to reduce the monthly payment amount.  (Robbins Aff. ¶

11; SMF ¶ 51.)  IKON also presented a written financial summary to HRD that summarized the

Second Agreement, set forth the price of the Second Equipment, and listed the equipment

charges, service and supply charges, and charges for the remaining obligation on the First

12

Agreement that comprised the Second Agreement's monthly payment. (Robbins Aff. ¶ 10; SMF ¶ 50.)

Again, neither Collins nor Carkhuff complained or expressed any dissatisfaction that the remaining obligation on the First Agreement was a component of the Second Agreement or accused IKON of telling HRD that the remaining obligation on the First Agreement would not be included in the Second Agreement. (Robbins Aff. ¶ 15; SMF ¶ 54.) In fact, Carkhuff sent an e-mail to Paul Lee after this meeting expressing his appreciation for the financial concessions that IKON made at the meeting. (Robbins Aff. ¶ 14; SMF ¶ 52.) Had anyone from IKON told Carkhuff that none of HRD's obligations under the First Agreement would be included in the Second Agreement, one could reasonably expect that he would have raised that issue during or after the meeting on November 7, 2003. Instead, Carkhuff thanked the IKON representatives for their assistance. That fact undermines HRD's subsequent claims that (1) IKON lied to HRD that HRD's obligations under the First Agreement would not be part of the Second Agreement, and (2) HRD relied on that alleged lie.

IKON evaluated several options to try to help HRD but was unable to find a solution that met HRD's needs. HRD did not have the financial ability to qualify for a new lease from IKON for the same or similar configuration of equipment that one of IKON's competitors had quoted HRD. (Robbins Aff. ¶ 16; SMF ¶ 55.) The discussions between HRD and IKON ended in February 2004 when Greg Carkhuff informed IKON that HRD's business and restructuring efforts were not going the way that he had anticipated and provided IKON with the contact information for HRD's bankruptcy and restructuring attorney. (Robbins Aff. ¶ 17; SMF ¶ 56.) HRD stopped making its monthly lease payments in May 2004, but retained possession of the Second Equipment. (Snyder Aff. ¶ 25; SMF ¶¶ 57-58.)

13

HRD's fraud allegations first surfaced in the September 2004 demand letter from its attorney. (Snyder Aff. ¶ 26; First Am. Compl., Ex. E.) The only fraud allegation asserted in that letter, however, accused IKON of telling HRD that it would not include the service and supply component of the First Agreement in the Second Agreement, which, again, is not a false statement because the Second Agreement did not include such charges. The letter lacks any allegation that IKON told HRD that it would not include the remaining obligation on the First Agreement in the Second Agreement or that HRD would not have entered the Second Agreement if it had known this fact. (First Am. Compl., Ex. E.) These allegations appeared for the first time when HRD filed this lawsuit in March 2005. (First Am. Compl., Counts I & II.) Hence, HRD raised its allegation of fraud not when it allegedly first learned that the First Agreement obligations were included in the Second Agreement or even during the second face-to-face meeting to discuss those issues. HRD only claimed fraud almost a year later and even then, did not claim that IKON had lied that the First Agreement obligations were not incorporated in the Second Agreement. That claim was only asserted when the complaint was filed.

In addition, as discussed above, there were only two conversations concerning the financial terms of the Second Agreement during the several month sales process – neither of which involved the remaining obligation on the First Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶¶ 17-21; SMF ¶¶ 27-32.) IKON had several meetings and discussions with HRD during the months before HRD signed the Second Agreement. (12/7 Snyder Dep. at 110-116; Snyder Aff. ¶ 10; SMF ¶¶ 21-22.) These meetings and discussions included an extensive evaluation of HRD's operations, demonstrations of the Second Equipment, a thorough explanation of the benefits and improvements that the Second Equipment could provide HRD's business, a meeting with Canon, the manufacturer of the Second Equipment to demonstrate the

new technology, and a survey of HRD's facilities to evaluate how to install the Second

Equipment at HRD, which included reinforcing the floor, installing a larger door, and evaluating

electrical and networking requirements.  (Id.)  Throughout this process HRD expressed its

excitement about the benefits that the Second Equipment offered and looked forward to

implementing it in its business.  (Id.)  Robert Carkhuff did not execute the Second Agreement

immediately, but rather told IKON that he wanted to go over the terms with his in-house finance

person and review the Second Equipment again with his production staff before signing the

papers.  (Snyder Aff. ¶ 13.)  After Robert Carkhuff reviewed the Second Agreement, his only

questions involved the benefits of the Second Equipment, logistics of installation, and whether

the installation would cause his business any downtime.  (12/7 Snyder Dep. at 110-113; Snyder

Aff. ¶ 19; SMF ¶ 29.)  He asked no questions about the costs.  (Id.)

These facts show that HRD did not enter into the Second Agreement in reliance upon the

alleged statement that IKON would not include the remaining obligation on the First Agreement

in the Second Agreement.  HRD did not question the costs of the Second Agreement or ask about

the First Agreement before it signed the Second Agreement.  It thoroughly evaluated the Second

Equipment and the benefits that equipment offered its business and, once convinced of the

benefits, executed the Second Agreement.

HRD did not question the fact that the remaining obligation on the First Equipment was

included in the Second Agreement when Glenn Robbins discussed this matter with Greg

Carkhuff and Don Collins in the fall of 2003.  HRD did not mention or even suggest that it had

entered into the Second Agreement based on IKON's alleged false statement.  This accusation

only surfaced after HRD could not get the result it wanted and decided to file this lawsuit.  This

pattern of conduct is completely inconsistent with HRD's claim that it relied on IKON's

15

representations concerning the remaining obligation on the First Equipment.  Accordingly,
IKON there is no genuine dispute about whether HRD relied on the alleged false statement and
therefore IKON is entitled to judgment as a matter of law on Count II.

> **3.    HRD's fraud claim is time-barred.**

The statute of limitations is an affirmative defense on which defendants bear the initial
burden of proof.  However, "where summary judgment is sought on the basis of a statute of
limitations, once the defendant establishes that the time period between the plaintiff's injury and
the plaintiff's complaint exceeds the limitations period set forth in the applicable statute, the
plaintiff bears the burden of alleging facts which would take his or her claim outside the statute."
*Micromuse, Inc. v. Micromuse, Plc.*, 304 F.Supp.2d 202, 209 (D. Mass. 2004).

The statute of limitations for a fraud claim is three years.  *See* Mass. Gen. L. ch. 260,
§2A.  This statute is tolled in cases where the harm is not readily apparent, or, as some courts
have stated, where the plaintiff has been injured by an "inherently unknowable" wrong.  *See
Micromuse*, 304 F.Supp.2d at 209-10.  "The 'inherently unknowable' criterion is used
interchangeably with the 'knew or should have known' standard, or as it is more often termed,
the discovery rule."  *Id.* at 210.  "The discovery rule starts the limitations period running when
events occur or facts surface which would cause a reasonably prudent person to become aware
that she or he had been harmed." *Id.*  At that point, the statute begins to run because "a plaintiff,
once placed on notice of a potential harm, has a duty to investigate the cause and extent of his
injury." *Id.* (Emphasis added.)

> **a.    HRD filed this lawsuit almost five years after the alleged
> fraudulent statements occurred.**

The alleged fraudulent statements that HRD claims induced it to enter into the Second
Agreement must have occurred prior to June 19, 2000 – the date on which it executed the Second

Agreement. HRD filed this lawsuit in March 2005 – almost five years after the alleged

statements were made. Accordingly, absent facts that trigger the discovery rule, HRD's fraud

claim is time-barred.

> **b.    HRD should have known in July 2000 that the Second Agreement included more than the costs of the Second Equipment.**

HRD claims that it did not learn that the Second Agreement included the equipment

charges from the First Agreement until November 2003. (Mem. & Order with Regard to

Defendant's Motion to Dismiss, at 8-9.) This claim, however, only suggests when HRD actually

knew of the alleged fraudulent statement, not when it should have known. The following facts

show that HRD had sufficient information as early as July 2000 to determine that the Second

Agreement's monthly payments included more than the cost of the Second Equipment and

therefore had a duty to investigate the cause and extent of its claimed harm at that time. *See*

*Micromuse*, 304 F.Supp.2d at 210.

In or about early July 2000, HRD asked IKON for the cost of the Second Equipment for

accounting and/or insurance purposes. (Snyder Aff.¶ 23, Ex. D; SMF ¶¶ 37-38.) Jeff Snyder

prepared and gave HRD an Accounting Value Statement dated July 7, 2000 that set forth the

manufacturer's suggested retail price of the Second Equipment. (Id.) The sum of the costs set

forth on the Accounting Value Statement is $317,282 (Id.)

At that same time, July 2000, HRD had a copy of the Second Agreement that set forth its

monthly payment amounts. The Second Agreement required HRD to pay $8,949.00 per month

for the first thirty-six months and $12,116.00 per month for the second thirty-six months of the

seventy two month lease. (Snyder Aff. Ex. C; SMF ¶ 34.) Simple arithmetic shows that these

payments total $758,340.00 – approximately $441,058.00 more than the total costs of the Second Equipment as set forth on the Accounting Value Statement.

In July 2000, HRD also knew that the First Agreement was a 60-month, <u>non-cancelable</u> agreement that required HRD to pay $4,268.00 per month for the first 24 months and $5,825.00 per month for the final 36 months, for a total of $293,448.00.  (Snyder Aff. Ex. A; SMF ¶ 7.) HRD also knew that it paid the First Agreement's monthly payments until May or June 2000. This meant that HRD paid approximately 24 months or $102,432.00 on the non-cancelable First Agreement and therefore $191,016.00 of the total $293,448.00 due under the First Agreement had not been paid as of July 2000.

All of these documents show that HRD should have known in July 2000 that the Second Agreement could have included the remaining amount owed on the First Agreement.  HRD knew that approximately $191,016.00 remained on the First Agreement as of June 2000 and that the Second Agreement included over $400,000.00 above and beyond the costs of the Second Equipment.  With the exception of an actual breakdown of the Second Agreement's costs, HRD could not have had more information in July 2000 to alert it to the claimed fraudulent statements that IKON allegedly made <u>only</u> <u>one</u> <u>month</u> <u>earlier</u>.  HRD may not have actually known that the Second Agreement included any part of the payments due on the First Agreement until 2003, as it has claimed.  But, it certainly should have known in July 2000 that it was paying for more than the cost of the Second Equipment.

The statute of limitations on HRD's fraud claim began to run in July 2000 when it received the Accounting Value Statement and now bars the claim that it filed in 2005.  *See Micromuse, Inc.*, 304 F.Supp.2d at 210 (limitations period begins when party knew or should have known about the claimed harm.)  HRD was "required to use [its] senses, and cannot recover

[for] blindly [relying] upon a[n] [alleged] misrepresentation." *Collins v. Huculak*, 783 N.E.2d 834, 839 (Mass. App. Ct. 2003).

**B.    Article 9 does not apply to the First Agreement.**

HRD has also asserted a claim against IKON for failure to dispose of the First Equipment in a commercially reasonable manner in violation of Article 9 of the Massachusetts Uniform Commercial Code.  (First Am. Compl., Count V.)  Article 9 applies to transactions that create a security interest.  *See* Mass. Gen. Laws. ch. 106 §9-109.  Section 9-610 imposes a duty on a secured party to dispose of its collateral in a commercially reasonable manner.  *See* Mass. Gen. Laws. ch. 106 §9-610.  If the secured party breaches this duty, Section 9-625 provides a cause of action for the debtor to recover its consequential damages.  *See* Mass. Gen. Laws. ch. 106 §9-625.  HRD cannot prevail on this claim however, because the First Agreement does not meet the Code's definition of a security interest and therefore Article 9 does not govern HRD's or IKON's rights or remedies under the First Agreement.

A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation …."  *See* Mass. Gen. Laws. ch. 106 §1-201(37).  The Code specifically addresses the difference between a lease and a security interest.  First, a transaction creates a 'security interest' if the consideration a lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee.  *Id.*  Additionally, one of the following conditions must apply:

> (a)    the original term of the lease is equal to or greater than the remaining economic life of the goods;
>
> (b)    the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
>
> (c)    the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal consideration upon compliance with the lease agreement, or

        (d)      the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

The terms of the First Agreement show that the agreement was "non-cancelable" and therefore not subject to termination during the lease period.  (Snyder Aff. Ex. A; SMF ¶ 6.) Accordingly, the plaintiff must prove that the First Agreement meets one of the criteria listed in subsections (a) through (d) of Section 1-201(37) in order to prevail on Count V.

This Court applied these criteria when it decided IKON's motion to dismiss.  In its written decision, the Court opined that "subparagraphs (a) through (c) are outside Plaintiff's reach."  (Mem. & Order with Regard to Def.'s Motion to Dismiss, p. 15.)  The Court noted that HRD's assertion that the First Agreement's term exceeded the First Equipment's remaining economic life was "pure speculation."  (Id.)  With respect to subparagraphs (b) and (c), the Court stated:  "As Plaintiff no doubt recognizes, it was not bound to renew the lease and nowhere in the lease was it granted a renewal option for the remaining economic life of the equipment."  (Id.) The Court allowed HRD's Article 9 claim to proceed so that HRD could have the opportunity to discover whether "buyout terms and conditions, albeit latent, applied to the First Agreement" despite the absence of an express provision concerning such an option.  (Id. at 16.)  The facts developed during discovery show that subparagraphs (a) – (c) are in fact outside HRD's reach and that HRD did not have the option to buy out the First Agreement and therefore subparagraph (d) does not apply either.

The First Agreement had a five-year term.  (Snyder Aff. Ex. A; SMF ¶ 5.)  At the inception of this five-year term, IKON determined that the First Equipment would have economic value remaining at the end of that term.  (Feldmann Dep. at 12-13.)  Specifically, IKON determined that the Oce 3100 would be worth approximately $11,820.00 and the Oce 3165 would be worth approximately $6,334.00 at the end of the First Agreement.  (Id.)

Accordingly, the First Agreement does not meet the criteria of subsection (a) because the estimated economic life of the First Equipment exceed the term of the First Agreement.

The express terms of the First Agreement show that subsections (b) through (d) are inapplicable as well. There are no terms in the First Agreement that bind HRD to renew the lease or become the owner of the equipment. (Snyder Aff. Ex. A; SMF ¶ 12.) There are no terms that give HRD the option to renew the lease or become the owner of the equipment for no additional consideration or nominal additional consideration. (Snyder Aff. Ex. A; SMF ¶¶ 13-14.) And, finally, IKON never gave HRD the option to become the owner of the First Equipment. (Snyder Aff. ¶ 22; SMF ¶ 33.) Accordingly, the First Agreement was a lease, not the grant of a security interest. Therefore, Article 9 does not apply to this case and IKON is entitled to judgment as a matter of law on Count V.

**C.     HRD cannot prove its Chapter 93A claim.**

Whether particular conduct falls within the scope of Chapter 93A is a question of law. *See Incase v. Timex Corp.*, 2007 U.S.App.LEXIS 12109 (1st Cir. May 24, 2007) ("Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law.") HRD claims that IKON violated Mass. Gen. Laws ch. 93A by engaging in allegedly unfair or deceptive acts in negotiating and performing the Second Agreement. (First Am. Compl., Count VII, ¶75, Ex. E, p. 4.) The factual allegations that purportedly support this claim fall into the following categories: (1) making fraudulent statements to induce HRD to sign the Second Agreement, (2) violating Article 9 of the Uniform Commercial Code, (3) violating Massachusetts' usury laws, and (4) billing HRD for service charges allegedly covered by its

contracts with IKON.  None of these allegations provide a legal basis for HRD's Chapter 93A claim.

**1.    HRD's allegations of fraud do not provide a basis for a Chapter 93A claim.**

HRD claims that IKON violated Chapter 93A by intentionally making two "material and false" representations to HRD in order to induce HRD to execute the Second Agreement.  (First Am. Comp., Count VII, ¶75, Ex. E, p. 4.)  First, HRD claims that IKON falsely informed HRD that it was getting a "significant discount" off the list price of the equipment.  (Id.)  Second, HRD claims that IKON lied to HRD and told it that the 2000 Agreement did not include the "service/maintenance or supplies charges for the First Equipment."  (Id.)  Neither of these statements supports a Chapter 93A claim.

This Court has already determined that the alleged statement that HRD was getting a "significant discount" does not rise to the level of actionable fraud.  (Mem. and Order With Regard to Defendant's Motion to Dismiss, at. 6-7.)  Therefore, this factual allegation cannot support HRD's Chapter 93A claim.

As discussed above, IKON did not include the service/maintenance or supply charges for the First Equipment in the Second Agreement.  *See supra* at 10-11.  Therefore, this statement, if made to HRD, was not false and therefore cannot support a fraud or Chapter 93A claim.

To the extent that HRD attempts to claim that the fraud alleged in Count II provides a basis for a Chapter 93A claim – despite the fact that HRD has not included those allegations in Count VII – such a necessary claim accrued in July 2000, *see supra* at 16-19, and is therefore barred by Chapter 93A's four-year statute of limitations.  *See* Mass. Gen. Laws ch. 260, § 5A.

### 2.    HRD's Uniform Commercial Code claims do not qualify as unfair or deceptive acts or practices.

HRD tries to spin its Uniform Commercial Code claims into violations of chapter 93A. (First Am. Compl., Count V, ¶75, Ex. E, p. 4.)  It repeats its assertion that IKON failed to dispose of the First Equipment in a commercially reasonable manner and credit HRD with the value of the First Equipment.  (*Id.*)  And, it claims, in the alternative, that IKON accepted the First Equipment "in full and complete satisfaction" of any obligations remaining under the First Agreement" but that IKON continued to seek and collect payment for the First Equipment through the Second Agreement.  (*Id.*)  Neither of these UCC-related allegations supports a Chapter 93A claim.

Both of these allegations assume that Article 9 of the Uniform Commercial Code applies to the First Agreement.  *See* Mass. Gen. Laws ch. 106, § 9-625 (providing remedy for secured party's failure to dispose of collateral in a commercially reasonable manner); § 9-620 (setting forth procedure required for secured party to accept collateral in full or partial satisfaction of obligation).  As discussed above, the First Agreement was not the sale and grant of a security interest and therefore Article 9 does not apply to the First Agreement or govern IKON's or HRD's rights or responsibilities with respect to the First Equipment.  *See supra* at 19-21.  Accordingly, alleged violations of Article 9 cannot provide a basis for HRD's Chapter 93A claim.

Even if Article 9 applied, the alleged conduct does not rise to the level of a Chapter 93A violation.  A mere breach of legal obligation under commercial law, without more, does not amount to an unfair or deceptive act under Chapter 93A.  *See Shaanxi Jinshan TCI Elecs. Corp. v. FleetBoston Fin. Corp.*, 61 Mass. App. Ct. 41, 49 (Mass. App. Ct. 2004) (wrongfully dishonoring a letter of credit in violation of the Uniform Commercial Code did not violate

Chapter 93A); *Framingham Auto Sales v. Workers' Credit Union*, 41 Mass. App. Ct. 416, 418 (Mass. App. Ct. 1996) (holding that breach of commercial law did not amount to a violation of Chapter 93A without allegations of a pernicious purpose, ulterior motive, or extortionate or coercive objective).

HRD has not alleged anything more than a failure to comply with Article 9. It does not claim that IKON acted with some ulterior motive, improper purpose, or extortionate objective. Accordingly, HRD's assertion that IKON violated Article 9 cannot support a Chapter 93A claim.

### 3.    The Court has already determined that Massachusetts usury laws do not apply in this case.

HRD also claims that IKON charged and collected interest payments that exceeded Massachusetts usury laws. The Court has already determined that Massachusetts usury laws do not apply to the First Agreement and therefore this allegation cannot support HRD's 93A claim. (Mem. & Order with Regard to Defendant's Motion to Dismiss at. 10-13.)

### 4.    HRD's allegations that IKON billed it for charges allegedly included in its contracts cannot support a Chapter 93A claim.

The last factual allegation of HRD's 93A claim stems from HRD's belief that IKON consistently invoiced HRD for service charges that HRD contends were covered by the First Agreement or Second Agreement. (First Am. Compl., Count VII, ¶75, Ex. E, p. 4.) This alleged conduct does not amount to a Chapter 93A violation.

"[A] good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made." *Duclersaint. v. Fannie Mae*, 696 N.E.2d 536, 540 (Mass. 1998). HRD's allegations amount to nothing more than a simple contract dispute about whether it owed IKON money. It has not made any claims of extortionate or coercive conduct that could bring this dispute within the scope of Chapter 93A.

In addition, HRD cannot prevail on a Chapter 93A claim based on this conduct because it does not claim that it actually paid the allegedly improper invoices. *See J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.*, 365 F. Supp. 2d 119, 148 (D. Mass. 2005) (holding that a plaintiff must prove that it has suffered a loss of money or property as a result of the alleged unfair or deceptive act). In fact, three of the four invoices that HRD claims were improper have hand-written notes on them that read "DO NOT PAY." (First Am. Compl., Ex. C.)

Finally, Chapter 93A's four-year statute of limitations bars any claims based on these allegations. The allegedly improper invoices are dated January 20, 2000, April 20, 2000, September 20, 2000, and September 21, 2000. (*Id.*) The "DO NOT PAY" notes on the invoices demonstrate that HRD believed on or about the invoice date that the charges were improper. Therefore, any claim based on these invoices accrued on or about their invoice date. Since HRD filed this lawsuit in March 2005 – beyond the four-year limitations period – a Chapter 93A claim based on these invoices is time-barred.

## V.    CONCLUSION

It is undisputed that HRD's fraud, UCC, and Chapter 93A claims did not surface until well after it determined that IKON could not help it get through its financial difficulties. HRD's primary claim – that IKON lied to it about the financial terms of the Second Agreement – is completely inconsistent with its behavior in the fall of 2003. HRD claims that it first learned about this alleged lie in November 2003. If that is true, then why did it wait almost a year to confront IKON with this accusation? Why didn't it use this accusation in November 2003 as leverage in its efforts to reduce its monthly payment obligation?

This lawsuit is an afterthought that came too late.  Even if HRD can create a dispute as to whether IKON made the alleged false statement and that HRD relied on it, the undisputed facts show that HRD had all the information that it could have had in July 2000 to figure out that the Second Agreement included remaining obligation on the First Agreement.  Its fraud claim is therefore time-barred.

HRD's conduct also shows that its Article 9 claim is an afterthought as well.  It did not exhibit any behavior consistent with its claimed ownership of the First Equipment.  The terms of the First Agreement and the fact that HRD did not have an option to purchase the First Equipment show that the First Agreement was really a lease, not a security interest as HRD now claims.

Finally, HRD attempts to dress up and masquerade these afterthoughts as a Chapter 93A claim.  In addition to being time-barred, this claim fails as a matter of law because violations of commercial law and mere disputes about whether money is owed under a contract are not unfair or deceptive acts or practices within the scope of Chapter 93A.

These undisputed facts show that IKON is entitled to judgment as a matter of law on Counts II, V, and VII.

> DEFENDANT,
> IKON OFFICE SOLUTIONS, INC.
>
> By_____/S/ Brett J. Boskiewicz_____
>     Bradford S. Babbitt (BBO# 566390)
>     e-mail: bbabbitt@rc.com
>     Brett J. Boskiewicz (BBO# 656545)
>     e-mail: bboskiewicz@rc.com
>     Robinson & Cole LLP
>     280 Trumbull Street
>     Hartford, CT  06103-3597
>     Tel. No.: (860) 275-8200
>     Fax No.: (860) 275-8299

July 10, 2007

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that Defendant IKON Office Solutions, Inc.'s MEMORANDUM OF

LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was filed

through the ECF system will be sent electronically to the registered participants as identified on

the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-

registered participants on July 10, 2007

      / S /  Brett J. Boskiewicz
      Brett J. Boskiewicz

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS INC., | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | 3:05-CV-30068-KPN |
| v. | : | |
| | : | |
| IKON OFFICE SOLUTIONS, INC. & IOS CAPITAL, INC. d/b/a IKON FINANCIAL SERVICES, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## AFFIDAVIT OF JEFFREY SNYDER
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Jeffrey Snyder, being duly sworn, do hereby depose and say:

1.     I am over 18 years of age and believe in the obligations of an oath.

2.     I make this affidavit in support of IKON Office Solutions, Inc.'s ("IKON")

motion for summary judgment in the above-captioned lawsuit based on my own personal

knowledge of the facts and circumstances set forth herein.

3.     I have been employed by IKON since March 16, 1996.

4.     During the time period January 2000 through October 2002, I was involved with

IKON's business relationship with Human Resource Development Press, Inc. ("HRD"),

including the several month sales process that culminated in HRD signing the June 19, 2000

lease agreement (the "Second Agreement") that is the subject of this lawsuit.

5.     I have reviewed the original file that IKON maintained in its West Springfield,

Massachusetts office concerning its business with HRD.  It is my understanding that, with the

exception of a copy of HRD's product catalog and a copy of a financial statement that HRD

provided to IKON in the fall of 2003, this entire file has been provided to HRD's attorney during

this lawsuit.

6.     HRD has had a business relationship with IKON or its predecessors since at least

1987. This relationship has involved at least three lease agreements – a 1996 lease agreement for

an Oce 2600 document reproduction machine and the 1998 and 2000 lease agreements that are

the subject of this lawsuit.

7.     On or about May 20, 1998, HRD and IKON entered into a written lease

agreement concerning HRD's use of two document reproduction machines (the "First

Agreement") – an Oce 3100 and an Oce 3165 (collectively, the "First Equipment"). A true and

correct copy of the First Agreement is attached as Exhibit A.

8.     In or about January 2000, Canon Inc. introduced its ImageRunner 110 digital

printing system. This product offered near offset press quality digital printing, high speed

production capacity, and various other improvements over other technology that existed at that

time.

9.     In January 2000, I attended a two-week training seminar at IKON's production

training school in Georgia to learn about the capabilities of the Canon ImageRunner 110 and to

acquire the technical knowledge to be able to support that machine.

10.     In early 2000, Doug Thornton contacted me and told me that HRD was interested

in evaluating the Canon ImageRunner 110. This began a several month long application,

development, and testing period during which HRD's technical and production printing staff

evaluated the process and benefits that the ImageRunner 110 system could provide for HRD.

11.    After several months of discussions, HRD decided to improve its existing technology and implement a Canon ImageRunner 110, ImageRunner 330, ImageRunner 210, and a CLC 900 (collectively, the "Second Equipment") into its business operation.

12.    On or about June 14, 2000, Doug Thornton, IKON's day-to-day account representative for HRD at the time, Al Maximino, the district sales manager, and I met with HRD's president, Robert Carkhuff, to present the terms of a proposed lease agreement and to discuss the logistics of installing the Second Equipment at HRD. I prepared a document dated June 14, 2000 and titled "Executive Summary" that detailed the information that I presented at this meeting, including the delivery and installation process, the removal of the First Equipment, training that IKON would give HRD's staff, services that IKON would provide to minimize HRD's production downtime during installation of the Second Equipment, and the financial terms of the proposed lease agreement. I gave HRD a copy of this document at the June 14, 2000 meeting. A true and correct copy of the Executive Summary is attached as Exhibit B. I typically create documents like this Executive Summary when I present new deals to customers. I also keep a copy of these summaries in the customer's file. I kept a copy of the June 14, 2000 Executive Summary in IKON's file for HRD's account.

13.    I also gave Robert Carkhuff a copy of the proposed lease agreement at the June 14, 2000 meeting. Robert Carkhuff told me that, before he signed the proposed lease agreement, he wanted to review the Executive Summary and the terms of the proposed lease agreement with his in-house finance person and confirm the benefits of the Second Equipment with his production printing staff.

14.    The June 14, 2000 meeting lasted about one and a half to two hours.

15.     On June 19, 2000, Doug Thornton, Al Maximino, and I returned to HRD to meet with Robert Carkhuff and finalize the deal for the Second Equipment. Robert Carkhuff, as HRD's authorized representative, signed the written lease agreement concerning HRD's use of the Second Equipment (the "Second Agreement"). A true and correct copy of the Second Agreement is attached as Exhibit C.

16.     The June 19, 2000 meeting lasted less than an hour.

17.     The June 14, 2000 and June 19, 2000 meetings were the only discussions that IKON and HRD had about the financial terms of the Second Agreement before HRD signed that agreement.

18.     Robert Carkhuff did not ask me or anyone else from IKON whether the Second Agreement included the remaining obligation that HRD owed on the First Agreement before HRD signed the Second Agreement.

19.     Robert Carkhuff did not question the Second Agreement's monthly payment amount or attempt to negotiate that amount before he signed the Second Agreement. His only questions during the June 14, 2000 and June 19, 2000 meetings concerned the installation logistics and whether HRD would experience any downtime during installation. He did not ask any questions about the costs.

20.     I did not tell Robert Carkhuff or anyone from HRD that the cost of the Second Agreement would not or did not include the remaining obligation that HRD owed on the First Agreement before he signed the Second Agreement.

21.     I was with Doug Thornton and Al Maximino the entire time that they were at HRD on June 14, 2000 and June 19, 2000. Neither Doug Thornton nor Al Maximino told Robert Carkhuff or anyone from HRD that the cost of the Second Agreement would not or did not

I certify under penalty of perjury that the foregoing is true and correct.

Jeffrey J. Snyder

Subscribed and sworn to before me
this 9th day of July , 2007.

Notary Public
My Commission Expires:

MICHELLE A. FINNEGAN
NOTARY PUBLIC
MY COMMISSION EXPIRES FEB. 28, 2009

# EXHIBIT A

## Copy Management Program

EXHIBIT
4
Snyder 12/6/06

Customer (Location)

Human Resource Development Press

Full Legal Name (Please Print)
22 AMHERST Rd

Address
AMHERST Hampshire MA    01002

City    County    State    Zip

Customer Contact (Must be billing contact)

Customer (Billing address, if different)

Full Legal Name (Please Print)

Address

City    County    State    Zip

Phone 413-253-3488

| Quantity | System Description: Make, Model & Serial Number | Quantity | System Description: Make, Model & Serial Number |
|---|---|---|---|
| 1 | Oce 3100   179420274 | | |
| 1 | Oce 3165   166004056 | | |
| | | | |
| | | | |
| | | | |

| Minimum Term (mos.) | Cost Per Copy | Guaranteed Minimum Monthly Copies | Cost of Additional Copies |
|---|---|---|---|
| 60 | $ See Variable lease ADDENDUM | 250,000 | $ .0097 |
| Minimum Payment (without tax) ☒ Monthly See Variable lease Addendum ☐ Quarterly | Documentation Fee: $____ ☐ Invoice ☐ Included in Advance Payment | Advance Payment (with tax) ☐ First ☐ Other | Meter Reading/Billing For Additional Copies ☐ Monthly ☒ Quarterly |

Sales Tax Exempt ☐ Yes (Attach Exemption Certificate)    Customer Purchase Order Number ____    (Attach Copy of Purchase Order)

**Authorized By: THE PERSON AUTHORIZING THIS AGREEMENT ON BEHALF OF THE CUSTOMER (as indicated above) SPECIFICALLY REPRESENTS THEY HAVE THE AUTHORITY TO DO SO.**

**Guaranty:** I guarantee that the Customer will make all rent payments and pay all other charges required under the agreement when they are due, and that the Customer will perform all other obligations under the agreement fully and promptly. I also agree that IOS Capital need not notify me of any default under the Agreement and, in the event of default, I will pay all amounts due under the terms of the Agreement. In addition, I will reimburse IOS Capital for any costs or attorney fees incurred in enforcing their rights.

By X _____    Date 3/26/98

Authorized By

R W Carkhuff    Director

Authorized Signer's Printed Name    Title

Witness _____    Date

Signature

X _____

An Individual (No Title)

Printed Name of Guarantor

Home Address

City/State

Home Phone

Social Security Number

**Copy Management Program Agreement:** The Customer agrees to use from IOS Capital the System listed above. THIS AGREEMENT IS NON-CANCELABLE. The Customer agrees to all of the terms and conditions contained in this Agreement.* The Customer agrees this Agreement is for the minimum usage term indicated above. The Customer also agrees that the System will be used for business only, and not for personal, family or household purposes. IOS Capital's acceptance of this Agreement is indicated by an IOS Capital manager's signature below.

Approved by IKON Office Solutions

By _____    5/28/98

IKON Office Solutions Manager    Date

Accepted in Macon, Georgia
IOS Capital    JUN 03 1998

By _____    Date

IOS Capital

**Delivery and Acceptance**
Customer certifies that all the System described above has been delivered to and is accepted by Customer. Customer acknowledges that such System is in good condition and is performing satisfactorily.

Customer

By X _____

Title _____    Date _____

Rev. 4/98  *IMPORTANT – See terms and conditions on reverse side of this document

IOS00003

## TERMS AND CONDITIONS

**1. Ownership of System:** IOS Capital is the sole owner and title holder to the System.

**2. Rent:** Monthly payments will begin on the Agreement date or delivery date, whichever is later. The Customer agrees to pay IOS Capital the rent payment when due and if any payment is more than ten days late, the Customer agrees to pay a penalty of 5% or $5 (whichever is greater) on the overdue amount. The Customer also agrees to pay $20 for each check that the bank returns for insufficient funds or any other reason. Customer agrees to pay a one time documentation fee, if any, as it appears on the front of this Agreement of up to $50.00.

**3. Taxes and Fees:** This is a net Agreement. In addition to rent, the Customer agrees to pay all taxes, fees, and filing costs related to the use of the System, even billed after the end of the Agreement. IOS Capital will file property tax returns and bill the Customer as soon as an invoice from the local jurisdiction is received. IOS Capital has the option to estimate any taxes due for the year and bill the Customer monthly in advance on the basis of that estimate. If IOS Capital is required to pay property tax, the Customer agrees to reimburse IOS Capital, even though the Customer is normally exempt from property tax.

**4. UCC Filing:** The Customer authorizes IOS Capital or the dealer to sign any documents in connection with the UCC on the Customer's behalf. The Customer authorizes IOS Capital to insert the serial number(s) of the System in this Agreement (including any schedules) and in any filings.

**5. Liability and Insurance:** The Customer is responsible for any losses or injury caused by the System. The Customer promises to keep the System fully insured against loss until the Agreement is paid in full and maintain insurance that protects IOS Capital from liability for any damage or injury caused by the System or its use. The Customer promises to provide us evidence of the insurance, showing IOS Capital as the loss payee and additional insured, upon request. If the Customer fails to provide such evidence, the Customer authorizes IOS Capital to obtain coverage on their behalf. IOS Capital may file claims and endorse insurance checks on the Customer's behalf. The Customer must continue to make payments until the Agreement is paid off by the insurance proceeds. Alternatively, IOS Capital may choose to self-insure and add an insurance surcharge to the Customer's rent.

**6. Indemnity:** IOS Capital is not responsible for any losses or injuries caused by the installation or use of the Equipment. The Customer agrees to reimburse IOS Capital for and defend IOS Capital against any claims, for losses or injuries caused by the System, unless due to the willful negligence or gross misconduct of IOS Capital.

**7. Maintenance and Care of IOS Capital's Equipment:** The Customer agrees to install, use and maintain the System in accordance with the dealer specifications and use only those supplies supplied or approved by IKON Dealer which meet manufacturer specifications.

**8. Location of Equipment:** The Customer will keep the System at the location specified in this Agreement. The Customer must obtain IOS Capital's written permission to move the System. The Customer will allow IOS Capital or its agents to inspect the System at any reasonable time wherever it is located.

**9. Assignment:** THE CUSTOMER HAS NO RIGHT TO SELL, TRANSFER, ENCUMBER, SUBLET OR ASSIGN THE SYSTEM OR THIS GREEMENT. IOS Capital may sell, transfer or assign this Agreement and if we do, the new owner will have the same rights and benefits IOS Capital has and will not have to perform any of IOS Capital's obligations.

**10. Warranties:** IOS CAPITAL IS RENTING THE SYSTEM "AS IS" TO THE CUSTOMER. IOS CAPITAL, BEING A FINANCIAL SERVICES COMPANY, AND NOT THE MANUFACTURER OR IKON DEALER MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR USE OR FOR A PARTICULAR PURPOSE. THE CUSTOMER CHOSE THE SYSTEM AS WELL AS IKON DEALER. THE CUSTOMER AGREES THAT IOS CAPITAL IS NOT RESPONSIBLE FOR REPAIRS, SERVICE OR DEFECTS. IOS CAPITAL DOES PASS TO YOU, WITHOUT RECOURSE THE BENEFITS OF ANY WARRANTIES MADE BY IKON DEALER OR MANUFACTURER TO IOS CAPITAL.

**11. Default:** If the Customer does not pay any amount due when it is due, the Customer will be in default. If the Customer defaults, IOS Capital can demand that the Customer pay the remaining balance of the Agreement and return the System to us at the Customer's expense. At IOS Capital's option, we may repossess the System. Customer waives any rights Customer may have to notice before IOS Capital seizes any of the System and waives any requirement that IOS Capital post a bond in connection with any such seizure or repossession. In addition, if the Customer breaks any promise in the Agreement, IOS Capital can use any remedies available to IOS Capital under the Uniform Commercial Code or any other applicable law. The Customer promises to pay reasonable attorney fees and any cost associated with any action or repossession of the System. This action will not void the Customer's responsibility to maintain and care for the System, nor will the dealer be liable for any action taken on IOS Capital's behalf.

**12. Business Agreement and Choice of Law:** THE CUSTOMER AGREES THAT THIS AGREEMENT WILL BE GOVERNED UNDER THE APPLICABLE LAW FOR THE STATE IN WHICH IOS CAPITAL HAS ITS HOME OFFICE. IOS CAPITAL HAS THE OPTION OF PURSUING ANY ACTION UNDER THIS AGREEMENT IN ANY COURT OF COMPETENT JURISDICTION AND THE CUSTOMER CONSENTS TO JURISDICTION IN THE STATE OF OUR CHOICE. IOS CAPITAL AND CUSTOMER WAIVE THE RIGHT TO A TRIAL BY JURY IN THE EVENT OF A LAWSUIT.

**13. Renewal:** After the Minimum Term or any extension agreed to, this Agreement will automatically renew on a month to month basis unless the Customer notifies IOS Capital in writing 30 days prior to the expiration of the Minimum Term or extension. At the end of the Agreement the Customer agrees to pay shipping charges as determined by IKON Dealer. The Customer must pay any additional rents due until the System is received in good working condition by IOS Capital or its agents.

**14. Other Rights:** The Customer agrees that IOS Capital's delay, or failure to exercise any rights, does not prevent IOS Capital from exercising them at a later time. If any part of this Agreement is found to be invalid, then it shall not invalidate any of the other parts and the Agreement shall be modified to the minimum extent as permitted by law.

**15. Entire Agreement:** This Agreement represents the entire Agreement between IOS Capital and the Customer. Neither IOS Capital nor the Customer will be bound by any amendment, waiver, or other change unless agreed to in writing and signed by both parties. Except for identifying the goods, services, or software ordered, the price(s), and the quantity(ies), the terms and conditions of the purchase order, or other ordering documents of Customer will not modify or affect this Agreement, or have any other legal effect whether issued or signed before, on, or after the date of this Agreement. The provisions of the EEO Clause in CFR § 60-1.4 and the Affirmative Action Clause at 4CFR § 60-250.4 and § 60-741.4 are incorporated in this Agreement.

IOS00004

# IOS CAPITAL

## Variable Lease Payments Addendum

### For Lease # _____
### Term of Lease __60__ Months

*Customer agrees that the lease payments will vary as indicated below:*

| STEP | MONTH | LEASE PAYMENT |
|------|-------|---------------|
| 1 | 1-36 | 4268 - |
| 2 | 37-60 | 5825 - |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |

Accepted In Macon, Georgia
IOS Capital

JUN 0 3 1998

By: _____
        Susan C. Morrow
Date: _____

Human Resource Development Press, Inc.
**Customer's Full Legal Name (Please Print)**

_____    _____
**Authorized Signer**                    **Date**

_Robert W. Curkluff_    _Director_
**Authorized Signer's Printed Name**    **Title**

_____    _____
**Witness**                    **Date**

A-9. 5/96
IOS00005

# EXHIBIT B

Executive Summary
Prepared For
HRD Press
June 14, 2000

EXHIBIT

3

Snyder 12/6/06

### Objective:

Provide HRD Press a high volume digital production system centering on the Canon image Runner 110. The goal is to deliver a program consisting of a sound installation, operation plan and financial program to demonstrate the IKON commitment to the ongoing partnership with HRD Press.

### -Equipment Summary:

Canon ImageRunner 110 Network Printer
-Second Paper Module
-High Capacity Stacker

Canon ImageRunner 330 Multifunction Device
-50 Page Automatic Document Feeder
-Dual Line Fax Board
-Multi PDL (Postscript III / PCL)
-Three Position Stapling Finisher C1
-Paperdeck C1
-SCSI Scan Board

Epson 8000 ColorPage Printer System
-192MB RAM
-RS6000 Fiery Server w/64MB RAM

Canon IR210 Multifunctional Device
Automatic Document Feeder
G3 Fax Board
Cabinet

### -Implementation Considerations:

*Training will be provided to HRD Personnel on the IR110 system in Glastonbury upto two weeks prior to the system going on-line.

~IKON will schedule the scanning of hardcopy documents in Glastonbury upon approval to minmize impact on the operations of HRD.

*The de-installation / installation process will consist of a three to four day period, Overflow copying will be provided to HRD Press from the IKON Western Mass office during the installation period to ensure a minimized impact on current workflow.

Site Survey Completed by AL Maximino (District Manager), Ron Bushey and Kenneth Stearns
-Review Image Runner 110 site preparation guidelines:
Entrance to system site
Cabling to IR330 & EPSON 8000
Flooring Requirments

Electrical to be installed
Service Clearances-Machine Placements
phone

Installation and training on the ImageRunner 330, Epson 8000, Canon IR210
The above equipment will be delivered within one week upon order approval from IOS Capital.

Move of the Canon 6085 to lower level

De-Installation of the OCE 3165 and 3100

Installation of the IR110 system        3 Days
-Application testing
-Install of drivers onto MAC & PC workstations

System training & quarterly account reviews provided on an ongoing basis

IOS00066

## Financial Considerations

### A. Financial / Service Considerations

*For the first thirty days from the installation date HRD press will only be responsible for service consisting of a monthly base $ 500.00 and $ 0.0087 for IR110 impressions, $ 0.0158 for IR330 Impressions.

-Freight, Delivery & Setup Fee of $ 2,500.00 due upon order.

### B. Financial Summary

-Ikon Office Solutions Capital Equipment Variable Lease Payment Progam

| Equipment | Month 1-36 | Months 36-72 |
|---|---|---|
| As proposed Above<br>Includes 300,000 impressions.<br>Additional Impressions @ $ 0.00783 | $ 8,809.00 | $ 11,876.00 |

Per Impression Cost @ 500K is   $ 0.0208

*The above is a pooled service / supply program , including 100% service & supplies (excluding paper and staple spools).  Impressions on the will be billed monthly in arrears based on actual combined useage.

*The EPSON 8000 is a client serviceable printer, HRD press is responsible for consumables seperately.

IOS00067

## Service / Supply Costs

| Equipment | Impressions Included | Monthly Base | Overage |
|---|---|---|---|
| CANON IR330 | 15,000 | $ 235.50 | $ 0.0133 |
| CANON IR210 | 5,000 | $ 119.00 | $ 0.0176 |

IOS00068

# EXHIBIT C



**EXHIBIT**

S

Snyder 12/6/06

_IOS Capital_

an IKON Office Solutions Company
P.O. Box 9115, Macon, GA 31208-9115

**PRODUCT SCHEDULE**
Copy Management
Product Schedule Number: 00787
To Master Agreement Number: _____

This Schedule is made part of the Master Agreement ( Master Agreement ) identified on this Schedule between IOS Capital, Inc. ( we or us ) and _Human Resource Development Press_, as Customer ( you ). All terms and conditions of the Master Agreement are incorporated into this Schedule and made a part hereof. It is the intent of the parties that this Schedule be separately enforceable as a complete and independent agreement, independent of all other Product Schedules to the Master Agreement.

## CUSTOMER INFORMATION

Human Resource Development Press
Customer (Bill To)
22 Amherst Road
Address
Amherst Hampshire MA  01002
City          County      State       Zip

Customer Contact Name:

Product Location

Address

EXHIBIT "B"

City          County      State      Zip

Customer Telephone Number: 413-253-3488

Marketplace: Hartford/Western Mass

## PRODUCT DESCRIPTION

| Quantity | Description: Make, Model & Serial Number | Quantity | Description: Make, Model & Serial Number |
|---|---|---|---|
| | Please See Addendum A-1 | | |
| | | | |
| | | | |

## MENT SCHEDULE

Minimum Term (mos.)  72

Cost Per Copy  $ _____

Additional Copies  $ 0.00583

Guaranteed Minimum Monthly Copies  300,000

Meter Reading/Billing For Additional Copies
☐ Monthly
✓ Quarterly
☐ Other

Minimum Payment (without tax)
$ _____

Payment Due:
✓ Monthly    ☐ Annually
☐ Quarterly  ☐ Other

Advance Payment (with tax)
✓ none
___ apply to 1st Payment
___ apply to other

es Tax Exempt ☐ Yes (Attach Exemption Certificate)   Customer Billing Reference Number (P.O.#, etc.)

dendum Attached ☒ Yes (Check if yes and indicate total number of pages: __2__ )

## ERMS AND CONDITIONS

he first Payment will be due on the Effective Date. The delivery date is to be indicated by signing a separate acceptance form.

ou, the undersigned Customer, have applied to us, IOS Capital, Inc., to rent the above described items ( Products ) for commercial (non-consumer) purposes. THIS IS AN UNCONDITION-NON-CANCELABLE AGREEMENT FOR THE MINIMUM TERM INDICATED ABOVE. If we accept this Product Schedule, you agree to rent the above Products) from us, and we e to rent such Products) to you, on all the terms hereof, including the Terms and Conditions on the Master Agreement. THIS WILL ACKNOWLEDGE THAT YOU HAVE READ AND ERSTAND THIS SCHEDULE AND THE MASTER AGREEMENT AND HAVE RECEIVED A COPY OF THIS SCHEDULE AND THE MASTER AGREEMENT.
ess Charges/Meters: In return for the Minimum Monthly Payment, you are entitled to use the number of Guaranteed Minimum Monthly Copies. If you use more than the Guaranteed num Monthly Copies in any month, you will additionally pay a charge equal to the number of additional metered copies times the Cost of Additional Copies. If we determine that you have more than 20% over the manufacturer s recommended specifications for supplies, you agree to pay reasonable charges for those excess supplies. The meter reading frequency and corresponding additional charges, if any, may be dif-monthly, quarterly, semi-annually or annually) for which the number of copies used will be reconciled. The meter reading frequency is the period of than the Minimum Payment frequency. You will provide us or our designee with the actual meter reading upon request. If such meter reading is not received within 7 days, we stimate the number of copies used. Adjustments for estimated charges for additional copies will be made upon receipt of actual meter readings. Notwithstanding any adjustment, you will pay less than the Minimum Monthly Payment.
itional Payments Terms (if any) are : _____

ed Name of Authorized Signer: R.W. Curichroff

W Curichroff
Authorized Signer         Date: 6/19/00

Accepted in Macon, Georgia by:
IOS Capital, Inc.

X _____

*(Tear on perforation)*     Authorized Signer          Date: _____

## VERY AND ACCEPTANCE  With respect to Product Schedule Number _____ to Master Agreement Number _____ between IOS Capital, Inc. and

f each such Product is in good condition and satisfactory for all purposes of the Product Schedule, you hereby certify that each Product described on such Product Schedule has been delivered, installed and accepted and you

OMER X _____

Date: _____

Human Resource Development Press
Addendum-AI to IOS Lease # 00787
Product Schedule

<u>Equipment / Component Description</u>

1. Canon ImageRunner 110 Network Printing System:
   -Marking Engine
   -(2) Paper Supply Modules
   -Marking Image Path
   -Finisher
   -System Controlling Subsystem
   -High Capacity Stacker

2. Canon ImageRunner 330 Multifunction Device System:
   -Base Unit
   -Automatic Document Feeder DADF-A1
   -Super G3 Multi Line Fax Board
   -Multi PDL Network Print Controller
   -Multi-Position Auto Stapler C-1
   -Expansion Board Base Unit C-1
   -Scanning Interface Board D-1
   -Cassette Feeding Unit R-1

3. CANON CLC 900 & CANON M20E Raster Image Processor
   (The above listed equipment is listed on the copy management agreement,
   Service and Supplies for both of the above items are covered by separate
   agreements)

4. Canon IR210 Multifunctional Device
   -Base Unit
   -Automatic Document Feeder RDF-G1
   -G3 Fax Board-D1
   -Multi PDL Network Print Controller D1
   -Multi-Output Tray C-1
   -IR210 Expansion Board A-1
   -IR210 Cabinet

Client Signature: _____        Date: 7/25/00

IOS00015

Addendum-A2to IOS Lease # 00787
Variable Lease Payment Addendum

*-Customer Agrees that the lease payments will vary as indicated below:*

| Step | Month | Lease Payment |
|------|-------|---------------|
| 1 | 1-36 | $ 8,949.00 |
| 2 | 37-72 | $ 12,116.00 |

_Human Resource Development Press, Inc._

**Customers Full Legal Name (Please Print)**

_WCarkhuff_                    _7/25/00_

**Authorized Signer**                    **Date**

_Robert W. Carkhuff  President_

**Authorized Signer's Printed Name        Title**

**Accepted in Macon, Georgia
IOS Capital**

**By:**_____

**Date:**_____

IOS00016

# MASTER AGREEMENT    Number: _____

**CUSTOMER:**

*IOS Capital* ℠

Full Legal Name: _Human Resource Development Press_

Address: _22 Amherst Road_

City: _Amherst_    State _MA_  Zip: _01002_  Contact: _Jim Czelusniak_  Phone: _____

This Master Agreement has been written in clear, easy to understand English. When we use the words "we", "us", "our" or "IOS Capital" in this Master Agreement, we mean you, our customer, as indicated above. When we use the words "you", "your" or "Customer" in this Master Agreement, we mean your customer. IOS Capital, Inc., a wholly-owned subsidiary of IKON Office Solutions, Inc. ("IKON"), located at P.O. Box 9115, Macon, GA 31208-9115.

**1. Agreement.** We agree to rent to you, and you agree to rent from us, subject to the terms of this Master Agreement, the personal and intangible property described in any equipment schedule (a "Schedule") executed by you and us and incorporating the terms of this Master Agreement by reference (the "Agreement"). The personal and intangible property described in any equipment a Schedule (together with all attachments, replacements, parts, substitutions, additions, repairs, and accessories incorporated in or affixed to the property and any license or subscription rights associated with the property will be collectively referred to as "Product"). The manufacturer and/or vendor of the tangible Product shall be referred to as the "Vendor." To the extent the Product includes intangible property or associated services such as periodic software licenses and prepaid data base subscription rights, such intangible property shall be referred to as the "Software."

**2. Schedules; Delivery and Acceptance.** Each Schedule that incorporates this Master Agreement shall be governed by the terms and conditions of this Master Agreement, as well as the terms and conditions set forth in such individual Schedule. Each Schedule shall constitute a complete agreement separate and distinct from this Master Agreement. The termination of this Master Agreement will not affect any Schedules executed prior to the effective date of such termination. When you receive the Product, you agree to inspect it to determine it is in good working order. Scheduled Payments (as specified in the applicable Schedule) will begin on the Product delivery date ("Effective Date"). You agree to sign and return to us a delivery and acceptance certificate within three business days after any Product is installed.

**3. Term; Payments.** The first scheduled Payment (as specified in the applicable Schedule) ("Payment") will be due on or before the Effective Date. The remaining Payments will be due on the same day of each subsequent month, unless otherwise specified on the applicable Schedule. If any Payment or other amount payable under any Schedule is not paid within ten days of its' due date, you will pay to us, in addition to that payment, a late charge of 5% of the overdue payment. You agree to pay $25.00 for each check that the bank returns for insufficient funds or for any other reason. You also agree that THIS IS AN UNCONDITIONAL, NON-CANCELABLE AGREEMENT FOR THE MINIMUM TERM INDICATED ON ANY SCHEDULE TO THIS MASTER AGREEMENT. All payments to us are "net" and are not subject to set off or reduction.

**4. Product Location; Use and Repair.** You will keep and use the Product only at the Product Location shown in the applicable Schedule. You will not move the Product from the location specified in the applicable Schedule or make any alterations, additions or replacements in the Product without our prior written consent, which consent will not be unreasonably withheld. At your own cost and expense, you will keep the Product eligible for any manufacturer's certification and in compliance with applicable laws and in good condition, except for ordinary wear and tear. All alterations, additions or replacements will become part of the Product and our property at no cost or expense to us. We may inspect the Product at any reasonable time.

**5. Taxes and Fees.** In addition to the payments under this Master Agreement, you agree to pay all taxes, fees, and filing costs related to the use of the Product, even if billed after the end of the term of this Master Agreement or any Schedules. We will file property tax returns and bill you as soon as an invoice from the local jurisdiction is received, if we are required to pay property tax, you agree to reimburse us. If you are required to file and pay the taxes directly to the tax collector, we will notify you in advance in writing.

**6. Warranties.** We transfer to you, without recourse, for the term of each Schedule, any warranties made by the Vendor or Supplier (as defined in Section 10 of this Master Agreement) with respect to the Product rented pursuant to such Schedule. We warrant that we will not interfere with your quiet enjoyment of the use of the Product so long as no event of default under this Master Agreement or any Schedule shall have occurred and be continuing. The parties to this Master Agreement each acknowledge that use of the Product so long as no event of default under this ACKNOWLEDGE THAT WE DO NOT MANUFACTURE OR DESIGN THE PRODUCT. YOU ACKNOWLEDGE THAT IOS Capital is a wholly-owned subsidiary of IKON. YOU OR EQUIPMENT SUPPLIER AND THAT YOU HAVE SELECTED THE PRODUCT AND THE VENDOR BASED ON YOUR OWN JUDGMENT. However, notwithstanding anything to the contrary, if you enter into any maintenance agreement ("Maintenance Agreement") with IKON with respect to any Product, no provision, clause or paragraph of this Master Agreement shall alter, restrict, diminish or waive the rights, remedies or benefits that (i) you may have against IKON as a vendor of the Product or in connection with the Maintenance Agreement or (ii) you may have against IKON under Article 2A of the UCC. EXCEPT FOR OUR WARRANTY OF QUIET ENJOYMENT, WE MAKE NO WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. AS TO US, YOU RENT THE PRODUCT (S) "AS-IS". The only warranties, express or implied, made to you are the warranties (if any) made by the Vendor to you in any documents executed by and between the Vendor and you. YOU AGREE THAT, NOTWITHSTANDING ANYTHING TO THE CONTRARY, WE ARE NOT RESPONSIBLE FOR, AND YOU WILL NOT MAKE ANY CLAIM AGAINST US FOR, ANY DAMAGES, WHETHER CONSEQUENTIAL, DIRECT, SPECIAL, OR INDIRECT.

**7. Loss or Damage.** You are responsible for any theft, destruction of, or damage to, the Product (collectively, "Loss") from any cause at all, whether or not insured, from the time of Product delivery to you until it is delivered to us at the end of the Schedule. You are required to make all Payments even if there is a Loss. You must notify us in writing immediately of any Loss. Then, at our option, you will either (a) repair the Product so that it is in good condition and working order, eligible for any manufacturer's certification, (b) pay us the amounts specified in Section 12 below, or (c) replace the Product with equipment of similar age and capacity from IKON.

**8. Indemnity, Liability and Insurance.** (a) The parties to this Master Agreement will indemnify, defend and hold each other harmless from all losses, damages, claims, suits and actions (including court costs and reasonable attorneys' fees) ("Claims") arising out of any breach of this Master Agreement except to the extent caused by the negligence or intentional acts or omissions of the other. (b) Because your have sole possession and control of the Product, you are fully responsible for any Claim, or other damage, injury or loss caused by (or to) the Product resulting from the use, misuse or possession of the Product or any accident or other casualty relating to the Product. We are responsible for damage or injury to third persons when the damage or injury is caused exclusively by our negligent acts or omissions. You agree to maintain insurance to cover the Product and will name us as an additional insured and as payee on your insurance policy. Such insurance will provide that we will be given 30 days advance notice of any cancellation. If you fail to provide evidence of insurance reasonably satisfactory to us, you authorize us to obtain coverage on your behalf and you agree to pay for this coverage. In the event of loss or damage to the Product, you agree to remain responsible for the payment obligations under this Master Agreement until the payment obligations are fully satisfied.

**Title; Recording.** We are the owner of and will hold title to the Product (except for any Software) during the term of each Schedule. You agree that this Master Agreement is a true rental. However, if any Schedule is deemed to be intended for security, you hereby grant to us a purchase money security interest in the Product covered by the applicable Schedule (including any replacements, substitutions, additions, attachments and proceeds) as security for the payment of the amounts owed under each Schedule. You authorize us to file a copy of this Master Agreement and/or any Schedule as a financing statement and appoint us, or our designee as your attorney-in-fact to execute and file, on your behalf, financing statements covering the Product.

Case 1:09-cv-XXXXX-XXX   Document 42-2   Filed 07/10/2009   Page 40 of 50

10. **Software or Intangibles.** To the extent that the Product includes Software or other intangibles, you understand and agree that we have no right, title or interest in the Software and you will comply throughout the term of this Master Agreement with any license and/or other agreement ("Software License") entered into with the supplier of the Software ("Supplier"). You are responsible for entering into any Software License with the Software Supplier no later than the Effective Date.

11. **Default.** Each of the following is a "Default" under this Master Agreement and all Schedules: (a) you fail to pay any Payment or any other payment within 30 days of its date, (b) any representation or warranty made by you in this Master Agreement is false or incorrect and/or you do not perform any of your other obligations under this Master Agreement or any Schedule or in any other agreement with us or with any of our affiliates and this failure continues for 10 days after we have notified you of it, (c) you become insolvent, you dissolve or are dissolved, or you assign your assets for the benefit of your creditors, or you file or have filed against you any bankruptcy or reorganization proceeding, or (d) any guarantor of this Master Agreement or of any Schedule does not perform its obligations under the guaranty, becomes subject to one of the events listed in clause (c) above, or (if a guarantor is an individual) dies.

12. **Remedies.** If a Default occurs, we may do one or more of the following: (a) we may cancel or terminate this Master Agreement and/or any or all Schedules, or any or all other agreements that we have entered into with you; (b) we may require you to immediately pay to us, as compensation for loss of our bargain and not as a penalty, a sum equal to (i) the present value of all unpaid Payments for the remainder of the term of each Schedule plus the present value of our anticipated value of the Product at the end of the initial term of any Schedule (or any renewal of such Schedule), each discounted at a rate equal to 6% per year, compounded monthly, plus (ii) all other amounts then due or that become due under this Master Agreement or any Schedule; (c) we may require you to deliver the Product to us as set forth in Section 14; (d) we or our representative may peacefully repossess the Product without court order and you will not make any claims against us for damages or trespass or any other reason; (e) we may exercise any and all other rights or remedies available to a lender or secured party under the Uniform Commercial Code ("UCC"), including without limit, Article 2A of the UCC, and at law or in equity; (f) immediately terminate your right to use the Software including the disabling (on-site or by remote communication) of any Software; (g) demand the immediate return and obtain possession of the Software and relicense the Software at a public or private sale; and/or cause the Supplier to terminate the Software License, support and other services under the Software License. You agree to pay all of our costs of enforcing our rights against you, including reasonable attorneys' fees. If we take possession of the Product, we agree to sell or otherwise dispose of it with or without notice, at a public or private sale, and/or (h) (after we have deducted all costs related to the sale or disposition of the Product including reasonable attorneys' fees) to the amounts that you owe us. You agree that if notice of sale is required by law to be given, 5 days notice shall constitute reasonable notice. You will remain responsible for any deficiency that is due after we have applied such net proceeds.

13. **Assignment.** YOU HAVE NO RIGHT TO SELL, TRANSFER, ENCUMBER, SUBLET OR ASSIGN THE PRODUCT OR THIS MASTER AGREEMENT OR ANY SCHEDULE WITHOUT OUR PRIOR WRITTEN CONSENT. You agree that we may sell or assign any of our interests without notice to you. In that event, the assignee will have such rights as we assign to them but none of our obligations (we will keep any such obligations) and the rights of the assignee will not be subject to any claims, defenses or set-offs that you may have against us.

14. **Renewal; Return of Equipment.** After the minimum term of any Schedule to this Master Agreement, such Schedule will renew on a month-to-month basis unless you notify us in writing at least 30 days prior to the expiration of the minimum term of such Schedule and return the Product to us as specified in this Section 14. At the end of or upon termination of each Schedule, you will immediately return the Product subject to such expired Schedule to us in as good condition as when you received it, except for ordinary wear and tear, to any place in the United States that we tell you. We will bear the shipping charges so long as replacement equipment is selected from IKON. Otherwise, you will bear all expenses of deinstalling, crating and shipping the Product. You will insure the Product for its full replacement value during shipping. You will, upon request from us, obtain from the supplier or manufacturer (or other maintenance service supplier previously approved by us) a certificate stating that the Product qualifies for a maintenance contract and service at the standard rates and terms then in effect. You must pay additional monthly payments, at the same rate as then in effect under a Schedule, until the Product is returned by you and is received in good condition and working order by us or our designee.

**Miscellaneous.** You agree that the terms and conditions contained in this Master Agreement and in each Schedule make up the entire agreement between us regarding the rental of the Product and supersede all prior written or oral communications, understandings or agreements between the parties relating to the subject matter contained herein, including without limitation, purchase orders. Any purchase order, or other ordering documents, will not modify or affect this Master Agreement or any Schedule, nor have any other legal effect and shall serve only the purpose of identifying the equipment ordered. You authorize us to supply any missing information in this Master Agreement or any Schedule. You acknowledge that you have not been induced to enter into this Master Agreement by any representation or warranty not expressly set forth in this Master Agreement or any Schedule. Neither this Master Agreement nor any Schedule is binding on us until we sign it. Any change in any of the terms and conditions of this Master Agreement or any Schedule must be in writing and signed by us. If we delay or fail to enforce any of its rights under this Master Agreement with respect to any or all Schedules, we will still be able to enforce those rights at a later time. All notices shall be given in writing by the party sending the notice and shall be effective when deposited in the U.S. Mail, addressed to the party receiving the notice at its address shown on the front of this Master Agreement to any other address specified by that party in writing) with postage prepaid. All of our rights and indemnities will survive the termination of this Master Agreement and each Schedule. If more than one customer has signed this Master Agreement or any Schedule, each customer agrees that its liability is joint and several. It is the express intent of the parties not to violate any applicable usury laws or to exceed the maximum amount of time price differential or interest, as applicable, permitted to be charged or collected by applicable law, and any such excess payment will be applied to Payments in inverse order of maturity, and any remaining excess will be refunded to you.

15. **Governing Law; Jurisdiction; Waiver of Trial By Jury and Certain Rights and Remedies Under The Uniform Commercial Code.** YOU AGREE THAT THIS MASTER AGREEMENT AND ANY SCHEDULES WILL BE GOVERNED UNDER THE APPLICABLE LAW FOR THE STATE IN WHICH OUR (OR OUR ASSIGNEE'S) PRINCIPAL CORPORATE OFFICES ARE LOCATED. YOU ALSO AGREE TO SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE IN WHICH OUR (OR OUR ASSIGNEE'S) PRINCIPAL CORPORATE OFFICES ARE LOCATED. THE PARTIES TO THIS MASTER AGREEMENT EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN THE EVENT OF A LAWSUIT. By signing each Schedule, you agree that either (a) you have reviewed, approved, and received, a copy of the Vendor contract and/or the Supplier software license agreement, or (b) that we have informed you of the identity of the Vendor and Supplier, that you may have rights under the Vendor contract and/or the Supplier software license agreement, and that you may contact the Vendor or Supplier for a description of those rights. TO THE EXTENT PERMITTED BY APPLICABLE LAW, YOU WAIVE ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A CUSTOMER OR LESSEE BY ARTICLE 2A OF THE UCC THAT YOU MAY HAVE AGAINST US (BUT NOT AGAINST ANY VENDOR OR SUPPLIER).

16. **Counterparts; Facsimiles.** Each Schedule may be executed in counterparts. The counterpart which has our original signature and/or is in our possession shall constitute chattel paper as that term is defined in the Uniform Commercial Code ("UCC") and shall constitute the original agreement for all purposes, including, without limitation, (i) any hearing, trial or proceeding with respect to such Schedule, and (ii) any determination as to which version of such Schedule constitutes the single true original item of chattel paper under the Uniform Commercial Code. You transmit a Schedule to us by facsimile, or by "e-commerce" transmission, if applicable, the facsimile copy or e-commerce version of a Schedule received by us shall be binding as if it were manually signed. However, no facsimile, e-commerce transmission or other version of a Schedule shall be binding against you unless it is manually signed by us. The facsimile or e-commerce version of a Schedule manually signed by us shall constitute the original agreement for all purposes, including, without limitation, those outlined above in this section. You agree to deliver the facsimile or e-commerce version of any counterpart of the Schedule with your original signature upon our request.

IN WITNESS WHEREOF, the parties have executed this Master Agreement as of _____ 20____.

PRINTED NAME OF AUTHORIZED SIGNER: _____   IOS CAPITAL, INC.

_Authorized Signer Signature   Title:_____   Date: 6/19/00   X_____

Authorized Signer Signature   Title:_____   Date:_____

# EXHIBIT D

CONFIDENTIAL

**Accounting Value Statement**
**Prepared For**
**Human Resource Development Press**
**July 7, 2000**

| Equipment / Component Description | Accounting Value |
|---|---|
| **1.Canon ImageRunner 110 Network Printing System:**<br>-Marking Engine<br>-(2) Paper Supply Modules<br>-Marking Image Path<br>-Finisher<br>-System Controlling Subsystem<br>-High Capacity Stacker | $276,735.00 |
| **2. Canon ImageRunner 330 Multifunction Device System:**<br>-Base Unit<br>-Automatic Document Feeder DADF-A1<br>-Super G3 Multi Line Fax Board<br>-Multi PDL Network Print Controller<br>-Multi-Position Auto Stapler C-1<br>-Expansion Board Base Unit C-1<br>-Scanning Interface Board D-1<br>-Cassette Feeding Unit R-1 | $ 21,168.00 |
| **3. EPSON Color Page 8000 System**<br>-192 MB RAM<br>-RS5000 Fiery Server w/64MB RAM | $ 5,995.00 |
| **4.Canon IR210 Multifunctional Device**<br>-Base Unit<br>-Automatic Document Feeder RDF-G1<br>-G3 Fax Board-D1<br>-Multi PDL Network Print Controller D1<br>-Multi-Output Tray C-1<br>-IR210 Expansion Board A-1<br>-IR210 Cabinet | $ 13,384.00 |

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

©**COPY**

HUMAN RESOURCE DEVELOPMENT        }
PRESS INC.,                        }
                                   }
                                   }    CIVIL ACTION NO.
        PLAINTIFF,                 }    3:05-CV-30068-KPN
                                   }
                                   }
VS.                                }
                                   }
                                   }
IKON OFFICE SOLUTIONS, INC.        }
& IOS CAPITAL, INC. d/b/a          }
IKON FINANCIAL SERVICES,           }
                                   }
        DEFENDANTS.                }
                                   }

CONTINUED DEPOSITION OF:    IKON OFFICE SOLUTIONS, INC.
WITNESS (VIA TELEPHONE):    DANIEL G. FELDMANN
DATE TAKEN:                 JUNE 26, 2007
LOCATION:                   Robinson & Cole
                            280 Trumbull Street
                            Hartford, Connecticut

Reporter:  Ann W. Friedman, LSR #91

BRANDON SMITH REPORTING SERVICE, LLC

44 Capitol Avenue              Six Landmark Square

Hartford, CT  06106            Stamford, CT  06901

Tel:  (860) 549-1850              (203) 316-8591

Fax:  (860) 549-1537              (860) 549-1537

Page 12

```
 1   BY MR. NOONAN:

 2        Q.    In July of 2000, did IKON establish what the

 3   residual value of the Océ 3100 was?

 4        A.    Did we establish the residual in July of

 5   2000?

 6        Q.    Yes.  Did IKON establish a residual value

 7   for that piece of equipment that was effective as of

 8   July 2000?

 9        A.    No, we didn't.

10        Q.    Did IKON ever establish a residual value for

11   the Océ 3100?

12        A.    Yes.  The residual was established at the

13   time that the original agreement was booked.

14        Q.    Did that residual value change throughout

15   the course of the lease or is that a static number?

16        A.    No, it's a static number.

17        Q.    And what was that number?

18        A.    On the 3100?

19        Q.    Correct.

20        A.    The residual value on that asset was 11,820.

21        Q.    And by "residual value," please explain to

22   me what IKON means by the term "residual value."

23        A.    The residual value is the -- I guess the

24   anticipated value of that asset.

25        Q.    At what point in time?  At the end of the
```

HRD v. IKON

6/26/2007

Daniel Feldman

Page 13

1   lease term?

2        A.   At the end of the lease term.

3        Q.   Okay.  Did IKON establish a residual value

4   for the Océ 3165 that was the subject of the first

5   agreement?

6        A.   Yes, it did.

7        Q.   And what was that value?

8        A.   6,334.

9        Q.   So is it your testimony that IKON believed

10  that those two pieces of equipment had a value of

11  $11,000 and then $6,000 at the end of the lease term?

12       A.   That was the anticipated value.

13       Q.   Okay.  In July of 2000, what was the

14  stipulated loss value for the Océ 3100?

15       A.   I'm not sure what a "stipulated loss value"

16  would be.

17       Q.   All right.  Well, in July 2000, if HRD Press

18  was unable to surrender or turn the equipment back to

19  IKON, what dollar amount would HRD Press have had to

20  have paid -- had to pay IKON?

21       A.   They would have had to satisfy the original

22  term of the agreement and pay off whatever the fair

23  market value was at the time.

24       Q.   So what was that value?

25            MR. BOSKIEWICZ:  Objection.  What

```
 1    STATE OF CONNECTICUT  )
                            )  SS.
 2    COUNTY OF HARTFORD    )

 3

 4           I, Ann W. Friedman, License No. 91, a notary

 5    public for the State of Connecticut, do hereby certify

 6    that the deposition of  DANIEL G. FELDMANN, was taken

 7    before me at the law offices of Robinson & Cole,

 8    280 Trumbull Street, Hartford, Connecticut, commencing

 9    at 11:01 a.m. on          , June 26, 2007.

10           I further certify that the witness was first

11    sworn by me to tell the truth, the whole truth, and

12    nothing but the truth, and was examined by counsel, and

13    his testimony was stenographically reported by me and

14    subsequently transcribed as hereinbefore appears; that

15    this deposition is a true record of the testimony given

16    by the witness to the best of my ability.

17           I further certify that I am not related to

18    the parties hereto or their counsel, and that I am not

19    in any way interested in the event of said cause.

20           Dated at New Britain, Connecticut, this ___

21    day of                   , 2007.

22    _____
      Ann W. Friedman, Notary Public
23    My commission expires:  8-31-11.

24

25
```

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


HUMAN RESOURCE DEVELOPMENT   )
PRESS, INC.,                 )
                  Plaintiff  )
                             )
v.                           )        3:05-CV-30068-KPN
                             )
IKON OFFICE SOLUTIONS, INC.  )
& IOS CAPITAL, INC. d/b/a    )
IKON FINANCIAL SERVICES,     )


DEPOSITION OF: JEFFREY SNYDER, taken before

Sharon R. Roy, Notary Public, Registered Professional

Reporter, pursuant to Rule 30 of the Massachusetts

Rules of Civil Procedure, at the law offices of

ROBINSON & COLE, LLP, 280 Trumbull Street, Hartford,

Connecticut on December 7, 2006, commencing at 10:47

a.m.


A P P E A R A N C E S:

(See Page 2)


Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

1        that their need for high production copies

2        would be satisfied?

3                "Answer:  No."

4        A.    Not in that -- not in those words.

5        Q.    Did you use similar words?

6        A.    The question related to HRD and what their

7    production -- those words are inaccurate to begin

8    with, of why we recommended new equipment and why the

9    technicians recommended new equipment.

10        Q.    Why did the technicians recommend new

11    equipment?

12        A.    Well, they were very knowledgeable of the

13    client's applications which is essentially book

14    production serving various subject matters.  They're

15    not only knowledgeable of applications but they're

16    knowledgeable of the work flow, which wasn't a truly

17    digital production printing system work flow.  It

18    consisted of, in their case, of creating books.  They

19    would print a proof of a book, say an example of a

20    30-page book, and put it onto the shelf.  And then

21    when orders came in they would paste these

22    pre-printed samples into a document feeder and make

23    copies which were part of the materials that were in

24    the production needs of HRD.

1              The imageRunner 110 was much different than

2    the current equipment at HRD.

3         Q.    The current equipment meaning the OCE?

4         A.    Yeah, the OCE 3165 and 3100.  It's a

5    production printing platform to not only deliver the

6    best lithographic quality for the client, which is

7    very important to HRD, but also streamline the from

8    order to production processes of HRD.

9              So the technicians are very well aware of

10   what kind of books they did and how they were doing

11   it and how the orders were taken from beginning

12   through the enterprise and delivered to the customer.

13        Q.    Did the technicians recommend an upgrade

14   because they thought an upgrade would help solve

15   HRD's production problems, photocopying problems?

16             MR. BOSKIEWICZ:  Objection to form.

17        A.    I believe they recommended HRD to look at

18   the imageRunner 110 based upon quality of output and

19   being a true digital production system.

20        Q.    And with whom did you speak to confirm that

21   they did make a recommendation for an upgrade?

22        A.    Kenneth Stearns and Dave Connery.

23        Q.    And was there anyone else involved on

24   behalf of IKON in making this recommendation for an

1    agreement?

2        A.    No.

3        Q.    Was that left primarily to Mr. Thornton?

4        A.    Rephrase the question.

5        Q.    You just said that you didn't have any

6    verbal communications with HRD Press about the

7    financial commitments of the second agreement, is

8    that correct?

9        A.    I thought your question was something else.

10   No, I was -- I could have answered any questions

11   about the pricing proposal on the second agreement.

12       Q.    No, I'm not asking whether you could have,

13   whether you were capable of doing it.  I'm asking did

14   you have verbal communications with HRD Press about

15   their financial commitment to IKON under the second

16   agreement?

17       A.    Yes.

18       Q.    With whom did you have those

19   communications?

20       A.    Robert Carkhuff.

21       Q.    And in what context did you have those

22   communications?

23       A.    The financial -- the delivery of our

24   financial proposal consisted of two meetings with Rob

1  Carkhuff.

2      Q.   Okay.

3      A.   The first meeting, without specifics, was

4  in the middle of June 2000 where we delivered a

5  summary of what we wanted to provide, detail of the

6  equipment, and the pricing.

7      Q.   Is there a document that you have in front

8  of you that is said summary?

9      A.   There is a document within these pages.

10      Q.   So, when you made -- during this meeting,

11  did you hand Mr. Carkhuff a piece of paper that

12  contained these terms that you just referred to?

13      A.   Yes.

14      Q.   And do you know what that document is

15  called?

16      A.   It was ... no.

17          MR. BOSKIEWICZ:  Can we go off the

18      record for a second.

19              (Exhibit 3, marked)

20      Q.   (By Mr. Noonan)  All right, sir, I'm going

21  to show you a document that's been marked as Exhibit

22  3.  And what is the Bates page number on the first

23  page of that document?

24      A.   The Bates number of this document is

1    IOS00066.

2        Q.    Okay, sir, is Exhibit No. 3 the document

3    that you provided to Greg -- to Robert Carkhuff in

4    June of 2000?

5        A.    Yes.

6        Q.    Was that the first written proposal that

7    IKON made to HRD concerning the second agreement?

8        A.    Yes.

9        Q.    Who prepared Exhibit No. 3?

10       A.    Doug Thornton and I.

11       Q.    When you say "and I," did you do this

12    simultaneously jointly or did you do a portion and he

13    did a portion?

14       A.    We were probably together in the West

15    Springfield office doing it together.

16       Q.    So it was jointly drafted?

17       A.    Yes.

18       Q.    Was anyone else involved in drafting this

19    document other than you and Mr. Thornton?

20       A.    Not drafting, but there were several

21    contributors to the document.

22       Q.    And who were these contributors?

23       A.    Well, for example, I had to contact both

24    the service manager and Kenneth Stearns of the site

1    proposal, Exhibit 3, did IKON contemplate that it was

2    going to somehow get possession back of the OCE

3    equipment.  H, that HRD was going to surrender the

4    equipment to you, was that part of this proposal?

5         A.    Yes.

6         Q.    Okay.  Now -- so, IKON knew at the time

7    that it prepared Exhibit 3 that as part of the

8    proposal, the original equipment, first equipment,

9    would be surrendered back to IKON?  Yes?

10        A.    Yes.  I wouldn't necessarily use the word

11   "surrendered," though.

12        Q.    Well, you'd get physical possession of it?

13        A.    Yeah, we'd go pick up the equipment, go

14   collect our assets.

15        Q.    And HRD would no longer have use of that

16   equipment?

17        A.    Yes, sir.

18        Q.    When you prepared Exhibit 3, did you know

19   what IKON would do with the OCE equipment once it had

20   been turned over back to IKON?

21        A.    It's not an exact science how they

22   determine whether -- there's three options for the

23   equipment when it's returned to IKON.  Based upon

24   market viability of the product, based upon age,

1    scope, number of impressions -- there's a lot of

2    variables, and what the final determination is I

3    don't know.  There's a lot of factors that go into

4    that.  But, yes, it's either usually they redeploy

5    them in the field under a -- you know, lease it to

6    somebody else or rent it to somebody or use it in the

7    showroom; an alternative use for it.  Or they

8    wholesale it to a wholesaler which basically sends

9    the equipment overseas.  Or they destroy it.

10        Q.    When you say "destroy," does that mean

11   throw it in a junk yard?

12        A.    Yeah.

13        Q.    Do they take salvage parts off it before

14   they destroy it?

15        A.    It really depends upon the asset.  Some

16   parts are more valuable than others, some parts are

17   quickly spoiled and have to be replaced with new,

18   anyways.

19        Q.    In some instances, prior to, quote,

20   destroying it, depending on the piece of equipment,

21   is the equipment cannibalized and parts removed for

22   re-use in another machine?

23        A.    They may do that, yeah.  I can share more

24   in that regard.

1    Q.    At the point in time when this executive

2    summary, Exhibit 3, was prepared, did IKON know

3    exactly what it was going to do with the OCE

4    equipment once it was returned to IKON?

5    A.    No.    No, they don't -- that's the way the

6    process works is basically we put in the truck's

7    deliver slip for the new equipment and then tell the

8    trucks when to come and get the old equipment.   Where

9    it goes from there could be, you know, directed back

10    to an IKON showroom, depending upon the asset, or

11    directed to the warehouse.   And from there, I mean,

12    once they pick it up, my knowledge of where that

13    thing's going, unless I have a need for it somewhere

14    else and really try to take that and put it into

15    another transaction, I have no idea.   Once the truck

16    picks it up, it could go anywhere.

17    Q.    So, in this particular case, is it your

18    testimony that the decision as to what to do with the

19    OCE equipment, that decision was made after HRD had

20    signed a second agreement?

21    A.    Yes.

22    Q.    Do you know what happened to the OCE

23    equipment?

24    A.    Yes, I do.

Q.    What happened to the OCE equipment?

A.    The 3100 was destroyed and the 3165 was

sold to a wholesaler in September of that same year,

or beginning of October, for the value of $4,500.

Q.    And are there documents in IKON's

possession that establish the facts that you just

told me?

A.    Yes.

Q.    What documents establish or support your

testimony?

A.    We were able to -- I had my inventory

specialist make some inquiries into the archives to

see if we could find proof of what happened to them,

and they were able to find a screen showing the same

serial number and what happened to them.  That actual

information was procured -- well, Brett asked --

Robinson & Cole finally got that information.

Q.    Was that information printed out onto a

piece of paper?

A.    It was an e-mail response, I don't know if

it got printed.

         MR. BOSKIEWICZ:  Dave, I might be

      able to short circuit this for you.  That's

      going to be part of our supplemental responses

1    document?

2        A.   Yes.

3        Q.   The piece of equipment that was destroyed,

4    was that the more expensive or the less expensive

5    piece of equipment?

6        A.   More expensive.

7        Q.   Do you know why it was destroyed?

8        A.   There's no rhyme or reason.  I know the

9    date was after the end of our fiscal year.  Also,

10   it's public information.  IKON was minimizing our

11   relationship with OCE due to their escalating

12   internal cost to us.  So, basically, OCE was a brand

13   on the way out of IKON.  But under agreements between

14   manufacturers, you know, you got seven years to

15   provide service and support for anything you sell.

16   We no longer sell OCE new, and I don't believe we

17   have since -- I want to say 2004.

18       Q.   Do you know why the one OCE was destroyed

19   as opposed to sold to a wholesaler?

20       A.   No rhyme nor reason.  The only thing that I

21   can think of is the OCE 3100 was a very, very heavily

22   engineered machine with a lot of parts, digits,

23   wheels, et cetera, and usually in a wholesale

24   relationship they aren't looking for more complicated

1    machines to support, because you need authorized

2    service personnel.  You just couldn't -- the OCE 3100

3    came apart in six different parts that weigh about

4    400 pounds apiece, and usually when you wholesale

5    something, it's usually a one-piece design product or

6    a smaller office copier maybe you're familiar with,

7    but the OCE did have its technical intricacies to it.

8    So, to wholesale it, the wholesaler would have to

9    have somebody on the other end they could sell to

10   that could provide the service, the reinstallation,

11   be an authorized dealer, and OCE just didn't -- they

12   just don't give up service dealerships without a lot

13   of financial investment from a company.

14        So, wholesale viability for a 3100 I

15   believe is -- and this is probably my opinion, but a

16   good one, is due to the intricacy of the product they

17   couldn't wholesale it, nobody would buy it because

18   you'd have to be an authorized dealer to service the

19   thing.  And the 3165 was a digital product, smaller

20   frame, a little easier to service, so I think that

21   had a little more viability in the market.  And also,

22   the OCE 3100, great machine, did a lot, but it was an

23   analog copier, meaning the only way you get output is

24   put in hard copy originals.  The market was heading

1    to digital, where every print is an original, not a

2    copy of a copy, and this is the main -- one of the

3    main reasons why HRD wanted the 110.

4        Q.   Do you know how many OCEs were surrendered,

5    turned over, to IKON during the period 1998 through

6    2000?

7                    MR. BOSKIEWICZ:  Objection.  Again,

8            we're going to object to that as outside the

9            scope of discovery and outside the scope of

10           this 30(b)(6) Deposition Notice.  Again, I

11           don't see how that question is relevant to

12           your claims and defenses that are pending in

13           this lawsuit.

14       Q.   (By Mr. Noonan) Mr. Snyder, would you

15   please refer to paragraph 15 of the deposition

16   notice?

17                   MR. BOSKIEWICZ:  I'll withdraw that

18           piece of the objection, Dave.  I stand

19           corrected.  But maintain the objection that I

20           think it's outside the scope of discovery.

21                   MR. NOONAN:  Okay, fine.

22       Q.   (By Mr. Noonan)  Answer the question.  Do

23   you know how many --

24       A.   No, I do not.

1   customer.

2       Q.    And the numbers you're referring to that

3   you needed from him, are those the numbers contained

4   in the financial consideration section of Exhibit 3?

5       A.    Yes.

6       Q.    Now, once you had these numbers, what did

7   you do with Exhibit 3?

8       A.    To confirm your question, are you saying

9   once Michael provided me what the payments were and I

10  delivered --

11      Q.    No, I'm asking you once you got the numbers

12  from Mr. Fusaro, what did you next do with this

13  document?

14      A.    Delivered it to Mr. Carkhuff.

15      Q.    Which Carkhuff?

16      A.    Bob.

17      Q.    Did you deliver it in hand?

18      A.    Yes.

19      Q.    And who was present with you when you

20  delivered it in hand?

21      A.    Bob Carkhuff, Al Maximino, Doug Thornton,

22  and myself.

23      Q.    And where did that meeting take place?

24      A.    In Bob's office, which is on the second

1    level of his building.

2        Q.    At HRD?

3        A.    Yes.

4        Q.    When you presented it to Bob, what did you

5    say to Bob?

6        A.    Well, at that point it was a culmination of

7    a four and a half month sales process of which he

8    knew what was going on but not directly day-to-day

9    activities.  For example, sending his technical folks

10   to Glastonbury, surrendering files to me, technical

11   information.  He empowered his people to do the

12   research and the validation of the equipment and the

13   processes that would be realized from this equipment

14   and asked for their recommendation, whether this is

15   something HRD should do.

16             The main technical person that we dealt

17   with, because this was a rather technical work flow

18   that both they wanted to include and we could

19   provide, was Dhannika.  Dhannika's the last name, I

20   couldn't pronounce, if you paid me, but it was always

21   Dhannika.  So Dhannika was like his lead technical

22   person.  Dhannika understood electronic work flow

23   very, very well, very well educated in that regard.

24   And we went through demonstrations over a three and a

1    half month period.  It came time to propose, so in

2    that initial meeting I proposed this summary to Bob

3    after his internal people made the recommendation

4    that this is where they'd like to go.

5        Q.    Okay.  What questions did Bob ask you about

6    the executive summary?

7        A.    Well, actually he -- from my memory, he

8    basically, as far as working our way down, because

9    that's the way we would go through things, from top

10    to bottom, he may have asked, "Okay, what does post

11    script 3 versus PCL mean on a multi-PDL print board?"

12    You know.  Or, "What's an SCSI board?  Why am I

13    paying for it?"  And that's an acronym for Small

14    Computer-something Interface.  And the PDL is a

15    Printer Definition Language.  So, nomenclature that's

16    common to me but not to him.  So, maybe generic

17    questions there.

18            As far as implementation, it's kind of

19    first, his first question was, "How are you going to

20    get this 110 through the door?  My building's not

21    wide enough."

22            "I'll have a carpenter, prior to delivery,

23    take down your door and I will put in a double door

24    in its place as part of the installation."

1        Q.    Okay.

2        A.    Going down the document, he asked us if

3    "How's the site," this and that.  They actually had

4    to order eight-foot by ten-foot by two-inch thick

5    metal plates to support this 6,500 pound printer.

6              So we reviewed how to get it in, everything

7    in regards to getting it in the site.  He

8    complemented us on training his people before the

9    machine got there.  We reviewed how we're going to

10   deinstall the 3165, how I'm going to keep his

11   department for their production needs running by

12   providing off-site printing capabilities and copying

13   during the testing time.  And we basically got to the

14   second page.  Very familiar with the IKON program, as

15   he did one almost identical in 1998.  So, sort of

16   comical, he just said, "Jeff, everything you show my

17   people better work," and he pointed to me directly.

18   And I said, "Your people speak on your own behalf.

19   We were just the facilitator of helping them get what

20   you guys require for the next period of time."

21       Q.    Did Bob have any questions about the

22   removal of the OCE equipment?

23       A.    None.  No, just "How are you going to do

24   it?  When are you going to do it?  Am I going to have

1    any downtime?"  He was more concerned about meeting

2    his daily production needs in the midst of the

3    install because the iR110 takes three to five days to

4    set up.  So, in some instances we leave the equipment

5    on site while we do that.  But due to his space

6    limitations and him having another analog copier in

7    the facility, we just -- he was more concerned

8    about -- and all concerned about "My training for my

9    staff.  Am I going to be able to run this the first

10   day it's ready?"  He was more concerned about that

11   than anything.

12        Q.    Other than on the bottom portion of the

13   first page of Exhibit 3, where it says

14   "Deinstallation of OCE 3165 and 3100," is there

15   anything else in this document that talks about the

16   removal of the equipment or what happens to the

17   equipment once it's removed?

18        A.    No.

19        Q.    And Bob didn't ask any questions concerning

20   that?

21        A.    No, he's been through several new equipment

22   moves over a ten-year period with us, and I think --

23   I don't think -- there wasn't any questions.  He was

24   more concerned about up time, getting the work out.

1     Q.   At this point in time, in June of 2000, did

2   IKON consider HRD Press to be a good customer?

3     A.   Absolutely.

4     Q.   Was HRD Press the type of customer that

5   IKON wanted?

6     A.   Absolutely.

7     Q.   And why is that?

8     A.   Well, first and foremost, IKON -- the

9   company's that are growing that are tied to our

10  business of production, both in black and white and

11  color, companies that are financially sound in a

12  solid financial history, you know, we don't say no to

13  anyone, but if you had your choice of a Fortune 100

14  company and a Fortune 3500 company -- I shouldn't say

15  that.  It's based upon they're in the business of

16  pushing paper.  Not all clients are.  The better they

17  do, the more, say, revenues are obtained from the

18  account of putting black on white.

19     HRD was a long-standing customer of ours,

20  and I believe could have still been from today, from

21  reading these notes.  But, yeah, to answer in

22  general, they were very -- they were financially

23  sound, great history, and growing volumes in the year

24  2000 and had projections to go in that direction even

1    further.  So, we like companies that are growing that

2    are financially sound.

3         Q.   Now, did Bob ask you any questions about

4    the financial considerations on page 2?

5         A.   He may have asked what can we determine --

6    what are our options in the third year or fourth year

7    or fifth year of this agreement.

8         Q.   Do you know what he meant by "What are our

9    options?"

10        A.   Well, one is, even though there's a whole

11   company like the 110, there's always new equipment

12   that comes out.  And my involvement from '99 to 2000,

13   from going back and talking to everybody, he wanted

14   to be on the bleeding edge of what technology we had

15   available and always did.  I only assume that based

16   upon what equipment he put in, what he moved to over

17   the last ten years of my experience of the equipment

18   and what he does and what was in these documents.

19             So, he wanted to be on the bleeding edge,

20   we sometimes called it.

21        Q.   Did you say bleeding or leading?

22        A.   Bleeding/leading.  I use it in two

23   different -- you know.

24        Q.   So, there weren't really any meaningful

1    questions asked about the financial considerations?

2              MR. BOSKIEWICZ:  Objection to form.

3        A.    No.  He had a similar agreement prior to

4    that.  This one was more money.  He understood the

5    value of it, and more concerned about production, and

6    he knew we did four months worth of homework prior to

7    this point with him.  He was more concerned about up

8    time.  He didn't even fret at the agreement.

9        Q.    At the time that this proposal was put

10   together, did you know whether HRD had complained

11   that the OCE equipment wasn't meeting its present

12   needs?

13       A.    I'll have to answer that in sort of a long

14   answer, but in the proper way.

15             Client perception of problems with

16   equipment and downtime have to be understood and

17   defined very clearly.  And usually -- and I've

18   learned how to answer those questions from watching

19   service managers and service reviews over the years

20   because they are ultimately the first line of

21   defense.

22             A lot is based upon the condition of the

23   paper.

24       Q.    No, I don't want to spend time having you

1    answer a different question.  I'm not concerned

2    whether or not HRD Press was using the right paper or

3    the wrong paper.  I'm simply asking you at the time

4    that this proposal was put together by IKON, did IKON

5    know, for whatever reason, that HRD Press did not

6    think that the OCE equipment was meetings its needs?

7        A.    Maybe in the winter of that year, but

8    certainly not the spring.

9        Q.    If the OCE equipment was meeting its needs,

10    why did it migrate away from the OCE equipment?

11        A.    Because the OCE equipment wasn't a true

12    production printing solution, and the imageRunner 110

13    was the first product from Canon, as well as IKON, to

14    accomplish that task.

15        At that point in time the leader -- the

16    type of equipment that -- there's only one piece of

17    equipment out there 15 years which HRD wanted to get

18    to, but we didn't have.  That's called a Xerox

19    DocuTech Platform, which is a high-volume digital

20    printing press.  And the iR110 not only emulated some

21    of the best attributes of that, but it beat the Xerox

22    hands down.

23        HRD wanted to get into print on demand

24    versus inventory and warehouse issues.  Because when

1    you pre-print 30 books and you make ten pages update,

2    you're throwing away the old 30, you're not printing

3    on demand.  Two, HRD wanted as close to offset press

4    finish as done in an offset press environment, but

5    when you try to get offset press finish in a -- "I

6    only need one of this book and one of those books,"

7    it costs -- it's not cost obtainable to produce one

8    book off of a press.  So they wanted all the benefits

9    of a digital printing system.  From the output

10   perspective backing up to the work flow, the work

11   flow they ended up with was designers would put the

12   latest revision of the book in the library, the 110.

13   When an order taker in a different department

14   obtained orders for those books, they would use the

15   print driver and other various software tools of the

16   110, bring that latest version up, put the

17   quantities, and send it right to the Q, which is

18   dramatically from acceptance of order to output of

19   book, probably double the time for them to produce a

20   book with the current version than the old

21   traditional pickup the phone, send the note, send an

22   e-mail to get it out the door.  And also it minimizes

23   inventory standing costs of products that you have to

24   destroy because a revision could come today, and if

1    you pre-printed 30 of them, that's now a loss value

2    of inventory.  So they wanted to get to a true print

3    on demand scenario with the best equipment to rival

4    offset press at a price point well below offset

5    press, and they did get that in return.

6        Q.    Did you discuss with HRD Press what was

7    going to happen with the first equipment agreement?

8        A.    No.  They never posed one question with

9    regards to it.

10       Q.    Did you have any discussions whatsoever

11   with HRD Press as to what was going to happen with

12   the first contract?

13       A.    No.

14       Q.    No?

15       A.    No.

16       Q.    Was there any discussion that this -- that

17   the second contract would be a substitute for the

18   first contract?

19       A.    No.

20       Q.    Why is it that there is no mention in the

21   executive summary about what happens with the first

22   contract?

23       A.    Because it was never asked.

24       Q.    Well, this is your document that IKON

117

1      produced, correct?

2          A.    Yes.

3          Q.    You didn't think it was relevant to discuss

4      what was going to happen with the first contract?

5          A.    Based upon review of the file and five

6      prior transactions, Bob Carkhuff knew IKON well and

7      rested the majority of his business in our hands for

8      over ten years.  He was very familiar with the IKON

9      paperwork process and his concern was more about

10     delivering the value of the equipment than the

11     financials.  My meetings with Bob Carkhuff consisted

12     of two meetings.  That was it with Bob.

13         Q.    Was there someone else that had more

14     meetings with Bob?

15         A.    No.

16         Q.    There's just the two meetings about the

17     second agreement?

18         A.    Yeah, he empowered his people.  It started

19     off in like January of 2000, late January, prior to

20     even me having a demonstration piece of equipment to

21     show him.

22         Q.    Did you discuss with any other HRD

23     employees what was going to happen with the first

24     agreement?

1    A.    None of their business, and no.  Meaning,

2    they wouldn't have asked the question because it's --

3    they're concerned about customer service, they're

4    concerned about production and printing, they're

5    concerned about work flow.  We did not deal with one

6    finance person prior to delivering this summary to

7    Bob Carkhuff.

8        Q.    Did Bob Carkhuff ask you if IKON was

9    swapping the new equipment for the old equipment?

10                MR. BOSKIEWICZ:  Objection to form.

11       A.    No.    The answer is no.

12       Q.    He didn't?

13       A.    No.

14       Q.    Did he ask you any questions about the

15   first contract?

16       A.    No.

17       Q.    How much was the first contract per month,

18   do you know, at that point in time?

19       A.    It's in here.  Off the top of my head, I

20   want to say the first 36 months were -- and this is

21   off memory -- 4,268.  The second agreement was -- the

22   second leg of the agreement was like -- or, to be

23   specific, the first -- it's right here, the first

24   agreement I want to say -- the first 24 months was

1      A.    No.

2      Q.    Other than the three pages contained in

3  Exhibit 4, which is in front of you, and other than

4  the five pages that are contained in Exhibit 5, which

5  is also in front of you, do you believe there are any

6  other pieces of paper which set forth the financial

7  obligations of my client to IKON?

8      A.    No, those are the executed client only

9  facing documents.

10     Q.    Now, the meeting with Bob Carkhuff when you

11 presented the executive summary dated June 14, 2000,

12 do you know if that meeting took place on June 14 or

13 some other date?

14     A.    I believe the date was accurate.

15     Q.    I know that's the date that's on the

16 document, but is that also the date that you met with

17 Bob Carkhuff about Exhibit 3?

18     A.    Yes, I believe so.

19     Q.    Was that your first meeting with Bob

20 Carkhuff where you discussed the terms of the second

21 agreement?

22     A.    That was our first meeting presenting the

23 summary of what we proposed.

24     Q.    And when was the second meeting?

1    A.    I believe it was June 19, when he signed

2    the document.  We gave him time to review it and ask

3    any questions before we came up.

4    Q.    And who was there during that meeting when

5    he executed the document?

6    A.    Doug Thornton, Al Maximino, Jeff Snyder,

7    and Robert Carkhuff.

8    Q.    Why were there four people from IKON there

9    for him --

10    A.    Three people.  Me, Max, Doug, and Robert

11    Carkhuff.

12    Q.    You said Al.

13    A.    I meant Al Maximino.  Doug Thornton, Al

14    Maximino, Jeff Snyder, and Robert Carkhuff from HRD.

15    Q.    Okay, sorry.  And what was discussed at

16    that point in time?

17    A.    During the second meeting?

18    Q.    Yes.

19    A.    Basically a very brief meeting; Bob signed

20    the paperwork and told me that the 110 better perform

21    the way you showed my people for the last four

22    months.

23    Q.    And where did that meeting take place?

24    A.    His office, on the second floor of HRD

1    Press.

2        Q.    And were there any further questions

3    concerning Exhibit 3, the executive summary that you

4    previously presented to him?

5        A.    No, we reviewed that thoroughly which is

6    more consistent of implementation and training in the

7    plan.  Because in the first meeting, when we left his

8    office, he, I, Al Maximino and Doug Thornton, we

9    walked down to the area to show him how we were going

10   get it in and get it out and where the other

11   equipment would be placed.  So, the second meeting

12   was very brief and the first meeting was just -- you

13   know, after we got done discussing this we walked

14   downstairs to just ensure that everything was going

15   to be in place before our arrival.

16       Q.    Now, subsequent to the execution of Exhibit

17   5 on June 19, 2000, did you have any further

18   discussions with Bob Carkhuff about HRD's financial

19   obligations under the second agreement?

20       A.    No.

21       Q.    From June 2000 going forward, did you

22   remain a rep that had HRD as an account?

23       A.    The answer is no.

24       Q.    Who was the rep?

STATE OF CONNECTICUT


    I, Sharon R. Roy, a Notary Public in and for the State of Connecticut, do certify that pursuant to notice, there came before me on the 7th day of December, 2006, at the law offices of ROBINSON & COLE, LLP, 280 Trumbull Street, Hartford, Connecticut, the following named person, to wit: JEFFREY SNYDER, who was by me duly sworn to testify to the truth and nothing but the truth as to his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath and said examination reduced to writing by me; and that the deposition is a true record of the testimony given by the witness, to the best of my knowledge and ability.

    I further certify that I am not a relative or employee of counsel or attorney for any of the parties, nor a relative or employee of such parties, nor am I financially interested in the outcome of the action.

    Witness my hand, this 13th day of December, 2006.




            ------------------------
            Sharon R. Roy



My commission expires:

April 28, 2011

# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HUMAN RESOURCE DEVELOPMENT  )
PRESS, INC.,                )
                 Plaintiff  )
                            )
v.                          )        3:05-CV-30068-KPN
                            )
IKON OFFICE SOLUTIONS, INC. )
& IOS CAPITAL, INC. d/b/a   )
IKON FINANCIAL SERVICES,    )

VOLUME II

CONTINUED DEPOSITION OF:  JEFFREY SNYDER,

taken before Sharon R. Roy, Notary Public, Registered

Professional Reporter, pursuant to Rule 30 (b)(6) of

the Massachusetts Rules of Civil Procedure, at the

law offices of  ROBINSON & COLE, LLP, 280 Trumbull

Street, Hartford, Connecticut on December 18, 2006,

commencing at 1:16 p.m.

Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

1          A.    Sales rep, production specialists like I,

2    and first line manager.

3          Q.    Do you mean that this is the figure upon

4    which anyone who is going to receive a commission the

5    calculation was done; is that what you're saying?

6          A.    Well, that's the equipment revenue which

7    actually reflects the next line which is the -- which

8    is the balance of money owed on the previous OCE

9    equipment.

10         Q.    Is that the 119,996 figure?

11         A.    Yes.  And then you'll see the subtotal of

12   rep total, which means they only credit us for new

13   equipment and not the old, so you'll see that the

14   older OCE equipment of 119,996 was taken away from

15   the 360,000.  So in this transaction, Doug Thornton,

16   being account rep, Jeff Snyder, being production

17   specialist, Al Maximino, being sales manager, we

18   would receive in the IKON sales/commission reporting

19   system revenue of $240,543 for the placement of a CLC

20   900, iR3300, iR110 system.

21         Q.    Is that otherwise known as the second

22   equipment?

23         A.    Yes, it is.

24         Q.    So, in summary, the 240,543 figure is the

1    STATE OF CONNECTICUT

2

3        I, Sharon R. Roy, a Notary Public in and for the
     State of Connecticut, do certify that pursuant to
4    notice, there came before me on the 18th day of
     December, 2006, at the law offices of ROBINSON &
5    COLE, LLP, 280 Trumbull Street, Hartford,
     Connecticut, the following named person, to wit:
6    JEFFREY SNYDER, who was by me duly sworn to testify
     to the truth and nothing but the truth as to his
7    knowledge touching and concerning the matters in
     controversy in this cause; that he was thereupon
8    examined upon his oath and said examination reduced
     to writing by me; and that the deposition is a true
9    record of the testimony given by the witness, to the
     best of my knowledge and ability.

10

         I further certify that I am not a relative or
11   employee of counsel or attorney for any of the
     parties, nor a relative or employee of such parties,
12   nor am I financially interested in the outcome of the
     action.

13

         Witness my hand, this 27th day of December,
14   2006.

15

16

17                  ------------------------
                    Sharon R. Roy
18

19

20   My commission expires:

21   April 28, 2011

22

23

24

# EXHIBIT 5

COPY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


HUMAN RESOURCE DEVELOPMENT )
PRESS, INC., )
     Plaintiff )
          )
v.          )    3:05-CV-30068-KPN
          )
IKON OFFICE SOLUTIONS, INC. )
& IOS CAPITAL, INC. d/b/a )
IKON FINANCIAL SERVICES, )


VOLUME III


  CONTINUED DEPOSITION OF: JEFFREY SNYDER,

taken before Sharon R. Roy, Notary Public, Registered

Professional Reporter, pursuant to Rule 30(b)(6) of

the Massachusetts Rules of Civil Procedure, at the

law offices of ROBINSON & COLE, LLP, 280 Trumbull

Street, Hartford, Connecticut on April 30, 2007,

commencing at 1:46 p.m.


Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

1   second equipment?

2       A.    Yes, it was.

3       Q.    Okay, thank you.  And included in that

4   121,998 would have been the $1,850 per month that HRD

5   Press was being charged for the service on the OCEs?

6       A.    No.

7       Q.    No?

8       A.    No.

9       Q.    How do you know that?

10      A.    These are internal payoff for upgrade

11  numbers at IKON.  This would be reflective of

12  equipment only.

13      Q.    Okay.  Do you know if any of the service

14  charges for the OCEs were included in the charges for

15  the Canon equipment, the second equipment?

16      A.    Only what was owed on the assets.  No

17  service and supplies numbers were taken from the old

18  agreement to the new agreement.

19      Q.    Is there any piece of paper you have in

20  front of you that shows that?

21      A.    Well, looking at previously listed Exhibit

22  4, if I read that correctly upside down, it lists

23  what the service breakdown was at the bottom of the

24  page and you don't see any service related to OCEs in

42

1    that service breakdown.  The transaction is a going

2    forward basis; it did not encumber any old service

3    supply costs.

4        Q.    So the 3,065.75 that was charged for

5    service in the second agreement didn't include

6    anything for the OCEs?

7        A.    No.

8        Q.    Okay.

9            MR. BOSKIEWICZ:  That's Exhibit 4

10    from Tony Maturo's deposition.

11        Q. (By Mr. Noonan) Okay.  I'll show you another

12    document that's been marked as Exhibit 18.  Do you

13    recall receiving this e-mail?

14        A.    Sure.

15        Q.    The 124,416 figure opposite the word

16    "Buyout of OCEs," does that represent the payments

17    that were remained due and owing under the first

18    agreement?

19        A.    That is whatever the payoff was for those

20    two assets that remained at that point in time under

21    the first agreement.

22            Very similar to the last thing we just

23    reviewed.  Doug received a buyout -- I call it

24    upgrade, he just termed it buyout.  He means what's

43

1    owed on the previous agreement.

2        Q.    All right.   What's owed on the previous

3    agreement, that wouldn't have included service

4    charges?

5        A.    No.

6        Q.    So if I backed out $1,850 for every monthly

7    payment that was due and owing under the OCE

8    agreement as of May 2000, I should get the figure of

9    24,416?

10        A.    Where do you get the number -- oh, 124,416?

11        Q.    Yes.

12        A.    That number was supplied to Dougie, unless

13    he took a guess at it, like some of the payments.

14    Based upon where the client was in their billing

15    cycle with outstanding bill and -- that's why on the

16    previous agreement we were a little lower because it

17    was a different snapshot.   So Dougie probably

18    requested this and at that time received a payoff

19    upgrade, or he said "buyout of OCEs" of 124.   It's a

20    computer generated number, but it does not include

21    service and supplies of a previous agreement.

22        Q.    Where was the document we just looked at

23    where you added up to get to the 121,000?

24                MR. BOSKIEWICZ:   The top one.

1    STATE OF CONNECTICUT

2

3        I, Sharon R. Roy, a Notary Public in and for the
State of Connecticut, do certify that pursuant to
4    notice, there came before me on the 30th day of
April, 2007, at the law offices of ROBINSON & COLE
5    LLP, 280 Trumbull Street, Hartford, Connecticut, the
following named person, to wit:  JEFFREY SNYDER, who
6    was by me duly sworn to testify to the truth and
nothing but the truth as to his knowledge touching
7    and concerning the matters in controversy in this
cause; that he was thereupon examined upon his oath
8    and said examination reduced to writing by me; and
that the deposition is a true record of the testimony
9    given by the witness, to the best of my knowledge and
ability.
10

11       I further certify that I am not a relative or
employee of counsel or attorney for any of the
12   parties, nor a relative or employee of such parties,
nor am I financially interested in the outcome of the
13   action.

        Witness my hand, this 9th day of May, 2007.
14

15

16              ------------------------
                Sharon R. Roy
17

18

19   My commission expires:

20   March 31, 2012

21

22

23

24

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HUMAN RESOURCE DEVELOPMENT    )
PRESS, INC.,                  )
                  Plaintiff  )
                              )
v.                            )          3:05-CV-30068-KPN
                              )
IKON OFFICE SOLUTIONS, INC.  )
& IOS CAPITAL, INC. d/b/a     )
IKON FINANCIAL SERVICES,      )


         DEPOSITION OF:   GLENN ROBBINS, taken before

Sharon R. Roy, Notary Public, Registered Professional

Reporter, pursuant to Rule 30 of the Massachusetts

Rules of Civil Procedure, at the law offices of

DAVID J. NOONAN, 228 Triangle Street, Amherst,

Massachusetts on December 6, 2006, commencing at

10:55 a.m.


A P P E A R A N C E S:

(See Page 2)


                  Sharon R. Roy
             Certified Shorthand Reporter
          Registered Professional Reporter

1        A.    Sure.

2        Q.    Do you know who prepared this Exhibit No.

3   10?

4        A.    I did.

5        Q.    And why did you prepare this exhibit?

6        A.    It was requested by HRD Press and Greg

7   Carkhuff.

8        Q.    Do you know why it was requested?

9        A.    Do I know why it was requested?  I recall

10   that he called me and asked me to prepare this

11   document.

12        Q.    Did he tell you what he wanted in the

13   document?  Did he control the form of the document?

14        A.    He had asked for a breakdown of his lease,

15   of his current lease.  He had shared with me that

16   they were having some financial difficulties and he

17   was called up from his previous employment down in

18   Virginia, I guess it was, and he had asked -- he said

19   he was reviewing all the -- I'm trying to again

20   recall everything that he told me, but they were

21   going through some financial difficulties at HRD and

22   he was looking at all of the obligations all the

23   payables, and we were a significant payable for HRD

24   Press, and he was reviewing all of the payables to

1   renegotiate whatever contracts were out there to see

2   if he could save the company.  If he couldn't save

3   it, he would have to shut it down is basically what

4   he told me.  He said, "We've got a pretty high

5   expense with IKON and we've got to see if we can

6   figure out how to reduce our expenses."

7        Q.   Did he ask you for specific types of

8   information?

9        A.   Again, I'm trying to recall exactly what he

10  asked for.  He had asked for a complete breakdown of

11  his existing agreement that he was paying on.

12       Q.   And when you say "complete breakdown," was

13  he more specific in what type of breakdown he wanted?

14       A.   I don't recall.

15       Q.   Now, did you consult with anyone within

16  IKON before you prepared this document?

17       A.   Yes.

18       Q.   With whom did you consult?

19       A.   Joe McGraw and Paul Lee, and possibly Mike

20  Fusaro.  I don't know if Mike was involved, but I'm

21  guessing that he may have been involved initially or

22  at some point in creating this.

23       Q.   And why did you consult with Mr. Lee and

24  Mr. Fusaro?

1      Q.    Prior to coming here today did you ingest

2    any alcohol?

3      A.    No.

4      Q.    In the last 24 hours have you taken any

5    type of drug, prescription or otherwise, which could

6    affect your ability to understand my questions or

7    respond to them?

8      A.    No.

9      Q.    Is there anything that you have ingested in

10   the last 24 hours which could affect your memory?

11     A.    No.

12     Q.    At some point in time did you deliver

13   Exhibit 10 to HRD Press?

14     A.    I did.

15     Q.    And how did you deliver it?

16     A.    In paper format.

17     Q.    And did you mail it?

18     A.    I did not.

19     Q.    How did you deliver the paper format?

20     A.    In person.

21     Q.    And to whom did you deliver it?

22     A.    To Greg.

23     Q.    Greg who?

24     A.    Carkhuff.

1       Q.    Did you have any discussion with Greg when

2    you delivered it to him?

3       A.    I did.

4       Q.    And what did you say?

5       A.    I don't recall.

6       Q.    What did he say?

7       A.    I don't recall.

8       Q.    You have absolutely no memory of either

9    producing this document or discussing this document

10   with Greg Carkhuff?

11              MR. BOSKIEWICZ:   Objection to form.

12      A.    I recall producing it, I recall meeting

13   with Greg, I recall who was at the meeting.

14      Q.    Who was at the meeting?

15      A.    Myself, Joe McGraw, Paul Lee, Greg

16   Carkhuff, and I believe there was one other

17   individual there from Greg's organization, although

18   I'm not a hundred percent sure of it, and I can't

19   remember his name, if he was there.

20      Q.    Okay.

21      A.    I believe he was there, and I'm trying to

22   remember that gentleman's name.

23      Q.    Prior to delivering this to HRD Press, was

24   a copy provided to IKON's legal department?

1    whole package goes to leasing, and it gets broken

2    apart at leasing, and this document, Exhibit 19, goes

3    to the service department, and Exhibit 17 goes

4    somewhere else, so I want to make sure that they

5    don't get billed from the service department because

6    they're already being billed into the lease.

7         See, I know a lot about this because I

8    wrote this deal.  I don't know a lot about the other

9    things you've asked me because I didn't write the

10   other deals, but this one I wrote.

11             MR. NOONAN:  Can we go off the

12        record for a second.

13                  (A recess was taken)

14                  (Exhibit 20, marked)

15   Q.   (By Mr. Noonan)  I'm going to show you

16   what's been marked as Exhibit No. 20.  Have you seen

17   this before?

18   A.   Yes.

19   Q.   What is this?

20   A.   It's an e-mail.

21   Q.   And whose e-mail is it?

22   A.   The first e-mail, the earlier e-mail, is

23   from me to Joe McGraw and Paul Lee.  And the second

24   e-mail is from Paul Lee to Joe McGraw and myself.

1       Q.    All right.  Why did you write the first

2    e-mail to Paul Lee and Joe McGraw?

3       A.    Let me read it.

4            Well, just reading the e-mail, Greg asked

5    for a proposal, Greg Carkhoff from HRD Press asked

6    for a proposal, and I was sending an e-mail to Paul

7    Lee and Joe McGraw asking for ideas on how to handle

8    the request.

9       Q.    What kind of proposal was Greg looking for?

10      A.    He was looking for a similar quote that he

11   got from a competitor in regards to configuration of

12   equipment.

13      Q.    I'm not following you.  What does that

14   mean?

15      A.    He was looking for a proposal to refinance.

16      Q.    Refinance the second equipment?

17      A.    No, he was looking -- let me just read it

18   again.

19            He received a proposal from a competitor,

20   and he was asking us for a proposal to compete

21   against what he got from a competitor.

22      Q.    For a new set of equipment?

23      A.    I don't really recall.  I mean, I'm reading

24   the e-mail as you are, and I don't recall the detail

1    of this other than that he had asked for a proposal

2    and I was asking for some help.

3         Q.   And you don't know what type of proposal?

4         A.   Well, just reading this e-mail it says that

5    he wanted us to quote on the same configuration that

6    Bloom's quoted on.  Bloom's was our competitor.

7         Q.   But you don't know if it was a proposal

8    relating to the second equipment?

9         A.   I can't recall.

10        Q.   And the third line here, where it says "how

11   to handle the talk track."  What does the talk track

12   mean?

13        A.   Well, it says right here, "As you know, we

14   could not credit approve them and I need some help

15   with how to handle the talk track."

16             I wasn't sure how to communicate that with

17   Greg, that we weren't able to get them credit

18   approved.  I was looking for some feedback from my

19   boss and Paul Lee on what their suggestions are on

20   how to deal with answering the question.  Talk track

21   is how do I respond?  He's asking for a proposal, how

22   do you propose I respond to him because he obviously

23   didn't pass credit approval on our end so I can't

24   finance any equipment to him.  So I was asking them

1    for advice on how to tell Greg that there's nothing I

2    can do.

3        Q.    I didn't know if "talk track" was a

4    specific term of art within the copying industry.

5        A.    No, I was just --

6        Q.    It means how to communicate?

7        A.    Yeah, how do you want me to communicate to

8    a current client that I can't get financed.

9        Q.    And the second to the last line where it

10   says "or they did not take into account our buyout to

11   return."  What does "our buyout to return" mean?

12       A.    We spoke about it in a previous exhibit.

13       Q.    Would that be that $400,000 figure?

14       A.    Yeah, it would be in Exhibit --

15       Q.    In the executive summary?

16       A.    Yeah, but you've got to remember, this was

17   a -- yeah, well, it's in there.  This was a few

18   months later, so that buyout to return may have

19   changed by the time this e-mail came.  Who knows what

20   happened to it by then.

21       Q.    You're referring to the same concept that

22   is referenced in Exhibit 10 where it talks about your

23   buyout to return equipment is $400,828?

24       A.    Correct.

1   COMMONWEALTH OF MASSACHUSETTS

2   Hampden

3

4        I, Sharon R. Roy, a Notary Public in and for the
    Commonwealth of Massachusetts, do certify that
5   pursuant to notice, there came before me on the 5th
    day of December, 2006, at the law offices of DAVID J.
6   NOONAN, 228 Triangle Street, Amherst, Massachusetts
    the following named person, to wit:  GLENN ROBBINS,
7   who was by me duly sworn to testify to the truth and
    nothing but the truth as to his knowledge touching
8   and concerning the matters in controversy in this
    cause; that he was thereupon examined upon his oath
9   and said examination reduced to writing by me; and
    that the deposition is a true record of the testimony
10  given by the witness, to the best of my knowledge and
    ability.
11
         I further certify that I am not a relative or
12  employee of counsel or attorney for any of the
    parties, nor a relative or employee of such parties,
13  nor am I financially interested in the outcome of the
    action.
14
         Witness my hand, this 12th day of December,
15  2006.

16

17

18        ---------------------------
          Sharon R. Roy
19

20

21  My commission expires:

22  April 28, 2011

23

24

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS INC., | : |
| | : |
| Plaintiff, | : |
| | : 3:05-CV-30068-KPN |
| v. | : |
| | : |
| IKON OFFICE SOLUTIONS, INC. & IOS CAPITAL, INC. d/b/a IKON FINANCIAL SERVICES, | : |
| | : |
| Defendants. | : |

## AFFIDAVIT OF GLENN ROBBINS
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Glenn Robbins, being duly sworn, do hereby depose and say:

1.    I am over 18 years of age and believe in the obligations of an oath.

2.    I make this affidavit in support of IKON Office Solutions, Inc.'s ("IKON") motion for summary judgment in the above-captioned lawsuit.

3.    I worked for IKON from approximately August 1994 to May 2005.

4.    In the fall of 2003, I was a sales representative for IKON. Human Resource Development Press, Inc. ("HRD") was one of the accounts for which I was responsible during that time period.

5.    As part of my job activities with IKON, I maintained a file relating to HRD's account. This file included copies of HRD's lease agreements and supporting financial documents, correspondence with HRD, documents prepared for and delivered to HRD, internal correspondence relating to HRD's account, and other documents related to HRD's business

relationship with IKON.  I reviewed this original file as part of my participation in this lawsuit.
It is my understanding that, with the exception of a copy of HRD's product catalog and a copy of
a financial statement that HRD provided to me in the fall of 2003, this entire file has been
provided to HRD's attorney during this lawsuit.

6.      Before making this affidavit, I reviewed a copy of the Site History for HRD's
account that was printed from IKON's OnTarget account management software program and put
into HRD's file in or about early 2004.  A true and correct copy of this Site History is attached
hereto as Exhibit A.  A Site History is a diary of chronological notes that IKON account
representatives maintain to keep a record of activity, conversations, meetings, and phone calls
related to each of their accounts.  I routinely made entries into this Site History to keep track of
HRD's account.  The Site History identifies the date on which I made the entry and the date on
which the event that I described occurred.  I followed this process for many of my other accounts
as well.

7.      In the fall of 2003, Don Collins, a consultant for HRD, contacted me and
informed me that HRD was having financial problems and wanted to meet with me to discuss
whether and how HRD could lower its monthly lease payments on its June 19, 2000 lease
agreement (the "Second Agreement").

8.      I met with Don Collins and Greg Carkhuff at HRD on October 29, 2003.  Collins
and Greg Carkhuff informed me that HRD had lost over $700,000 during the past three years and
that they were evaluating whether they could save the business, liquidate it, or file for
bankruptcy.  During the course of this meeting we discussed the Second Agreement's monthly
payment amount and how it was comprised of charges for the leased equipment, charges for
service and supplies, and charges to satisfy the obligation that remained on their 1998 lease

agreement (the "First Agreement") when HRD signed the Second Agreement. They asked me

for the dollar amounts for each of these three components. I did not have that information with

me during that meeting, but told them that I would get that information for them. They also

asked me how much it would cost HRD to buy out the Second Agreement and whether they

could purchase the leased equipment without buying out the service and supply component of the

Second Agreement.

     9.     After I returned to the office from this meeting, I entered a brief summary of what

we discussed into the Site History that is attached as Exhibit A.

     10.     I met with Don Collins and Greg Carkhuff at HRD again on November 7, 2003. I

brought Paul Lee, a Director of Finance, and Joe McGrath, a Business Development Manager,

with me to this meeting. Before this meeting, I had a prepared a document that I titled

"Executive Financial Summary" dated November 7, 2003. A true and correct copy of this

Executive Financial Summary is attached as Exhibit B. This document was included as part of

IKON's original file for HRD's account when I reviewed it.

     11.     At the November 7, 2003 meeting, IKON agreed to immediately reduce the

service and supply portion of the Second Agreement by $1,315.75 per month to $1,750.00 per

month and credit a late fee that HRD had recently incurred. IKON also agreed to extending part

of the Second Agreement to lower the monthly payment amount and to re-revaluate the cost for

HRD to buy out the Second Agreement, which would allow HRD to obtain financing of the buy

out from a lender of its choice. When I returned to the office after this meeting, I entered a brief

summary of what we discussed into the Site History.

     12.     As part of my job responsibilities, I sent an e-mail to Greg Carkhuff and Don

Collins on November 10, 2003 detailing what IKON agreed to do for HRD at the November 7,

2003 meeting. A true and correct copy of that e-mail is included in a chain of e-mails between Greg Carkhuff and me and is attached as Exhibit C. A copy of this e-mail chain was included in IKON's original file relating to HRD when I reviewed it.

13.     Greg Carkhuff replied to my November 10, 2003 e-mail on November 11, 2003. In his reply, he indicated that he appreciated IKON's efforts and looked forward to working with IKON further. A true and correct copy of this e-mail is also included in Exhibit C.

14.     On November 20, 2003, Paul Lee forwarded me an e-mail that he received from Greg Carkhuff on November 19, 2003. A true and correct copy of that e-mail is attached as Exhibit D and was included in the original file that I reviewed. In that November 19, 2003 e-mail, Greg Carkhuff thanks IKON for reducing HRD's monthly service charges and asks IKON to put together a more competitive buy out quote for the Second Agreement.

15.     HRD did not express any dissatisfaction or surprise during the October 29, 2003 or November 7, 2003 meetings or its subsequent e-mails in November 2003 that Second Agreement's monthly payments included the remaining obligation that it owed on the First Agreement or accuse IKON of misrepresenting that fact to HRD at any time.

16.     Greg Carkhuff informed IKON during late November or early December 2003 that HRD had obtained quotes for other document printing equipment from one of IKON's competitors and asked IKON to provide a quote for the same or a similar configuration of equipment. I attempted to put together such a quote, but at that time HRD did not qualify for a new lease agreement with IKON for the same or similar configuration of equipment that the competitor had quoted.

17.     I met with Greg Carkhuff on January 22, 2004 and informed him that HRD did not have the financial ability to qualify for a new lease with IKON for the same or similar

configuration of equipment that the competitor had quoted and therefore I could not give HRD a quote for the equipment that the competitor had proposed.

18.     The discussions between IKON and HRD ended in February 2004 when Greg Carkhuff sent Paul Lee, Joe McGrath, and me an e-mail that reads: "Unfortunately things are not working out the way we hoped with business or the restructuring. I am therefore turning everything over to our attorney David Noonan. You should direct all your inquiries to him. For everybody's reference, I am including contact information below." A true and correct copy of this e-mail is attached as Exhibit E and was included in IKON's original file relating to HRD when I reviewed it.

[AFFIRMATION AND SIGNATURE PAGE FOLLOWS]

I certify under penalty of perjury that the foregoing is true and correct.

Glenn Robbins

Subscribed and sworn to before me
this _9_ day of _July_, 2007.

Notary Public
My Commission Expires:

**MICHELLE A. FINNEGAN**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES FEB. 28, 2009

# EXHIBIT A

## Site History - HUMAN RESOURCE DEVELOP PRESS

| Date | Activity | Staff | | Add Date |
|------|----------|-------|---|----------|
| 01/22/04 | MEETING HELD | G. ROBBINS | **SUBJECT:** MEETING<br>**NOTE:** MET W GRREG - TOLD HIM I COULD NOT GET HIM APPROVED - HE WANTED TO KNOW IF REFI WAS STILL DO-ABLE. TOLD HIM I WOULD CHECK ON IT. HE WON'T GET HIS OWN FINANCING | 01/23/04 |
| 01/12/04 | PHONE CALL COMPLETED | G. ROBBINS | **SUBJECT:** CALL<br>**NOTE:** SHE IS HAVING PROBLEMS WITH THEIR NETWORK BUT I TOLD HER THAT THE BOX IS COMING OUT WED... | 01/12/04 |
| 12/23/03 | DEMO COMPLETE | G. ROBBINS | **SUBJECT:** VISIT<br>**NOTE:** DEMOED 3200 TO CHRIS AND EILEEN | 12/23/03 |
| 12/15/03 | PHONE CALL COMPLETED | G. ROBBINS | **SUBJECT:** CALL<br>**NOTE:** TOLD EILEEN TO CALL ME WHEN BOX COMES IN ON WED - DON WILL FAX CREDIT APP - L/M FOR GREG | 12/15/03 |
| 12/15/03 | PHONE CALL COMPLETED | G. ROBBINS | **SUBJECT:** CALL<br>**NOTE:** SPOKE TO GREG - HE HAS 01 REVEIWED RETURNS AND 02 DRAFTS (DRAFT WILL BE READY WITH A FEW WEEKS). TOLD HIM TO PUT TOGETHER A PACKAGE FOR ME FOR FRIDAY | 12/15/03 |
| 12/02/03 | MEETING HELD | G. ROBBINS | **SUBJECT:** MEETING<br>**NOTE:** MET W JOHN, JOE AND GREG - QUOTE SAME EXACT CONFIG AS BLOOMS (NO MINIMUM) AND ALSO TRY QUOTING A REFI OF 60 MO ON 110 ALONG WITH NEW GEAR TO REPLACE REST (SIMILAR TO BLOOMS). PUT IN TRIAL 3200 ASAP FOR EILEEN) | 12/02/03 |
| 11/25/03 | PHONE CALL LEFT MSG | G. ROBBINS | **SUBJECT:** CALL<br>**NOTE:** L/M FOR GREG | 11/25/03 |
| 11/20/03 | MEETING HELD | G. ROBBINS | **SUBJECT:** CALL<br>**NOTE:** SCHEDULED NEXT MEETING W JOHN AND LEFT VM FOR EILEEN... | 11/20/03 |
| 11/13/03 | MEETING HELD | G. ROBBINS | **SUBJECT:** MEETING<br>**NOTE:** MET WITH JOE, JOHN, DANAKA, EILEEN AND GREG. THEY DO LOTS OF HIGH QUAL PHOTOS ON 110 AND OUTSOURCE LOTS OF BLACK (GUTS ARE BLACK, COVERS ARE FULL BLEED COLOR - SADDLE). JOHN SAID THEY MAY OREDER RUNS OF 1500 TO LAST 1 YEAR BUT USAULLY THEY SELL 500 AND THROUGH AWAY THE REST AFTER 3 YEARS. DANAKA AND JOE AND JOHN ALL THINK THE 110 IS GREAT - NO JAMS, RUN HEAVEY STOCK MUCH BETTER THAN PREVIOIUS MACHINES. RAW FILE COMES IN, GETS CONVERTED TO PDF AND THEY USE DOWNLOADER TO GET IT TO THE MACHINE - ALICIA IS THE MAIN DIGITAL PERSON WHO GETS JOBS ONTO THE 110. THEY STORE ALL JOBS IN THE LIB ON 110 AND ALSO KEEP A PDF ARCHIVE UP STAIRS. EILEEN OUTSOUCES LOTS OF COLOR BECAUSE HER BOX IS SLOW AND POOR QUAL - I NEED TO MEET WITH HER AND JOHN (AM FOR JOHN) SO THAT THEY CAN PUT TOETHER MORE OUTSOURCED INFO - CALL JOHN | 11/13/03 |

EXHIBIT

7

Snyder 12/18/06

IOS00056

| | | |
|---|---|---|
| | | MONDAY AM TO SET NEXT APPT WITH BOTH HIM AND EILEEN..GREG IS REALY PUSHING FOR US TO GET RID OF S&S IF HE GOES TO A COMPETTITIOR - I TOLD HIM ITS PAULS DECISION..HE IS SPEAKING TO AN ATTORNEY IN AMHERST WHO HAS SEEN AND FOUGHT OUR AGREEMENTS IN THE PAST AND TOLD HIM WE HAVE TO BACK OUT THE S&S... |
| 11/07/03 MEETING HELD | G. ROBBINS | SUBJECT: MEETING    11/07/03 |
| | | NOTE: MET W GREG AND DON. PAUL WILL ADJUST THE S&S IMMEDIATLY TO .007 GOING FORWARD FOR BOTH THE 300K AND OVERAGE, HE WILL WAIVE THE LATE CHARGE ON CURRENT IOS INVOICE AND WILL LOOK AT BRINGING THE 110 OUT AN ADDITIONAL 12 MONTHS (OVER THE 14 THATS ON THE TABLE). THEY ARE LOOKING AT BLLOMS AND XEROX. THEY WANT A B/O THAT DOES NOT INC S&S - PAUL WILL CHECK WITH MARK HERSHEY TO SEE IF WE CAN GIVE THEM 2 SETS OF #'S - ONE IF THEY STAY WITH US UTILIZING ALTERNATIVE FIN AND THE S&S INCLUSIVE IF COMPETITION IS INVOLVED. I NEED TO INVESTIGATE SHORT RUN COLOR TO SEE IF IT MAKES SENSE TO UPGRADE 900 AND BRING THAT WORK IN HOUSE. |
| 10/29/03 MEETING HELD | G. ROBBINS | SUBJECT: MEETING    10/29/03 |
| | | NOTE: MET W GREG AND DON. THEY NEED FIN INFO PER ASSET AND HOW MUCH WAS RE-FI INTO NEW DEAL. ALSO NEED TO BACK OUT S&S FROM BUYOUT TO RETURN AND BUYOUT TO OWN. NEED COMPLETE MACHINE BY MACHINE DETAIL. GET INFO FROM FUZZ AND REVEIW WITH PAUL AND FUZZ BEFORE I EMAIL IT TO GREG AND DON - TRY TO BRING PAUL/JOE TO ACCT...THEY HAVE LOST APPROX 700K OVER LAST 3 YEARS. THEY EITHER NEED TO GET BUS IN SHAPE, LIQUIDATE, CHAP 11 ETC OR FIX IT. |
| 09/30/03 PIPELINE CLEARED | G. ROBBINS | NOTE: OPPORTUNITY CLEARED AS NO BUY    10/05/03 |
| 07/14/03 PHONE CALL COMPLETED | G. ROBBINS | SUBJECT: CALL    07/14/03 |
| | | NOTE: CALLED EILLEN AND MENTIONED THAT SCOTT M SAID THE MACHINE MAY NEED A NEW DRUM (3-4 MONTHS AGO) - SHE WILL MENTION IT TO CHRIS. ALSO, THE APP IS DISKETTE LABLES (SHE WON'T DO THEM ON THE CLC BECAUSE IT JAMS). |
| 07/10/03 MEETING HELD | G. ROBBINS | SUBJECT: VISIT    07/10/03 |
| | | NOTE: MET W BOB - MAY WANT TO LOOK AT A 3200 - SEE IF #'S WORK |
| 04/22/03 MEETING HELD | G. ROBBINS | SUBJECT: MEETING    04/22/03 |
| | | NOTE: MET W CHRIS AND DANAKA - ALL IS WELL |
| 11/17/02 MEETING HELD | G. ROBBINS | SUBJECT: PIPELINE: GIVE BOB DEMO DATES FOR BOOKLETMAKER    12/02/02 |
| 09/17/02 MEETING HELD | G. ROBBINS | SUBJECT: PIPELINE: GIVE BOB DEMO DATES FOR BOOKLETMAKER    10/22/02 |
| 08/29/02 MEETING HELD | G. ROBBINS | SUBJECT: MEETING    08/29/02 |
| | | NOTE: MET W DANAKA, CHRIS AND BOB. KEN NEEDS TO GET DANAKA DRIVERS - BOB SAYS BUS IS SLOW AND HE WANTS TO WAITE ON 5000. |
| 07/17/02 MEETING HELD | G. ROBBINS | SUBJECT: PIPELINE: GIVE BOB DEMO DATES FOR JUNE    08/29/02 |

IOS00057

| Date | Activity | Rep | Details | Date |
|------|----------|-----|---------|------|
| 06/04/02 | MEETING HELD | G. ROBBINS | SUBJECT: MEETING<br>NOTE: MET W BOB - NEED TO SET UP DEMO ASAP - ALSO, RUN #'S ON RE-WRITING THE WHOLE DEAL INSTEAD OF WAITING TILL THE STEP COMES DUE. | 06/04/02 |
| 06/01/02 | MEETING HELD | G. ROBBINS | SUBJECT: PIPELINE: GIVE BOB DEMO DATES FOR JUNE | 06/27/02 |
| 05/15/02 | MEETING HELD | G. ROBBINS | SUBJECT: MEETING<br>NOTE: HAD TO BRING JOE 110 TONER | 05/15/02 |
| 05/07/02 | PHONE CALL LEFT MSG | G. ROBBINS | SUBJECT: PHONE CALL<br>NOTE: LEFT MESSAGE FOR CHRIS | 05/07/02 |
| 05/03/02 | PHONE CALL COMPLETED | G. ROBBINS | SUBJECT: PHONE CALL<br>NOTE: SPOKE TO JOE AS A CURITSY CALL - HE IS ALMOST OUT OF TONER - NES WILL LET HIM BOWWOR ONE - HE PLACED HIS ORDER ON 4/25 - IT ISW ON B/O | 05/03/02 |
| 04/30/02 | PIPELINE CLEARED | G. ROBBINS | NOTE: OPPORTUNITY CLEARED AS SOLD | 04/30/02 |
| 04/18/02 | MEETING HELD | G. ROBBINS | SUBJECT: MEETING<br>NOTE: MEET W CHRIS-GOT LABELS TO FINALLY RUN FROM BYPASS - NOW HE NEEDS UNTIL TUES TO SEE IF IT WILL WORK FLAWLESSY | 04/19/02 |
| 04/17/02 | MEETING HELD | G. ROBBINS | SUBJECT: PIPELINE: GIVE BOB DEMO DATES FOR APRIL | 04/30/02 |
| 04/08/02 | MEETING HELD | G. ROBBINS | SUBJECT: VISIT<br>NOTE: MET W CHRIS AND DANAKA - CHRIS IS HAVING ISSUES W TRIAL - GIVE HIM 1 MORE WEEK DUE TO THE EPSON NOT UP AND RUNNING FOR 1ST WEEK - STILL HAVING PDF FORMAT PROBS | 04/08/02 |
| 04/05/02 | MEETING HELD | G. ROBBINS | SUBJECT: PIPELINE: GIVE BOB DEMO DATES FOR APRIL | 04/17/02 |
| 04/02/02 | MEETING HELD | G. ROBBINS | SUBJECT: MEETING<br>NOTE: MET W CHRIS - WE STILL HAVE NOT HOOKED UP HIS EPSON - HE IS LOSING FAITH IN IKON DUE TO POOR RESPONSE TIME FROM PROF SERVICES | 04/03/02 |
| 04/02/02 | MEETING HELD | G. ROBBINS | SUBJECT: PIPELINE: TRIAL | 04/17/02 |
| 04/01/02 | MEETING HELD | G. ROBBINS | SUBJECT: MEETING<br>NOTE: MEET W CHRIS TO FOLLOW UP ON EPSON INSTALL-MACHINE IS IN - GET RAY THEIR TO COMPLETE INSTALL | 04/02/02 |
| 03/28/02 | MEETING HELD | G. ROBBINS | SUBJECT: FOLLOW UP<br>NOTE: FOLLOW UP W BOB AND CHRIS - 60 DAY UPGRADE ON 8000 WAS PROP ON LAST CALL - SCHEDULE BOOKLET MAKER DEMO W BOB-SEE NOTES-MET W CHRIS TODAY AND GAVE HIM NETWORK SURVEY - HE WILL FAX IT TO JENN - I HAD JENN ORDER MACHINE FOR TRIAL - IF IT RUNS THE LABLES THEY WILL GO WITH IT | 03/28/02 |
| 03/26/02 | MEETING HELD | G. ROBBINS | SUBJECT: MEETING<br>NOTE: SCHEDULE DEMO EITHER AT CANON OR PROVIDENCE TO SEE BOOKLET MAKER AND 5000. GET BOB A FEW DATES TO CHOOSE FROM-INVITE TO POD-WENT TO SEE HIM AND CHRIS TODAY - QUOTED 165/MO INC SERV TO DO LABLES ON EPSON 8000 (36 MO) INCLUDES SERV. ALSO INVITED BOB TO POD OR BOST OR CANON - GET BACK TO HIM N/W TO CONFIRM | 03/26/02 |
| 02/18/02 | MEETING NOT | G. ROBBINS | SUBJECT: PIPELINE: GIVE BOB DEMO DATES FOR FEB | 02/21/02 |

IOS00058

http://internet.ik...

Site History

| | | | |
|---|---|---|---|
| HELD | | | |
| 01/10/02 MEETING HELD | G. ROBBINS | SUBJECT: PIPELINE: FOLLOW UP W NEW PRICING | |
| 01/09/02 PHONE CALL COMPLETED | G. ROBBINS | SUBJECT: FOLLOWUP | 01/09/02 01/09/02 |

NOTE: CALL BOB TO SEE HOW MANY COVERS/MO HE IS DOING. CURRENT COVER COST IS $ 1.00 PLUS .40 TO INSERT. ACCORDING TO JOHN, THEY CAN DO 30/HOUR. THE ONLY WAY HE WILL DO THE 5000 IS IF HE ADDS BOOKLET MAKER TO 110. NEED TO SCHEDULE DEMO ON 5000 AND BOOKLET MAKER WITHIN NEXT 2 WEEKS

| | | | |
|---|---|---|---|
| 01/09/02 PHONE CALL COMPLETED | G. ROBBINS | SUBJECT: PIPELINE: CALL TO FIND OUT HOW MANY COVERS/MO THEY | 01/09/02 |
| 01/09/02 PHONE CALL COMPLETED | G. ROBBINS | SUBJECT: PHONE CALL | 01/09/02 |

NOTE: SPOKE TO BOB-HE ONLY DOES ABOUT 1000 COLOR COVERS / MO. IN ORDER TO JUSTIY CLC5000 HE WOULD HAVE TO PUT SADDLE STITCH ONTO 110- THEN HE MAY DO 10-15K IN COLOR COVERS. SET UP DEMO EITHER AT CANON OR PROV TO SEE GEAR-GIVE HIM SEVERAL DATES IN FEB

| | | | |
|---|---|---|---|
| 01/08/02 PROPOSAL PRESENTATION | G. ROBBINS | SUBJECT: PROP PRES | 01/09/02 |
| | | NOTE: BRING BOB NEW PROP-DONE. | |
| 01/07/02 MEETING HELD | G. ROBBINS | SUBJECT: PIPELINE: FOLLOW UP W NEW | 01/09/02 |
| 01/07/02 MEETING HELD | G. ROBBINS | SUBJECT: REDO #'S | 01/09/02 |
| | | NOTE: REDO $ - STOP BY THIS WEEK W LOWER #'S- | |
| 01/04/02 PHONE CALL COMPLETED | G. ROBBINS | SUBJECT: FOLLOWUP | 01/07/02 |

NOTE: REDO #'S W JEFF-GET BACK IN FRONT OF BOB BEFORE END OF WEEK-JEFF SPOKE TO DANAKA AND DANAKA MAY WANT TO KEEP 900 AND ADD RICOH - IF SO, I CAN LOWER ALL MY MONTHLY COSTS BY $ 16,000 - SPOKE TO BOB 1/3 - CALL HIM IN THE PM ON 1/4 (LEFT HIM A MESSAGE ON 1/2 ABOUT POSSIBLE PRICE REDUCTION

| | | | |
|---|---|---|---|
| 12/18/01 PROPOSAL PRESENTATION | G. ROBBINS | SUBJECT: COLOR PRES 110 ACCESS | 12/18/01 |
| | | NOTE: PRESENTED ALL $-FOLLOWUP W BOB BEFORE YEAR END | |
| 12/18/01 PROPOSAL PRESENTATION | G. ROBBINS | SUBJECT: COLOR PRES 110 ACCESS | 12/18/01 |
| | | NOTE: PRESENTED ALL $-FOLLOWUP W BOB BEFORE YEAR END | |
| 12/17/01 PHONE CALL COMPLETED | G. ROBBINS | SUBJECT: CALL BOB | 12/17/01 |
| | | NOTE: CALL BOB TO REMIND HIM OF OUR CALL TOMORROW-ALL SET | |
| 12/05/01 TO DO COMPLETE | G. ROBBINS | SUBJECT: PROPOSAL | 12/17/01 |
| | | NOTE: DO PROP AND SET APPT TO PRESENT #'S - ENGAGE JEFF SNYDER-DONE | |
| 11/26/01 MEETING HELD | G. ROBBINS | SUBJECT: COLOR UPGRADE & IR110 SS BOOKLET MAKER | 11/26/01 |

NOTE: MET W BOB TODAY - HE HAS AN INTEREST IN SEEING #'S ON UPGRADING THE 900 TO A PRODUCTION SYSTEM CAPABLE OF IMAGING ONTO 8PT STOCK AND 12 X 18. WOULD ALSO LIKE TO SEE #'S ON ADDING BOOKLET MAKER & POST PROCESS COVER INSERTER TO 110 TO FEED COLOR COVERS AND SADDLE STITCH. I NEED TO DO #'S FOR CLC 5000 W/COLORPASS AT VARIOUS VOLUME LEVELS

IOS00059

BEGINNING WITH 10K / MO. HE IS OUTSOURCING
BINDER COVERS CURRENTLY DUE TO STOCK
LIMITATIONS AND SPEED OF 900. HE WILL THINK
ABOUT HOW MUCH VOLUME HE COULD BRING IN IF HE
HAD A BETTER SYSTEM.

07/31/00 PIPELINE CLEARED  D. THORNTON    **NOTE:** OPPORTUNITY CLEARED AS SOLD                  07/31/00
05/23/00 TO DO COMPLETE   D. THORNTON    **NOTE:** JEFF SNYDER WILL BE DOING AN IR110 DEMO  05/23/00
                                          IN G-BURY
02/22/00 NOTE            S. HOCK         **NOTE:** ALL SET.
01/05/00 NOTE            S. HOCK         **NOTE:** DROPPED OFF INFORMATION                 06/22/00
                                                                                          06/22/00

IOS00060

# EXHIBIT B

# HRD Press
# Executive Financial Summary

11/07/03

## Current Situation:

HRD Press is financing an iR 110, iR330, iR210 and CLC 900 on a 72 month Copy Management Agreement that began on 7/25/00 and runs through 7/25/08. For the first 36 months of this agreement your monthly cost was $ 8,949 and included the equipment listed above, all service, parts, labor, toner, developer, fuser oil and 300,000 monthly impressions. From months 37 through 72 your payments are $ 12,116.

In addition you have a separate service and supply agreement for your CLC 900 which bills at $ 450 per quarter and includes 3,000 impressions, all parts, labor, toner, developer and fuser oil. Overage's are @ .15 per impression

The financial breakdown of this Copy Management Program (acct # 434797-121202mlsl) is as follows:

| Term | New Equipment | Service & Supplies | Previous Contract* | Total Contract Payment |
|------|--------------|--------------------|--------------------|------------------------|
| 1-36 | $ 4,110.37 | $ 3,065.75 | $ 1,772.88 | $ 8,949 |
| 37-72 | $ 6,301.13 | $ 3,065.75 | $ 2,749.12 | $ 12,116 |

\* 11 months remaining on your previous contract @ $ 4,268 and 24 months remaining @ $ 5,825 for an Oce 3100 and an Oce 3165 along with 250,000 monthly impressions included (service and supplies).

As of today your buyout to return the equipment on this Copy Management Program is $ 400,828. Your Buyout to own is $ 482,195.77.

## Equipment Pricing

| | |
|---|---|
| Canon iR110 | $ 290,975 |
| Canon iR330 | $ 27,196 |
| Canon iR210 | $ 13,585 |
| Canon CLC 900 | $ 28,560 |
| Total | $360,316 |

## Equipment / Component Description

1. Canon Image Runner 110 Network Printing System:
   - Making Engine
   - (2) Paper Supply Modules
   - Marking Image Path
   - Finisher
   - System Controlling System
   - High Capacity Stacker

2. Canon Image Runner 330 Multifunction Device System
   - Base Unit
   - Automatic Document Feeder DADF-A1
   - Super G3 Multi Line Fax Board
   - Multi PDL Network Print Controller
   - Multi-Position Auto Stapler C-1
   - Expansion Board Base Unit C-1
   - Cassette Feeding Unit R-1
   -

3. Canon CLC900 & Canon M20E Raster Image Processor

4. Canon IR210 Multifunctional Device
   - Base Unit
   - Automatic Document Feeder RDF-G1
   - G3 Fax Board-D1
   - Multi PDL Network Print Controller D1
   - Multi-Output Tray C-1
   - IR210 Expansion Board A-1
   - IR210 Cabinet

# EXHIBIT C

## Robbins, Glenn R

**From:**     Greg Carkhuff [greg@hrdpress.com]
**Sent:**      Wednesday, November 12, 2003 9:18 AM
**To:**        Robbins, Glenn R
**Subject:**   RE: HRD Press (lease # 434797-121202MLSL) - Details of our meeting on 10/07/03

thursday at 1:30 will work fine with me.

> -----Original Message-----
> **From:** Robbins, Glenn R [mailto:GRobbins@IKON.com]
> **Sent:** Tuesday, November 11, 2003 2:33 PM
> **To:** 'Greg Carkhuff'
> **Cc:** McGrath, Joe
> **Subject:** RE: HRD Press (lease # 434797-121202MLSL) - Details of our meeting on 10/07/03

Hi Greg

I would like to come in around 1:30 on the 13th if that works for you...

## Glenn Robbins
Strategic Account Executive-Graphic Arts
**IKON** Document Efficiency *At Work*
1 Interstate Drive
West Springfield, MA 01089
413-737-5605 x 6227
1-800-660-5181
413-737-3629 (fax)

> -----Original Message-----
> **From:** Greg Carkhuff [mailto:greg@hrdpress.com]
> **Sent:** Tuesday, November 11, 2003 9:15 AM
> **To:** Robbins, Glenn R
> **Subject:** RE: HRD Press (lease # 434797-121202MLSL) - Details of our meeting on 10/07/03

Sounds good. Nov 13th is fine just let me know when you want to come by. As far as the buyout quote goes, as discussed I will use it to get quotes to compare with what Ikon can offer and hope that Ikon can and will match what is available out in the market. I appreciate the consideration and look forward to working with you.

Sincerely,

Greg Carkhuff
(800) 822-2801  ext 131

> -----Original Message-----
> **From:** Robbins, Glenn R [mailto:GRobbins@IKON.com]
> **Sent:** Monday, November 10, 2003 5:14 PM
> **To:** 'greg@hrdpress.com'; 'don@hrdpress.com'
> **Cc:** Lee, Paul; McGrath, Joe; Fusaro, Mike; Goodrich, Jana; Regan, Judy
> **Subject:** HRD Press (lease # 434797-121202MLSL) - Details of our meeting on 10/07/03

Gentlemen,

Thanks for taking time to meet with us last Friday. We appreciate the open and honest

communication and hope that we can come to a mutually beneficial agreement. As discussed, we will provide the following to HRD Press:

1.  We will credit out the late fee that appears on the invoice that you provided to us on Friday.
2.  We will immediately adjust the Service and Supply portion of your agreement down to $ 1,750 per month (.007 x 250,000) which will include 250,000 impressions, all service, parts, labor, toner, developer and fuser oil on the iR110, iR330 and iR210. This will save you $ 1,315.75 monthly going forward and your quarterly overage will be adjusted down to .007.
3.  We will look into extending your iR110 an additional 12 months beyond the 14 month extension that was proposed a few weeks ago and if this is possible we will give you the financial details.
4.  We will re-look at the buyout to see if we can provide HRD with an opportunity to re-finance your remaining obligation through a 3rd party of your choice.
5.  I will look at all of your applications currently being run in-house as well as those being outsourced (color and black) to determine if there are any additional efficiency's that IKON can bring to the table to potentially add volume and reduce current expenses. In order to accomplish this task I will need complete disclosure of all out-sourced applications over the last 12 months such as invoices, run length and samples of the documents. I would like to begin this task Nov 13th if that works for you.

If I have missed anything please let me know and again, we value our relationship with HRD Press and look forward to helping your organization regain its financial footing.

**Glenn Robbins**
Strategic Account Executive-Graphic Arts
**IKON Document Efficiency At Work**
1 Interstate Drive
West Springfield, MA 01089
413-737-5605 x 6227
1-800-660-5181
413-737-3629 (fax)

# EXHIBIT D

**Robbins, Glenn R**

| | |
|---|---|
| **From:** | Lee, Paul |
| **Sent:** | Friday, November 21, 2003 4:03 PM |
| **To:** | Hershey, Mark |
| **Cc:** | McGrath, Joe; Robbins, Glenn R |
| **Subject:** | FW: HRD Press lease |



Robbins, Glenn
R.vcf (3 KB)

-----Original Message-----
From: Robbins, Glenn R
Sent: Thursday, November 20, 2003 7:57 PM
To: Lee, Paul
Cc: McGrath, Joe
Subject: RE: HRD Press lease


No

Per our discussion you were going to check to see if we could (or if we wanted to, or if we could provide one that did not include S&S only if they got alternate financing from a 3rd party which would really be a buyout to own with residual payoff...). We were concerned that if we remove S&S we give up our competitive advantage.

Mark, we have an account, HRD, that is looking for a "competitive" buyout without service and supplies. I am requesting, is there any language we could use to quote the buyout without service and supplies as long as they do not upgrade with a competitor? I can not think of any language that legally we could give --- but???


-----Original Message-----
From: Lee, Paul
Sent: Thursday, November 20, 2003 6:22 PM
To: Robbins, Glenn R
Cc: McGrath, Joe
Subject: FW: HRD Press lease

Glenn,

Did we supply a revised payoff?

-----Original Message-----
From: Greg Carkhuff [mailto:greg@hrdpress.com]
Sent: Wednesday, November 19, 2003 9:48 AM
To: plee@ikon.com
Subject: HRD Press lease


Paul,
Nice to meet you the other day.   Thanks for reducing our service charge right away, I appreciate it. As we discussed, could you please provide me with a more reasonable buyout quote so that we can compare bids. Since you guys are the largest distributor in the country, I think it reasonable to believe that you can match or beat any offer that a competitor makes. I think the buyout quote should at least not include the service portion of the lease. I think that would be a reasonable place to start to compare quotes. Again thank you for you consideration and as soon as I get a buyout quote from Ikon, I will get a quote from no more than 2 competitors and provide you the

IOS00097

opportunity to match or beat their quotes.

Thank You

Sincerely,

Greg Carkhuff
HRD Press

IOS00098

# EXHIBIT E

**Robbins, Glenn R**

From:            Greg Carkhuff [greg@hrdpress.com]
Sent:            Friday, February 13, 2004 1:23 PM
To:              Grobbins@ikon.com; plee@ikon.com; jmcgrath@ikon.com
Cc:              David Noonan

Dear Glenn,
Unfortunately things are not working out the way we hoped with business or the
restructuring. I am therefore turning everything over to our attorney David Noonan. You
should direct all your inquires to him. For everybody's reference I am including contact
information below.

Sincerely,

Greg Carkhuff
HRD Press

Contact Info:
David Noonan (Attorney)          (413) 549-5491

Glenn Robbins (Account rep)      (413) 737-5605 ext 6227
Paul Lee (Director of Finance)   (800) 832-7100
Joe McGrath (Manager)            (800) 972-9416

1

IOS00096