UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS INC., <br><br> Plaintiff, <br><br> v. <br><br> IKON OFFICE SOLUTIONS, INC. & IOS CAPITAL, INC. d/b/a IKON FINANCIAL SERVICES, <br><br> Defendants. | 3:05-CV-30068-KPN |

**DEFENDANT'S L. CIV. R. 56.1 STATEMENT OF MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

1.  HRD creates, owns, and publishes certain assessment tests, human resource training materials, and various other training and development materials. (First Am. Compl., ¶ 6.)

2.  HRD has had a business relationship with IKON or its predecessors since at least 1987. This relationship has involved at least three lease agreements – a 1996 lease agreement for an Oce 2600 document reproduction machine and the 1998 and 2000 lease agreements that are the subject of this lawsuit. (Affidavit of Jeffrey Snyder ("Snyder Aff.") ¶ 6; Mem. Law Supp. Def.'s Summ. J., Ex. 1.)

**The First Agreement**

3.  On or about May 20, 1998, HRD and IKON entered into a written agreement concerning HRD's use of two document reproduction machines (the "First Agreement") – an

Oce 3100 and an Oce 3165 (collectively, the "First Equipment"). (Snyder Aff. ¶ 7, Ex. A.; First Am. Compl., ¶ 8.)

  4. A true and correct copy of the First Agreement is attached as Exhibit A to the Affidavit of Jeffrey Snyder. (Snyder Aff. ¶ 7, Ex. A.)

  5. The First Agreement specifies that the "Minimum Term" of that agreement is 60 months. (Snyder Aff. Ex. A.)

  6. The First Agreement specifies that: "THIS AGREEMENT IS NON-CANCELABLE. The Customer agrees to all of the terms and conditions contained in this Agreement. The Customer agrees this Agreement is for the minimum usage term indicated above." (Snyder Aff. Ex. A.)

  7. The First Agreement sets forth the monthly payments due from HRD to IKON as $4,268.00 per month for the first 36 months of the 60-month term and $5,825.00 for months 37 through 60. The sum of these payments totals $293,448.00. (Snyder Aff. Ex. A.)

  8. Paragraph 1 of the Terms and Conditions of the First Agreement reads: "Ownership of System. IOS Capital is the sole owner and title holder to the System." (Snyder Aff. Ex. A.)

  9. Paragraph 9 of the Terms and Conditions of the First Agreement reads, in part: "THE CUSTOMER HAS NO RIGHT TO SELL, TRANSFER, ENCUMBER, SUBLET OR ASSIGN THE SYSTEM OR THIS AGREEMENT." (Snyder Aff. Ex. A.)

  10. Paragraph 13 of the Terms and Conditions of the First Agreement reads: "Renewal. After the Minimum Term or any extension agreed to, this Agreement will automatically renew on a month to month basis unless the Customer notifies IOS Capital in writing 30 days prior to the expiration of the Minimum Term or extension. At the end of the

Agreement the Customer agrees to pay shipping charges as determined by IKON Dealer. The Customer must pay any additional rents due until the System is received in good working condition by IOS Capital or its agents." (Snyder Aff. Ex. A.)

11. Paragraph 15 of the Terms and Conditions of the First Agreement reads in part: "Entire Agreement: This Agreement represents the entire Agreement between IOS Capital and the Customer. Neither IOS Capital nor the Customer will be bound by any amendment, waiver, or other change unless agreed to in writing and signed by both parties. Except for identifying the goods, services, or software ordered, the price(s), and the quantity(ies), the terms and conditions of the purchase order, or other ordering documents of Customer will not modify or affect this Agreement, or have any other legal effect whether issued or signed before, on, or after the date of this Agreement." (Snyder Aff. Ex. A.)

12. The First Agreement does not include any terms that bind HRD to renew the lease for the remaining economic life of the First Equipment or to become the owner of the First Equipment. (Snyder Aff. Ex. A.)

13. The First Agreement does not include any terms that allow HRD to renew the lease for the remaining economic life of the First Equipment for no additional consideration or nominal addition consideration upon compliance with the First Agreement. (Snyder Aff. Ex. A.)

14. The First Agreement does not include any terms that give HRD the option to become the owner of the First Equipment for no additional consideration or nominal additional consideration upon compliance with the First Agreement. (Snyder Aff. Ex. A.)

15. At the inception of the First Agreement, IKON determined that the First Equipment would have a certain value at the end of the First Agreement. (Deposition of Daniel Feldmann ("Feldmann Dep.") at 12:10-13:8; Mem. Law Supp. Def.'s Summ. J., Ex. 2.)

16. At the inception of the First Agreement, IKON determined that the Oce 3100 that was the subject of the First Agreement would be worth approximately $11,820.00 at the end of the First Agreement. (Feldmann Dep. at 12-13.)

17. At the inception of the First Agreement, IKON determined that the Oce 3165 that was the subject of the First Agreement would be worth approximately $6,334.00 at the end of the First Agreement. (Feldmann Dep. at 13.)

**The Second Agreement**

18. In early 2000, document production technology evolved and Canon Inc. introduced its ImageRunner 110 digital printing system. (Snyder Aff. ¶ 8.)

19. The ImageRunner 110 was a new digital document production system that offered near offset press quality printing and high speed production capacity. (Snyder Aff. ¶ 8.)

20. An IKON service technician told HRD about the new technology and suggested that it look into the benefits that the ImageRunner could offer HRD's business. (December 7, 2006 Deposition of Jeffrey Snyder ("12/7 Snyder Dep.") at 62-63; Mem. Law Supp. Def.'s Summ. J., Ex. 3.)

21. HRD contacted its IKON account representative and began a several month process of evaluating the ImageRunner product line. (Snyder Aff. ¶ 10; 12/7 Snyder Dep. at 110-116.)

22. This process included several meetings between IKON and HRD personnel to assess HRD's business needs, demonstrate the ImageRunner technology, and inspect and assess HRD's facilities to determine installation logistics such as electric service, network requirements, and physical space requirements. (12/7 Snyder Dep. at 106-110.)

23. HRD was pleased with the technology and eventually decided to implement a Canon ImageRunner 110, ImageRunner 330, ImageRunner 210, and a CLC 900 (collectively, the "Second Equipment") into its business operations. (12/7 Snyder Dep. at 114-116; Snyder Aff. ¶ 11.)

24. On or about June 14, 2000, IKON's Jeff Snyder, Doug Thornton, and Al Maximino met with HRD's President, Robert Carkhuff, to present the terms of a proposed lease agreement and discuss the logistics of installing the Second Equipment. (12/7 Snyder Dep. at 68-70; Snyder Aff. ¶ 12, Ex. B.) This meeting detailed the delivery and installation process, the removal of the First Equipment, training that IKON would give HRD's staff, services that IKON would provide to minimize the production downtime during installation, and the financial terms of the proposed lease agreement. (12/7 Snyder Dep. at 106-110; Snyder Aff. ¶ 12.)

25. On or about June 19, 2000, Snyder, Thornton, and Maximino met with Robert Carkhuff again to finalize the proposed agreement. (12/7 Snyder Dep. at 134-136; Snyder Aff. ¶ 15, Ex. C.) During this meeting, Robert Carkhuff executed a written agreement concerning HRD's use of the Second Equipment (the "Second Agreement"). (12/7 Snyder Dep. at 134-136; Snyder Aff. ¶ 15.)

26. A true and correct copy of the Second Agreement is attached as Exhibit C to the Affidavit of Jeffrey Snyder. (Snyder Aff. ¶ 15, Ex. C.)

27. The June 14th and June 19th meetings were the only two times when HRD and IKON discussed the financial terms of the Second Agreement before HRD signed that agreement. (Snyder Aff. ¶ 17.)

28. Robert Carkhuff did not ask IKON whether the Second Agreement included the remaining obligation that HRD owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶ 18.)

29. Robert Carkhuff did not question the Second Agreement's monthly payment amount or attempt to negotiate that amount before he signed the Second Agreement. (12/7 Snyder Dep. at 110-113; Snyder Aff. ¶ 19.) His only questions during the June 14, 2000 and June 19, 2000 meetings with IKON concerned the logistics of installation and whether HRD would experience any downtime during installation. (12/7 Snyder Dep. at 109-113; Snyder Aff. ¶ 19.) He asked no questions about the costs. (12/7 Snyder Dep. at 109-113; Snyder Aff. ¶ 19.)

30. Jeff Snyder did not tell Robert Carkhuff or anyone from HRD that cost of the Second Agreement would not or did not include the remaining obligation that HRD owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶ 20.)

31. Doug Thornton did not tell Robert Carkhuff or anyone from HRD that cost of the Second Agreement would not or did not include the remaining obligation that HRD owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶ 21.)

32. Al Maximino did not tell Robert Carkhuff or anyone from HRD that cost of the Second Agreement would not or did not include the remaining obligation that HRD owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶ 21.)

33. IKON did not give HRD the option to buy out or become the owner of the First Equipment before or after HRD signed the Second Agreement. (Snyder Aff. ¶ 22.)

34. The Second Agreement was a 72-month lease agreement that required HRD to pay $8,949.00 per month for the first thirty-six months and $12,116.00 per month for the final thirty-six months. (Snyder Aff. Ex. C.)

35. The Second Agreement's monthly payments included charges for use of the Second Equipment, charges for services and supplies for the Second Equipment, and charges to satisfy the remaining $119,996.00 that HRD owed for the equipment charges on the First Agreement. (Dec. 18, 2006 Deposition of Jeffrey Snyder ("12/16 Snyder Dep.") at 68, Mem. Law Supp. Def.'s Summ. J., Ex. 4; April 30, 2007 Deposition of Jeffrey Snyder ("4/30 Snyder Dep.") at 53-54, Mem. Law Supp. Def.'s Summ. J., Ex. 5.)

36. The Second Agreement's monthly payments did not include the remaining service and supply charges associated with the First Agreement. (4/30 Snyder Dep. at 41-43; December 6, 2006 Deposition of Glenn Robbins ("Robbins Dep.") at 114, Mem. Law Supp. Def.'s Summ. J., Ex. 6.)

37. In July 2000, HRD asked Jeff Snyder to provide HRD with the costs of the Second Equipment for insurance and/or accounting purposes. (Snyder Aff. ¶ 23.) In response to this request, Jeff Snyder prepared an Accounting Value Statement for the Second Equipment based on the manufacturer's suggested retail price of that equipment and gave it to HRD in July 2000. (Snyder Aff. ¶ 23, Ex. D.)

38. A true and correct copy of the Accounting Value Statement is attached as Exhibit D to the Affidavit of Jeffrey Snyder. (Snyder Aff. ¶ 23, Ex. D.) Jeff Snyder prepared this Accounting Value Statement in July 2000 in the regular course of his job duties with IKON at that time. (Snyder Aff. ¶ 23.) IKON maintained a copy of this Accounting Value Statement in

the regular course of its business activities in a file located at its West Springfield, Massachusetts office.  (Snyder Aff. ¶ 23.)

      39.    IKON installed the Second Equipment at HRD in July 2000.  (Snyder Aff. ¶ 24.)

      40.    IKON removed the First Equipment from HRD's facilities in or about July 2000.  (Snyder Aff. ¶ 24.)

      41.    IKON subsequently evaluated the First Equipment to determine whether it had any value at that time.  (12/7 Snyder Dep. at 95-97.)

      42.    The Oce 3100, which was part of the First Equipment, did not have any value at that time and therefore IKON discarded the machine or stripped it for parts.  (12/7 Snyder Dep. at 98, 100-102.)

      43.    The Oce 3165, which was part of the First Equipment, was sold for $4,500 to a wholesaler.  (12/7 Snyder Dep. at 98, 100-102.)

**HRD Experiences Financial Troubles**

      44.    HRD contacted IKON in the fall of 2003 and informed IKON that it had been having financial problems for the past three years and had lost over $700,000 during that time.  (Affidavit of Glenn Robbins ("Robbins Aff.") ¶¶ 7-8, Mem. Law Supp. Def.'s Summ. J., Ex. 7.)

      45.    HRD's consultant, Don Collins, told IKON's Glenn Robbins that he and HRD's Greg Carkuff were evaluating the business finances to determine whether to continue the business, liquidate, or file for bankruptcy.  Collins asked to meet with IKON to discuss ways to lower HRD's monthly payment obligation.  (Robbins Aff. ¶ 7.)

      46.    Robbins met with Collins and Greg Carkhuff on October 29, 2003.  (Robbins Aff. ¶ 8.)

47.     At the October 29, 2003 meeting between IKON and HRD, the parties discussed HRD's need to reduce its monthly payments. This discussion also included what the monthly payments comprised – the equipment charges, the service and supply charges, and the remaining obligation from the First Agreement. (Robbins Aff. ¶ 8.)

48.     At the October 29, 2003 meeting, HRD asked Robbins for the specific dollar amounts for the equipment charges, service and supply charges, and the charges for the remaining obligation on the First Agreement that made up the Second Agreement's monthly payments. (Robbins Dep. at 99-100; Robbins Aff. ¶ 8.) Robbins did not have that information but told HRD that he would get the figures and get back to them. (Robbins Aff. ¶ 8.)

49.     IKON met with Collins and Greg Carkhuff again on November 7, 2003. (Robbins Aff. ¶¶ 10-11.) Robbins, Paul Lee, a Director of Finance, and Joe McGrath, a Business Development Manager, attended this meeting. (Robbins Dep. at 105; Robbins Aff. ¶ 10.)

50.     Robbins prepared and presented a written financial summary dated November 7, 2003 that included the information that HRD had requested at the October 29th meeting. (Robbins Dep. at 105; Robbins Aff. ¶ 10, Ex. B.)

51.     At the November 7, 2003 meeting, IKON agreed to reduce the service and supply component by approximately $1,300 per month and waive a late fee on a recent invoice. (Robbins Aff. ¶ 11.) IKON also agreed to evaluate whether HRD could re-finance and extend the Second Agreement for a longer period of time, which would reduce the monthly payment amount. (Robbins Aff. ¶ 11.)

52.     After the November 7, 2003 meeting, Greg Carkhuff sent an e-mail to Paul Lee expressing his appreciation for the financial concessions that IKON had made and stating that he

looked forward to receiving a proposal to re-finance the Second Agreement. (Robbins Aff. ¶ 14.)

53.     A true and correct copy of the November 19, 2003 e-mail that Greg Carkhuff sent to Paul Lee is attached as Exhibit D to the Affidavit of Glenn Robbins. (Robbins Aff. ¶ 14, Ex. D.)

54.     HRD did not express any dissatisfaction or surprise at either the October 29, 2003 or November 7, 2003 meetings that the remaining obligation from the First Agreement was a component of the Second Agreement or accuse IKON of misrepresenting that fact to HRD. (Robbins Aff. ¶ 15.)

55.     Greg Carkhuff informed IKON during late November or early December 2003 that HRD had obtained quotes for other document printing equipment from one of IKON's competitors and asked IKON to provide a quote for the same or a similar configuration of equipment. (Robbins Dep. at 163-66; Robbins Aff. ¶ 16.) Glenn Robbins attempted to put together such a quote, but at that time HRD did not qualify for a new lease agreement with IKON for the same or similar configuration of equipment that the competitor had quoted. (Robbins Aff. ¶ 16.) Glenn Robbins met with Greg Carkhuff on January 22, 2004 and informed him that HRD did not have the financial ability to qualify for a new lease with IKON for the same or similar configuration of equipment that the competitor had quoted and therefore IKON could not give HRD a quote for the equipment that the competitor had proposed. (Robbins Aff. ¶ 16.)

56.     The discussions between IKON and HRD ended in February 2004 when Greg Carkhuff sent an e-mail to IKON that read: "Unfortunately things are not working out the way we hoped with business or the restructuring. I am therefore turning everything over to our

attorney David Noonan. You should direct all your inquiries to him. For everybody's reference, I am including contact information below." (Robbins Aff. ¶ 17, Ex. E.)

57. HRD made its monthly payments on the Second Agreement until May 2004. (Snyder Aff. ¶ 25.) It has not made a payment since then. (Snyder Aff ¶ 25.)

58. HRD still has possession of the Second Equipment.

59. HRD's fraud allegations first surfaced in a demand letter that IKON received from HRD's attorney in September 2004. (Snyder Aff. ¶ 26.)

60. HRD's September 2004 demand letter accused IKON of telling HRD that the Second Agreement would not include the service and supply component of the First Agreement. (First Am. Compl., Ex. E.) It did not claim that IKON told it that the Second Agreement would not include any of the remaining obligation on the First Agreement. (Id.) That allegation appeared for the first time when HRD filed this lawsuit in March 2005. (Compl., Count II, ¶ 57.)

DEFENDANT,
IKON OFFICE SOLUTIONS, INC.


By     /S/ Brett J. Boskiewicz
    Bradford S. Babbitt (BBO# 566390)
    e-mail: bbabbitt@rc.com
    Brett J. Boskiewicz (BBO# 656545)
    e-mail: bboskiewicz@rc.com
    Robinson & Cole LLP
    280 Trumbull Street
    Hartford, CT  06103-3597
    Tel. No.: (860) 275-8200
    Fax No.: (860) 275-8299

July 10, 2007

**CERTIFICATE OF SERVICE**

  I hereby certify that Defendant IKON Office Solutions, Inc.'s DEFENDANT'S L. CIV. R. 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT was filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 10, 2007

              / S / Brett J. Boskiewicz
              Brett J. Boskiewicz