**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

HUMAN RESOURCE DEVELOPMENT )
PRESS, INC., )
    Plaintiff, )
         )
v. )    3:05-CV-30068-KPN
         )
IKON OFFICE SOLUTIONS, INC. )
         )
    Defendant, )

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

The Defendant, Ikon Office Solutions, Inc. ("IKON"), has filed a Motion for

Summary Judgment on all 4 remaining counts of the Plaintiff's Amended Complaint (the

"Motion for Summary Judgment"). The Plaintiff, Human Resource Development Press,

Inc. ("HRD"), by and through its counsel of record, hereby submits this Memorandum of

Law In Support of its Opposition to Defendant's Motion for Summary Judgment and

incorporates by reference the Affidavits of Robert Carkhuff and Gregory Carkhuff

respectively attached hereto as Exhibit "1" and Exhibit "2" and filed in support of HRD's

opposition to the Motion for Summary Judgment as well as Plaintiff's Response to

Defendant's Statement of Material Facts.

In light of the appropriate legal standard for determining motions for summary

1

judgment and viewing all facts in the light most favorable to HRD this Court must deny the Defendant's Motion for Summary Judgment.

## II. LEGAL STANDARD IN DECIDING MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56(c) summary judgment is only appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The 1st Cir. in the case of *Garside v. Osco Drug, Inc.,* 895 F.2d 46 C.A.1 (Mass.),1990 has provided clear guidance as to how to apply the standard set forth in the rule and has discussed and relied upon the cases cited herein.

In the present case IKON has asserted that there is an absence of evidence to support HRD's case. HRD has the burden to establish the existence of at least one fact which is both genuine and material. *Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989); *Finn v. Consolidated Rail Corp.,* 782 F.2d 13, 15 (1st Cir.1986). A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

HRD, through the affidavits of Robert Carkhuff and Gregory Carkhuff has asserted facts which directly challenge the truth and accuracy of those facts asserted by IKON in its supporting affidavits and Statement of Material Facts. HRD's supporting affidavits and the herein memorandum have established that there is a genuine issue of material fact because there is "sufficient evidence supporting the claimed factual dispute" to require a choice between "the parties' differing versions of the truth at trial.

2

*Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* ( *quoting First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592-93, 20 L.Ed.2d 569 (1968)).

Finally, as explained by Judge Ponsor in *Johnson v. Plastic Packaging, Inc.* 892 F.Supp. 25, D.Mass., 1995, a court must view all facts in the light most favorable to the non-movant and indulge all inferences to be drawn favorably to that party, citing *Petitti v. New England Tel. and Tel. Co.,* 909 F.2d 28, 31 (1st Cir.1990).

## III. SUMMARY OF KEY FACTUAL ALLEGATIONS IN PLAINTIFF'S SUPPORTING AFFIDAVITS & THE FIRST AMENDED COMPLAINT

HRD creates, owns and publishes assessment tests, human resource training resources and various training and development materials. ( Am. Complaint, ¶ 6). IKON, among other things, provides its customers with copier equipment. (Am. Complaint, ¶ 7) and IKON's former sister company IOS Capital, Inc. was, at all relevant points of time to the parties dispute, in the business of purchasing and servicing finance contracts for equipment sold and/or leased by IKON OFFICE to third parties. (Am. Complaint, ¶ 7). The Complaint stems from two contracts for photocopiers executed by the parties.

In May and June of 1998, HRD and IKON executed two documents ("Am. First Agreement") whereby IKON provided HRD with two (2) commercial grade copiers - an Oce 3100 and Oce 3165 - (the "First Equipment"). IKON was granted a security interest in the First Equipment. (Am. Complaint, ¶¶ 8-9). A copy of said First Agreement is

3

attached to HRD's amended complaint and marked as Exhibit "A".

The contract term of the First Agreement was for sixty (60) months. (Am. Complaint, ¶ 10). Pursuant to the First Agreement, HRD agreed to pay FOUR THOUSAND TWO HUNDRED SIXTY-EIGHT DOLLARS ($4,268.00) per month for the first thirty-six (36) months of the contract term and FIVE THOUSAND EIGHT HUNDRED TWENTY-FIVE DOLLARS ($5,825.00) for the remaining twenty-four (24) months of the contract term (jointly, the "First Equipment Monthly Charges"). (Am. Complaint, ¶ 11). The First Equipment Monthly Charges included service/maintenance and supplies. (Am. Complaint, ¶ 12). June 19, 2000 HRD executed a second agreement with IKON (the "Second Agreement") relating to photocopying/printing equipment manufactured by Canon. (the "Second Equipment") (Am. Complaint, ¶ 18).

The First Equipment failed to meet HRD's copying needs (Affidavit of Robert Carkhuff) (R. Carkhuff Aff. ¶ 4 ) and IKON's service technicians recommended that in order to obtain a high production photocopying capacity HRD would have to "upgrade" its photocopying/printing equipment. (R. Carkhuff Aff. ¶ 5).

Once HRD indicated it was willing to consider "upgrading" its photocopying/printing equipment one of IKON's equipment specialist, Jeffrey Snyder, contacted HRD and asked for the opportunity to demonstrate the effectiveness of photocopying/printing equipment made by Canon. (R. Carkhuff Aff. ¶ 7). During HRD's first conversations with Jeffrey Snyder, he specifically represented to HRD that IKON would simply swap the First Equipment for the new equipment that was under consideration and that HRD would have no further payment obligations for the First

4

Equipment and that the new equipment would be paid for through a new contract. (R. Carkhuff Aff. ¶ 7).

The same representations were made by Jeffrey Snyder to Robert Carkhuff before HRD confirmed that it was interested in entertaining a specific proposal for the use of the Canon equipment. (R. Carkhuff Aff. ¶ 8). Finally, on June 14, 2000 Jeffrey Snyder and two associates presented IKON's written proposal for the Canon equipment entitled " Executive Summary". (Def. Mem. Law Supp. Def.'s Summ. J. p. 4) Robert Carkhuff confirmed that the written proposal was for the contract that he and Jeffrey Snyder had previously discussed wherein Jeffrey Snyder had represented that HRD would have no further payment obligations for the First Equipment under the proposed new contract. (R. Carkhuff Aff. ¶ 9). While discussing the proposal, Robert Carkhuff specifically questioned Jeffrey Snyder as to why the monthly payments for the proposed agreement for the Canon equipment were so much more expensive than the monthly payments for the First Equipment. (R. Carkhuff Aff. ¶ 9). Instead of disclosing that the monthly payments for the proposed new contract would include payments for the balance due under the First Agreement, Jeffrey Snyder gave Robert Carkhuff four different reasons why the payments were so much higher. (R. Carkhuff Aff. ¶ 9).

IKON, through one of its Rules 30 (b)(6) designees, Jeffrey Snyder, has admitted that the Executive Summary did not disclose that HRD would be charged for the remaining balance due under the First Agreement, simply because IKON wanted to present the financial information in the same fashion that it knew the Second Agreement would contain (G. Carkhuff Aff. ¶ 4). Through discovery, HRD obtained a

5

document (which IKON originally withheld because it was deemed "confidential" even though it contained no profit margin or trade secret information) and learned that IKON intentionally deleted from a draft of the Second Agreement certain footnotes that would have disclosed to HRD that it would be paying for payments due under the First Agreement through the Second Agreement, (G. Carkhuff Aff. ¶ 4 & ref. Ex. "B").

HRD has established through the affidavit of Robert Carkhuff that HRD executed the Second Agreement only in reliance upon the misrepresentations of material fact made by Jeffrey Snyder and but for said misrepresentations HRD would not have executed the Second Agreement. (R. Carkhuff Aff. ¶ 10).

Through the affidavit of Gregory Carkhuff, HRD has established that the first date that HRD did or could have discovered that IKON was collecting payments for the First Agreement through the Second Agreement was in November 2003 when it received the Executive Summary, (G. Carkhuff Aff. ¶ 17). Additionally through the affidavit of Gregory Carkhuff, HRD has established that HRD did not formally assert its fraud in the inducement claim against IKON until HRD filed its complaint in this civil action, not because it knew any time prior to November 2003 that it had been lied to and misled by IKON, but rather only due to Robert and Gregory Carkhuff's failure to discuss the events which occurred prior to HRD's execution of the Second Agreement until just before HRD's complaint was filed, (G. Carkhuff Aff. ¶ 18).

6

## IV.  CRITICAL MATERIAL FACTS THAT IKON HAS ADMITTED BY FAILING TO TIMELY RESPOND TO THE PLAINTIFF'S FIRST REQUEST TO ADMIT FACTS

Most if not all of the critical material facts at issue in this civil action have been established and disputes concerning the same have been foreclosed due to IKON's failure to timely respond to HRD's First Request to Admit Facts a copy of which is attached hereto and marked as Exhibit "3". IKON during prior hearings before this Court has an admitted that it failed to respond to HRD's Request for Admissions until after September 7, 2006 when responses to the same were due on or before August 13, 2006.

A review by this Court of the 53 specific requests for admissions will establish that virtually every fact which IKON seeks to establish through its affidavits filed in support of its Motion for Summary Judgment has already been determined and there is both in fact and in law (see, HRD's legal authority herein) no dispute as to the 53 facts sought to be established through the said request for admissions.

## V.          ADDITIONAL FACTS ADMITTED BY IKON THROUGH ITS DEPOSITION TESTIMONY

Through the testimony of its various Rule 30 (b)(6) designees, IKON has admitted the following facts:

> A) the Second Agreement fails to disclose the dollar amount imposed for service and supply charges for the Second Equipment, (G. Carkhuff Aff. ¶ 7); and

7

B) the Second Agreement fails to disclose to HRD that it is making payments for the First Agreement through the Second Agreement, (G. Carkhuff Aff. ¶ 5); and

C) IKON rolled $119,996 of the cost for the First Agreement into the Second Agreement, (G. Carkhuff Aff. ¶ 8); and

D) IKON does not have a single document that rebuts HRD's allegation contained in paragraph 23 of its amended complaint that IKON represented to HRD that IKON was simply replacing and substituting the First Agreement with the Second Agreement and that HRD would have no further payment obligations for the First Equipment, (G. Carkhuff Aff. ¶ 11); and

E) IKON does not have a single piece of paper that it uses to disclose to a customer the legal effect of substituting one contract for another, (G. Carkhuff Aff. ¶ 12); and

F) Jeffrey Snyder was paid a commission in the amount of $13,292 as a result of HRD's execution of the Second Agreement, (G. Carkhuff Aff. ¶ 14); and

G) IKON, as opposed to IOS Capital, Inc., made a profit of between $105,000 and $110,000 as result of HRD's execution of the Second Agreement, (G. Carkhuff Aff. ¶ 14); and

H) IKON's Director of Financial Operations has no knowledge of what the purpose of the Accounting Value Statement (Snyder Aff. ¶ 23, Ex. D)

was or what it meant, (G. Carkhuff Aff. ¶ 14); and

I) Even though IKON determined at the inception of the First Agreement that the Oce 3100 and 3165 respectively would have "residual" values in May 2003 of $11,820 and $6,330, IKON, in September 2000, only halfway through the contract term, simply destroyed the Oce 3100 in September 2000 and received only $4,500 for the Oce 3165. Furthermore in spite of receiving this $4500 IKON did not credit HRD with any value, (G. Carkhuff Aff. ¶ 24 & 25); and

J) In spite of the facts established through paragraph I above, IKON would, in July 2000, still have sought to collect the approximate $119,000 that was due under the First Agreement had HRD, in July 2000, been unable to surrender to IKON the Oce 3100 and 3165, (G. Carkhuff Aff. ¶ 26); and

K) In 2003, the last year of the term of the First Agreement, IKON would not have even attempted to market an Oce 3100 or 3165 because said equipment had no value and were obsolete, (G. Carkhuff Aff. ¶ 27).

## VI.  RESPONSE TO IKON'S AGRUMENT THAT HRD CAN NOT PROVE ITS FRAUD CLAIM BECAUSE IKON DID NOT MAKE ANY FALSE STATEMENTS OF MATERIAL FACT THAT INDUCED HRD TO EXECUTE THE SECOND AGREEMENT

HRD asserts in its Amended Complaint that, in order to induce it into executing the Second Agreement, IKON engaged in fraudulent misrepresentations by falsely representing that IKON would simply swap equipment HRD's existing

9

photocopying/printing equipment for the new equipment being considered and then enter into a new contract and that as a result HRD would not be paying for any of its contractual obligations under the First Agreement through the Second Agreement, (Am. Complaint, ¶¶ 22 & 23).  IKON's factual assertions that no such representations were made has been specifically rebutted by Robert Carkhuff's affidavit (R. Carkhuff Aff. ¶ 7, 8 & 9). Furthermore, Robert Carkhuff has specifically stated that but for the misrepresentations of fact made by Jeffrey Snyder, HRD would not have executed the Second Agreement, (R. Carkhuff Aff. ¶ 10).

Additionally, IKON's argument that HRD, through Robert Carkhuff, never asked a single question concerning the financial components of the Second Agreement (Def.'s Memo. Law Supp. Def.' s Summ. J. p.10 ) is ludicrous as Robert Carkhuff was well aware of the approximate contract balance due under the First Agreement, (R. Carkhuff Aff. ¶ 11). The assertions of Robert Carkhuff  in ¶ 7, 8, 9, 10 & 11 of his affidavit directly contradict IKON's  factual assertions used to support of its argument and by applying the standards established in *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* there is a genuine issue of material fact because there is "sufficient evidence supporting the claimed factual dispute" to require a choice between "the parties' differing versions of the truth at trial.

## VII.    RESPONSE TO IKON'S AGRUMENT THAT HRD DID NOT RELY ON THE "ALLEGED" FALSE STATEMENTS

The sum and substance of this portion of IKON's argument is that because HRD

did not express "surprise" that it was being charged for the First Agreement through the Second Agreement it means that HRD had somehow known all along that it was the victim of IKON's fraud. This portion of IKON's argument is flawed because it is based on the false premise that IKON during or before the meetings on October 29, 2003 and then again on November 7, 2003 had actually disclosed that HRD was being charged for the First Agreement through the Second Agreement.

Prior to HRD's receipt of the Executive Financial Summary dated November 7, 2003 (Exhibit "D. HRD Am. Complaint) HRD had no reason to be questioning whether or not IKON was collecting payments for the First Agreement through the Second Agreement (G. Carkhuff Aff. ¶ 17). Prior to the October 29, 2003 meeting Gregory Carkhuff had been seeking a breakdown of the monthly charges under the Second Agreement in order to determine what the service and supply charges were as opposed to trying to confirm any suspicion that HRD had been defrauded with respect to payments for the First Agreement being collected through the Second Agreement, (G. Carkhuff Aff. ¶ 17).  Gregory Carkhuff has specifically stated that on October 29, 2003 Glen Robbins would not agree to provide any breakdown of any charges relating to service and supplies and that he, Gregory Carkhuff, had not received the Executive Financial Summary dated November 7, 2003 (Exhibit "D. HRD Am. Complaint) until after the meeting on November 7, 2003 because it was only at that meeting that IKON finally relented and agreed to provide the requested information, (G. Carkhuff Aff. ¶ 16 & 17 ).

IKON is correct that HRD did not formally assert that it had been the victim of a

fraud by IKON's collection of payments for the First Agreement through the Second

Agreement until the complaint in this civil action was filed. However, the conclusion

IKON asks this Court to make based on this admitted fact is based on a false premise.

As stated by Gregory Carkhuff in his affidavit, the earliest HRD could have known of

IKON's fraud was after November 7, 2003 (G. Carkhuff Aff. ¶ 17 ); however HRD did

not actually learn it had been the victim of IKON's fraud until just before HRD filed its

complaint in this civil action solely because two brothers with a strained relationship

were not communicating, (G. Carkhuff Aff. ¶ 18 ). The fact that it took HRD from

November 2003 until March 2005 to assert the claim that IKON was fraudulently

collecting payments for the First Agreement through the Second Agreement does not

change the fact that HRD did not and could not have known of IKON's fraud until

November 2003, (G. Carkhuff Aff. ¶ 17 ).

## VIII.    RESPONSE TO IKON'S ARGUMENT THAT HRD'S FRAUD CLAIM IS TIMED BARRED

IKON argues that the fraud and misrepresentation claim should be dismissed

because it is time barred. An action for fraudulent misrepresentation is an action in tort.

Tagliente v. Himmer, 949 F.2d 1, 4 (1st Cir. 1991) (citation omitted). Accordingly, an

action for fraudulent misrepresentation may only be brought within three years after the

cause of action accrues. See Mass. Gen. Laws ch. 260, § 2A ("[A]ctions of tort . . .

shall be commenced only within three years next after the cause of action accrues.").

An action in tort generally accrues when the plaintiff is injured. Tagliente, 949

12

F.2d at 4. However, the "discovery rule" provides that actions in both contract and tort may be tolled until such time as the plaintiff discovers the facts giving rise to the cause of action. Frank Cooke , Inc. v. Hurwitz, 10 Mass App. Ct. 99 (1980). Accordingly, the discovery rule tolls the "limitations period until a prospective plaintiff learns or should have learned that he has been injured by the defendant's conduct." Clough v. Brown, 59 Mass. App. Ct. 405 (2003) (citations and quotations omitted). "Where compliance with a statute of limitations is at issue, 'factual disputes concerning when a plaintiff knew or should have known of his cause(s) of action *are to be resolved by the jury.*'" Id. (emphasis added).

In a fraud action, the plaintiff is not required to investigate the truth of assertions that are made to him. The recipient of a fraudulent misrepresentation of fact is ordinarily justified in relying on its truth, although he might have ascertained the falsity of the representation had he made an investigation. Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 467 (2003), *citing* Yorke v. Taylor, 332 Mass. 368, 374 (1955). On the other hand, the plaintiff is not entitled to rely on a representation that he knows to be false or its falsity is obvious to him. Id. at 468. If a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious. Id. (citations omitted); Collins v. Huculak, 57 Mass. App. Ct. 387, 392 (2003) ("The person claiming justifiable reliance is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he utilized his opportunity to make a cursory examination"). "*'[T]he question,* whether the plaintiff exercised due diligence and was justified in placing confidence in the

13

statement of the defendant or should have known from the beginning that [the statement was false],' *is one of fact.*" Id. (citation omitted). (emphasis added)

IKON, on pages 17 and 18 of its Memorandum, argues that because HRD was provided with a document entitled "Accounting Value Statement" ( Snyder Aff.¶ 23, Ex. D) in the summer of 2000 it should have discovered IKON's fraud shortly thereafter.

IKON has taken a major liberty with the facts when it argues on page 17 of its Memorandum and that the Accounting Value Statement sets forth the "manufacturer's suggested retail price". Nowhere does the Accounting Value Statement indicate what the numbers on the document actually represent, (G. Carkhuff Aff. ¶ 20 ) in fact it was because this document was so cryptic in nature that HRD requested an explanation of the figures and IKON refused to provide the same, (R. Carkhuff Aff. ¶ 12 ).

IKON's argument is without merit also because of the following facts:

>1) IKON's own Rule 30(b)(6) designee had no idea what the Accounting Value Statement was or actually meant, (G. Carkhuff Aff. ¶ 21 ); and

>2) the Accounting Value Statement does not define what the accounting value figures actually are, nor does it reference what the service and supply charges are, nor does it reference the interest rate included in the second agreement (G. Carkhuff Aff. ¶ 20 ); and

>3) if HRD conducted the speculative math IKON argues HRD should have conducted and if HRD was off by only .01 cent on the per copy amount that IKON was charging for service and supplies, HRD's calculation would have been twice the dollar amount that IKON actually

14

deceitfully "rolled" into the Second Agreement for the obligations under the First Agreement,(G. Carkhuff Aff. ¶ 21 & 22 ); and

4) HRD did not know that IKON had a 40 to 50% profit margin on the service component of the Second Agreement until April 30, 2007, (G. Carkhuff Aff. ¶ 21 ) which would have made any speculative math process even more futile; and

5) IKON refused HRD's requests to explain the very document that IKON argues should have disclosed IKON's own fraud, (R. Carkhuff Aff. ¶ 12 )

It is ironic that IKON argues that its fraud should have been discovered through a document which is cryptic at best and for which IKON refused to provide any additional explanation. The statute of limitations with respect to HRD's fraud claim began to run as of the date which HRD received the Executive Financial Summary dated November 7, 2003 and HRD could not have discovered IKON's fraud prior to that date, (G. Carkhuff Aff. ¶ 17 ). HRD's complaint was filed on March 15, 2005 more than nine months prior to the expiration of the three-year statute limitations and as a result, this Court must deny IKON's Motion for Summary Judgment with respect to the fraud and misrepresentation claim since it is not time barred.

## IX. <u>RESPONSE TO IKON ARGUMENT THAT ARTICLE 9 DOES NOT APPLY TO THE FIRST AGREEMENT</u>

HRD has alleged in its Amended Complaint that while IKON has asserted that both the First Agreement and the Second Agreement were lease agreements, HRD has asserted that both were substantively purchase and sale agreements and not lease

agreements, ( Am. Complaint ¶ 25 & 26 ). Pursuant to Count IV, HRD has plead in the alternative and asserted that if IKON is correct and both the First and Second Agreements were leases then IKON has failed to comply with Mass. Gen. Laws ch. 106 § 2A[5] , et seq.; or alternatively if both agreements were purchase agreements then IKON with a failed to dispose of the First Equipment in a commercially reasonable manner, ( Am. Complaint ¶ 64-66 ).

The factual issue of whether the First Agreement was a lease or purchase and sale agreement has been determined and all issues concerning the same have been foreclosed due to IKON's failure to timely respond to HRD's Request for Admissions nos. 22- 53 copy of which is attached hereto and marked as Exhibit "3". IKON, during prior hearings before this Court, has admitted that it failed to respond to HRD's Request for Admissions until after September 7, 2006 when responses to the same were due on or before August 13, 2006.

The failure of a party to respond to the opposing party's Request for Admissions operates as a constructive admission of each request. *See,* Fed. R. Civ. Pro. 36(a) (request not answered within thirty days of receipt is deemed admitted.) Any matter admitted is considered "conclusively established." Fed. R. Civ. Pro. 36(b). *See,* Farr Man & Co., Inc. v. M/V Rozita 903 F.2d 871, 876 (1st Cir. 1990). Also see, Duncan v. Santaniello v. Duncan, 1996 WL 121730 (D.Mass) (holding that "the use of admissions to 'conclusively establish' such facts as are not disputed is precisely the reason that Rule 36 was adopted.")

---

[5] HRD has filed a Motion for Leave to File Second Amended Complaint which seeks to expand and clarify the relief

16

In light of the well settled law in the 1st Circuit concerning IKON's failure to respond to HRD's Requests to Admit Facts, HRD had the right to rely upon the legal effect of IKON's failure to timely respond to said requests and for purposes of, inter alia, defending IKON's Motion for Summary Judgment this Court should determine that genuine issues of material fact with respect to all facts necessary for HRD to prosecute its claims pursuant to Count IV have been established. In particular through requests for admission No. 52, HRD has established that the First Equipment could have been purchased by HRD for less than 25% of the total of all of the first equipment monthly charges. See also (G. Carkhuff Aff. ¶ 29 ). By establishing this fact, HRD has answered the Court's own question as to "whether similar buyout terms and conditions, albeit latent and, applied to the First Agreement as well" (see, Memorandum and Order, dated January 12, 2006, P. 16)

Separate and apart from the legal effect of IKON's failure to respond to HRD's 53 requests to admit facts, HRD through the affidavit of Gregory Carkhuff, HRD has established that:

1) in July 2000, more than 2 ½ years before the expiration of the First Agreement the First Equipment was virtually worthless, (G. Carkhuff Aff. ¶ 24 ); and

2) IKON itself established that at the end of the lease the Oce 3 respectively would have respectively a "residual value" of only $11,820 and $6,330, (G. Carkhuff Aff. ¶ 25 ); and

3) IKON offered to sell the Second Equipment to HRD pursuant to the

sought pursuant to Count IV.

17

Second Agreement and the First Agreement and the Second are
substantially identical, (G. Carkhuff Aff. ¶ 29 ).

IKON's own actions of destroying the Oce 3100 and selling the Oce 3165 for only for
only $4500, coupled with its own determination of nominal residual value are facts that
must establish that HRD could have purchased the first equipment for less than the
25% standard established by *In re Access Equip., Inc.,* 62 B.R. 642, 646 (Bankr. D.
Mass. 1986). Additionally, these same facts establish that the "economic useful life of
the First Equipment was less than 60 months, i.e., its term" (see, Memorandum and
Order, dated January 12, 2006, P. 15)

IKON through its Executive Financial Summary dated November 7, 2003 (Exhibit
"D. HRD Am. Complaint) established that HRD could purchase the Second Equipment,
(G. Carkhuff Aff. ¶ 29 ). The total cost to HRD under the Second Agreement was $
758,340 ( 36 months at $ 8,949 each & 36 months at $ 12,116) ("Total Contract Cost").
On November 7, 2003, the date of the "Executive Financial Summary", HRD had 33
months remaining on the term of the agreement. Those last 33 months were at a cost
of $ 12,116 per month, totaling  $399,828. Through the "Executive Financial Summary"
IKON discloses that if HRD wants to return the equipment in November 2003, HRD
must still pay the remaining 33 months or $ 400,828[6]. However, if HRD wants to
"purchase" the equipment it only has to pay an additional $81, 367.77 ( $ 482,195.77 –
$ 400,828) ("Option Price"). Thus, the Option Price was only 10.729% of the Total
Contract Cost   ($81,367.77 X 100  ÷ 758,340).

The Massachusetts Uniform Commercial Code controls the issue of whether a

---

[6] HRD assume the de minimums discrepancy between the $ 400,828 and the $ 399,828 are early surrender or

18

personal property contract is a true lease or a security agreement. Mass. Gen. Laws,

ch. 106, § 1-201(37); *Carlson v. Giachetti,* 35 Mass. App. Ct. 57, 59 (1993); *Rocky*

*River Condo Corp. v. F.D.I.C.,* 855 F. Supp. 489, 492 (D. Mass. 1994). Under

Massachusetts law, it is well settled that, in determining whether a contract is a "true

lease" or is intended for security, courts do not consider what description the parties

have given to it, but what is its essential character. *Rocky River Condo Corp.,* 855 F.

Supp. at 491. Moreover, "[i]n determining whether a transaction involves a 'true lease'

or a disguised security interest, the court may consider factors outside the lease as well

as the contents of the lease." *In re APB Online, Inc.,* 259 B.R. 812, 817 (Bkrtcy.

S.D.N.Y. 2001).

It is the established rule in Massachusetts that if the option price is less than

25% of the original price of the leased property, then the lease is intended for security.

*See In re Access Equip., Inc.,* 62 B.R. 642, 646 (Bankr. D. Mass. 1986) ("[I]f the option

price amounts to 25% or more of the total list price, then the 'lease' is not one intended

for security."). Because the Option Price is clearly less than the above referenced

twenty- five (25) %, the Second Agreement and by analogy the First Agreement cannot

be characterized as a "lease" transaction.

HRD has established the facts to support its argument that both the First

Agreement and the Second Agreement or purchase and sale agreements and not

leases. As a result, title to the Second Equipment should be determined to be held by

HRD[7] and title to the First Equipment should also be determined to have previously

---

transportation fees.

[7] HRD has filed a Motion for Leave to File Second Amended Complaint which seeks to expand and clarify the relief sought pursuant to Count IV including a determination that title to the Second Equipment should be deemed to be

19

been held by HRD. IKON's cavalier destruction of the Oce 3100 and its conversion of

the value of the Oce 3165, be it the $4,500 IKON received or a different market value,

are both actionable pursuant to Count IV. As a result of this determination, IKON's rule

Motion for Summary Judgment as to Count IV must fail.

## X.    RESPONSE TO IKON'S ARGUMENT THAT HRD'S ALLEGATIONS OF FRAUD DO NOT PROVIDE A BASIS FOR A CHAPTER 93A CLAIM

HRD's through sections VI – VIII herein has established that HRD did not know

and could not have known that IKON committed fraud until after November 7, 2003 and

as a result IKON's argument concerning the application of the four year statute of

limitations contained in Mass. Gen. Laws ch. 260, § 5A is without merit. The accrual

date of a Chapter 93A claim is "'established by the same principles that govern the

determination of the underlying actions.'" Kozikowski v. Toll Bros., Inc., 246 F. Supp.2d

93, 98 (D. Mass. 2003) (citation omitted). A Chapter 93A claim based on fraud accrues

when the plaintiff knew or reasonably should have known about the alleged fraud. See

Geo. Knight & Co., Inc., 170 F.3d 210, 213 (1999).  As discussed above, the fraudulent

representation claim began to accrue no earlier than November 7, 2003 when HRD first

knew or reasonably should have known about the alleged fraud. Accordingly, this Court

must deny IKON's Motion for Summary Judgment as to HRD's Chapter 93A claims

since they are not time barred.

---

held by HRD.

## XI.    RESPONSE TO IKON'S ARGUMENT THAT HRD'S UNIFORM COMMERCIAL CLAIMS DO NOT QUALIFY AS UNFAIR OR DECEPTIVE ACTS OR PRACTICES

IKON argues that its gross violations of the Massachusetts Uniform Commercial Code are a mere breach of commercial law and as a result cannot be actionable under .Mass. Gen. Law ch. 93A. In order to succeed on a Chapter 93A claim, the plaintiff must prove that the defendant, while engaged in "trade or commerce", engaged in "[u]nfair methods of competition and unfair or deceptive acts or practices" and that as a result, the plaintiff suffered a loss of money or property. Mass. Gen. Laws ch. 93A, § 2(a); See Szalla v. Locke, 421 Mass. 448, 450-451 (1995).  A claim under Chapter 93A does not have to be premised on a violation of an independent common law or statutory duty, so long as the conduct complained of falls "'within at least the penumbra of some common-law, statutory, or other established concept of unfairness,'" or is "immoral, unethical, oppressive or unscrupulous'".  PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 595-96 (1975) (citations omitted).

Attached hereto and marked as Exhibit "4" are pages 177 and 178 of the transcript of the deposition of Jeffrey Snyder conducted on December 6, 2006 and pages 50 and 51 of the transcript of the deposition of Jeffrey Snyder conducted on December 18, 2006.  In response to the question posed on page 177 line 20 through 24, Jeffrey Snyder, on page 178 line 8 through 14, states that during his 10 year career at IKON, it has never provided monetary value for a customer when said customer surrenders equipment is part of the process of switching from one contract to another[8].

---

[8] What appears to be a double negative in Jeffrey Snyder's answer on page 178, line 13 was corrected during his third day of deposition testimony on April 30, 2007 and he clarified his answer to mean that no value was ever provided to a customer. A copy of the pages of said deposition are also included as part of Exhibit 4.

In response to the question posed on page 50, line 13 through 15, and 22 through 24 Jeffrey Snyder on page 50 lines 16 through 21 and page 51 line 1 highlights the total corporate disregard that IKON has for HRD's and any other customers' rights. On these pages, Jeffrey Snyder, IKON's primary Rule 30 (b)(6) designee, admits to IKON's brazen, constant and intentional disregard of not only HRD's rights under the Massachusetts Uniform Commercial Code but also every other unfortunate customer of IKON. Evidence of such intentional and outrageous commercial conduct is exactly the type of commercial behavior that the Legislature had in mind when it enacted Chapter 93A.

In *Patricia Kennedy & Co. v. Zam-Cul Enterprises, Inc., 830 F.Supp. 53, 59 (1993)*, the court said that a party does not need to allege a separate independent tort such as fraud or misappropriation under Chapter 93A, because "a claim under Chapter 93A rises or falls on its own merit." *Patricia Kennedy & Co. v. Zam-Cul Enters., Inc., 830 F.Supp. at 59*. Similarly, the federal appeals court recently said that under "basic Chapter 93A law [a] party is not exonerated from Chapter 93A liability because there has been no breach of contract." *NASCO v. Public Storage, Inc., 127 F.3d 148, 151 (1st Cir. 1997)* "This flexible set of guidelines as to what should be considered lawful or unlawful under c. 93A suggests that the Legislature intended the terms "unfair and deceptive' to grow and change with the times." *Nei v. Burley, 388 Mass. 307, 313, 446 N.E.2d 674, 678 (1983)*. For example, in *Schubach v. Household Finance Corp., 375 Mass. 133, 376 N.E.2d 140 (1978)*, the Court rejected the argument that an act or practice that is authorized by statute ""can never be an unfair or deceptive act or

22

practice." *Schubach v. Household Fin. Corp., 375 Mass. at 137, 376 N.E.2d at 142.* The Schubach Court held that a complaint alleging that the defendant finance company engaged in a practice of intentionally filing collection actions against consumers in inconvenient courts, with the purpose and effect of securing default judgments, stated a cause of action under G.L. c. 93A.

Accordingly, this Court must deny IKON's Motion for Summary Judgment as to the Chapter 93A claim because HRD has establish that there are material facts in dispute that support HRD's claim under Chapter 93A.

## V.  CONCLUSION

For all of the foregoing reasons, this Court must deny IKON's Motion for Summary Judgment since HRD has established that there disputes as to significant material facts and IKON is not entitled to a judgment as a matter of law.

Respectfully submitted this the 27th day of July, 2007

> HUMAN RESOURCE
> DEVELOPMENT PRESS, INC.
>
> /S/ David J. Noonan
> David J. Noonan, Esq.
> 228 Triangle Street
> Amherst, MA 01002
> Tel. No.: (413) 549-5491
> Fax No.: (413) 549-5156
> e-mail: david.noonan@verizon.net
> B.B.O. No. 373260

23

# EXHIBIT "1"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

)
HUMAN RESOURCE DEVELOPMENT )
PRESS, INC., )
    Plaintiff, )
)
v. )          3:05-CV-30068-KPN
)
IKON OFFICE SOLUTIONS, INC. )
& IOS CAPITAL, INC. d/b/a )
IKON FINANCIAL SERVICES, )
    Defendants. )
)

## AFFIDAVIT OF ROBERT CARKHUFF IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

The undersigned being duly sworn deposes and says:

1) My name is Robert Carkhuff and I reside at 15 Bayberry Lane, Amherst

Massachusetts. I am presently the publisher of the plaintiff, Human Resource

Development Press, Inc. ("HRD"). I have held this position for over 10 years. At

all times relevant to this dispute HRD has been a publisher of various human

resource training and development materials and has had significant need for

effective photocopying/printing equipment.

2) From 1996 to 2003 , I also served as the chief executive officer of HRD and in

this capacity had responsibility for negotiating contracts of any significant value.

3) On or about May 28, 1998 I executed, on behalf of HRD, an agreement with IKON Office Solutions, Inc. ("IKON") wherein two large commercial grade photocopiers were provided to HRD for its use ("First Agreement"). The photocopying equipment provided was an Oce 3100 and an Oce 3165 ("First Equipment"). As part of the negotiations of the First Agreement, the IKON made various representations that the First Equipment would provide HRD with a minimum of 250,000 copies per month and fully satisfy HRD's photocopying needs.

4) Almost immediately after HRD began using the First Equipment, the First Equipment began experiencing mechanical problems. The First Equipment was constantly failing and required continuous service calls from IKON. IKON would make repairs, tell HRD that the problem was cured but inevitably the equipment would break down again and again. Over the course of approximately 1 ½ years it became clear that, despite IKON'S representations and numerous attempts to repair the First Equipment, the First Equipment would never meet HRD's photocopying needs.

5) The two primary repair technicians of IKON who made the numerous service and repair calls for the First Equipment were Ken Stearns and Dave Connery. At some time in early 2000, one of these two service technicians told me that in order to obtain the high production photocopying capacity that HRD needed it would have to consider upgrading from the First Equipment to a higher quality

2

more capable photocopying and printing system. I stated that I would consider
almost anything to solve the problems that the First Equipment was causing for
our business.

6) At the time the technicians recommended that HRD would have to upgrade
from the First Equipment IKON'S primary sales representative for its HRD
account was Doug Thornton. Doug Thornton confirmed with me that I would
consider upgrading from the First Equipment and he indicated that there was
new photocopying/printing equipment manufactured by Canon that he believed
would solve HRD's photocopying and printing problems. He further stated that he
would introduce me to a person who specialized in handling this new Canon
equipment and that I would be dealing primarily with this new person. The person
he introduced me to was Jeffrey Snyder.

7) Jeffrey Snyder contacted me by phone some time in late March or early April
2000. He briefly explained to me some of the features of the Canon equipment
and asked for the opportunity to show us a demonstration of the proposed Canon
equipment which was being used by another business. He asked for the
opportunity to answer all of HRD's questions about how this canon equipment
would solve all of HRD's photocopying and printing problems. During this initial
phone conversation I asked him what would IKON do with the First Equipment
and the contract for the First Equipment. He told me that IKON "swapped" new
equipment for existing equipment all the time and that IKON would simply take

3

back the Oce 3100 and 3165 and substitute that equipment with the new proposed equipment. He further stated that HRD PRESS would have no further payment obligations for the First Equipment and that we would pay for the new equipment through a new contract.

8) After that phone conversation various members of HRD's staff began a several week process of trying to determine if the proposed new Canon equipment would solve HRD's photocopying and printing problems. My staff dealt primarily with Jeff Snyder in conducting this due diligence process.  Sometime in the end of May or the beginning of June 2000, Jeff Snyder and I had a conversation wherein Jeff asked if we were prepared to go forward with the new Canon equipment and whether he could prepare a contract proposal for my consideration. During that conversation he once again orally represented to me that that IKON was simply replacing and substituting the First Agreement with a new and totally different contract for the Cannon equipment and that HRD PRESS would have no further payment obligations for the First Equipment. These representations by Jeff Snyder that HRD would have no further payment obligations for the First Equipment were very important to me and I relied upon his representations and proceeded to allow IKON to develop and then make a proposal to me for a new substitute contract.

9) On or about June 14, 2000 Jeff Snyder, Doug Thornton and Al Maximino came to my office at HRD in order to discuss IKON's proposal for the new

4

contract. Jeff Snyder handed to me a document entitled "Executive Summary Prepared for HRD Press June 14, 2000", ( Attached hereto as Ex. "A"). He told me this document was a summary of the proposed terms for the new contract that he and I had previously discussed as referenced in paragraph 8 above. I asked him why the monthly payments were so much higher than the monthly payments we were making for the Oce 3100 and the Oce 3165. In response to my question he told me that A) the new Canon equipment was a significant upgrade from the Oce 3100 and the Oce 3165, had a far greater capacity and were much higher quality pieces of equipment than the Oce 3100 and the Oce 3165, B) there were four pieces of equipment instead of just two, C) the monthly payments included service, maintenance and supplies for 4 different machines for 3.6 million copies a year over a six-year period and D) the Canon equipment would solve all the production problems we were having and everyone my staff who had looked at the new equipment thought the same.

10) On June 19, 2000 I executed, on behalf of HRD, an agreement ("Second Agreement" with IKON for the provision of four different and new Canon photocopier/printing pieces of equipment ("Second Equipment"). Based on the representations previously made to me by Jeff Snyder, I believed the payments that HRD agreed to pay for the Second Equipment was solely for the Second Equipment and that HRD was not, through this Second Agreement, paying any obligations that may have  previously existed under the First Agreement. In November 2003 I determined that Jeff Snyder's representations to me were

5

materially false. I specifically relied upon Jeff Snyder's representations to me that HRD would have no financial obligations for the First Agreement if it signed an agreement for the Canon equipment. I would never have executed the agreement for the Canon equipment if I new that the agreement had hidden charges for the First Equipment. In light of all the facts, I believe that I was reasonable in relying upon Jeff Snyder's false representations of fact.

11)   As part of my preparation for preparing this affidavit I have reviewed the deposition transcript of Jeffrey Snyder dated December 6, 2006. I have identified certain portions of Jeff Snyder's testimony which are patently false. Specifically on page 116 lines 6 -23, (Snyder Depo., attached as Ex. "B") Jeff Snyder's answers to all of the questions asked on these lines are patently false and defy reason. The First Agreement that I executed had a total contract value of $293,448. While HRD was conducting its due diligence concerning the Second Equipment and prior to executing the Second Agreement I was fully aware that HRD was still obligated to pay IKON approximately $200,000 for the First Equipment. Jeff Snyder's testimony which claims that I did not ask a single question concerning how or if the First Agreement would be affected by the proposed new agreement is totally false. It is ludicrous and insulting to suggest that I would totally disregard a known $200,000 obligation pursuant to the First Agreement and blindly sign a new agreement without asking a single question about how the Second Agreement affected the First Agreement.

6

12) The Defendant's Memorandum asserts (Def. Mem. page 17-18) that because in July 2000 HRD was provided a it should have discovered sometime in 2000 the fraud that IKON perpetrated upon HRD. Shortly after the execution of the Second Agreement, HRD's accountants asked for tax accounting information concerning the value of the equipment that was the subject of the Second Agreement. I conveyed this request to IKON. IKON was very reluctant to provide any financial information concerning the Second Equipment. After several requests, IKON finally provided the document entitled "Accounting Value Statement". This document did not provide any explanation of the numbers contained on it nor did it explain or relate to any of the terms and conditions of the Second Agreement. I contacted Jeffrey Snyder and requested a further explanation of the figures contained on the Accounting Value Statement. Jeffrey Snyder told me that IKON would not provide any further explanation of the Accounting Value Statement because it was contrary to IKON's policy. HRD's requested this information solely for tax accounting purposes and at no time prior to the fall of 2003 did HRD have reason to suspect that Jeffrey Snyder and IKON had made materially false representations to HRD in order to induce it to execute the Second Agreement.

Signed under the pains and penalties of perjury this the 24th day of July, 2007.

Robert Carkhuff

7

EXHIBIT  "A"

Executive Summary
Prepared For
HRD Press
June 14, 2000

**EXHIBIT**

**3**

Snyder 12/6/06

## Objective:

Provide HRD Press a high volume digital production system centering on the Canon image Runner 110. The goal is to deliver a program consisting of a sound installation, operation plan and financial program to demonstrate the IKON commitment to the ongoing partnership with HRD Press.

## -Equipment Summary:

Canon ImageRunner 110 Network Printer
    -Second Paper Module
    -High Capacity Stacker

Canon ImageRunner 330 Multifunction Device
    -50 Page Automatic Document Feeder
    -Dual Line Fax Board
    -Multi PDL (Postscript III / PCL)
    -Three Position Stapling Finisher C1
    -Paperdeck C1
    -SCSI Scan Board

Epson 8000 ColorPage Printer System
    -192MB RAM
    -RS6000 Fiery Server w/64MB RAM

Canon IR210 Multifunctional Device
Automatic Document Feeder
G3 Fax Board
Cabinet

## -Implementation Considerations:

*Training will be provided to HRD Personnel on the IR110 system in Glastonbury upto two weeks prior to the system going on-line.

-IKON will schedule the scanning of hardcopy documents in Glastonbury upon approval to minmize impact on the operations of HRD.

*The de-installation / installation process will consist of a three to four day period, Overflow copying will be provided to HRD Press from the IKON Western Mass office during the installation period to ensure a minimized impact on current workflow.

Site Survey Completed by AL Maximino (District Manager), Ron Bushey and Kenneth Stearns
    -Review Image Runner 110 site preparation guidelines:
        Entrance to system site        Electrical to be installed
        ⊗Cabling to IR330 & EPSON 8000    Service Clearances-Machine Placements
        Flooring Requirments        phone

Installation and training on the ImageRunner 330, Epson 8000, Canon IR210
The above equipment will be delivered within one week upon order approval from IOS Capital

Move of the Canon 6085 to lower level

De-Installation of the OCE 3165 and 3100

Installation of the IR110 system        3 Days
    -Application testing
    -Install of drivers onto MAC & PC workstations

System training & quarterly account reviews provided on an ongoing basis

IOS00066

## Financial Considerations

A. Financial / Service Considerations

  \*For the first thirty days from the installation date HRD press will only be responsible for service consisting of a monthly base $ 500.00 and $ 0.0087 for IR110 impressions, $ 0.0158 for IR330 Impressions.

  -Freight, Delivery & Setup Fee of $ 2,500.00 due upon order.

B. Financial Summary

  -Ikon Office Solutions Capital Equipment Variable Lease Payment Progam

| Equipment | Month 1-36 | Months 36-72 |
|-----------|-----------|--------------|
| As proposed Above | $ 8,809.00 | $ 11,876.00 |
| Includes 300,000 impressions. | | |
| Additional Impressions @ $ 0.00783 | | |

Per Impression Cost @ 500K is  $ 0.0208

  \*The above is a pooled service / supply program , including 100% service & supplies (excluding paper and staple spools). Impressions on the will be billed monthly in arrears based on actual combined useage.

  \*The EPSON 8000 is a client serviceable printer, HRD press is responsible for consumables seperately.

IOS00067

EXHIBIT "B"

1      you pre-printed 30 of them, that's now a loss value

2      of inventory.  So they wanted to get to a true print

3      on demand scenario with the best equipment to rival

4      offset press at a price point well below offset

5      press, and they did get that in return.

6           Q.    Did you discuss with HRD Press what was

7      going to happen with the first equipment agreement?

8           A.    No.  They never posed one question with

9      regards to it.

10          Q.    Did you have any discussions whatsoever

11     with HRD Press as to what was going to happen with

12     the first contract?

13          A.    No.

14          Q.    No?

15          A.    No.

16          Q.    Was there any discussion that this -- that

17     the second contract would be a substitute for the

18     first contract?

19          A.    No.

20          Q.    Why is it that there is no mention in the

21     executive summary about what happens with the first

22     contract?

23          A.    Because it was never asked.

24          Q.    Well, this is your document that IKON

EXHIBIT  "2"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HUMAN RESOURCE DEVELOPMENT ) <br> PRESS, INC., ) <br>　　　Plaintiff, ) <br> ) <br> v. ) <br> ) <br> IKON OFFICE SOLUTIONS, INC. ) <br> & IOS CAPITAL, INC. d/b/a ) <br> IKON FINANCIAL SERVICES, ) <br>　　　Defendants. ) | 3:05-CV-30068-KPN |

## AFFIDAVIT OF GREGORY CARKHUFF IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

The undersigned being duly sworn deposes and says:

1) My name is Gregory Carkhuff and I reside at 30 Overlook Drive, Amherst, Massachusetts. I am the CEO of the plaintiff, Human Resource Development Press, Inc. ("HRD"). I have held this position since September 2003. At all times relevant to this dispute HRD has been a publisher of various human resource training and development materials and has had significant need for effective photocopying/printing equipment.

2) As part of my preparation for preparing this affidavit I have reviewed the transcripts of the deposition of Jeffrey Snyder[1] dated December 6, 2006, December 18, 2006 and April 30, 2007, the transcript of the deposition of

---

[1] Jeffrey Snyder was designated by IKON as one of its Rule 30 (b)(6) designees.

Anthony Maturo[2] dated April 30, 2007 and the transcript of the deposition of

Daniel Feldmann[3] dated June 26, 2007 ("collectively Reviewed Transcripts"). I

have identified certain pages of said Reviewed Transcripts and attached copies

of the same as exhibits to my affidavit and will make reference to them

throughout this affidavit.

3) I have also reviewed IKON's Memorandum of Law in Support of Defendant's

Motion for Summary Judgment and the exhibits attached thereto ("Defendant's

Memorandum"). After reviewing the Defendant's Memorandum and the

Reviewed Transcripts I have determined that the Defendant, in an attempt to

avoid responsibility for its actions, has made false and misleading statements

and failed to fully disclose all the facts established by the Defendant's own

witnesses. Through this affidavit I will provide facts which specifically rebut those

asserted by IKON and rebut the misleading implications of the argument

contained in the Defendant's Memorandum.

4) On page 120 of the December 6, 2006 transcript of the deposition of Jeffrey

Snyder (Snyder Depo., attached as Ex. "A", page 1) Jeffrey Snyder admits that

on June 14, 2000, when IKON provided an "Executive Summary" outlining the

proposed terms of the new contract (Def. Mem. page 4) it did not disclose the

fact that HRD would, through the new agreement, be charged for the remaining

balance due under the First Agreement. According to Jeffrey Snyder, IKON did

---

[2] Anthony Maturo was designated by IKON as one of its Rule 30 (b)(6) designees.
[3] Daniel Feldmann was designated by IKON as one of its Rule 30 (b)(6) designees.

2

not disclose this critical fact because IKON wanted to present the financial terms in the same format that it would be presented under the Second Agreement. This is an admission that IKON knew that the Second Agreement would not disclose the hidden charges for the First Agreement and in order to perpetrate the fraud IKON drafted the Executive Summary in a manner to hide a material fact in the same manner that the Second Agreement would hide a material fact.

5)  On page 131 of the December 6, 2006 transcript of the deposition of Jeffrey Snyder (Snyder Depo., attached as Ex. "A", page 2) Jeffrey Snyder admits that the Second Agreement itself does not disclose to HRD that it is making payments for the First Agreement through the Second Agreement.

6)  During Jeffrey Snyder's deposition on April 30, 2007 he reviewed a document, deemed confidential by IKON, which was marked as Exhibit 23 for the purposes of the deposition. (Attached as Ex. "B"). At the bottom of this Exhibit "B", the Court can see footnotes one of which clearly discloses that somewhere through the monthly payments referenced above the footnotes, HRD would be paying off the financial obligations for the Oce 3100 and 3165. A comparison of Exhibit "B" to the actual final addendum to the Second Agreement ("Exhibit B" to First Amended Complaint) discloses that but for the addition of signature lines and the deletion of said footnotes the two documents are exactly the same. On page 70 and 71 of the April 30th, 2007 transcript of the deposition of Jeffrey Snyder, (Snyder Depo., attached as Ex. "C", page 1 & 2), Jeffrey Snyder admits that

3

IKON deleted these footnotes and they did not appear on the actual addendum to the Second Agreement.

7)  On page 22 of the April 30, 2007 transcript of the deposition of Jeffrey Snyder (Snyder Depo., attached as Ex. "C", page 3), Jeffrey Snyder admits that there is no disclosure in the Second Agreement of the dollar amount imposed for any of the service and supply charges for the Second Equipment. As a result of this failure to disclose, HRD had no way of knowing what it was being charged for service and supplies under the Second Agreement.

8)  On page 54 of the April 30, 2007 transcript of the deposition of Jeffrey Snyder (Snyder Depo., attached as Ex. "C", page 4), Jeffrey Snyder admits that $119,996 of the cost for the First Agreement was rolled into the Second Agreement.

9)  On page 124 of the December 6, 2006 transcript of the deposition of Jeffrey Snyder (Snyder Depo., attached as Ex. C, page 5), Jeffrey Snyder admits that in 2000, at the time the Second Agreement was executed, IKON did not even have a single piece of paper that reflected the calculation and insertion of the remaining financial obligations under the First Agreement into the Second Agreement.

10)  On page 59 of the April 30, 2007 transcript of the deposition of Jeffrey Snyder (Snyder Depo., attached as Ex. "C", page 6), Jeffrey Snyder admits that even he could not calculate the lease rate factor (i.e. the interest rate) imposed on the $119,000 of charges for the First Agreement which were rolled in the Second Agreement.

11)  On page 25 - 27 of the December 18, 2006 transcript of the deposition of Jeffrey Snyder (Snyder Depo., attached as Ex. "C", pages 7, 8 & 9), Jeffrey Snyder admits that there is not a single document that rebuts HRD's allegation contained in paragraph 23 of its Amended Complaint that IKON represented to HRD that IKON was simply replacing and substituting the First Agreement with the Second Agreement and that HRD would have no further payment obligations for the First Equipment.

12)  On page 59 of the December 18, 2006 transcript of the deposition of Jeffrey Snyder (Snyder Depo., attached as Ex. "C", page 10), Jeffrey Snyder admits there is not a single piece of paper that IKON gives to a customer, such as HRD, which discloses the legal effect of substituting one contract for another contract. I believe that the fact that IKON has not created such a document disclosing the legal effect of substituting one contract for another is clear evidence that IKON has a pattern and practice of not disclosing the fact that it is "rolling up" outstanding charges for any existing contract into any substitute contract.

13)  The Defendant's Memorandum asserts that "IKON Did Not Make Any False Statements of Material Fact That Induced HRD into the Second Agreement". HRD, through the affidavit of my brother Robert Carkhuff, has specifically described how and when IKON, through its employee Jeffrey Snyder, made material misrepresentations of fact which directly induced HRD to execute what has been designated the Second Agreement. By reading portions of the Reviewed Transcripts the Court will discover why both IKON and Jeffrey Snyder were motivated to make such false material misrepresentations.

14)  On page 15 of the April 30, 2007 transcript of the deposition of Jeffrey Snyder (Snyder Depo., attached as Ex. "D", page 1), Jeffrey Snyder admits that he personally was paid a commission in the amount of $13,292 as result of HRD's execution of the Second Agreement. On page 67 and 68 of the same transcript (Snyder Depo., attached as Ex. "D", page 2 & 3), Jeffrey Snyder explains that Ikon Office Solutions Inc., his employer which was a separate and distinct entity from IOS Capital, Inc., made a profit of between $105,000 and $110,000 as a result of HRD's execution of the Second Agreement. HRD has no information as to what amount of profit IOS Capital, Inc. made as a result of HRD's execution of the Second Agreement. It is my opinion that Jeffrey Snyder and IKON were motivated to make materially false representations to HRD because of the significant payments that both Jeffrey Snyder and IKON received as a result of HRD's execution of the Second Agreement

6

15) In September 2003 I became the CEO of HRD. I assumed this position because HRD was experiencing financial difficulties. I immediately began to review all of the highest re-occurring expenses that the company had. One of the highest recurring expenses was the monthly payments to IKON. I began to ask Glenn Robbins, our IKON account representative, to provide a detailed explanation of the monthly payments required under the Second Agreement. My prime focus was to determine what dollar amount HRD was paying for service and supplies in order to see if HRD could eliminate some portion of the monthly charges and help the company's cash flow position. At the time I made these requests I had no reason to suspect that IKON committed fraud by illegally inducing HRD to execute the Second Agreement.

16) Despite my numerous requests Glenn Robbins and IKON refused to provide any detailed explanation of the component parts of the monthly payments required by the Second Agreement. On October 29th, 2003 during my initial meeting with Glenn Robbins he would not agree to provide any breakdown of the service and supply charges in the Second Agreement and stated that it didn't matter any way because HRD had received a great price on the service and supply component and IKON would never reduce those charges. As a result, in early November 2003, I began to conduct my own independent research concerning photocopier/printer equipment contracts. On November 7, 2003 I met with Glenn Robbins and his supervisor Paul Lee and I told them that I thought HRD was "being ripped off" because IKON would not disclose any information

7

concerning the pricing of the monthly payments under the Second Agreement. It was only as a result of my threatening comments that, Paul Lee, Glenn Robbins' supervisor agreed to provide a financial breakdown of the monthly charges under the Second Agreement. Contrary to what is stated in the Defendant's Memorandum, the Executive Summary dated November 7, 2003 (Exhibit "D", HRD Amended Complaint) which disclosed IKON's fraud was provided to me by e-mail after my meeting with Glenn Robbins and Paul Lee on November 7, 2003.

17)  A careful review of the affidavit of Glenn Robbins will establish IKON's "cover-up" mentality and refusal to disclose information until absolutely forced to do so. In paragraph 10 of his affidavit, Glenn Robbins discloses that before the scheduled meeting on November 7, 2003 he had actually prepared the document entitled "Executive Financial Summary" dated November 7, 2003. (Robbins Aff. ¶ 10) Even though IKON had already prepared the Executive Financial Summary it did not present the document to me during the meeting on November 7, 2003. It was only after Glenn Robbin's supervisor, Paul Lee, Glenn Robbins supervisor realized the nature of my allegations and my demands for this information that it was subsequently released to me. Prior to the date HRD actually received the "Executive Financial Summary" dated November 7, 2003, HRD had no knowledge, and without IKON's cooperation or disclosure could not have obtained said knowledge, that IKON was collecting payments for the First Agreement through the Second Agreement.

8

18) HRD is a family owned corporation. The shareholders of the Company are my parents. My older brother Robert Carkhuff operated and managed HRD for several years before I assumed the position of chief executive officer in August 2003. When the company began experiencing financial difficulties my parents decided that I, the younger brother, should assume management responsibilities in an attempt to make the business profitable. This engendered hard feelings between myself and my brother Robert. As a result, there was virtually no communication between myself and my brother for more than a year and a half. In November 2003 when IKON finally disclosed, through the Executive Summary (Exhibit "D", HRD Amended Complaint), that it was collecting payments for the First Agreement through the Second Agreement, I did not share this information with my brother due to our almost total lack of communication. It was not until HRD's attorney was preparing the complaint filed in this civil action that he and I communicated directly with my brother Robert and we simultaneously learned that he and HRD had been fraudulently induced to enter into the Second Agreement. As a result, the argument advanced by the Defendant's Memorandum, that HRD's failure to immediately assert a fraud in the inducement claim is evidence that HRD knew from the very beginning that it was obligating itself to pay for the balance of the First Agreement through the Second Agreement is totally without factual merit.

19) The Defendant's Memorandum also asserts (Def. Mem. page 17-18) that because in July 2000 HRD was provided a document entitled "Accounting Value

9

Statement" it should have discovered sometime in 2000 the fraud that IKON's perpetrated upon HRD. Through paragraphs 4-17 above I have referenced the numerous facts which establish IKON's cold, calculated perpetration of fraud against HRD and constant refusal to provide information. Additionally, these paragraphs and paragraph 21 herein establish that IKON's own employees, even today, do not understand the math that was behind the transaction that resulted in HRD's execution of the Second Agreement.

20)  Subsequent to executing the Second Agreement, HRD's accountants requested tax accounting information concerning the Second Agreement that they could use in preparing HRD's next corporate tax return. HRD requested IKON for this information. IKON provided a document entitled Accounting Value Statement. A review of this document (Attached as Ex. "E", page 1) discloses that it does not define what the "accounting value" figures are, does not in any way relate to the monthly payments referenced in the Second Agreement, does not reference service and supply charges, nor does it reference the lease rate factor (i.e. interest charges) for any of the charges.  Subsequent to receiving this Accounting Value Statement HRD requested an explanation of the figures contained on the Accounting Value Statement. As established through the accompanying affidavit of Robert Carkhuff, IKON steadfastly refused to provide any additional information concerning the Accounting Value Statement of.

21) On April 30, 2007, HRD took the deposition of one Anthony Maturo[4]. On page 5 of the transcript of his deposition Mr. Maturo explained that he is the area Director of Financial Operations for IKON and that he is responsible for all financial transactions that take place in his geographical area of responsibility. (Maturo Depo., attached as Ex. "F", page 1). Even though Mr. Maturo is responsible for all financial transactions that take place in a territory consisting of two whole states and various counties in 2 other states, he had no knowledge of what the Accounting Value Statement prepared by Ikon and delivered to HRD in July 2000 actually was or meant. On page 93 and 94 of the transcript of his deposition (Maturo Depo., attached as Ex. "F", pages 2 & 3), Mr. Maturo also discloses that IKON expects a profit margin of between 40 and 50% on the service component of any contract. IKON never disclosed to HRD at any time prior to this deposition any of its profit margins for providing the equipment or the service and supplies to HRD.

22) Pursuant to the Second Agreement, HRD paid to have the right to make 3.6 million copies per year through the Second Equipment. The service and supply charges for all these copies were hidden in the monthly payments and not disclosed to HRD until it received the Executive Summary (Exhibit "D", HRD Amended Complaint)in November of 2003. If when reviewing the Accounting Value Statement, HRD made an estimate of the service and supply charges it was paying through the monthly payments and if that estimate was off by .01 per copy that would equate to a $36,000 difference per year and over the six year

---

[4] Anthony Maturo was designated by IKON as one of its Rule 30 (b)(6) designee's.

11

term of the Second Agreement that would equate to $216,000. The principal amount of the charges for the First Agreement which were rolled into the Second Agreement was $119,996. HRD did not know what service and supply charges were included in the monthly payments, nor did have any way of knowing or determining IKON's own costs for those services, nor did it know, until June 2007, that IKON had a 40-50% markup on these services.  As a result, I believe that IKON's argument that HRD should have somehow have performed mathematical calculations in 2000 and determined that IKON had perpetrated a fraud is, in light of all the facts, totally without merit.

23)  The Accounting Value Statement does not in any way disclose that IKON, by fraud and deceit, misled HRD into executing the Second Agreement. No reasonable review of this document can lead to any other conclusion.

24)  On page 97 and 98 of the December 6, 2006 transcript of the deposition of Jeffrey Snyder (Snyder Depo., attached as Ex. G, page 1 & 2), Jeffrey Snyder admits that subsequent to HRD's execution of the Second Agreement, IKON simply destroyed HRD's Oce 3100. He also admits that IKON received only $4,500 for the sale of the Oce 3165. IKON has admitted that it did not credit or provide HRD with any value IKON received for the resale or disposition of the Oce 3100 and Oce 3165. ( Defs. answer to First Am, Com. ¶ 28).

25) On page 6 of the June 26, 2007 transcript of the deposition of Daniel Feldman (Feldmann Depo., attached as Ex. "H", page 1), Mr. Feldmann discloses that he is the senior manager of sales operations for leasing for IKON. On pages 12 and 13 of the same transcript (Feldmann Depo., attached as Ex. "H", pages 2 & 3), Mr. Feldmann discloses that when the First Agreement was executed in 1998 IKON internally determined that the "residual value" the Oce 3100 and 3165 would have at the end of the five year contract term was respectively $11,820 and $6,330. Even though IKON itself had determined that as of May 2003 the Oce 3100 would have a value of $11,820, as early as September 2000 IKON simply destroyed that piece of equipment.

26) Attached hereto and marked as Exhibit "I" is an e-mail from HRD's counsel to IKON's counsel which provided advance notice of the questions which would be asked of Daniel Feldmann during his deposition ("Feldmann Questions"). On page 14 & 15 of the June 26, 2007 transcript of the deposition of Daniel Feldmann (Feldmann Depo., attached as Ex. "J", pages 1 & 2), in response to question No. 17 and 18 of the Feldmann Questions, Daniel Feldmann disclosed that if HRD had been unable to surrender the First Equipment July of 2000, HRD would still have been responsible for paying the total dollar amount due under the First Agreement (approximately $119,000) plus the fair market value at that point in time.

27) On page 26 and 27 of the transcript of the April 30, 2007 deposition of Anthony Maturo (Maturo Depo., attached as Ex. "K", pages 1 & 2), Mr. Maturo discloses that in 2003, the year that the term of the First Agreement ended, IKON would not have even attempted to market either the Oce 3100 and/or 3165 because they were obsolete.

28) IKON's admission through Mr. Maturo (¶ 27 infra.) that IKON would not even attempt to market the Oce 3100 and/or 3165 in 2003, is in admission that those pieces of equipment had no useful economic life as of May 2003. IKON's destruction of the Oce 3100 in September 2000, is an admission that this piece of equipment had no useful economic life as of May 2003, the end of the term of the First Agreement. IKON's determination that the Oce 3165 would have a residual value of $6,334 in May 2003 but yet accepted only $4, 500 for this equipment in September 2000, is a factual admission that this piece of equipment had no useful economic life as of May 2003. IKON's insistence that, despite overwhelming evidence that both the Oce 3100 and 3165 in June 2000 had virtually no value, it would still seek to collect from HRD the approximately $119,000 that was still due and owing under the First Agreement is a factual admission of an unfair and deceptive trade practice .

29) IKON pursuant to the Executive Summary (Exhibit "D", HRD Amended Complaint) gave HRD and the opportunity to purchase the Second Equipment for

14

a specified price. I have reviewed the terms and conditions of the First Agreement with those of the Second Agreement and the terms and conditions of these agreements are virtually the same. Both are similar in that they do not prohibit the "lessee" from purchasing the equipment during or at the end of the lease. Additionally, they are similar in that neither prevents IKON from offering to sell the equipment to the "lessee" during or at the end of the lease.

Signed under the pains and penalties of perjury this the 24th day of July, 2007.

Gregory Carkhuff

15

# EXHIBIT "A"

# PAGE 1

1      looked at this agreement, do you recall whether Bob

2      Carkhuff asked you any questions about what would

3      happen under the first agreement when the new, second

4      agreement, was signed?

5          A.   No.  And if he did, we would have answered

6      all questions in detail prior to our second meeting

7      when he signed the paperwork.

8          Q.   In the executive summary, Exhibit 3, why

9      didn't IKON break out within the financial

10     consideration portion how much of the $8,809 per

11     month for the first 36 months was related to the

12     remaining balance due under the first agreement?

13         A.   We presented the way the financial

14     agreements would have been presented to him and

15     executed after this fact.  If he would have asked for

16     line itemization, we would have provided it to Mr.

17     Carkhuff.

18         Q.   So you presented this in this fashion

19     because that's the way it was going to be presented

20     in the actual agreement?

21         A.   Sure.  Clients like to see the numbers that

22     are going to match the proposal to the agreement 95

23     percent of the time in my business, absolutely.

24         Q.   Have you, for any other clients, customers

EXHIBIT "A"

PAGE 2

```
 1        A.   No, I do not see specific --

 2        Q.   Well, do you see anything in general?

 3        A.    I don't believe I see anything that

 4   relates.   Then again, I'm not -- I don't think I

 5   qualify to understand all the language on this

 6   agreement.

 7        Q.   Well, were you chosen by IKON to be the

 8   designated Rule 30(b)(6) deponent here today?

 9        A.   Yes, I was.

10        Q.   Who made that decision?

11             MR. BOSKIEWICZ:  Objection.  I think

12        that's privileged.  It's discussions

13        between --

14        Q.   (By Mr. Noonan)  What supervisor -- did a

15   supervisor of you decide that you should be the Rule

16   30(b)(6) deponent?

17        A.    I really don't -- no.  I don't know.  I

18   basically was contacted by Brett one day saying, "I'd

19   like to see if you could be involved with" --

20             MR. BOSKIEWICZ:  Objection.  Any

21        conversations between us are privileged

22             THE WITNESS:  Oh, I'm sorry.

23        Q.   (By Mr. Noonan)  Did you have any

24   communications with anyone in IKON about your being
```

EXHIBIT "B"

CONFIDENTIAL

**Addendum-A2 to IOS Lease # 00787**
**Variable Lease Payment Addendum**

EXHIBIT ___23___
_Snyder_
_4-30-07_
**S. ROY, RPR**

*-Customer Agrees that the lease payments will vary as indicated below:*

| Step | Month | Lease Payment |
|------|-------|---------------|
| 1 | 1-36 | $ 8,809.00 |
| 2 | 37-72 | $ 11,876.00 |

Includes all of the equipment listed on the previous page.

Includes dealer payoff of 3100 & 3165, deliver back to the sdc?

The above figures include 300k minimum with overage of 0.00783, they expectro run 500k per month. Service is whole on ir330 & ir210 and at a 10% drop on the ir110. The total Base monthly service fee is $ 3071.66 or 3071.66/300,000=0.01024

Less % of a step than the current agreement.

EXHIBIT  "C"

PAGE 1 & 2

```
 1      actual cost of -- acquisition cost?

 2          A.   Agreed.  What I was going to do was just

 3      take the 105 against -- well, no, that won't work.

 4          Q.   Well, never mind.  I'm wasting your time.

 5      Someone is coming back to further testify about

 6      actual acquisition cost.

 7          A.   Oh, okay.

 8          Q.   I'm going to show you Exhibit No. 23.

 9      What's the Bates No., please?

10          A.   00239.

11          Q.   In the third to the last paragraph from the

12      bottom up, do you see the words "Includes dealer

13      payoff"?

14          A.   Yes.

15          Q.   Who is the dealer?  Who is "dealer"

16      referencing?

17          A.   IKON.

18          Q.   Okay.  Why is IKON called -- when you say

19      IKON, you're talking about IKON IOS Capital?

20          A.   Yes.

21          Q.   IOS Capital?

22          A.   Sure.

23          Q.   And on the same line someone has the words

24      "deliver back to the sdc" --
```

```
 1          A.    Shared distribution center; that's our
 2    warehouse.  That's where equipment is delivered from
 3    and taken out of the field and delivered back to.
 4    It's a central warehouse.
 5          Q.    Is it fair to say that these -- we'll call
 6    them four footnotes don't appear on the actual
 7    addendum to the second agreement?  You have that in
 8    front of you.  I think it's Exhibit No. 5.
 9          A.    Yes, right here.
10          This is probably before we even proposed
11    the final payment to them.  This is something that I
12    was doing internally to get a clarification of
13    something on.
14          Q.    The last line here, "Less percent of a step
15    than the current agreement."  What does that mean?
16          A.    Well, if you look at the current agreement
17    and you divide the first payment by the second
18    payment, you get a percentage.
19          Q.    When you say the first agreement, you're
20    referring to the OCEs?
21          A.    The OCE agreement, yes.  So -- actually, I
22    had that exhibit in front of me.  But, basically, if
23    you -- oh, here it is.
24          Q.    What are you referring to?
```

EXHIBIT "C"

PAGE 3

1       Q.   Do you know why there is no specific
2    breakout within those figures of how much is being
3    charged for service?

4       A.   The type of agreement this is is copy
5    management; it's looking for a total payment.  And
6    also, I think I used past precedence in doing the
7    paperwork for HRD, meaning they've had similar
8    agreements in the past and it was just all under one
9    dollar amount, very clean and easy to understand
10   and/or administrate, and so I followed past
11   precedence from prior engagement with HRD.

12      Q.   In any of the other deals you were involved
13   in does IKON ever break out within the monthly
14   payment that's being charged to the customer how much
15   is actually being charged for service?

16      A.   Well, we have several ways of doing
17   business at IKON.  This happens to be an all-combined
18   program agreement.  Clients can lease the equipment
19   on one agreement and then pay service on another.
20   Also, in the means of proposing up to this point in
21   time, things could have been separate or they
22   couldn't have, showing the client where the breakdown
23   was, but then for simplicity purposes it probably
24   would have been just done as I did here under one

EXHIBIT "C"

PAGE 4

```
 1    confirm that the dollar amount that was rolled in

 2    from the first contract into the second contract that

 3    my client paid for was $119,996?

 4         A.   Yeah, we could prove that.

 5         Q.   Well, you don't have to prove it, I just --

 6    from looking at the Lease Approval Form, Exhibit No.

 7    29, is that the dollar amount that you believe was

 8    rolled into the second contract?

 9         A.   Yes.

10         Q.   Now, is it fair to say that what we don't

11    have, after your review of all the confidential

12    documents, that we do not have a specific break-out

13    that shows what the interest cost was to HRD for

14    financing through the second contract the 119,996

15    that we just referenced?

16         A.   No, she took the old money --

17         Q.   No, just -- we don't have any piece of

18    paper that shows the interest charge on that 119

19    figure, is that true?

20         A.   No, we don't.

21         Q.   Okay.  Is the closest thing we have to show

22    what the interest charge for the dollar amount that

23    was due and owing under the OCEs contained in Exhibit

24    No. 19?
```

EXHIBIT "C"

PAGE 5

1    In that credit approval process you denote what the

2    equipment payments are.  Or in the credit approval

3    from them comes back with the payments and it lists,

4    as a line item, a dollar amount for the trade-up

5    amount, but it doesn't reflect what the trade-up

6    amount, how it is broken out in the monthly payments

7    above.

8         Q.   So, is there no piece of paper that IKON

9    has that actually reflects the calculation and

10   insertion of the remaining obligation under the first

11   contract into the monthly payments for the second

12   contract?

13                  MR. BOSKIEWICZ:  Objection to form.

14        A.   At the time of the transaction of the

15   transaction year 2000, no.

16        Q.   Is there today?

17        A.   In the materials --

18        Q.   In what materials?

19        A.   Oh, in the exhibits, the Bates stamped

20   exhibits, there is an executive summary provided to

21   Mr. Carkhuff in a meeting from Glenn Robbins, Paul

22   Lee, and Joe McGraw which provided a breakdown of

23   what the previous agreement value was in the new

24   agreement.

# EXHIBIT "C"

# PAGE 6

```
 1   agreement.
 2        Q.   If you were given access to IKON's computer
 3   and a calculator and all these documents, could you
 4   figure out for me what the lease rate factor was
 5   imposed on the 119,000-odd figure that was due and
 6   owing under the OCE contract?
 7        A.   No.
 8        Q.   You could not?  You personally couldn't do
 9   that?
10        A.   No.
11        Q.   Who could?
12        A.   An IKON leasing person.
13        Q.   Give me the name of an IKON leasing person
14   that you're certain can do that mathematical
15   calculation.
16        A.   Well, Kate's now gone, but Michael Fusaro.
17        Q.   Is he still employed?
18        A.   I don't know if G.E. hired him, but I think
19   he's still working -- whether he works for G.E. or
20   us, he represents the IKON account.
21        Q.   Where is he located, where's his business
22   address?
23        A.   Last time I knew -- he took a promotion a
24   couple months ago, but I want to -- I still think he
```

EXHIBIT "C"

PAGE 7, 8 &9

1       A.    Yes, sir.

2       Q.    Tell me what specific words -- I only want

3    you to talk about the words that are on this document

4    that provides a fact that rebuts the second sentence

5    of paragraph 23 of the Amended Complaint.

6       A.    In the wording of the message on Exhibit 8,

7    "But wanted to make sure you are all set for the

8    demo" or product demonstration "this Thursday."

9       Q.    Are there any other words that rebut that

10   second sentence in paragraph 23?

11      A.    Sure.   "Please bring pdf files to be

12   printed with fonts and images embedded, both color

13   and black and white --

14      Q.    I want you to stop and please re-read the

15   second sentence of paragraph 23 in the Amended

16   Complaint.   Please read that out loud.

17      A.    "IKON represented to HRD that IKON was

18   simply replacing and substituting the First Agreement

19   with the Second Agreement and that HRD Press would

20   have no further payment obligations for the First

21   Equipment."

22      Q.    Explain to me how any of the words you just

23   read from Exhibit 8 rebut that specific allegation

24   contained in paragraph 23 of the Complaint?

1           A.    That entire paragraph rebuts "was simply

2      replacing and substituting the First Agreement with

3      the Second."  There was nothing simple about it.

4           Q.    Where does Exhibit 8 even reference the

5      first agreement or the second agreement?

6           A.    It references the statement "IKON was

7      simply replacing and substituting the First

8      Agreement."

9           Q.    No, please answer the questions I'm asking.

10     Where on Exhibit 8 can you point to me that Exhibit 8

11     refers to either the first agreement or the second

12     agreement?

13          A.    The entire paragraph rebuts the beginning

14     of that sentence which is vaguely --

15          Q.    No, please, Jeff, it will take all day.

16     Focus on my question.  If you don't understand the

17     question, and I sometimes pose bad questions, I'll

18     rephrase it.  Listen to my question, Jeff.

19          A.    Yes.

20          Q.    Please tell me what words on Exhibit 8

21     refer to either the first agreement or the second

22     agreement.

23          A.    None.

24          Q.    Okay.  Is there anything on Exhibit 8 that

```
 1    rebuts the specific allegation that IKON represented

 2    to HRD Press that it would have no further payment

 3    obligations for the first equipment?

 4         A.   None.

 5         Q.   Is there any other document that you have

 6    come across in all of your preparation for testifying

 7    here today that you found which contains the fact

 8    that rebuts the allegation that HRD Press has made in

 9    paragraph 23 that HRD Press would have no further

10    payment obligations for the first equipment?

11         A.   None.

12         Q.   Okay, Jeff, if you would go back to the

13    Amended Complaint and please read out loud paragraph

14    28.

15         A.   "IKON has not credited HRD Press for any

16    value IKON may have later received from the resale or

17    other disposition of the First Equipment."

18         Q.   Do you know of any facts that rebut that

19    allegation contained in paragraph 28?

20              MR. BOSKIEWICZ:  I'm going to --

21         well, I guess he can answer the question

22         but the -- I'm looking at paragraph 28 and the

23         answer.  I think IKON admitted that.

24              MR. NOONAN:  Oh, I'm sorry.  I'm
```

# EXHIBIT "C"

# PAGE 10

```
 1         A.    I would like written confirmation to tell

 2    my accounting department that invoice whatever, the

 3    next time the invoice comes in for old equipment,

 4    that the new agreement covers that and not to pay the

 5    old.

 6         Q.    Okay.

 7         A.    Because sometimes the people signing the

 8    agreements aren't the financial folks paying for

 9    them, so, they want to make sure the correct invoice

10    is being paid.

11         Q.    Is there any piece of paper that is

12    routinely given to a party like HRD when it is moving

13    from one contract to the next that says anything

14    about what effect the first agreement has?

15         A.    No.

16               MR. BOSKIEWICZ:  Objection to form.

17         Q.    (By Mr. Noonan)  There is none?

18         A.    No.

19         Q.    Did anyone at HRD ask IKON for a piece of

20    paper similar to what you were referring to earlier

21    when you said confusion about paying invoices?

22         A.    They did in May 2004, per the note and the

23    response in file from Glenn Robbins and company for

24    another option for lowering their payment and also
```

EXHIBIT "D"

PAGE 1

1    gross profit commission we have at that time, either

2    through compensation plan or promotion, a placement

3    fee for placing an IR110.

4        Q.    Okay, let me slow you down.  Where it says

5    "Placement fee," is that a fee to someone like you?

6        A.    Yes, a high volume specialist.

7        Q.    So, that's also deemed a commission?  Well,

8    do you deem it a commission?

9        A.    Placement fee commissions, I --

10       Q.    Is it compensation to you?

11       A.    It's compensation, yes.

12       Q.    To you as a sales rep for concluding the

13   deal?

14       A.    Yes.

15       Q.    Is the placement fee for $400 also the same

16   type of compensation to you?

17       A.    Yes.

18       Q.    And the placement fee of another $400 for

19   the IR330, is that also compensation to you?

20       A.    Yes.

21       Q.    So where it says "total commission,

22   13,292," is that every dollar that you earned on the

23   HRD transaction?

24       A.    I believe so, yes.

EXHIBIT  "D"

PAGE 2 & 3

1        sales rep that we had talked about before?

2            A.    That's what it looks like, yes.

3            Q.    That's not -- is that referencing IKON's

4        actual acquisition cost?

5            A.    No, it's not.

6            Q.    All right.  The Gross Profit Marketplace of

7        105 to 110,000, is that profit only to the

8        marketplace or is that the total proposed profit for

9        IKON Office Solutions, Inc.?

10           A.    That's an estimation of what -- how much

11       money the marketplace made on the transaction.

12           Q.    The marketplace, meaning what?

13           A.    If you were to take the funding against the

14       true cost of goods.

15           Q.    The true cost?  You mean the acquisition

16       cost?

17           A.    Yeah, what IKON paid for the printer.  Not

18       my sales rep floor.

19                 The $43,000 number is selling price, less

20       sales rep floor, gross profit.  The gross profit

21       marketplace number would have been my guess of what

22       the sales price was, less IKON's cost of buying that

23       product or acquisition cost.

24           Q.    Okay.  So, on the second agreement

1    transaction someone is saying that IKON would be

2    making 105 to $110,000?

3         A.    That was my estimate, guesstimate.

4         Q.    Did you produce this document?

5         A.    Yeah, that's mine.

6         Q.    Oh.  Why did you produce this document?

7         A.    Well, it was probably -- I don't have the

8    date on it.  It was either -- you can see there's

9    several iterations in the file of different dates

10   because of when the deal closes; the amounts could

11   change.  So this is probably a high-end snapshot of

12   it.  And then I was probably asked to itemize it with

13   further detail, which produced like Exhibit No. 4.

14   So this is relatively the same content but somebody

15   probably asked me to line itemize it into the various

16   pieces and parts.

17        Q.    Now, your gross profit for marketplace, or

18   the gross profit for IKON, you said that that's an

19   estimate.  Is that because you didn't know the actual

20   acquisition cost?

21        A.    Yeah, I didn't know the exact dollar

22   amount; I took an estimate.  And basically the reason

23   I put it in there was I always put it in all of my

24   deals.  I just wanted the marketplace to realize how

EXHIBIT "E"

PAGE 1

CONFIDENTIAL

**Accounting Value Statement**
**Prepared For**
**Human Resource Development Press**
**July 7, 2000**

| Equipment / Component Description | Accounting Value |
|---|---|
| **1.Canon ImageRunner 110 Network Printing System:** | **$276,735.00** |
| **-Marking Engine** | |
| **-(2) Paper Supply Modules** | |
| **-Marking Image Path** | |
| **-Finisher** | |
| **-System Controlling Subsystem** | |
| **-High Capacity Stacker** | |
| | |
| **2. Canon ImageRunner 330 Multifunction Device System:** | **$  21,168.00** |
| **-Base Unit** | |
| **-Automatic Document Feeder DADF-A1** | |
| **-Super G3 Multi Line Fax Board** | |
| **-Multi PDL Network Print Controller** | |
| **-Multi-Position Auto Stapler C-1** | |
| **-Expansion Board Base Unit C-1** | |
| **-Scanning Interface Board D-1** | |
| **-Cassette Feeding Unit R-1** | |
| | |
| **3. EPSON Color Page 8000 System** | **$     5,995.00** |
| **-192 MB RAM** | |
| **-RS5000 Fiery Server w/64MB RAM** | |
| | |
| **4.Canon IR210 Multifunctional Device** | **$   13,384.00** |
| **-Base Unit** | |
| **-Automatic Document Feeder RDF-G1** | |
| **-G3 Fax Board-D1** | |
| **-Multi PDL Network Print Controller D1** | |
| **-Multi-Output Tray C-1** | |
| **-IR210 Expansion Board A-1** | |
| **-IR210 Cabinet** | |

EXHIBIT "F"

PAGE 1

1       Q.   Do you understand that your testimony here

2    as a Rule 30(b)(6) designee can bind IKON?

3       A.   Yes.

4       Q.   what function do you serve with IKON right

5    now, what is your title or function?

6       A.   Area director of financial operations.

7       Q.   And tell me what an area director of

8    financial operations does.

9       A.   First of all, the area is Connecticut,

10    Rhode Island, Southern Mass., and Westchester out of

11    New York, Westchester County, and I'm responsible for

12    the financial transactions that take place, make sure

13    that we're doing things properly, deals are handled

14    and administered and processed and so on and so forth

15    according to the rules that we have in place, that

16    we're following not only our rules but we're

17    following the rules of law.  I have SOX compliance

18    issues that I'm responsible for as well, and

19    basically as a financial and operational status of

20    this marketplace.  Understand we don't have

21    inventory; inventory is handled in another area.  But

22    other than that, financial and operational status.

23       Q.   Why do you make that distinction that

24    inventory is handled in another area?

EXHIBIT  "F"

PAGE 2 & 3

1    second contract?

2         A.    At this point in time I probably could not.

3    I wouldn't be able the recreate it back to that.

4         Q.    Why is that?

5         A.    Because I don't have our parts cost and

6    supplies cost specific to that machine.

7         Q.    Have those costs gone up or down since

8    2000?

9         A.    You'd need the service history to do the

10   comparison.  On an individual account, you're asking

11   me to do a single individual account, you would need

12   the actual service history to do that.

13        Q.    Well, going into a deal when you're pricing

14   a service cost, does IKON have some expectation of

15   margin?

16        A.    We have the price book for that as well,

17   yes, and that has a margin built into it.  I'm not

18   sure of what the actual margin that they build in,

19   but I deal with what's left afterwards.  And the

20   pricing, that price is built based on, you know,

21   years of accumulated data in terms of how much it's

22   costing us to do.

23        Q.    What is the average margin that IKON

24   expects on service?

```
 1        A.    Between 40 and 50 percent.

 2        Q.    In this type of mid-use deal -- you've

 3    previously testified that you thought that HRD would

 4    be put in a mid-use category user.  Would the margin

 5    be the same for the mid-use category user?

 6        A.    Yeah, we would pretty much expect to get

 7    the same margin with everybody.

 8        Q.    Okay.  Do you have any knowledge of how

 9    many OCEs were purchased by IKON in 1998?

10        A.    I do not.

11        Q.    And will you, as part of your homework

12    assignment, make the attempt to see if you can

13    determine the acquisition cost, IKON's acquisition

14    cost for the two OCEs?  I know you've given us your

15    best estimate of the cost --

16        A.    I'll make an attempt, but I will be very

17    surprised if I can come up with something to verify

18    it, but I'll look.

19        Q.    Is that because you expect that those files

20    were purged or dropped off because of age?

21        A.    Yes.  Yes.

22              MR. NOONAN:  Then why don't we just

23         continue this to whenever.  I assume it will

24         be on the day when the person for 18 comes,
```

EXHIBIT  "G"

PAGE 1 & 2

1        Q.    At the point in time when this executive

2   summary, Exhibit 3, was prepared, did IKON know

3   exactly what it was going to do with the OCE

4   equipment once it was returned to IKON?

5        A.    No.   No, they don't -- that's the way the

6   process works is basically we put in the truck's

7   deliver slip for the new equipment and then tell the

8   trucks when to come and get the old equipment.   Where

9   it goes from there could be, you know, directed back

10  to an IKON showroom, depending upon the asset, or

11  directed to the warehouse.   And from there, I mean,

12  once they pick it up, my knowledge of where that

13  thing's going, unless I have a need for it somewhere

14  else and really try to take that and put it into

15  another transaction, I have no idea.   Once the truck

16  picks it up, it could go anywhere.

17       Q.    So, in this particular case, is it your

18  testimony that the decision as to what to do with the

19  OCE equipment, that decision was made after HRD had

20  signed a second agreement?

21       A.    Yes.

22       Q.    Do you know what happened to the OCE

23  equipment?

24       A.    Yes, I do.

```
 1        Q.    What happened to the OCE equipment?

 2        A.    The 3100 was destroyed and the 3165 was

 3   sold to a wholesaler in September of that same year,

 4   or beginning of October, for the value of $4,500.

 5        Q.    And are there documents in IKON's

 6   possession that establish the facts that you just

 7   told me?

 8        A.    Yes.

 9        Q.    What documents establish or support your

10   testimony?

11        A.    We were able to -- I had my inventory

12   specialist make some inquiries into the archives to

13   see if we could find proof of what happened to them,

14   and they were able to find a screen showing the same

15   serial number and what happened to them.  That actual

16   information was procured -- well, Brett asked --

17   Robinson & Cole finally got that information.

18        Q.    Was that information printed out onto a

19   piece of paper?

20        A.    It was an e-mail response, I don't know if

21   it got printed.

22             MR. BOSKIEWICZ:  Dave, I might be

23        able to short circuit this for you.  That's

24        going to be part of our supplemental responses
```

EXHIBIT "H"

PAGE 1

Page 6

```
 1   name?

 2        A.    Daniel George Feldmann.

 3        Q.    And do you have a title at IKON?

 4        A.    Senior manager of sales operations over

 5   leasing.

 6        Q.    And how long have you been in that position?

 7        A.    Seventeen months.

 8        Q.    And did you have a position with IKON prior

 9   to that?

10        A.    Yes.  Well, it was with IKON Synergy

11   Services.

12        Q.    Okay.  And what was that position?

13        A.    Financial services manager.

14        Q.    And what did you -- what is your function in

15   your present position?

16        A.    I guess the best way to describe it is to

17   manage the sales operations in regards to our sales

18   force's ability to lease the equipment we sell.

19        Q.    Well, do you have any type of specialized

20   skills or degrees in accounting?

21        A.    No.

22        Q.    Do you have an accounting degree of any

23   type?

24        A.    No.

25        Q.    Have you ever served in any type of
```

Brandon Smith Reporting

EXHIBIT "H"

PAGE 2 & 3

Page 12

```
 1   BY MR. NOONAN:
 2        Q.   In July of 2000, did IKON establish what the
 3   residual value of the Océ 3100 was?
 4        A.   Did we establish the residual in July of
 5   2000?
 6        Q.   Yes.  Did IKON establish a residual value
 7   for that piece of equipment that was effective as of
 8   July 2000?
 9        A.   No, we didn't.
10        Q.   Did IKON ever establish a residual value for
11   the Océ 3100?
12        A.   Yes.  The residual was established at the
13   time that the original agreement was booked.
14        Q.   Did that residual value change throughout
15   the course of the lease or is that a static number?
16        A.   No, it's a static number.
17        Q.   And what was that number?
18        A.   On the 3100?
19        Q.   Correct.
20        A.   The residual value on that asset was 11,820.
21        Q.   And by "residual value," please explain to
22   me what IKON means by the term "residual value."
23        A.   The residual value is the -- I guess the
24   anticipated value of that asset.
25        Q.   At what point in time?  At the end of the
```

Page 13

 1    lease term?

 2         A.    At the end of the lease term.

 3         Q.    Okay.  Did IKON establish a residual value

 4    for the Océ 3165 that was the subject of the first

 5    agreement?

 6         A.    Yes, it did.

 7         Q.    And what was that value?

 8         A.    6,334.

 9         Q.    So is it your testimony that IKON believed

10    that those two pieces of equipment had a value of

11    $11,000 and then $6,000 at the end of the lease term?

12         A.    That was the anticipated value.

13         Q.    Okay.  In July of 2000, what was the

14    stipulated loss value for the Océ 3100?

15         A.    I'm not sure what a "stipulated loss value"

16    would be.

17         Q.    All right.  Well, in July 2000, if HRD Press

18    was unable to surrender or turn the equipment back to

19    IKON, what dollar amount would HRD Press have had to

20    have paid -- had to pay IKON?

21         A.    They would have had to satisfy the original

22    term of the agreement and pay off whatever the fair

23    market value was at the time.

24         Q.    So what was that value?

25                    MR. BOSKIEWICZ:  Objection.  What

EXHIBIT "I"

June 17th, 2007

Brett

Since the subject matters which Mr. Maturo was unable to answer were clearly identified in the first day of his deposition I will not be providing specific follow-up questions. I assume that he has searched for the information that he agreed on the record he would search for.

Here are some but not all of the questions I intend to ask IKON's designated Rule 30 (6) deponent for paragraph No. 18 of the subject matters identified in the deposition notice.

I reserve the right to ask follow-up questions to any of the answers provided to the below listed questions as well as deviate from the exact form of the below listed questions or ask additional questions not listed below. These questions are provided to you solely to help enable your designated witness be fully prepared. These questions are provided to you in advance solely as an accommodation and HRD Press neither is nor was under any obligation to provide the questions to you in advance. Your client has had several months advance notice that it needed to provide answers to questions concerning paragraph No. 18. Here are the questions:

1) Name, title, background, function at Ikon etc.

2) In order to testify here today what steps did you take to familiarize yourself with facts within the control and possession of Ikon in order to allow you to answer questions concerning paragraph No. 18

3) are you familiar with Statement of Financial Accounting Standards, No. 13 issued by the Financial Accounting Standards Board

4) if you are not familiar with Statement of Financial Accounting Standards No. 13 issued by the Financial Accounting Standards Board what steps did you take to consult with anyone within Ikon concerning Statement of Financial Accounting Standards No. 13 issued by the Financial Accounting Standards Board in order to enable you to testify concerning paragraph No. 18

5) does Ikon believe the first agreement was a capital lease or an operating lease

6) why does IKon believe it was a ?

7) in May 1998 did Ikon establish the residual value of the OCE 3100 that was the subject of the "first agreement"

8) at any time subsequent to May 1998 did Ikon establish the residual value of the OCE 3100 that was the subject of the "first agreement"

9) what steps did it take to establish the residual value of the OCE 3100 that was the subject of the "first agreement"

10) what residual value did Ikon establish the residual value of the OCE 3100 that was the subject of the "first agreement"

11) what residual value did Ikon establish the residual value of the OCE 3100 that was the subject of the "first agreement" was as of July 2000

11) in May 1998 did Ikon establish the residual value of the OCE 3165 that was the subject of the "first agreement"

12) at any time subsequent to May 1998 did Ikon establish the residual value of the OCE 3165 that was the subject of the "first agreement"

13) what steps did it take to establish the residual value of the OCE 3165 that was the subject of the "first agreement"

14) what residual value did Ikon establish the residual value of the OCE 3165 that was the subject of the "first agreement"

15) what residual value did Ikon establish the residual value of the OCE 3165 that was the subject of the "first agreement" was as of July 2000

16) what interest rate was implicit in the first agreement

17) if in July 2000 HRD press was unable to return to IKON the OCE 3100 that was the subject of the "first agreement" what dollar amount      would HRD press have had to pay Ikon

18) if in July 2000 HRD press was unable to return to IKON the OCE 3165 that was the subject of the "first agreement" what dollar amount      would HRD press have had to pay Ikon

19) does Ikon take any steps to determine the estimated economic life of any photocopiers its leases to third parties

20) what steps does Ikon take any steps to determine the estimated economic life of any photocopiers its leases to third parties

21) what documents indicate what Ikon believed the estimated economic life of the OCE 3100 was as of July 2000

22) what documents indicate what Ikon believed the estimated economic life of the OCE 3165 was as of July 2000

23) what did Ikon determine the estimated economic life of the OCE 3100 was as of July 2000

24) what did Ikon determine the estimated economic life of the OCE 3165 was as of July 2000

25) what interest rate is implicit in the second agreement

26) what documents indicate what Ikon believed the estimated economic life of the cannon image runner 110 was as of July 2000

27) what documents indicate what Ikon believed the estimated economic life of the cannon image runner 110  was as of July 2000

28) what did Ikon determine the estimated economic life of the cannon image runner 110  was as of July 2000

29) what did Ikon determine the estimated economic life of the cannon image runner 110 was as of July 2000

30) what interest rate is implicit in the second agreement


Regards,

David J. Noonan, Esq.


Signature, Tax Disclosure and Confidentiality Notice:

Nothing in this communication is intended to constitute an electronic signature, unless a specific statement to the contrary or a valid VeriSign Digital Signature Certificate is included in this communication.

Nothing contained in this email was intended or written to be used, or can be used by any taxpayer for the purpose of avoiding penalties that may be imposed on such taxpayer under the Internal Revenue Code of 1986, as amended. No one, without our express prior written permission, may use any part of this email relating to any Federal Tax matter in promoting, marketing or recommending a partnership or other entity, investment plan or arrangement to one or more taxpayers.

This message is covered by the Electronic Communications Privacy Act, Title 18, United States Code, § 2510-2521. This email message and any attached files are the exclusive property of the Law Office of David J. Noonan and are deemed privileged and confidential and are intended only for the person or entity to which it is addressed. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please immediately advise the sender of same.

EXHIBIT  "J"

PAGE 1 & 2

Page 14

    1              value?

    2                    MR. NOONAN:  He just said that they

    3              would have to pay off the fair market value.

    4                    MR. BOSKIEWICZ:  Okay.  So you're

    5              asking him what the fair market value was as

    6              of July of 2000?

    7                    MR. NOONAN:  I'm asking him --

    8    BY MR. NOONAN:

    9         Q.   Sir, you've never heard the term "stipulated

   10    loss value"?

   11         A.   No, I have not.

   12         Q.   In all your time at IKON, you've never heard

   13    those terms?

   14         A.   No.  In 11 years, I have not heard that.

   15         Q.   Okay.  Do you understand the question that

   16    I'm asking, what dollar amount HRD would have to pay to

   17    IKON in July 2000 for both of these pieces of equipment

   18    if it was -- if HRD was unable to surrender the

   19    equipment?

   20         A.   Yes, I understand.

   21         Q.   All right.  What is the dollar amount for

   22    both of these pieces of equipment?

   23         A.   I don't know.

   24         Q.   Why don't you know that?

   25         A.   I just don't know.

Page 15

1              Q.    Sir, do you have in front of you an email

2     dated June 17th, 2007, that's addressed to Brett

3     Boskiewicz that has a series of questions and consists

4     of three pages?

5              A.    No, I don't.

6                        MR. NOONAN:   Off the record.

7                        (Off-the-record discussion.)

8                        MR. NOONAN:   Back on the record.

9     BY MR. NOONAN:

10             Q.    Do you have this three-page email in front

11    of you now dated June 17th, 2007?

12             A.    Yes, I got it opened.

13             Q.    When did you first review this?

14             A.    Yesterday morning.

15             Q.    Okay.  And what's the date on the top of

16    this email?

17             A.    Monday, June 18th, 2007.

18             Q.    And focusing your attention to paragraphs 17

19    and 18.

20             A.    Okay.

21             Q.    Do you have no answer to paragraphs -- the

22    questions numbered 17 and 18?

23             A.    Well, I believe I gave you the answer, that

24    the client would have had to pay the remaining

25    obligation plus the fair market value at that time.

EXHIBIT "K"

PAGE 1 & 2

```
 1    you can't go back and --

 2        A.    I don't have an archive of it.  I don't

 3    have any reason to do that.  I don't know if anyone

 4    else does.

 5        Q.    So IKON is no longer trying to sell or

 6    lease the OCE 3100 or 3165?

 7        A.    That's correct.

 8        Q.    And that is because why?

 9        A.    Again, both those models are old models and

10    have not been currently marketed at least since --

11    I'm going to say 2001 is probably when we stopped

12    marketing that, those products.

13        Q.    Is the technology that was in the OCE 3100

14    and 3165 that my client had, is that considered

15    obsolete technology compared to today's equipment?

16        A.    The technology of print, yes.  You know,

17    when you get a copier, you get the results, but you

18    also get a process to create the results, and the

19    results are definitely -- it's obsolete compared to

20    the results that you get today.

21        Q.    Do you know approximately how many years

22    ago that became obsolete?

23        A.    Obsolete's, I think, a bad word, but the

24    technology improvement probably began around the time
```

1    the IR110 came out, which I believe was like '98 or

2    so, '99 maybe, somewhere in that neighborhood.  And

3    that technology started to supercede the technology

4    on the OCEs; the quality of the output was just much

5    better.

6         Q.   In 2003 would you have attempted to market

7    the OCE 3100 or 3165 to anyone?

8         A.   We would not.  Let me -- we might have sold

9    one used at that point in time but definitely not

10   new.

11        Q.   Would that be true for your competitors as

12   well?

13        A.   Those two models, yes, they would not have

14   been available new even from OCE.

15        Q.   Okay.

16             MR. NOONAN:  Could we just take a

17        30-second break.

18                  (A recess was taken.)

19             MR. NOONAN:  All right.  Back on the

20        record, please.

21        Q.   (By Mr. Noonan)  Tony, please look at the

22   document I've just handed to you and tell me if you

23   can identify that document.

24             MR. BOSKIEWICZ:  Are you going to

EXHIBIT "3"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

)
HUMAN RESOURCE DEVELOPMENT )
PRESS, INC., )
    Plaintiff, )
)
v. )            3:05-CV-30068-KPN
)
IKON OFFICE SOLUTIONS, INC. )
& IOS CAPITAL, INC. d/b/a )
IKON FINANCIAL SERVICES, )
    Defendants. )
_____ )

## PLAINTIFF'S FIRST REQUEST TO ADMIT FACTS TO DEFENDANT IKON OFFICE SOLUTIONS, INC.

The Plaintiff, Human Resource Development Press, Inc. ("HRD") hereby requests that the Defendant Ikon Office Solutions, Inc.[1] ("IKON OFFICE"), either admit or deny the Requests for Admission attached as Appendix "A" within thirty (30) days from the date of service hereof, as required by Rule 36 of the Federal Rules of Civil Procedure as adopted by and Rule 36.1 of the Local Rules of the United States District Court For the District of Massachusetts ("Discovery Rules").

Pursuant to said Discovery Rules, IKON OFFICE is required to provide written responses to the herein Requests for Admission no later than 30 days after the service of the herein Requests for Admission. A failure to admit or deny any specific Request for Admission will result in said Request for Admission being deemed admitted.

---

[1] HRD is serving the herein Request To Admit facts only upon Ikon Office Solutions, Inc. in direct reliance upon IOS Capital, Inc.'s Answer to Plaintiff's First Amended Complaint wherein said Answer asserts that IOS Capital, Inc. no longer exist as a legal entity and that it merged into the Defendant Ikon Office Solutions, Inc.

Specific notice is hereby provided to IKON OFFICE that should IKON OFFICE fail to properly admit to the truth of any matter as requested herein, HRD will, pursuant to Rule 37 (c) (2) of the Federal Rules of Civil Procedure seek an Order requiring IKON OFFICE to pay the expenses, including reasonable attorney's fees, incurred in proving the truth of the matter which was not admitted.

These Requests for Admission are continuing and each and every response must be supplemented in accordance with the Discovery Rules.

## DEFINITIONS

A.     The term IKON Office Solutions, Inc. refers to the Defendant any and all predecessors in interest and its and their past and present agents, employees, consultants, attorneys, and/or other persons or entities acting or purporting to act on IKON Office Solutions, Inc.'s behalf, including IOS Capital, Inc. and IOS Capital, LLC.

B.     The terms "you," and "your" refers to IKON Office Solutions, Inc. as defined above.

C.     The term "Field Order" means the Field Order Form/Security Agreement dated May 20, 1998 identified in paragraph 8 in the Plaintiff's First Amended Complaint.

D.     The term "Oce Agreement" means the Agreement dated May 28, 1998 a copy of which is attached hereto and marked as Exhibit "B".

E.     The term "First Equipment" means the Oce 3100 photocopying equipment, serial no. 179420274 and the Oce 3165 photocopying equipment, serial no. 166004056 identified in paragraph 9 of the Plaintiff's First Amended Complaint.

2

F.     The term "Second Agreement" means the contract dated June 19, 2000 executed by HRD and IOS Capital, Inc. identified in paragraph 18 of the Plaintiff's First Amended Complaint.

G.     The term "Second Equipment" means the Canon IR330 photocopying equipment, the Canon IR210 photocopying equipment, the Canon IR110 photocopying equipment and the Canon IRCLC 900 photocopying equipment identified in paragraph 19 of the Plaintiff's First Amended Complaint.

H.     The term "Amended Complaint" means HRD's pleading entitled First Amended Complaint, dated November 28, 2005.

I.     The term "Defendant's Answer" means your pleading entitled Defendants' Answer to Plaintiff's First Amended Complaint.

J.     The term "Executive Financial Summary" means that document identified in paragraph 38 of the Plaintiff's First Amended Complaint and attached thereto and mark as Exhibit "D".

K.     The term "Demand for Relief" means that letter dated September 20, 2004, identified in paragraph 48 of the Plaintiff's First Amended Complaint and attached thereto and marked as Exhibit "E".

L.     The term "Documents" shall mean every document within the custody, possession, or control of the person or entity to whom a Request To Admit is directed, and/or its attorneys, representatives, employees, and/or agents, whether an original or copy, as defined above, known to you and every such document or writing which you can locate or discover by reasonably diligent efforts.

M.     The term "Communicating" or "communication" shall mean and include every manner or means of disclosure, transfer or exchange of information (in the form of facts, ideas, inquiries or otherwise) whether orally or by document and whether by face-to-face exchange, telephone, telecopier, mail, facsimile, personal delivery, e-mail, computer mail, electronic mail, overnight delivery or otherwise.

N.     The term "Person" or "persons" shall mean any natural person, business, proprietorship, public or private corporation, company, limited liability company, partnership, firm, government or governmental partnership, trusts, joint venture, entity (including any government agency, board, authority, commission, political subdivision or department thereof) or any other form of business or legal entity, organization or arrangement, group or association, whether or not such organization, entity or association has a separate juristic existence in its own right.

O.     The term "Meeting" shall mean and include any assembly, convocation, or encounter, a contemporaneous exchange between two or more persons for any purpose (including via telephone), whether or not planned, arranged or scheduled in advance and whether or not the meeting was formal or informal or occurred in connection with some other activity.

P.     The term "Concerning" shall mean relating to, referring to, regarding, describing, evidencing or constituting.

Q.     The singular includes the plural and the plural includes the singular. The masculine includes the feminine and the neutral genders.

R.     The term "And" shall mean and/or.

S.     The term "Or" shall mean and/or.

T.     The term "HRD" shall mean the Plaintiff, Human Resource Development Press, Inc.

U.     The term "First Equipment Monthly Charges" shall mean those payments which HRD was obligated to pay you pursuant to the Oce Agreement.

V.     The term "Second Equipment Monthly Charges" shall mean those payments which HRD was obligated to pay you pursuant to the Second Agreement.

## INSTRUCTIONS

1.    Each of the matters for which an admission is requested is admitted unless, within thirty (30) days after service of these requests for admission, the party to whom this request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or his attorney. If objection is made, the reasons therefore shall be stated. The Answer shall specifically deny the matter set forth and detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify his answer or deny only a part of the matter for which an admission is requested, he shall specify so much of it as is true and qualify or deny the remainder. An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless he states that he has made reasonable inquiry and that the information known to him or readily obtainable by him is insufficient to enable him to admit or deny. A party who considers that a matter, of which an admission has been requested, will be presented as a genuine issue for trial may not, on that ground alone, object to the request. Moreover, requests for admissions that relate to statements or opinions of fact, or the application of law to fact must be responded to. It is insufficient to object on the ground that a request for admission calls for a legal conclusion.

5

Respectfully Submitted this the ⅄ day of July, 2006

Human Resource Development Press, Inc.
By Its Counsel

David J. Noonan, Esq.
228 Triangle Street
Amherst, MA 01002
Tel: (413)-549-5491
Fax: (413)-549-5156
B.B.O.# 373260

## CERTIFICATE OF SERVICE

I, DAVID J. NOONAN, hereby certify that on July, 2006 I caused a copy of

PLAINTIFF'S FIRST REQUEST TO ADMIT FACTS TO THE DEFENDANT IKON

OFFICE SOLUTIONS, INC. to be served upon Defendant's Counsel by mailing the

same by overnight "Express Mail" to Brett Boskiewicz, Esq. Robinson & Cole, LLP 280

Trumbull St, Hartford, CT 06103.

David J. Noonan, Esq.

# EXHIBIT "A"

## **REQUEST TO ADMIT FACTS**

Request for Admission No. 1

Admit that the Field Order was drafted by IKON Office Solutions, Inc.

Request for Admission No. 2

Admit that the Oce Agreement was drafted by IKON Office Solutions, Inc.

Request for Admission No. 3

Admit that the Second Agreement was drafted by IKON Office Solutions, Inc.

Request for Admission No. 4

Admit that the Executive Summary was drafted by IKON Office Solutions, Inc.

Request for Admission No. 5

Admit that IKON Office Solutions, Inc. received the Plaintiff's Demand for Relief.

Request for Admission No. 6

Admit that IKON Office Solutions, Inc. did not tender to the Plaintiff a written response to the Plaintiff's Demand for Relief.

Request for Admission No. 7

Admit that the first paragraph of the reverse side of the Field Order provides that IKON Office Solutions, Inc. be referred to as the "SECURED PARTY".

1

### Request for Admission No. 8

Admit that the first paragraph of the reverse side of the Field Order provides that IKON Office Solutions, Inc. be granted a purchase money security interest in the First Equipment that was the subject of the Field Order.

### Request for Admission No. 9

Admit that during the first year the Plaintiff used the First Equipment, the Plaintiff, on more than five occasions, verbally communicated to IKON Office Solutions, Inc. that the First Equipment was experiencing mechanical problems.

### Request for Admission No. 10

Admit that during the first year the Plaintiff used the First Equipment, the Plaintiff, on more than five occasions, verbally communicated to IKON Office Solutions, Inc. that the First Equipment was not meeting HRD's photocopying needs.

### Request for Admission No. 11

Admit that in response to HRD's communications as set forth in Request for Admission No. 9 &10 above, IKON Office Solutions, Inc. told HRD that if it wanted a high production photocopying capacity it would have to upgrade the First Equipment.

### Request for Admission No. 12

Admit that IKON Office Solutions, Inc. negotiated the Second Agreement with Robert W. Carkhuff, HRD's Treasurer and Secretary.

2

Request for Admission No. 13

Admit that at no time prior to IKON Office Solutions, Inc. and HRD's negotiation of the
Second Agreement was HRD in arrears of its monetary payment obligations to IKON Office
Solutions, Inc.

Request for Admission No. 14

Admit that, during IKON Office Solutions, Inc. and HRD's negotiation of the Second
Agreement, IKON Office Solutions, Inc. told Robert W. Carkhuff, HRD's Treasurer and
Secretary, that IKON Office Solutions, Inc was substituting the Oce Agreement with the
Second Agreement and that HRD would have no further payment obligations pursuant to the
Oce Agreement.

Request for Admission No. 15

Admit that when IKON Office Solutions, Inc. told Robert W. Carkhuff, HRD's Treasurer and
Secretary, that IKON Office Solutions, Inc was substituting the Oce Agreement with the
Second Agreement and that HRD would have no further payment obligations pursuant to the
Oce Agreement, you knew said statement was false.

Request for Admission No. 16

Admit that HRD surrendered its possession and control of the First Equipment to IKON Office
Solutions, Inc.

Request for Admission No. 17

Admit that at no time after HRD surrendered its possession and control of the First
Equipment to IKON Office Solutions, Inc. did you provide to HRD any financial credit or
monetary value in exchange for the surrendered First Equipment.

3

## Request for Admission No. 18

Admit that after the execution of the Second Agreement, IKON Office Solutions, Inc. continued to impose and collect payments from HRD for obligations you believed HRD still had under the Oce Agreement.

## Request for Admission No. 19

Admit that as a result of the fact that IKON Office Solutions, Inc. did not provide HRD with any financial credit or monetary value in exchange for its surrender of the First Equipment, you continued to charge HRD the full amount of the remaining payments due pursuant to the Oce Agreement.

## Request for Admission No. 20

Admit that you did not provide HRD any reduction in the amount of the Second Equipment Monthly Charges in consideration for HRD's surrender of the First Equipment to you.

## Request for Admission No. 21

Admit that there are no terms or provisions in the Oce Agreement which state that the Oce Agreement supersedes or cancels any of the provisions contained in the Field Order.

## Request for Admission No. 22

Admit that pursuant to the Executive Financial Summary, as of November 7, 2003, if HRD wanted to purchase the Second Equipment from you, HRD only had to pay $81,367.77 more than the amount HRD was required to pay you if HRD wanted to return the Second Equipment to you.

4

## Request for Admission No. 23

Admit that pursuant to the Executive Financial Summary the total amount of payments HRD was obligated to pay you pursuant to the Second Agreement was $758,340.

## Request for Admission No. 24

Admit that in the case of In re Access Equipment, Inc., 62 B.R. 642, 646 (D. Mass. 1986) the court held that the most significant factor in distinguishing the conditional sale masquerading as a lease and a true lease is the relationship of the option price to the value of the goods at the end of the lease term.

## Request for Admission No. 25

Admit that in the case of In re Access Equipment, Inc., 62 B.R. 642, 646 (D. Mass. 1986) the court held that if at the end of the lease term the only sensible course economically for the lessee would be for him to exercise his option to purchase, the transaction is really a secured installment sale to which Article Nine applies.

## Request for Admission No. 26

Admit that in the case of In re Access Equipment, Inc., 62 B.R. 642, 646 (D. Mass. 1986) the court reasoned that if the option price to purchase a piece of equipment is more than 25% of the total payments to be paid under the contract then the contract is not intended for security.

## Request for Admission No. 27

Admit that the $81,367.77 referenced In Request for Admission No. 21 is not more than 10.729% of the total amount of payments referenced in Request for Admission No. 23.

5

### Request for Admission No. 28

Admit that if you apply the legal holdings of the In re Access Equipment, Inc. court, as set forth in Request for Admissions Nos. 24, 25 and 26 above to the facts requested to be admitted in Request for Admissions Nos. 22, 23 and 27 above, the Second Agreement is an agreement intended to provide a security interest to you.

### Request for Admission No. 29

Admit that that IKON collected service / maintenance charges from HRD for the First Equipment through the Second Equipment Monthly Charges.

### Request for Admission No. 30

Admit that the Oce Agreement imposed an obligation upon HRD to pay sales taxes for the First Equipment.

### Request for Admission No. 31

Admit that you collected from HRD sales taxes for the First Equipment.

### Request for Admission No. 32

Admit that the Second Agreement imposed an obligation upon HRD to pay sales taxes for the Second Equipment.

### Request for Admission No. 33

Admit that you collected from HRD sales taxes for the Second Equipment.

### Request for Admission No. 34

Admit that the Oce Agreement imposed an obligation upon HRD to maintain comprehensive insurance on the First Equipment.

6

Request for Admission No. 35

Admit that HRD paid for comprehensive insurance on the First Equipment.

Request for Admission No. 36

Admit that the Second Agreement imposed an obligation upon HRD to maintain

comprehensive insurance on the Second Equipment.

Request for Admission No. 37

Admit that HRD paid for comprehensive insurance on the Second Equipment.

Request for Admission No. 38

Admit that the Oce Agreement imposed an obligation upon HRD to maintain the First

Equipment.

Request for Admission No. 39

Admit that HRD paid for the maintenance of the First Equipment.

Request for Admission No. 40

Admit that the Second Agreement imposed an obligation upon HRD to maintain the Second

Equipment.

Request for Admission No. 41

Admit that HRD paid for the maintenance of the Second Equipment.

Request for Admission No. 42

Admit that the Oce Agreement imposed upon HRD the risk of loss for the First Equipment.

7

Request for Admission No. 43

Admit that the Second Agreement imposed upon HRD the risk of loss for the Second

Equipment.

Request for Admission No. 44

Admit that pursuant to the Oce Agreement you had the right to accelerate payments upon default.

Request for Admission No. 45

Admit that pursuant to the Second Agreement you had the right to accelerate payments upon default.

Request for Admission No. 46

Admit that pursuant to the terms of the Oce Agreement you had the right to file a U.C.C. financing statement.

Request for Admission No. 47

Admit that pursuant to the terms of the Second Agreement you had the right to file a U.C.C. financing statement.

Request for Admission No. 48

Admit that the Oce Agreement disclaims all warranties of fitness for a particular purpose and/or merchantability.

Request for Admission No. 49

Admit that the Second Agreement disclaims all warranties of fitness for a particular purpose and/or merchantability.

Request for Admission No. 50

Admit that the photocopying equipment which was the subject of the Oce Agreement was pre-selected by HRD and purchased by you for HRD's use pursuant to the Oce Agreement.

8

Request for Admission No. 51

Admit that the photocopying equipment which was the subject of the Second Agreement was pre-selected by HRD and purchased by you for HRD's use pursuant to the Second Agreement.

Request for Admission No. 52

Admit that the First Equipment could have been purchased by HRD for less then 25% of the total of all the First Equipment Monthly Charges.

Request for Admission No. 53

Admit that in exchange for monetary consideration, you transferred title to the First Equipment to a third party.

EXHIBIT  "4"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

HUMAN RESOURCE DEVELOPMENT )
PRESS, INC.,                )
                Plaintiff )
                            )
v.                          )      3:05-CV-30068-KPN
                            )
IKON OFFICE SOLUTIONS, INC. )
& IOS CAPITAL, INC. d/b/a   )
IKON FINANCIAL SERVICES,    )

DEPOSITION OF:  JEFFREY SNYDER, taken before

Sharon R. Roy, Notary Public, Registered Professional

Reporter, pursuant to Rule 30 (b)(6) of the

Massachusetts Rules of Civil Procedure, at the law

offices of  ROBINSON & COLE, LLP, 280 Trumbull

Street, Hartford, Connecticut on December 6, 2006,

commencing at 10:47 a.m.

A P P E A R A N C E S:

(See Page 2)

Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

A P P E A R A N C E S:


FOR THE PLAINTIFF:

DAVID J. NOONAN, ESQ.
228 Triangle Street
Amherst, MA 01002
413-549-5491


FOR THE DEFENDANT:

ROBINSON & COLE, LLP
280 Trumbull Street
Hartford, CT 06103
860-275-8289
     BY:  BRETT J. BOSKIEWICZ, ESQ.



In Attendance:

Gregory Carkhuff

```
 1    costs the customer, two, three, four hundred thousand

 2    dollars.  The trade-in value is $4,000 for a system

 3    four years ago that costs $200,000.

 4              See, the value of the copier coming back is

 5    based upon are they acceptable in today's network

 6    standards because those change by Mr. Gates all the

 7    time.  So if they are based upon old technology, slow

 8    network cables, even though it's the fastest digital

 9    machine on earth, the market viability of that is

10    nil, is very limited.  So, we like to give the

11    customer some value to that.  But as a

12    remarketability standard, it's four years past its

13    networking prime.

14              In a competitive situation against a Xerox,

15    customers want something that they've paid all that

16    money four years ago.  It never adds up to what it

17    is.  But we have provided something in the past to

18    them, you know, but it's not even close to what that

19    is.

20         Q.   Is it your testimony that IKON does not

21    give any credit or any value to any customer when

22    they surrender equipment that is under a, quote,

23    lease when they're upgrading to another piece of

24    equipment?
```

```
 1                    MR. BOSKIEWICZ:  Objection to form.

 2                    MR. NOONAN:  What's the objection?

 3                    MR. BOSKIEWICZ:  "Value" is vague.

 4           What kind of -- are you talking about cash

 5           value?

 6                    MR. NOONAN:  Monetary value.  Yes,

 7           monetary value.

 8           A.   I am not aware of, in my history at IKON of

 9      over ten years, of upgrading a piece of equipment

10      from one lease document to another lease document

11      that, when that equipment is surrendered, whether it

12      be sold, remarketed, or placed back in the field,

13      that no monetary value is applied to the customer to

14      the first agreement.

15           Q.   Do you know what IKON's rationale for

16      having that policy is?

17           A.   No, I do not.

18           Q.   One last question because I know people

19      want to break at five.  Is it your testimony that

20      IKON made no determination of the value of the OCE

21      equipment that was going to be surrendered to it when

22      it went to the process of determining what the cost

23      to HRD would be under the second agreement?

24           A.   One more time.
```

180

1 | STATE OF CONNECTICUT

2

3 |        I, Sharon R. Roy, a Notary Public in and for the
   | State of Connecticut, do certify that pursuant to
4 | notice, there came before me on the 7th day of
   | December, 2006, at the law offices of ROBINSON &
5 | COLE, LLP, 280 Trumbull Street, Hartford,
   | Connecticut, the following named person, to wit:
6 | JEFFREY SNYDER, who was by me duly sworn to testify
   | to the truth and nothing but the truth as to his
7 | knowledge touching and concerning the matters in
   | controversy in this cause; that he was thereupon
8 | examined upon his oath and said examination reduced
   | to writing by me; and that the deposition is a true
9 | record of the testimony given by the witness, to the
   | best of my knowledge and ability.

10

   |        I further certify that I am not a relative or
11 | employee of counsel or attorney for any of the
   | parties, nor a relative or employee of such parties,
12 | nor am I financially interested in the outcome of the
   | action.

13

   |        Witness my hand, this 13th day of December,
14 | 2006.

15

16

17 |             Sharon Roy

   |        Sharon R. Roy
18

19

20 | My commission expires:

21 | April 28, 2011

22

23

24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


HUMAN RESOURCE DEVELOPMENT  )
PRESS, INC.,                )
                Plaintiff )
                            )
v.                          )          3:05-CV-30068-KPN
                            )
IKON OFFICE SOLUTIONS, INC. )
& IOS CAPITAL, INC. d/b/a   )
IKON FINANCIAL SERVICES,    )


VOLUME II


CONTINUED DEPOSITION OF:  JEFFREY SNYDER,

taken before Sharon R. Roy, Notary Public, Registered

Professional Reporter, pursuant to Rule 30 (b)(6) of

the Massachusetts Rules of Civil Procedure, at the

law offices of  ROBINSON & COLE, LLP, 280 Trumbull

Street, Hartford, Connecticut on December 18, 2006,

commencing at 1:16 p.m.


Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

A P P E A R A N C E S:


FOR THE PLAINTIFF:

DAVID J. NOONAN, ESQ.
228 Triangle Street
Amherst, MA 01002
413-549-5491


FOR THE DEFENDANT:

ROBINSON & COLE, LLP
280 Trumbull Street
Hartford, CT 06103
860-275-8289
     BY:  BRETT J. BOSKIEWICZ, ESQ.

1          A.    No, it does not.

2          Q.    Do you know why?

3          A.    Well, the document used in this instance

4     was just to show that we've picked up -- we're going

5     to schedule a pickup of two assets off of their site.

6          Q.    Do you know why it does not tell HRD Press

7     what IKON is going to do with the equipment?

8          A.    It's technically IKON Office Solutions'

9     assets and there are many determinations of what

10    happens to equipment being returned, so I don't

11    believe that they could put all those possible

12    variables on one document.

13         Q.    Why doesn't it tell HRD Press that IKON

14    doesn't know what it's going to do with the equipment

15    once it's surrendered?

16         A.    I don't really think it's any of HRD's

17    business.  These assets are owned by IKON Office

18    Solutions Capital, not HRD.

19         Q.    So, is it your testimony that HRD is not

20    entitled to that information?

21         A.    Yes.

22         Q.    And is it your testimony that it's not

23    entitled to that information because IOS Capital

24    owned the two OCEs?

1        A.    Yes.

2        Q.    Now, do you believe -- pursuant to what

3    agreement was the equipment in the use and possession

4    of HRD?

5        A.    Exhibit No. 1.

6              MR. BOSKIEWICZ:   No.   That's

7        Robbins' deposition exhibit.

8        A.    Oh, I'm sorry.   Snyder Exhibit 4.

9        Q.    And is this a sale agreement, a lease

10   agreement, a rental agreement; what is this?

11       A.    It's a lease agreement.

12       Q.    So IKON didn't disclose to HRD what it was

13   doing with the OCEs once those pieces were

14   surrendered because IOS owned the equipment and HRD

15   was simply a lessee?

16       A.    Yes.

17              (Exhibit 11, marked)

18       Q.    (By Mr. Noonan)   Jeff, I'm showing you

19   what's been marked as Exhibit 11 and ask you to

20   please review that.

21              Have you seen that document before?

22       A.    Yes.

23       Q.    What is that document?

24       A.    Field Order Form/Security Agreement.

1    STATE OF CONNECTICUT

2

3          I, Sharon R. Roy, a Notary Public in and for the
     State of Connecticut, do certify that pursuant to
4    notice, there came before me on the 18th day of
     December, 2006, at the law offices of ROBINSON &
5    COLE, LLP, 280 Trumbull Street, Hartford,
     Connecticut, the following named person, to wit:
6    JEFFREY SNYDER, who was by me duly sworn to testify
     to the truth and nothing but the truth as to his
7    knowledge touching and concerning the matters in
     controversy in this cause; that he was thereupon
8    examined upon his oath and said examination reduced
     to writing by me; and that the deposition is a true
9    record of the testimony given by the witness, to the
     best of my knowledge and ability.

10
           I further certify that I am not a relative or
11   employee of counsel or attorney for any of the
     parties, nor a relative or employee of such parties,
12   nor am I financially interested in the outcome of the
     action.

13
           Witness my hand, this 27th day of December,
14   2006.

15

16                         Sharon R. Roy

17                    ------------------------

                           Sharon R. Roy
18

19

20   My commission expires:

21   April 28, 2011

22

23

24

ACCURATE COURT REPORTING  (413) 747-1806

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


HUMAN RESOURCE DEVELOPMENT )
PRESS, INC.,                )
                Plaintiff )
                            )
v.                          )          3:05-CV-30068-KPN
                            )
IKON OFFICE SOLUTIONS, INC. )
& IOS CAPITAL, INC. d/b/a   )
IKON FINANCIAL SERVICES,    )


VOLUME III


CONTINUED DEPOSITION OF:   JEFFREY SNYDER,

taken before Sharon R. Roy, Notary Public, Registered

Professional Reporter, pursuant to Rule 30(b)(6) of

the Massachusetts Rules of Civil Procedure, at the

law offices of  ROBINSON & COLE, LLP, 280 Trumbull

Street, Hartford, Connecticut on April 30, 2007,

commencing at 1:46 p.m.


Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

A P P E A R A N C E S:


FOR THE PLAINTIFF:

DAVID J. NOONAN, ESQ.
228 Triangle Street
Amherst, MA 01002
413-549-5491


FOR THE DEFENDANT:

ROBINSON & COLE, LLP
280 Trumbull Street
Hartford, CT 06103
860-275-8289
    BY:  BRETT J. BOSKIEWICZ, ESQ.

 1          record?

 2                    MR. NOONAN:  Sure.

 3              (Off-record discussion from 1:49 to 1:52 p.m.

 4                    MR. BOSKIEWICZ:  On page 178, line

 5          13, the second word on that line, "no," of

 6          Mr. Snyder's -- let me start over, Sharon.

 7                    Looking at page 178 of Mr. Snyder's

 8          December 6 deposition, page 178, line 13, the

 9          second word of that line, the word "no" can

10          be stricken.

11                    Is that acceptable to you,

12          Mr. Snyder?

13                    THE WITNESS:  Yes.

14                    MR. BOSKIEWICZ:  And Dave, while

15          we're at it, I just want to make sure we

16          designate this part of Jeff's deposition as

17          confidential according to the confidentiality

18          agreement in place, seeing you are going to be

19          asking questions about confidential documents.

20                    MR. NOONAN:  That's correct.

21          Q.   (By Mr. Noonan)  Jeff, have you taken any

22          steps in between the last day you were deposed to the

23          present date to prepare in any way for this

24          deposition today?

1    STATE OF CONNECTICUT

2

3         I, Sharon R. Roy, a Notary Public in and for the
     State of Connecticut, do certify that pursuant to
4    notice, there came before me on the 30th day of
     April, 2007, at the law offices of ROBINSON & COLE
5    LLP, 280 Trumbull Street, Hartford, Connecticut, the
     following named person, to wit:  JEFFREY SNYDER, who
6    was by me duly sworn to testify to the truth and
     nothing but the truth as to his knowledge touching
7    and concerning the matters in controversy in this
     cause; that he was thereupon examined upon his oath
8    and said examination reduced to writing by me; and
     that the deposition is a true record of the testimony
9    given by the witness, to the best of my knowledge and
     ability.

10
          I further certify that I am not a relative or
11   employee of counsel or attorney for any of the
     parties, nor a relative or employee of such parties,
12   nor am I financially interested in the outcome of the
     action.

13
          Witness my hand, this 9th day of May, 2007.

14

15

16                    _____
                      Sharon R. Roy

17

18

19   My commission expires:

20   March 31, 2012

21

22

23

24