## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS INC., | : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | :    3:05-CV-30068-KPN <br> : |
| IKON OFFICE SOLUTIONS, INC. & <br> IOS CAPITAL, INC. d/b/a IKON <br> FINANCIAL SERVICES, | : <br> : <br> : <br> : |
| Defendants. | : |

## MOTION TO WITHDRAW ADMISSIONS

The defendant IKON Office Solutions, Inc. ("IKON") hereby moves pursuant to Fed. R. Civ. P. 36(b) to withdraw the admissions that the plaintiff Human Resources Development Press, Inc. ("HRD") contends control certain issues in this case.  The circumstances of this lawsuit are an example of the very reasons that Rule 36(b) exists – to prevent a technicality from precluding a lawsuit from being decided on its merits.  HRD has had full discovery in this case, including countless hours of depositions and hundreds of pages of written discovery.  Granting this motion will not prejudice HRD and will allow the case to be heard on its merits.

### A.    Relevant Background Information

HRD served its requests for admission and other written discovery requests on IKON on or about July 11, 2006.  Responses to these discovery requests were due on August 13, 2006.  In early August, undersigned counsel contacted HRD's counsel and requested a 30-day extension of time in which to respond to the July 11, 2006 discovery requests.  HRD's counsel agreed to the

requested extension.  But, due to undersigned counsel's failure to adequately explain the reasons

for the requested extension, the Court denied the motion despite HRD's counsel's consent.

IKON served its responses to the requests for admission and other discovery requests,

which included several objections, on HRD at the September 7, 2006 case management

conference.  (See IKON's Responses, dated Sep. 7, 2006, attached hereto as Exhibit A.)  IKON

provided fair and accurate responses to HRD's requests for admission.  (Id.)  IKON

supplemented its interrogatory responses and provided supplemental documents on several

occasions over the course of the next few months.  Not once during discovery did HRD claim

that IKON had waived its objections by its late responses or that IKON's late response

constituted a constructive admission of all of HRD's requests for admission.  This claim only

surfaced when HRD was faced with a summary judgment motion that it could not rebut despite

conducting approximately 30 hours of depositions and obtaining full written discovery.

**A.    Rule 36(b) allows withdrawal of admissions to facilitate consideration of the merits.**

Fed. R. Civ. P. 36(b) allows the Court to "permit withdrawal or amendment when the

presentation of the merits of the action will be subserved thereby and the party who obtained the

admission fails to satisfy the court that the withdrawal or amendment will prejudice that party in

maintaining an action on the merits."  Therefore, the court may allow withdrawal of the

admissions when (1) presentation of the merits will be subserved by allowing the withdrawal;

and (2)  the party who obtained the admission fails to satisfy the court that withdrawal will

prejudice that party in maintaining an action or defense on the merits.  *See Conlon v. U.S.*, 474

F.3d 616, 621 (9th Cir. 2007).

"The first half of the test in Rule 36(b) is satisfied when upholding the admissions would

practically eliminate any presentation of the merits of the case."  *Id.* at 622; *Sonoda v. Cabrera*,

255 F.3d 1035, 1039-40 (9th Cir. 2001) (granting motion to withdraw admissions that would effectively eliminate a merits consideration). In addition, amendments should be permitted when facts developed during discovery contradict the previously "admitted" facts. *See FDIC v. Prusia*, 18 F.3d 637, 641 (8th Cir. 1994) ("Permitting an amendment of responses to a request for admissions is in the interests of justice if the record demonstrates that the 'admitted facts' are contrary to actual facts.")

Once the moving party establishes that withdrawing the admissions will facilitate presentation of the merits, the party who obtained the admissions has the burden of proving that withdrawal or amendment of the admissions will prejudice its case. *Sonoda*, 255 F.3d at 1039. "The prejudice contemplated by 36(b) is not simply that the party who obtained the admission will now have to convince the factfinder of the truth; rather it relates to the difficulty a party may face in proving its case, for example by the unavailability of a key witness in light of the delay." *Id.*; *Conlon*, 474 F.3d at 622. This inquiry focuses on whether the nonmoving party will suffer any prejudice at trial. *Id.* at 623. Reliance upon a deemed admission in preparing a summary judgment motion does not constitute prejudice. *Id.* at 624; *Raiser v. Utah County*, 409 F.3d 1243, 1246 (10th Cir. 2005) ("preparing a summary judgment motion in reliance upon an erroneous admission does not constitute prejudice"). And, lack of discovery, without more, does not constitute prejudice. *Conlon,* 474 F.3d at 624. Again, prejudice must relate to a difficulty that the party may face in proving its case at trial. *Id.*

> **B.    The merits of this case will be subserved by allowing IKON to withdraw the deemed admissions.**

Allowing IKON to withdraw the claimed deemed admissions will allow this matter to be heard on its merits – fully and fairly for both parties. HRD has claimed that the deemed admissions have established "most if not all of the critical material facts at issue[.]" (Opp. to M.

Summ. J. at 7.)  This statement alone provides the basis for determining that IKON has satisfied the first part of the Rule 36(b) inquiry.  *See Conlon*, 474 F.3d at 622 ("The first half of the test in Rule 36(b) is satisfied when upholding the admissions would practically eliminate any presentation of the merits of the case.")  In fact, several of HRD's requests for admission include statements that may establish material issues in this case.  For example, Request for Admission Nos. 14, 15, and 18 would likely establish at least two or three of the material elements of HRD's fraud claim. (Ex. A.)  Accordingly, granting this motion to withdraw the claimed constructive admissions will allow this issue to be heard on the merits and therefore IKON has satisfied the first party of the Rule 36(b) inquiry.  *See Sonoda*, 255 F.3d at 1039-40.

Moreover, HRD developed several facts during discovery that contradict the claimed admissions.  For example, Request for Admission No. 29 sets forth a fact that even HRD admits is contradicted by the current record and that HRD now accepts as false.  Request for Admission No. 29 asks IKON to admit that it collected service/maintenance charges from HRD for the First Equipment through the Second Equipment Monthly Charges.  (Ex. A.)  IKON's Statement of Material Facts expressly contradicts this request for admission.  (Def.'s S.M.F. at ¶ 36, attached as Ex. B.)  HRD now concedes that IKON did not in fact impose such charges. (Pltf.'s R. to Def.'s S.M.F. at ¶ 36, attached as Ex. C.)  Accordingly, the Court should allow IKON to withdraw the claimed admissions.  *See Prusia*, 18 F.3d at 641 ("Permitting an amendment of responses to a request for admissions is in the interests of justice if the record demonstrates that the 'admitted facts' are contrary to actual facts.").

Request for Admission No. 52 also sets forth a fact that is contradicted by the current record.  That request asks IKON to admit that HRD could have purchased the First Equipment for a certain value.  Again, IKON's Statement of Material Facts expressly contradicts this request

4

for admission.  (Def.'s S.M.F. at ¶ 33.)  And again, HRD admits this fact. (Pltf.'s R. to Def.'s

S.M.F. at ¶ 33.)  Accordingly, IKON should be permitted to withdraw the claimed admissions.

*See Prusia*, 18 F.3d at 641.

      **C.**    **HRD cannot show that it will suffer any prejudice at trial if the Court allows this motion.**

      HRD cannot show that it will be prejudiced at trial if the Court grants this motion.  HRD

has known since the inception of this lawsuit that IKON disputes its claims.  IKON's responses

to HRD's requests for admission, albeit late, show IKON's continued opposition to HRD's

claims.  HRD cannot legitimately claim that it relied on the claimed admissions when it

conducted discovery.  Notably, HRD has not filed a motion for summary judgment or any other

requests for affirmative relief based on these admissions that it now claims have established

"most if not all of the critical material facts at issue[.]"  (Opp. to M. Summ. J. at 7.)  If relying on

admissions when preparing and filing a summary judgment motion does not qualify as prejudice

for the Rule 36(b) inquiry, *see Conlon*, 474 F.3d at 624, then allegedly relying on deemed

admissions when opposing a summary judgment motion cannot prejudice HRD.  And again, the

Rule 36(b) inquiry focuses on HRD's potential prejudice at trial, not the summary judgment

stage, particularly when it has had full discovery.  *Id.*

      **D.**    **Conclusion**

      Rule 36 is "not to be used in an effort to 'harass the other side' or in the hope that a

party's adversary will simply concede essential elements."  *Conlon*, 474 F.3d at 622.  "Rather,

the rule seeks to serve two important goals:  truth-seeking in litigation and efficiency in

dispensing justice."  *Id.*  It includes a safe-harbor, Rule 36(b), to ensure that these goals are met

and that parties do not prevail on a technicality rather than the merits.

Granting this motion will allow this matter to proceed on the merits and will serve the interests of justice.  HRD will not be prejudiced at trial because it has had full discovery. Accordingly, the Court should grant this motion and allow IKON to withdraw the deemed admissions, allow the September 7, 2006 responses to HRD's requests for admissions to stand, and allow this matter to proceed on its merits.

DEFENDANT,
IKON OFFICE SOLUTIONS, INC.


By_____/S/ Brett J. Boskiewicz_____
    Bradford S. Babbitt (BBO# 566390)
    e-mail: bbabbitt@rc.com
    Brett J. Boskiewicz (BBO# 656545)
    e-mail: bboskiewicz@rc.com
    Robinson & Cole LLP
    280 Trumbull Street
    Hartford, CT  06103-3597
    Tel. No.: (860) 275-8200
    Fax No.: (860) 275-8299

July 31, 2007

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that Defendant IKON Office Solutions, Inc.'s MOTION TO

WITHDRAW ADMISSIONS was filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies

will be sent to those indicated as non-registered participants on July 31, 2007

 / S /  Brett J. Boskiewicz
Brett J. Boskiewicz

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS INC.,<br>　　　　Plaintiff, | : <br> : <br> : <br> : |
| v. | : 　　3:05-CV-30068-KPN <br> : |
| IKON OFFICE SOLUTIONS, INC. &<br>IOS CAPITAL, INC. d/b/a IKON<br>FINANCIAL SERVICES,<br>　　　　Defendants. | : <br> : <br> : <br> : |

## DEFENDANT IKON OFFICE SOLUTIONS, INC.'S RESPONSES TO PLAINTIFF'S FIRST REQUEST TO ADMIT FACTS TO

Pursuant to Fed. R. Civ. P. 26 and 33 and D. Mass. L. Civ. R. 26.5 and 33.1, the defendant IKON Office Solutions, Inc. hereby responds to the Plaintiff's First Request to Admit Facts.

## DEFINITIONS

A.　　The term IKON Office Solutions, Inc. refers to the Defendant any and all predecessors in interest and its and their past and present agents, employees, consultants, attorneys, and/or other persons or entities acting or purporting to act on IKON Office Solutions, Inc.'s behalf, including IOS Capital, Inc. and IOS Capital, LLC.

B.　　The terms "you," and "your" refers to IKON Office Solutions, Inc. as defined above.

C.　　The term "Field Order" means the Field Order Form/Security Agreement dated May 20, 1998 identified in paragraph 8 in the Plaintiff's First Amended Complaint.

D.　　The term "Oce Agreement" means the Agreement dated May 28, 1998 a copy of which is attached hereto and marked as Exhibit "B".

E.       The term "First Equipment" means the Oce 3100 photocopying equipment, serial no. 179420274 and the Oce 3165 photocopying equipment, serial no. 166004056 identified in paragraph 9 of the Plaintiff's First Amended Complaint.

F.       The term "Second Agreement" means the contract dated June 19, 2000 executed by HRD and IOS Capital, Inc. identified in paragraph 18 of the Plaintiff's First Amended Complaint.

G.       The term "Second Equipment" means the Canon IR330 photocopying equipment, the Canon IR210 photocopying equipment, the Canon IR110 photocopying equipment and the Canon IRCLC 900 photocopying equipment identified in paragraph 19 of the Plaintiff's First Amended Complaint.

H.       The term "Amended Complaint" means HRD's pleading entitled First Amended Complaint, dated November 28, 2005.

I.       The term "Defendant's Answer" means your pleading entitled Defendants' Answer to Plaintiff's First Amended Complaint.

J.       The term "Executive Financial Summary" means that document identified in paragraph 38 of the Plaintiff's First Amended Complaint and attached thereto and mark as Exhibit "D".

K.       The term "Demand for Relief" means that letter dated September 20, 2004, identified in paragraph 48 of the Plaintiff's First Amended Complaint and attached thereto and marked as Exhibit "E".

L.       The term "Documents" shall mean every document within the custody, possession, or control of the person or entity to whom a Request To Admit is directed, and/or its attorneys, representatives, employees, and/or agents, whether an original or copy, as defined

2

above, known to you and every such document or writing which you can locate or discover by reasonably diligent efforts.

     M.     The term "Communicating" or "communication" shall mean and include every manner or means of disclosure, transfer or exchange of information (in the form of facts, ideas, inquiries or otherwise) whether orally or by document and whether by face-to-face exchange, telephone, telecopier, mail, facsimile, personal delivery, e-mail, computer mail, electronic mail, overnight delivery or otherwise.

     N.     The term "Person" or "persons" shall mean any natural person, business, proprietorship, public or private corporation, company, limited liability company, partnership, firm, government or governmental partnership, trusts, joint venture, entity (including any government agency, board, authority, commission, political subdivision or department thereof) or any other form of business or legal entity, organization or arrangement, group or association, whether or not such organization, entity or association has a separate juristic existence in its own right.

     O.     The term "Meeting" shall mean and include any assembly, convocation, or encounter, a contemporaneous exchange between two or more persons for any purpose (including via telephone), whether or not planned, arranged or scheduled in advance and whether or not the meeting was formal or informal or occurred in connection with some other activity.

     P.     The term "Concerning" shall mean relating to, referring to, regarding, describing, evidencing or constituting.

     Q.     The singular includes the plural and the plural includes the singular.  The masculine includes the feminine and the neutral genders.

     R.     The term "And" shall mean and/or.

S.     The term "Or" shall mean and/or.

T.     The term "HRD" shall mean the Plaintiff, Human Resource Development Press, Inc.

U.     The term "First Equipment Monthly Charges" shall mean those payments which HRD was obligated to pay you pursuant to the Oce Agreement.

V.     The term "Second Equipment Monthly Charges" shall mean those payments which HRD was obligated to pay you pursuant to the Second Agreement.


## REQUEST TO ADMIT FACTS

Request for Admission No. 1

Admit that the Field Order was drafted by IKON Office Solutions, Inc.

**RESPONSE:**

Admitted.


Request for Admission No. 2

Admit that the Oce Agreement was drafted by IKON Office Solutions, Inc.

**RESPONSE:**

Admitted.


Request for Admission No. 3

Admit that the Second Agreement was drafted by IKON Office Solutions, Inc.

**RESPONSE:**

Admitted.

Request for Admission No. 4

Admit that the Executive Summary was drafted by IKON Office Solutions, Inc.

**RESPONSE:**

Admitted.


Request for Admission No. 5

Admit that IKON Office Solutions, Inc. received the Plaintiff's Demand for Relief.

**RESPONSE:**

Admitted.


Request for Admission No. 6

Admit that IKON Office Solutions, Inc. did not tender to the Plaintiff a written response to the

Plaintiff's Demand for Relief.

**RESPONSE:**

Admitted.


Request for Admission No. 7

Admit that the first paragraph of the reverse side of the Field Order provides that IKON Office

Solutions, Inc. be referred to as the "SECURED PARTY".

**RESPONSE:**

Admitted.

Request for Admission No. 8

Admit that the first paragraph of the reverse side of the Field Order provides that IKON Office

Solutions, Inc. be granted a purchase money security interest in the First Equipment that was the

subject of the Field Order.

**RESPONSE:**

Admitted.

Request for Admission No. 9

Admit that during the first year the Plaintiff used the First Equipment, the Plaintiff, on more than

five occasions, verbally communicated to IKON Office Solutions, Inc. that the First Equipment

was experiencing mechanical problems.

**RESPONSE:**

Denied.

Request for Admission No. 10

Admit that during the first year the Plaintiff used the First Equipment, the Plaintiff, on more than

five occasions, verbally communicated to IKON Office Solutions, Inc. that the First Equipment

was not meeting HRD's photocopying needs.

**RESPONSE:**

Denied.

Request for Admission No. 11

Admit that in response to HRD's communications as set forth in Request for Admission No. 9 &

10 above, IKON Office Solutions, Inc. told HRD that if it wanted a high production

photocopying capacity it would have to upgrade the First Equipment.


**RESPONSE:**

Denied.


Request for Admission No. 12

Admit that IKON Office Solutions, Inc. negotiated the Second Agreement with Robert W.

Carkhuff, HRD's Treasurer and Secretary.

**RESPONSE:**

Admitted.


Request for Admission No. 13

Admit that at no time prior to IKON Office Solutions, Inc. and HRD's negotiation of the Second

Agreement was HRD in arrears of its monetary payment obligations to IKON Office Solutions,

Inc.

**RESPONSE:**

IKON does not have sufficient information within its possession, custody, or control to

respond to this request. In December 2003, IKON and the former IOS Capital, LLC sold certain

assets and liabilities of IOS Capital, including a portion of its lease portfolio, its facilities,

systems, and processes to General Electric Capital Corporation ("GE Capital"). As part of this

transaction, the approximately 400 IOS Capital employees were offered employment by GE

Capital. HRD's lease was ultimately transferred to General Electric Capital Corporation in April

2004.

Request for Admission No. 14

Admit that, during IKON Office Solutions, Inc. and HRD's negotiation of the Second

Agreement, IKON Office Solutions, Inc. told Robert W. Carkhuff, HRD's Treasurer and

Secretary, that IKON Office Solutions, Inc was substituting the Oce Agreement with the Second

Agreement and that HRD would have no further payment obligations pursuant to the Oce

Agreement.

**RESPONSE:**

Denied.

Request for Admission No. 15

Admit that when IKON Office Solutions, Inc. told Robert W. Carkhuff, HRD's Treasurer and

Secretary, that IKON Office Solutions, Inc was substituting the Oce Agreement with the Second

Agreement and that HRD would have no further payment obligations pursuant to the Oce

Agreement, you knew said statement was false.

**RESPONSE:**

Denied.

8

Request for Admission No. 16

Admit that HRD surrendered its possession and control of the First Equipment to IKON Office

Solutions, Inc.

**RESPONSE:**

Admitted.


Request for Admission No. 17

Admit that at no time after HRD surrendered its possession and control of the First Equipment to

IKON Office Solutions, Inc. did you provide to HRD any financial credit or monetary value in

exchange for the surrendered First Equipment.

**RESPONSE:**

Denied.


Request for Admission No. 18

Admit that after the execution of the Second Agreement, IKON Office Solutions, Inc. continued

to impose and collect payments from HRD for obligations you believed HRD still had under the

Oce Agreement.

**RESPONSE:**

Admitted.

Request for Admission No. 19

Admit that as a result of the fact that IKON Office Solutions, Inc. did not provide HRD with any

financial credit or monetary value in exchange for its surrender of the First Equipment, you

continued to charge HRD the full amount of the remaining payments due pursuant to the Oce

Agreement.

**RESPONSE:**

Denied.


Request for Admission No. 20

Admit that you did not provide HRD any reduction in the amount of the Second Equipment

Monthly Charges in consideration for HRD's surrender of the First Equipment to you.

**RESPONSE:**

Denied.


Request for Admission No. 21

Admit that there are no terms or provisions in the Oce Agreement which state that the Oce

Agreement supersedes or cancels any of the provisions contained in the Field Order.

**RESPONSE:**

Denied.

Request for Admission No. 22

Admit that pursuant to the Executive Financial Summary, as of November 7, 2003, if HRD

wanted to purchase the Second Equipment from you, HRD only had to pay $81,367.77 more

than the amount HRD was required to pay you if HRD wanted to return the Second Equipment

to you.

**RESPONSE:**

Admitted.


Request for Admission No. 23

Admit that pursuant to the Executive Financial Summary the total amount of payments HRD was

obligated to pay you pursuant to the Second Agreement was $758,340.

**RESPONSE:**

Admitted.


Request for Admission No. 24

Admit that in the case of In re Access Equipment, Inc., 62 BR. 642, 646 (D. Mass. 1986) the

court held that the most significant factor in distinguishing the conditional sale masquerading as

a lease and a true lease is the relationship of the option price to the value of the goods at the end

of the lease term.

**OBJECTION:**

IKON objects to this request because it incompletely characterizes a written document and a legal conclusion. IKON further objects because this request does not comply with Fed. R. Civ. P. 36. This request seeks an admission of an opinion of law, not fact and not an application of facts to law and therefore is outside the scope of Rule 36.

Request for Admission No. 25

Admit that in the case of In re Access Equipment, Inc., 62 B.R. 642, 646 (D. Mass. 1986) the court held that if at the end of the lease term the only sensible course economically for the lessee would be for him to exercise his option to purchase, the transaction is really a secured installment sale to which Article Nine applies.

**OBJECTION:**

IKON objects to this request because it incompletely characterizes a written document and a legal conclusion. IKON further objects because this request does not comply with Fed. R. Civ. P. 36. This request seeks an admission of an opinion of law, not fact and not an application of facts to law and therefore is outside the scope of Rule 36.

Request for Admission No. 26

Admit that in the case of In re Access Equipment, Inc., 62 B.R. 642, 646 (D. Mass. 1986) the court reasoned that if the option price to purchase a piece of equipment is more than 25% of the total payments to be paid under the contract then the contract is not intended for security.

**OBJECTION:**

IKON objects to this request because it incompletely characterizes a written document and a legal conclusion. IKON further objects because this request does not comply with Fed. R. Civ. P. 36. This request seeks an admission of an opinion of law, not fact and not an application of facts to law and therefore is outside the scope of Rule 36.

Request for Admission No. 27

Admit that the $81,367.77 referenced In Request for Admission No. 21 is not more than 10.729% of the total amount of payments referenced in Request for Admission No. 23.

**RESPONSE:**

Admitted.

Request for Admission No. 28

Admit that if you apply the legal holdings of the In re Access Equipment, Inc. court, as set forth in Request for Admissions Nos. 24, 25 and 26 above to the facts requested to be admitted in Request for Admissions Nos. 22, 23 and 27 above, the Second Agreement is an agreement intended to provide a security interest to you.

**RESPONSE:**

Denied.

Request for Admission No. 29

Admit that that IKON collected service / maintenance charges from HRD for the First Equipment through the Second Equipment Monthly Charges.

13

**RESPONSE:**

IKON does not have sufficient information within its possession, custody, or control to respond to this request. In December 2003, IKON and the former IOS Capital, LLC sold certain assets and liabilities of IOS Capital, including a portion of its lease portfolio, its facilities, systems, and processes to General Electric Capital Corporation ("GE Capital"). As part of this transaction, the approximately 400 IOS Capital employees were offered employment by GE Capital. HRD's lease was ultimately transferred to General Electric Capital Corporation in April 2004.

Request for Admission No. 30

Admit that the Oce Agreement imposed an obligation upon HRD to pay sales taxes for the First Equipment.

**RESPONSE:**

Denied. IKON does, however, admit that paragraph 3 of the Oce Agreement requires HRD to pay "all taxes, fees, and filing costs related to the use of the System...."

Request for Admission No. 31

Admit that you collected from HRD sales taxes for the First Equipment.

**RESPONSE:**

IKON does not have sufficient information within its possession, custody, or control to respond to this request. In December 2003, IKON and the former IOS Capital, LLC sold certain assets and liabilities of IOS Capital, including a portion of its lease portfolio, its facilities, systems, and processes to General Electric Capital Corporation ("GE Capital"). As part of this

14

transaction, the approximately 400 IOS Capital employees were offered employment by GE

Capital. HRD's lease was ultimately transferred to General Electric Capital Corporation in April

2004.


Request for Admission No. 32

Admit that the Second Agreement imposed an obligation upon HRD to pay sales taxes for the

Second Equipment.

**RESPONSE:**

Denied. IKON does, however, admit that paragraph 5 of the Second Agreement requires HRD to

pay "all taxes, fees, and filing costs related to the use of the System...."


Request for Admission No. 33

Admit that you collected from HRD sales taxes for the Second Equipment.

**RESPONSE:**

IKON does not have sufficient information within its possession, custody, or control to

respond to this request. In December 2003, IKON and the former IOS Capital, LLC sold certain

assets and liabilities of IOS Capital, including a portion of its lease portfolio, its facilities,

systems, and processes to General Electric Capital Corporation ("GE Capital"). As part of this

transaction, the approximately 400 IOS Capital employees were offered employment by GE

Capital. HRD's lease was ultimately transferred to General Electric Capital Corporation in April

2004.

Request for Admission No. 34

Admit that the Oce Agreement imposed an obligation upon HRD to maintain comprehensive

insurance on the First Equipment.

**RESPONSE:**

Denied.


Request for Admission No. 35

Admit that HRD paid for comprehensive insurance on the First Equipment.

**RESPONSE:**

IKON does not have sufficient information within its possession, custody, or control to

respond to this request. In December 2003, IKON and the former IOS Capital, LLC sold certain

assets and liabilities of IOS Capital, including a portion of its lease portfolio, its facilities,

systems, and processes to General Electric Capital Corporation ("GE Capital"). As part of this

transaction, the approximately 400 IOS Capital employees were offered employment by GE

Capital. HRD's lease was ultimately transferred to General Electric Capital Corporation in April

2004.


Request for Admission No. 36

Admit that the Second Agreement imposed an obligation upon HRD to maintain comprehensive

insurance on the Second Equipment.

**RESPONSE:**

Denied.

16

Request for Admission No. 37

Admit that HRD paid for comprehensive insurance on the Second Equipment.

**RESPONSE:**

IKON does not have sufficient information within its possession, custody, or control to respond to this request. In December 2003, IKON and the former IOS Capital, LLC sold certain assets and liabilities of IOS Capital, including a portion of its lease portfolio, its facilities, systems, and processes to General Electric Capital Corporation ("GE Capital"). As part of this transaction, the approximately 400 IOS Capital employees were offered employment by GE Capital. HRD's lease was ultimately transferred to General Electric Capital Corporation in April 2004.

Request for Admission No. 38

Admit that the Oce Agreement imposed an obligation upon HRD to maintain the First Equipment.

**RESPONSE:**

Denied.

Request for Admission No. 39

Admit that HRD paid for the maintenance of the First Equipment.

**RESPONSE:**

IKON does not have sufficient information within its possession, custody, or control to respond to this request. In December 2003, IKON and the former IOS Capital, LLC sold certain assets and liabilities of IOS Capital, including a portion of its lease portfolio, its facilities,

17

systems, and processes to General Electric Capital Corporation ("GE Capital"). As part of this transaction, the approximately 400 IOS Capital employees were offered employment by GE Capital. HRD's lease was ultimately transferred to General Electric Capital Corporation in April 2004.

Request for Admission No. 40

Admit that the Second Agreement imposed an obligation upon HRD to maintain the Second Equipment.

**RESPONSE:**

Denied.

Request for Admission No. 41

Admit that HRD paid for the maintenance of the Second Equipment.

**RESPONSE:**

IKON does not have sufficient information within its possession, custody, or control to respond to this request. In December 2003, IKON and the former IOS Capital, LLC sold certain assets and liabilities of IOS Capital, including a portion of its lease portfolio, its facilities, systems, and processes to General Electric Capital Corporation ("GE Capital"). As part of this transaction, the approximately 400 IOS Capital employees were offered employment by GE Capital. HRD's lease was ultimately transferred to General Electric Capital Corporation in April 2004.

18

Request for Admission No. 42

Admit that the Oce Agreement imposed upon HRD the risk of loss for the First Equipment.

**OBJECTION:**

IKON objects to this request because it incompletely characterizes the terms of a written

document. The terms of the document speak for themselves.

Request for Admission No. 43

Admit that the Second Agreement imposed upon HRD the risk of loss for the Second Equipment.

**OBJECTION:**

IKON objects to this request because it incompletely characterizes the terms of a written

document. The terms of the document speak for themselves.

Request for Admission No. 44

Admit that pursuant to the Oce Agreement you had the right to accelerate payments upon default.

**RESPONSE:**

Admitted.

Request for Admission No. 45

Admit that pursuant to the Second Agreement you had the right to accelerate payments upon

default.

**RESPONSE:**

Admitted.

Request for Admission No. 46

Admit that pursuant to the terms of the Oce Agreement you had the right to file a U.C.C.

financing statement.

**OBJECTION:**

IKON objects to this request because it incompletely characterizes the terms of a written

document. The terms of the document speak for themselves.

Request for Admission No. 47

Admit that pursuant to the terms of the Second Agreement you had the right to file a U.C.C.

financing statement.

**OBJECTION:**

IKON objects to this request because it incompletely characterizes the terms of a written

document. The terms of the document speak for themselves.

Request for Admission No. 48

Admit that the Oce Agreement disclaims all warranties of fitness for a particular purpose and/or

merchantability.

**RESPONSE:**

Denied.

Request for Admission No. 49

Admit that the Second Agreement disclaims all warranties of fitness for a particular purpose

and/or merchantability.

**RESPONSE:**

Denied.


Request for Admission No. 50

Admit that the photocopying equipment which was the subject of the Oce Agreement was pre-

selected by HRD and purchased by you for HRD's use pursuant to the Oce Agreement.

**RESPONSE:**

Denied.


Request for Admission No. 51

Admit that the photocopying equipment which was the subject of the Second Agreement was

pre-selected by HRD and purchased by you for HRD's use pursuant to the Second Agreement.

**RESPONSE:**

Denied.


Request for Admission No. 52

Admit that the First Equipment could have been purchased by HRD for less then 25% of the total

of all the First Equipment Monthly Charges.

**RESPONSE:**

Denied.

Request for Admission No. 53

Admit that in exchange for monetary consideration, you transferred title to the First Equipment

to a third party.

**RESPONSE:**

Denied.


DEFENDANT
IKON OFFICE SOLUTIONS, INC.

By _____
    Bradford S. Babbitt (BBO# 566390)
    e-mail: bbabbitt@rc.com
    Brett J. Boskiewicz (BBO# 656545)
    e-mail: bboskiewicz@rc.com
    Robinson & Cole LLP
    280 Trumbull Street
    Hartford, CT  06103-3597
    Tel. No.: (860) 275-8200
    Fax No.: (860) 275-8299

Dated:  September 7, 2006

22

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served by hand delivery this 7th day of September, 2006, to the following counsel of record:

David J. Noonan
228 Triangle Street
Amherst, MA  01002


_Brett J. Boskiewicz_
Brett J. Boskiewicz

**EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | 3:05-CV-30068-KPN |
| v. | : | |
| | : | |
| IKON OFFICE SOLUTIONS, INC. & IOS CAPITAL, INC. d/b/a IKON FINANCIAL SERVICES, | : | |
| | : | |
| Defendants. | : | |

**DEFENDANT'S L. CIV. R. 56.1 STATEMENT OF MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

1.      HRD creates, owns, and publishes certain assessment tests, human resource training materials, and various other training and development materials. (First Am. Compl., ¶ 6.)

2.      HRD has had a business relationship with IKON or its predecessors since at least 1987. This relationship has involved at least three lease agreements – a 1996 lease agreement for an Oce 2600 document reproduction machine and the 1998 and 2000 lease agreements that are the subject of this lawsuit. (Affidavit of Jeffrey Snyder ("Snyder Aff.") ¶ 6; Mem. Law Supp. Def.'s Summ. J., Ex. 1.)

**The First Agreement**

3.      On or about May 20, 1998, HRD and IKON entered into a written agreement concerning HRD's use of two document reproduction machines (the "First Agreement") – an

Oce 3100 and an Oce 3165 (collectively, the "First Equipment"). (Snyder Aff. ¶ 7, Ex. A.; First Am. Compl., ¶ 8.)

4.      A true and correct copy of the First Agreement is attached as Exhibit A to the Affidavit of Jeffrey Snyder. (Snyder Aff. ¶ 7, Ex. A.)

5.      The First Agreement specifies that the "Minimum Term" of that agreement is 60 months. (Snyder Aff. Ex. A.)

6.      The First Agreement specifies that: "THIS AGREEMENT IS NON-CANCELABLE. The Customer agrees to all of the terms and conditions contained in this Agreement. The Customer agrees this Agreement is for the minimum usage term indicated above." (Snyder Aff. Ex. A.)

7.      The First Agreement sets forth the monthly payments due from HRD to IKON as $4,268.00 per month for the first 36 months of the 60-month term and $5,825.00 for months 37 through 60. The sum of these payments totals $293,448.00. (Snyder Aff. Ex. A.)

8.      Paragraph 1 of the Terms and Conditions of the First Agreement reads: "Ownership of System. IOS Capital is the sole owner and title holder to the System." (Snyder Aff. Ex. A.)

9.      Paragraph 9 of the Terms and Conditions of the First Agreement reads, in part: "THE CUSTOMER HAS NO RIGHT TO SELL, TRANSFER, ENCUMBER, SUBLET OR ASSIGN THE SYSTEM OR THIS AGREEMENT." (Snyder Aff. Ex. A.)

10.      Paragraph 13 of the Terms and Conditions of the First Agreement reads: "Renewal. After the Minimum Term or any extension agreed to, this Agreement will automatically renew on a month to month basis unless the Customer notifies IOS Capital in writing 30 days prior to the expiration of the Minimum Term or extension. At the end of the

2

Agreement the Customer agrees to pay shipping charges as determined by IKON Dealer. The Customer must pay any additional rents due until the System is received in good working condition by IOS Capital or its agents." (Snyder Aff. Ex. A.)

11.     Paragraph 15 of the Terms and Conditions of the First Agreement reads in part: "Entire Agreement: This Agreement represents the entire Agreement between IOS Capital and the Customer. Neither IOS Capital nor the Customer will be bound by any amendment, waiver, or other change unless agreed to in writing and signed by both parties. Except for identifying the goods, services, or software ordered, the price(s), and the quantity(ies), the terms and conditions of the purchase order, or other ordering documents of Customer will not modify or affect this Agreement, or have any other legal effect whether issued or signed before, on, or after the date of this Agreement." (Snyder Aff. Ex. A.)

12.     The First Agreement does not include any terms that bind HRD to renew the lease for the remaining economic life of the First Equipment or to become the owner of the First Equipment. (Snyder Aff. Ex. A.)

13.     The First Agreement does not include any terms that allow HRD to renew the lease for the remaining economic life of the First Equipment for no additional consideration or nominal addition consideration upon compliance with the First Agreement. (Snyder Aff. Ex. A.)

14.     The First Agreement does not include any terms that give HRD the option to become the owner of the First Equipment for no additional consideration or nominal additional consideration upon compliance with the First Agreement. (Snyder Aff. Ex. A.)

15.     At the inception of the First Agreement, IKON determined that the First Equipment would have a certain value at the end of the First Agreement. (Deposition of Daniel Feldmann ("Feldmann Dep.") at 12:10-13:8; Mem. Law Supp. Def.'s Summ. J., Ex. 2.)

3

16.    At the inception of the First Agreement, IKON determined that the Oce 3100 that was the subject of the First Agreement would be worth approximately $11,820.00 at the end of the First Agreement. (Feldmann Dep. at 12-13.)

17.    At the inception of the First Agreement, IKON determined that the Oce 3165 that was the subject of the First Agreement would be worth approximately $6,334.00 at the end of the First Agreement. (Feldmann Dep. at 13.)

**The Second Agreement**

18.    In early 2000, document production technology evolved and Canon Inc. introduced its ImageRunner 110 digital printing system. (Snyder Aff. ¶ 8.)

19.    The ImageRunner 110 was a new digital document production system that offered near offset press quality printing and high speed production capacity. (Snyder Aff. ¶ 8.)

20.    An IKON service technician told HRD about the new technology and suggested that it look into the benefits that the ImageRunner could offer HRD's business. (December 7, 2006 Deposition of Jeffrey Snyder ("12/7 Snyder Dep.") at 62-63; Mem. Law Supp. Def.'s Summ. J., Ex. 3.)

21.    HRD contacted its IKON account representative and began a several month process of evaluating the ImageRunner product line. (Snyder Aff. ¶ 10; 12/7 Snyder Dep. at 110-116.)

22.    This process included several meetings between IKON and HRD personnel to assess HRD's business needs, demonstrate the ImageRunner technology, and inspect and assess HRD's facilities to determine installation logistics such as electric service, network requirements, and physical space requirements. (12/7 Snyder Dep. at 106-110.)

23.    HRD was pleased with the technology and eventually decided to implement a

Canon ImageRunner 110, ImageRunner 330, ImageRunner 210, and a CLC 900 (collectively, the

"Second Equipment") into its business operations.  (12/7 Snyder Dep. at 114-116; Snyder Aff.

¶ 11.)

24.    On or about June 14, 2000, IKON's Jeff Snyder, Doug Thornton, and Al

Maximino met with HRD's President, Robert Carkhuff, to present the terms of a proposed lease

agreement and discuss the logistics of installing the Second Equipment.  (12/7 Snyder Dep. at

68-70; Snyder Aff. ¶ 12, Ex. B.)  This meeting detailed the delivery and installation process, the

removal of the First Equipment, training that IKON would give HRD's staff, services that IKON

would provide to minimize the production downtime during installation, and the financial terms

of the proposed lease agreement.  (12/7 Snyder Dep. at 106-110; Snyder Aff. ¶ 12.)

25.    On or about June 19, 2000, Snyder, Thornton, and Maximino met with Robert

Carkhuff again to finalize the proposed agreement.  (12/7 Snyder Dep. at 134-136; Snyder Aff. ¶

15, Ex. C.)  During this meeting, Robert Carkhuff executed a written agreement concerning

HRD's use of the Second Equipment (the "Second Agreement").  (12/7 Snyder Dep. at 134-136;

Snyder Aff. ¶ 15.)

26.    A true and correct copy of the Second Agreement is attached as Exhibit C to the

Affidavit of Jeffrey Snyder.  (Snyder Aff. ¶ 15, Ex. C.)

27.    The June 14th and June 19th meetings were the only two times when HRD and

IKON discussed the financial terms of the Second Agreement before HRD signed that

agreement.  (Snyder Aff. ¶ 17.)

5

28.     Robert Carkhuff did not ask IKON whether the Second Agreement included the remaining obligation that HRD owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶ 18.)

29.     Robert Carkhuff did not question the Second Agreement's monthly payment amount or attempt to negotiate that amount before he signed the Second Agreement.   (12/7 Snyder Dep. at 110-113; Snyder Aff. ¶ 19.)  His only questions during the June 14, 2000 and June 19, 2000 meetings with IKON concerned the logistics of installation and whether HRD would experience any downtime during installation. (12/7 Snyder Dep. at 109-113; Snyder Aff. ¶ 19.)  He asked no questions about the costs. (12/7 Snyder Dep. at 109-113; Snyder Aff. ¶ 19.)

30.     Jeff Snyder did not tell Robert Carkhuff or anyone from HRD that cost of the Second Agreement would not or did not include the remaining obligation that HRD owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶ 20.)

31.     Doug Thornton did not tell Robert Carkhuff or anyone from HRD that cost of the Second Agreement would not or did not include the remaining obligation that HRD owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶ 21.)

32.     Al Maximino did not tell Robert Carkhuff or anyone from HRD that cost of the Second Agreement would not or did not include the remaining obligation that HRD owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶ 21.)

33.     IKON did not give HRD the option to buy out or become the owner of the First Equipment before or after HRD signed the Second Agreement. (Snyder Aff. ¶ 22.)

6

34.    The Second Agreement was a 72-month lease agreement that required HRD to pay $8,949.00 per month for the first thirty-six months and $12,116.00 per month for the final thirty-six months. (Snyder Aff. Ex. C.)

35.    The Second Agreement's monthly payments included charges for use of the Second Equipment, charges for services and supplies for the Second Equipment, and charges to satisfy the remaining $119,996.00 that HRD owed for the equipment charges on the First Agreement. (Dec. 18, 2006 Deposition of Jeffrey Snyder ("12/16 Snyder Dep.") at 68, Mem. Law Supp. Def.'s Summ. J., Ex. 4; April 30, 2007 Deposition of Jeffrey Snyder ("4/30 Snyder Dep.") at 53-54, Mem. Law Supp. Def.'s Summ. J., Ex. 5.)

36.    The Second Agreement's monthly payments did not include the remaining service and supply charges associated with the First Agreement. (4/30 Snyder Dep. at 41-43; December 6, 2006 Deposition of Glenn Robbins ("Robbins Dep.") at 114, Mem. Law Supp. Def.'s Summ. J., Ex. 6.)

37.    In July 2000, HRD asked Jeff Snyder to provide HRD with the costs of the Second Equipment for insurance and/or accounting purposes. (Snyder Aff. ¶ 23.) In response to this request, Jeff Snyder prepared an Accounting Value Statement for the Second Equipment based on the manufacturer's suggested retail price of that equipment and gave it to HRD in July 2000. (Snyder Aff. ¶ 23, Ex. D.)

38.    A true and correct copy of the Accounting Value Statement is attached as Exhibit D to the Affidavit of Jeffrey Snyder. (Snyder Aff. ¶ 23, Ex. D.) Jeff Snyder prepared this Accounting Value Statement in July 2000 in the regular course of his job duties with IKON at that time. (Snyder Aff. ¶ 23.) IKON maintained a copy of this Accounting Value Statement in

7

the regular course of its business activities in a file located at its West Springfield, Massachusetts office. (Snyder Aff. ¶ 23.)

39.    IKON installed the Second Equipment at HRD in July 2000. (Snyder Aff. ¶ 24.)

40.    IKON removed the First Equipment from HRD's facilities in or about July 2000. (Snyder Aff. ¶ 24.)

41.    IKON subsequently evaluated the First Equipment to determine whether it had any value at that time. (12/7 Snyder Dep. at 95-97.)

42.    The Oce 3100, which was part of the First Equipment, did not have any value at that time and therefore IKON discarded the machine or stripped it for parts. (12/7 Snyder Dep. at 98, 100-102.)

43.    The Oce 3165, which was part of the First Equipment, was sold for $4,500 to a wholesaler. (12/7 Snyder Dep. at 98, 100-102.)

**HRD Experiences Financial Troubles**

44.    HRD contacted IKON in the fall of 2003 and informed IKON that it had been having financial problems for the past three years and had lost over $700,000 during that time. (Affidavit of Glenn Robbins ("Robbins Aff.") ¶¶ 7-8, Mem. Law Supp. Def.'s Summ. J., Ex. 7.)

45.    HRD's consultant, Don Collins, told IKON's Glenn Robbins that he and HRD's Greg Carkuff were evaluating the business finances to determine whether to continue the business, liquidate, or file for bankruptcy. Collins asked to meet with IKON to discuss ways to lower HRD's monthly payment obligation. (Robbins Aff. ¶ 7.)

46.    Robbins met with Collins and Greg Carkhuff on October 29, 2003. (Robbins Aff. ¶ 8.)

47.     At the October 29, 2003 meeting between IKON and HRD, the parties discussed HRD's need to reduce its monthly payments. This discussion also included what the monthly payments comprised – the equipment charges, the service and supply charges, and the remaining obligation from the First Agreement. (Robbins Aff. ¶ 8.)

48.     At the October 29, 2003 meeting, HRD asked Robbins for the specific dollar amounts for the equipment charges, service and supply charges, and the charges for the remaining obligation on the First Agreement that made up the Second Agreement's monthly payments. (Robbins Dep. at 99-100; Robbins Aff. ¶ 8.) Robbins did not have that information but told HRD that he would get the figures and get back to them. (Robbins Aff. ¶ 8.)

49.     IKON met with Collins and Greg Carkhuff again on November 7, 2003. (Robbins Aff. ¶¶ 10-11.) Robbins, Paul Lee, a Director of Finance, and Joe McGrath, a Business Development Manager, attended this meeting. (Robbins Dep. at 105; Robbins Aff. ¶ 10.)

50.     Robbins prepared and presented a written financial summary dated November 7, 2003 that included the information that HRD had requested at the October 29th meeting. (Robbins Dep. at 105; Robbins Aff. ¶ 10, Ex. B.)

51.     At the November 7, 2003 meeting, IKON agreed to reduce the service and supply component by approximately $1,300 per month and waive a late fee on a recent invoice. (Robbins Aff. ¶ 11.) IKON also agreed to evaluate whether HRD could re-finance and extend the Second Agreement for a longer period of time, which would reduce the monthly payment amount. (Robbins Aff. ¶ 11.)

52.     After the November 7, 2003 meeting, Greg Carkhuff sent an e-mail to Paul Lee expressing his appreciation for the financial concessions that IKON had made and stating that he

looked forward to receiving a proposal to re-finance the Second Agreement. (Robbins Aff. ¶ 14.)

53.    A true and correct copy of the November 19, 2003 e-mail that Greg Carkhuff sent to Paul Lee is attached as Exhibit D to the Affidavit of Glenn Robbins. (Robbins Aff. ¶ 14, Ex. D.)

54.    HRD did not express any dissatisfaction or surprise at either the October 29, 2003 or November 7, 2003 meetings that the remaining obligation from the First Agreement was a component of the Second Agreement or accuse IKON of misrepresenting that fact to HRD. (Robbins Aff. ¶ 15.)

55.    Greg Carkhuff informed IKON during late November or early December 2003 that HRD had obtained quotes for other document printing equipment from one of IKON's competitors and asked IKON to provide a quote for the same or a similar configuration of equipment. (Robbins Dep. at 163-66; Robbins Aff. ¶ 16.) Glenn Robbins attempted to put together such a quote, but at that time HRD did not qualify for a new lease agreement with IKON for the same or similar configuration of equipment that the competitor had quoted. (Robbins Aff. ¶ 16.) Glenn Robbins met with Greg Carkhuff on January 22, 2004 and informed him that HRD did not have the financial ability to qualify for a new lease with IKON for the same or similar configuration of equipment that the competitor had quoted and therefore IKON could not give HRD a quote for the equipment that the competitor had proposed. (Robbins Aff. ¶ 16.)

56.    The discussions between IKON and HRD ended in February 2004 when Greg Carkhuff sent an e-mail to IKON that read: "Unfortunately things are not working out the way we hoped with business or the restructuring.  I am therefore turning everything over to our

10

attorney David Noonan.  You should direct all your inquiries to him.  For everybody's reference, I am including contact information below."  (Robbins Aff. ¶ 17, Ex. E.)

57.    HRD made its monthly payments on the Second Agreement until May 2004. (Snyder Aff. ¶ 25.)  It has not made a payment since then.  (Snyder Aff ¶ 25.)

58.    HRD still has possession of the Second Equipment.

59.    HRD's fraud allegations first surfaced in a demand letter that IKON received from HRD's attorney in September 2004.  (Snyder Aff. ¶ 26.)

60.    HRD's September 2004 demand letter accused IKON of telling HRD that the Second Agreement would not include the service and supply component of the First Agreement. (First Am. Compl., Ex. E.)  It did not claim that IKON told it that the Second Agreement would not include any of the remaining obligation on the First Agreement.  (Id.)  That allegation appeared for the first time when HRD filed this lawsuit in March 2005.  (Compl., Count II, ¶ 57.)

DEFENDANT,
IKON OFFICE SOLUTIONS, INC.

By_____ /S/ Brett J. Boskiewicz _____
     Bradford S. Babbitt (BBO# 566390)
     e-mail: bbabbitt@rc.com
     Brett J. Boskiewicz (BBO# 656545)
     e-mail: bboskiewicz@rc.com
     Robinson & Cole LLP
     280 Trumbull Street
     Hartford, CT  06103-3597
     Tel. No.: (860) 275-8200
     Fax No.: (860) 275-8299

July 10, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that Defendant IKON Office Solutions, Inc.'s DEFENDANT'S L. CIV.

R. 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR

SUMMARY JUDGMENT was filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies

will be sent to those indicated as non-registered participants on July 10, 2007

   / S /  Brett J. Boskiewicz
Brett J. Boskiewicz

**EXHIBIT C**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                        )
HUMAN RESOURCE DEVELOPMENT )
PRESS, INC.,                            )
        Plaintiff,                      )
                                        )
v.                                      )          3:05-CV-30068-KPN
                                        )
IKON OFFICE SOLUTIONS, INC.             )
                                        )
        Defendant                       )
                                        )
```

## PLAINTIFF'S RESPONSE TO DEFENDANT'S L. CIV. R. 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.    HRD creates, owns, and publishes certain assessment tests, human resource training materials, and various other training and development materials. (First Am. Compl., ¶ 6.)


**( admitted )**


2.    HRD has had a business relationship with IKON or its predecessors since at least 1987. This relationship has involved at least three lease agreements a 1996 lease agreement for an Oce 2600 document reproduction machine and the 1998 and 2000 lease agreements that are the subject of this lawsuit. (Affidavit of Jeffrey Snyder ("Snyder Aff.") ¶ 6; Mem. Law Supp. Def.'s Summ. J., Ex. 1.)

( admitted )

The First Agreement

3.    On or about May 20, 1998, HRD and IKON entered into a written
agreement concerning HRD's use of two document reproduction machines (the
"First Agreement") – an Oce 3100 and an Oce 3165 (collectively, the "First
Equipment'). (Snyder Aff. ¶ 7, Ex. A., First Am. Compl. ¶ ; 8.)

( admitted )

4.    A true and correct copy of the First Agreement is attached as Exhibit A
to the Affidavit of Jeffrey Snyder. (Snyder Aff. ¶ 7, Ex. A.)

( admitted )

5.    The First Agreement specifies that the "Minimum Term" of that
agreement is 60 months. (Snyder Aff. Ex. A.)

( admitted )

6.    The First Agreement specifies that: "THIS AGREEMENT IS NON-
CANCELABLE. The Customer agrees to all of the terms and conditions
contained in this Agreement. The Customer agrees this Agreement is for the
minimum usage term indicated above." (Snyder Aff. Ex. A.)

2

( admitted )

7.    The First Agreement sets forth the monthly payments due from HRD to IKON as $4,268.00 per month for the first 36 months of the 60-month term and $5,825.00 for months 37 through 60. The sum of these payments totals $293,448.00. (Snyder Aff. Ex. A.)


( admitted )


8.    Paragraph 1 of the Terms and Conditions of the First Agreement reads: "Ownership of System. IOS Capital is the sole owner and title holder to the System." (Snyder Aff. Ex. A.)

( admitted paragraph 1 contains said words but denied that said words control the legal impact of the document )


9.    Paragraph 9 of the Terms and Conditions of the First Agreement reads, in part: "'THE CUSTOMER HAS NO RIGHT TO SELL, TRANSFER, ENCUMBER, SUBLET OR ASSIGN THE SYSTEM OR THIS AGREEMENT." (Snyder Aff. Ex. A.)


( admitted paragraph 9 contains said words but denied that said words control the legal impact of the document )

3

10.   Paragraph 13 of the Terms and Conditions of the First Agreement reads: "Renewal. After the Minimum Term or any extension agreed to, this Agreement will automatically renew on a month to month basis unless the Customer notifies IOS Capital in writing 30 days prior to the expiration of the Minimum Term or extension. At the end of the Agreement the Customer agrees to pay shipping charges as determined by IKON Dealer. The Customer must pay any additional rents due until the System is received in good working condition by IOS Capital or its agents." (Snyder Aff. Ex. A.)

**( admitted paragraph 13 contains said words but denied that said words control the legal impact of the document )**

11.   Paragraph 15 of the Terms and Conditions of the First Agreement reads in part: "Entire Agreement: This Agreement represents the entire Agreement between IOS Capital and the Customer. Neither IOS Capital nor the Customer will be bound by any amendment, waiver, or other change unless agreed to in writing and signed by both parties. Except for identifying the goods, services, or software ordered, the price(s), and the quantity(ies), the terms and conditions of the purchase order, or other ordering documents of Customer will not modify or affect this Agreement, or have any other legal effect whether issued or signed before, on, or after the date of this Agreement." (Snyder Aff. Ex. A.)

4

( admitted paragraph 15 contains said words but denied that said words control the legal impact of the document )

12.    The First Agreement does not include any terms that bind HRD to renew the lease for the remaining economic life of the First Equipment or to become the owner of the First Equipment. (Snyder Aff. Ex. A.)

( admitted )

13.    The First Agreement does not include any terms that allow HRD to renew the lease for the remaining economic life of the First Equipment for no additional consideration or nominal addition consideration upon compliance with the First Agreement. (Snyder Aff. Ex. A.)

( admitted said specific terms are not included but denied HRD was not able to purchase the First Equipment from IKON, see Aff. of G. Carkhuff, ¶ 29)

14.    The First Agreement does not include any terms that give HRD the option to become the owner of the First Equipment for no additional consideration or nominal additional consideration upon compliance with the First Agreement. (Snyder Aff. Ex. A.)

( admitted said specific terms are not included but denied HRD was then able to purchase the First Equipment from IKON, see Aff. of G. Carkhuff, ¶ 29)

15.   At the inception of the First Agreement, IKON determined that the First

Equipment would have a certain value at the end of the First Agreement.

(Deposition of Daniel Feldmann ("Feldmann Dep.") at 12:10-1 3:8; Mem. Law Supp.

Def.'s Summ. J., Ex. 2.)


**( admitted but denied said determination had any basis in reality or law**

**or that IKON itself even deemed said determination to be valid, see Aff. of G.**

**Carkhuff, ¶ 25, 26, 27 & 28 )**


16.   At the inception of the First Agreement, IKON determined that the

Oce 3100 that was the subject of the First Agreement would be worth

approximately $11.820.00 at the end of the First Agreement. (Feldmann <u>Dep. at</u>

12-13.)


**( admitted but denied said determination had any basis in reality or law**

**or that IKON itself even deemed said determination to be valid, see Aff. of G.**

**Carkhuff, ¶ 24, 25, 26, 27 & 28 )**


17.   At the inception of the First Agreement, IKON determined that the

Oce 3165 that was the subject of the First Agreement would be worth

approximately $6,334.00 at the end of the First Agreement. (Feldmann <u>Dep. at</u>

13.)

( admitted but denied said determination had any basis in reality or law or that IKON itself even deemed said determination to be valid, see Aff. of G. Carkhuff, ¶ 24, 25, 26, 27 & 28 )

The Second Agreement

18.   In early 2000, document production technology evolved and Canon Inc. introduced its ImageRunner 110 digital printing system. (Snyder Aff. ¶ 8.)

( admitted )

19.   The ImageRunner 110 was a new digital document production system that offered near offset press quality printing and high speed production capacity. (Snyder Aff. ¶ 8.)

( admitted )

20.   An IKON service technician told HRD about the new technology and suggested that it look into the benefits that the ImageRunner could offer HRD's business. (December 7, 2006 Deposition of Jeffrey Snyder ("12/7 Snyder Dep.") at 62-63; Mem. Law Supp. Def.'s Summ. J., Ex. 3.)

( partially admitted, but see Aff. of B. Carkhuff, ¶ 4, 5, & 6 )

7

21.    HRD contacted its IKON account representative and began a
several month process of evaluating the ImageRunner product line. (Snyder
Aff. ¶ 10; 12/7 Snyder Dep. at 110-116.)


( partially admitted, but see Aff. of B. Carkhuff, ¶ 6, 7 & 8 )


22.    This process included several meetings between IKON and HRD
personnel to assess HRD's business needs, demonstrate the ImageRunner
technology, and inspect and assess HRD's facilities to determine installation
logistics such as electric service, network requirements, and physical space
requirements. (12/7 Snyder Dep. at 106-110.)


( partially admitted, but see Aff. of B. Carkhuff, ¶ 6, 7 & 8 )


23.    HRD was pleased with the technology and eventually decided to
implement a Canon ImageRunner 110, ImageRunner 330, ImageRunner 210, and a
CLC 900 (collectively, the "Second Equipment") into its business operations. (12/7
Snyder Dep. at 114-116; Snyder Aff. ¶ 11.)


( admitted )


24.    On or about June 14, 2000. IKON's Jeff Snyder, Doug Thornton, and Al
Maximino met with HRD's President, Robert Carkhuff, to present the terms of a
proposed lease agreement and discuss the logistics of installing the Second

8

Equipment. (12/7 Snyder <u>Dep. at</u> 68-70; Snyder Aff. ¶ 12, Ex. B.) This meeting

detailed the delivery and installation process, the removal of the First Equipment,

training that IKON would give HRD's staff, services that IKON would provide to

minimize the production downtime during installation, and the financial terms of the

proposed lease agreement. (12/7 Snyder <u>Dep. at</u> 106-110; Snyder Aff. ¶ 12.)


**( partially admitted, but denied that representations concerning the**

**financial terms and conditions of the Second Agreement were not discussed**

**see Aff. of B. Carkhuff, ¶ 9 )**


25.    On or about June 19, 2000, Snyder, Thornton, and Maximino met with

Robert Carkhuff again to finalize the proposed agreement. (12/7 Snyder <u>Dep. at</u>

134-136; Snyder Aff. ¶ 15, Ex. C.) During this meeting, Robert Carkhuff executed a

written agreement concerning HRD's use of the Second Equipment (the "Second

Agreement"). (12/7 Snyder <u>Dep. at</u> 134-136; Snyder Aff. ¶ 15.)


**( partially admitted, but see Aff. of B. Carkhuff, ¶ 10 )**


26.    A true and correct copy of the Second Agreement is attached as

Exhibit C to the Affidavit of Jeffrey Snyder. (Snyder Aff. ¶, 15, Ex. C.)


**( admitted )**

27.   The June 14th and June 19th meetings were the only two times when HRD and IKON discussed the financial terms of the Second Agreement before HRD signed that agreement. (Snyder Aff. ¶ 17.)

**( denied, see Aff. of B. Carkhuff, ¶ 7 & 8 )**

28.   Robert Carkhuff did not ask IKON whether the Second Agreement included the remaining obligation that HRD owed on the non-cancelable First Agreement before he signed the Second Agreement. (12/7 Snyder Dep. at 116-118; Snyder Aff. ¶ 18.)

**( denied, see Aff. of B. Carkhuff, ¶ 7, 8 & 9)**

29.   Robert Carkhuff did not question the Second Agreement's monthly payment amount or attempt to negotiate that amount before he signed the Second Agreement. (12/7 Snyder Dep. at 110-113; Snyder Aff. ¶ 19.) His only questions during the June 14, 2000 and June 19, 2000 meetings with IKON concerned the logistics of installation and whether HRD would experience any downtime during installation. (12/7 Snyder Dep. at 109-113; Snyder Aff.19.) He asked no questions about the costs. (12/7 Snyder Dep. at 109-11 3; Snyder Aff. ¶ 19.)

**( denied, see Aff. of B. Carkhuff, ¶ 7, 8, 9 & 10 )**

30.    Jeff Snyder did not tell Robert Carkhuff or anyone from HRD that
cost of the Second Agreement would not or did not include the remaining
obligation that HRD owed on the non-cancelable First Agreement before he
signed the Second Agreement. (12/7 Snyder <u>Dep. at</u> 116-118; Snyder Aff. ¶
20.)

**( denied, see Aff. of B. Carkhuff, ¶ 7, 8, 9 & 10 )**

31.    Doug Thornton did not tell Robert Carkhuff or anyone from HRD that
cost of the Second Agreement would not or did not include the remaining
obligation that HRD owed on the non-cancelable First Agreement before he
signed the Second Agreement. (12/7 Snyder <u>Dep. at</u> 116-118; Snyder Aff. ¶ 21.)

**( admitted he did not personally make said representation, but denied
that he was not party to said representation, also see Aff. of B. Carkhuff, ¶ 7,
8, 9 & 10 )**

32.    Al Maximino did not tell Robert Carkhuff or anyone from HRD that
cost of the Second Agreement would not or did not include the remaining
obligation that HRD owed on the non-cancelable First Agreement before he
signed the Second Agreement. (12/7 Snyder <u>Dep. at</u> 116-11 8; Snyder Aff. ¶
21.)

**( admitted he did not personally make said representation, but denied that he was not party to said representation also see Aff. of B. Carkhuff, ¶ 7, 8, 9 & 10 )**

33.    IKON did not give HRD the option to buy out or become the owner of the First Equipment before or after HRD signed the Second Agreement. (Snyder Aff. 22.)

**( admitted, but only because the equipment was surrendered as required as part of the Second Agreement transaction )**

34.    The Second Agreement was a 72-month lease agreement that required HRD to pay $8,949.00 per month for the first thirty-six months and $12.116.00 per month for the final thirty-six months. (Snyder Aff. Ex. C.)

**( admitted )**

35.    The Second Agreement's monthly payments included charges for use of the Second Equipment, charges for services and supplies for the Second Equipment, and charges to satisfy the remaining $119,996.00 that HRD owed for the equipment charges on the First Agreement. (Dec. 18, 2006 Deposition of Jeffrey Snyder ("12/16 Snyder Dep.") at 68, Mem. Law Supp. Def.'s Summ. J., Ex. 4; April 30, 2007 Deposition of Jeffrey Snyder ("4/30 Snyder Dep.") at 53-54, Mem. Law Supp. Def.' Summ. J., Ex. 5.)

( admitted, except that HRD was legally obligated to pay $119,996, see
Aff. of B. Carkhuff, ¶ 7, 8, 9 & 10 )

36.    The Second Agreement's monthly payments did not include the
remaining service and supply charges associated with the First Agreement. (4/30
Snyder <u>Dep. at</u> 41-43; December 6, 2006 Deposition of Glenn Robbins ("Robbins
Dep.") at 114, Mem. Law Supp. Def.'s Summ. J., Ex. 6.)

( admitted )

37.    In July 2000, HRD asked Jeff Snyder to provide HRD with the costs of
the Second Equipment for insurance and/or accounting purposes. (Snyder Aff. ¶ 23.)
In response to this request, Jeff Snyder prepared an Accounting Value Statement for
the Second Equipment based on the manufacturer's suggested retail price of that
equipment and gave it to HRD in July 2000. (Snyder Aff. ¶ 23, Ex. D.)

( partially admitted, but see Aff. of B. Carkhuff, ¶ 12 also see Aff. of G.
Carkhuff ¶ 19, 20, 21 & 22 )

38.    A true and correct copy of the Accounting Value Statement is attached
as Exhibit D to the Affidavit of Jeffrey Snyder. (Snyder Aff. ¶ 23, Ex. D.) Jeff Snyder
prepared this Accounting Value Statement in July 2000 in the regular course of his
job duties with IKON at that time. (Snyder Aff. ¶ 23.) IKON maintained a copy of

this Accounting Value Statement in the regular course of its business activities in a
file located at its West Springfield, Massachusetts office. (Snyder Aff. ¶ 23.)


**( admitted that the Accounting Value Statement is a true and correct
copy, denied that said document was prepared in the regular course of his job
duties, see Aff. of G. Carkhuff, ¶ 21 )**


39.     IKON installed the Second Equipment at HRD in July 2000. (Snyder Aff.
¶ 24.)

**( admitted )**


40.   IKON removed the First Equipment from HRD's facilities on or about
July 2000. (Snyder Aff. ¶ 24.)


**( admitted )**


41.     IKON subsequently evaluated the First Equipment to determine
whether it had any value at that time. (12/7 Snyder Dep. at 95-97.)


**( admitted )**


14

42.    The Oce 3100, which was part of the First Equipment, did not have any value at that time and therefore IKON discarded the machine or stripped it for parts. (12/7 Snyder <u>Dep. at</u> 98, 100-102.)

( admitted )

43.    The Oce 3165, which was part of the First Equipment, was sold for $4,500 to a wholesaler. (12/7 Snyder <u>Dep. at</u> 98, 100-102.)

( admitted )

HRD Experiences Financial Troubles

44.    HRD contacted IKON in the fall of 2003 and informed IKON that it had been having financial problems for the past three years and had lost over $700,000 during that time. (Affidavit of Glenn Robbins ("Robbins Aff") ¶ ¶ 7-8, Mem. Law Supp. Def.' Summ. J., Ex. 7.)

( admitted )

45.    HRD's consultant, Don Collins, told IKON'S Glenn Robbins that he and HRD's Greg Carkuff were evaluating the business finances to determine whether to continue the business, liquidate, or file for bankruptcy. Collins asked to meet with

IKON to discuss ways to lower HRD's monthly payment obligation. (Robbins Aff. ¶ 7.)

( admitted )

46. Robbins met with Collins and Greg Carkhuff on October 29, 2003. (Robbins Aff. ¶ 8.)

( admitted )

47.   At the October 29. 2003 meeting between IKON and HRD the parties discussed HRD's need to reduce its monthly payments. This discussion also included what the monthly payments comprised the equipment charges, the service and supply charges, and the remaining obligation from the First Agreement. (Robbins Aff. ¶ 8.)

( partially admitted but denied there was any disclosure that said monthly payments included payments for the remaining obligation for the First Agreement, see, Aff. of G. Carkhuff, ¶ 16 )

48.   At the October 29, 2003 meeting, HRD asked Robbins for the specific dollar amounts for the equipment charges; service and supply charges, and the charges for the remaining obligation on the First Agreement that made

up the Second Agreement's monthly payments. (Robbins <u>Dep. at</u> 99-100; Robbins Aff. ¶ 8.) Robbins did not have that information but told HRD that he would get the figures and get back to them. (Robbins Aff. ¶ 18.)

**( partially admitted that HRD asked for a detailed breakdown of the monthly charges under the Second Agreement, but denied that Glenn Robbins agreed to disclose said breakdown, see Aff. of G. Carkhuff, ¶ 16 )**

49.    IKON met with Collins and Greg Carkhuff again on November 7, (Robbins Aff. ¶ ¶ 10-11.) Robbins, Paul Lee, a Director of Finance, and Joe McGrath, a Business Development Manager, attended this meeting. (Robbins <u>Dep. at</u> 105; Robbins Aff. ¶ 10.)

**( admitted )**

50.    Robbins prepared and presented a written financial summary dated November 7, 2003 that included the information that HRD had requested at the October 29" meeting. (Robbins <u>Dep. at</u> 105; Robbins Aff. ¶ 10, Ex. B.)

**( admitted that Robbins prepared a written financial summary dated November 7, 2003 but denied that said summary was presented during the November 7, 2003 meeting see, Aff. of G. Carkhuff, ¶ 16 )**

51.     At the November 7, 2003 meeting, IKON agreed to reduce the service and supply component by approximately $1,300 per month and waive a late fee on a recent invoice. (Robbins Aff. ¶ 11.) IKON also agreed to evaluate whether HRD could re-finance and extend the Second Agreement for a longer period of time. which would reduce the monthly payment amount. (Robbins Aff. ¶ 11.)

**( admitted IKON agreed to reduce the monthly charges by approximately $1300 but only while simultaneously reducing the number of copies HRD was allowed to make each month )**

52.     After the November 7, 2003 meeting, Greg Carkhuff sent an e-mail to Paul Lee expressing his appreciation for the financial concessions that IKON had made and stating that lie looked forward to receiving a proposal to re-finance the Second Agreement. (Robbins Aff. ¶ 14.)

**( admitted )**

53.     A true and correct copy of the November 19, 2003 e-mail that Greg Carkhuff sent to Paul Lee is attached as Exhibit D to the Affidavit of Glenn Robbins. (Robbins Aff. ¶ 14, Ex. D.)

**( admitted )**

54.     HRD did not express any dissatisfaction or surprise at either the October 29, 2003 or November 7, 2003 meetings that the remaining obligation from the First

Agreement was a component of the Second Agreement or accuse IKON of
misrepresenting that fact to HRD. (Robbins Aff. ¶15.)

**( partially admitted, but see, Aff. of G. Carkhuff, ¶ 18 )**

55.     Greg Carkhuff informed IKON during late November or early
December 2003 that HRD had obtained quotes for other document printing
equipment from one of IKON's competitors and asked IKON to provide a quote for
the same or a similar configuration of equipment. (Robbins <u>Dep.</u> at 163-66; Robbins
Aff. T 16.) Glenn Robbins attempted to put together such a quote, but at that time
HRD did not qualify for a new lease agreement with IKON for the same or similar
configuration of equipment that the competitor had quoted. (Robbins Aff. ¶ 16.)
Glenn Robbins met with Greg Carkhuff on January 22, 2004 and informed him that
HRD did not have the financial ability to qualify for a new lease with IKON for the
same or similar configuration of equipment that the competitor had quoted and
therefore IKON could not give HRD a quote for the equipment that the competitor
had proposed. (Robbins Aff. ¶56. The discussions between IKON and HRD ended
in February 2004 when Greg Carkhuff sent an e-mail to IKON that read:
"Unfortunately things are not working out the way we hoped with business or the
restructuring. I am therefore turning everything over to our attorney David Noonan.
You should direct all your inquiries to him. For everybody's reference. I am
including contact information below." (Robbins Aff. ¶ 17. Ex. E.)

( admitted )

57.    HRD made its monthly payments on the Second Agreement until May 2004. (Snyder Aff. ¶ 25.) It has not made a payment since then. (Snyder Aff ¶25.)

( admitted )

58.    HRD still has possession of the Second Equipment.

( admitted )

59.    HRD's fraud allegations first surfaced in a demand letter that IKON received from HRD's attorney in September 2004. (Snyder Aff. ¶ 26.)

( admitted )

60.    HRD's September 2004 demand letter accused IKON of telling HRD that the Second Agreement would not include the service and supply component of the First Agreement. (First Am. Compl., Ex. E.) It did not claim that IKON told it that the Second Agreement would not include any of the remaining obligation on the First Agreement. (Id.) That allegation appeared for the first time when HRD filed this lawsuit in March 2005. (Compl., Count II, ¶ 57.)

( partially admitted but see, Aff. of G. Carkhuff, ¶ 18 )

Additionally, HRD asserts and relies upon all of the facts established as a result of IKON's failure to timely respond to HRD's Requests To Admit Facts as argued in its Memorandum In Support of Opposition to Motion For Summary Judgment, which is hereby incorporated by reference.

Respectfully submitted this the 27th day of July, 2007

HUMAN RESOURCE
DEVELOPMENT PRESS, INC.

/S/ David J. Noonan
David J. Noonan, Esq.
228 Triangle Street
Amherst, MA 01002
Tel. No.: (413) 549-5491
Fax No.: (413) 549-5156
e-mail: david.noonan@verizon.net
B.B.O. No. 373260