UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS INC., <br>     Plaintiff, <br><br> v. <br><br> IKON OFFICE SOLUTIONS, INC. & IOS CAPITAL, INC. d/b/a IKON FINANCIAL SERVICES, <br>     Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> :   3:05-CV-30068-KPN <br> : <br> : <br> :   LEAVE TO FILE <br> :   GRANTED AUGUST 8, 2007 |

**DEFENDANT'S REPLY TO
PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

IKON Office Solution, Inc. ("IKON") hereby submits this reply to Human Resource Development Press, Inc.'s ("HRD") opposition to IKON's summary judgment motion. This reply provides IKON's position concerning the arguments that HRD made concerning the statute of limitations and Uniform Commercial Code issues in IKON's moving brief.

    A.    **The undisputed facts show that HRD's fraud claim accrued in July 2000 and is therefore barred by the statute of limitations.**

IKON's statute of limitations argument is simple: HRD could not have had any more information than it had in July 2000 to determine that the Second Agreement included the remaining amount due on the First Agreement. Therefore, HRD should have known in July 2000 that the claimed representation to the contrary was false.

HRD tries to counter this argument by citing case law that says that "factual disputes concerning when a plaintiff knew or should have known of his causes of action are to be resolved by the jury." *Clough v. Brown*, 59 Mass. App. Ct. 405, 407 (2003). This holding, however, is not a blanket prohibition against granting summary judgment on a statute of limitations issue involving the discovery rule. Like other summary judgment issues, the court

can decide when the plaintiff should have known of events giving rise to a fraud claim unless a factual dispute about this issue exists. *See Szymanski v. Boston Mut. Life Ins. Co.*, 56 Mass. App. Ct. 367, 370 (2002).

*Szymanski* involved a customer's fraud claim against a life insurance company stemming from an agent's alleged misrepresentation that the premiums would "vanish" after nine years and the policy would be self-sustaining until death. *Id*. at 369-70. The trial court granted the insurance company summary judgment based on the fact that the plaintiff did not sue until almost twelve years after purchasing the policy. *Id.* The Appeals Court found factual disputes as to when the plaintiff should have known that the agent's representations were false and reversed the summary judgment.

The court began its analysis by stating that "[w]hen, as here, the parties press different events as triggering accrual, the factual inquiry focuses on which was the first event reasonably likely to put the plaintiff on notice that the defendant's conduct had caused him injury." *Szymanski*, 56 Mass. App. Ct. at 371. "Notice here refers not to discovery of every fact necessary to prevail on the claim, but rather to discovery of the plaintiff's injury as causally connected to the defendant's [tortious conduct]." *Id.* The court stated that the "critical determination in a summary judgment context is whether, as a matter of law, we can identify the point at which Szymanski should have known or should have made inquiry, based on the information available to him, about the shortfall in the accumulated value of his policy that would preclude covering the cost of annual premiums at the end of nine years." *Id.* at 372. The court then conducted an extensive review and analysis of the summary judgment record and determined that it could not, as a matter of law, pinpoint when the plaintiff should have known that his claim accrued because several factual disputes existed. *Id.* at 372-79.

HRD has not identified any disputed facts that prevent this Court from determining this issue as a matter of law. HRD admits that it requested and received the Accounting Value Statement in July 2000. (Affidavit of Robert Carkhuff ¶ 12.) That document clearly sets forth values – dollar amounts – for the Second Equipment as of July 7, 2000. In addition, HRD does not dispute that it knew (1) what its monthly payments on the First and Second Agreements were at that time, and (2) the amount of payments remaining on the First Agreement at the time. These are the only facts necessary to determine that HRD should have known in July 2000 that the claimed misrepresentation could have been false.

Contrary to HRD's assertion, IKON's argument does not hang on "speculative math." There is nothing speculative about calculating the sum of the monthly payments due on the Second Agreement and comparing it to the value of the Second Equipment. It does not matter, as HRD contends, that HRD did not know what the service and supply charges were for the Second Agreement or whether the payment amounts included an interest component. HRD had all of the information necessary to determine that its payments on the Second Agreement exceeded the value of the Second Equipment by over $400,000 in July 2000. This was about $200,000 more than the $191,016 that remained due on the First Agreement only a month earlier.

HRD does not even mount an argument as to when it should have known that IKON's alleged statement was false. It does not present any facts or argument that show that it could not have known that IKON's alleged statement was false before November 2003. Its only response is that it did not actually know until November 2003, when it received the Executive Financial Summary, that the Second Agreement included the remaining amount due on the First Agreement. The law, however, does not require that the plaintiff "know of every fact necessary to prevail on its claim" before that claim accrues. *Szymanski*, 56 Mass. App. Ct. at 371. The

plaintiff has a duty to investigate the cause and extent of its injury once placed on notice of potential harm. *See Micromuse, Inc. v. Micromuse, Plc.*, 304 F.Supp.2d 202, 210 (D. Mass. 2004). The Accounting Value Statement placed HRD on notice of its claimed harm in July 2000. Its fraud claim is therefore time-barred.

> **B.    The undisputed facts show that Article 9 does not apply to the First Agreement.**

HRD has not responded with facts that show that the First Agreement meets the Uniform Commercial Code's definition of a security interest.[1] HRD's argument appears to focus on Section 1-201(37)(d)'s criteria of whether HRD had "an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement." HRD does not dispute that the First Agreement did not include terms that gave it such an option. (Pltf.'s Resp. to Def.'s L.R. 56.1 S.M.F. at ¶¶ 12-14.) And, HRD admits that IKON did not give it the option to purchase the First Equipment. (*Id*. at ¶ 33.) Therefore, it is undisputed that HRD cannot show that the First Agreement meets Section 1-201(37)'s definition of a security interest. Its Article 9 claim therefore fails.

HRD also engages in a convoluted and incorrect application of the case *In re Access Equipment, Inc.*, 62 B.R. 642 (Bankr. D. Mass 1986) to try to show that First Agreement was a sale, not a lease. *In re Access Equipment, Inc.* does not help HRD's case. In fact, it supports IKON's summary judgment motion.

---

[1] HRD also attempts rely on requests for admission that it claims were deemed admitted because of IKON's late response. IKON has addressed this issue in its motion to withdraw these alleged admissions. It does, however, merit noting that IKON served its responses within the time period in which HRD's counsel agreed and HRD has not done anything that in the past year that shows that HRD actually relied on these alleged admissions.

Access Equipment, Inc. ("Access") leased several work platforms and related equipment from Access Satellite International (USA), Inc. ("Satellite"). *Id.* at 644. The lease expressly provided that the lessee could not cancel or terminate the lease during the lease term. *Id.* at 645 n.2. During the lease term, however, Satellite offered to sell the leased equipment to Access at a cost of 86% of the list price – the price at which Satellite would sell the equipment if it was new. *Id*. at 644. Access agreed to purchase the equipment for this price if it could obtain the necessary outside financing. *Id*.

Satellite invoiced Access for the agreed purchase price, but continued to bill Access for the lease payments while Access attempted to obtain financing to fund the proposed purchase. *Id*. Access made several of the billed lease payments during this time, but could not obtain the necessary financing. *Id*. This process lasted approximately 180 days. *Id*. Three and a half months after that, Satellite terminated the lease due to Access's nonpayment and insolvency. *Id*. Access ultimately filed for bankruptcy and claimed that the equipment leases were really security agreements, not true leases.

The Bankruptcy Court disagreed. The court applied U.C.C. § 1-201(37) and focused its analysis on the existence of the purchase option as a criteria in determining whether the leases between Access and Satellite were true leases. *Id*. at 645-646. The court quoted the Tenth Circuit's view on the application of this provision:

> The presence of a purchase option does not automatically preclude a finding of a true lease. … If a purchase option exists and it or other terms in the 'lease' permit the 'lessee' to become full owner by merely paying no or nominal consideration after complying with its terms, … the lease is deemed a secured transaction as a matter of law and thus subject to the provisions of U.C.C. Article Nine. … If the option does not require greater than nominal consideration for full ownership, a true lease is usually found. … Even though nothing in the 'lease' may permit purchase at nominal consideration, the 'lease' will still be deemed one intended for security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot.

5

*Id*. The court then stated that "[t]he most significant factor in distinguishing the conditional sale masquerading as a lease and a true lease is the relationship of the option price to the value of the goods at the end of the lease term." *Id*. at 646. This means that the courts will compare the option price – the price at which the seller offered to sell the equipment to the buyer – to the equipment's list price at the time the offer to sell is made. "If the option price amounts to 25% or more of the total list price, then the 'lease' is not one intended for security." *Id*. Again, this comparison is between the offered sale price and the value of the equipment. It does not involve the total lease payment amount.

      The leases in *In re Access Equipment, Inc.* did not have terms that gave Access an option to purchase the equipment. *Id*. Satellite, however, chose to give Access this option during the lease term and offered to sell the equipment to Access for 86% of the equipment's purchase price at the time. *Id*. Accordingly, the court determined that the leases were in fact true leases. *Id*.

      By HRD's own admission, it never had the option to purchase the First Equipment. The First Agreement did not give HRD the option to purchase the equipment. (Plft's Opp. to Def. L.R. 56.1 S.M.F. at ¶¶ 12-14.) And, unlike the lessor in *In re Access Equipment, Inc.*, IKON never gave HRD the option to purchase the First Equipment. (*Id*. at ¶ 33.) Therefore, there is no "option price" for the First Equipment that the Court could compare to the value of the First Equipment to determine whether the First Agreement a true lease. Accordingly, *In re Access Equipment, Inc.*'s analysis does not support HRD's argument.

      HRD also argues that *In re Access Equipment, Inc.* shows that the Second Agreement is not a true lease. (Pltf's Opp. to Def.'s M . Summ. J. at 18.) This argument is irrelevant in determining whether the First Agreement is a true lease. The First Agreement and the Second Agreement were two separate contracts. The only similarities between these two contracts were

some of the written terms. Again, IKON did not give HRD the option to purchase the First Equipment. Its decision to give HRD the option to purchase the Second Equipment has no bearing on the terms or intent of a completely separate and prior contract.

The issue of whether the Second Agreement is a true lease or a sale is not before the Court or even in the case at this time.[2] But, it should be noted that HRD's argument concerning the Second Agreement incorrectly applies *In re Access Equipment, Inc.* HRD calculates what it believes is the option price for the Second Equipment, $81,367.77, and compares it to the total payments due on the Second Agreement. (Pltf's Opp. to Def.'s M. Summ. J. at 18.) This is incorrect. The court in *In re Access Equipment, Inc.* did not consider the total lease payments in its analysis. Rather, it compared the option price to the value of the equipment at the time. *In re Access Equipment, Inc.*, 62 B.R. at 646. HRD has not presented any facts that show the value of the Second Equipment when it received the option to purchase the Second Equipment in November 2003. Accordingly, HRD cannot show that the Second Agreement was not a true lease. But again, this analysis is irrelevant to whether the First Agreement is a true lease. Accordingly, HRD's Article 9 claim fails.

|  |  |
|---|---|
|  | DEFENDANT,<br>IKON OFFICE SOLUTIONS, INC.<br><br>By      /S/ Brett J. Boskiewicz<br>    Bradford S. Babbitt (BBO# 566390)<br>    e-mail: bbabbitt@rc.com<br>    Brett J. Boskiewicz (BBO# 656545)<br>    e-mail: bboskiewicz@rc.com<br>    Robinson & Cole LLP<br>    280 Trumbull Street<br>    Hartford, CT  06103-3597<br>    Tel. No.: (860) 275-8200 |
| August 10, 2007 |     Fax No.: (860) 275-8299 |

---

[2] IKON has opposed HRD's motion to amend its complaint to add such a claim.

**CERTIFICATE OF SERVICE**

      I hereby certify that Defendant IKON Office Solutions, Inc.'s DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 10, 2007

                                          / S /  Brett J. Boskiewicz
                                         Brett J. Boskiewicz