# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS INC., | : |
| Plaintiff, | : |
| v. | :    3:05-CV-30068-KPN |
| IKON OFFICE SOLUTIONS, INC. & IOS CAPITAL, INC. d/b/a IKON FINANCIAL SERVICES, | : |
| Defendants. | : |

## DEFENDANT'S MOTION IN LIMINE TO PRECLUDE EVIDENCE OF PLAINTIFF'S DAMAGES

The defendant IKON Office Solutions, Inc. ("IKON") hereby moves to preclude the plaintiff Human Resource Development Press, Inc. ("HRD") from introducing any evidence at trial relating to damages. HRD failed to disclose a computation of damages as required by Federal Rule of Civil Procedure 26 (a)(1)(C). Rule 37(c)(1) imposes an automatic and mandatory sanction for this failure and, thus, precludes HRD from offering any evidence at trial of damages to support its fraud or Chapter 93A claims.

Rule 26(a)(1) imposes a duty to disclose, without awaiting formal discovery requests, certain basic information that is needed to prepare for trial or make an informed decision about settlement. *See* Fed. R. Civ. P. 26, Advisory Committee Notes, 1993 Am., 2000 Am. Damages are just one category of this basic information. Rule 26 (a)(1)(C) requires a party to provide:

> a computation of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

This rule requires the plaintiff to disclose the dollar amount of its claimed damages and explain how it calculated that amount. *See City & County of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 291, 221 (N.D. Cal. 2003); *McKinney v. Reassure Am. Life Ins. Co.*, 2006 WL 3228791, at \*2 (E.D. Okla. Nov. 2, 2006) (computation of damages is more than setting forth the figure demanded).[1] A mere description of the type of damages claimed is insufficient. *Id.* In addition, the plaintiff must give the defendant all of the documents that support its claimed damages and computation. *See* Fed. R. Civ. P. 26(a)(1)(C). This burden is the functional equivalent of a standing Request for Production under Rule 34. *See* Fed. R. Civ. P. 26(a), Advisory Committee Notes, 1993 Am., 2000 Am.

Rule 37(c)(1) provides a "self-executing, mandatory sanction for failure to make a disclosure required by Rule 26(a)." *Ortiz-Lopez v. Sociedad Espanola de Auxilo Mutuo y Beneficia de Puerto Rico*, 248 F.3d 29, 34 (1st Cir. 2001). This rule reads in relevant part:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed. R. Civ. P. 37(c)(1). This automatic sanction is intended to "put teeth into" Rule 26(a)(1) and "clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches." *Gagnon v. Teledyne Princeton, Inc.*, 437 F.3d 188, 191 (1st Cir. 2005). While mandatory preclusion of evidence may seem harsh, it is the "required sanction in the ordinary case[.]" *Id.*; *Primus v. United States*, 389 F.3d 231 (1st Cir. 2004). To overcome preclusion, the plaintiff must prove that it had a substantial justification for its failure to comply with Rule

---

[1] Copies of all unreported cases are attached hereto as Exhibit A.

2

26(a)(1) or that its failure to comply was harmless. *See Alves v. Mazda Motor of Am., Inc.,* 448 F.Supp.2d 285, 293 (D. Mass. 2006).

This Court has routinely applied Rule 37(c)(1)'s automatic sanction to exclude evidence of damages.[2] For example, last year Judge Woodlock precluded a plaintiff from introducing evidence to support $207,000 in corrective advertising expenses in a trademark infringement case. *See Nat'l Fire Prot. Ass'n v. Int'l Code Council, Inc.,* 2006 U.S. Dist. LEXIS 14360, at *96 (D. Mass. Mar. 29, 2006) ("*NFPA*"). The plaintiff had not disclosed these damages in its discovery responses, its Rule 26(a) damages disclosures, or its 30(b)(6) witness testimony. *Id.* This damages theory and amount first surfaced in an expert report that the plaintiff disclosed after fact discovery had closed and either immediately before or during the expert's deposition. *Id.* The Court observed that there was "no reason why NFPA could not have provided [the damages] calculations, let alone its theory of corrective advertising damages, before the close of fact discovery," and precluded the plaintiff from introducing evidence of those damages. *Id.*

Judge Saris came to the same conclusion in *The Hip Saver Co., Inc. v. J.T. Posey Co.,* 497 F.Supp.2d 96, 103-04 (D. Mass. 2007). The plaintiff failed to disclose certain evidence to support a new theory of injury and causation until after discovery had closed and just before trial. *Id.* at 102-03. The plaintiff argued that this error was inadvertent and did not prejudice the defendant because the trial had been postponed. *Id.* The Court disagreed and, applying Rule 37(c)(1), held that "negligence is not a substantial justification for non-production" and that "the

---

[2] The First Circuit and this Court have also routinely applied Rule 37(c)(1) to preclude expert testimony as a result of a party's failure to comply with Fed. R. Civ. P. 26(a). *See Pena-Crespo v. Comm. of Puerto Rico,* 408 F.3d 10, 13-14 (1st Cir. 2005); *Ortiz-Lopez,* 248 F.3d at 35; *Cell Genesys, Inc. v. Applied Research Sys. ARS Holding, N.V.,* 499 F. Supp.2d 59 (D. Mass. 2007); *Alves v. Mazda Motor of Am., Inc.,* 448 F.Supp.2d 285, 293-301 (D. Mass. 2006).

delay and additional expense (not to mention stress) … are precisely the sort of harm
contemplated by the Rule." *Id.*

Many other federal courts have applied Rule 37(c)(1) to preclude evidence of damages
due to a party's failure to disclose the information required by Rule 26(a)(1)(C). *See
MicroStrategy, Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1356-58 (Fed. Cir. 2005)
(affirming Rule 37(c)(1) exclusion of non-expert damages theories for failure to supplement
discovery interrogatories); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp*, 259 F.3d 1101, 1105-07
(9th Cir. 2001) (affirming the "use of the automatic sanction of exclusion" and excluding
damages expert's testimony); *MRO Communications, Inc. v. Am. Tel. & Tel. Co.*, 205 F.3d 1351
(9th Cir. 1999) (affirming exclusion of evidence supporting a $1.4 million damages claim due to
a two-year delay in disclosure); *Big Lots Stores, Inc. v. Luv N' Care*, 2007 WL 2668136, at
*3-*4 (S.D. Ohio Sep. 6, 2007) (excluding evidence of lost profits damages disclosed after
summary judgment entered; court rejected plaintiff's argument that these damages were within
the parties' contemplation at the time of the contract); *Silong v. United States*, 2007
WL 2580543, at *4 (E.D. Cal. Sep. 5, 2007) (excluding loss of consortium and emotional
distress damages due to failure to comply with Rule 26(a)(1)(C)); *Mooring Cap. Fund., LLC v.
Phoenix Central, Inc.*, 2007 WL 2292426, at *6 (W.D. Okla. Aug. 7, 2007) (excluding evidence
of lost profits due to failure to comply with Rule 26(a)(1)(C)); *Classic Cheesecake Co., Inc. v.
JPMorgan Chase Bank*, 2007 WL 2897747, at *1-*2 (S.D. Ind. Mar. 19, 2007) (excluding
emotional distress damages due to failure to comply with Rule 26(a)(1)(C)); *Multimatic, Inc. v.
Faurecia Interior Sys. USA, Inc.*, 2007 WL 627874, at *7-*8 (E.D. Mich. Feb. 26, 2007)
(excluding evidence of damages calculated for the first time in response to plaintiff's summary
judgment motion and noting that failure to disclose was prejudicial because discovery was closed

4

and trial scheduled). The sheer number of these decisions shows that, as the First Circuit has stated, "mandatory preclusion is the required sanction in the ordinary case." *Primus*, 389 F.3d at 235.

Indeed, there are a myriad of circumstances in which courts have applied Rule 37(c)(1) to preclude evidence of damages. For example, a plaintiff's failure to disclose a computation of damages related to his fraud claim has resulted in preclusion. *See Stearns v. McGuire*, 2004 WL 3174425, at *2 (D. Colo. Sep. 23, 2004). The plaintiff's disclosure listed amounts for "contract damages" and "punitive/exemplary damages," but not any actual damages caused by the alleged misrepresentation. *Id.* The court found this disclosure was "wholly inadequate" as it related to the disclosure of any actual damages caused by the misrepresentation. *Id.*

Another court precluded a plaintiff from offering any evidence to support a claim for unreimbursed lodging and travel expenses from his employer. *See Gilvin v. Fire*, 2002 WL 32170943, at *3 (D.D.C. Aug. 16, 2002). The court found that the plaintiff "never quantified or substantiated the claim with receipts or any other documentation. Nor did he provide any computation of the alleged damages." *Id.* The plaintiff's failure to comply with Rule 26(a)(1)(C) was "particularly significant in light of the fact that less than seven weeks remain[ed] before trial." *Id.*

Even late disclosures made before the close of the discovery period have resulted in preclusion orders. *See Austrian Airlines Oesterreichische Lufverkehers Ag v. UT Finance Corp.*, 2005 WL 977850, at *1-*2 (S.D.N.Y. Apr. 28, 2005). The court found that disclosure of a new damages theory two weeks <u>before</u> the close of discovery was "simply too late" and that the plaintiff could have provided its damages calculation, including this theory, in its original

disclosure. *Id.* Therefore, the court applied Rule 37(c)(1) to preclude the plaintiff from asserting the late-disclosed damages theory. *Id.*

HRD's failure in this case is no different than any of the plaintiffs' failures in the cases recited above. HRD has completely failed to comply with Rule 26(a)(1)(C). Its initial disclosures did not disclose any damages, a computation of damages, or any supporting documents. (See HRD's Rule 26(a) Disclosures; attached hereto as Exhibit B.) HRD never supplemented its disclosures before the close of discovery. IKON notified HRD of this deficiency in July 2007 when IKON was drafting its summary judgment motion. IKON asked HRD to provide the missing information concerning HRD's damages before IKON's summary judgment motion was due. (See Email from IKON to HRD, dated June 29, 2007, attached hereto as Exhibit C.) HRD ignored this request.

The trial date in this case is now nearly three weeks away, yet HRD still has not provided any computation of damages or any supporting documents. It served a supplemental disclosure on October 10, 2007, only 25 days before trial and over 20 months after its original disclosure. (See copy attached as Exhibit D.) However, this supplement merely identifies categories of the damages that it intends to claim at trial. It also fails to identify any dollar amounts for HRD's claimed damages, an explanation of how HRD calculated those damages, or any supporting documentation. Even this supplemental disclosure, filed months after the close of discovery – essentially on the eve of trial – patently fails to comply with Rule 26(a)(1)(C). *See City & County of San Francisco*, 218 F.R.D. at 221. ("The 'computation' of damages required by Rule 26(a)(1)(C) contemplates some analysis."). Thus, Rule 37(c)(1) automatically precludes HRD from offering any evidence at trial related to its alleged damages.

The Court should also consider the equities of the circumstances and potential impact on the Court's docket. The First Circuit has explained that "preclusion order[s] ... fall in the heartland of case management decisions – the area where a trial judge has the remorseless responsibility, evenhandedly and efficiently, to govern, monitor, and police the progress of an endless line of cases through the court." *Gagnon*, 437 F.3d at 197.

> [T]rial judges must work a complicated equation, balancing fairness to the parties with the need to manage crowded dockets. This means that the court [ ] must consider a multiplicity of pertinent factors, including the history of the litigation, the proponent's need for the challenged evidence, and the opponent's ability to overcome its adverse effects. Surprise and prejudice are important integers in this calculation. So too is an assessment of what the late disclosure portends for the court's docket.

*Id.* (internal citations and quotations omitted).

HRD filed this case over two and a half years ago. It is scheduled for trial on November 5 – only three weeks away. There is simply no justification for HRD's failure to disclose its damages as required by Rule 26(a)(1)(C). Rule 37(c)(1) therefore precludes HRD from offering any evidence of damages at trial. *See Nat'l Fire Prot. Ass'n*, 2006 U.S. Dist. LEXIS 14360, at *96 (finding that there was "no reason why [the plaintiff] could not have provided [the damages] calculations, let alone its theory of [ ] damages, before the close of fact discovery.")

HRD's failure has harmed IKON in several ways. First, HRD disclosed unforeseen categories of damages less than a month before trial. Specifically, HRD now claims that it lost sales and profits as a result of paying for the First Equipment through the Second Lease. It also seeks compensation for the time that its officer's and director's spent investigating the alleged fraud and prosecuting this lawsuit. IKON never had the opportunity to conduct discovery on these categories because it had no way of knowing that HRD claimed these damages. And, more importantly, HRD has not provided a dollar amount, computation, or any documentary support for these alleged damages. This late disclosure alone is enough to warrant Rule 37(c)(1)'s

7

automatic sanction. *See Gilvin*, 2002 WL 32170943, at \*3 (holding that the plaintiff's failure to comply with Rule 26(a)(1)(C) was "particularly significant in light of the fact that less than seven weeks remain[ed] before trial"); *Austrian Airlines*, 2005 WL 977850, at \*1-\*2 (precluding damages theory disclosed two weeks <u>before</u> the close of discovery as "simply too late").

HRD has not disclosed dollar amounts for <u>any</u> claimed damages or computations for these damages. IKON has no idea how much HRD claims in this case. Rule 26(a) is designed to prevent this exact situation. *See Ortiz-Lopez*, 248 F.3d at 35 (stating that the purpose of Rule 26(a)'s mandatory disclosures is to avoid ambush at trial). The rule "imposes on parties a duty to disclose, without awaiting formal discovery requests, certain basic information that is needed in most cases to prepare for trial or make an informed decision about settlement." *See* Fed. R. Civ. P. 26(a), Advisory Committee Notes, 1993 Am. HRD's failure has deprived IKON of the basic information needed to evaluate HRD's claims and prepare for trial.

HRD has not produced a single document regarding any of its alleged damages. Rule 26(a) operates as a standing request for production under Rule 34 and obligated HRD to produce these documents to IKON long ago. *Id.* at 2000 Am. HRD merely included vague descriptions of categories of documents in its disclosures – i.e. "various financial records" and "various other documents." These descriptions disclose nothing and do not satisfy HRD's obligations. *See* Fed. R. Civ. P. 26(a)(1)(C). Even ordering HRD to provide the required documents at this point would be too little, too late – particularly given that discovery has been closed for over a year, a summary judgment motion has been filed and decided, trial is less than three weeks away, and IKON has been forced to make several decisions without this basic information.

HRD's failure also affected IKON's decision whether it needed expert testimony to rebut HRD's damages claim. For example, if HRD depreciated any of its lease payments, the

corresponding tax benefit that it received would offset a portion of any damages arising from the lease payments. An accountant would likely be necessary to prove the amount of this offset. In addition, expert testimony might be needed to rebut HRD's late-disclosed damages claims for the time that its officers and directors spent prosecuting this case and for lost profits for sales that it now claims to have sustained as a result of paying for the First Equipment through the Second Lease. HRD did not disclose any damages before the expert disclosure deadline; therefore it was impossible for IKON to determine whether it would need an expert to rebut these claims.

HRD's failure to disclose its damages also affected IKON's summary judgment motion. IKON did not have HRD's damages information when it prepared and submitted its summary judgment motion, despite its request to HRD, and therefore was robbed of the opportunity to evaluate and include additional arguments for potential summary disposition of this matter.

Finally, HRD's failure to disclose its damages has harmed and will continue to harm IKON's ability to fully prepare for trial. HRD has failed to provide the documents that it intends to rely on to prove its damages. Even now, only 21 days before trial, HRD has deprived IKON of the ability to know what information HRD will offer to support any of its damages claims, particularly its claims for its officer's and director's time spent prosecuting this case, lost interest, and lost profits on lost sales from continuing to pay for the First Equipment through the Second Lease.

The Court has rigorously enforced compliance with scheduling orders and the Rules of Civil Procedure throughout this case and IKON requests that it continue to do so when considering the instant motion. HRD cannot dispute that it has failed to comply with Rule 26(a)(1)(C) and that this failure has harmed IKON. Rule 37(c)(1)'s "self-executing" and

9

"mandatory" sanction therefore precludes HRD from introducing any evidence of damages at trial.

<div style="margin-left: 40%;">

DEFENDANT,
IKON OFFICE SOLUTIONS, INC.

By_____/S/ Brett J. Boskiewicz_____
    Bradford S. Babbitt (BBO# 566390)
    e-mail: bbabbitt@rc.com
    Brett J. Boskiewicz (BBO# 656545)
    e-mail: bboskiewicz@rc.com
    Robinson & Cole LLP
    280 Trumbull Street
    Hartford, CT  06103-3597
    Tel. No.: (860) 275-8200
    Fax No.: (860) 275-8299

</div>

October 16, 2007

## **CERTIFICATE OF SERVICE**

I hereby certify that Defendant IKON Office Solutions, Inc.'s DEFENDANT'S MOTION

IN LIMINE TO PRECLUDE EVIDENCE OF PLAINTIFF'S DAMAGES was filed through the

ECF system will be sent electronically to the registered participants as identified on the Notice of

Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered

participants on October 16, 2007

                                     / S / Brett J. Boskiewicz
                                     Brett J. Boskiewicz

**EXHIBIT A**

Not Reported in F.Supp.2d                                                                              **Page 1**
Not Reported in F.Supp.2d, 2006 WL 3228791 (E.D.Okla.)
**(Cite as: Not Reported in F.Supp.2d)**
c

McKinney v. Reassure America Life Ins. Co.
E.D.Okla.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Oklahoma.
Robert M. MCKINNEY, Plaintiff,
v.
REASSURE AMERICA LIFE INSURANCE
COMPANY, Defendant.
No. 06-CIV-271-RAW.

Nov. 2, 2006.

Mike Jones, Jones Law Office, Bristow, OK,
Stephen Q. Peters, Harris McMahan Peters
Thompson & Stall, Tulsa, OK, for Plaintiff.
Bryce Quine, Edwin R. Deyoung, Roger B. Cowie,
Locke Liddell & Sapp, Dallas, TX, Michael S.
Linscott, Scott R. Helton, Linscott & Luna, Tulsa,
OK, for Defendant.

### ORDER
WHITE, J.
**\*1** Before the Court is Plaintiff's Amended Initial
Disclosures [Docket No. 33]. On October 23, 2006,
this Court entered an Order directing the Plaintiff to
supplement his Initial Disclosures by October 31,
2006 [Docket No. 32]. The problem with Plaintiff's
first attempt was that he failed to provide a
computation of his claimed damages. Plaintiff timely
filed his Amended Disclosures; however, his second
attempt at providing proper disclosures is not a great
improvement and results in the Court contemplating
the inclusion of the phrase "and we mean it" at the
conclusion of all future orders regarding disclosures.

Rule 26 mandates a party disclose and provide the
following information:
a computation of any category of damages claimed
by the disclosing party, making available for
inspection and copying as under Rule 34 the
documents or other evidentiary material, not
privileged or protected from disclosure, on which
such computation is based, including materials
bearing on the nature and extent of injuries suffered.

Fed.R.Civ.P. 26(a)(1)(C). On Page 3 of Plaintiff's
Amended Initial Disclosures, Paragraph 2, Non-
Economic Damages, the Plaintiff states as
follows:Plaintiff may be entitled to "emotional
distress" types of damages based on his claims for

negligence, common law fraud, breach of fiduciary
duty and/or bad faith, and conversion. Non-
economic damages such as emotional distress
damages, pursuant to Oklahoma law, are peculiarly
with [sic] the province of the jury. Based upon
current knowledge, and without further discovery,
Plaintiff anticipates requesting emotional distress
damages in the range of $500,000 to $2,000,000.

The Court does not accuse Plaintiff or his counsel of
disrespect or recalcitrance. Instead, "what we've got
here is failure to communicate."FN*

FN**Cool Hand Luke* (1967) *Seehttp://
www.youtube.com/watch?v=1u-I0D9ReqI.*

The Court finds (again) that this disclosure is
inadequate, as Plaintiff has merely provided a very
broad range of the potential amount of his damages.
Without citation to any authority, Plaintiff blithely
asserts that non-economic damages "are peculiarly
with [sic] the province of the jury."That may be
true, yet Plaintiff does not explain what relevance
that truism has with regard to his obligations under
Rule 26(a)(1)(C). Plaintiff does not explain why that
rule does not state, "except, of course, non-
economic damages." Plaintiff does not explain the
incongruity of the assertion that a jury can and must
calculate such non-economic damages, yet the
person claiming them is excused from doing so.

As stated in the Court's previous Order of October
23, 2006, the purpose of Rule 26 is to "accelerate
the exchange of basic information" that is "needed
in most cases to prepare for trial or make an
informed decision about settlement."*Sender v.
Mann,* 225 F.R.D. 645, 650 (D.Colo., 2004). Early
disclosure also assists the parties "in focusing and
prioritizing their organization of discovery."*City
and County of San Francisco, et al. v. Tutor-Saliba
Corporation, et al.,* 218 F.R.D. 219, 221
(N.D.Cal.2003).

**\*2** The court in *City and County of San Francisco*
also addressed the issue of the Plaintiff providing a
calculation of damages:
Given these purposes, the plaintiff should provide
more than a lump sum statement of the damages
allegedly sustained. As one treatise explained:
The meaning of "category" of damages is not clear.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

Presumably, however, it requires more than merely the broad types of damages ("wrongful death," or "property damage," "bodily injury," etc.). To make the disclosure obligation meaningful, a more detailed specification of damages is apparently required: For example, in a personal injury case, the nature and extent of any injuries suffered must be disclosed, including amounts claimed for "general" damages (pain, suffering or disfigurement) as well as "special" damages (medical bills, lost wages, cost of repairing damaged property, etc.). Rutter Group, Fed. Civ. Proc. Before Trial § 11:166 (2001). Moreover, the "computation" of damages required by Rule 26(a)(1)(C) contemplates some analysis; for instance, in a claim for lost wages, there should be some information relating to hours worked and pay rate. *See Bullard v. Roadway Exp.,* 3 Fed.Appx. 418, 420 (6th Cir.2001) (unpublished).*See also U.S. v. Rempel,* 2001 WL 1572190 (D.Alaska 2001) at *2 (government required to disclose computation of tax liability, the functional equivalent of damages calculation in a tort case).

*Id.* Additionally, a "discovery request calling for the calculation of damages requires more than merely setting forth the figure demanded....."*First Nat. Bank of Chicago v. Ackerley Communications, Inc.,* No. 94 CIV. 7539, 2001 WL 15693, at *6 n. 6 (S.D.N.Y. Jan.8, 2001).

Furthermore, as stated in the Court's previous Order, the Court believes that due process requires a plaintiff to specify *how much* they are requesting in damages. It is simply unfair for any defendant to remain in forced ignorance regarding this number until the rebuttal portion of a plaintiff's closing argument. *Cf.American Realty Trust, Inc. v. Matisse Partners, L.L.C.,* No. CIV.A.3:00-CV-1801-G, 2002 WL 1489543 (N.D.Tex. Jul.10, 2002) (the tactic of "trial by ambush" will not be condoned). Additionally, failure to specify a number for the jury arguably results in standardless discretion, which in some contexts is inconsistent with due process. *Cf.Bankers Life & Cas. Co. v. Crenshaw,* 486 U.S. 71, 88, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988) (O'Connor, J., concurring in part and concurring in the judgment).

Rule 26 disclosures are "designed to accelerate the exchange of basic information and 'help focus the discovery that is needed, and facilitate preparation

for trial or settlement." ' *Sender,* 225 F.R.D. at 650 (citation omitted). "Counsel who make the mistake of treating Rule 26(a)(1) disclosures as a technical formality, rather than as an efficient start to relevant discovery, do their clients no service and necessarily risk the imposition of sanctions." *Id.*

*3 The Court is optimistic about the capabilities of Plaintiff's counsel. Certainly the third time will be the proverbial charm. Plaintiff is again ordered to supplement his disclosures to provide a calculation of damages pursuant to Rule 26 no later than November 8, 2006.

Failure to do so will necessarily result in foreclosure of Plaintiff's claim for non-economic damages.

E.D.Okla.,2006.
McKinney v. Reassure America Life Ins. Co.
Not Reported in F.Supp.2d, 2006 WL 3228791 (E.D.Okla.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



LEXSEE 2006 US DIST LEXIS 14360



Cited
As of: Oct 16, 2007

**NATIONAL FIRE PROTECTION ASSOCIATION, INC., Plaintiff, v. INTERNATIONAL CODE COUNCIL, INC., BUILDING OFFICIALS AND CODE ADMINISTRATORS INTERNATIONAL, INC., INTERNATIONAL CONFERENCE OF BUILDING OFFICIALS, and SOUTHERN BUILDING CODE CONGRESS INTERNATIONAL, INC., Defendants.**

**CIVIL ACTION NO. 03-10848-DPW**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*2006 U.S. Dist. LEXIS 14360*

**March 29, 2006, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff nonprofit, membership organization filed an action against defendant nonprofit organization, alleging, inter alia, trademark infringement, false designation of origin, breach of contract, and violations of Mass. Gen. Laws ch. 93A. Defendant filed a counterclaim alleging that plaintiff breached a settlement agreement the parties signed because it filed suit. The parties filed cross-motions for partial summary judgment.

**OVERVIEW:** Plaintiff claimed that defendant breached an agreement the parties signed, and violated *15 U.S.C.S. §§ 1114* and *1125* and Mass. Gen. Laws ch. 93A, when it used certain words in its publications and on its website which infringed on plaintiff's mark, "International Electrical Code®," and defendant claimed that plaintiff violated the parties' agreement by filing suit. The court held that (1) transactions which formed the basis of plaintiff's claims did not occur primarily and substantially in Massachusetts, and defendant was entitled to summary judgment on plaintiff's claim that it violated Mass. Gen. Laws ch. 93A; (2) plaintiff was entitled to partial

summary judgment on its claims alleging trademark infringement and breach of contract, based on defendant's admissions that it used plaintiff's mark without permission; (3) there was a triable issue as to whether defendant's actions lessened plaintiff's goodwill and reputation associated with its marks; but (4) plaintiff had not shown that it was entitled to recover damages for lost royalties, because it had to engage in corrective advertising, or because defendant was unjustly enriched.

**OUTCOME:** The court granted plaintiff's motion for partial summary judgment on its claims that defendant infringed plaintiff's mark and breached the parties' settlement agreement, granted defendant's motion for summary judgment on plaintiff's claim that defendant violated state law, and granted in part and denied in part defendant's motion for summary judgment on plaintiff's claims for damages.

**CORE TERMS:** electrical, trademark, settlement agreements, summary judgment, goodwill, trademark infringement, unfair, confusingly, counterclaim, confused, unjust enrichment, advertising, similarity, website, Lanham Act, designation, partial, purchaser, covenant, advertizing, corrective, breached, supplied,

  

Case 3:05-cv-30068-KPN    Document 61-2    Filed 10/16/2007    Page 5 of 15

Page 2
2006 U.S. Dist. LEXIS 14360, *

royalty, actual harm, breach of contract, declaratory judgment, unauthorized, impair, infringement

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. Once the movant makes such a showing, the nonmovant must point to specific facts demonstrating that there is, indeed, a trial-worthy issue.

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2] A fact is "material" if it has the potential to affect the outcome of the suit under the applicable law, and a "genuine" issue is one supported by such evidence that a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party. Conclusory allegations, improbable inferences, and unsupported speculation are insufficient to establish a genuine dispute of fact. While infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > Cross-Motions*
[HN3] Cross-motions for summary judgment do not alter the basic summary judgment standard, but rather require courts to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. Thus, in deciding cross-motions for summary judgment, courts must consider each motion separately, drawing all

reasonable inferences against each movant in turn.

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > State Regulation*
[HN4] See *Mass. Gen. Laws ch. 93A, § 11.*

*Antitrust & Trade Law > Consumer Protection > Deceptive Acts & Practices > State Regulation*
[HN5] To determine whether the circumstances that gave rise to a claim occurred primarily and substantially in Massachusetts, Massachusetts courts examine the center of gravity of the allegedly unfair and deceptive conduct. The Supreme Judicial Court of Massachusetts has disavowed the use of any particular set of factors in determining whether alleged wrongful conduct occurred primarily and substantially in Massachusetts.

*Contracts Law > Breach > General Overview*
*Contracts Law > Performance > General Overview*
[HN6] When performance under a contract is concurrent, one party cannot put the other in default unless he is ready, able, and willing to perform and has manifested this by some offer of performance, although a tender of performance is not necessary if the other party has shown that he cannot or will not perform.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > Trademark Infringement*
*Trademark Law > Infringement Actions > General Overview*
[HN7] See *15 U.S.C.S. § 1114(1)(a).*

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > Trademark Infringement*
*Trademark Law > Infringement Actions > Determinations*
[HN8] To win a trademark case, a plaintiff must show (1) that he uses, and thereby owns, a mark, (2) that the defendant is using that same or a similar mark, and (3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > Trademark Infringement*
*Trademark Law > Infringement Actions > General Overview*

  

*Trademark Law > Likelihood of Confusion > General Overview*
[HN9] The "likelihood of confusion" requirement is the key element in any infringement action.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > Trademark Infringement*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 1st Circuit Court*
[HN10] The United States Court of Appeals for the First Circuit has identified eight factors to be weighed in determining likelihood of confusion. They are: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. No one factor is necessarily determinative, but each must be considered. The factors are non-exclusive, however, and are not always apt to the particular facts of a case. Courts may consider other factors and may accord little weight to factors that are not helpful on the particular facts of a case.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > Trademark Infringement*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview*
[HN11] In Astra Pharmaceutical Products, Inc. v. Beckman Instruments, the United States Court of Appeals for the First Circuit explained why there is always less likelihood of confusion where goods are expensive and purchased after careful consideration.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > False Designation of Origin*
*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > General Overview*
*Trademark Law > Federal Unfair Competition Law > Lanham Act > Scope*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview*
[HN12] Actual confusion is commercially relevant if the alleged infringer's use of a trademark could inflict commercial injury in the form of a diversion of sales, damage to goodwill, or loss of control over reputation on the trademark holder. However, *15 U.S.C.S. § 1125(a)*

only provides a cause of action for the use in commerce of any word, term, or name which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > Trademark Infringement*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 1st Circuit Court*
[HN13] Courts must consider the length of time a trademark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark when determining if a defendant's use of the mark caused actual confusion.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > Trademark Infringement*
*Trademark Law > Infringement Actions > General Overview*
*Trademark Law > Likelihood of Confusion > General Overview*
[HN14] The test of trademark infringement is the likelihood of confusion, not the proof of actual confusion.

*Civil Procedure > Declaratory Judgment Actions > General Overview*
[HN15] A declaratory judgment may be appropriate despite suggestions of mootness, even if the defendant voluntarily ceased the act complained.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > General Overview*
[HN16] The Declaratory Judgment Act provides that, in a case of actual controversy within its jurisdiction, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. *28 U.S.C.S. § 2201(a)*. The statutory provision limiting declaratory judgments to cases of actual





controversy is no more than a recognition that the federal judicial power extends only to cases or controversies in the constitutional sense. The distinction is between a case appropriate for judicial determination, on the one hand, and a difference or dispute of a hypothetical or abstract character on the other, a distinction which is necessarily one of degree.

*Antitrust & Trade Law > Consumer Protection > False Advertising > State Regulation*
*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > False Designation of Origin*
*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > Trademark Infringement*
*Trademark Unfair Competition Law > False Designation of Origin > General Overview*
*Trademark Law > Infringement Actions > General Overview*
[HN17] The elements of a claim alleging trademark infringement under § 32 of the Lanham Act, *15 U.S.C.S. § 1114*, a claim alleging false designation of origin under § 43(a)(1) of the Lanham Act, *15 U.S.C.S. § 1125(a)(1)*, and a claim alleging unfair competition under state law are essentially similar, and the same set of facts will support a suit for any of these claims.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > False Designation of Origin*
*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > General Overview*
*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > Palming Off*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview*
[HN18] Unfair competition, in its common law signification, implies palming off. As under federal law, the confusion referred to in unfair competition claims has been extended from the traditional confusion as to source or origin of goods or services, to the factors of sponsorship or endorsement. The plaintiff need only show a likelihood of confusion in order to be entitled to equitable relief. However, actual confusion is the best evidence of likelihood of confusion. Likelihood of confusion is whether the similarity of names is such as to make likely the deception of any appreciable number of ordinary prudent customers. Similarly, although *15 U.S.C.S. § 1125(a)(1)(A)* creates a federal statutory tort broader in scope than the common law of unfair competition and the law of infringement, a showing that

the marks or packaging of the defendant create a likelihood of confusion with the products of the plaintiff is still a key to establishing a claim of false designation of origin.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 1st Circuit Court*
[HN19] Similarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features. Some of the factors that courts have considered when assessing the similarity of trademarks are the phonetics, font, design, layout, color scheme, total number of words and syllables, spelling and pronunciation. Meaning alone, without reference to appearance and sound, may also be sufficiently close to constitute similarity.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 1st Circuit Court*
[HN20] If the dominant portion of two trademarks is the same, then confusion may be likely, notwithstanding peripheral differences.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 1st Circuit Court*
[HN21] Even where a defendant clearly marked its product with its company name, similarity might be found.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 1st Circuit Court*

  

[HN22] When one uses a mark similar to one already in use, there is generally an affirmative duty to avoid the likelihood of confusion. Few would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 1st Circuit Court*
[HN23] It is well settled that under certain circumstances, otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 1st Circuit Court*
[HN24] Trademark infringement and unfair competition laws exist largely to protect the public from confusion anent the actual source of goods or services. These causes of action are therefore distinct from state and federal false advertising or deceptive marketing laws, like § 43(a)(1)(B) of the Lanham Act, *15 U.S.C.S. § 1125(a)(1)(B)*, which provide a remedy where someone who, in connection with the marketing of goods or services, makes a representation relating to the actor's own goods, services, or commercial activities that is likely to deceive or mislead prospective purchasers to the likely commercial detriment of another.

*Antitrust & Trade Law > Consumer Protection > False Advertising > State Regulation*
*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > False Designation of Origin*
*Trademark Law > Federal Unfair Competition Law > False Designation of Origin > General Overview*
[HN25] Similar to trademark infringement, the statutory tort of false designation of origin is designed to reach, among other things, attempts to appropriate the goodwill

associated with a competitor's trademark by means of confusingly similar marking and packaging, which would create the impression that the products of the defendant originated with the plaintiff. The tort of unfair competition in Massachusetts only gives those whose trade name has acquired a secondary meaning in the minds of the public, as indicating the origin of his products or as identifying his goods known to them by a trade name, the right to have his trade name protected by securing an injunction to prevent another from using the same name or a name so similar as to mislead the public into buying the defendant's goods in the belief that they were buying those of the plaintiff and from palming off his goods as those of the plaintiff to the injury of the latter.

*Contracts Law > Contract Interpretation > General Overview*
[HN26] Under Massachusetts law, contract interpretation is largely an individualized process, with the conclusion in a particular case turning on the particular language used against the background of other indicia of the parties' intention. Courts must construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished.

*Contracts Law > Contract Interpretation > General Overview*
[HN27] Massachusetts courts recognize a series of canons as aids to the interpretation of contracts. For instance, it is a canon of construction that every word and phrase of an instrument is, if possible, to be given meaning, since a contract is to be construed to give reasonable effect to each of its provisions. Another canon provides that courts are to give greater weight to specific and exact terms than general language when the meaning of the provisions is in doubt. In any event, common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > General Overview*
*Trademark Law > Likelihood of Confusion > General Overview*
[HN28] The term "confusingly similar" has two potential meanings in trademark law: the general similarity of the marks and the overall likelihood of confusion. The latter meaning would require an analysis of the eight factors

  

developed for trademark infringement claims under the Lanham Act. The former meaning is akin to the definition the United States District Court of the District of Massachusetts adopted in Northern Lights Technology, Inc. v. Northern Lights Club.

***Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview***
[HN29] Under Massachusetts law, the question of whether a contract term is ambiguous is an issue to be determined by a court. A contract is only considered ambiguous when the language is reasonably prone to different interpretations or susceptible to differing, but nonetheless plausible, constructions.

***Contracts Law > Contract Interpretation > General Overview***
[HN30] It is a canon of construction that every word and phrase of an instrument is if possible to be given meaning.

***Contracts Law > Performance > Discharges & Terminations***
[HN31] A party is only excused from its contractual promises if there is an uncured material failure to perform by the other party.

***Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion > General Overview***
***Trademark Law > Likelihood of Confusion > General Overview***
[HN32] While a showing of a likelihood of confusion will suffice to support liability and the grant of injunctive relief, a higher standard of proof is required for the grant of money damages.

***Trademark Law > Federal Unfair Competition Law > Lanham Act > Remedies***
***Trademark Law > Infringement Actions > Remedies > Damages > General Overview***
[HN33] According to the Lanham Act, a successful plaintiff shall be entitled, subject to the principles of equity, to recover a defendant's profits, any damages sustained by the plaintiff, and the costs of the action. *15 U.S.C.S. § 1117(a)*. If a court finds that the amount of the recovery based on profits is either inadequate or excessive, it may in its discretion enter judgment for such

sum as it finds to be just, according to the circumstances of the case. Such sum shall constitute compensation and not a penalty. *15 U.S.C.S. § 1117(a)*. To implement these statutory directives, the U.S. Court of Appeals for the First Circuit has adopted the following four rules, summarizing the additional showings required to secure an award of damages under the Lanham Act: (1) a plaintiff seeking damages must prove actual harm, such as the diversion of sales to the defendant; (2) a plaintiff seeking an accounting of defendant's profits must show that the products directly compete, such that the defendant's profits would have gone to the plaintiff if there was no violation; (3) the general rule of direct competition is loosened if the defendant acted fraudulently or palmed off inferior goods, such that actual harm is presumed; and (4) where the defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory.

***Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards***
***Trademark Law > Infringement Actions > Remedies > Attorney Fees***
***Trademark Law > Infringement Actions > Remedies > Damages > General Overview***
***Trademark Law > Infringement Actions > Remedies > Damages > Treble Damages***
[HN34] *15 U.S.C.S. § 1117(a)* provides that in assessing damages, a court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount, and that the court in exceptional cases may award reasonable attorney fees to the prevailing party. *15 U.S.C.S. § 1117(b)* provides that in assessing damages under *§ 1117(a)*, the court shall, unless it finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of *15 U.S.C.S. § 1114(1)(a)* that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark, as defined in *15 U.S.C.S. § 1116(d)*, in connection with the sale, offering for sale, or distribution of goods or services.

***Trademark Law > Infringement Actions > Remedies > Damages > General Overview***
[HN35] Because trademark remedies are guided by tort law principles, damages need only be established with

  

reasonable certainty. The fact of damages must be established with at least reasonable certainty, but the amount of damages may be estimated, provided it is not merely speculative. Although uncertainty created by wrongful acts does not insulate a wrongdoer from liability, and in fact a wrongdoer ought to bear the burden of uncertainty, plaintiffs who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence.

*Contracts Law > Remedies > Compensatory Damages > General Overview*
*Contracts Law > Remedies > Foreseeable Damages > Lost Profits*
*Trademark Law > Infringement Actions > Remedies > Damages > General Overview*
*Trademark Law > Infringement Actions > Remedies > Profits*
[HN36] As with damages for trademark violations, contract law damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty. An injured party only has a right to damages compensating for incidental or consequential losses actually suffered that were caused by the breach. Damages in the form of prospective profits may be recovered when the loss of them appears to have been the direct result of the wrong complained of and when they are capable of proof to a reasonable degree of certainty.

*Trademark Law > Infringement Actions > Remedies > Damages > General Overview*
[HN37] It is true that, in addition to its own loss of profits, a plaintiff may suffer harm to the goodwill associated with its trademark.

*Trademark Law > Infringement Actions > Remedies > Damages > Compensatory Damages*
[HN38] The measure of damage to business property, such as good will, is based on the measurement of the difference in value of the property before and after the injury. Factors to be considered in determining the loss of good will are the length of time the business has been in existence, its average profits, its success, and the likelihood of its continuing business under the same name.

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Trademark Law > Infringement Actions > Remedies > Damages > General Overview*
*Trademark Law > Infringement Actions > Summary Judgment > General Overview*
[HN39] Direct evidence is not required to establish harm to goodwill on summary judgment. The conventional rule that a plaintiff may amass a preponderance of the evidence through direct or circumstantial evidence should also apply to a plaintiff opposing summary judgment as to damages.

*Trademark Law > Infringement Actions > Remedies > Damages > General Overview*
[HN40] Proof of the inferiority of an infringing product is not required for a court to infer harm to a trademark holder's goodwill. Nothing in the statute suggests that demonstrable harm to plaintiff's goodwill and reputation resulting from confusion of marks is restricted to the classic situation where a defendant's product is inferior.

*Trademark Law > Infringement Actions > Remedies > Profits*
[HN41] Of the courts that have allowed an award of reasonable royalties in trademark infringement cases, only the United States Court of Appeals for the Seventh Circuit has permitted such an award without evidence of a prior licensing relationship or when the parties have not shown a willingness to license the mark. An award of lost royalties is made most often for continued use of a product beyond authorization, and damages are measured by the license the parties had or contemplated.

*Contracts Law > Remedies > Compensatory Damages > General Overview*
*Trademark Law > Infringement Actions > Remedies > Damages > Compensatory Damages*
[HN42] Compensatory damages for both trademark infringement and breach of contract are intended to make the injured plaintiff whole; they are not meant to provide a windfall. In certain circumstances, an award equaling the amount necessary for corrective advertising is recoverable as a remedy where there was actual harm. The award may be prospective, that is a reasonable estimation of the future costs of corrective advertising when the plaintiff has not yet spent any money on advertising to counteract any confusion in the industry.

 LexisNexis™     LexisNexis™     LexisNexis™

However, the award must still satisfy the determinable-with-reasonable-certainty requirement, and expenses for repair cannot be justified when they exceed the value of the asset. Prospective costs present a danger of overcompensation if they exceed the value of the mark.

***Civil Procedure > Discovery > Disclosures > Mandatory Disclosures***

[HN43] *Fed. R. Civ. P. 26(a)(1)* requires disclosure of a computation of any category of damages claimed by the disclosing party. The parties must also make available for inspection and copying the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including material bearing on the nature and extent of injuries. *Fed. R. Civ. P. 26(a)(1)*. *Fed. R. Civ. P. 37* provides that a party that, without substantial justification, fails to disclose information required by *Fed. R. Civ. P. 26(a)* is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion, any witness or information not so disclosed. *Fed. R. Civ. P. 37(1)*.

***Contracts Law > Remedies > Equitable Relief > Quantum Meruit***
***Trademark Law > Infringement Actions > Remedies > Equitable Relief > Accountings***

[HN44] Where a defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory. But under case law established by the United States Court of Appeals for the First Circuit, even damages granted on a deterrent or an unjust enrichment theory have never been allowed absent some form of fraud or palming off.

**COUNSEL:** [*1]  For National Fire Protection Association, Inc., Plaintiff: David J. Byer, Phoebe Sears Winder, Tara C. Clancy, Thomas F. Holt, Jr., Aimee E. Bierman, Kirkpatrick & Lockhart Nicholson Graham LLP, Boston, MA.

For International Code Council, Inc., Defendant: James Hamilton, Swidler Berlin LLP, Washington, DC; Warren Anthony Fitch, Swidler & Berlin Shereff Friedman, LLP, Washington, DC; Douglas K. Mansfield, Casner & Edwards, LLP, Boston, MA.

For Building Officials and Code Administrators International, Inc., International Conference of Building Officials, Southern Building Code Congress International, Inc., Defendants: Warren Anthony Fitch, Swidler & Berlin Shereff Friedman, LLP, Washington, DC; Douglas K. Mansfield, Casner & Edwards, LLP, Boston, MA.

For Building Officials and Code Administrators International, Inc., International Code Council, Inc., International Conference of Building Officials, Southern Building Code Congress International, Inc., Counter Claimants: Douglas K. Mansfield, Casner & Edwards, LLP, Boston, MA.

For National Fire Protection Association, Inc., Counter Defendant: Aimee E. Bierman, Kirkpatrick & Lockhart Nicholson Graham LLP, Boston, MA.

**JUDGES:** DOUGLAS [*2] P. WOODLOCK, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** DOUGLAS P. WOODLOCK

**OPINION**

MEMORANDUM AND ORDER

March 29, 2006

The plaintiff and counterclaim defendant, National Fire Protection Association, Inc. (the "Plaintiff") and the defendants and counterclaim plaintiffs, International Code Council, Inc., Building Code Officials and Code Administrators International, Inc., International Conference of Building Officials, and Southern Building Code Congress International, Inc. (collectively, "ICC" or the "Defendant"), have both moved for partial summary judgment to resolve liability with respect to certain of the claims and counterclaims raised in their ongoing dispute over ICC's commercial use of the marks INTERNATIONAL ELECTRICAL CODE, INTERNATIONAL CODE COUNCIL ELECTRICAL CODE, and ICC ELECTRICAL CODE.

Specifically, the following liability issues have been raised in summary judgment motions: (1) whether ICC's admitted commercial use of the marks in question infringed NFPA's registered trademark ("INTERNATIONAL ELECTRICAL Code(r)"); (2)

  

Case 3:05-cv-30068-KPN    Document 61-2    Filed 10/16/2007    Page 12 of 15

Page 9
2006 U.S. Dist. LEXIS 14360, *2

whether the same alleged commercial use breached the parties' 1999 Settlement Agreement and Mutual Release ("Settlement Agreement"); (3) whether NFPA breached [*3] the parties' Settlement Agreement by asserting claims against ICC arising from ICC's commercial use of the mark INTERNATIONAL CODE COUNCIL ELECTRICAL CODE; and (4) whether NFPA's claim against ICC for violating Mass. Gen. L. ch. 93A fails for lack of a sufficient nexus with Massachusetts.

After a hearing was held on these liability motions, ICC moved for partial summary judgment on the issues of damages and unjust enrichment, seeking an order declaring that NFPA has not suffered any actual damages and that ICC has not been unjustly enriched by using any of the marks in question. I consider and resolve the several motions for partial summary judgment together.

## I. BACKGROUND

### A. Facts

#### 1. The Parties

The Plaintiff, **National Fire Protection Association, Inc. ("NFPA")**, describes itself as "an international, nonprofit, membership organization founded in 1896" whose mission is to develop "scientifically based consensus codes and standards" and provide "research, training, and education . . . to reduce the worldwide burden of fire and other hazards." NFPA's most successful and widely-distributed publication is the NATIONAL ELECTRICAL Code(r), [1] also known [*4] as the NEC(r). This 720-page publication establishes technical requirements for the design and installation of electrical wiring systems. The NEC(r) has been adopted in whole or in part in various jurisdictions throughout the United States, as well as in Puerto Rico, Mexico, Venezuela, Columbia, Costa Rica and Panama. The NFPA added "administrative provisions" to the NEC(r) in the 2002 edition.

> 1    NFPA is the owner of the registered trademarks NATIONAL ELECTRICAL CODE(r) (reg. number 1094460) and NEC(r) (reg. number 1165496).

In October 1997, NFPA began using the INTERNATIONAL ELECTRICAL CODE(r) mark on the 1996 edition of its Spanish version of the NEC(r), Codigo Electrico Nacional, and on other products it

wished to identify as part of the INTERNATIONAL ELECTRICAL Code(r) series. [2] The NEC(r) remains the anchor of the INTERNATIONAL ELECTRICAL CODE(r) product line series. NFPA has sold over 2.75 million copies of publications bearing the mark "INTERNATIONAL ELECTRICAL CODE(r). The suggested retail price for [*5] the NEC(r) is $ 65, but the actual retail price varies according to the year of the edition, style of edition and the identity of the purchaser. The prices of the other products within the INTERNATIONAL ELECTRICAL CODE(r) series vary with some being sold for less than $ 25.

> 2    The INTERNATIONAL ELECTRICAL CODE(r) series includes the, NEC(r) (1999, 2002, 2005), Codigo Electrico Nacional (1996, 1999), NEC Handbook (1999, 2002), NEC Changes (1999), NFPA 70 -- NEC Requirements for One-and Two-Family Dwellings, Electrical Inspection Manual (editions based on the 1999 NEC and 2002 NEC), Pocket Guide to Residential Electrical Inspections, User's Guide to the National Electrical Code, NFPA's Electrical References, two-volume Pocket Guide to Electrical Installations Under the NEC (2002, 2005), NEC Expert (1999, 2002), Manual Del Codigo Electrico Nacional, Manual De Inspeccion Electrica NFPA, and NEC Guide to the Major Changes video.

The Defendant, **The International Code Council, Inc. ("ICC")** [3], describes itself [*6] as a "non-profit organization whose principal activities consist of developing and publishing national model codes which are used by states, municipalities, architects, engineers, designers, contractors, and others." According to the ICC, "these codes seek to protect the public health, safety, and welfare by providing . . . model standards for consideration and adoption by governmental entities and for use by various professionals and others in the building industry." ICC was formed in 1994 to facilitate cooperation among three existing national code writing organizations: Building Officials and Code Administrators, Inc., the International Conference of Building Officials, and the Southern Building Code Congress International, Inc. [4] ICC develops and sells a collection of model code documents, collectively marketed as "International Codes." These publications include the International Building Code, International Fire Code, International Fuel Gas Code, International

 
LexisNexis™   LexisNexis™   LexisNexis™

Mechanical Code, and what is now called the International Code Council Electrical Code.

> 3   The ICC owns the registered trademark INTERNATIONAL CODE COUNCIL trademark (reg. number 2242343).

**[*7]**

> 4   In 2003, the three groups formally combined into a single entity, ICC.

**2. The First Dispute Over the INTERNATIONAL ELECTRICAL CODE mark**

In January 1996, NFPA filed an application with the United States Patent and Trademark Office ("PTO") to register the mark "INTERNATIONAL ELECTRICAL CODE." In July 1996, ICC filed its own application with the PTO to register the mark "INTERNATIONAL ELECTRICAL CODE." On June 9, 1997, ICC filed an Opposition to NFPA's application.

In 1997, NFPA began publishing works under the mark INTERNATIONAL ELECTRICAL CODE SERIES(r) and in 1999 ICC published a new document for its International Code series entitled INTERNATIONAL ELECTRICAL CODE.

On March 24, 1999, ICC filed a lawsuit styled *International Code Council, Inc. v. National Fire Protection Association, Inc.,* (Civil Action No. 99-395-A, E.D. Va.) against NFPA for infringement and false designation of origin with respect to the "INTERNATIONAL ELECTRICAL CODE" mark (the "1999 Lawsuit"). NFPA filed a counterclaim against ICC for infringement and false designation of origin, among other claims, with **[*8]** respect to the same mark.

**3. The Settlement Agreement**

On December 1, 1999, NFPA and the ICC parties executed a Settlement Agreement and Mutual Release resolving that NFPA would be the exclusive owner of the trademark INTERNATIONAL ELECTRICAL CODE. The provisions of the Settlement Agreement are discussed as relevant later in this Memorandum. At this stage I observe simply that ICC also agreed to destroy all of its publications bearing the mark INTERNATIONAL ELECTRICAL CODE, which it has done. The PTO subsequently granted NFPA's trademark application for the mark INTERNATIONAL ELECTRICAL CODE(r), which was registered as number 2427178 on February 6,

2001.

**4. The Instant Dispute**

In the instant case, the parties revisit issues involving the INTERNATIONAL ELECTRICAL CODE trademark because, after the execution of the Settlement Agreement, ICC renamed and published its 1999 INTERNATIONAL ELECTRICAL CODE as the "ICC Electrical Code Administrative Provisions" [5] in 2000 and the "INTERNATIONAL CODE COUNCIL ELECTRICAL CODE Administrative Provisions" in 2003 (collectively, "Administrative Provisions"). NFPA seeks relief from this activity; ICC counterclaims that by initiating **[*9]** this litigation NFPA breached the Settlement Agreement.

> 5   On November 24, 1999, prior to the execution of the Settlement, ICC submitted an application to the PTO to register the trademark ICC ELECTRICAL CODE. NFPA was not aware of the application and did not oppose it. The PTO granted ICC's trademark application for ICC ELECTRICAL CODE, and the mark was registered as reg. number 2586007 on June 25, 2002.

ICC's Administrative Provisions can be used to implement the NEC(r). Advertisements for the Administrative Provisions make direct reference to the NATIONAL ELECTRICAL CODE(r), characterizing ICC's publications as a "comprehensive and necessary set of regulations for administering and enforcing the NFPA's NATIONAL ELECTRICAL CODE(r)," a characterization that NFPA objects to. The ICC publications, which are approximately 25 pages in length excluding the prefaces, have a suggested retail price of $ 7.00-$ 9.00, but have been advertised at a higher price.

NFPA alleges that ICC's Administrative Provisions, even **[*10]** though renamed, still infringe its trademark and breach the Settlement Agreement. As a result, NFPA seeks relief in this lawsuit from ICC's alleged unauthorized commercial use of the marks INTERNATIONAL CODE COUNCIL ELECTRICAL CODE and ICC ELECTRICAL CODE. NFPA also seeks relief against ICC for its admitted unauthorized commercial use of the registered mark INTERNATIONAL ELECTRICAL CODE to refer to its Administrative Provisions. Specifically, ICC admits that its e-commerce website made a reference to the "2003 International Electrical Code" alongside a picture of its

  

INTERNATIONAL CODE COUNCIL ELECTRICAL CODE Administrative Provisions publication; that its March 2004 edition of its monthly "Building Safety Bulletin" listed the ICC publication as the "2000 ICC International Electrical Code Administrative Provisions"; and that its online Membership Application listed the ICC publication as the "2003 International Electrical Code(r) Administrative Provisions." ICC characterizes these uses as "inadvertent" and occurring only "in a few isolated instances."

The parties have submitted numerous affidavits and statements of fact in support of their respective positions. NFPA's submissions [*11] purport to establish confusion in a certain segment of the public about the relationship between NFPA and ICC's publications through the following factual proffers:

. NFPA's expert Brooke Stauffer, in his role as Executive Director of Standards and Safety for the National Electrical Contractors Association, has observed many instances where the mark INTERNATIONAL ELECTRICAL CODE has been used by third parties to refer to the ICC ELECTRICAL CODE Administrative Provisions.

. Stauffer has personally communicated with electricians and other contractors who have called him to ask technical questions about the "International Electrical Code" and its relationship with NEC(r). The callers believed that "International Electrical Code" referred to the ICC ELECTRICAL CODE Administrative Provisions. The callers also made "general inquiries along the lines of what is this International Electrical Code anyway? Is it part of the NEC?' or what is this International Electrical Code? Does it replace the NEC?'; or I've already got a code book in my trunk. Do I have to pay attention to this International Electrical Code now?"

. INTERNATIONAL ELECTRICAL CODE constituted the ninth-most [*12] common entry of all search terms entered on the ICC website http://www.iccsafe.org

for the week ending August 9, 2003. [6]

. A third party e-mailed the ICC on April 24, 2002 to inquire about the availability of a book or publication on the International Electrical Codes.

. A website for electrical contractors featured an online discussion forum wherein the moderator and members discussed a proposed bill to remove the NFPA's NATIONAL ELECTRICAL CODE(r) as Florida's electrical code and replace it with the "INTERNATIONAL ELECTRICAL CODE." One posting stated: "The more I read the Bill, the more I am starting to wonder if the Florida Building Commission actually thinks the IEC is an actual electrical code and not just an Administrative Code." Another subsequent posting noted that the "ICC IEC has been removed from the Bill and the NFPA codes as normally adopted, . . ., have been added back in. The NFPA codes were omitted by mistake." [7]

. ICC's third party distributors have used NFPA's trademark "INTERNATIONAL ELECTRICAL CODE" in advertising and selling ICC's Administrative Provisions. NFPA produced printouts of 11 distributor websites that used NFPA's mark. (Pl. Facts I (Spring [*13] 2005), PP 68-69; Cote Aff. Ex. P).

. Certain governmental entities and industry groups have erroneously referred to the ICC Administrative Provisions as the "International Electrical Code." For example:

. The Town of Hilton Head Island's website stated that the IEC (defined as International Electrical Code) 2002 is its current code;

. The Denver website stated that it "recently



changed to the series of International Codes developed by the International Code Council, the ICC. These include the 2003 Series of I Codes and accompanying National Electrical Code regulated by the National Fire Protection Association and the State of Colorado Electrical board."

. The City of Philadelphia City Council stated that it was "adopting and incorporating, with certain additions, deletions and amendments, the 2003 International Electrical Code Administrative Provisions as the Philadelphia Electrical Code."

. The City of Coatesville, PA Codes Department website includes International Electrical Code 2000, edition 1 and the NFPA Electrical Code in its list of Current Codes Being Used.

. The Rock Island Illinois website includes 2002 National Electrical Code and 2003 International [*14] Electrical Code Administrative Procedures in its list of Current Codes Being Used.

6 ICC notes that the parties were in litigation by August 9, 2003 so these searches likely include searches by the parties.

7    ICC objects, based on hearsay and authentication grounds, to these statements and the other online documents attached to the Cote Affidavit as Exhibits. NFPA correctly points out that these documents are not hearsay to the degree they are being proffered as examples of actual confusion and not to prove the truth of the matter asserted therein. [NFPA Reply Brief, fn. 13 (citing *Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 31 (1st Cir. 1989).*] See *Fed. R. Evid. 801(c).* I find, however, that Exhibit M of the Cote Affidavit cannot be used as evidence that "the Florida Building Commission actually thinks the IEC is an actual electrical code and not just an Administrative Code."

I note more generally that the parties have filed a Joint Stipulation Regarding Authentication Issues on Summary Judgment waiving objections that an affiant or other witness propounding documents is not the appropriate person through which to authenticate such documents, but this stipulation does not resolve totem pole hearsay issues such as the view being ascribed to the Florida Building Commission.

[*15] B. Procedural History

NFPA filed the Complaint commencing this action on May 6, 2003 asserting eight counts: Trademark Infringement (Count I); False Designation of Origin (Count II); Declaratory Judgment (Count III), Breach of Contract (Count IV); Breach of the Covenant of Good Faith and Fair Dealing (Count V); Common Law Unfair Competition (Count VI); Unjust Enrichment (Count VII); and Violation of Mass. Gen. L. ch. 93A (Count VIII).

ICC filed an Answer and Counterclaim, followed by an Amended Answer and Counterclaim with leave. ICC's first counterclaim, which is not at issue in the present motions, relates to NFPA's allegedly wrongful use of ICC's federally-registered trademark "Building a Safer World." The second counterclaim asserts that NFPA breached the Settlement Agreement by undertaking the present litigation against ICC for its use of INTERNATIONAL CODE COUNSEL ELECTRICAL CODE.

On February 11, 2004, NFPA filed a Motion for Judgment on the Pleadings, or in the Alternative, Motion for Summary Judgment as to ICC's Counterclaim. On

  

March 24, 2004, NFPA also filed a Motion for Partial Summary Judgment as to Counts I, III, and IV of the Complaint. I denied both motions [*16] on March 25, 2004 without prejudice to renewal in accordance with an amended Scheduling Order. Pursuant to that Order, NFPA filed a Renewed Motion for Partial Summary Judgment as to Counts I, III, and IV of the Complaint on April 1, 2005 requesting entry of "partial summary judgment as to the NFPA's Count I (Trademark Infringement), Count III (Declaratory Judgment), and Count IV (Breach of Contract) of the Complaint as to [ICC's] use of the mark INTERNATIONAL ELECTRICAL CODE.'"

For its part, ICC filed a Motion for Partial Summary Judgment on April 1, 2005 requesting entry of judgment against Plaintiff and Counterclaim Defendant NFPA on ICC's counterclaim for breach of the Settlement Agreement (Second Counterclaim); all of NFPA's claims related to ICC's use of the marks "INTERNATIONAL CODE COUNCIL ELECTRICAL CODE" and "ICC ELECTRICAL CODE"; and on NFPA's Chapter 93A claim.

After a hearing was held on these liability motions on September 21, 2005, ICC moved on December 1, 2005 for partial summary judgment on the issue of damages and unjust enrichment. By that motion, ICC seeks a declaration that NFPA has not suffered any actual damages and that ICC has not been unjustly enriched [*17] by the alleged breach of contract and trademark infringement.

## II. STANDARD OF REVIEW

[HN1] Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. A party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists. *Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)*, cert. denied, *515 U.S. 1103, 115 S. Ct. 2247, 132 L. Ed. 2d 255 (1995)*. Once the movant makes such a showing, the nonmovant must point to specific facts demonstrating that there is, indeed, a trialworthy issue. Id.

[HN2] A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)*, and a "genuine" issue is one supported by such evidence that "a reasonable jury, drawing favorable inferences,' could resolve it in favor of the [*18] nonmoving party." *Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)* (quoting *Smith v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996))*. "Conclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. *Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)*. "While infringement and unfair competition cases often present factual issues that render summary judgment inappropriate, this is not invariably so." *Kazmaier v. Wooten, 761 F.2d 46, 48-49 (1st Cir. 1985)*.

[HN3] Cross-motions for summary judgment do not alter the basic summary judgment standard, but rather require courts to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. See *Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103 (1st Cir. 2001)*; *Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)*. Thus, in deciding cross-motions for summary judgment, courts must consider each motion separately, drawing all reasonable inferences [*19] against each movant in turn. *Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997)*.

## II. DISCUSSION

### A. Mass. Gen. Laws ch. 93A (Count VIII)

I begin with the least complicated issue. ICC seeks entry of summary judgment against NFPA on its Mass. Gen. Laws ch. 93A claim because there is no evidence that ICC's actions "occurred primarily and substantially within the Commonwealth" of Massachusetts as required by *ch. 93A, § 11*, which provides:

> [HN4] No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not



occur primarily and substantially within the commonwealth.

[HN5] To determine whether the circumstances that gave rise to a claim occurred "primarily and substantially" in Massachusetts, Massachusetts courts examine the "center of gravity" of the allegedly unfair and deceptive conduct. *Uncle Henry's, Inc. v. Plaut Consulting Co., Inc., 399 F.3d 33, 44 (1st Cir. 2005)* [*20] citing *Kuwaiti Danish Computer Co. v. Digital Equipment Corp., 438 Mass. 459, 473, 781 N.E.2d 787 (2003).* The Supreme Judicial Court has disavowed the use of any particular set of factors in determining whether alleged wrongful conduct occurred primarily and substantially' in Massachusetts. *Uncle Henry's, 399 F.3d at 44.*

In this case, NFPA asserts that its "[ch.] 93A claim centers on the fact that ICC negotiated and entered into a contract with NFPA," a Massachusetts-based company whose operations are centered in Massachusetts, "that it had no intention of upholding. . . . [Furthermore, ICC] set about on a course of conduct designed to cause confusion in the marketplace through the repeated use of its confusing marks, as well as NFPA's International Electrical Code(r) mark."

ICC notes the following facts to support its argument that the "center of gravity" of the allegedly unfair and deceptive conduct occurred outside Massachusetts: ICC does not maintain offices in Massachusetts; ICC negotiated the Settlement Agreement from outside Massachusetts; ICC chose new names for its Administrative Provisions in offices outside Massachusetts; ICC filed a trademark [*21] application for the ICC ELECTRICAL CODE with the PTO, which is located outside Massachusetts; ICC's Administrative Provisions were not printed in Massachusetts; ICC did not ship the publications from Massachusetts; ICC did not target its advertising in Massachusetts; and only 1.26% of ICC's sales of the subject publications were derived from Massachusetts' customers.

NFPA responds that the work done by NFPA in "analyzing and negotiating the Agreement occurred in Massachusetts" and that it received "deceptive communications" from ICC in Massachusetts resulting in a form of fraud in the inducement to enter into the Settlement Agreement. However, as ICC noted in its Reply Brief, NFPA has not identified any particular

"deceptive communications" that ICC directed to it in Massachusetts. Moreover, I observe that NFPA does not seek to void the Settlement Agreement it argues it was fraudulently induced to execute, but rather seeks to enforce it.

Under the circumstances, I find, as a matter of law, that the actions and transactions constituting the alleged unfair methods of competition or the unfair or deceptive acts or practices, namely the use of NFPA's marks and the registration and [*22] use of marks allegedly confusingly similar to NFPA's marks, did not occur primarily and substantially within Massachusetts. Accordingly, I will grant summary judgment to ICC on Count VIII.

## B. ICC's use of INTERNATIONAL ELECTRICAL CODE

NFPA alleges broadly that ICC's unauthorized use of its mark INTERNATIONAL ELECTRICAL CODE after the Settlement Agreement breaches that agreement (Count IV) and the related covenant of good faith and fair dealing (Count V). In addition, NFPA alleges that this use infringes its registered trademark (Count I) and amounts to false designation of origin (Count II), pursuant to *§ 32* and *§ 43(a)(1)* of the Lanham Act, respectively, and that the use amounts to unfair competition (Count VI) under Massachusetts common law. As separate causes of action and grounds of relief, NFPA also requests a declaratory judgment that ICC has no right to use the mark INTERNATIONAL ELECTRICAL CODE (Count III) and relief from ICC's unjust enrichment (Count VII).

In its renewed motion, NFPA seeks partial summary judgment only as to ICC's liability for use of the mark INTERNATIONAL ELECTRICAL CODE and as to that use only under Counts I (Trademark Infringement), III [*23] (Declaratory Judgment), and IV (Breach of Contract). ICC has opposed this motion, but did not file its own motion for summary judgment as to its liability for using NFPA's mark INTERNATIONAL ELECTRICAL CODE. ICC has, however, filed a motion for partial summary judgment on the issues of damages and unjust enrichment, seeking an order that NFPA did not suffer any damages and that ICC was not unjustly enrichment by its use of NFPA's mark INTERNATIONAL ELECTRICAL CODE or, for that matter, its use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL

  

CODE. Before considering the damages issue, I will fist conduct my analysis of the liability issue with respect to ICC's use of INTERNATIONAL ELECTRICAL CODE.

### 1. Breach of Contract (Count IV)

NFPA alleges that ICC breached the 1999 Settlement Agreement by using INTERNATIONAL ELECTRICAL CODE on its website and in certain materials. This use was in direct contravention of P A-3 of the Settlement Agreement which provides that ICC will not use the trademark INTERNATIONAL ELECTRICAL CODE, except in reference to the goods or services of NFPA. Paragraph G-6 specifically contemplates NFPA bringing an action in this Court to enforce [*24] this provision. ICC does not deny that it used NFPA's mark in violation of the Settlement Agreement, although it claims to have done so inadvertently. Rather, ICC opposes summary judgment as to this count because NFPA cannot demonstrate that it was ready, willing, and able to perform its end of the bargain at the time of ICC's alleged breach. I find this anticipatory breach defense unavailing.

ICC relies upon the general rule "'that [HN6] when performance under a contract is concurrent, one party cannot put the other in default unless he is ready, able, and willing to perform and has manifested this by some offer of performance' although a tender of performance is not necessary if the other party has shown that he cannot or will not perform.'" *Frostar Corp. v. Malloy, 63 Mass.App.Ct. 96, 106, 823 N.E.2d 417 (Mass. App. Ct. 2005)* citing *Kanavos v. Hancock Bank & Trust Co., 395 Mass. 199, 202, 479 N.E.2d 168 (1985)*(quoting *Mayer v. Boston Metropolitan Airport, Inc., 355 Mass. 344, 354, 244 N.E.2d 568 (1969))*. But ICC does not offer any factual support for its claim that NFPA was not "ready, able, and willing to perform" its part of the bargain when ICC allegedly inadvertently began [*25] using NFPA's mark, other than the fact that NFPA brought the instant suit four years after executing the Settlement Agreement. To the contrary, it is undisputed that NFPA has refrained from using any ICC Marks itself and that NFPA has filed Consents and withdrawn oppositions as required by the Settlement Agreement. Consequently, I will grant summary judgment to NFPA as to liability on its breach of contract claim related to ICC's admitted use of INTERNATIONAL ELECTRICAL CODE after the execution of the Settlement Agreement.

### 2. Trademark Infringement (Count I)

NFPA pursues its trademark infringement claim under the authority § 32 of the Lanham Act, which provides:

> [HN7] Any person who shall, without the consent of the registrant -- (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

*15 U.S.C. § 1114* [*26] *(1)(a).* [HN8] "To win a trademark case, a plaintiff must show 1) that he uses, and thereby owns,' a mark, 2) that the defendant is using that same or a similar mark, and 3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff." *DeCosta v. Viacom International, Inc., 981 F.2d 602, 605 (1st Cir. 1992)* (citations omitted).

ICC does not dispute that NFPA uses and owns its INTERNATIONAL ELECTRICAL CODE mark. Similarly, ICC admits that it used NFPA's mark commercially after NFPA registered the trademark in 2001. [8] As a result, the trademark infringement claim turns on [HN9] the "likelihood of confusion" requirement, which is "the key element in any infringement action." *Purolator, Inc. v. EFRA Distributors, Inc., 687 F.2d 554, 561 (1st Cir. 1982)*.

> 8 Specifically, ICC admits that its e-commerce website made a reference to the "2003 International Electrical Code" alongside a picture of its INTERNATIONAL CODE COUNCIL ELECTRICAL CODE Administrative Provisions publication; that its March 2004 edition of its monthly "Building Safety Bulletin" listed the ICC publication as the "2000 ICC International Electrical Code Administrative Provisions"; and that its online Membership Application listed the ICC publication as the "2003 International Electrical Code(r) Administrative Provisions."

[*27] [HN10] The First Circuit has "identified eight factors to be weighed in determining likelihood of

  

confusion." *I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 43 (1st Cir. 1998)* citing *Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981).* They are:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

*I.P. Lund, 163 F.3d at 43.* "No one factor is necessarily determinative, but each must be considered. The factors are non-exclusive, however, and are not always apt to the particular facts of a case." Id. (citations omitted). "Courts may consider other factors and may accord little weight to factors that are not helpful on the particular facts of a case." *Beacon Mutual Insurance Co. v. OneBeacon Insurance Group, 376 F.3d 8, 15 (1st Cir. 2004).* I consider each factor [*28] in turn.

a. Similarity of the Marks: ICC's use of the mark INTERNATIONAL ELECTRICAL CODE in reference to its publications involves the use of identical words, so this factor plainly favors NFPA.

b. Similarity of the Goods: The parties agree that the goods to be compared here are ICC's two Administrative Provisions and NFPA's INTERNATIONAL ELECTRICAL CODE(r) series. I find that these goods are substantially similar and overlapping, despite the fact that ICC's publications do not constitute a complete electrical code like the NEC(r), the anchor publication for NFPA's INTERNATIONAL ELECTRICAL CODE(r) series. As ICC conceded in its Answer to NFPA's counterclaims in the 1999 Lawsuit between the parties, the disputed marks are "in connection with goods that are related and, in point, similar to NFPA's National Electrical Code."

ICC markets its publications as "administrative provisions for implementing the NEC" and "necessary to administer and enforce" NFPA's NATIONAL ELECTRICAL CODE(r). ICC's publications are also shorter and less costly than the NEC(r). Nevertheless, ICC's publications include at least limited provisions that

address the same topics. According to NFPA's expert, [*29] Chapter 12 of ICC's Administrative Provisions contains wiring rules on some of the same subjects covered by the NEC(r) and Annex G of the 2005 NEC(r) and Article 80 of the 2002 NEC(r) contain administrative provisions similar to ICC's publications. And, although ICC's publications may have been, as plaintiff's expert Beutel explains, "primarily designed to be a complement to the NFPA's NATIONAL ELECTRICAL CODE(r), rather than a substitute for it[,] . . . [they] contain[] substantive provisions that are intended to replace various portions of NFPA's NEC(r)." In addition, both sets of publications profess to include model electrical codes available for adoption by local or state governments. [9] Thus, I find that ICC's Administrative Provisions and NFPA's INTERNATIONAL ELECTRICAL CODE(r) series are substantially similar and this factor also favors NFPA.

> 9 The prefaces of the ICC's publications describe themselves as "model code regulations . . . available for adoption and use by jurisdictions internationally." NFPA has consistently described its "anchor publication" as a "model electrical code" available to be "adopted as the standard electrical code at the state, county, or local level."

[*30] c. Channels of Trade; Advertising; Classes of Prospective

Purchasers: [10] I find that the relationship between the parties' channels of trade and their advertising and the classes of prospective purchasers all favor NFPA.

> 10 Both parties considered the next three factors together since "the overlap between the parties' trade channels, advertisers, and markets are three factors conventionally analyzed together." *Copy Cop, Inc. v. Task Printing, Inc., 908 F.Supp. 37, 45 (D.Mass. 1995).*

ICC admits that "ICC and NFPA sell their products through the same channels of trade and advertising and to the same customers, but ICC also points out that defendants in trademark infringement cases have prevailed even when these factors favor the plaintiff. See, e.g., *Pump, Inc. v. Collins Management, Inc., 746 F.Supp. 1159, 1168-69 (D. Mass. 1990), CCBN.com. Inc. v. c-call.com, Inc., 73 F.Supp.2d 106, 112-13 (D. Mass. 1999),* and *HQ Network Systems v. Executive Headquarters, 755 F. Supp. 1118 (D.Mass. 1991).* [*31]

 

With respect to the similarity between the classes of prospective purchaser factors, ICC cites *International Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 204 (1st Cir. 1996)* for the proposition that:

> the requisite inquiry is not limited merely to determining whether the class of prospective purchasers is the same or different. Instead, a court called upon to assay likelihood of confusion must ponder the sophistication of the class, thereby taking account of the context in which the alleged infringer uses the mark.

In this connection, ICC points to admissions made by NFPA that the purchasers of NFPA's products in the INTERNATIONAL ELECTRICAL CODE(r) series and the purchasers of ICC's two publications are "professional members of a highly technical industry." Consequently, ICC contends I should discount the likelihood of confusion among such informed customers. NFPA resists this conclusion and refers to *Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245 (4th Cir. 1970)*, where the Court disagreed with the defendant's argument that the purchasers are "so sophisticated and knowledgeable [*32] that they will not be confused" because "the expertise of purchasers does not always assure the absence of confusion." Having considered both arguments, I find that the arguable sophistication of prospective purchasers does not tip this factor in favor of ICC because this is not a case where the "goods are expensive and purchased [only] after careful consideration." Compare *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, 718 F.2d 1201, 1206 (1st Cir. 1983);* [11] and *Pignons, 657 F.2d at 489*. The goods in this case are all technical manuals of a sort for electrical wiring that cost well under $ 100 and are purchased by various participants in the building industry in near instantaneous transactions. Thus, I do not discount the degree to which these factors favor NFPA.

11    [HN11] The Court in Astra explained why there is always less likelihood of confusion where goods are expensive and purchased after careful consideration: "The sales effort [in selling the computerized blood analyzer machine] is directed to those normally in charge of the lab . . . It takes from three months to a year to consummate the sale of a Beckman analyzer, involving an average

of 55 hours of personal contact between lab personnel and sales representatives. The decision to buy a machine worth thousands of dollars is obviously not done on an impulse, and involves a careful consideration of the reliability and dependability of the manufacturer and seller of the product." *Astra, 718 F.2d at 1206*.

[*33]  d. Actual Confusion: The most hotly debated issue is whether NFPA's "evidence" of actual confusion suffices.

[HN12] "Actual confusion is commercially relevant if the alleged infringer's use of the mark could inflict commercial injury in the form of . . . a diversion of sales, damage to goodwill, or loss of control over reputation of the trademark holder." *Beacon Mutual, 376 F.3d at 15* quoting *The Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 963 (2d Cir. 1996)*. However, *Section 1125(a)* only "provides a cause of action for the use in commerce of any word, term, [or] name' which is likely to cause confusion, or to cause mistake, or to *deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.*'" *Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 36 n. 1 (1st Cir. 2006)*(emphasis supplied). Focusing on this limitation, ICC argues that "there is no evidence in the record of actual confusion as to the source of ICC's publications, or confusion as to whether [*34] ICC's publication is approved or sponsored by NFPA, or affiliated with NFPA. NFPA's so-called evidence of confusion focuses on confusion as to the [proper] title of ICC's publication." I do not fully agree.

There is no doubt that there is confusion in the industry as to the proper title for the ICC publications. It is undisputed that many third parties have referred to the ICC ELECTRICAL CODE Administrative Provisions as the International Electrical Code Administrative Provisions or even just the International Electrical Code. ICC's use of the phrase International Electrical Code to refer to its publications on its e-commerce website, in its monthly bulletin and on its online membership application has without a doubt contributed to this general confusion.

There is also some evidence, loosely defined, of confusion in the industry as to "the nature and purpose" of the ICC publications. That is, whether people in the

  

industry understand that ICC's publication is an administrative document and not a complete electrical code like ICC's other International Codes and the NEC(r). For instance, NFPA points to an online discussion forum where the moderator and members discussed a proposed **[\*35]** bill to remove the NFPA's NATIONAL ELECTRICAL CODE(r) as Florida's electrical code and replace it with the "INTERNATIONAL ELECTRICAL CODE." One posting stated: "The more I read the Bill, the more I am starting to wonder if the Florida Building Commission actually thinks the IEC is an actual electrical code and not just an Administrative Code." NFPA also points to another website, "Mike Holt's Code Forum", which contains the following inquiry from wirenut 1980':

> Is the International Electrical Code meant as a supplement to the NEC? I have a copy and have not found it particularly useful. It is only 36 pages and it does not touch on safety. Pretty much it touches on procedures for permits, fees, enforcement, inspection, etc. Is there an international electrical code that is comparable to the NEC in terms of content?

The parties also dispute whether or not ICC accurately advertizes its publications as "necessary" to implement or administer the NEC(r). These assertions and arguments are not relevant to the form of unfair competition NFPA presses in its motion for partial summary judgment; that is, trademark infringement under the Lanham Act as opposed to false advertizing. **[\*36]** See discussion *infra* Section II.C.1.b.

More to the point then, the only evidence brought to my attention that directly suggests affiliation or source confusion is a printout of the website of the Town of Seabrook, New Hampshire and part of Stauffer's deposition testimony and expert report.

The Seabrook website lists the building codes adopted by the town, which includes seven codes published by ICC and the "International Electrical Code 2000, published by the National Fire Protection Association." Since NFPA did not publish an International Electrical Code 2000, rather it was published by ICC, it appears that at least the Town of Seabrook is confused about the source of the "International Electrical Code 2000".

In his expert report, Stauffer [12] indicated that he has personally communicated with electricians and other contractors who have called him to ask technical questions about the "International Electrical Code" and its relationship with NEC(r). Similarly, in his deposition, Stauffer testified that callers also made "general inquiries along the lines of what is this International Electrical Code anyway? Is it part of the NEC?'" [13] But see Stauffer's Deposition, **[\*37]** pp. 106-08, discussed *infra*.

> 12    Stauffer offered his expert report and deposition testimony based on his professional experience and involvement in regulatory codes and standards for electrical construction. He is currently the Executive Director of Standards and Safety for the National Electrical Contractors Association. He is also the author of the *User's Guide to the National Electrical Code(r)*, which is published by the NFPA.
> 13    Stauffer's account of communications with these callers is not hearsay because it is not "offered in evidence to prove the truth of the matter asserted." *Fed.R.Evid. 801 (c)*. I only consider these statements as evidence showing that the declarants were confused about the relationship between the ICC's publications and the NFPA. *Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 31 (1st Cir. 1989)*("The statement was made not to prove that the defendants' shirts were in fact officially authorized, but rather to show that the declarant, a member of the public, believed that they were officially authorized.").

**[\*38]** "While not as accurate as a survey might have been," nor as comprehensive as evidence in other cases, "this evidence shows that [at least] some people were actually confused as to who sponsors" the ICC's publications. *Id. at 31-32*. More of this kind of direct affiliation and source confusion evidence would have made the case for actual confusion stronger, but I find that the circumstances are such that I find that ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE on its e-commerce website, in its monthly bulletin and on its online membership application caused actual confusion.

e. ICC's Intent in Using the Mark: Despite NFPA's dogged attempt to establish ICC's bad faith and intentional scheme to confuse, [14] I find insufficient evidence to contradict ICC's assertion that its use of

  

INTERNATIONAL ELECTRICAL CODE to refer to its Administrative Provisions was inadvertent and not willful or fraudulent.

14    NFPA also suggests that because "ICC proceeded to destroy its computer tabs that evidenced ICC's repeated use of NFPA's International Electrical Code(r) mark on ICC's web-page . . . soon after NFPA filed the instant action" I should draw an adverse inference against ICC citing *Nation-Wide Check Corp. v. Forest Hills, 692 F.2d 214, 219 (1982)*. I am not convinced that ICC's policy of overwriting its back up tapes, as described in the letter found as Ex. 4 to the Winder Affidavit, suggests bad faith evidence destruction.

[*39] ICC maintains that, in accordance with the Settlement Agreement, it "sought to eliminate all references to the International Electrical Code in all media forms, or to change those references to ICC ELECTRICAL CODE"; "sent e-mails to its employees advising them of the Settlement Agreement, and instructing them not to use the INTERNATIONAL ELECTRICAL CODE mark"; and "periodically reminded its employees of the proper title of the ICC ELECTRICAL CODE Administrative Provisions." ICC further states that when it "learned that one of its employees had inadvertently used the phrase International Electrical Code,' [it] took prompt steps to correct the mistake, and then continued to investigate the matter in an effort to eradicate any other inadvertent uses of the phrase." The undisputed evidence suggests that ICC did in fact remove the reference to INTERNATIONAL ELECTRICAL CODE from its online membership application form.

The parties disagree about ICC's efforts with respect to third parties. ICC claims that it has also "on occasion, contacted its resellers directly to inform them of the proper name of the ICC Electrical Provisions." NFPA does not specifically contradict this statement, [*40] but it argues that "ICC has done nothing to dispel confusion over the Publication's title, use and affiliation." This disagreement does not undermine the other undisputed facts and since NFPA is the moving party on this issue, I must draw all reasonable inferences in favor of ICC. Thus, I find insufficient evidence to conclude that ICC's post Settlement Agreement use of INTERNATIONAL ELECTRICAL CODE was made in bad faith. I note

further that this factor would be significant at this stage only where "an alleged infringer copied a mark in bad faith; a converse finding of good faith carries little weight'." *Beacon Mutual, 376 F.3d at 19* citing *I.P. Lund, 163 F.3d at 44*.

f. The Strength of NFPA's Mark: The record before me requires a nuanced evaluation of the strength I should attribute to NFPA's mark INTERNATIONAL ELECTRICAL CODE.

[HN13] Courts must consider "the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark." *Star Financial Services v. Aastar Mortgage Corp., 89 F.3d 5, 11 (1st Cir. 1996)*. Here, NFPA sought to register the mark in 1996. It has been [*41] using the mark since 1997, when it first used it on the 1996 edition of its Spanish version of the NEC(r), Codigo Electrico Nacional. Since then, NFPA has used the mark on various editions of a dozen or so publications that it wishes to identify as part of the INTERNATIONAL ELECTRICAL CODE(r) series.

ICC does not dispute that NFPA has sold over 2.75 million copies of publications bearing NFPA's INTERNATIONAL ELECTRICAL CODE(r) mark, nor does it challenge the "muscularity" of NFPA's mark for its anchor publication, the NEC(r) mark. Instead, ICC notes that "there is no evidence in the summary judgment record that NFPA has invested substantial sums in promoting the INTERNATIONAL ELECTRICAL CODE mark." ICC also argues that NFPA has not been vigilant in protecting this mark. Given the comparative lack of evidence about the strength of NFPA's relevant INTERNATIONAL ELECTRICAL CODE(r) mark, as opposed to the NEC(r) mark, and NFPA's burden as the moving party, I decline to give substantial weight to this factor.

In addition, I note that in attempting to prove actual confusion, NFPA has argued that many third parties continue to refer to the ICC ELECTRICAL CODE Administrative Provisions as [*42] the International Electrical Code Administrative Provisions or even just the International Electrical Code. While some of this confusion is likely attributable to ICC's wrongful" use of NFPA's INTERNATIONAL ELECTRICAL CODE series as discussed above, the continued use of INTERNATIONAL ELECTRICAL CODE to refer to ICC's publications also somewhat undermines the

  

strength of NFPA's mark.

g. Conclusion: In sum, I find that all but the last two factors favor NFPA and allow the Plaintiff to meet its burden of showing that there is a strong likelihood of confusion. While the evidence of actual confusion is far from overwhelming, NFPA does not need, as it points out, to provide evidence of. actual confusion to prevail because [HN14] "the test of infringement is the likelihood of confusion, not the proof of actual confusion." See generally *Baker v. Simmons*, 307 F.2d 458, 462 (1st Cir. 1962); *HQ Network Systems*, 755 F.Supp. at 1119 (holding that plaintiff "need not show actual confusion in order to prevail on its claim of service mark infringement. Mere likelihood of confusion is enough.")

In support of my conclusion, I again note ICC's adamant assertions [*43] in its Answer in the 1999 Lawsuit that:

> ICC admits that there is a segment of the public which is likely to be confused, mistaken and deceived by NFPA's use of the phrase "International Electrical Code," and ICC's simultaneous use of one or more of its family of trademarks that include the root phrase "INTERNATIONAL CODE," including the use by ICC of its INTERNATIONAL ELECTRICAL CODE trademark. ICC further admits that there is a segment of the public which is likely to be confused, deceived or mistaken, as to whether there is an affiliation, connection, sponsorship, endorsement or approval between ICC and NFPA, or their respective goods, because of the simultaneous use of the "International Electrical Code" mark.

Accordingly, I conclude NFPA is entitled to partial summary judgment for liability against ICC on the trademark infringement claim as to ICC's admitted use of NFPA's mark INTERNATIONAL ELECTRICAL CODE.

3. Declaratory Judgment (Count III)

NFPA seeks in its complaint, pursuant to the Declaratory Judgment Act, *28 U.S.C. § 2201*, a declaration that ICC has "no right to use the marks

INTERNATIONAL ELECTRICAL CODE,' INTERNATIONAL [*44] CODE COUNCIL ELECTRICAL CODE' and ICC ELECTRICAL CODE' and that [ICC's] use of the marks . . . infringes NFPA's INTERNATIONAL ELECTRICAL CODE(r) mark and has caused, and will cause, confusion amongst purchasers and potential consumers of the NFPA's INTERNATIONAL ELECTRICAL CODE(r)." In the motion for partial summary judgment now before me, however, NFPA seeks only a declaration with respect to ICC's right to use its trademark "INTERNATIONAL ELECTRICAL CODE."

ICC argues that entering a declaratory judgment is inappropriate because it "has never claimed a right' to use the phrase International Electrical Code.' Rather, ICC says it has repeatedly informed NFPA that its use of that phrase was inadvertent and unintentional." [15] [HN15] A declaratory judgment may, however, be appropriate despite suggestions of mootness, even if the defendant voluntarily ceased the act complained. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982).

> 15    I note that ICC's assertion would be more accurate if it were qualified that it has not claimed a right to use NFPA's mark since the execution of the Settlement Agreement.

[*45] [HN16] The Declaratory Judgment Act provides that: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *28 U.S.C. § 2201(a)*. "The statutory provision limiting declaratory judgments to cases of actual controversy' is no more than a recognition that the federal judicial power extends only to cases' or controversies' in the constitutional sense." *Indemnity Insurance Co. of North America v. Kellas*, 173 F.2d 120, 123 (1st Cir. 1949) citing *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 239-240, 57 S. Ct. 461, 81 L. Ed. 617 (1937). "The distinction is between a case appropriate for judicial determination', on the one hand, and a difference or dispute of a hypothetical or abstract character', on the other -- a distinction which is necessarily one of degree.'" *Id*. 123-24 citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941).

  

There is nothing hypothetical about the recurrent [*46] and ongoing disputes between the parties. Given the litigation history between them, even following the Settlement Agreement, I will exercise my power to enter the requested Declaratory Judgment, recognizing that ICC now admits that it has no right to use NFPA's trademark and claims to have stopped using it.

## C. ICC'S use of INTERNATIONAL CODE COUNCIL (ICC) ELECTRICAL CODE

ICC's liability cross-motion seeks summary judgment as to all of NFPA's claims relating to ICC's use of the marks INTERNATIONAL CODE COUNCIL ELECTRICAL CODE and ICC ELECTRICAL CODE. Specifically, ICC contends that it is entitled to summary judgment as to these marks under Counts I (trademark infringement), II (false designation of origin) and VI (unfair competition) because NFPA cannot establish a likelihood of confusion; and that it is entitled to summary judgment as to Counts III (declaratory judgment), V (breach of the covenant of good faith and fair dealing), VII (unjust enrichment), and VIII (ch. 93A) for the same reasons it is entitled to summary judgment as to Count IV (breach of contract): that the Settlement Agreement authorizes it to use the marks INTERNATIONAL CODE COUNCIL ELECTRICAL CODE and [*47] ICC ELECTRICAL CODE. Consequently, I consider ICC's liability motion in two parts, first addressing the alleged unfair competition claims, broadly conceived, and then addressing the alleged breach of contract claims, also broadly conceived. In considering ICC's liability for the alleged breach of contract, I also consider ICC's counterclaim against NFPA that it breached the Settlement Agreement by bringing this action against ICC for using the mark INTERNATIONAL CODE COUNCIL ELECTRICAL CODE.

### 1. Trademark Infringement, False Designation of Origin, & Unfair Competition (Counts I, II and VI)

As to the unfair competition claims, broadly conceived, ICC seeks entry of summary against NFPA with respect to its claim that ICC's use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE amounts to trademark infringement under § 32 of the Lanham Act, false designation of origin under § 43(a)(1) of the Lanham Act, and unfair competition under state law. [HN17] "The elements of each of these causes of action are essentially similar, and the same set of facts will support a suit for either." *Schutt Mfg. Co. v. Riddell, Inc.,* 673 F.2d 202, 206 (7th Cir. 1982). [*48] [16] The central question to be resolved as to each of the claims is whether ICC's use of the marks ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE as part of the titles for its Administrative Provisions publications creates a likelihood of confusion with NFPA's INTERNATIONAL ELECTRICAL CODE(r) series of publications.

16 [HN18] "Unfair competition, in its common law signification, implies palming off." *Smartfoods, Inc. v. Northbrook Property and Cas. Co.,* 35 Mass.App.Ct. 239, 244, 618 N.E.2d 1365 (1993). As under federal law, the confusion referred to in unfair competition claims has been extended from the traditional confusion as to source or origin of goods or services, to the factors of sponsorship or endorsement. *Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc.,* 398 Mass. 480, 489, 498 N.E.2d 1044 (1986) "The plaintiff need only show a likelihood of confusion in order to be entitled to equitable relief. However, actual confusion, which is present in this case, is the best evidence of likelihood of confusion." Id. (internal citations omitted). "Likelihood of confusion is whether the similarity of names is such as to make likely the deception of any appreciable number of ordinary prudent customers.'" *Id. at 489 n. 10* quoting *I.T.S. Industria Tessuti Special v. Aerfab Corp.,* 280 F.Supp. 581, 586 (S.D.N.Y. 1967).

Similarly, although section 15 U.S.C. § 1125(a)(1)(A) "creates a federal statutory tort broader in scope than the common law of unfair competition and the law of infringement, . . . a showing that the marks or packaging of defendant create a likelihood of confusion with the products of the plaintiff . . . [is still] a key to establishing a claim of false designation of origin." *Purolator,* 687 F.2d at 560-61.

[*49] The analysis for the second, third, fourth, fifth and eighth factors discussed *supra* with respect to ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE does not change with the change of focus in this Section, except for shifting the burden to ICC as the moving party on this issue. Consequently, the second, third, fourth, and fifth factors favor NFPA, whereas I

  

continue to give little weight to the eighth factor (strength of NFPA's INTERNATIONAL ELECTRICAL CODE mark). I therefore re-analyze only the first (similarity of the marks), sixth (evidence only actual confusion), and seventh (defendant's intent in adopting its mark) factors as they apply to ICC's use of the ICC ELECTRICAL CODE AND INTERNATIONAL CODE COUNCIL ELECTRICAL CODE variants.

a. Similarity of the Marks: [HN19] "Similarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Pignons, 657 F.2d at 487* (citations omitted). Some of the factors that courts have considered when assessing the similarity of the marks are the phonetics, font, design, layout, color scheme, total number of words and syllables, spelling and pronunciation. "Meaning [*50] alone, without reference to appearance and sound, may [also] be sufficiently close to constitute similarity." *Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989)* citing 3A Callman § 20.18.

Here, the marks at issue are comprised only of text used on the cover of publications related to electrical code standards. Clearly, the challenged marks use overlapping descriptive words. NFPA's mark has three generic words: International, Electrical, and Code. Pointing out the obvious then, the mark ICC ELECTRICAL CODE shares its last two words with NFPA's mark; and the mark INTERNATIONAL CODE COUNCIL ELECTRICAL CODE uses all three of the words that comprise NFPA's mark, but injects the words "Code Council" in the middle.

NFPA's mark is usually printed in all uppercase letters followed by the symbol "(R)" and the word "SERIES." The NFPA publications presented to the court display the INTERNATIONAL ELECTRICAL CODE(r) series mark as a subtitle in a smaller font below the title of the publications. In contrast, ICC's publications use the challenged marks in large uppercase font, followed by the words "Administrative Provisions" in smaller font. However, the [*51] ICC does not always describe its 2000 and 2003 publications with the words Administrative Provisions.

Despite the apparent but superficial differences, I find that the dominant wording in all three of the marks is the phrase "electrical code." See *OneBeacon, 376 F.3d at 18* citing 3 McCarthy § 23:44 [HN20] ("If the dominant' portion of both marks is the same, then confusion may be

likely, notwithstanding peripheral differences.") Arguably distinguishing the similarity between the dominant portions is that the differentiating element -- ICC and INTERNATIONAL CODE COUNCIL -- is ICC's company name, the latter of which is an ICC registered trademark.

ICC argues that "the Court of Appeals and other courts have stressed that otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer.' *Pignons, 657 F.2d at 487* (finding that defendant Polaroid's use of the mark "Alpha" was not likely to be confused with the plaintiff's mark "Alpha" because the word "Polaroid" was displayed in close proximity to the word "Alpha" on Polaroid's cameras and in its advertising)." On the other [*52] hand, the First Circuit has also said that [HN21] "even where defendant clearly marked its product with its company name, similarity might be found." *Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989)* citing *Astra, 718 F.2d at 1205*. Furthermore, in this case, the name INTERNATIONAL CODE COUNCIL contributes to the overlapping words.

[HN22] "When one uses a mark similar to one already in use, there is generally an affirmative duty to avoid the likelihood of confusion." *BAA, 867 F.2d at 29* citing *Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 817-818 (1st Cir. 1987)*. Drawing all reasonable inferences in favor of NFPA, the non-moving party on this issue, I find that the presence of ICC's company name is not enough to avoid the conclusion "that while the marks are not identical, they are at least similar for the purposes of the present review." *Astra, 718 F.2d at 1205*. [17] "Few would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with [*53] enough points of difference to confuse the courts." *BAA, 867 F.2d at 30* citing *Baker v. Master Printers Union of New Jersey, 34 F.Supp. 808, 811 (D.N.J. 1940)*.

17    In *Astra*, as here with respect to INTERNATIONAL CODE COUNCIL (ICC) ELECTRICAL CODE, the defendant sought summary judgment. The Court held:

[HN23] It is well settled that

  

under certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer. *Pignons, 657 F.2d at 487; Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626 F.2d 193, 194-95 (1st Cir. 1980).* This rule would seem to apply in this case, where the Beckman name is clearly visible on the analyzer. Nevertheless, in reviewing the granting of the summary judgment, we must consider the evidence in the light most favorable to the appellant. Under this standard, the presence of the word ASTRA' on both Beckman and Astra products leads us to conclude that while the marks are not identical, they are at least similar for the purposes of the present review.

*Astra Pharmaceutical Products, Inc. v. Beckman, 718 F.2d 1201, 1205 (1st Cir. 1983)*

[*54] b. Actual Confusion: The evidence supporting actual confusion is the same as discussed above in connection with ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE. However, I am concerned now solely with any confusion attributable to ICC's use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL, and not its unauthorized use of INTERNATIONAL ELECTRICAL CODE.

In this connection, ICC has obtained significant concessions by NFPA's expert. In his deposition, Stauffer bluntly stated "I don't believe persons in the industry feel that the ICC Electrical Code Administrative Provisions is an NFPA publication," thereby denying the existence of source confusion among persons in the industry. This denial is further evidenced in the following exchange:

Q. Do you have any knowledge of anyone in the industry being confused about whether the ICC Electrical Provisions are an ICC publication versus

an NFPA publication?

A. It is my expert opinion that every time anybody in my industry uses the term International Electrical Code or ICC Electrical Code, they are referring to the smaller booklet published by the International Code Council.

Q. . . . Why don't we look [*55] at tab 6. The first document in tab 6 is the ICC Electrical Code Administrative Provisions 2000. Do you have any knowledge of any person being confused about whether this was an NFPA publication?

A. No.

Q. And the other document in there is the International Code Council Electrical Code Administrative Provisions 2003. Do you have any knowledge of any person being confused about whether this is an NFPA publication?

A. No.

Q. Do you have any knowledge of any person being confused about whether this is a publication that is sponsored by NFPA.

A. I don't understand the difference between the last two questions, but my answer is no.

Q. Do you have any knowledge of any person being confused about whether this publication is affiliated with NFPA.

A. Same answer.

Q. Do you have any knowledge as to whether any person has been confused about whether this publication has been approved by NFPA?

A. Same answer.

Q. Okay. And I was asking you about the 2003 document. Would you have the

  

same answers with respect to the 2000 ICC Electrical Code.

A. Yes.

[Stauffer Deposition, pp. 106-8.]

I do not bind NFPA conclusively to its expert's [*56] concessions. Nevertheless, Stauffer's testimony regarding confusion provides considerable support for ICC's position on the actual confusion factor.

NFPA's arguments about confusion in the industry as to "the nature and purpose" of the ICC publications and whether ICC misrepresents its publications as "necessary" to implement or administer the NEC(r) do not repair the damage done by Stauffer or help meet its burden. NFPA asserts claims under trademark infringement (Count I), false designation of origin under § 43(a)(1) of the Lanham Act (Count II) and unfair competition (Count VI), not false advertizing. [18] [HN24] "Trademark infringement and unfair competition laws exist largely to protect the public from confusion anent the actual source of goods or services." *International Ass'n of Machinists, 103 F.3d at 200.* [19] These causes of action are therefore distinct from state and federal false advertizing or deceptive marketing laws, like § 43(a)(1)(B) of the Lanham Act, which provide a remedy where someone "who, in connection with the marketing of goods or services, makes a representation relating to the actor's *own* goods, services, or commercial activities that is likely [*57] to deceive or mislead prospective purchasers to the likely commercial detriment of another [.]" *Restatement (Third) of Unfair Competition § 2* (1995)(emphasis supplied); see also *Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Avenue, 284 F.3d 302, 310-11 (1st Cir. 2002).*

18 Count II of NFPA's Complaint purports to state a cause of action under § 43 (a) (1) of the Lanham Act without specifying which of the two prongs, (A) false designation of origin or (B) false advertising, it is based on. However, the Complaint only includes "a short and plain statement of the claim showing that the pleader is entitled to relief" under the first prong. *Fed. R. Civ. P. 8(a)(2).* NFPA alleges that ICC's use of the contested marks is a false and misleading representation "as it falsely represents an affiliation, connection, association, sponsorship, endorsement or approval by the NFPA of ICC's

Publication, and an affiliation or connection between the NATIONAL ELECTRICAL CODE(r) and ICC's Publication." [Complaint, P 43] In none of its subsequent filings does NFPA try to expand the scope of Count II to include false advertizing, nor does NFPA refer to or discuss the five elements required to succeed in a false advertising claim under the Lanham Act. See *Cashmere & Camel Hair Manufacturers Institute v. Saks Fifth Avenue, 284 F.3d 302, 310-11 (1st Cir. 2002).*

[*58]

19 [HN25] Similar to trademark infringement, the statutory tort of false designation of origin "is designed to reach, among other things, attempts to appropriate the goodwill associated with a competitor's trademark *by means of confusingly similar marking and packaging, which would create the impression that the products of the defendant originated with the plaintiff.*" *Purolator, 687 F.2d at 561* (emphasis supplied). The tort of unfair competition in Massachusetts only gives those "whose trade name has acquired a secondary meaning in the minds of the public as indicating the origin of his products or as identifying his goods known to them by a trade name has the right to have his trade name protected by securing an injunction *to prevent another from using the same name or a name so similar as to mislead the public into buying the defendant's goods in the belief that they were buying those of the plaintiff and from palming off his goods as those of the plaintiff to the injury of the latter.*" *Planned Parenthood, 398 Mass, at 485* quoting *Monroe Stationers & Printers, Inc. v. Munroe Stationers, Inc., 332 Mass. 278, 280, 124 N.E.2d 526 (1955)*(emphasis supplied).

[*59] Returning to the issue of actual source or affiliation confusion, there is still to be considered the printout of the website of the Town of Seabrook, New Hampshire and Stauffer's deposition testimony and expert report about his communications with confused electricians and other contractors. ICC bears the burden of establishing that there is no genuine issue of material fact on this issue. Consequently, I find that this evidence satisfies NFPA's burden of pointing to specific facts demonstrating that there is a trialworthy issue. While more direct source or affiliation confusion evidence would have made the case for actual confusion stronger,

  

there is enough for a reasonable juror to find actual confusion, drawing reasonable inferences in favor of NFPA.

c. ICC's Intent in Using the Marks ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE: NFPA characterizes ICC's intent in a negative light suggesting,

> Undeterred and in violation of the terms of the Agreement, ICC sought to place confusingly similar marks on its Publication and to affiliate its Publication with the NFPA's National Electrical Code(r). While ICC argues that its use of its tradename in connection [*60] with the words "electrical code" negates any bad intent on ICC's part, the Publication is not a comprehensive electrical code. ICC purposefully chose words describing the Publication that not only misidentify the product, but that also create a false association with the National Electrical Code.

ICC's use of the mark "NATIONAL ELECTRICAL CODE" is not being challenged and it is only indirectly consequential that ICC's publication is not a "comprehensive electrical code." The issue is whether ICC's adoption of the replacement names for its publications was done in bad faith.

ICC was obviously aware of the past litigation and the terms of the Settlement Agreement when it selected the replacement names. Notably, however, the Settlement Agreement did not contain a provision prohibiting ICC from republishing its Administrative Provisions under another name. Thus, the question is whether ICC chose its replacement names in an underhanded defiance of the Settlement Agreement.

ICC applied to register the trademark ICC ELECTRICAL CODE shortly before and during negotiations preceding the execution of the Settlement. It did so without advising NFPA. While the Settlement Agreement did not [*61] specifically forbid ICC from republishing its Administrative Provisions under a different name and it did not specifically forbid ICC from using the chosen replacement names, I find that there is, nonetheless, a genuine issue of material fact as to whether

ICC adopted the names in bad faith with the purpose of cutting corners on the prospective Settlement Agreement.

d. Conclusion: Considering all of the factors and the record in the light most favorable to NFPA, I find that there is a genuine issue of material fact about whether potential purchasers and those "whose confusion threatens the trademark owner's commercial interest in its mark," *Beacon Mutual, 376 F.3d at 16*, would likely be confused or misled into believing that ICC's publications were produced by or affiliated with NFPA causing commercial injury to NFPA. Accordingly, I deny summary judgment to ICC on Counts I, II, and VI with respect to ICC's use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE.

2. Breach of Contract (Counts III, IV, V, and VII)

NFPA also challenges ICC's use of the marks ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE as allegedly [*62] "confusingly similar" to its trademark INTERNATIONAL ELECTRICAL CODE(r) in breach of the Settlement Agreement. ICC defends the titles of its 2000 and 2003 Administrative Provisions on the basis that the Agreement permits it to use its names (ICC and International Code Council) combined with the generic term "Electrical Code." ICC also brings a counterclaim against NFPA for challenging its use of the mark INTERNATIONAL CODE COUNCIL ELECTRICAL CODE in breach of NFPA's promise in the Settlement Agreement not to object to or take any action to prevent or impair ICC's use of the ICC Marks.

[HN26] Under Massachusetts law, [20] "contract interpretation is largely an individualized process, with the conclusion in a particular case turning on the particular language used against the background of other indicia of the parties' intention." *Shea v. Bay State Gas Co., 383 Mass. 218, 222-223, 418 N.E.2d 597 (1981)* citing *United States v. Seckinger, 397 U.S. 203, 213 n. 17, 90 S. Ct. 880, 25 L. Ed. 2d 224 (1970)*. I must "construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished." *Id. at 223.*

> 20   The choice of law clause in the Settlement Agreement states that "this Agreement shall be construed in accordance with the laws of Massachusetts." In their briefing, both sides have

  

cited Massachusetts law for their breach of contract claims. Given the agreement between the parties, and the absence of any suggestion of other applicable law, I apply Massachusetts law in this case without inquiring further. See *McAdams v. Massachusetts Mutual Life Ins. Co., 391 F.3d 287, 298 (1st Cir. 2004)* citing *Hershey v. Donaldson, Lufkin & Jenrette Securities Corp., 317 F.3d 16, 20 (1st Cir. 2003).*

**[*63] [HN27]** Massachusetts courts recognize a series of canons as aids to the interpretation of contracts. For instance, "it is a canon of construction that every word and phrase of an instrument is if possible to be given meaning." *Massachusetts Insurers Insolvency Fund v. The Premier Insurance Co. of Massachusetts, 439 Mass. 318, 322, 787 N.E.2d 550 (2003)* quoting *National Shawmut Bank v. Joy, 315 Mass. 457, 466, 53 N.E.2d 113 (1944),* since "a contract is to be construed to give reasonable effect to each of its provisions." *J.A. Sullivan Corp. v. Com., 397 Mass. 789, 494 N.E.2d 374, (1986)* citing *McMahon v. Monarch Life Ins. Co., 345 Mass. 261, 264, 186 N.E.2d 827 (1962).* See also *Restatement (Second) of Contracts, § 202* (1981). Another canon provides that courts are to give greater weight to specific and exact terms than general language when the meaning of the provisions is in doubt. *Restatement (Second) of Contracts § 203 (c)* (1981), comment a; *Kobico, Inc. v. Pipe, 44 Mass.App.Ct. 103, 108, 688 N.E.2d 1004 (1997); Arcari v. Marder, 225 B.R. 253, 256 (D. Mass. 1998).* In any **[*64]** event, "common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." *Massachusetts Insurers Insolvency, 439 Mass, at 322* quoting *Cadle Co. v. Vargas, 55 Mass.App.Ct. 361, 366, 771 N.E.2d 179 (2002)* (quoting *Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302, 6 Fed. Appx. 52 (1st Cir.2001)).*

ICC alleges that it has the right to use the titles of its 2000 and 2003 Administrative Provisions and that NFPA breached paragraphs A-8, A-9, A-13 and A-14 of the Settlement Agreement by challenging ICC'S use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE. These paragraphs provide:

Except as otherwise provided herein, NFPA recognizes that ICC is the exclusive owner of trademarks in the form of "INTERNATIONAL ___ CODE," including but not limited to:

"INTERNATIONAL PLUMBING CODE," "INTERNATIONAL PRIVATE SEWAGE DISPOSAL CODE," . . ., "INTERNATIONAL ADMINISTRATIVE CODE," . . . "INTERNATIONAL HOUSING CODE" (collectively, the "ICC Marks"). NFPA further recognizes that ICC is the exclusive owner of the trademark "INTERNATIONAL CODE COUNCIL." [P A-8.] (emphasis supplied)

As part of this understanding, except as provided **[*65]** in paragraphs 1, 3, 4, and 5 of this section, NFPA specifically recognizes ICC and the ICC Parties' right to register and use without opposition or interference all trademarks, using "INTERNATIONAL ___ CODE," including all such marks, except for the NFPA Marks, that are currently being used by, or that are the subject of any trademark registration filed by the ICC and/or the ICC Parties, as well as any future mark or marks that ICC or the ICC Parties may develop using this phrase. [P A-9.] (emphasis supplied)

. . . Except as otherwise provided herein, NFPA will not object to nor directly or indirectly take any action or cause any action to be taken that would impair or prevent the use or trademark registration by the ICC or the ICC Parties of any of the ICC Marks worldwide . . . [P A-13.] (emphasis supplied)

Except as provided in paragraphs 1 and 3 of this section, NFPA will not use, seek to register, or object to the use or registration by the ICC or the ICC Parties of any trademark using the mark "INTERNATIONAL ___ CODE" or any marks confusingly similar thereto. [P A-14.] (emphasis supplied)

These sections of the Settlement Agreement embody NFPA's **[*66]** promise that it would not object to or take any action to prevent or impair ICC's use or registration of any of the ICC Marks worldwide or any trademark





using the form "INTERNATIONAL __ CODE" or any marks confusingly similar thereto. While the mark ICC ELECTRICAL CODE does not squarely fit within the definition of the protected ICC Marks, INTERNATIONAL CODE COUNCIL ELECTRICAL CODE -- like INTERNATIONAL ADMINISTRATIVE CODE, INTERNATIONAL ENERGY CONSERVATION CODE, and INTERNATIONAL ONE & TWO FAMILY DWELLING CODE -- does. Thus, except as otherwise provided in the Agreement, ICC is correct that NFPA could be said to have promised in PP A-13 and A-14 it would not object to ICC's use of the title INTERNATIONAL CODE COUNCIL ELECTRICAL CODE.

For its part, NFPA argues that the paragraphs cited by ICC must be read in light of the rest of the Agreement, and paragraphs A-1 and A-3 in particular, which provide:

> ICC and the ICC Parties recognize that NFPA is the exclusive owner of the trademark "INTERNATIONAL ELECTRICAL CODE." [P A-1.]

> ICC and the ICC Parties will not use the following trademarks, or any trademarks confusingly similar to the following trademarks [*67] , except in reference to the goods or services of NFPA: "INTERNATIONAL ELECTRICAL CODE," "NEC," "NATIONAL ELECTRICAL CODE," "CODIGO ELECTRICO NACIONAL" (collectively, the NFPA Marks'). [P A-3.](emphasis supplied)

The following additional sections provide support for NFPA's argument that it is entitled to file suit if ICC is in breach of ICC's promises in PP A-1 and A-3.

> Upon the execution of this Agreement by the parties hereto, this Agreement shall constitute a MUTUAL RELEASE, REMISE, AND IRREVOCABLE DISCHARGE by NFPA of ICC and the ICC Parties and by ICC and the ICC Parties of NFPA of any and all claims . . . whatsoever which (i) NFPA may have had, from the beginning of the world to

the present, against ICC and the ICC Parties, and (ii) which ICC and the ICC Parties may have had, from the beginning of the world to the present, against NFPA, by reason of the events which resulted in the Civil Action, and facts underlying the same, it being understood and agreed that execution of this Agreement constitutes full settlement, satisfaction and discharge of any and all claims, rights damages, demands, causes of action and/or liabilities of any nature whatsoever, which [*68] were or could have been asserted in the Civil Action; provided, however, that this Agreement is not intended to and does not relieve the parties of liability for the obligations expressly assumed herein, [P F.] (emphasis supplied)

> This Agreement shall be construed in accordance with the laws of Massachusetts. The parties agree that jurisdiction and venue for any action brought to enforce the terms of this Agreement shall be in the United States District Court for the District of Massachusetts. [P G-6.](emphasis supplied)

Reading this Agreement as a whole, I find that NFPA promised in PP A-13 and A-14 not to object to or taken any action to prevent or impair ICC's use of ICC Marks and any trademark using mark in the form "INTERNATIONAL __ CODE" or any marks confusingly similar thereto, except that it may object by filing suit in this Court to ICC's use of the trademark "INTERNATIONAL ELECTRICAL CODE" or any trademarks confusingly similar to "INTERNATIONAL ELECTRICAL CODE" pursuant to PP A-1, A-3, F, and G-6. This resolution provides a reasonable, common sense interpretation of the competing clauses. It also takes into account the core purpose of the Agreement, which [*69] was the resolution of who could use the mark INTERNATIONAL ELECTRICAL CODE, by permitting NFPA to file suit against ICC if ICC continued to use the mark INTERNATIONAL ELECTRICAL CODE pursuant to PP A-P, A-3, F, and G-6 without breaching ICC's rights in PP A-8, A-9, A-13 and A-14, even though INTERNATIONAL

  

ELECTRICAL CODE literally fits within the definition of ICC Marks in P A-8. It also allows NFPA, as the exclusive owner of the trademark INTERNATIONAL ELECTRICAL CODE, to challenge ICC's use of marks "confusingly similar" to INTERNATIONAL ELECTRICAL CODE.

I am not persuaded by ICC's argument that "the general statement that ICC will not use any mark confusingly similar' to INTERNATIONAL ELECTRICAL CODE [in P A-3] must give way to [the] specific reservations" in P A-8 that ICC is the exclusive owner of the trademark INTERNATIONAL CODE COUNCIL, its company name, and in other paragraphs that ICC has "the right to use all current and future marks in the form of INTERNATIONAL __ CODE." The rationale for this argument rests on but one of the many canons used as an aid when interpreting a contract and ignores the principle that when interpreting a contract, a court must read the agreement [*70] as a whole. *McAdams v. Massachusetts Mutual Life Ins. Co., 391 F.3d 287, 299 (1st Cir. 2004)* citing *Starr v. Fordham, 420 Mass. 178, 190, 648 N.E.2d 1261 (1995).* ICC's proposed reading would preclude NFPA from filing a suit to enforce its rights as exclusive owner of the trademark INTERNATIONAL ELECTRICAL CODE. Furthermore, the specific reservation in P A-8 regarding ICC's tradename comes after the list defining the ICC Marks and the reservation is not included in the operative PP A-13 and A-14. Consequently, NFPA's objection to ICC's use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE is not an actionable failure to recognize ICC's trademark "INTERNATIONAL CODE COUNCIL."

Given my interpretation of the contract, NFPA and ICC's liability to each other on NFPA's breach of contract claim and ICC's counterclaim depends on the scope of the terms "object", "take any action," and "confusingly similar" as used in the Settlement Agreement and whether the mark INTERNATIONAL CODE COUNCIL ELECTRICAL CODE is "confusingly similar" to INTERNATIONAL ELECTRICAL CODE. If INTERNATIONAL CODE COUNCIL ELECTRICAL CODE and ICC ELECTRICAL CODE are "confusingly similar" to INTERNATIONAL [*71] ELECTRICAL CODE, then ICC has breached the Agreement. If they are not, then NFPA may have breached the Agreement by suing ICC over its use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE depending on the

meaning of "object" and "take any action", and on whether ICC's use of INTERNATIONAL ELECTRICAL CODE excuses NFPA's conduct.

The parties disagree about the meaning of "confusingly similar" as used in P A-3, and presumably in PP A-13 and A-14. As NFPA points out, [HN28] the term "confusingly similar" has two potential meanings in trademark law: the general similarity of the marks and the overall likelihood of confusion. See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 23:4 (1999). The latter meaning would require an analysis of the eight factors developed for trademark infringement claims under the Lanham Act. The former meaning is akin to the definition I adopted in *Northern Light Tech., Inc. v. Northern Lights Club, 97 F. Supp. 2d 96, 117-18 (D. Mass. 2000),* aff'd *236 F.3d 57, 66 fn. 14 (1st Cir. 2001)* (approving my conclusion that the "likelihood of confusion" test of trademark infringement is "more comprehensive" than the "identical [*72] or confusingly similar" requirement of ACPA, as it requires considering factors beyond the facial similarity of the two marks.")

NFPA argues that the meaning of "confusingly similar" in the 1999 Settlement Agreement is ambiguous, in that it is unclear which of the two meanings the parties intended to adopt, but that parol evidence shows that the parties intended the term to mean the former non-Lanham Act meaning. In contrast, ICC argues that the term as used the Settlement Agreement is simply shorthand for "likely to create confusion."

[HN29] Under Massachusetts law, the question of whether a contract term is ambiguous is an issue to be determined by the court. *Alison H. v. Byard, 163 F.3d 2, 6 (1st Cir. 1998)* (citations omitted). A contract is only considered ambiguous when the language is "reasonably prone to different interpretations" or "susceptible to differing, but nonetheless plausible, constructions." *Lanier Professional Services, Inc. v. Ricci, 192 F.3d 1, 4 (1st Cir. 1999)*(citations omitted). In this case, I disagree with NFPA that the term is ambiguous. My decision in Northern Lights, which I decided after the negotiation and execution of [*73] the Settlement Agreement, does not persuade me otherwise. While the term "confusingly similar" may have two meanings if considered in the abstract, as ICC points out, the parties used the phrase "confusingly similar" in the context of settling various Lanham Act and related claims. Consequently, I find that the parties intended to align their obligations under the

 LexisNexis™    LexisNexis™    LexisNexis™

Settlement Agreement with their obligations under federal trademark law, having settled the dispute over who would be the exclusive owner of the INTERNATIONAL ELECTRICAL CODE mark.

Since I denied summary judgment to ICC as to Counts I, II, and VI there is a triable issue of fact as to likelihood of confusion under the Lanham Act, I also find that there is a triable issue as to whether ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE are "confusingly similar" to NFPA's mark within the meaning of the Settlement Agreement.

Consequently, I deny summary judgment to ICC as to Counts III, IV, V, and VII with respect to ICC's use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE. Since I cannot resolve whether ICC breached the Settlement Agreement by adopting ICC ELECTRICAL CODE and [*74] INTERNATIONAL CODE COUNCIL ELECTRICAL CODE, I cannot conclusively resolve whether NFPA itself breached the Agreement by bringing this suit against ICC for its use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE. Consequently, I also deny summary judgment to ICC on its counterclaim. However, I do resolve the meaning of the relevant sections of the Settlement Agreement so that this issue can be resolved at trial.

NFPA's negative obligations depend on the meaning of "object" and "take any action" in PP A-13 and A-14. As support for the existence of an enforceable covenant not to sue, ICC points to the language in P A-13 where NFPA promised "not [to] object to nor directly or indirectly take any action or cause any action to be taken that would impair or prevent the use . . . by the ICC . . . of any of the ICC Marks [.]" ICC contends that this promise necessarily includes the promise not to file a lawsuit that would impair or prevent ICC from using INTERNATIONAL CODE COUNCIL ELECTRICAL CODE as the title of its publication.

Given the context and the purpose of settlement agreements generally, it is certainly arguable that the promise not to "object" and not to "take any action or cause [*75] any action to be taken that would impair or prevent" ICC's use of its marks includes a covenant not to sue. See, e.g., Rossner v. CBS, Inc., 612 F.Supp. 334, 341 (S.D.N.Y. 1985) (finding that defendant's covenant not to object in a prior Agreement was, "in essence, a covenant

not to sue," not just a "waiver of objection.") NFPA contends, however, that these words do not amount to a covenant not to sue because P G-6 expressly contemplates one party bringing an action against the other to enforce the terms of the Settlement Agreement, and because the Agreement could have included an express covenant not to sue if the parties had intended to do so. [21]

> 21    NFPA also claims that "numerous legal doctrines, including the litigation privilege, the Massachusetts Anti-SLAPP statute, the Noerr Pennington Doctrine, and the *First Amendment,* protect NFPA from retaliatory claims premised on NFPA's lawful exercise of its right to petition." But, as ICC points out, NFPA concedes that the parties could have included an enforceable covenant not to sue. Given that tailored covenants not to sue are enforceable in circumstances like these, I reject NFPA's contention that any of the legal doctrines referenced prevent a counterclaim based on a breach of a covenant not to sue.

[*76] [HN30] "It is a canon of construction that every word and phrase of an instrument is if possible to be given meaning." *Massachusetts Insurers Insolvency Fund,* 439 Mass, at 322 quoting *National Shawmut Bank,* 315 Mass, at 466. Consequently, NFPA's promise in P A-13 not to "*take any action* or cause any action to be taken that would impair or prevent" ICC's use of its marks (other than marks confusingly similar to NFPA's marks) ought to be given, if possible, a meaning independent from NFPA's promise in PP A-13 and A-14 not to "object to" ICC's use of its marks and its promise in P A-11 not to "file, or cause to be filed, oppositions or petitions to cancel any trademark application or registration currently owned by ICC." Similarly, ICC's reciprocal promise "not [to] directly or indirectly *take any action* or cause any action to be taken that would impair or prevent NFPA's use" of INTERNATIONAL ELECTRICAL CODE in P A-2 ought to be given, if possible, a meaning independent from ICC's promise in P A-2 to withdraw its opposition to NFPA's application with the PTO and ICC's promise in P A-6 "not [to] object to the use or trademark registration by [*77] NFPA of any of the NFPA Marks." Accordingly, I find that the scope of each of their promises not to object and not to take any action to prevent or impair each other's use of their own marks includes a promise not to sue over disputes covered by the Settlement Agreement, except to

  

enforce the terms of the Agreement and to determine colorable legal rights under the Agreement. [22] This means that NFPA has the right under P G-6 to sue ICC for using INTERNATIONAL ELECTRICAL CODE after the execution of the Settlement Agreement in violation of PP A-1 and A-3; but, NFPA would be in violation of its covenant not to sue in P A-13 if, for instance, it sued ICC for using the mark INTERNATIONAL PLUMBING CODE listed in P A-8.

> [22] Of course, the promises also include more drastic actions like filing injunction papers seeking to enjoin the other from using a certain mark, sending "cease and desist" letters to the other's customers and distributors, and issuing a press release in connection with the initiation of a lawsuit.

[*78] I add the qualifier that a party is entitled to seek a legal determination of its rights under the Settlement Agreement, in addition to enforcing its express rights under the Agreement, in order to reconcile the quasi-covenant not to sue with the express reservation in P G-6 that a party may bring an action against the other to enforce the terms of the Agreement. The most reasonable resolution of these competing obligations and protections is that a party may bring an action in good faith for a colorable claim under the Settlement Agreement without breaching its promise not to object or take any action to prevent or impair the other's use of its marks.

Given my conclusion on this issue, I do not need to reach NFPA's additional argument that it was under no obligation to forebear from suing over ICC's use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE because ICC breached the Agreement before NFPA filed this suit by using NFPA's mark INTERNATIONAL ELECTRICAL CODE. I do note, however, that [HN31] a party is only excused from its contractual promises if there is an *uncured material failure* to perform by the other party. *G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co., 41 Mass.App.Ct. 274, 278, 669 N.E.2d 787 (1996)* [*79] citing *Restatement (Second) of Contracts § 237* (1981) (emphasis supplied).

## C. NFPA's DAMAGES

NFPA seeks damages because "injunctive relief, standing alone, will not suffice to make NFPA whole." NFPA concedes that my finding that ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE amounts to trademark infringement and breach of the 1999 Settlement Agreement does not necessarily entitle NFPA to an award of damages under either theory. Something more is required. *Aktiebolaget Electrolux v. Armatron International, Inc., 999 F.2d 1, 5 (1st Cir. 1993)*. See also *Schutt Mfg. Co. v. Riddell, Inc., 673 F.2d 202, 206 (7th Cir. 1982)* [HN32] (While a showing of a likelihood of confusion will suffice to support liability and the grant of injunctive relief, "[a] higher standard of proof is required for the grant of money damages.") ICC argues that NFPA has not provided sufficient admissible evidence creating a genuine issue as to the availability of damages as to its use of INTERNATIONAL CODE COUNCIL ELECTRICAL CODE, ICC ELECTRICAL CODE, and INTERNATIONAL ELECTRICAL CODE.

[HN33] According to the relevant section [*80] of the Lanham Act, a successful plaintiff "shall be entitled, . . . subject to the principles of equity, to recover":

> (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

*15 U.S.C. § 1117(a).* "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum . . . shall constitute compensation and not a penalty." *15 U.S.C. § 1117(a).* [23] To implement these statutory directives, the First Circuit has adopted the following four rules, summarizing the additional showings required to secure an award of damages under the Lanham Act.

> 1) a plaintiff seeking damages must prove actual harm, such as the diversion of sales to the defendant; 2) a plaintiff seeking an accounting of defendant's profits must show that the products directly compete, such that defendant's profits would have gone to plaintiff if there was no violation; 3) the general rule of direct competition is loosened if the [*81] defendant acted fraudulently or palmed off inferior goods, such that actual harm is presumed; and 4) where defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust

  

enrichment or deterrence theory.

*Aktiebolaget Electrolux, 999 F.2d at 5.*

23    [HN34] *15 U.S.C. § 1117(a)* also provides that "in assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount," and that "the court in exceptional cases may award reasonable attorney fees to the prevailing party." *15 U.S.C. 1117(b)* further provides that "in assessing damages under subsection (a) of this section, the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of *section 1114(1)(a)* of this title . . . that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in *section 1116(d)* of this title), in connection with the sale, offering for sale, or distribution of goods or services."

NFPA alleged in the Complaint that ICC's trademark infringement and false designation of origin was willful and intentional, making this case "exceptional" within the meaning of *§ 35* of the Lanham Act. In the Prayer for Relief section, NFPA again requested that "this case be declared exceptional" and that the "damages be trebled under *§ 35* of the Lanham Act in view of the willful and deliberate acts described herein." The parties have not addressed this request and I do not reach it.

[*82] [HN35] Because "trademark remedies are guided by tort law principles," damages need only be established with "reasonable certainty." *Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993)* citing 2 J.T. McCarthy, Trademarks and Unfair Competition § 30:27, at 511 (2d ed. 1984). Compare *Thompson v. Haynes, 305 F.3d 1369, 1382 (Fed. Cir. 2002)* citing, among others, *Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563-64, 51 S. Ct. 248, 75 L. Ed. 544 (1931)* and *Montreal Trading Ltd, v. Amax Inc., 661 F.2d 864, 868 n. 1 (10th Cir. 1981)* ("The fact of damages . . . must be established with at least reasonable certainty," but "the amount of

damages . . . may be estimated, provided it is not merely speculative.") "Although uncertainty created by wrongful acts does not insulate the wrongdoer from liability," *Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 505 (7th Cir. 1992),* and in fact the wrongdoer ought to bear the burden of uncertainty, *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1374 (10th Cir. 1977)* citing *Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265, 66 S. Ct. 574, 90 L. Ed. 652 (1946),* [*83] plaintiffs "who want damages have to prove them, using methodologies need not be intellectually sophisticated but must not insult the intelligence." *Zazu, 979 F.2d at 505* quoting *Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415 (7th Cir. 1992).*

[HN36] As with damages for trademark violations, contract law "damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." *Restatement (Second) of Contracts § 352* (1981). The injured party only has a right to damages compensating for incidental or consequential losses actually suffered that were "caused by the breach." *Restatement (Second) of Contracts § 347, comment c* (1981). See also *Augat v. Aegis, Inc., 417 Mass. 484, 631 N.E.2d 995, (1994)* quoting *Lowrie v. Castle, 225 Mass. 37, 51, 113 N.E. 206 (1916)*(Damages in the form of "prospective profits may be recovered . . . when the loss of them appears to have been the direct result of the wrong complained of and when they are capable of proof to a reasonable degree of certainty.") [*84]

NFPA contends that it has suffered actual damages, including lost royalties, the loss of its goodwill, and the diminution of the strength and value of its INTERNATIONAL ELECTRICAL CODE(r) mark. NFPA also claims that it will incur corrective advertising costs in order to dispel confusion and rehabilitate NFPA's mark and that ICC has been unjustly enriched by its infringement. Challenging these assertions, ICC has moved for summary judgment on the issues of damages and unjust enrichment claiming that "NFPA cannot establish that it has suffered any ascertainable monetary damages or show unjust enrichment." I consider each of the claimed elements of monetary relief in turn.

a. Lost Sales: NFPA does not claim to have lost any sales as a result of ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE in certain publications, or even as a result of ICC's use of

  

INTERNATIONAL CODE COUNCIL (ICC) ELECTRICAL CODE. NFPA's damages expert, Phillip Beutel, stated that "NFPA is unlikely to have lost sales of its National Electrical Code as a result of ICC's alleged infringement." In fact, NFPA's associate general counsel Maureen Brodoff testified that while NFPA's loss "would include the loss [*85] of any profits associated with the sale of its goods and services," she is not aware of any documents indicating the amount of any lost revenue. Thus, NFPA cannot establish that it suffered any harm in the form of lost sales or profit.

b. Accounting of Profits: In its Complaint, NFPA claims that it "has sustained and will continue to sustain loss of value of its business and associated good will, and other monetary damages in an amount which is presently indeterminable." In NFPA's Opposition to ICC's motion for partial summary judgment on the issues of damages and unjust enrichment, NFPA claims to have "proffered evidence of actual harm to its business in the form of loss of its good will." This proffer was not made to show NFPA is entitled to damages in the amount of the loss to its goodwill. Rather, NFPA suggests that it is entitled to compensatory damages in an amount equal to loss of royalties and the cost of corrective advertizing because it has suffered loss to its goodwill. See *Trovan, Ltd. v. Pfizer, Inc.*, 2000 U.S. Dist. LEXIS 7522, CV-98-00094, 2000 WL 709149, *9-12 (C.D. Cal. May 24, 2000). NFPA also seeks an accounting of the Defendant's profits, a remedy which is intended [*86] to be a "proxy for the detriment suffered by" the plaintiff. *Tamko Roofing Products, Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 37 (1st Cir. 2002).

[HN37] It is true that "in addition to its own loss of profits, a plaintiff may, for example, suffer harm to the goodwill associated with its mark." *Tamko Roofing*, 282 F.3d at 37; *Beacon Mutual*, 376 F.3d at 15. I find that there is a genuine issue of material fact as to whether NFPA suffered actual harm to its goodwill associated with its INTERNATIONAL ELECTRICAL CODE mark.

[HN38] "The measure of damage to business property, such as good will, is based on the measurement of the difference in value of the property before and after the injury. Factors to be considered in determining the loss of good will are the length of time the business has been in existence, its average profits, its success, and the likelihood of its continuing business under the same name." *38 Am. Jur. 2d Good Will § 28* (2005). One

Appellate Court has held that "loss of goodwill should be proven by detailed business records before and after the breach, as well as testimony by those who have first-hand [*87] knowledge of such loss. . . . Where loss of goodwill is not adequately proven by expert testimony, the trial court should not allow the jury to speculate as to what those damages would be and should direct a verdict against any damages for goodwill." *Kinetico, Inc. v. Independent Ohio Nail Co.*, 19 Ohio App.3d 26, 31-32, 19 Ohio B. 92, 482 N.E.2d 1345 (1984) cited in *38 Am. Jur. 2d Good Will § 28* (2005).

While not subscribing to a rule requiring expert testimony to prove harm to a plaintiff's goodwill, I note that NFPA has failed to provide any business records or other evidence supporting Brodoff's "self-serving declaration that such a loss was sustained." *Kinetico, 19 Ohio App.3d at 31*; see Brodoff's Testimony, pp. 63-71. In fact when ICC's counsel asked Brodoff, who according to ICC was NFPA's only 30(b)(6) designee on the issue of damages allegedly sustained by NFPA to its goodwill and reputation, "what is the amount of the loss that NFPA has sustained to the value of its business," NFPA counsel objected, stating that NFPA will "be designating an expert to speak to this issue and Miss Brodoff isn't prepared to speak to how goodwill and [*88] reputation, loss of value of business is quantified." But NFPA never designated an expert to speak about any loss of goodwill and Beutel, NFPA's damages expert, did not make any reference to loss of goodwill in his report or in the excerpt of his deposition provided in support of ICC's motion for partial summary judgment. NFPA has, therefore, failed to prove actual harm to its goodwill and reputation.

I recognize, however, that the question is before me on a summary judgment motion and [HN39] direct evidence is not required to establish harm to goodwill on summary judgment. *Beacon Mutual, 376 F.3d at 15, 17* (discussing the plaintiff's burden in opposing summary judgment as to *liability* under the Lanham Act where the defendant argued the plaintiff had not produced evidence of actual confusion, that is evidence specifically demonstrating that the confusion "'could inflict commercial injury in the form of . . . a diversion of sales, damage to goodwill, or loss of control over reputation' on the trademark holder"). See also *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 161 (1st Cir. 1997) ("A precise showing [of actual harm to the plaintiff's [*89] business] is not required, and a diversion of sales, for

  

example, would suffice.") "The conventional rule that a plaintiff may amass a preponderance of the evidence through direct or circumstantial evidence" should also apply to a plaintiff opposing summary judgment as to damages. *Beacon Mutual, 376 F.3d at 17.*

NFPA contends that its "name and mark have come to be linked with ICC's inferior ICC Publication -- a text that does not comply with the stringent code standards to which NFPA adheres; was not subjected to any comment and review from its membership; contains technical provisions directly at odds with the National Electrical Code(r); and is not an electrical code even though it deceptively claims to be an electrical code." [24] Consequently, NFPA suggests that ICC's conduct in using "words describing the Publication that not only misidentify the product, but that also create a false association with the National Electrical Code(r) . . . has damaged NFPA's reputation and has eroded its goodwill."

24   In ICC's Response to NFPA's Statement of Additional Facts, ICC objects to many of the characterizations included in this statement.

[*90] Drawing all reasonable inferences in favor of NFPA, I find that there is a triable issue as to whether any confusion caused by ICC's use of any of the three marks lessened NFPA's goodwill and reputation associated with the INTERNATIONAL ELECTRICAL CODE mark. Although there is little more than a self-serving assertion by NFPA's Assistant Vice President and Chief Electrical Engineer that the provisions in Chapter 12 of ICC's publications "are inferior to the similar NEC(r) provisions in that ICC's provisions have not gone through the rigorous and independent process of code review" and a letter from Stauffer on behalf of the National Electrical Contractors Association, whose policy it is to support the NEC(r) as the uniform national rules for safe wiring, to ICC requesting "the withdrawal of [ICC's] incomplete and confusing administrative' document that includes technical provisions conflicting with those of the NEC," [HN40] proof of the inferiority of the infringing product is not required for a Court to infer harm to the trademark holder's goodwill. See *Beacon Mutual, 376 F.3d at 16* ("Nothing in the statute suggests that demonstrable harm to plaintiff's goodwill and [*91] reputation resulting from confusion of marks is restricted to the classic situation" where the defendant's product is inferior.)

As indicated above, NFPA seeks an accounting of the defendant's profits, which is a remedy that is intended

to be a "proxy for the detriment suffered by" the plaintiff. *Tamko Roofing, 282 F.3d at 37.* Although there is no evidence here from which a jury could find that ICC's unauthorized use of NFPA's mark was willful and amounted to fraud or palming off inferior goods, such that actual harm is presumed, there is sufficient evidence from which a reasonable jury could find that the products directly compete, despite ICC's arguments to the contrary. *Aktiebolaget Electrolux, 999 F.2d at 5.* Accordingly, there is a triable issue as to whether NFPA is entitled to an accounting of ICC's profits on the sale of its Electrical Code Administrative Provisions as a proxy for the harm caused to NFPA's goodwill and reputation as a result of ICC's allegedly inadvertent and isolated use of INTERNATIONAL ELECTRICAL CODE, and potentially for its use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE depending on the resolution [*92] of the merits.

c. Lost Royalties: NFPA's damages expert surmised that NFPA suffered a "second measure of [] economic harm" in the form of a "trademark owner's lost opportunity to negotiate a license with the alleged infringer." NFPA argues that since it "has shown actual harm and bad faith, it should be up to the jury to assess the amount of damage suffered. The reasonable royalty provides one measure of such damage." Although I have found that there is a triable issue as to whether NFPA suffered damage in the form of loss of goodwill, I grant ICC's summary judgment motion as to the availability of lost royalties.

[HN41] Of the courts that have allowed an award of reasonable royalties in trademark infringement cases, only the Seventh Circuit has permitted such an award without evidence of a prior licensing relationship or when the parties had not shown a willingness to license the mark. *Trovan, 2000 WL 709149 at *16; A & H Sportswear Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197, 208-09 (3rd Cir. 1999)* (An award of lost royalties is made "most often for continued use of a product beyond authorization, and damages [are] measured by the license [*93] the parties had or contemplated."). The anomalous case is *Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 963 (7th Cir. 1992),* remanded and affirmed, *34 F.3d 1340 (7th Cir. 1994).*

NFPA cites to Sands for the proposition that a reasonable royalty would be an appropriate measure of damages in these circumstances. But, like Judge Baird in

  

Trovan, I do not consider the treatment of the issue in the *Sands* litigation to be compelling, given the lack of "any evidence that plaintiff[] in this case would have licensed the rights to the mark." *Trovan, 2000 WL 709149 at *17-18.* In fact, Beutel, NFPA's own expert, suggests that given "the industry in which the parties operate, . . . there is little if any economic incentive for a code organization to enter into a business arrangement with another organization that could increase the likelihood that the other party could enter its markets and cause jurisdictions to switch to alternative codes." More specifically, "NFPA would be reluctant to provide ICC with intellectual property, in the form of its well-known International Electrical Code(r)' trademark, that could **[*94]** potentially be used to assist ICC's entry into the market." Consequently, I find that an "award of reasonable royalties has no basis in reality, much less any basis in fact. Thus, [Beutel's estimate] cannot be said to have been made with reasonable certainty.'" *Id. at *18* quoting *Sanchez-Corea v. Bank of Am., 38 Cal.3d 892, 907, 215 Cal. Rptr. 679, 701 P.2d 826 (1985).* In fact, given that Beutel believes that NFPA "would not willingly license the marks at issue to ICC for the uses to which ICC has put them -- at least not for any fee of the same magnitude as the profits earned by ICC on the ICC *Electrical Provisions* itself," I find that it is utterly speculative for him to assume, even if conservatively, "that the outcome of a hypothetical negotiation between the parties would have resulted in a royalty no greater than the profits earned by the Defendants on the allegedly infringing publications."

Accordingly, I find there is no cognizable basis for an award of lost royalties and grant ICC's summary judgment as to this measure of damages.

c. Corrective Advertizing: [HN42] Compensatory damages for both trademark infringement and breach of contract are intended to make the injured plaintiff **[*95]** whole; they are not meant to provide a windfall. *Big O, 561 F.2d at 1374; Quabaug Rubber, 567 F.2d at 161; Adray v. Adry-Mart, Inc., 76 F.3d 984, 988 (9th Cir. 1996).* In certain circumstances an award equaling the amount necessary for corrective advertizing is recoverable as a remedy where there was actual harm. *Zazu, 979 F.2d at 506; Big O, 561 F.2d at 1374-75; Adray, 76 F.3d at 988.* The award may be prospective, that is a reasonable estimation of the future costs of corrective advertizing when the plaintiff has not yet spent any money on advertising to counteract any confusion in

the industry. *Zazu, 979 F.2d at 506; Big O, 561 F.2d at 1375; Adray, 76 F.3d at 988-89.* However, the award must still satisfy the determinable-with-reasonable-certainty requirement, and "expenses for repair cannot be justified when they exceed the value of the asset." *Zazu, 979 F.2d at 506; Adray, 76 F.3d at 989* ("Prospective costs . . . present a danger of overcompensation if they exceed the value of the mark.")

NFPA contends **[*96]** that Beutel's Expert Report and the Affidavit of Paul Crossman amount to sufficient evidence supporting its position that the cost of corrective advertising would be at lest $ 207,000. I disagree and will preclude recovery based on this theory.

[HN43] *Rule 26(a)(1)* requires disclosure of "a computation of any category of damages claimed by the disclosing party." The parties must also make available for inspection and copying "the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including material bearing on the nature and extent of injuries." *Fed. R. Civ. P. 26 (a) (1). Rule 37* provides that "[a] party that without substantial justification fails to disclose information required by *Rule 26(a),* . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." *Fed. R. Civ. P. 37(c)(1).*

NFPA does not dispute that it "never claimed in its discovery responses, its *Rule 26(a)* damage disclosures, or in its 30(b)(6) witness testimony that it has ever **[*97]** conducted a corrective advertising campaign, or that it plans to do so." Yet, on or about January 20, 2005, after the close of fact discovery, Crossman, NFPA's Vice President of Marketing and Sales, prepared a document entitled International Electric Code Brand Advertising -- Media Schedule (estimated costs) (the Media Schedule). This document was provided to Beutel, who appears to have completed his expert report including the corrective advertizing theory of recovery on February 1, 2005. ICC only appears to have been provided with this document shortly before or at the deposition of Beutel on March 3, 2005. Consequently, ICC was not aware of this theory or Crossman's January 2005 document when it deposed Crossman, who was not even designated as a witness on damages, on November 29, 2004.

There is no reason why NFPA could not have provided Crossman's calculations, let alone its theory of

  

corrective advertizing damages, before the close of fact discovery. ICC's inability to cross-examine Crossman within the schedule established by this court on his estimations is surely not harmless, given Beutel's blind reliance on Crossman's calculations. NFPA has not presented any justification [*98] for its failure to follow the procedural rules. Consequently, disregard of Crossman's Second Affidavit and preclusion of the theory of corrective advertizing is appropriate. See *Austrian Airlines Oesterreichische Lufverkehrs AG v. UT Finance Corp., 2005 U.S. Dist. LEXIS 7283, 04 Civ. 3854RCCAJP, 2005 WL 977850 (S.D.N.Y. April 28, 2005)*("This is not a case where plaintiff needed discovery from defendant to compute its currency conversion damages. And even if plaintiff could not calculate its currency conversion damages at the time of its initial disclosure . . ., there is no reason that it did not disclose its currency conversion damage theory. The Court will not allow plaintiff . . . to assert this new, additional damage theory at the eleventh hour. Pursuant to *Rules 26(a)(1)(C)* and *37(c)(1)*, preclusion is appropriate.") Without Crossman's Affidavit, Beutel's report and testimony is nothing more than unsupported speculation.

On the basis of the evidence properly before me, therefore, I find that there is no cognizable basis for an award of corrective advertising costs as compensation for ICC's breach of contract and trademark infringement.

d. Unjust Enrichment: [HN44] "Where defendant's inequitable [*99] conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory." *Aktiebolaget Electrolux, 999 F.2d at 5; Quabaug Rubber, 567 F.3d at 162 n. 15*. But under First Circuit case law, even damages granted on a deterrent or an unjust enrichment theory have never been allowed absent some form of fraud or palming off. *Aktiebolaget Electrolux, 999 F.2d at 6*. None

is shown here. Consequently, I disagree with NFPA that "there are genuine issues of material fact as to ICC's conduct, which should preclude summary judgment on unjust enrichment," and I find that there is no cognizable basis for an award for unjust enrichment as compensation for ICC's breach of contract and trademark infringement.

## III. CONCLUSION

For the reasons set forth more fully above:

I GRANT summary judgment to ICC on NFPA's claim under Mass. Gen. Laws ch. 93A in Count VIII of NFPA's Complaint;

I GRANT summary judgment to NFPA as to Counts I, III and IV concerning ICC's unauthorized use of INTERNATIONAL ELECTRICAL CODE after the execution of the Settlement Agreement;

I DENY summary judgment to ICC as to [*100] all of NFPA's claims concerning ICC's use of ICC ELECTRICAL CODE and INTERNATIONAL CODE COUNCIL ELECTRICAL CODE;

I DENY summary judgment to ICC on its breach of contract counterclaim;

I DENY summary judgment to ICC on its damages motion as to the issue of an accounting of ICC's profits; and

I GRANT summary judgment to ICC on its damages motion as to the issues of corrective advertizing, lost royalties, and unjust enrichment.

/s/Douglas P. Woodlock

UNITED STATES DISTRICT JUDGE

  

Slip Copy

Slip Copy, 2007 WL 2668136 (S.D.Ohio)

**(Cite as: Slip Copy)**

H

Big Lots Stores, Inc. v. Luv N' Care

S.D.Ohio,2007.

Only the Westlaw citation is currently available.

United States District Court,S.D. Ohio,Eastern Division.

BIG LOTS STORES, INC. d/b/a Consolidated International, et al., Plaintiffs,

v.

LUV N' CARE, et al., Defendants.

No. 2:04-810.

Sept. 6, 2007.

William Darrell Kloss, Jr., Heidi L. Yurkiw, Joseph R. Miller, Vorys Sater Seymour & Pease, Columbus, OH, for Plaintiffs.

James Stern Oliphant, Ryan P. Sherman, Porter Wright Morris & Arthur, Columbus, OH, Joe D. Guerriero, Fuerriero & Guerriero, Monroe, LA, for Defendants.

GEORGE C. SMITH, United States District Judge.

*1 On March 29, 2007, this Court granted Plaintiffs Big Lots' Motion for Summary Judgment and denied Defendants Luv N' Care's Motion for Partial Summary Judgment (Doc. 50). Defendants Luv N' Care were ordered to indemnify Big Lots for any expenses incurred as a result of selling the infringed Beatrix Potter products minus any setoff owed to Luv N' Care. As a result of this Order, both parties moved to Alter and/or Amend the Judgment (Docs. 52 and 53). Plaintiffs' Motion to Amend the Judgment was granted in part and denied in part, and Defendants' Motion to Amend the Judgment was granted. In the April 14, 2007 Opinion and Order addressing the parties Motions to Amend the Judgment, the Court ordered Plaintiffs to file their motion for damages, detailing the exact amount of damages sought with sufficient support such as the invoices, etc. (Doc. 54). Defendants were then ordered to respond to Plaintiffs' demand and to include their damages sought and any setoff amount. The parties' Motions for Award of Damages are now ripe for a decision.

Plaintiffs Big Lots Stores, Inc. d/b/a Consolidated International CSC Distribution, Inc., West Coast Liquidators, Inc., Closeout Distribution, Inc., and Durant DC, LLC's Motion for Award of Damages seeks a total award of $323,213.49 in damages

(Doc. 56). Defendants Luv N' Care, Ltd. and Luv N' Care International, Inc. contest Plaintiffs' damages calculation and also seek an award of $116,082.24 in damages in their favor.

Plaintiffs Big Lots seeks damages of $323,213.49 comprised of six categories: (1) attorneys' fees and costs; (2) the cost of the unsold Beatrix Potter products remaining in its warehouses; (3) the loss on the sale of these Beatrix Potter products to USI Bridgefield; (4) storage costs; (5) lost profits; and (6) prejudgment interest.

Defendants do not contest the award of damages for categories 2, 3, and 6, the costs of the Beatrix Potter product remaining in its inventory, the loss on the sale of the Beatrix Potter products to USI and the prejudgment interest. However, Defendants do contest any award of attorneys' fees and costs, storage costs, and lost profits. The Court will therefore address each of these in turn.

1. Attorneys' Fees and Costs

Plaintiffs assert that as of April 25, 2007, they had incurred $150,520.71 in attorneys' fees and costs for this action. Plaintiffs argue that the services provided by their counsel were reasonable and necessary in the prosecution of Big Lots' interests and claims asserted in this litigation and for the defense of Luv N' Care's counterclaims. They further assert that the attorneys' fees and costs are reasonable and consistent with the rates charged by other attorneys for similar services.FN1

FN1. Plaintiffs also appear to argue that the Court has already found that they were entitled to attorneys' fees. This is simply not the case. In this Court's March 29, 2007 Opinion and Order, the phrase "attorneys' fees" appears just once in a block quote where the Court was citing to paragraph 15 of Big Lots's purchase orders. The Court solely addressed liability in its March 29, 2007 Opinion and Order, the Court's Order. The issue of damages and/or attorneys' fees was not addressed because the parties did not seek them at the time, nor reserve the right to address the issue after a ruling on the motions for summary judgment. At no time has the Court stated that Plaintiffs would be entitled to attorneys' fees.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants argue that Big Lots is not entitled to recover any attorneys' fees incurred during this lawsuit because the attorney fee provision in Big Lots' purchase orders, on which Big Lots is relying, is unenforceable. Specifically, Defendants argue that Big Lots' boilerplate attorney fee provision, contained within the purchase orders, is unenforceable under Ohio law. This Court agrees.

**\*2** In Ohio, courts have consistently held that contractual attorney fee provisions are unenforceable as a matter of law. *See e.g., Vermeer of S. Ohio, Inc. v. Argo Constr. Co.,* 144 Ohio App.3d 271, 276 (Ohio Ct.App.2001). The *Vermeer* Court did not uphold the attorney fee provision because it did not believe it was the product of "free and understanding negotiation." *Id.* at 278.

Similarly, in *Colonel's Inc. v. Cincinnati Milacron Mktg. Co.,* 1998 U.S.App. LEXIS 11756 (6th Cir.1998), the Sixth Circuit considered a case involving a Sale and Security Agreement entered into between two commercial entities. The *Colonel* defendant sought to enforce an attorney fee provision contained in its contract, which was a standard contract form. The Sixth Circuit, applying Ohio law held that the enforceability of such provisions turns on whether or not it was "arrived at through free and understanding negotiation."*Id.* at \*4. The Court explained:

the attorney fee provision in the agreement was not the product of specific free and understanding negotiation. Instead, it was a preprinted clause that appeared in defendant's standard contract forms. Accordingly, the district court did not err when it concluded that the provision is void as against the public policy of Ohio.

*Id.* at 5.

In *Scotts Co. v. Cent. Garden & Pet Co.,* 403 F.3d 781 (6th Cir.2005), the Sixth Circuit, relying on this well-settled principle as articulated in *Cincinnati Milacron,* upheld the District Court's finding that an attorney fee provision in a standard form contract between two commercial entities was void as against public policy. The Court, applying Ohio law, stated once again that fee provisions are enforceable only where "the provision is specifically negotiated for." *Id.* at 791.

In the present case, this Court has already found that

the terms and conditions of the purchase orders were "never discussed between the parties." (March 29, 2007 Opinion and Order at 5). This finding is well-supported. Big Lots' attorney fee provision is couched within twenty-three purported "Terms and Conditions" listed on the purchase orders. The phrase "attorneys' fees" is written only once in the purchase order. Further, a review of the fee provision reveals that it is one-sided, providing recovery of attorneys' fees for just Big Lots. Finally, despite the purchase order's express requirement for vendor signature, Defendants Luv N' Care never signed the purchase orders, and there is no evidence indicating that they otherwise assented to each and every term and condition. Instead, the evidence indicates that Luv N' Care responded to the purchase orders by sending their own invoices, which contained their own terms and conditions. Based upon the foregoing, this Court echoes it's earlier finding that the terms and conditions of the purchase orders, including the attorneys' fee provision, were never discussed or negotiated between the parties. As set forth above, because the attorneys' fee provision contained in the purchase orders was not a product of specific free and understanding negotiation, this Court, applying Ohio law as set forth in *Vermeer, Milacron,* and *Scotts,* finds that the Big Lots attorneys' fees provision is not enforceable.

### 2. Lost Profits and Storage Costs

**\*3** Plaintiffs Big Lots seeks to recover $31,198.49 for lost profits on the 18,378 Beatrix Potter products they were unable to sell. Big Lots argues that lost profits are recoverable in a breach of contract action under Ohio law, *citing Charles R. Combs Trucking, Inc. v. International Harvester Co.,* 12 Ohio St.3d 241 (1984). In addition, Big Lots seeks to recover for storage costs they have incurred to date of $27,475.80 on 181 pallets of Beatrix Potter products stored in Big Lots' warehouses. The storage cost is calculated at $4.60 per month, per pallet from August 1, 2004 through April 30, 2007. Big Lots asserts that this amount is both their actual storage cost for the products, as well as a reasonable and customary storage cost within the wholesale-closeout industry.

Defendants Luv N' Care argue that Big Lots should not be awarded lost profits and storage costs because these are damages now being sought that they never

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

disclosed in discovery, despite specific requests to identify the damages sought in this lawsuit.

Rule 37(c)(1) of the Federal Rules of Civil Procedure specifically provides:
A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Defendants argue that in this case, Big Lots has failed to disclose any existence of lost profits and/or storage cost damages. Defendants served interrogatories on Big Lots which were specifically designed to identify the precise categories and amounts of damages that Big Lots was seeking from this lawsuit. Specifically, on April 11, 2005, Defendants served their first set of interrogatories which asked Big Lots to "Identify and individually itemize all damages that you are seeking in the lawsuit ."Big Lots responded by identifying three categories of damages: the cost of the product, the loss on the sale of the product, and attorneys' fees and costs. Defendants then asked Big Lots to supplement their response with the amount of each damage claimed. After responding to that request, Big Lots has never provided any additional supplemental responses regarding damages to Defendants Luv N' Care.

Thus, Defendants Luv N' Care are asserting that they first learned of Big Lots' intent to seek damages for lost profits and storage costs when their Motion for Damages was filed. It appears from earlier pleadings in this case that Luv N' Care is correct that Big Lots has not indicated their intent to seek damages for lost profits and/or storage costs. The Court's Order permitting the parties to file Motions on Damages was not an invitation to begin conjuring up new and additional damages claims. Such claims must have been properly plead and/or disclosed to the other party during the discovery phase. *See* Rule 26(e)(2) of the Federal Rules of Civil Procedure.

**\*4** Plaintiffs Big Lots asserts that their lost profits damages are recoverable because such profits were within the contemplation of the parties at the time the parties entered the contracts for the Beatrix

Potter products. This further strengthens Defendants Luv N' Care's argument that Big Lots knew of these potential damages prior to the lawsuit or at a very minimum, prior to the end of the discovery period. Big Lots was aware of the amount it expected to make in profits from the Beatrix Potter products and therefore that amount sought should have been provided to Defendants during discovery. Further, Big Lots was aware that it was holding Beatrix Potter products at the start of this lawsuit and could have provided an estimated value of what it would cost to store those products throughout the duration of the lawsuit. Again, however, Big Lots failed to disclose that it was even seeking such damages.

Therefore, in accordance with Rules 26(e)(2) and 37(c)(1) of the Federal Rules of Civil Procedure, Big Lots is prohibited from seeking any damages not previously disclosed to Defendants Luv N' Care during the discovery phase. The Court would have, at a minimum, entertained the arguments on these damages had they been previously disclosed to Defendants during the discovery phase. Therefore, Big Lots' claims for lost profits and storage costs are denied.

### 3. Luv N' Care's Setoff Amount

In this Court's March 29, 2007 Opinion and Order, Defendants Luv N' Care were awarded the right to setoff the money they are owed on the outstanding invoices from the amount of damages they have to pay Big Lots. Specifically, Luv N' Care is owed $100,883.40 from three invoices issued to Big Lots in July 2004. While approximately $7,575 of the total amount owed on these invoices is for Beatrix Potter product which this Court has found to be infringing, Luv N' Care is still entitled to a credit for this amount. This Court has previously awarded Big Lots a refund on all the Beatrix Potter products remaining in their inventory, but the Court did not take into account that Big Lots never paid for $7,565.00 of those Beatrix Potter products. Therefore, unless Big Lots pays the full amount of these invoices, they would receive a refund on money that was never paid. Defendants Luv N' Care are therefore entitled to setoff in the amount of $100,883.40.

For the reasons stated above, the Court GRANTS IN PART AND DENIES IN PART Plaintiffs' Motion for Award of Damages. Plaintiffs Big Lots

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
**(Cite as: Slip Copy)**

<div style="text-align: right;">Page 4</div>

are hereby awarded $73,512.00 for the cost of the unsold Beatrix Potter products remaining in Big Lots' warehouses and $9,953.41 for the loss on the sale of the Beatrix Potter products to USI Bridgefield, totaling $83,465.41. Plaintiffs Big Lots are also entitled to prejudgment interest on these damages pursuant to Ohio Revised Code Section 1343.03(A), from August 10, 2004 to the date of filing this Order.

Defendants Luv N' Care are entitled to setoff in the amount of $100,883.40, plus prejudgment interest from the dates the invoices were due to the date of filing this Order.

**\*5** The parties shall arrange for payment to be made no later than 30 days after the disposal of this case on appeal.

The Clerk shall remove Document 56 from the Court's pending motions list and remove this case from the Court's pending cases list.

IT IS SO ORDERED.

S.D.Ohio,2007.
Big Lots Stores, Inc. v. Luv N' Care
Slip Copy, 2007 WL 2668136 (S.D.Ohio)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 2580543 (E.D.Cal.)
**(Cite as: Slip Copy)**
**H**

Silong v. U.S.
E.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. California.
Gina Melissa SILONG, et al., Plaintiffs,
v.
UNITED STATES of America, Defendant.
No. CV F 06-0474 LJO DLB.

Sept. 5, 2007.

Lynette Diane Hecker, Law Offices of David J. St.
Louis, Inc., Fresno, CA, Michael Archuleta,
Michael Archuleta Law Firm, Austin, TX, for
Plaintiffs.
Kelli L. Taylor, United States Attorney's Office,
Sacramento, CA, for Defendant.

DECISION ON GOVERNMENT'S SUMMARY
ADJUDICATION MOTION ON DAMAGES
(Docs.51, 68.)
LAWRENCE J. O'NEILL, United States District
Judge.

**\*1** In this medical malpractice action addressing
complications of the birth of minor plaintiff Paige
Silong ("Paige"), defendant United States of
America ("Government") seeks summary
adjudication on all damage claims, except Paige's
alleged general damages and future medical expenses
after age 23.FN1The Government seeks to preclude
damage claims of Paige's parents, Air Force
Lieutenant Colonel Richard Silong
("Lt.Col.Silong") and Gina Melissa Silong
("Ms.Silong"). This Court considered the
Government's summary adjudication motion on the
record,FN2 pursuant to Local Rule 78-230(h). For
the reasons discussed below, this Court GRANTS in
part and DENIES in part summary adjudication for
the Government.

FN1. As will be discussed in greater detail below,
the Government contends that Paige's future medical
expenses will be covered by insurance until age 23,
if she attends college as expected.

FN2. This Court carefully reviewed and considered
all arguments, points and authorities, declarations,
depositions, exhibits, statements of undisputed facts
and responses thereto, objections and other papers

filed by the parties. Omission of reference to an
argument, document, paper or objection is not to be
construed to the effect that this Court did not
consider the argument, document, paper or
objection. This Court thoroughly reviewed and
considered the evidence it deemed admissible,
material and appropriate for summary adjudication.

*Paige's Birth*

On March 5, 2001, Ms. Silong was eight weeks
pregnant with Paige and began prenatal care at
Lemoore Naval Hospital ("hospital"). On October
20, 2001 at 4:20 a.m., Ms. Silong arrived at the
hospital's maternal infant unit in active labor. The
delivery team encountered what the Government
characterizes as an unpredicted shoulder dystocia
that physically impeded Paige's normal descent
through the birth canal. Shoulder dystocia results
when the baby's shoulder becomes impacted or
caught within the birthing canal after the baby's
head is delivered to prevent full delivery of the
baby. Dane Winkelman, M.D. ("Dr.Winkelman"),
applied traction, pulling on Paige's head, to
facilitate delivery, and Paige was delivered at 5:28
a.m. Lt. Col. Silong and Ms. Silong contend that
excessive traction after shoulder dystocia is
substandard care. Examination revealed weakness to
Paige's left arm, consistent with injury to her
brachial plexus, a network of nerves in the neck and
armpit.

On October 21, 2001, Ms. Silong was discharged
with Paige. Four weeks later, Lt. Col. Silong and
Ms. Silong learned that Paige's brachial plexus
condition may not resolve.

*Improved Condition*

Paige received therapy and showed muscle
movement in her shoulder and hands by November
21, 2001. During 2002 and 2003, neurosurgical
procedures were performed to Paige's brachial
plexus nerves, including reconstructive and release
procedures and a left posterior shoulder
capsulodesis. Paige's left arm use and function
improved, and she continued to receive therapy.

The Government describes Paige as a "vivacious
five-year old" and points to deposition testimony of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

her school teacher that Paige is happy, easygoing, well-adjusted, typical, bright, articulate, loving and one of the better students. Paige's teacher notes that she has observed Paige jump rope, hang upside down from monkey bars, bounce a ball, hit a ball with a bat, run, play soccer, swing and climb a jungle gym.

### Plaintiffs' Claims

Lt. Col. Silong and Ms. Silong proceed on their original complaint for themselves and Paige to pursue medical malpractice claims against the Government, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680. Lt. Col. Silong and Ms. Silong allege that due to "failure to properly manage the pregnancy, labor and delivery, Paige Silong suffered a traumatic delivery which caused permanent and irreparable damage to her. Specifically, Paige Silong sustained permanent injury to her nerves, and the soft tissues of her left upper extremity, neck and shoulder."Lt. Col. Silong and Ms. Silong further allege that "Paige remains in a severely handicapped disabled condition that limits her daily active living."

**\*2** The complaint alleges Lt. Col. Silong and Ms. Silong's damages for past and future medical expenses for Paige and loss of parent-child consortium. For Paige, Lt. Col. Silong and Ms. Silong seek damages for:
1. Past and future mental anguish;
2. Past and future physical pain and suffering;
3. Past and future physical disfigurement;
4. Past and future permanent physical impairment;
5. Loss of earnings and earning capacity;
6. Past and future medical expenses;
7. Loss of enjoyment of life; and
8. Loss of parent-child consortium.

The Government seeks to preclude damages claims of Lt. Col. Silong, Ms. Silong and Paige (collectively "plaintiffs") (except Paige's alleged general damages and future medical expenses after age 23) on grounds that they are barred as a matter of law and by plaintiffs' inadequate discovery disclosures.

### Summary Judgment/Adjudication Standards

F.R.Civ.P. 56(b) permits a party against whom a claim is asserted to seek "summary judgment in the

party's favor upon all or any part thereof."Summary judgment/adjudication is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment/ adjudication as a matter of law. F.R.Civ.P. 56(e); *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn.,* 809 F.2d 626, 630 (9th Cir.1987). The purpose of summary judgment/ adjudication is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."*Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538;*International Union of Bricklayers v. Martin Jaska, Inc.,* 752 F.2d 1401, 1405 (9th Cir.1985).

On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(c); *Covey v. Hollydale Mobilehome Estates,* 116 F.3d 830, 834 (9th Cir.1997); *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcast System,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Loehr v. Ventura County Community College Dist.,* 743 F.2d 1310, 1313 (9th Cir.1984). The evidence of the party opposing summary judgment/adjudication is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348, 89 L.Ed.2d 538. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."*Anderson,* 477 U.S. at 251-252, 106 S.Ct. 2505, 91 L.Ed.2d 202.

To carry its burden of production on summary judgment/adjudication, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.,* 210 F.3d 1099, 1102 (9th Cir.2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563, 574

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

(9th Cir.1990)."[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact."*Nissan Fire,* 210 F.3d at 1102;*see High Tech Gays,* 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."*Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202.

**\*3** "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."*Nissan Fire,* 210 F.3d at 1102-1103;*See Adickes,* 398 U.S. at 160, 90 S.Ct. 1598, 26 L.Ed.2d 142. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."*Nissan Fire,* 210 F.3d at 1103;*see High Tech Gays,* 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."*Nissan Fire,* 210 F.3d at 1103;*see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion."*Nissan Fire,* 210 F.3d at 1103;*see Celotex,* 477 U.S. at 322, 106 S.Ct. 2548, 91 L.Ed.2d 265. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."*Anderson,* 477 U.S. at 252, 106 S.Ct. 2505, 91 L.Ed.2d 202.

Under F.R.Civ.P. 56(c), a summary judgment/

adjudication motion, interlocutory in character, may be rendered on the issue of liability alone."In cases that involve ... multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties, but not as to others."*Barker v. Norman,* 651 F.2d 1107, 1123 (5th Cir.1981); *see also Robi v. Five Platters, Inc.,* 918 F.2d 1439 (9th Cir.1990); *Cheng v. Commissioner Internal Revenue Service,* 878 F.2d 306, 309 (9th Cir.1989). A court "may grant summary adjudication as to specific issues if it will narrow the issues for trial."*First Nat'l Ins. Co. v. F.D.I.C.,* 977 F.Supp. 1051, 1055 (S.D.Cal.1977).

As discussed below, this Court grants the Government's requested relief on plaintiffs' damages claims, except as to Paige's future earning capacity and a complete offset as to future medical expenses incurred up to age 23.

*Governing Law*

A district court applies the substantive law of the state where the negligent act or omission occurred in an FTCA action. *See Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) ."The extent of the government's [FTCA] liability is a matter of federal law (28 U.S.C. §§ 1346(b), 2674), albeit determined according to state standards."*Taylor v. United States,* 821 F.2d 1428, 1433 (9th Cir.1987). The Government points out that California substantive law applies to plaintiffs' damages claims given that "all activities," including Paige's prenatal care and birth, occurred in California but that federal law governs procedural matters.

*Failure To Disclose Damages Computations*

**\*4** The Government contends that plaintiffs' original and supplemental F.R.Civ.P. 26(a)(1) initial disclosures fail to include computations of alleged damages for loss of consortium, emotional distress and past medical expenses to bar such damages claims. As such, the Government argues that damages claims are limited to Paige's general damages and future medical expenses up to age 23.

F.R.Civ.P. 26(a)(1)(C) requires a party, "without awaiting a discovery request," to disclose "a computation of any category of damages claimed by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                        **Page    4**
(Cite as: Slip Copy)

the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered."Pursuant to F.R.Civ.P. 37(c)(1), a "party that without substantial justification fails to disclose information required by Rule 26(a)... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any ... information not so disclosed."F.R.Civ.P. 37(c)(1)"gives teeth ... by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed" and provides a "self-executing," "automatic" sanction as "a strong inducement for disclosure of material."*Yeti By Molly Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir.2001) (quoting, in part, F.R.Civ.P. 37 Advisory Comm. Notes (1993)).

The Ninth Circuit Court of Appeals gives "particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)." *Yeti,* 259 F.3d at 1106. The Ninth Circuit has explained that "even absent a showing in the record of bad faith or willfulness, exclusion is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a)."*Yeti,* 259 F.3d at 1106. "The sanction of exclusion is thus automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless."*Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1230 (7th Cir.1996) ."Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness." *Yeti,* 259 F.3d at 1107. Summary judgement may be imposed based on absence of evidence excluded for failure to comply with F.R.Civ.P. 26(a).*See Wong v. Regents of the Univ. of California,* 379 F.3d 1097, 1103 (9th Cir.2004).

The Government argues that plaintiffs' requisite F.R.Civ.P. 26(a) (1)(C) damages computations were limited to a $250,000 claim for Paige's general damages and reference to expert reports for future medical expenses and lost earnings. The Government faults plaintiffs' delay to July 6, 2007, four days prior to the discovery cutoff, to make such limited disclosures and absence of computation of damages for loss of consortium, emotional distress and past medical expenses. The Government

continues that plaintiffs fail to demonstrate substantial justification for failure to disclose damages computations in that their attorneys specialize in FTCA cases throughout the United States. Based on plaintiffs' initial disclosures, the Government seeks to preclude Lt. Col. Silong and Ms. Silong's alleged damages (past and future medical expenses and loss of consortium) and Paige's alleged damages for past medical expenses and lost earning capacity.

**\*5** Plaintiffs do not oppose meaningfully the Government's absence of damages computation arguments as to Lt. Col. Silong and Ms. Silong's loss of consortium and emotional distress claims and Paige's past medical expenses.

Based on the absence of plaintiffs' sufficient F.R.Civ.P. 26(a) (1)(C) damages computations and for more specific reasons discussed below, this Court agrees with the Government to bar Lt. Col. Silong and Ms. Silong's loss of consortium and emotional distress damages claims and claims for Paige's past medical expenses and plaintiffs' out-of-pocket expenses for her care.

*Loss Of Parent-Child Consortium*

The Government argues that California law "disallows" claims for loss of parent-child consortium. The Government points to the California Supreme Court pronouncement in *Baxter v. Superior Court,* 19 Cal.3d 461, 463, 466, 138 Cal.Rptr. 315, 563 P.2d 871 (1977):
In California, however, the parent's cause of action has not expanded beyond the ancient right to recover for loss of earnings and services of economic value. For the policy reasons stated in *Borer,* in particular the intangible nature of the injury and the danger of multiplication of claims and liability, we decline to enlarge the parent's cause of action to permit recovery for the loss of affection and society.
...
... We therefore conclude that a parent has no cause of action in negligence to recover damages for loss of filial consortium.

In *Foy v. Greenblott,* 141 Cal.App.3d 1, 7, 190 Cal.Rptr. 84 (1983), the California Court of Appeals explained:Losses of parental or filial consortium are not actionable. "[T]he inadequacy of monetary damages to make whole the loss suffered,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
**(Cite as: Slip Copy)**

Page 5

considered in light of the social cost of paying such awards, constitutes a strong reason for refusing to recognize the asserted claim."(*Borer v. American Airlines, Inc.* (1977) 19 Cal.3d 441, 447 [138 Cal.Rptr. 302, 563 P.2d 858];*also see Baxter v. Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315, 563 P.2d 871].)

More recently, the California Supreme Court reaffirmed:
It is well established in this state that parents may not recover damages for loss of filial consortium. ( *Baxter v. Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315, 563 P.2d 871].) Reasons of public policy explain why such a cause of action is not recognized, including: "[t]he intangible character of the loss, which can never really be compensated by money damages; the difficulty of measuring damages; the dangers of double recovery of multiple claims and of extensive liability...."(*Id.* at p. 464, 138 Cal.Rptr. 315, 563 P.2d 871.)

*Burgess v. Superior Court,* 2 Cal.4th 1064, 1084, 9 Cal.Rptr.2d 615, 831 P.2d 1197 (1992) ("we hold that damages arising from loss of Joseph's affection, society, companionship, love and disruption of Burgess's 'normal' routine of life to care for Joseph cannot be recovered by Burgess no matter how her claim for these damages is denominated."); *see Miller v. United States,* 803 F.Supp. 1120, 1124-1125 (E.D.Va.1992) (claim for "destruction of the normal loving relationship between parents and child ... is not viable because California does not allow recovery for loss of consortium between parent and child."); *Zavala v. Arce,* 58 Cal.App.4th 915, 937, 68 Cal.Rptr.2d 571 (1997) ("However, for public policy reasons parents in California may not recover for loss of filial consortium ... Zavala's recovery may not include damages for emotional distress arising from loss of her child's affection, society, companionship and love, or other similar loss of filial consortium.)

**\*6** Based on the above authorities, the Government seeks to bar Lt. Col. Silong and Ms. Silong's claims for "[l]oss of parent-child consortium, loss of companionship, love, nurturing, and affection."

The Government continues that despite the legal bar to Lt. Col. Silong and Ms. Silong's loss of consortium claims, the claims lack "basis in fact." The Government notes that Paige's shoulder injury

"has not deprived her parents Paige's love, affection or companionship."The Government points to Lt. Col. Silong and Ms. Silong's deposition testimony that they have the same love and affection from Paige as from their 10-year-old son and that they have a caring, affectionate relationship with Paige that is not compromised by her shoulder condition. Lt. Col. Silong and Ms. Silong acknowledge that they spend more "quality" time with Paige because of her shoulder condition, Ms. Silong's decision not to return to work or hire a nanny, and Lt. Col. Silong's decision to transfer from the Navy to the Air Force to avoid 10-month aircraft carrier deployments. The Government contends that Lt. Col. Silong and Ms. Silong "have not suffered any loss of consortium, companionship, love, nurturing or affection."

Lt. Col. Silong and Ms. Silong agree that California law bars their loss of consortium claims and to dismissal of such claims. The Government is entitled to summary adjudication that Lt. Col. Silong and Ms. Silong are not entitled to recover on loss of consortium claims.

*Lt. Col. Silong And Ms. Silong's Emotional Distress*

The Government points out that plaintiffs' complaint does not allege a claim or prayer for Lt. Col. Silong or Ms. Silong's "emotional distress." The Government argues that since F.R.Civ.P. 8(a) requires "a demand for judgment for the relief the pleader seeks," a complaint "defines the scope of issues." The Government points to an absence of claims for Lt. Col. Silong and Ms. Silong's emotional distress and computation of such damages in their F.R.Civ.P. 26(a)(1) initial disclosures. The Government argues that the nature and extent of injuries must be disclosed, including amounts claimed for general damages (pain and suffering). *See City and County of San Francisco v. Tutor-Saliba Corp.,* 218 F.R.D. 219, 221 (N.D.Cal.2003)

The Government continues that Lt. Col. Silong and Ms. Silong's discovery and deposition responses fail to allege or support emotional distress or general damages claims. As noted by the Government, Lt. Col. Silong's interrogatory responses regarding damages raised objections, reiterated their complaint's allegations, and provided no meaningful information. The Government further points to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

absence of produced documents to support a factual basis for Lt. Col. Silong and Ms. Silong's general damages. The Government notes that Lt. Col. Silong and Ms. Silong have not claimed fright, nervousness, grief, anxiety, mortification, shock, humiliation, indignity or physical pain from Paige's birth or brachial plexus injury.

*7 Lt. Col. Silong and Ms. Silong concede that they have not pled a claim for "emotional distress" damages and assert that "use of summary judgment for claims not part of this litigation is a misuse of the Court's time and resources."

Lt. Col. Silong and Ms. Silong are correct that they do not pursue a claim for "emotional distress' damages. This Court presumes that the Government addressed such claim out of an abundance of caution to clarify what damages claims Lt. Col. Silong and Ms. Silong pursued based on their discovery responses and objections. Although Lt. Col. Silong and Ms. Silong's emotional distress damages are not put in issue by their complaint to warrant summary adjudication, this Court nonetheless bars Lt. Col. Silong and Ms. Silong to pursue emotional distress damages.

*Lt. Col. Silong's Negligence Claim*

The Government contends the Lt. Col. Silong is unable to allege or establish that the Government breached a legal duty to him to support a negligence claim.

The negligence elements which a plaintiff must prove are: (1) legal duty of care owed to plaintiff; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from breach of the duty of care. *See Hanson v. Grode,* 76 Cal.App.4th 601, 606, 90 Cal.Rptr.2d 396 (1999); *see also Burgess v. Superior Court,* 2 Cal.4th 1064, 1072, 9 Cal.Rptr.2d 615, 831 P.2d 1197 (1992)."Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability."*Burgess,* 2 Cal.4th at 1072, 9 Cal.Rptr.2d 615, 831 P.2d 1197. A duty of care arises when it is assumed by the defendant, imposed on the defendant as a matter of law, or arises out of a relationship between plaintiff and

defendant. *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.,* 48 Cal.3d 583, 590, 257 Cal.Rptr. 98, 770 P.2d 278 (1989).

The Government notes that plaintiffs' complaint fails "to specify what legal duty was owed to Lt. Col. Silong or that any breach of that duty occurred."The Government points out that the portion of the complaint entitled "Cause of Action Against the United States of America" fails to mention Lt. Col. Silong. The Government further notes the absence of allegations that Lt. Col. Silong had a physician-patient relationship with Dr. Winkelman or the hospital, that the Government assumed an applicable duty to Lt. Col. Silong, or that such duty was imposed by law.

The Government continues that Lt. Col. Silong fails to meet requirements for a bystander victim negligence claim. In *Burgess,* 2 Cal.4th at 1072-1073, 9 Cal.Rptr.2d 615, 831 P.2d 1197, the California Supreme Court contrasted "bystander" and "direct victim" cases:
The distinction between the "bystander" and "direct victim" cases is found in the source of the duty owed by the defendant to the plaintiff. The "bystander" cases, commencing with *Dillon v. Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912], and culminating in *Thing, supra,* 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814, address "the question of duty in circumstances in which a plaintiff seeks to recover damages as a percipient witness to the injury of another."(*Christensen, supra,* 54 Cal.3d at p. 884, 2 Cal.Rptr.2d 79, 820 P.2d 181.) These cases "all arise in the context of physical injury or emotional distress caused by the negligent conduct of a defendant with whom the plaintiff had no preexisting relationship, and to whom the defendant had not previously assumed a duty of care beyond that owed to the public in general."(*Ibid.,* italics added.) In other words, bystander liability is premised upon a defendant's violation of a duty not to negligently cause emotional distress to people who observe conduct which causes harm to another.

*8 In *Thing v. La Chusa,* 48 Cal.3d 644, 647, 257 Cal.Rptr. 865, 771 P.2d 814 (1989), the California Supreme Court set limits to bystander liability:In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
**(Cite as: Slip Copy)**

related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness.

Turning to a father's claim for injury to his child during prenatal care and birth, the California Supreme Court has observed that "the physician-patient relationship critical to a mother's cause of action is almost always absent in a father's claim. It, therefore, appears that a father must meet the criteria set forth in *Thing, supra,* 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814. 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814, if he is to state a viable claim."*Burgess,* 2 Cal.4th at 1078, n. 8, 9 Cal.Rptr.2d 615, 831 P.2d 1197.

The Government contends that Lt. Col. Silong is unable to meet *Thing* criteria given the absence of his bystander victim claim. The Government points to Lt. Col. Silong's deposition testimony that he was unaware of Paige's injury during birth. The Government concludes that Lt. Col. Silong lacked contemporaneous knowledge of alleged malpractice or injury and did not suffer requisite emotional distress for a bystander victim claim.

Lt. Col. Silong appears to concede that he did not pled a bystander victim and asserts that "use of summary judgment for claims not part of this litigation is a misuse of the Court's time and resources."Lt. Col. Silong appears to acknowledge he lacks legal grounds for a bystander victim claim.

A bystander victim claim is not apparent from the complaint. This Court presumes that the Government addressed such claim out of an abundance of caution to clarify what claims Lt. Col. Silong pursued based on his discovery responses and objections. Although a bystander victim claim for Lt. Col. Silong is not put in issue by the complaint to warrant summary adjudication, this Court nonetheless bars Lt. Col. Silong to pursue a bystander victim claim.

*Paige's Lost Earning Capacity Claim*

The Government argues that Paige's shoulder injury should not decrease her life-long earnings. The Government contends that Paige's lost earning

capacity claim fails because there is no dispute that Paige is able to perform 90 percent of jobs. The Government argues that "the test is not whether Paige can perform *all* jobs, but whether it is reasonably probable that her shoulder injury will cause her to sustain lost earnings in the future."(Italics in original.)

Plaintiffs argue that "the evidence conclusively establishes Paige Silong's diminished capacity to work due to her permanent arm injury."Plaintiffs respond that in the absence of dispute that Paige suffered a permanent injury, she may pursue a lost earning capacity claim.

*Reasonable Certainty*

**\*9** To support its position, the Government points to the following from *Walden v. United States,* 31 F.Supp.2d 1230, 1235 (S.D.Cal.1998):
Plaintiff can only recover those elements that he can prove with reasonable certainty. "The burden of proof is upon the party claiming damage to prove that he has suffered damage and to prove the elements thereof with reasonable certainty."*Peters v. Lines,* 275 F.2d 919, 930 (9th Cir.1960). It follows that any claim by plaintiff for lost wages, medical expenses, and impaired future earning capacity must be supported by concrete evidence, not merely an optimistic forecast of loss divorced from plaintiff's past history substantiated by the facts. *See, Fleming v. American Export Isbrandtsen Lines, Inc.,* 318 F.Supp. 194 (S.D.N.Y.1970), aff'd451 F.2d 1329 (2nd Cir.1971).
An award for lost or future earnings must be based on actual proof of the amount of impairment and not mere conjecture. *Oregon-Washington R.R. & Nav. Co. v. Branham,* 259 F. 555, 557 (9th Cir.1919); *Firth v. United States,* 554 F.2d 990 (9th Cir.1977). The base figure used to calculate future wage loss is the difference between what a person earned before the accident and what he would be able to earn upon returning to work, not necessarily in the same job.

"[D]amages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery."*Frustuck v. City of Fairfax,* 212 Cal.App.2d 345, 367-368, 28 Cal.Rptr. 357 (1963).

The Government argues that plaintiffs do not meet their burden to establish reasonable certainty of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
**(Cite as: Slip Copy)**

Page  8

future lost earning capacity for five-year-old Paige and that no reliable evidence demonstrates reasonable certainty that Paige will sustain future lost earnings. The Government points to the deposition testimony of plaintiffs' physician-life care plan expert Alex C. Willingham ("Dr.Willingham") that "I don't see any reason why the child could not as an adult pursue some type of work activity or vocational or self support perspective. There will be things she can't do, but that doesn't mean there won't be anything she can't do."

The Government points to the deposition testimony of its vocational rehabilitation expert Andrew Michael O'Brien that Paige will not suffer future lost earning capacity because:
1. Her physical impairment has mild functional limitations;
2. She reasonably should be able to participate in occupations consistent with her physical limitations to provide an equal or greater earning potential;
3. Her parents are college-educated to serve as a great predictor of future academic success;
4. Her left upper extremity limitations do "not preclude the lion's share of white-collar types of employment [which] can be easily accommodated and, again, would provide her with essentially the same earning potential as those which she's precluded from";
5. She will be able to perform a full-range of sedentary, light- and medium-level work;
**\*10** 6. She should not have a keyboarding impairment; and
7. She is not intellectually impaired.

The Government notes further factors to support no lost earning capacity:1. The types of jobs precluded by shoulder injury are low paying and not performed typically by women;
2. Even without a college degree, Paige, as a woman, with reasonable probability would not seek jobs requiring significant bimanual overhead strength;
3. Paige lacks a mental or cognitive impairment; and
4. Lt. Col. Silong and Ms. Silong testified that they will support Paige's educational and vocational aspirations.

The Government concludes that Paige's inability to perform some jobs does not establish reasonable probability that her shoulder injury causes lost earning capacity.

Plaintiffs respond there is no dispute that Paige suffered a permanent disability. Plaintiffs point to the deposition testimony of Paige's treating surgeon Rahul Nath, M.D. ("Dr.Nath"): "She has a permanent injury to severe injury. She'll require lifelong management of that, including multiple surgeries and including lifelong physical therapy and other modalities, as well."Plaintiffs argue that the evidence creates material factual issues as to Paige's future earning capacity to defeat summary adjudication of the claim.

Plaintiffs point to an unpublished decision *Roberts Barrows v. Schneider National Carriers, Inc.*, 1998 U.S.App. Lexis 17536 (9th Cir.1998), where the Ninth Circuit Court of Appeals observed that "in the ordinary case, and as a general rule, evidence that a plaintiff sustained a permanent injury is sufficient to entitle him to submit to the jury the question whether there has been an impairment of his future earning capacity."(quoting *Tavenner v. Figini*, 273 Ore. 415, 541 P.2d 437, 438 (Or.1975)). Plaintiffs further point to an unpublished California district court decision *Simplicio v. United States*, 1991 U.S. Dis. Lexis 18081, \*20 (N.D.Cal.1991), where the court noted that "[l]oss of earning power is an element of general damages that may be inferred from the nature of the injury, with or without proof of actual earnings or income either before or after the injury."(quoting *Hilliard v. A.H. Robins Co.*, 148 Cal.App.3d 374, 412, 196 Cal.Rptr. 117 (1983).

Plaintiffs note the deposition testimony of the Government's physical rehabilitation expert Joseph Capell, M.D. ("Dr.Capell"), examined Paige and estimates there are more than 1,000 jobs which Paige will be unable to perform. Dr. Capell testified:
Well, my opinion is that in the future in spite of optimal treatment, Paige is going to continue to have some limitations in terms of her upper-left upper extremity function. And these limitations will be stated in vocational terms. A limitation from very heavy lifting using both arms at shoulder level and above or prolonged work with both arms, or hands in this case, at shoulder level or above. Those are the two preclusions.
**\*11** And those two preclusions do eliminate certain jobs that she probably would be able to do but not in a competitive fashion and shouldn't really be considered employment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

Plaintiffs further point to the deposition testimony of their physical rehabilitation expert Dr. Willingham that "there will be ... restrictions of some jobs that she will never be capable of."Plaintiffs conclude that Paige's permanent injury precludes certain jobs and no less than 10 percent of the job market.

Future lost earning capacity is not a precise science to render specific calculation. Imprecision is compounded in that Paige is five years old with no work history. There is no meaningful dispute that Paige suffered a permanent injury which she will carry through adulthood. The issue is not whether Paige will work. The issue is how and the extent to which her injury will impact her earning capacity. The parties' experts agree that Paige is foreclosed from no less than 10 percent of otherwise available work. That she would unlikely pursue the foreclosed jobs is a factor but not dispositive of the future earning capacity issue. Plaintiffs have raised a factual issue that Paige's future earning capacity is impaired. Their burden at trial is to prove the extent to entitle Paige to potential recovery for lost future earning capacity. Based on the evidence presented, this Court is not in a position at this point to foreclose Paige's future earning capacity claim.

*Impairment Rating*

The Government attributes plaintiffs to pursue $1 million lost earning capacity claim based on an "impairment rating" prepared by plaintiffs' life care planning expert Dr. Willingham. The Government attributes plaintiffs' economist to have multiplied the "whole body impairment rating" for Paige's shoulder injury by the number of years of her productive work life to render use of the impairment rating improper or unreliable.

Plaintiffs accuse the Government of mispresenting the "evidence on this issue" in that plaintiffs' economist testified that Paige's 10 percent impairment translated to a future lost earning capacity of $130,000-$280,000.

The Government contends that plaintiffs are unable to rely on a whole body impairment rating to support future lost earnings because:
1. There is a difference between physical impairment medically and impairment that affects ability to earn;

2. Plaintiffs' life care expert Dr. Willingham drafted the impairment rating and acknowledges that it is not intended to reflect specific claimed lost earning capacity;
3. The impairment rating's accuracy has not been confirmed given that it is based on an examination of Paige 2 1/2 years ago;
4. Impairment ratings are used for workers' compensation for employed persons, not minors with no work history; and
5. California courts exclude workers' compensation information in civil cases.

The Government concludes that the impairment rating "cannot form the basis for a determination that it is reasonably certain that Paige will sustain any lost earnings."

*12 The Government characterizes impairment ratings as "merely tools used for determining workers compensation benefits" which cannot be used in a civil action to evidence lost earning capacity. The Government points to *Scalice v. Performance Cleaning Systems,* 50 Cal.App.4th 221,231-232, 57 Cal.Rptr.2d 711 (1996), where the California Court of Appeal explained:
The difference in workers' compensation benefits and the economic damages ... stems from the fundamentally different nature of the workers' compensation system and the tort law system. The foundation of the workers' compensation system is the presumed compensation bargain, wherein the employer assumes liability for industrial injury or death without regard to fault and the employee is afforded relatively quick payment of benefits....
... Although some items of workers' compensation benefits resemble economic damages, others do not. The system is a substitute for bringing an action against an employer, and the benefits paid are akin to a compromise payment made to avoid litigation. Therefore, rather than attempting to fit the different components of worker's compensation benefits into specified items of out-of-pocket or more subjective losses, we view the benefits as the proceeds of a settlement imposed by the Legislature for claims arising out of and occurring in the course of employment.

*See also Clemente v. State of California,* 40 Cal.3d 202, 222, 219 Cal.Rptr. 445, 707 P.2d 818 (1985) ("courts have recognized the legal fiction of the 100 percent disability rating").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs do not meaningfully respond to the Government's impairment rating contentions. As such, this Court presumes plaintiffs do not rely on an impairment rating to oppose summary adjudication. In any event, this Court does not deny the Government summary adjudication on the future earning capacity claim based on plaintiffs' proposed impairment rating.

### Past Medical Expenses

Plaintiffs' complaint alleges claims for past "medical, health care, and attendant care expenses."The Government contends such damages claims are barred based on plaintiffs' failure to disclose evidence on computation of such damages and supporting documents. The Government appears to focus on F.R.Civ.P. 26(a)(1)(C)'s requirement to provide damages computations with initial disclosures and plaintiffs' failure to produce such computations and documents to reflect past medical expenses in response to the Government's document requests. The Government notes that Lt. Col. Silong and Ms. Silong did not produce at their May 2007 depositions records of past medical expenses despite the Government's requests for the documents. The Government points to Lt. Col. Silong and Ms. Silong's deposition testimony that they paid out-of-pocket medical expenses and have records of expenses for which they have not searched.

"The power of the trial court to exclude exhibits and witnesses not disclosed in compliance with discovery and pretrial orders is essential" to judicial case management. *Sylla-Sawdon,* 47 F.3d at 284; *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 897-898 (8th Cir.1978). A party is prejudiced by its opponent's actions to impair ability to proceed to trial or to threaten to interfere with the case's rightful decision. *Adriana Int'l Corp. v. Thoeren,* 913 F.2d 1406, 1412 (9th Cir.1990); *Malone v. United States Postal Service,* 833 F.2d 128,131 (9th Cir.1987), *cert. denied sum nom Malone v. Frank,* 488 U.S. 819, 109 S.Ct. 59, 102 L.Ed.2d 37 (1988).

*\*13* F.R.Civ.P. 26(e)(2) addresses supplementation of discovery responses and provides:
A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material aspect incomplete or

incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

F.R.Civ.P. 26(g)(2) addresses the significance of an attorney's signature to discovery responses: "The signature of the attorney ... constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the ... response ... is: (A) consistent with these rules ..." Under F.R.Civ.P. 26(g)(3), sanctions may be imposed for an improper certification: "If without substantial justification a certification is made in violation of the rule, the court, upon motion or upon its own initiative, shall impose upon the person who made the certification, the party on whose behalf the ... response ... is made, or both, an appropriate sanction ..." Such sanction may preclude the violating party form introducing designated evidence. F.R.Civ.P. 37(b)(2)(B).

In *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976), the United States Supreme Court stressed that the most severe sanctions provided by the rules "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."

Lt. Col. Silong and Ms. Silong note that they incurred "a small amount of out of pocket expenses" for Paige's injury but "could not quantify the amount and could not document what those amounts were."Plaintiffs note that TRICare FN3 has covered Paige's past medical expenses. As such, plaintiffs note they "will not submit past medical expenses and out of pocket expenses as elements of damages at the time of trial and agree with their preclusion at trial."

FN3. TRICare is the Department of Defense's worldwide health care program for active duty and retired service personnel and their families.

Plaintiffs apparently fold on their claim for past medical expenses in that they agree not to present evidence on such expenses. In the absence of a dispute over past medical expenses, the Government

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is entitled to summary adjudication on plaintiffs'
claim for past medical expenses.

### Future Medical Expenses Offset

The Government asserts an affirmative defense of
"offset for any and all collateral sources of
indemnity to Plaintiffs."The Government seeks
summary adjudication that it is entitled to an offset
for Paige's future medical expenses because the
Government will continue to fund the expenses
under existing federal TRICare benefits until Paige
reaches age 21, or age 23, if she attends college.
The Government characterizes an award of future
medical expenses as a windfall to plaintiffs in that
the Government continues to pay for such expenses.

*14 The Government points to California Civil
Code section 3333.1(a) ( "section 3333.1(a)"),
which provides in pertinent part:
In the event the defendant so elects, in an action for
personal injury against a health care provider based
upon professional negligence, he may introduce
evidence of any amount payable as a benefit to the
plaintiff as a result of the personal injury pursuant to
… any health, sickness or income-disability
insurance, accident insurance that provides health
benefits or income-disability coverage, and any
contract or agreement of any group, organization,
partnership, or corporation to provide, pay for, or
reimburse the cost of medical, hospital, dental, or
other health care services. Where the defendant
elects to introduce such evidence, the plaintiff may
introduce evidence of any amount which the plaintiff
has paid or contributed to secure his right to any
insurance benefits concerning which the defendant
has introduced evidence.

In *Fein v. Permanente Medical Group,* 38 Cal.3d
137, 164-165, 211 Cal.Rptr. 368, 695 P.2d 665
(1985), the California Supreme Court explained
application of California Civil Code section
3333.1(a):Under section 3333.1, subdivision (a), a
medical malpractice defendant is permitted to
introduce evidence of such collateral source benefits
received by or payable to the plaintiff; when a
defendant chooses to introduce such evidence, the
plaintiff may introduce evidence of the amounts he
has paid-in insurance premiums, for example-to
secure the benefits. Although section 3333.1,
subdivision (a)-as ultimately adopted-does not
specify how the jury should use such evidence, the

Legislature apparently assumed that in most cases
the jury would set plaintiff's damages at a lower
level because of its awareness of plaintiff's "net"
collateral source benefits.

"Apparently, the Legislature's assumption was that
the trier of fact would take the plaintiff's receipt of
such benefits into account by reducing damages."
*Barme v. Wood,* 37 Cal.3d 174, 179, 207 Cal.Rptr.
816, 689 P.2d 446 (1984).

In connection with an FTCA case, one district court
has observed:
In sum, the weight of authority clearly demonstrates
that plaintiff is not entitled to recover any medical
expenses already paid by the government. To award
her such expenses would require the government to
pay for the same services twice and allow the
plaintiff a double recovery. The Federal Tort Claims
Act is designed to compensate those wronged by the
U.S. government in tort actions; it is not a reward
system designed to provide windfalls to tort
claimants.

*Kornegay v. United States,* 929 F.Supp. 219, 222
(E.D.Va.1996).

Plaintiffs argue that the Government has failed to
offer evidence to support a "complete future offset."
Plaintiffs argue that TRICare payment of past
medical expenses does not entitle the Government to
a blanket offset.Section 3333.1(a) does not preclude
recovery of future medical expenses but "rather, it
allows the jury to decide how to apply the evidence
in calculation of damages. As such, the fact that all
medical expenses may have been paid from a
collateral source … does not stand for the
proposition that a plaintiff has suffered no
recoverable damages …"*Hernandez v. California
Hospital Medical Center,* 78 Cal.App.4th 498, 505,
93 Cal.Rptr.2d 97(2000).

*15 Plaintiffs contend that the Government is not
entitled to an offset because the Government's future
medical insurance benefits expert, Tess
Wolstenholme ("Ms.Wolstenholme"), lacks
expertise on TRICare coverage FN4 for Paige's
future medical care. Ms. Wolstenholme is a health
benefits advisor and beneficiary assistance
counseling coordinator at Lemoore Naval Air
Station and is responsible to coordinate insurance
coverage for military personnel and their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

dependents. Plaintiffs argue that the Government cannot meet its summary adjudication burden in the absence of competent expert testimony on TRICare coverage for Paige's future medical care.

FN4. Plaintiffs filed a belated summary adjudication motion on the offset issue. Plaintiffs combined the summary adjudication motion with a motion to exclude Ms. Wolstenholme's testimony. This Court construes the combined motions as an opposition to the Government's summary adjudication motion on the offset issue.

Plaintiffs point to F.R.Evid. 702, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods of reliability to the facts of the case.

Plaintiff further point to *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141-142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), where the United States Supreme Court explained:We conclude that *Daubert's*FN5 general holding-setting forth the trial judge's general "gatekeeping" obligation-applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" and "other specialized" knowledge. *See*Fed. Rule Evid. 702. We also conclude that a trial court may consider one or more of the more specific factors that Daubert mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in Daubert, the test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.

FN5.*Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Plaintiffs point out that the Government relies on Ms. Wolstenholme to provide technical or other

specialized knowledge but that her deposition testimony reveals "that her opinion substantially fails to meet the reliability test required for admission pursuant to F.R.E. 702 and *Kumho Tire."* F.R.Evid. 702 establishes a standard of evidentiary reliability and requires a valid connection to the pertinent inquiry as a precondition to admissibility. *Kumho Tire,* 526 U.S. at 149, 119 S.Ct. 1167, 143 L.Ed.2d 238. Plaintiffs characterize the pertinent inquiry as whether "TRICare insurance will provide future coverage, if any, for Paige Silong's medical needs. Thus, the Court must determine whether Ms. Wolstenholme's testimony has a 'reliable basis in knowledge and experience of the discipline.' "

**\*16** Plaintiffs argue that Ms. Wolstenholme lacks requisite experience, training, education or specialized knowledge to provide reliable expert opinion on future TRICare coverage. Plaintiffs point to Ms. Wolstenholme's:
1. *Educational Background-*a two-year associates degree in office management from West Hills College;
2. *Current Work Experience-*"health benefits advisor" for two years during which she has acted as a liaison between military family members and TRICare personnel who have qualifications and authority to make TRICare coverage decisions. Ms. Wolstenholme lacks responsibility to approve or deny TRICare coverage and admitted that she is unqualified to offer an opinion about what is medically necessary for TRICare coverage approval;
3. *Past Work Experience-*secretarial, clerk and personal assistant; and
4. *Lack of Specialized Training-*No professional or specialized training on TRICare coverage or insurance coverage.

Plaintiffs further note that Ms. Wolstenholme conceded that she has not reviewed Paige's medical history to acknowledge that Ms. Wolstenholme is unfamiliar with Paige's past and future medical needs. Ms. Wolstenholme has not determined what Paige's future medical needs will be.

To address Ms. Wolstenholme's qualifications, the Government submits her declaration that she received "extensive informal and on-the-job training" on TRICare coverage and devotes 50 percent of her time to explain TRICare benefits to military families and 35 percent of her time to "working with the health care providers, case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

managers, TriCare representatives, families, and others regarding submittals, responding to questions, monitoring paperwork and requested activities, and to ensure that claims are properly submitted and paid and that medically necessary treatment is approved and received."Ms. Wolstenholme notes that prior to her deposition, she compiled information on Paige, including "requests for treatment, referrals and care, and all TriCare responses including dates of the response, whether it was approved or disapproved, and, if disapproved, the reason why." Ms. Wolstenholme concludes:

My duties and responsibilities as a Health Care Advisor require me to know the terms and conditions of TriCare coverage, eligibility issues, what is and is not covered, the process for submittals and approvals, the transition from active military to retire, and everything health benefits related. As such, I am capable of offering qualified, reliable and relevant testimony about Silong's TriCare coverage at trial.

The Government further points to Ms. Wolstenholme's testimony that TRICare will cover Paige's "medically necessary" expenses. The Government asserts that questions as to Ms. Wolstenholme's qualifications go to the weight of her testimony, not its admissibility. In addition to Ms. Wolstenholme, the Government notes that it "relies on multiple sources to prove offsets including, without limitation, Plaintiffs' admissions, documentary evidence, confirmed payment of all past medical expenses, ongoing coverage, terms of future coverage if Lt. Col. Silong retires, and the deposition testimony of Lt. Com. Yoakley, Dr. Nath, and others."

*17 State and federal law provide the Government legal grounds to seek an offset. In other words, as a matter of law, the Government may seek an offset. The question turns to evidence to support the offset. Plaintiffs take the position that the Government lacks competent offset evidence based on Ms. Wolstenholme's lack of qualifications. The evidence raises a question as to Ms. Wolstenholme's qualifications to opine on future TRICare coverage and the weight to give to her opinions. Ms. Wolstenholme is a two-year health benefits advisor and apparently not employed by TRICare. The Government claims it will produce evidence in addition to Ms. Wolstenholme but fails to detail such evidence. The parties do not identify specific

future care for Paige. At this stage, this Court is left to examine the offset question in a vacuum in that if Ms. Wolstenholme is the Government's primary source of TRICare coverage opinion (and the Government has given this Court no meaningful grounds to believe otherwise), the Government lacks sufficient evidence for summary adjudication on the offset issue. With a factual dispute as to the competency of the Government's TRICare coverage evidence, the Government has not satisfied its summary adjudication burden regarding offset.

Moreover, this Court is unclear as to what the Government seeks. The Government notes that TRICare will provide medical benefits until Paige reaches age 21 or 23, if she attends college. The Government appears to seek a blanket offset for all of Paige's future medical expenses without consideration that she may not receive TRICare coverage after she reaches age 21 or 23. Such factor further prevents summary adjudication for the Government.

More fundamentally, as noted by plaintiffs, section 3333.1(a) does not preclude plaintiffs' recovery of future medical expenses. It allows this Court, as trier of fact, to determine how to apply future TRICare benefits to damages calculation. TRICare coverage for Paige's future medical expenses does not vitiate plaintiffs' claims for recoverable damages. TRICare coverage is a factor for this Court to consider.

As an alternative to an offset, the Government advocates establishment of a "trust" for future medical expenses under California Code of Civil Procedure section 667.7(a), which provides in pertinent part:

In any action for injury or damages against a provider of health care services, a superior court shall, at the request of either party, enter a judgment ordering that money damages or its equivalent for future damages of the judgment creditor be paid in whole or in part by periodic payments rather than by a lump-sum payment if the award equals or exceeds fifty thousand dollars ($50,000) in future damages. In entering a judgment ordering the payment of future damages by periodic payments, the court shall make a specific finding as to the dollar amount of periodic payments which will compensate the judgment creditor for such future damages.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**\*18** California Code of Civil Procedure section 667.7 does not specify establishment of a trust. It provides for periodic payments of future medical expenses exceeding $50,000. Determination of the mechanism of future medical expenses is premature at this time.

Lastly, this Court clarifies that it is not ruling on plaintiffs' belated motion to exclude Ms. Wolstenholme's testimony. Since the Court addresses the Government's summary adjudication motion, trial exclusion of Ms. Wolstenholme's testimony is not before the Court and is an issue for another day. Furthermore, based on the above rulings, Lt. Col. Silong's sole remaining claim, if any, appears limited to Paige's future medical expenses which he may incur prior to Paige turning age 18, at which point Paige will be legally responsible for such expenses. This Court is unclear if Lt. Col. Silong pursues such a claim and requires Lt. Col. Silong to inform this Court in writing what, if any, damages claims Lt. Col. Silong pursues. If Lt. Col. Silong pursues no damages claims arising from Paige's medical care, this Court intends to dismiss him as a plaintiff.

For the reasons discussed below, this Court:
1. GRANTS the Government summary adjudication on Lt. Col. Silong and Ms. Silong's loss of consortium claims;
2. BARS Lt. Col. Silong and Ms. Silong to seek emotional distress damages;
3. BARS Lt. Col. Silong to pursue a bystander victim claim;
4. DENIES the Government summary adjudication on Paige's future lost earning capacity claim;
5. GRANTS the Government summary adjudication on plaintiffs' past medical expenses claim;
6. DENIES the Government summary adjudication that TRICare benefits offset Paige's future medical expenses in their entirety; and
7. ORDERS Lt. Col. Silong, no later than September 14, 2007, to file and serve his statement to identify what, if any, damages claims he pursues in light of this Court's rulings.

IT IS SO ORDERED.

E.D.Cal.,2007.
Silong v. U.S.
Slip Copy, 2007 WL 2580543 (E.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 2292426 (W.D.Okla.)
**(Cite as: Slip Copy)**
ℍ

Mooring Capital Fund, LLC v. Phoenix Central, Inc.
W.D.Okla.,2007.
Only the Westlaw citation is currently available.
United States District Court,W.D. Oklahoma.
MOORING CAPITAL FUND, LLC, Plaintiff,
v.
PHOENIX CENTRAL, INC., et al., Defendants.
No. CIV-06-0006-HE.

Aug. 7, 2007.

Kurt M. Rupert, Hartzog Conger Cason & Neville, Robert G. Kirby, Robert W. Nelson, Whitten Nelson McGuire Terry & Roselius, Oklahoma City, OK, for Plaintiff.
Elizabeth C. Nichols, L. Vance Brown, Elias Books Brown & Nelson PC, Joseph D. Andrews, Jr., Travis W. Watkins, Mulinix Ogden Hall Andrews & Ludlam PLLC, Oklahoma City, OK, Joe B. Lawter, Norman, OK, for Defendants.

JOE HEATON, United States District Judge.
**\*1** By separate order entered this date, the court has addressed plaintiff's motion for summary judgment. Pursuant to that order, the only claims or issues remaining for trial are a determination of the amount due plaintiff on the promissory note involved here and defendant's counterclaim for breach of contract. This order addresses the various motions in limine which have been filed by the parties. It also addresses plaintiff's motions directed to damages and/or proof of damages pursued as a sanction for discovery abuse.

The central issue involved in most of the remaining motions is the nature of, and proof of, defendant's damages as to its counterclaim. The defendant's most recent statement of its claimed losses is found in its second supplemental response to plaintiff's Interrogatory no. 14, dated July 18, 2007.FN1They include attorney's fees incurred as a result of Kurt Pfenning's and Stanley Ward's efforts to "obtain a correct payoff balance" from Mooring, defendant's Exhibit 18, plus attorney's fees incurred in connection with this litigation; appraisal, environmental and loan costs; lost lease revenue; additional interest and costs paid on the 2525 Manchester Property loan, additional interest and costs assessed on the Mooring loan subsequent to

"Mooring's prevention of new loans;" additional interest owed or paid to bankruptcy unsecured creditors; additional interest, penalties and fees owed on real estate taxes; additional interest paid on credit cards; and interest on new loans "that would not have been needed."[Doc. # 165], Exhibit 5. The damages sought approximate $500,000. The court deals first with the substantive objections to each category of claimed damages.FN2

FN1.*Phoenix initially also sought to recover for losses it allegedly sustained in conjunction with a development project involving a 40 acre tract of land in Oklahoma City owned by Ms. Knight. Ms. Knight testified during her deposition, and Phoenix subsequently confirmed, that it has withdrawn its claim for those damages. See Exhibits 10 to plaintiff's summary judgment brief, p. 225-27; Doc. # 165, Exhibit 5.*

FN2.*The court has also relied on the descriptions of the evidence contained in the parties' summary judgment briefs.*

Phoenix's first category of claimed damages, addressed in Mooring's motion in limine [Doc. # 148] is for attorney's fees. It seeks $130,361.97, based on fees paid or owed to Stanley Ward ($720), Kurt Pfenning ($8200), the Mulinex firm ($51,243.27), and the Elias, Brooks firm ($70,198.70). Plaintiff objects to this category of damages on the basis that they are not damages attributable to defendant's substantive claims, but are properly a matter in the nature of costs to be determined by the court at the conclusion of the case. Phoenix argues all the fees are damages it incurred as a result of Moorings actions and should therefore be recoverable. The court concludes the fees attributable to Ward and Pfenning are properly treated as elements of damage. These prelitigation fees are potentially recoverable even though they are attorney's fees, as they were not incurred in connection with litigation, but rather are costs resulting from the defendant's alleged inability to obtain an accurate payoff balance from the plaintiff. FN3They are akin to the charges Phoenix might have incurred had it elected to hire an accountant to determine the amount due on the note and are, in the circumstances existing here, properly sought as damages. See generally, *Phillips v. Snug Harbor*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
**(Cite as: Slip Copy)**

*Water and Gas Co.,* 596 P.2d 1273, 1276 (Okla.Civ.App.1979) (recoverable damages for breach of contract included the hiring of "a lawyer to invoke the aid of the corporation commission ."The fees charged by the Mulinex and Elias, Brooks firms, by contrast, are litigation costs in connection with this case and any recovery of those will be determined by the court at the conclusion of the case.

FN3.*The discussions underlying the Ward fees suggest litigation was contemplated, but had not yet been commenced.*

**\*2** Defendant's second category of claimed damages is appraisal, environmental and loan costs. The court concludes these are proper elements of damage if they are attributable to the efforts to refinance the loan on the shopping center. If they relate instead to the Manchester property or to some other property claimed to have been collaterally impacted by the failed refinance efforts, they are not proper elements of damages in this case, as discussed more fully in connection with the Manchester property.

Defendant's third category of damages is "lost lease revenues," the amount of which Phoenix asserts to be $216,988. Assuming that the claimed lost revenues relate to revenues of the shopping center, there does not appear to be any substantive reason why evidence as to them would be inadmissible. To be sure, defendant's potential damages do not equate to "lost lease revenues." In a case of this sort, it appears that "lost profits" is an appropriate element of defendant's damages, if the evidence supports it. *Phillips v. Snug Harbor Water and Gas Co.,* 596 P.2d 1273, 1276 (Okla.1979) (Where contract breached, "Loss of profits is, of course, recognized compensable detriment, but loss of anticipated profits is extremely difficult to prove.") Lost profits and lost lease revenues, which is a description of gross income, are not the same thing. Lost lease revenues could be *part of* a lost profits calculation, which calculation would ordinarily involve consideration of other factors such as expenses incurred or saved by reason of the lost revenues, reduction of future net payments to present value and the like. In the present circumstances, it is impossible to know how the defendant contemplates using this evidence, but the court merely notes that, from a substantive (i.e. legally available and relevant to the issues in the case) standpoint, it

appears to be admissible.

Defendant's fourth category of damages is for additional interest and costs incurred (totaling $31,113) as to a loan taken out on the property at 2525 Manchester, allegedly necessary due to the failed refinancing on the shopping center. As noted previously, the only surviving claim to which these damages would potentially apply is one for breach of contract. Oklahoma has generally followed the "time-honored general rules on recovery of damages for breach of contract" found in *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854), including that, in the absence of special circumstances that would distinguish the contract at issue from similar contracts, the damages recoverable are those that "would naturally and generally result from the breach according to the usual course of things."*Florafax Int'l, Inc. v. GTE Market Resources, Inc.,* 933 P.2d 282, 292 (Okla.1997)."No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin."23 Okla. Stat. 21. Applying these principles, Oklahoma permits recovery for damages flowing from a collateral contractual relationship only "if such damages can be said to have been within the contemplation of the parties at the time of contracting."*Florafax,* 933 P.2d at 293. Here, the court can discern no basis for concluding that, at the time the note was originally given (or even at the date of Mooring's acquisition of it) the parties contemplated costs associated with some future collateral undertaking of Phoenix. Accordingly, evidence as to this category of damages will not be permitted.

**\*3** Defendant's fifth category of claimed damages is interest charged on the Mooring loan subsequent to the failed refinance efforts. As noted in the court's summary judgment order, the nature of Mooring's breach of contract, if ultimately established, is not such as would justify a forfeiture of the entire amount due. Similarly, that claimed breach does not justify a complete suspension of the running of interest. However, as the post-refinance interest running on the Mooring loan is an element in the calculation of damages (though not itself the measure of the damages) due to the alleged breach, this category of evidence will not be categorically excluded.FN4If an appropriate foundation for this evidence is laid at trial, it will be permitted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

FN4.*The difference between the interest costs incurred by Phoenix on the Mooring loan and the interest it would have paid, attributable to the same amount financed, on the refinance loans, appears to be an appropriate element of damage here.*

Defendant's sixth category-additional interest paid or owed to Phoenix's bankruptcy creditors-runs afoul of the same principle as applied to costs on the Manchester property loan and will therefore be excluded.

Defendant's seventh category of damages is additional interest, penalties and fees in connection with real estate taxes. As the specific nature of this evidence is not apparent from the brief description of it in the schedules and the parties' briefs do not discuss it in detail, the court declines to address its admissibility via this limine ruling.

Defendant's eighth and ninth categories involves additional interest paid by Ms. Knight on her credit cards and interest paid on loans which defendant says would not otherwise have been needed. These categories, like the increased liability to bankruptcy creditors, are "too remote and speculative to permit recovery." *Coker v. Southwestern Bell Telephone Co.,* 580 P.2d 151, 153 (Okla.1978).

Resolution of the "substantive" concerns as to the categories of damages is relatively straightforward. The far harder question is to determine the appropriate resolution of the issues in light of the pattern of disclosure and discovery abuse, and the shell game as to use of expert witnesses, that defendant has employed in this case.

Defendant has repeatedly failed or refused to discharge its disclosure and discovery obligations under the rules. Rule 26 requires a party, without awaiting a discovery request, to provide other parties with:
a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

Fed.R.Civ.P. 26(a)(1)(C).Rule 26(e) also imposes a duty on a party to supplement or correct disclosures

made under subdivision (a) or in response to a discovery request if the party learns "that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other part[y] during the discovery process or in writing."Rule 26(e)(1).FN5

FN5.*There are specific provisions in Rule 26 pertaining to disclosures with respect to expert witnesses. See Rule 26(a)(2); (e).*

**\*4** Mooring claims that Phoenix failed to provide any explanation or evidence supporting its damages claims until it delivered its trial exhibit notebook on Wednesday, July 11, 2007. Mooring asserts that the notebook contains versions of documents and spreadsheets prepared by Ms. Knight that were not produced during discovery. The plaintiff also contends that the business records or other materials on which those exhibits are based have never been produced and that the exhibits reflect expert opinion testimony, yet Phoenix has not designated an expert witness to testify at trial. A review of the litigation history substantially confirms the plaintiff's contention that, despite its obligations under Rule 26 and despite the plaintiff's specific request for information regarding the defendant's damages claims in its discovery requests, Phoenix has repeatedly failed to explain how the bulk of its damages are calculated or produce documents supporting them.

Mooring asked for information regarding Phoenix's damages in its interrogatories, specifically Interrogatory No. 14,FN6 and in its document production requests. *See* plaintiff's motion to compel, [Doc. # 61], Exhibits 1-2. Ignoring the fact that it already had a disclosure obligation based on Rule 26, Phoenix objected to Interrogatory No. 14 on the ground that the plaintiff had exceeded the number of permissible interrogatories. Counsel for the parties met and Phoenix's attorney agreed to provide the information requested in Interrogatory No. 14 and also documents supporting Phoenix's damages claims. *See* [Doc. # 61], Exhibit 4. When the information and documents were not provided, Mooring filed a motion to compel. *See id.*Exhibits 5, 6 ("Also, what is the status of discovery responses and production on Phoenix's damages claims. It's been a month since our meet and confer and you've yet to provide damage calculations or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                    **Page   4**
(Cite as: Slip Copy)

supporting evidence."). Phoenix then supplemented its response to Interrogatory No. 14, stating "Phoenix further states that the requested damage calculation is the subject of analysis by an expert witness. Phoenix's expert identification and report will be submitted on or before January 1, 2007, in accordance with the Court's October 27, 2006 Amended Scheduling Order."[Doc. # 153], Exhibit 3.

FN6.*Other interrogatories also sought information or documents relating to damages Phoenix sought in connection with its counterclaims.*

The court subsequently set a hearing on the motion to compel, but directed the parties, through counsel, to confer and attempt to resolve the dispute. Counsel then filed a report stating they had reached an agreement that would moot the motion to compel and, pursuant to which:
1. Phoenix will provide an itemization of its alleged damages including, the type of damage, the basis for the damage claim and the value of the damage claim. (It is understood that Phoenix's damage claims are being reviewed by an expert and may be revised as permitted by the Federal Rules.)
2. Phoenix will identify and produce all exhibits relating to its damage claims.
3. Phoenix will identify all witnesses supporting its damage claims and provide a summary of expected testimony for each.
*5 4. Items 1 through 4 above will be completed and provided to Plaintiff on or before, January 19, 2007.

[Doc. # 71]. The court struck the motion to compel as moot and Phoenix supplemented its response to Interrogatory No. 14 on January 24, 2007, providing some information pertaining to the calculation of its damages, which was "[s]ubject to review by an expert witness to be formally disclosed on or before February 1, 2007."[Doc # 153], Exhibit 4. The documents that apparently were provided to support the defendant's alleged losses appear mainly to be spreadsheets created by Judith Knight. *See* [Doc. # 165], Exhibit 2.

Mooring states that it was advised by Phoenix's counsel that its damage calculations required expert testimony, that Phoenix anticipated that Todd Lisle, a certified public accountant, would be its expert, and that his designation and report would be

provided as required by the scheduling order. However, Judith Knight was the only witness Phoenix designated in its final list of expert witnesses filed on February 1, 2007. [Doc. # 75].

New counsel then entered an appearance on behalf of the defendant after the court granted the defendant's former attorney's emergency motion to withdraw on February 14, 2007. The new counsel filed an application to designate Todd Lisle as an expert witness out of time on April 22, 2007, stating in the application that "[t]hrough review and investigation of the instant matter, counsel for Phoenix has determined that the expert testimony of Lisle will be required on Phoenix's damage claim."[Doc. # 104]. The court granted the defendant's motion and directed the defendant to file Mr. Lisle's expert report no later than May 14, 2007, and to produce Mr. Lisle for deposition, if requested by the plaintiff, before June 1, 2007, the discovery cut-off date. However, when an expert report was not filed, Mooring moved to exclude the expert testimony of Judith Knight on the basis she was not qualified to render an opinion on banking policy or to testify about Phoenix's damages claims. Phoenix then withdrew its designation of Judith Knight as a designated expert witness, stating that she would testify as a fact witness with respect to the circumstances pertaining to Mooring's negligence and misrepresentations, as to which she has personal knowledge. Phoenix also stated that she would testify "as a fact witness, but not a designated expert witness, as to damages sustained by Phoenix arising from Mooring's negligence."[Doc. # 124], p. 1.

Mooring contends Phoenix has failed "to provide any explanation or documentary evidence foundation, or support for *any* of the damage claims it is making in this case."Plaintiff's motion, [Doc. # 153], p. 1. Phoenix responds that it has provided the plaintiff with documents and spreadsheets and asserts that most of its damage claims "are not the type for which 'documents' exist."Defendant's response, [Doc. # 165], p. 3. That might be true with respect to some of the interest the defendant seeks to recoup. However, the defendant clearly had to rely on some documents to calculate the $216,988 in "lost lease revenue."

*6 As recently as April 22, 2007, the defendant advised the court that its new counsel had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

Page 5

"determined that the expert testimony of Lisle will be required on Phoenix's damage claim."Doc. # 104. Phoenix now claims that Ms. Knight can testify as to its "lost lease income." However, she testified during her deposition on April 30, 2007, that she had not calculated the lost revenues and would need her expert to make the calculation. Plaintiff's Exhibit 10, pp. 254-55.FN7Even if Ms. Knight were competent to testify as to lost lease income, the defendant never provided Mooring with documents-such as lease agreements or tax returns-substantiating such a sizeable loss.FN8The defendant repeatedly assured the plaintiff that it would provide the "basis for the damage claim" and would produce "all exhibits relating to its damage claims," [Doc. # 71], yet none were forthcoming.

FN7.*In its response to the motions in limine Phoenix distinguishes between the "future value of Phoenix's lost revenue," and "lost lease income." Doc. # 165, p. 10. The defendant states that while Mr. Lisle was retained to testify as to the former, Ms. Knight is capable of testifying to the latter.*

FN8.*The spreadsheets the court has reviewed do not even appear to address the lost revenue claim. See Doc. # 165, Exhibit 2.*

Phoenix failed to comply with its obligations under Rule 26 and the discovery rules. Despite assurances to opposing counsel and the court that it would provide the plaintiff with the documents underlying, and an expert's report explaining, the calculation of its lost revenue and other damages claims, little more than spreadsheets have been produced. The defendant has disregarded the discovery rules and has forced the plaintiff to prepare for trial without the information needed to defend against significant damages claims. The disregard of the rules, coupled with defendant's dodging and weaving as to use of, and the necessity for, expert testimony, would substantially prejudice plaintiff's ability to defend itself if forced to go forward in the present posture of the case.

"A party that without substantial justification fails to disclose information required by Rule 26(a)... is not, unless such failure is harmless, permitted to use as evidence at a trial ... any witness or information not so disclosed."Rule 37(c)(1). Because the failure here is not harmless, the court concludes that as a sanction for its misconduct the defendant will not be

allowed to introduce any evidence of damages based on claimed lost lease revenues or "lost profits" as such.FN9

FN9.*While the plaintiff focused in its motion in limine on the defendant's failure to support its claim for lost lease revenue, the defendant also was less than forthcoming with evidence substantiating some of its other claimed losses. Therefore, the sanction is based on compliance in general.*

The exclusion of lost profits evidence, which was to be offered by and through the testimony of Ms. Knight, is consistent with the conclusion that would likely have been reached as to her testimony even in the absence of disclosure/discovery abuse. Mooring argues that Ms. Knight, as a fact witness, could not testify to various things she apparently intends to testify to, FN10 citing Fed.R.Evid. 701(c). Contrary to Mooring's suggestion, the court does not view 701(c) as necessarily barring testimony by a fact witness (i.e.Ms. Knight) about lease revenues or lost profits. The Advisory Committee Notes to the 2000 amendments, which added the provisions of 701(c), specifically disclaimed any intention to overturn the result in those cases which allowed a business owner or officer, although not qualified as an expert, to testify in a proper case to the "value or projected profits of the business."However, the problem in this case is that, in her deposition, Ms. Knight specifically stated she could not explain the claimed lost revenues or lost profits without the assistance of some other expert. Having disclaimed that ability, it is extraordinarily difficult to justify Ms. Knight later testifying, whether as an expert or a fact witness, to those very facts or conclusions.

FN10.*Plaintiff suggests Ms. Knight may also attempt to testify as to proper banking practices, proper accounting practices and the like, citing to references in defendant's trial brief. The court cannot determine from the present submissions what the scope of Ms. Knight's testimony may be. Depending on the nature of her testimony, there may be other areas (beyond lost revenues/profits) that Rule 701 would preclude her testifying to as a fact witness.*

*7 Based on the foregoing, plaintiff's motion to exclude the testimony of Judith Knight [Doc. # 147] is GRANTED insofar as Ms. Knight seeks to testify as to lost least revenues or to lost profits based on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                      **Page    6**
**(Cite as: Slip Copy)**

lost lease revenues. Plaintiff's motion in limine as to
evidence of attorney's fees [Doc. # 148] is DENIED
as to the fees of Mr. Ward and Mr. Pfenning, but
otherwise GRANTED.Plaintiff's motions to exclude
evidence of damages [Doc. # 153] and to strike trial
exhibits [Doc. # 156] are GRANTED to the extent
set forth in the above discussion.

IT IS SO ORDERED.

W.D.Okla.,2007.
Mooring Capital Fund, LLC v. Phoenix Central,
Inc.
Slip Copy, 2007 WL 2292426 (W.D.Okla.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2897747 (S.D.Ind.)
**(Cite as: Slip Copy)**

Classic Cheesecake Co., Inc. v. JPMorgan Chase Bank
S.D.Ind.,2007.
Only the Westlaw citation is currently available.NOT INTENDED FOR PUBLICATION IN PRINT

United States District Court,S.D.
Indiana,Indianapolis Division.
CLASSIC CHEESECAKE COMPANY, INC., et al., Plaintiffs,
v.
JPMORGAN CHASE BANK, Defendant.
No. 1:05-cv-0236-WTL-JDT.

March 19, 2007.

John Michael Bowman, George M. Plews, Plews Shadley Racher & Braun, Martin D. Allain, Steven T. Fulk, Fulk & Allain, Indianapolis, IN, for Plaintiffs.
Alan S. Brown, Jennifer Lyn Dolak Vanlandingham , Locke Reynolds LLP, Indianapolis, IN, for Defendant.

WILLIAM T. LAWRENCE, Magistrate Judge.
**\*1** The Plaintiffs have tendered jury instructions which indicate their intention to ask the jury to award them damages for "mental anguish, humiliation, or embarrassment" (hereinafter "emotional distress damages"). The Defendant has objected to this on the ground that the Plaintiffs failed to include emotional distress damages in their response to interrogatories asking for "an itemized list of damages Plaintiffs claim they sustained as a result of the acts or omissions of Defendant."The Plaintiffs counter that the Defendant was on notice that they claimed emotional distress damages because they stated in affidavits submitted as part of summary judgment briefing that they suffered from severe emotional distress. There are two problems with this argument, however. First, the Defendant was entitled to rely upon the Plaintiffs' answers to its interrogatories that clearly seek the Plaintiffs' contentions regarding damages; the issue of damages was not relevant to or argued during the summary judgment process, and therefore the mention of damages in summary judgment affidavits was not sufficient to act as a de facto amendment of the Plaintiffs' interrogatory answers. Second, the affidavits pointed to by the Plaintiffs state that the emotional distress they suffered was the result of

"Dowling's misrepresentations and Classic Cheesecake's reliance on the same."However, the Plaintiffs' claims based upon Dowling's alleged misrepresentations have been dismissed; damages at trial will be limited to any damages suffered by the Plaintiffs as a result of the Defendant's violation of certain notice provisions, if the jury finds that a violation occurred.FN1

FN1. The Plaintiffs also point to the fact that Plaintiff Danny Woods testified during a Rule 30(b)(6) deposition that he suffered emotional distress; again, this testimony related to distress caused by Dowling's alleged misrepresentations, not by the alleged notice violations that remain at issue in this case.

Federal Rule of Civil Procedure 37(c)(1) provides:
A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Federal Rule of Civil Procedure 26(a)(1)(C) required the Plaintiffs to provide as part of their initial disclosures "a computation of any category of damages claimed" as well as "materials bearing on the nature and extent of the injuries suffered," and the Defendant specifically sought information about the damages claimed by the Plaintiffs in its interrogatories.FN2The Plaintiffs have not demonstrated substantial justification for failing to provide information regarding the emotional distress damages they now claim, and their failure to do so was not harmless, as the Defendant was deprived of the opportunity to conduct discovery regarding the nature and extent of these damages and whether the emotional distress claimed may have had another cause. Accordingly, the Plaintiffs will not be permitted to seek emotional distress damages at trial.

FN2. The Plaintiffs' argument that they did not have to list *all* of the damages they sought because the interrogatory did not use the word "all" is without merit.

SO ORDERED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
**(Cite as: Slip Copy)**

S.D.Ind.,2007.
Classic Cheesecake Co., Inc. v. JPMorgan Chase
Bank
Slip Copy, 2007 WL 2897747 (S.D.Ind.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 627874 (E.D.Mich.)
**(Cite as: Slip Copy)**
н

Multimatic, Inc. v. Faurecia Interior Systems USA, Inc.

E.D.Mich.,2007.

Only the Westlaw citation is currently available.
United States District Court,E.D.
Michigan,Southern Division.
MULTIMATIC, INC., a Canadian corporation,
Plaintiff/Counter-Defendant,
v.
FAURECIA INTERIOR SYSTEMS USA, INC., a
Delaware corporation, Defendant/Counter-Plaintiff.
No. 05-60120.

Feb. 26, 2007.

Kevin B. Hirsch, Rodger D. Young, Steven C. Susser, Young & Susser, Southfield, MI, for Plaintiff/Counter-Defendant.
Thomas J. Schank, Hunter & Schank, Toledo, OH, for Defendant/Counter-Plaintiff.

JOHN CORBETT O'MEARA, United States District Judge.

*1 Before the court are the parties' motions for summary judgment, which were filed on January 16, 2007, and have been fully briefed. The court heard oral argument on February 8, 2007, and took the matter under advisement.

This is a contract dispute between two auto suppliers. Plaintiff Multimatic worked with Defendant Faurecia to design and manufacture an instrument panel for DaimlerChrysler vehicles. Specifically, Multimatic designed a cross-beam, which was a component of the instrument panel that Faurecia supplied to DaimlerChrysler.

### A. The Confidentiality Agreement

In early 2004, Faurecia selected Multimatic to supply the cross-beam. Multimatic contends that it was difficult to engineer the cross-beam to Faurecia and DaimlerChrysler's exacting specifications. Multimatic declined to share its designs with Faurecia until the parties executed a Confidentiality Agreement. Multimatic wanted to protect its designs and technical information from disclosure, particularly to competitors. In February 2004, Multimatic and Faurecia signed a Confidentiality Agreement. The Agreement provides:

Each of Multimatic, Venture and Faurecia possesses proprietary confidential information pertaining to its business and customers and possesses technical information relating to its products, designs and services, including compositions, raw materials, formulations, additives, components, production processes, plant layout, engineering concepts and designs, analysis models and results, know-how, and other intellectual and industrial property, which is generally not available to the public ( ... "Sensitive Information")....

All Sensitive Information of a disclosing party and all rights thereto shall remain the exclusive property of the disclosing party and shall be held in trust by the receiving party for the disclosing party.

Pl.'s Ex. 20. The Agreement further provides that the parties will keep Sensitive Information confidential and not disclose it to any third party.*Id.* The Agreement included a signature line for a third company, Venture. Soon after the Agreement was drafted, however, it became clear that Venture was not going to participate in the project. Multimatic did not pursue Venture's signature to the Agreement and did not disclose any of its designs or Sensitive Information to Venture.

After the Confidential Agreement was signed by Faurecia, Multimatic submitted its initial design for the cross-beam. Multimatic contends that this initial proposal constituted Sensitive Information as defined and protected by the Confidentiality Agreement. In June 2004, Faurecia sent Multimatic's cross-beam design to Multimatic's competitors without Multimatic's knowledge or consent. Faurecia disclosed Multimatic's design for the purpose of conducting a "market test" to determine if the cross-beam could be manufactured more cheaply. Faurecia did a second market test in October 2004, again without Multimatic's knowledge or consent.

*2 Multimatic submitted what it considered to be an innovative new design for the cross-beam to Faurecia, known as the "Mass Saving Design," in November 2004. In December 2004, Faurecia approved the Mass Saving Design from an engineering perspective. In April 2005, Faurecia conducted a third market test by sending Multimatic's Mass Saving Design to at least three of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
(Cite as: Slip Copy)

Multimatic's competitors.

Soon thereafter, Faurecia obtained a lower price quote for the manufacture of the cross-beam from one of Multimatic's competitors, Brown Corporation. Faurecia demanded a price reduction from Multimatic, to no avail. Faurecia then awarded the cross-beam program to Brown. Faurecia subsequently provided Brown with additional Sensitive Information that belonged to Multimatic, including CAD designs, CAE models and analysis, Multimatic's Design Failure Mode and Effects Analysis, its Design Verification Plan & Report, and a prototype cross-beam manufactured by Multimatic. Multimatic contends that Faurecia's disclosure of this information and other information through market tests violated the Confidentiality Agreement.

B. *The Letter of Intent*

Multimatic alleges that, before it submitted its Mass Savings Design to Faurecia in November 2004, it insisted on a firm sourcing commitment. According to Multimatic, Faurecia had always verbally represented that Multimatic would be the production source for the cross-beam, not just the designer. Multimatic contends that it was unwilling to share its Mass Savings Design with Faurecia until it received a sourcing commitment. According to Multimatic, that commitment came in the form of a Letter of Intent executed on November 16, 2004. *See* Pl.'s Ex. 6, Def.'s Ex. B. The Letter of Intent provides, in part:
On behalf of Faurecia Interior Systems, I am pleased to inform you that Multimatic has been selected as the Pre-Development supplier for the part listed below [cross-beam]. This decision is based on your Initial Quote ... Dated April 7, 2004....
The price level for this program is as follows:
   Piece price: $22.7753 Ex. Works
* * *
Jeff Stull will distribute the production LOI for this package. The LOI will cover the final pricing level of all negotiated engineering changes incremental to the above pricing. In addition the LOI will contain the SOR, Quality Agreement and General Terms of Purchase and other pertinent program deliverables.
In the event Multimatic fails to meet the applicable quality, delivery, and product launch standards that are expected during production, Faurecia has the right to quote and source alternative production

suppliers. In this case, Multimatic will be compensated for design and development efforts completed.

*Id.*

After receiving the Letter of Intent, Multimatic uploaded its Mass Savings Design to the DaimlerChrysler VPM system, which is a computer network that allows suppliers to share information. Although DaimlerChrysler's computer system administrator has access to all files on the system, the suppliers otherwise control who has access to their information. Multimatic contends that it only granted Faurecia access to its information on the VPM system.

*3 Multimatic contends that in April 2005, apparently after conducting a market test with its Mass Savings Design, Faurecia demanded price concessions from Multimatic. Multimatic asserts that it was willing to negotiate engineering changes, but that Faurecia wanted to disregard the Letter of Intent and renegotiate the price of the part from $0. Multimatic also claims that Faurecia demanded that Multimatic pay it $200,000 if Multimatic wanted to remain the cross-beam supplier. When Multimatic refused to meet Faurecia's demands for a price reduction and "kick-back," Faurecia awarded the cross-beam contract to Brown. Multimatic contends that, in doing so, Faurecia violated the Letter of Intent.

C. *Procedural History*

Multimatic filed its complaint on May 25, 2005, alleging the following causes of action: Count I, breach of Confidentiality Agreement; Count II, anticipatory repudiation of Confidentiality Agreement; Count III, specific performance of Confidentiality Agreement; Count IV, breach of Letter of Intent; and Count V, breach of prototype protective orders. *See* Amended Complaint (filed June 30, 2005). Multimatic sought a preliminary injunction, which the court denied on August 1, 2005, essentially because Multimatic failed to demonstrate irreparable harm.

Faurecia filed a counterclaim, alleging the following causes of action: Count I, breach of purchase orders; Count II, breach of contract; Count III, breach of implied covenant of good faith and fair dealing;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

Count IV, tortious interference with contractual relations; Count V, tortious interference with economic relations; Count VI, anticipatory repudiation; and Count VII, unauthorized use of intellectual property.

Multimatic has filed two summary judgment motions, one for judgment in its favor on Count I of its complaint (breach of the Confidentiality Agreement) and one for judgment on Faurecia's counterclaims. Faurecia has also filed a motion for summary judgment, seeking judgment on Counts I-IV of Multimatic's complaint.

### A. *Standard of Review*

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, the facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party opposing summary judgment, however, must present more than a "mere scintilla" of evidence; the evidence must be such that a reasonable jury could find in favor of the plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. *Contract Interpretation*

Under Michigan law, "the main goal in the interpretation of contracts is to honor the intent of the parties."*Mahnick v. Bell Co.,* 256 Mich.App. 154, 158-59, 662 N.W.2d 830 (2003).FN1

FN1. The Agreement contains a choice of law clause stating that it is governed by the laws of Ontario, Canada. Faurecia contends that the Agreement is not binding and that, based upon Michigan's choice of law rules, Michigan law applies. Multimatic does not dispute that Michigan law applies and contends that, in any event, the elements of a contract claim are the same under Ontario and Michigan law.

\*4 The court must look for the intent of the parties in the words used in the contract itself. When contract language is clear, unambiguous, and has a definite meaning, courts do not have the ability to write a different contract for the parties, or to consider extrinsic testimony to determine the parties' intent. The determination of whether contract language is clear and unambiguous is a question of law. If a contract is subject to two interpretations, factual development is necessary to determine the intent of the parties and summary disposition is inappropriate. When contractual language is clear, its construction is a question of law for the courts. Courts must not create ambiguity where it does not exist. If the meaning of the language is unclear, the trier of fact must determine the intent of the parties.
*Id.* (citations omitted).

### C. *The Confidentiality Agreement*

Faurecia claims that the Confidentiality Agreement is not enforceable and that, even if it is enforceable, Faurecia did not breach it. First, Faurecia argues that the Confidentiality Agreement is not binding because Venture did not sign it. According to Faurecia, the plain language of the Agreement conditions the disclosure of "Sensitive Information" "[u]pon execution of this Agreement by all parties...." Faurecia does not dispute, however, that Venture ultimately had nothing to do with the cross-beam project and that Multimatic did not disclose its Sensitive Information to Venture. Faurecia also does not explain how its ability to perform under the Confidentiality Agreement was affected by Venture's failure to sign.

Moreover, the law does not invalidate the Confidentiality Agreement simply because all parties did not execute it. Rather, "those who do sign the writing may have intended to be bound by its terms even though less than all the named persons sign. Their intention governs. The intention of the parties is a fact to be decided upon the evidence, not by invoking our personal, professional or judicial experience."*Wiegand v. Tringali,* 22 Mich.App. 230, 234, 177 N.W.2d 435 (1970). Further, "[w]here there are multiple parties to a contract, a signatory has the burden of proving that it was the intent of all of the parties that none would be bound unless all signed."*Earl Dubey & Sons, Inc. v. Macomb Concrete Corp.,* 81 Mich.App. 662, 673, 266 N.W.2d 152 (1978).

Although the intent of the parties is often a question of fact, Faurecia has not set forth evidence that it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

<div align="right">Page  4</div>

was the intent of all parties that none would be bound unless all signed the Confidentiality Agreement. The evidence suggests that Multimatic certainly expected that Faurecia intended to be bound, or Multimatic would not have shared its confidential designs. The evidence also suggests that Faurecia thought it was bound by the Agreement, because it shopped around Multimatic's designs without informing Multimatic. A review of all the evidence demonstrates that Faurecia has not met its burden of establishing that its signature to the Confidentiality Agreement did not bind it.

*5 Faurecia's second argument is that no agreement was formed because it lacked consideration. That is, because Venture did not participate and disclose its "Sensitive Information," "there was a failure of consideration."However, in exchange for receiving Multimatic's Sensitive Information, Faurecia agreed to keep that information confidential. There was a bargained-for exchange and, therefore, legally sufficient consideration. *See General Motors Corp. v. Department of Treas.*, 466 Mich. 231, 239, 644 N.W.2d 734 (2002) ("It has been said '[a] cent or a pepper corn, in legal estimation, would constitute a valuable consideration.'") (citation omitted).

Faurecia's third argument is that it did not breach the Confidentiality Agreement because "Sensitive Information" does not encompass "proprietary information created from and after execution of the document" or "foreground technology." Faurecia contends that the Agreement covers information in existence at the time it was executed and does not cover any information developed by the parties in pursuit of their work on the cross-beam. Faurecia also asserts that ownership of the designs was to be transferred to DaimlerChrysler.

The Confidentiality Agreement does not, expressly or implicitly, exclude "foreground technology" from coverage. Faurecia's interpretation is without support in the language of the Agreement. Further, Multimatic contends, and Faurecia does not dispute, that some of the Sensitive Information conveyed was "background technology" that the parties agree is covered under the Agreement. Although Faurecia contends that the cross-beam design would ultimately be the property of DaimlerChrysler, Faurecia has not demonstrated that Multimatic agreed to surrender ownership of its designs and other technical information at the time Faurecia did

its market tests and chose another supplier.

Faurecia's fourth argument is that Multimatic waived its rights under the Confidentiality Agreement by uploading its designs to the DaimlerChrysler Virtual Product Manager ("VPM") system. However, Multimatic contends that Faurecia was the only party (other than the system administrator) who was granted access to view Multimatic's designs on the VPM. Faurecia has not shown that Multimatic's posting of the designs on the VPM constituted the type of public disclosure that would jeopardize the confidentiality of the designs such that a waiver could be implied. Moreover, the Agreement itself requires any waiver to be in writing.

Faurecia's fifth argument is that its disclosure of information to Multimatic's competitors was permitted under the Confidentiality Agreement because those competitors signed similar confidentiality agreements, thus agreeing to keep Multimatic's information confidential. This argument ignores the purpose of the Confidentiality Agreement, which was to keep Multimatic's information from being disclosed to competitors, presumably because such disclosure could damage Multimatic's competitive position.

*6 Faurecia's sixth argument is that the Confidentiality Agreement was "superseded" by the Letter of Intent, which contemplates Faurecia's disclosure of Multimatic's designs. The Letter of Intent provides that "[i]n the event Multimatic fails to meet applicable quality, delivery, and product launch standards that are expected during production, Faurecia has the right to quote and source alternative production suppliers."Although the Letter of Intent gives Faurecia the right to seek a quote under certain circumstances, Faurecia does not argue that those circumstances were actually present here-that is, that Multimatic failed "to meet applicable quality, delivery, and product launch standards that are expected during production."The Letter of Intent does not address the situation here, where Faurecia disclosed Multimatic's designs pre-production. Accordingly, the Letter of Intent is not inconsistent with and does not supersede the Confidentiality Agreement. In addition, Faurecia disclosed Multimatic's initial design before the Letter of Intent was signed, so that alleged breach is not affected by the Letter of Intent. FN2

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
**(Cite as: Slip Copy)**

FN2. Further, as discussed below, the court finds that the Letter of Intent is not a binding agreement.

In sum, Faurecia's arguments regarding the Confidentiality Agreement are without merit. Faurecia has admitted that it disclosed Multimatic's confidential designs and technical information, which the court finds were clearly covered by the Agreement. Faurecia violated the Confidentiality Agreement by disclosing Multimatic's confidential information to its competitors. Accordingly, the court will grant Multimatic's motion for summary judgment as to Count I and deny Faurecia's motion for summary judgment as to Counts I, II, and III.

### D. *The Letter of Intent*

The remaining issue with respect to Multimatic's complaint is Count IV, the breach of the Letter of Intent. Faurecia seeks summary judgment, arguing that the Letter of Intent is not a binding contract and that, alternatively, Multimatic breached first. Multimatic contends that summary judgment is not appropriate because there are issues of fact for the jury.

"In order to form a valid contract there must be a meeting of the minds on all material facts."*Ford Motor Co. v. Kahne,* 379 F.Supp.2d 857, 868 (E.D.Mich.2005) (Cleland, J.) (quoting *Heritage Broadcasting Co. v. Wilson Comm. Inc.,* 170 Mich.App. 812, 428 N.W.2d 784 (1988)). Under Michigan law, a "contract to make a subsequent contract [*i.e.* an 'agreement to agree'] is not per se unenforceable; in fact it may just as enforceable as any other contract."*Id.* However, a contract to enter into a future contract "must specify all its material and essential terms and leave none to be agreed upon as the result of future negotiations."*Id.* at 869 (citing *Heritage,* 428 N.W.2d at 787).

Faurecia contends that the Letter of Intent is not enforceable because it is merely an "agreement to agree" that does not contain all the necessary essential terms. Although the Letter of Intent contemplates that Multimatic will be the production source for the cross-beam, it does not contain all the essential terms of a production contract. The Letter of Intent itself reveals that the parties anticipated negotiating in the future: "Jeff Stull will distribute the production LOI for this package. The LOI will cover the final pricing level of all negotiated

engineering changes incremental to the above pricing. In addition the LOI will contain the SOR, Quality Agreement and General Terms of Purchase and other pertinent program deliverables."

**\*7** Based upon the plain language of the Letter of Intent, no reasonable jury could conclude that the parties agreed to all the essential terms and left none for future negotiations. Therefore, the court finds that the Letter of Intent is not enforceable. The court will grant summary judgment in favor of Faurecia on Multimatic's Count IV.

### E. *Faurecia's Counterclaim*

Faurecia filed a seven-count countercomplaint, mostly alleging variations on breach of contract and tortious interference theories. Multimatic seeks to have all of Faurecia's counterclaims dismissed because Faurecia failed to disclose any evidence relating to its damages.

Faurecia's initial disclosures did not include an estimate or calculation of its damages; Faurecia stated that "additional discovery and the input of experts will be required to calculate an exact amount of damages claimed."In interrogatories, Multimatic requested that Faurecia provide a calculation of damages. Faurecia objected to the interrogatory as "premature" and stated that "[a]ll such calculations will be addressed by the experts in their reports, which reports will be exchanged by September 15, 2006."

On September 15, 2006, Faurecia informed Multimatic that it would not be submitting an expert report regarding damages. Multimatic then emailed Faurecia on September 19, requesting that Faurecia supplement its answers to interrogatories to provide a calculation of damages. Faurecia apparently did not respond and did not supplement its answer to Multimatic's interrogatory regarding damages. Discovery closed on December 29, 2006.

Multimatic contends that because Faurecia has failed to present evidence of damages, and because damages are an essential element of each of Faurecia's claims, the court must dismiss Faurecia's countercomplaint. Faurecia responds that it does not need experts to establish its damages, but only the "simple application of basic math principles to a small sampling of the documents exchanged between

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
(Cite as: Slip Copy)

Page 6

the parties...." Faurecia then proceeds to calculate its damages for each claim.

The problem with Faurecia's response is that the time for calculating damages and disclosing its theory on damages was long ago. Faurecia was required to calculate its damages in its initial disclosures or in response to Multimatic's interrogatory, which Multimatic reminded Faurecia to supplement. Instead, Faurecia blindsided Multimatic by calculating its damages for the first time in response to Multimatic's motion for summary judgment.

Fed.R.Civ.P. 37(c)(1) provides:
A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed....

"The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless."*Dickenson v. Cardiac & Thoracic Surgery of Eastern Tenn.*, 388 F.3d 976, 983 (6th Cir.2004) (citation omitted). Faurecia has offered no justification for its failure to disclose information regarding its calculation of damages. This failure is not harmless, but is prejudicial to Multimatic, given that discovery is closed and trial is scheduled for March 20, 2007.

**\*8** The court will not permit Faurecia to use evidence of its damages, either at trial or in response to Multimatic's motion. Having no evidence of damages, Faurecia cannot prevail on its claims as a matter of law. The court will grant summary judgment on Faurecia's counterclaims in favor of Multimatic.

IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment on Count I [docket # 84] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment on Faurecia's counterclaims [docket # 83] is GRANTED.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment [docket # 85] is

GRANTED IN PART and DENIED IN PART, consistent with this opinion.

E.D.Mich.,2007.
Multimatic, Inc. v. Faurecia Interior Systems USA, Inc.
Slip Copy, 2007 WL 627874 (E.D.Mich.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 3174425 (D.Colo.)

**(Cite as: Not Reported in F.Supp.2d)**

**H**

Stearns v. McGuire

D.Colo.,2004.

Only the Westlaw citation is currently available.

United States District Court,D. Colorado.

John R. STEARNS, an individual, and Walnut Realty, Inc., a Colorado corporation, Plaintiffs,

v.

Michael T. MCGUIRE, an individual, Defendant.

No. Civ.02-RB-1912(OES).

Sept. 23, 2004.

Kenneth L. Levinson, Balaban & Levinson, Denver, CO, Richard Francis Schaden, Danial Alan Nelson, Schaden, Katzman, Lampert & McClune, Broomfield, CO, for Plaintiffs.

James R. Ghiselli, Ghiselli Law Offices, PC, Boulder, CO, for Defendant.

ORDER GRANTING DEFENDANT'S MOTION IN LIMINE REGARDING DAMAGES ON PLAINTIFF'S FRAUD CLAIM

BLACKBURN, J.

*1 This matter is before me on the Defendant's Motion in Limine Regarding Plaintiff's Fraud Claim or Alternative Motion for Summary judgment [# 62], filed August 20, 2004.

The defendant's motion for summary judgment is denied because it is untimely. The dispositive motions deadline in this case was June 1, 2003. The motion for summary judgment was filed August 20, 2004. The defendant did not seek an extension of the dispositive motions deadline.

In Count III of their Amended Complaint, the plaintiffs allege a claim of misrepresentation against the defendant. The defendant argues that the plaintiffs should be precluded from admitting evidence in support of their misrepresentation claim because the plaintiffs have not disclosed any evidence of actual damages caused by the alleged misrepresentation. *Motion in limine,* p. 6. The defendant says no such disclosure was made in the plaintiffs' Rule 26(a)(1) disclosures, or in response to the defendants' discovery requests. The plaintiffs argue that their Rule 26(a) disclosures were adequate.

In their Rule 26(a) disclosures, the plaintiffs

described their claim for damages as:

1. Contract damages-$82,500.00

2. Exemplary/punitive damages-$ 257,500.00

*Motion in limine,* Exhibit A (Plaintiffs' 26(a)(1) Initial Disclosures), item D. The plaintiffs argue that, with regard to the misrepresentation claim, they "complied with FED. R. CIV. P. 26(a)(1) by stating the amount of their exemplary /punitive damages to be $247,000."*Response,* fifth consecutive page.

The plaintiffs provided the following response to an interrogatory seeking a detailed description of the damages claimed by the plaintiffs based on their misrepresentation claim:

The damages for loss of income started at the aborted date of the first closing and continue up through the present time, including lost income to which the plaintiff was entitled for the extensive work performed to accomplish this transaction and multiples thereof as a result of the ongoing torts expressed in the claim consistent with multiples permitted in the states of Colorado and California for intentional torts and misrepresentation, additionally including the time value of money.

*Motion in limine,* p. 3.

In the Final Pretrial Order, the plaintiffs describe their damages as "damages in the form of lost commission, and pre-judgment interest."*Final Pretrial Order,* [# 47], filed September 18, 2003, p. 3. This statement was made in reference to all three of the plaintiffs' claims for relief. The Final Pretrial Order does not mention a claim for exemplary or punitive damages by the plaintiffs. Consistent with FED. R. CIV. P. 16, the Final Pretrial Order states that the order controls the subsequent course of this case, and that all pleadings are deemed merged into the Final Pretrial Order. *Final Pretrial Order,* [# 47], filed September 18, 2003, p. 13. *Rigby v. Beech Aircraft Co.,* 548 F.2d 288, 292 (10th Cir.1977).

*2 The plaintiffs' Rule 26(a) disclosure is wholly inadequate as it relates to the plaintiffs' purported claim for actual damages on their misrepresentation claim. The disclosure mentions "contract damages." Labeled as "contract damages," this statement of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
**(Cite as: Not Reported in F.Supp.2d)**

**Page 2**

damages relates to the plaintiffs' claim for breach of contract, and possibly to their promissory estoppel claim. This statement cannot reasonably be read to be a statement of the plaintiffs' claim for damages based on their misrepresentation claim. The only other damages mentioned in the plaintiffs' Rule 26(a) disclosures are exemplary or punitive damages, not actual damages.

The plaintiffs' interrogatory response does nothing to clarify what the plaintiffs' might be claiming as actual damages caused by the defendant's alleged misrepresentation. The plaintiffs speak of "damages for lost income," but they provide no specific basis for calculating such damages. The Final Pretrial Order does little to clarify the situation. There, the plaintiff simply points to the lost commission as the actual damages they seek to recover under each of their three claims for relief.

I find that the plaintiffs did not comply with the requirements of FED. R. CIV. P. 26(a)(1) because they did not disclose a computation of their claim for actual damages caused by the defendant's alleged misrepresentation. The plaintiffs' discovery response, quoted above, was not sufficient to clarify the nature of the plaintiffs' claim for actual damages based on the defendant's alleged misrepresentation. In short, the plaintiffs have simply failed to define their claim for actual damages. I note that proof of actual damages is necessary to establish a misrepresentation claim. *Forsyth v. Associated Grocers of Colorado, Inc.,* 724 P.2d 1360, 1363 (Colo.App.1986).

Rule 37(c)(1) provides that if a party fails to disclose information as required by Rule 26(a), then the party is not permitted to use evidence which they failed to disclose. Based on the plaintiffs' violation of Rule 26(a), the plaintiffs shall be prohibited from introducing any evidence in support of their claim for actual damages caused by the defendant's alleged misrepresentation, as alleged in Count III of the Plaintiffs' First Amended Complaint.

I further would note that, even if the plaintiffs were permitted to present evidence of actual damages caused by the defendant's alleged misrepresentation, the plaintiffs would be precluded from asserting a claim for exemplary or punitive damages. The plaintiffs made no mention of any claim for exemplary or punitive damages in the Final Pretrial

Order. As noted above, all pleadings are deemed merged into the Final Pretrial Order, and that order controls the subsequent course of this case. The plaintiffs' claim for misrepresentation, as defined by the plaintiffs in the Final Pretrial Order, does not include a claim for exemplary or punitive damages.

THEREFORE, IT IS ORDERED as follows:

**\*3** 1) That the Defendant's Motion in Limine Regarding Plaintiff's Fraud Claim or Alternative Motion for Summary judgment [# 62], filed August 20, 2004, is DENIED insofar as the defendant seeks summary judgment;

2) That defendant's Motion in Limine Regarding Plaintiff's Fraud Claim or Alternative Motion for Summary judgment [# 62], filed August 20, 2004, is GRANTED as to the defendant's request for exclusion of evidence under FED. R. CIV. P. 37(c)(1); and

3) That the plaintiffs SHALL BE PROHIBITED from introducing any evidence in support of their claim for actual damages caused by the defendant's alleged misrepresentation, as alleged in Count III of the First Amended Complaint.

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing *Order* was faxed on *9.23,* 2004, to:
Richard Francis Schaden, Esq.
Danial A. Nelson, Esq.
Schaden, Katzman, Lampert & McClune
*FAX: (303) 465-3884*
James R. Ghiselli, Esq.
Ghiselli Law Offices, PC
*FAX: (303) 530-4071*
Kenneth L. Levinson, Esq.
Balaban & Levinson, PC
*FAX: (303) 825-7520)*

D.Colo.,2004.
Stearns v. McGuire
Not Reported in F.Supp.2d, 2004 WL 3174425 (D.Colo.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                    **Page    1**
Not Reported in F.Supp.2d, 2002 WL 32170943 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**
**H**

Gilvin v. Fire
D.D.C.,2002.
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Ron GILVIN, Plaintiff,
v.
Edward FIRE, individually and as President of the
International Union of Electronic, Electrical,
Salaried, Machines and Furniture Workers, et al.,
Defendants.
No. 99-CV-530.

Aug. 16, 2002.

Ron Gilvin, Miamisburg, OH, pro se.
James F. Wallington, Baptiste & Wilder, P.C.,
Washington, DC, for Plaintiff.
Alexia Fay McCaskill, Peter Edward Mitchell,
Stephen M. Koslow, Washington, DC, Thomas M.
Kennedy, Schwartz & Cure, P.C. New York, NY,
for Defendants.

KESSLER, J.
**\*1** This matter is before the Court on Defendants'
Motion *InLimine* [# 44]. Upon consideration of the
Motion, Opposition, Reply, and the entire record
herein, for the reasons stated below, the Court
grants Defendants' Motion.

### I. BACKGROUND

Plaintiff, Ron Gilvin, the former Secretary-
Treasurer of the International Union of Electronic,
Electrical, Salaried, Machine and Furniture
Workers, AFL-CIO ("IUE"), brought this action on
March 1, 1999. Defendants are IUE, IUE President
Edward Fire, and members of the IUE International
Executive Board.

Plaintiff alleged that Defendants violated the IUE
constitution and Sections 101(a)(1), 101(a)(2) and
101(a)(4) of the Labor-Management Reporting and
Disclosure Act ("LMRDA"). Plaintiff argued that
Defendants violated his rights by suspending him
from the office of IUE Secretary-Treasurer from
June 10, 1998 to October 9, 1998 and unlawfully
recalling him from that office on October 9, 1998.

On September 15, 1999, the Court dismissed
Plaintiff's claims pursuant to Section 101(a)(1) of

the LMRDA and the IUE constitution. *SeeGilvin v.
Fire,* No. 99-cv-530, slip op. at 6 (D.D. C. Sept.
15, 1999). On July 21, 2000, the Court granted
summary judgment against Plaintiff's remaining
LMRDA claims. *SeeGilvin v. Fire,* No. 99-cv-530,
slip op. at 22 (D.D.C. July 21, 2000). In a decision
dated August 21, 2001, the D.C. Circuit reinstated
Gilvin's claims under LMRDA Sections 101(a)(2)
and (a)(4) arising from his suspension from office.
The Court of Appeals upheld the dismissal of
Gilvin's other allegations including claims relating
to his recall and removal from office. *SeeGilvin v.
Fire,* 259 F.3d 749 (D.C.Cir.2001). Trial is now set
for October 1, 2002.

On May 16, 2002, Defendants filed the present
motion *inlimine,* seeking to preclude Plaintiff from
introducing the following evidence at trial: (1)
damages resulting from Plaintiff's recall and
removal from office; (2) economic damages
resulting from the expense restrictions imposed on
Plaintiff prior to his suspension; (3) damages for
emotional distress resulting from Plaintiff's
suspension; (4) Plaintiff's request for reinstatement
to the office of IUE Secretary-Treasurer; and (5)
IUE officer

### II. ANALYSIS

A. Plaintiff May Not Introduce Evidence of
Damages From His Lawful Recall and Removal
From Office

As noted above, the D.C. Circuit upheld this
Court's dismissal of Plaintiff's claims relating to his
October 1998 recall and removal from the office of
Secretary-Treasurer. Nonetheless, Plaintiff contends
that he is entitled to compensatory damages
including the loss of salary and pension credits
resulting from the recall. Plaintiff reasons that this
post-recall economic loss was proximately caused by
his unlawful suspension and that he is therefore
entitled to recover those damages.

Specifically, Plaintiff argues that his economic
damages from the recall may be introduced to the
jury because (1) Fed.R.Evid. 403 is an
extraordinary remedy to be used sparingly; (2) a
union's actions, though arguably authorized by and
not patently unreasonable under the union's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      **Page   2**
**(Cite as: Not Reported in F.Supp.2d)**

governing documents, may be subject to a valid statutory claim if undertaken by union officials in bad faith; and (3) the D.C. Circuit merely found that Gilvin had no procedural or constitutional right to remain in office, and did not limit his claim for LMRDA damages. For the following reasons, Plaintiff's arguments are unpersuasive.

**\*2** First and foremost, any evidence of Plaintiff's damages resulting from his lawful recall is simply not relevant to his claim for unlawful suspension. Those damages, if any, are the result of the IUE members' determination that Gilvin should no longer represent them. They were not caused by the IUE Executive Board's prior decision to suspend him. Gilvin's post-recall damages are therefore unrelated to and distinct in time from his suspension. Accordingly, this evidence is irrelevant to the resolution of Gilvin's claims regarding his unlawful suspension and is therefore excluded pursuant to Fed.R.Evid. 402.

Second, in upholding this Court's dismissal of Plaintiff's claims for unlawful recall and removal, the D.C. Circuit considered and rejected Gilvin's LMRDA claims in connection with his recall from office. Contrary to Plaintiff's contention, that ruling is not limited to Gilvin's "procedural 'right" ... to remain in office."Pl.'s Response to Defs.' Mot. *in Limine* at 10. Rather, the Court of Appeals specifically found that a union official is not protected from removal by a recall election because, although Gilvin had every right to express his views, the union's membership did not share his views and Plaintiff's removal by the vote of the union's membership represents the "expression of democracy." *Gilvin,* 259 F.3d at 292.

Third, the cases Plaintiff cites for the proposition that a union's action taken in bad faith may be subject to a valid statutory claim, even if authorized by the union constitution, are inapplicable. *See Monzillo v. Biller,* 735 F.2d 1456, 1458 (D.C.Cir.1984); *Lamb v. Miller,* 660 F.2d 792, 794 (D.C.Cir.1981); *Rogers v. Lucassen,* 777 F.Supp. 997, 999 (D.D.C.1991). In those cases, the plaintiffs alleged that bad faith actions of the unions caused their damages. Here, as addressed above, the damages Gilvin seeks are not the result of action taken by the IUE, namely his suspension. Instead, those damages were caused by the IUE members' vote to remove him from office in a democratically

conducted and constitutionally permitted recall. The IUE's motivation is not relevant to such a democratic procedure.

Fourth, even if Gilvin's post-recall damages were relevant to his claim for unlawful suspension, the evidence must be excluded pursuant to Fed.R.Evid. 403, because its probative value is substantially outweighed by the danger of unfair prejudice. If the jury were presented with evidence of Gilvin's substantial post-recall damages, there is a risk they would increase other LMRDA categories of damages that are imprecise and difficult to quantify.

Accordingly, Plaintiff is precluded from presenting evidence at trial of damages he sustained as a result of his lawful recall and removal from office.

B. Plaintiff May Not Introduce Evidence of Damages for Expense Restrictions Prior to His Suspension

Plaintiff contends that, beginning in April 1997, the Executive Board restricted Plaintiff's reimbursement for lodging and travel expenses. Plaintiff claims that he sustained $30,000 in damages as a result. This evidence must also be excluded from Gilvin's trial.

**\*3** Pursuant to Fed.R.Civ.P. 26(a)(1)(C), a party is required to disclose, without awaiting a discovery request, "a computation of any category of damages claimed" and make available for inspection and copying the documents or other evidentiary material on which the computation is based.Fed.R.Civ.P. 37(c)(1) provides that a party who fails to disclose this information may be precluded from using that evidence at trial. Plaintiff has failed to comply with the disclosure requirement in Rule 26(a)(1)(C) and the evidence of his damages for travel restrictions must therefore be excluded.

At no time prior to filing the Pretrial Statement did Plaintiff identify any actual damages resulting from the Executive Board's restriction on his travel expense reimbursements, let alone provide a computation of such damages in accordance with Fed.R.Civ.P. 26(a)(1)(C). Moreover, even in the Pretrial Statement, Plaintiff failed to reveal any basis for the conclusory assertion that he sustained $30,000 in damages.

Plaintiff's    allegations    in    his    Complaint    and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



deposition only suggest that the Executive Board prohibited him from engaging in particular travel. They do not reveal any actual travel expenses Gilvin incurred. In fact, prior to submission of the Pretrial Statement, Gilvin made only one reference to unreimbursed expenses. In an interrogatory answer, Gilvin asserted that he is seeking "[a]ll expenses denied after political censorship of May 1997. Includes living expenses paid to other Executive Board Members and Ed Fire when he was IUE Secretary Treasurer."Def. Ex. C. ¶ 22(A). This assertion is insufficient to sustain Plaintiff's claim for damages resulting from his expense restrictions. Plaintiff never quantified or substantiated the claim with receipts or any other documentation. Nor did he provide any computation of the alleged damages. This failure is particularly significant in light of the fact that less than seven weeks remain before trial. FN1In short, Gilvin has failed to provide any evidence of expenses he incurred that should have been and were not reimbursed.

FN1. In fact, trial was originally scheduled to commence eight weeks earlier, on August 5, 2002.

In sum, because Plaintiff failed to provide Defendant with a computation of his damages for expense restrictions and failed to provide any factual basis whatsoever for the claim, Plaintiff may not present evidence at trial of those damages.

### C. Plaintiff May Not Introduce Evidence of Damages for Emotional Distress From His Suspension

Plaintiff seeks damages for emotional distress resulting from his suspension. This evidence must also be excluded.

The weight of judicial authority FN2 requires proof of actual damages in order to award damages for emotional distress under the LMRDA.FN3*See Guidry v. Int'l Union of Operating Engineers,* 882 F.2d 929, 943 (5th Cir.1989) ("LMRDA claimants who seek damages for emotional distress must adduce some evidence of actual injury"); *Rodonich,* 817 F.2d at 977-78 (requiring a "physical manifestation of emotional distress before permitting an award"); *Bise v. Int'l Brotherhood of Electrical Workers,* 618 F.2d 1299, 1305 (9th Cir.1979) (" 'emotional distress, standing alone, does not constitute a sufficient basis for the awarding of

damages under the (LMRDA)" ') (quoting *Int'l Brotherhood of Boilermakers v. Rafferty,* 348 F.2d 307, 315 (9th Cir.1965)); *Bollitier v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers,* 735 F.Supp. 623, 626 (D.N.J.1989) (denying emotional damages under LMRDA because plaintiff failed to demonstrate actual or measurable injury and a physical manifestation of emotional distress).

FN2. There is authority to the contrary. *See Bradford v. Textile Workers of America,* 563 F.2d 1138, 1144 (4th Cir.1977).

FN3." 'Such awards could deplete union treasuries, thereby impairing the effectiveness of unions as collective-bargaining agents." ' *Rodonich v. House Wreckers Union Local 95,* 817 F.2d 967, 977 (2d Cir.1987) (quoting *International Brotherhood of Electrical Workers v. Foust,* 442 U.S. 42, 50-51, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979)).

*4 Here, Plaintiff has failed to allege that he sustained any actual damages as a consequence of his suspension. Plaintiff has not alleged or demonstrated any physical manifestation of his emotional distress nor can he establish any economic loss from the suspension since he was compensated during that time. Moreover, as addressed above, he has not sufficiently alleged any economic loss resulting from his travel and lodging expense restrictions.FN4

FN4. Several circuits have differed over the nature of actual damages necessary to establish a basis for awarding damages for emotional distress. *Compare Rodonich,* 817 F.2d at 978,*withBise,* 618 F.2d at 1305. It is not necessary for this Court to determine whether evidence of economic loss is sufficient to sustain an emotional damages claim, or whether physical manifestations of emotional distress are necessary, since Gilvin has failed to adduce evidence of either.

Accordingly, Plaintiff is precluded from introducing evidence at trial of damages for emotional distress resulting from his suspension.

### D. Plaintiff Has Waived His Claim for Reinstatement to the Office of Secretary-Treasurer

Plaintiff seeks injunctive relief for his suspension,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
**(Cite as: Not Reported in F.Supp.2d)**

including reinstatement to the office of Secretary-Treasurer of the IUE.

In October 2000, the IUE held an election in which a candidate was elected as Secretary-Treasurer. Although Plaintiff was eligible to run for that position, he did not chose to be a candidate. Therefore, Plaintiff has waived any claim for reinstatement to the office of Secretary-Treasurer. Finally, as of now, that position no longer exists.

### E. Plaintiff May Not Introduce Evidence of IUE Officers' Compensation in 1997-1999

Defendants seek to preclude Plaintiff from introducing any evidence concerning the compensation of IUE officers and their reimbursed expenses in 1997-1999. Plaintiff claims this evidence is relevant to prove the restriction on compensation directed against him.

To the extent that Plaintiff seeks to introduce this evidence to establish damages resulting from the Executive Board's restriction on his reimbursement for lodging and travel expenses, the evidence must be excluded.FN5As addressed above, Plaintiff is precluded from presenting evidence at trial of these travel-related damages. Therefore, any evidence offered to prove those damages is irrelevant and must be excluded pursuant to Fed.R.Evid. 402.

FN5. It is not clear from the briefs whether Plaintiff seeks to introduce this evidence for any other purpose.

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion *InLimine.*An Order will issue with this Opinion.

This matter is before the Court on Defendants' Motion *InLimine* [# 44]. Upon consideration of the motion, opposition, reply, and the entire record herein, for the reasons stated in the accompanying Memorandum Opinion, it is this *15th* day of August 2002 hereby

ORDERED, that Defendants' Motion *InLimine* is granted.

Upon consideration of Plaintiff's Motion for Reconsideration of August 16, 2002, Order granting Defendants' Motion in Limine, Defendants' Opposition, and the entire record herein, and for the reasons stated in the Order itself and the extremely detailed facts contained in Defendants' Opposition, it is hereby

ORDERED    that    Plaintiff's    Motion    for Reconsideration is denied.

D.D.C.,2002.
Gilvin v. Fire
Not Reported in F.Supp.2d, 2002 WL 32170943 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                      **Page   1**
Not Reported in F.Supp.2d, 2005 WL 977850 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**
c

Austrian Airlines Oesterreichische Lufverkehrs Ag
v. UT Finance Corp.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
AUSTRIAN AIRLINES OESTERREICHISCHE
LUFVERKEHRS AG, Plaintiff,
v.
UT FINANCE CORPORATION, Defendant.
No. 04 Civ. 3854RCCAJP.

April 28, 2005.

PECK, Chief Magistrate J.
*1 Presently before the Court is defendant UTF's
application to strike plaintiff Austrian Airlines'
supplemental Rule 26(a) disclosure as to, *inter alia,*
currency fluctuation damages. (*See* Toriello 4/19/05
Letter to Court.)

Plaintiff Austrian Airlines' original Rule 26(a)
disclosure provided:

### C. Computation of Damages

As pled in the Complaint, Austrian is entitled to
recovery from UTF for the difference between the
contract price of the Aircraft under the Agreement
and the market price as of the date of UTF's
repudiation of the Agreement, plus interest, fees and
expenses. Austrian has not completed a damage
analysis at this time.
(Toriello 4/19/05 Letter to Court, Ex. A: 9/17/04
Austrian Airlines Rule 26(a) Disclosure.)

At defendant UTF's request, the Court directed
plaintiff Austrian Airlines to amend its Rule 26(a)
damage disclosure. Austrian Airlines' amended Rule
26(a) disclosure provided, *inter alia:*
1. The contract price for the Aircraft under the
Aircraft Purchase Agreement, which is $33 million.
Austrian is also entitled to damages resulting from
the currency fluctuation of the U.S. dollar since the
date on which UTF was to have paid the $33 million
contract price. The precise amount of currency
fluctuation damages will be he subject of expert
calculation.

(Toriello 4/19/05 Letter to Court, Ex. B: 4/13/05
Austrian Airlines "First Supplement to Plaintiff's

Initial Disclosures.") The Court notes that the date
for the conclusion of fact discovery has long been
set as April 29, 2005.

Defendant UTF's letter application to strike was
discussed at the April 21, 2005 status conference. (
*See generally* 4/21/05 Conf. Tr.) FN1 As to
currency fluctuation damages, plaintiff's counsel
conceded that the contract at issue in the case is in
dollars, but asserted that it was foreseeable to
defendant UTF that plaintiff Austrian Airlines
would have converted those dollars to Euros. (4/21/
05 Conf. Tr. at 26-27.) Plaintiff's counsel also
asserted that the amount had not yet been calculated
because it would depend on the conversion rate at
the time of judgment. (*Id.* at 27-28.)The Court
challenged plaintiff's counsel to identify a single
case supporting such a damage theory, and
plaintiff's counsel asked for the opportunity to
submit a letter brief. (*Id.* at 28-31.)

FN1. Defendant UTF's other objections to
plaintiff's revised damage disclosure were, for the
most part, deferred for re-consideration after the
testimony of plaintiff's Rule 30(b)(6) witness and
plaintiff's expert report. (*See* 4/21/05 Conf. Tr. a
18-19, 26.) The Court also precluded plaintiff from
using any documents not already provided. (*Id.* at
23-26.)

Plaintiff's letter, however, took a different tack, and
alleged that under New York law, currency
conversion damages should be determined as of the
date of the breach. (4/25/05 Wallace Letter to Court
at 2.)

For the reasons stated below, the Court precludes
plaintiff Austrian Airlines' currency conversion
damage theory.

First, plaintiff's complaint did not put defendant on
notice of this currency conversion damage claim. (
*See* Compl. ¶¶ 87-89 & Wherefore Clause.)

Second, and most important, plaintiff's original
Rule 26(a) disclosure (quoted above), did not assert
any claim for currency conversion damages. Rule
26(a)(1)(C) requires *initial* disclosure of "a
computation of any category of damages claimed by
the disclosing party...." Nowhere does plaintiff's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

initial Rule 26(a) disclosure refer to currency conversion damages, much less make the calculation-which, on plaintiff's theory that it is as of the date of breach, could have been easily calculated at the time of the initial disclosure. Plaintiff's amended disclosure, just two weeks before the close of discovery, is not a reasonable amendment or update; it is simply too late.

**\*2** Rule 37 requires virtually automatic preclusion of information not disclosed pursuant to Rule 26(a)(1). Rule 37 provides:

A party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed.R.Civ.P. 37(c)(1). This is not a case where plaintiff needed discovery from defendant to compute its currency conversion damages. And even if plaintiff could not calculate its currency conversion damages at the time of its initial disclosure (which the Court doubts, since the Euros' value as against the dollar is published in the New York Times, among other sources), there is no reason that it did not disclose its currency conversion damage *theory*. The Court will not allow plaintiff Austrian Airlines to assert this new, additional damage theory at the eleventh hour. Pursuant to Rules 26(a)(1)(C) and 37(c)(1), preclusion is appropriate. The case law supports application of these Rules to failure to disclose damage theories in the Rule 26(a)(1)(C) initial disclosure. *See, e.g., Gilvin v. Fire,* No. 99-CV-530, 2002 WL 32170943 at \*3 (D.D.C. Aug. 16, 2002) ("At no time prior to filing the Pretrial Statement did Plaintiff identify any actual damages resulting from [defendant's conduct], let alone provide a computation of such damages in accordance with Fed.R.Civ.P. 26(a)(1)(C).... [B]ecause Plaintiff failed to provide Defendant with a computation of his damages for expense restrictions and failed to provide any factual basis whatsoever for the claim, Plaintiff may not present evidence at trial of those damages."); *American Realty Trust, Inc. v. Matisse Partners, L.L.C.,* No. 00-CV-1801, 2002 WL 1489543 at \*6 (N.D.Tex. July 10, 2002) ("[T]he plaintiffs here had all of the necessary facts to disclose their damage theory months ago, and they have never provided proper support for their damage calculations. Therefore, for all of the reasons

discussed, the court grants the defendants' motion to exclude the plaintiffs' evidence of damages arising from securities liquidated due to margin calls."); *Colombini v. Members of the Bd. of Dirs. of the Empire Coll. Sch. of Law,* No. C9704500CRB, 2001 WL 1006785 at \*8 (N.D.Cal. Aug. 17, 2001) (Defendants' motion for summary judgment on the plaintiff's claims for damages granted pursuant to Fed.R.Civ.P. 26(a) and 37(c)(1) where plaintiff "has utterly failed to provide a calculation of those damages despite repeated requests from the defendants."), *aff'd,* No. 01-16872, 61 Fed. Appx. 387, 2003 WL 1827225 (9th Cir. Apr. 7), *cert. denied,* 540 U.S. 1000, 124 S.Ct. 486 (2003).

Finally, the Court had required plaintiff Austrian Airlines to find case law support for its currency conversion damage theory. (*See* page 2 above.) The cases Austrian Airlines has cited (*see* 4/25/05 Wallace Letter to Court at 2), however, are not on point-they all involved contracts where the price was expressed in a foreign currency, and the court therefore had to convert to U.S. dollars in order to enter judgment in dollars. *See Vishipco Line v. Chase Manhattan Bank N.A.,* 660 F.2d 854, 865, 866 (2d Cir.1981) (contract was in Vietnamese piastres; "As a federal court sitting in diversity, we must apply the currency-conversion rule employed by the courts of New York, which has followed the breach-day rule for many years. Therefore, plaintiffs are entitled to recover an amount in dollars which reflects the exchange rate between dollars and South Vietnamese piastres at the time of breach ....") (citing New York cases), *cert. denied,* 459 U.S. 976, 103 S.Ct. 313 (1982); *Parker v. Hoppe,* 257 N.Y. 333, 178 N.E. 550 (1931) (contract in Russian rubles, conversion to dollars to be at date of breach or declaration of intention to rescind contract); *Teca-Print A.G. v. Amacoil Mech., Inc.,* 138 Misc.2d 777, 252 N.Y.S.2d 575 (Sup.Ct.N.Y.Co.1988) (contract in Swiss Francs, conversion into dollars for the judgment); 11-55 *Corbin on Contracts* § 1005 (2004) (where breach of contract for dollars occurs, judgment is for that amount in dollars; where a foreign currency is involved, conversion to dollars is required). Accordingly, plaintiff has not demonstrated that any New York court (or federal court applying New York law in a diversity case) has awarded currency conversion damages where the contract is expressed in dollars, as opposed to a foreign currency. The Court is not, however, ruling on this issue as one of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

substantive law (*i.e.,* summary judgment) as plaintiff alleges. (*See* 4/25/05 Wallace Letter at 2-3.) Rather, the Court has reviewed the substantive law to determine if the Court should, in the interest of justice, *see* Fed.R.Civ.P. 1, allow plaintiff's late assertion of its conversion damage theory. The Court has concluded that since it is highly unlikely that plaintiff would prevail on this issue, even if its late disclosure were permitted, that there is no reason to excuse plaintiff's failure to comply with Rule 26(a)(1)(C).

**\*3** For the reasons set forth above, pursuant to Rule 26(a)(1)(C) and 37(c)(1) of the Federal Rules of Civil Procedure, the Court precludes plaintiff from asserting any currency conversion damage claim in this case.FN2

FN2. Plaintiff's claim for its attorneys' fees as sanctions against defendant UTF for what plaintiffs counsel asserts was defendant's "frivolous" application is of course denied. The Court can only wonder what plaintiff's counsel was thinking in asserting that defendant's motion was frivolous and in bad faith.

SO ORDERED.

S.D.N.Y.,2005.
Austrian Airlines Oesterreichische Lufverkehrs Ag v. UT Finance Corp.
Not Reported in F.Supp.2d, 2005 WL 977850 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**EXHIBIT B**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS, INC.,      Plaintiff, <br><br> v. <br><br> IKON OFFICE SOLUTIONS, INC. & IOS CAPITAL, INC. d/b/a IKON FINANCIAL SERVICES,      Defendants. | )<br>)<br>)<br>)<br>)<br>)       3:05-CV-30068-KPN<br>)<br>)<br>)<br>)<br>)<br>) |

## INITIAL DISCLOSURES OF THE PLAINTIFF HUMAN RESOURCE DEVLOPMENT PRESS, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEEDURE 26 (a)

Human Resource Development Press, Inc. makes the following initial disclosures to the Defendants, Ikon Office Solutions, Inc. & IOS Capital, Inc.:

(A)    Individuals likely to have discoverable information:

1) Gregory Carkhuff, 22 Amherst Rd., Amherst, MA;

2) Robert Carkhuff, 22 Amherst Rd., Amherst, MA;

3) Certain as of yet unidentified photocopier lease and sale expert witnesses;

4) Certain as of yet unidentified representatives of Ikon Office Solutions,

Inc. & IOS Capital, Inc.;

(B)        Documents which will support the Plaintiff's claims:


1) Field Order Form/ Security Agreement dated 5-20-98;

2) Product Schedule dated 6-19-00;


3) Various Invoices for services and supplies dated from1-20-00 through 9-21-00;

4) Executive Financial Summary dated 11-07-03;

5) M.G.L. Chapter 93A Demand letter dated 9-20-04[1]


6) Various financial records, including checks and bank account records showing the
payments received by the Defendants;


7) Various other documents received from the Defendants in response to Plaintiff's
discovery requests.



Respectfully submitted this the 22nd day of February, 2006.


HUMAN RESOURCE
DEVELOPMENT PRESS, INC.


/S/ David J. Noonan
David J. Noonan, Esq.
Amherst, MA 01002
Tel. 413-549-5491
Fax: 413-549-5156
BBO # 373260

## <u>CERTIFICATE OF SERVICE</u>

I, DAVID J. NOONAN, ESQ., hereby certify that on the 22nd day of February, 2006 a

copy of the herein PLAINTIFF'S INITIAL DISCLOSURES OF THE PLAINTIFF

HUMAN RESOURCE DEVLOPMENT PRESS, INC. PURSUANT TO FEDERAL

RULE OF CIVIL PROCEEDURE 26 (a)  was served by emailing the same to the

parties listed below.

<u>/s/ David J. Noonan, Esq.</u>

The following is the list of attorneys who are currently on the list to receive e-mail
notices and service for this case.

- **Bradford S. Babbitt**      **Brett Boskiewicz**
  <u>bbabbitt@rc.com</u>           bboskiewicz@rc.com


The following is the list of attorneys who are currently on the list to receive service and
notices for this case by regular mail.

   **None**

**EXHIBIT C**

## Boskiewicz, Brett

**From:**    Boskiewicz, Brett
**Sent:**    Friday, June 29, 2007 4:26 PM
**To:**      'David J Noonan, Esq.'
**Subject:** IKON/HRD Press

Dave:

I don't have a record of ever receiving this initial disclosure until your June 18, 2007 email.  Do you have a copy of the email with which you sent it to us?

Also, this initial disclosure is incomplete. Fed. R. Civ. P. 26(a)(1)(C) requires you to provide "a computation of any category of damages claimed by the disclosing party, making available for inspection and copying as under Rule 34 the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered[.]"  HRD's initial disclosure does not disclose its claimed damages or the computation of those damages or provide the documentation that supports those damages.

Please supplement this disclosure to comply with Rule 26(a)(1)(C) at your earliest convenience, but no later than next Friday July 6th.

Regarding the supplemental information from Tony Maturo, I spoke with him yesterday and expect to have that information for you early next week.

Regards,

Brett Boskiewicz

---

**Brett J. Boskiewicz**

**Robinson & Cole LLP**
280 Trumbull Street
Hartford, CT  06103-3597
Direct (860) 275-8289 | Fax (860) 275-8299
bboskiewicz@rc.com | www.rc.com
Bio | Contact Card

---

Boston  New London  Hartford  Stamford  White Plains  New York  Sarasota

-----Original Message-----
**From:** David J Noonan, Esq. [mailto:david.noonan@verizon.net]
**Sent:** Monday, June 18, 2007 11:55 AM
**To:** Boskiewicz, Brett
**Subject:**

June 18, 2007

Brett

Here is the Rule 26 (a) you requested.

Also please confirm by email that Maturo will provide his answers to my questions in writing by email.

Regards,

David J. Noonan, Esq.

Signature, Tax Disclosure and Confidentiality Notice:

Nothing in this communication is intended to constitute an electronic signature, unless a specific statement to the contrary or a valid VeriSign Digital Signature Certificate is included in this communication.

Nothing contained in this email was intended or written to be used, or can be used by any taxpayer for the purpose of avoiding penalties that may be imposed on such taxpayer under the Internal Revenue Code of 1986, as amended. No one, without our express prior written permission, may use any part of this email relating to any Federal Tax matter in promoting, marketing or recommending a partnership or other entity, investment plan or arrangement to one or more taxpayers.

This message is covered by the Electronic Communications Privacy Act, Title 18, United States Code, § 2510-2521. This email message and any attached files are the exclusive property of the Law Office of David J. Noonan and are deemed privileged and confidential and are intended only for the person or entity to which it is addressed. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please immediately advise the sender of same.

**EXHIBIT D**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HUMAN RESOURCE DEVELOPMENT PRESS, INC.,<br>    Plaintiff, | ) ) ) ) ) | |
| v. | ) ) | 3:05-CV-30068-KPN |
| IKON OFFICE SOLUTIONS, INC.<br>& IOS CAPITAL, INC. d/b/a<br>IKON FINANCIAL SERVICES,<br>    Defendants. | ) ) ) ) ) | |

### SUPPLEMENTAL DISCLOSURES OF THE PLAINTIFF HUMAN RESOURCE DEVLOPMENT PRESS, INC. PURSUANT TO FEDERAL RULE OF CIVIL PROCEEDURE 26 (a)

Human Resource Development Press, Inc. makes the following initial disclosures to the Defendants, Ikon Office Solutions, Inc. & IOS Capital, Inc.:

(A)      Individuals likely to have discoverable information:

1) Gregory Carkhuff, 22 Amherst Rd., Amherst, MA;

2) Robert Carkhuff, 22 Amherst Rd., Amherst, MA;

3) The following employees of Ikon Office Solutions, Inc. Jeffrey Snyder, Daniel Feldman, Anthony Maturo, Douglas Thornton, Al Maximino, Glenn Robbins; [1]

---

[1] The Plaintiff reserves the right to disclose additional witnesses through its Final Pre-trial memorandum.

(B)        Documents which will support the Plaintiff's claims:


1) Field Order Form/ Security Agreement dated 5-20-98;

2) Product Schedule dated 6-19-00;

3) Over 300 pages of documents previously produced by Ikon Office Solutions, Inc.

   in Civil Action No. 3:05 CV-30068-KPN;


4) Deposition transcripts of the deposition testimony of Jeffrey Snyder,

   Daniel Feldman, Anthony Maturo and Glenn Robbins; and

5) Executive Financial Summary dated 11-07-03;

6) M.G.L. Chapter 93A Demand letter dated 9-20-04$_1$

7) Various financial records, including checks and bank account records showing the
payments received by the Plaintiff;

8) Various other documents received from the Defendants in response to Plaintiff's
discovery requests.

(C)          <u>Damages</u>

1) All dollars the Plaintiff was wrongfully obligated to pay pursuant to the Second

Agreement for prior obligations pursuant to the First Agreement as well as all dollars

actually paid to the Plaintiff for obligations pursuant to the First Agreement; and


2) Lost Profits on lost sales due to Plaintiff's expenditure of dollars for obligations

pursuant to the First Agreement; and


3) Lost interest on those dollars used to pay for obligations pursuant to the First

Agreement; and


4) Dollar value of lost time spent by the Plaintiff's Officers and Directors identifying

and thereafter prosecuting the fraud claims set forth in the Defendant's counterclaim

and the ; and


5) Legal fees incurred and to be incurred in defending GE Capital's claims and

prosecuting the Plaintiff's counterclaim in Civil Action No. 07- 30152.

3

Respectfully submitted this the 10th day of October, 2007.

> HUMAN RESOURCE
> DEVELOPMENT PRESS, INC.
>
> /S/ David J. Noonan
> David J. Noonan, Esq.
> Amherst, MA 01002
> Tel. 413-549-5491
> Fax: 413-549-5156
> BBO # 373260

## **CERTIFICATE OF SERVICE**

I, DAVID J. NOONAN, ESQ., hereby certify that on the 10th day of October, 2007

a copy of the herein PLAINTIFF'S SUPPLEMENTAL DISCLOSURES OF THE

PLAINTIFF HUMAN RESOURCE DEVLOPMENT PRESS, INC. PURSUANT TO

FEDERAL RULE OF CIVIL PROCEEDURE 26 (a)  was served by emailing the same

to the parties listed below.

> /s/ David J. Noonan, Esq.

The following is the list of attorneys who are currently on the list to receive e-mail
notices and service for this case.

- **Bradford S. Babbitt**     **Brett Boskiewicz**
  bbabbitt@rc.com        bboskiewicz@rc.com

The following is the list of attorneys who are currently on the list to receive service and
notices for this case by regular mail.

> **None**

4